**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **MCCLAIN FEED YARD, INC., et al.,**[1] | § | **CASE NO. 23-20084-RLJ-7** |
| | § | |
| | § | |
| **Debtors,** | § | **Jointly Administered.** |

**MOTION TO TRANSFER JOINTLY ADMINISTERED CASES**
\* \* \*  \* \* \*  \* \* \*

Come now Meagan B. Goad ("Goad") and Kinsey Moreland ("Moreland" and together

with Goad, "Interested Parties"), by counsel, and hereby file their Motion to Transfer Jointly

Administered Cases pursuant to 28 U.S.C. §1412. In support of this Motion, Interested Parties

respectfully state as follows:

**Jurisdiction**

1.    The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This

is a core proceeding as defined in 28 U.S.C. § 157(b).

2.    The statutory bases for the relief sought in this Motion are 11 U.S.C. §§ 105, 1408,

and 1412, and Fed. R. Bankr. P. 1014.

**I.    Facts**

1.    On April 28, 2023 (the "Petition Date"), McClain Feed Yard, Inc. ("MFY"),

McClain Farms, Inc. ("MFI"), and 7M Cattle Feeders, Inc. ("7M" and collectively with MFY and

MFI, "McClain Debtors") filed their voluntary petitions for relief under chapter 7 of title 11 of the

United States Code (the "Bankruptcy Code").

---

[1] The Debtors in these chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-RLJ), McClain Farms,
Inc. (Case No. 23-20085-RLJ), and 7M Cattle Feeders, Inc. (Case No. 23-20086-RLJ)

### *McClain Feed Yard, Inc.*

2.      MFY was founded in 2009 and is a Texas corporation with its principal place of business located at 824 Mullins Lane, Benton, Kentucky 42025. The sole owner of MFY was Brian McClain. Brian McClain resided at 824 Mullins Lane, Benton, Kentucky 42025.

3.      MFY books and records are maintained in Benton, Kentucky with Meagan Goad and Angela Powell listed as custodians on the Statement of Financial Affairs. [Doc. 48] Meagan Goad and Angela Powell reside in Kentucky and maintained the books and records in Kentucky.

4.      MFY held a bank account at Mechanics Bank which is headquartered in California. The checks written out of that bank account were written at the Benton, Kentucky address.

5.      Secured Lenders recorded UCC liens against MFY in Texas and Kentucky.

6.      MFY held title to one property located in Texas and some equipment located thereon. Rabo Agrifinance, LLC ("Rabo") was granted relief from stay to foreclose on its collateral and the real property and equipment are no longer property of the estate.

7.      MFY listed feed as its only other asset in its petition and schedules.

8.      All of MFY's co-debtors have their principal places of business in Kentucky and are incorporated in Kentucky.

9.      All MFY invoices and checks were issued from Kentucky and used the Benton, Kentucky address.

### *McClain Farms, Inc.*

10.      MFI was founded in 2009 and is a Kentucky corporation with its principal place of business located at 824 Mullins Lane, Benton, Kentucky 42025. The sole owner of MFI was Brian McClain. Brian McClain resided at 824 Mullins Lane, Benton, Kentucky 42025.

11.     MFI books and records are maintained in Benton, Kentucky with Meagan Goad and Angela Powell listed as custodians on the Statement of Financial Affairs. [Doc. 56, Case No. 23-20085] Meagan Goad and Angela Powell reside in Kentucky and maintained the books and records in Kentucky.

12.     MFI held a bank account at Mechanics Bank which is headquartered in California. The checks written out of that bank account were written at the Benton, Kentucky address.

13.     MFI held two bank accounts at Chase Bank which is based out of Arizona. The checks written out of that bank account were written at the Benton, Kentucky address.

14.     MFI held a bank account at Community Financial Services Bank which is headquartered in Kentucky. The checks written out of that bank account were written at the Benton, Kentucky address.

15.     Secured Lenders recorded UCC liens against MFI in Texas and Kentucky.

16.     MFI owns no real property in Texas or Kentucky.

17.     MFI's list of equipment reflects that it is located in Benton, Kentucky. Rabo was granted relief from stay to foreclose on its collateral, so the equipment is no longer property of the estate.

18.     MFI holds a lease on land located in Kentucky.

19.     All of MFI's co-debtors have a principal place of business in Kentucky.

20.     All MFI checks and invoices were issued from Kentucky and listed the Benton, Kentucky address for MFI.

21.     Riley Livestock is based in Mayfield, Kentucky and holds a claim against MFI totaling approximately $69 million.

22.    MAP Enterprises, Inc. is based in Mayfield, Kentucky and holds a claim against MFI totaling approximately $9.1 million.

23.    Wildforest Cattle Company, LLC is based in Mayfield, Kentucky and holds a claim against MFI totaling approximately $5.4 million.

### *7M Cattle Feeders, Inc.*

24.    7M was founded in 2019 and is a Kentucky corporation with its principal place of business located at 824 Mullins Lane, Benton, Kentucky 42025. The sole owner of 7M was Brian McClain. Brian McClain resided at 824 Mullins Lane, Benton, Kentucky 42025.

25.    7M books and records are maintained in Benton, Kentucky with Meagan Goad and Angela Powell listed as custodians on the Statement of Financial Affairs. [Doc. 52, Case No. 23-20086] Meagan Goad and Angela Powell reside in Kentucky and maintained the books and records in Kentucky.

26.    7M held a bank account at Mechanics Bank which is headquartered in California. The checks written out of that bank account were written at the Benton, Kentucky address.

27.    Secured Lenders recorded UCC liens against 7M in Texas and Kentucky.

28.    7M held title to one property located in Texas and some equipment located thereon. Rabo was granted relief from stay to foreclose on its collateral and the real property and equipment are no longer property of the estate.

29.    7M listed feed as its only other asset in its petition and schedules.

30.    All of 7M's co-debtors have a principal place of business in Kentucky.

31.    All 7M invoices and checks were issued from Kentucky and listed Benton, Kentucky address for 7M.

*Facts in Common to All Debtors*

32.     Rabo was the McClain Debtors' primary lender and is based out of Chesterfield, Missouri.

33.     Prior to the bankruptcy cases, Rabo declared defaults under the loan documents and on April 6, 2023, Rabo, through counsel, issued its Default Notice by mail delivery to all of the McClain Debtors and guarantors at the Benton, Kentucky address. See at true and correct copy of the Default Notice attached hereto as Exhibit "A."

34.     Also in April 2023, Rabo entered into an Amended and Restated Forbearance Agreement with the McClain Debtors and guarantors. A requirement of the Forbearance Agreement was the appointment of CFO Solutions, LLC d/b/a Ampleo as the chief restructuring officer of the McClain Debtors by April 10, 2023. The designated individual by Rabo was Glenn Karlberg. See a true correct copy of the Amended and Restated Forbearance Agreement attached hereto as Exhibit "B."

35.     On April 25, 2023, after Mr. McClain's passing, Rabo initiated its lawsuit against the McClain Debtors in the proper venue, the Western District of Kentucky. See, Case No. 23-CV-55-BJB in the Western District of Kentucky, Paducah Division. See a true and correct copy of the Verified Complaint attached hereto as Exhibit "C."

36.     In its Verified Complaint, Rabo avers in paragraph 10, "[v]enue is proper in this Court pursuant to 28 U.S.C. §1391 because all Defendants reside or maintain place of business in this district and the collateral and personal property that is the subject matter of this Verified Complaint are located in this district." See, Exhibit C, Para. 10.

37.     Rabo has blanket liens on McClain Debtors' collateral.

38.     Inexplicably, after averring that venue is proper in the Western District of Kentucky based upon the debtors' "place of business" and location of "collateral and personal property," Rabo's appointed CRO initiated Chapter 7 proceedings in the Northern District of Texas.

39.     Glenn Karlberg, the McClain Debtors' chief restructuring officer, is based in Arizona.

40.     On May 9, 2023, Rabo filed its Ex Parte Motion for Rule 2004 Order Authorizing the Issuance of Document Subpoenas to Various Third Parties (the "2004 Motion"). [Doc. 17]

41.     Rabo's 2004 Motion lists eleven (11) persons or entities believed to have discoverable information relevant to the estate and affairs of the debtors. Of those eleven (11), only two (2) are based in Texas while *eight (8) are based in Kentucky*. One is based in California. As a result, nine (9) out of eleven (11) of the relevant witnesses and information are located beyond the subpoena power of this Court.

42.     The cattle were located in both Texas and Kentucky, among other locations.

43.     All of the litigation that was pending at the time the case was filed is pending resolution in Colorado (USDA Claims) or Kentucky, only.

44.     The Chapter 7 Trustee for the McClain Debtors asserts that "any substantial assets of this case will result from Chapter 5 claims and other litigation." See, Doc. 54, Trustee's Response to Rabo's Motion for Relief from Automatic Stay.

45.     The Chapter 5 claims will be controlled by Kentucky state law under Texas choice of law rules based upon "most significant contacts" test.

46.     The Section 341 meeting of creditors was conducted jointly for all three debtors on June 14, 2023 and was largely ineffectual based on lack of information.

## II.    <u>Argument and Citation of Authorities</u>

These bankruptcy cases should be transferred to the United States Bankruptcy Court for the Western District of Kentucky, Paducah Division. The McClain Debtors' principal place of business was Benton, Kentucky with the domicile of only one of the debtors technically being in the Northern District of Texas solely based on place of incorporation. The witnesses, evidence, and books and records are primarily located in Benton, Kentucky. The alleged fraudulent acts took place in Benton, Kentucky. The Debtors literally complied with 28 U.S.C. §1408 but should not be allowed to forum shop where Rabo already averred in its Verified Complaint that the place of business and property are located in the Western District of Kentucky. This is particularly relevant in that the CRO for the McClain Debtors was selected and required by Rabo.

A. <u>Venue is Proper in the United States Bankruptcy Court for the Western District of Kentucky, Paducah Division.</u>

28 U.S.C. §1408 provides that "a case under title 11 may be commenced in the district court for the district in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located." Here, there is no dispute that the McClain Debtors' principal place of business was in Benton, Kentucky. The Secretary of State websites for Kentucky and Texas indicate the same. The largest secured creditor of all three debtors likewise admitted as much in its Verified Complaint. The sole owner of the McClain Debtors was Brian McClain. Mr. McClain lived in Benton, Kentucky until his passing and his estate is being probated there. The "most important, consequential, or 'influential' place where a corporation or partnership does business is likely to be the place where its management decisions are made." *Matter of Peachtree Lane Associates, Ltd.*, 150 F.3d 788, 795 (7th Cir. 1998)(agreeing with the Fifth Circuit, *C.I.R. v. Solomon*, 506 U.S. 168, 174 (1993)). All of the McClain Debtors' decisions and activities were

made in the Western District of Kentucky. All of the McClain Debtors have their principal places

of business in the Western District of Kentucky.

The McClain Debtors' principal assets are cash, cash equivalents, accounts receivable,

chapter 5 causes of action and related litigation. The nerve center for these debtors has always been

in Benton, Kentucky. Debtors' land and equipment assets are fully encumbered and worth a

fraction of recoveries likely to be sought in this case. Debtors' accounts receivable, checks,

records, and bank accounts are all handled in Benton, Kentucky. The cattle were located in

different locations including, but not limited to, Kentucky and Texas. The only tie to Texas for

venue in Texas is "domicile" of MFY solely due to its incorporation in Texas. MFI and 7M could

only file in Texas as "related to" entities. MFI boasts the largest summary of liabilities at $175

million with 7M holding the largest summary of assets at $1.1 million.

B.  The Bankruptcy Cases Should be Transferred Pursuant to 28 U.S.C. §1412.

"A district court may transfer a case or proceeding under title 11 to a district court for

another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. §1412.

The basis for venue in Texas is that MFY is incorporated in Texas. Although MFY is still

technically a Texas corporation, it has no ongoing operation in Texas and no offices there. While

it may exist in Texas, it does so in name only. Debtors' principal lived in Kentucky and Debtors'

books and records were maintained in Kentucky. See, e.g. *In re Custom Builders of Steamboat,

Inc*., 349 B.R. 39, 43 (Bankr.D.Idaho 2005)(holding venue proper in Idaho even though debtor

was still technically a Colorado corporation but had no ongoing operations or offices there) See

also, *In re Weber*, 118 B.R. 441, 444 (Bankr. E.D.Va. 1990)(holding venue for Chapter 7

liquidation of corporate debtor proper in New York where accountant, books, and records were

located even though assets of nominal importance to the liquidation of the estate were located in

8

Virginia). Here, it is clear that only assets of nominal importance to the liquidation of the McClain Debtors were located in the Northern District of Texas.

 1. *Interest of justice standard.*

 "The standard for transfer in the interest of justice is flexible, and relevant factors include the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness. *In re BDRC Lofts, Ltd.*, 12-11559-CAG, 2013 WL 395129, at *2 (Bankr. W.D. Tex. Jan. 31, 2013). "The interest of justice prong is a broad and flexible standard that is applied based on the facts and circumstances of each case. In evaluating the interest of justice, the court must consider what will promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *In re Enron Corp.*, 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002). These bankruptcy cases should be transferred in the interest of justice and to promote the integrity of the bankruptcy court system.

 a. *Efficient Administration of the Estate.*

 "[T]he factor given the most weight is the promotion of the economic and efficient administration of the estate." *In re Condor Expl., LLC*, 294 B.R. 370, 378 (Bankr.D.Colo. 2003). Given the proximity of the McClain Debtors' books and records to the Western District of Kentucky, Paducah Division, it is more efficient to administer and liquidate the estate there. The primary witnesses, largest unsecured creditors, Debtors' principal places of business, and books and records are primarily located in the Western District of Kentucky. Nine of the eleven already identified parties with Rule 2004 information are beyond the subpoena power of this Court while eight out of eleven are within the subpoena power of the Western District of Kentucky. Although a trustee has been appointed over the McClain Debtors, very little has otherwise occurred in the administration of these bankruptcy cases. This factor tips in favor of a transfer to the Western District of Kentucky.

   b. *Judicial Economy.*

These bankruptcy cases have only been pending for approximately two and half months with the largely unproductive meeting of creditors having only recently taken place on June 14, 2023. The Interested Parties point out that the likely reason for the largely unproductive 341 hearing was due to the information necessary from witnesses and parties located in the Western District of Kentucky. There is not a significant learning curve for the bankruptcy court in the Western District of Kentucky especially in light of the number of cattle cases the Paducah division sees. The panel Chapter 7 trustee, Mark Little, is able and adept to handle cattle cases of this type. Mr. Little has served as a Chapter 7 trustee in the Paducah division for over ten (10) years and has handled a wide variety of cases including large Chapter 11 cases that are converted to Chapter 7. This factor also tips in favor of the Western District of Kentucky, Paducah Division for venue.

   c. *Timeliness.*

"If a petition is filed in the proper district, the court, on the timely motion of a party in interest or on its own motion, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court may transfer the case to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties." Fed. R. Bankr. P. 1014. These bankruptcy cases have only been pending for eighty-one (81) days. The skeletal petitions were filed on April 28, 2023 with amended skeletal petitions filed on May 4, 2023. The schedules and statements of financial affairs for the McClain Debtors weren't filed until June 7, 2023. The only substantive decision altering party rights was an agreed order on Rabo's Motion for Relief from Stay on June 23, 2023.  The Interested Parties submit that this motion is timely.

d. *Fairness*.

The Rabo appointed CRO selected the Northern District of Texas as the home court for these bankruptcy cases despite the thin nexus between the McClain Debtors and Texas. Given Rabo's position in the Verified Complaint filed in Kentucky, the utilization of one debtor's state of incorporation solely as a basis for venue of these bankruptcy cases gives the appearance of forum shopping by the Debtors' largest secured lender. Although this factor would appear to tip in the McClain Debtors' favor, the Court should look to the totality of the circumstances and representations that have been made by the parties.

The facts preceding these bankruptcy cases support the conclusion that the Commonwealth of Kentucky has a strong interest in having the controversies decided within its borders, by those familiar with its laws. Much has already been written about these debtors with salacious detail regarding what has been called a "massive fraud" emanating out of Kentucky. The three largest unsecured USDA claimants totaling approximately $84 million are Kentucky businesses: MAP Enterprises, Inc., Riley Livestock, and Wildforest Cattle Company, LLC.  The media outlets have described this as the second largest cattle ponzi scheme in history emanating from Benton, Kentucky. Kentucky law will govern the Chapter 5 causes of action so the Kentucky courts should apply and interpret its own laws.

2.  <u>Convenience of parties</u>.

Six (6) factors are endorsed for consideration on a motion to transfer venue under the heading of convenience of the parties: (1) the proximity of the creditors of every kind to the Court; (2) the proximity of the debtor to the Court; (3) the proximity of the witnesses necessary to the administration of the estate; (4) the location of the assets; (5) the economic administration of the

estate; and (6) the necessity for ancillary administration. See, *Matter of Cmmw. Oil Refining Co., Inc.,* 596 F.2d 1239, 1247 (5th Cir. 1979).

> ### a.  Proximity of Creditors

The largest unsecured USDA claimant creditors are located in the Western District of Kentucky holding approximately $84 million of the unsecured debt. Rabo is the largest secured creditor and is located in Missouri.   The distance from Chesterfield, Missouri to Paducah, Kentucky is 196 miles or approximately a three-hour drive. By contrast, the distance from Chesterfield, Missouri to Amarillo, Texas is 782 miles or an eleven hour drive. It is clear that the creditors are likewise closer to the Western District of Kentucky Bankruptcy Court located in Paducah, Kentucky where this case should be transferred. The CRO was likewise aware that he was accepting a position in the Western District of Kentucky.

> ### b.  Proximity of Debtor

The McClain Debtors all had a principal place of business in Benton, Kentucky where the owner of all three debtors resided until his death in April 2023. The Debtors' books and records are maintained in Benton, Kentucky. The CRO is based in Arizona, not Texas. As such, the proximity of Debtor and its books and records weighs in favor of venue in the Western District of Kentucky. When Rabo first required the appointment of the CRO, it knew and averred that the Debtors were located in Benton, Kentucky. This factor weighs in favor of the Western District of Kentucky, Paducah Division.

> ### c.  Proximity of Witnesses

Rabo issued eleven Rule 2004 subpoenas to the witnesses it believed to have documents and information related to Debtors' estates. Eight (8) of the eleven (11) reside in Kentucky. One has a principal place of business in California with only two (2) witnesses located in Texas. This

factor weighs in favor of venue in Kentucky. "[T]he concern is with the corporation's employees who must appear in court…" *In re Pope Vineyards*, 90 B.R. 252, 257 (Bankr.S.D.Tex. 1988). Here, in the very early stages of the bankruptcy cases, the participating creditor has already determined that eight of the eleven necessary witnesses are located in the Western District of Kentucky. This factor weighs in favor of transferring venue to the Western District of Kentucky.

### d. Location of Assets

The Chapter 7 Trustee in this case has averred that the likely primary source of recovery will be Chapter 5 causes of action yet to be identified. In addition, Rabo has already been granted relief from stay by agreed order to exercise its rights to debtors' tangible assets upon which it held liens. The remaining items relevant to claims and causes of action are located in Benton, Kentucky and those items serve to be the most valuable pieces for the administration of these estates.

### e. Economic Administration of the Estate

"The bankruptcy court correctly concluded that the most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate." *Matter of Cmmw. Oil Refining Co., Inc.*, 596 F.2d 1239, 1247 (5th Cir. 1979). Given the nerve center of the McClain Debtors as having always been in Benton, Kentucky, the relevant witnesses and documents are predominantly located in the Western District of Kentucky. The alleged acts of fraud occurred in Benton, Kentucky rendering it more likely than not that Kentucky law would be applied. Although this Bankruptcy Court is certainly able to interpret and apply Kentucky law, there are many other factors as outlined herein that warrant the transfer of venue to the Western District of Kentucky.

####   *f.   Necessity for ancillary administration*

As stated hereinabove, there are either none or very nominal value tangible assets remaining to administer in Texas. The bulk of what is necessary for the administration of these bankruptcy estates is located in Kentucky and beyond the subpoena power of this Court. It is more effective to transfer these bankruptcy cases to the Western District of Kentucky, Paducah Division for a Chapter 7 trustee to pursue the Chapter 5 causes of action where the Debtors' books and records are located.

WHEREFORE, the Interested Parties respectfully request that this Court transfer these bankruptcy cases to the United States Bankruptcy Court for the Western District of Kentucky, Paducah Division.

Respectfully submitted,

**Boerner, Dennis & Franklin, PLLC**
Attorneys at Law
P.O. Box 1738
Lubbock, Texas 79408-1738
(806) 763-0044
(806) 763-2084 (fax)
Email: bfranklin@bdflawfirm.com
Email: cpatterson@bdflawfirm.com
Email: ohutchin@bdflawfirm.com

*/S/ William A. Franklin*
_____
William A. Franklin
State Bar No. 24007200
Chandler Patterson
State Bar No. 24121293
Orion Hutchin
State Bar No. 24122288

ATTORNEYS FOR MEAGAN GOAD AND KINSEY MORELAND

14

## Certificate of Conference

In accordance with L.B.R. 7007-1, Counsel for the Interested Parties contacted the respective counsels associated with this case and the Motion is opposed.

*/s/ William A. Franklin*
WILLIAM A. FRANKLIN

## Certificate of Service

I hereby certify that on July 18, 2023, a true and correct copy of the above and foregoing instrument has been served upon all parties receiving electronic notice via the Court's CM/ECF system as well as those parties listed in the Matrix.

*/s/ William A. Franklin*
WILLIAM A. FRANKLIN

15

EXHIBIT "A"

RAY QUINNEY & NEBEKER

April 6, 2023

**VIA EMAIL (mcclainfarms@gmail.com), FEDERAL EXPRESS
DELIVERY, AND REGULAR MAIL**

Borrowers and Guarantors

**Michael R. Johnson**
ATTORNEY AT LAW

PO Box 45385
Salt Lake City, Utah
84145-0385

36 South State Street
Suite 1400
Salt Lake City, Utah
84111

801 532-1500 FIRM
801 323-3363 DIRECT
801 532-7543 FAX
mjohnson@rqn.com
www.rqn.com

McCLAIN FEED YARD, INC.
824 Mullins Lane
Benton, KY 42025

7M CATTLE FEEDER, INC.
824 Mullins Lane
Benton, KY 42025

McCLAIN FARMS, INC.
824 Mullins Lane
Benton, KY 42025

BRIAN KEITH McCLAIN
824 Mullins Lane
Benton, KY 42025

CRYSTAL D. McCLAIN
824 Mullins Lane
Benton, KY 42025

Re: *Rabo AgriFinance LLC ("**RAF**"); McClain Feed Yard, Inc.; Loan
Obligation Nos. 22114481, 22117432, 22122951/0000030687, and
22122952/22122953 (collectively, the "**Loans**") related to and as
evidenced by, Among Other Documents, (a) that certain Master Credit
Agreement, dated May 11, 2018, by and between McClain Feed Yard, Inc.
("**MFY**") and RAF, (b) that certain Joinder, dated July 15, 2019, by and
between 7M Cattle Feeders, Inc. ("**7M**"), MFY, and RAF, (c) that certain
Joinder, dated August 27, 2021, by and between Brian Keith McClain
("**B. McClain**"), MFY, 7M and RAF, (d) that certain Addendum to Master
Credit Agreement, dated July 24, 2019, by and between MFY, 7M and
RAF, (e) that certain Addendum to Master Credit Agreement, dated
January 13, 2023, by and between McClain Farms, Inc. ("**MFI**"), MFY,
7M, B. McClain and RAF, (f) those certain Facility Sheets, of various
dates, by and between MFI, MFY, 7M, B. McClain and/or Crystal D.
McClain ("**C. McClain**") in favor of RAF, (g) those certain Master Loan
Guaranty Agreements, of various dates, executed by B. McClain, C.
McClain, MFI, MFY and 7M in favor of RAF, (h) that certain Real Estate
Term Loan 1 Note, dated May 11, 2018, in the principal amount of
$332,500.00, executed by MFY in favor of Rabo, (i) that certain Real
Estate Term Loan 2 Note, dated July 24, 2019, in the principal amount of
$625,000.00, executed by 7M in favor of RAF, (j) that certain Real Estate*

*Term Loan 3 Note, dated August 27, 2021, in the principal amount of $1,019,800.00, executed by B. McClain in favor of RAF, (k) that certain Operating Line of Credit 3 Note, dated January 13, 2023, in the principal amount of $54,000,000.00, executed by MFY, MFI and 7M in favor of RAF, (l) that certain Master Security Agreement, dated August 27, 2021, executed by MFY, MFI and 7M, as Grantor, in favor of RAF, and (n) that certain Master Security Agreement, dated July 24, 2019, executed by MFY and 7M, as Grantor, in favor of RAF (collectively, along with all other loan and security documents between RAF and any of MFY, MFI, 7M, B. McClain or C. McClain related to the Loans, the "**Loan Documents**") (MFY, MFI, 7M, B. McClain and C. McClain are collectively referred to herein as the "**Loan Parties**"); NOTICE OF DEFAULT AND ACCELERATION, DEMAND FOR PAYMENT AND SATISFACTION IN FULL OF ALL OBLIGATIONS (INCLUDING BUT NOT LIMITED TO ALL SECURED OBLIGATIONS AND ALL GUARANTEED OBLIGATIONS), AND FULL RESERVATION OF RIGHTS*

Dear Loan Parties:

This law firm represents RAF with respect to the above-referenced Loans and that are evidenced by the Loan Documents. Under and pursuant to the Loan Documents, MFY, MFI and 7M pledged essentially all of their personal property assets, including but not limited to all accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, deposit accounts, inventory, equipment, fixtures, farm products (including crops grown, growing or to be grown and livestock, born or unborn, supplies used in farming operations, and products of crops and livestock), general intangibles, including all Intellectual Property, all proceeds of crop insurance, price support payments, government program payments, rights and interests under Hedging Agreements, and all accessions, attachments, additions to, substitutes or replacements for, and all proceeds, products, rents and profits of the forgoing (the "**Personal Property Collateral**") in both Texas and Kentucky to secure the Loan Parties' Obligations to RAF under the Loan Documents. Additionally, one or more of the Loan Parties also granted RAF liens on certain real property and related fixtures, improvements and related property located in Deaf Smith and Parmer Counties, State of Texas, and Marshall County, Kentucky (the "**Real Property Collateral**" and, together with the Personal Property Collateral, the "**Collateral**"). The Collateral secures all of the Loan Parties Obligations under the Loan Documents.

As you know, the Loans are cross-collateralized and cross-defaulted. Among other things, the purpose of this letter is to notify the Loan Parties that one or more Defaults/Events of Default, as defined in the Loan Documents, has occurred and is continuing regarding the Loans. Specifically, and among other potential monetary and non-monetary Defaults/Events of Default as defined in the Loan Documents, the Loan Parties are in default of their Obligations under the Loan Documents for at least the following reasons:

1. Pursuant to Article 1.03 of the Facility Sheet (Operating Line of Credit 3), as of April 1, 2023, the aggregate unpaid balance of the Operating Line of Credit 3 must not exceed the lesser of (a) $48,000,000.00, or (b) the Operating Line of Credit 3 Borrowing Base. As of the date of this letter, the unpaid principal balance of the Operating Line of Credit 3 is $50,628,072.06, and the total amount due under the Operating Line of Credit 3 (excluding Default Interest, attorneys' fees and costs, and other expenses and advances authorized or allowed by the Loan Documents) is $51,345,671.18. The aggregate unpaid principal balance of the Operating Line of Credit 3 currently exceeds $48,000,000.00. This is an Event of Default as defined in Sections 1.121(a) (non-payment) and 1.121(c) (covenant violation) of the Schedule of Definitions and Covenants (the "**Schedules**") which are part of the Loan Documents.

2. Further, not only does the aggregate unpaid principal balance of the Operating Line of Credit 3 currently exceed $48,000,000.00, it also exceeds the Operating Line of Credit 3 Borrowing Base. This is another Event of Default as defined in sections 1.21(a) and 1.21(c) of the Schedules.

3. Based upon recent audits or inspections conducted by RAF's AFCID collateral inspection team and by Focus Management, the Loan Parties have made numerous statements in Loan Documents that are materially incorrect, misleading, and/or false and fraudulent. Such statements include, but are not limited to, submitting materially incorrect, misleading, and/or false and fraudulent Borrowing Base Reports ("**BBRs**") for the periods ending December 31, 2022, January 31, 2023 and/or February 28, 2023. Such statements also include, but are not limited to, statements and representations that the Loan Parties' business operations were cattle feeding operations not cattle broker operations when, in fact, the Loan Parties are engaged in cattle broker operations. These defaults, individually and collectively, constitute

additional Events of Default as defined in section 1.121(b) (false
representation) of the Schedules. These defaults, individually and
collectively, also constitute the violation of or failure to comply with
Borrower Covenants (which is another Event of Default), as defined in
section 1.121(c) of the Schedules.

4.  Based upon recent audits and inspections conducted by RAF's AFCID
collateral inspection team and by Focus Management, and also based
upon the Loan Parties' inability to provide credible and verifiable
information to address RAF's concerns, RAF has substantial reason to
believe that its Personal Property Collateral has been or is in danger of
being lost, destroyed, stolen, damaged or substantially impaired.
Among other things, the Loan Parties have been unable to provide
RAF or its agents with credible and verifiable information as to the
legitimacy and collectability of various substantial accounts receivable
that are alleged owed by various third-party account debtors.  These
defaults, individually and collectively, constitute additional Events of
Default as defined in sections 1.121(b), (c), (d) (collateral
maintenance) and (n) (material adverse effect) of the Schedules.

5.  Based upon recent audits and inspections conducted by RAF's AFCID
collateral inspection team and also by Focus Management, and also
based upon the Loan Parties' inability to provide credible and
verifiable information to address RAF's concerns, RAF has substantial
reason to believe the Loan Parties' actions, as outlined above, violate
or may violate various federal, state and or local laws or ordinances,
including laws or ordinances addressing bank or mail fraud.  If and to
the extent the Loan Parties, or any of them, have or may have violated
any federal, state or local laws or ordinances, such actions would
constitute additional Events of Default under the Schedules.

6.  Even assuming the BBRs submitted by the Loan Parties are true,
accurate and complete in all material respects, those BBRs
demonstrate that any excess in the Borrowing Base has materially and
substantially eroded during 2023, and that RAF's equity position in the
Collateral is at risk.  Indeed, the Loan Parties' own BBRs, as
submitted, reported that as of December 31, 2022, RAF's Personal
Property Collateral consisted of 89,522 head of cattle with a borrowing
base value of $97,218,821.00. The Loan Parties then reported that, as
of February 28, 2023, RAF's Personal Property Collateral consisted of
only 37,992 head of cattle with a borrowing base value of

$36,686,120.00.  In other words, the Loan Parties themselves reported a decrease in owned cattle of 51,530, and a corresponding decrease in cattle valuation of over $60 million.  Finally, as you are aware, the Loan Parties recently assisted Focus Management in a current cattle count.  The Loan Parties count came in at 10,559 head of cattle at all locationst.  Focus Management counted 10,575 head of cattle at all locations.  Under either the Loan Parties' count or the Focus Management count, the head count has decreased by over 27,000 head from the numbers reported on the February 28, 2023 BBR.  This unexplained decline in cattle, along with the Loan Parties' failure to provide satisfactory support for the amount or collectability of accounts receivable they are claiming as included in RAF's Collateral, constitutes an Event of Default under several subparagraphs of the "Events of Default" paragraph of the Schedule.

**AS A RESULT OF THE DEFAULTS/EVENTS OF DEFAULT NOTED ABOVE, AND TO THE EXTENT REQUIRED OR CONTEMPLATED BY THE LOAN DOCUMENTS, RAF HEREBY ACCLERATES ALL OBLIGATIONS (AS DEFINED IN THE LOAN DOCUMENTS, AND DECLARES ALL SUCH OBLIGATIONS DUE AND PAYABLE IN FULL.  RAF HEREBY DEMANDS FROM ALL LOAN PARTIES, JOINTLY AND SEVERALLY, THE IMMEDIATE, FULL AND PROMPT PAYMENT OF ALL OBLIGATIONS DUE UNDER THE LOAN DOCUMENTS.**

As of April 5, 2023, the amounts required to pay and satisfy the Loans (excluding Default Interest, attorneys' fees and costs and other charges as allowed by the Loan Documents) are as follows:

Obligation No. 22122952/22122953 (Operating Line of Credit 3)

| | |
|---|---|
| Principal: | $50,628,072.06 |
| Interest: | $   717,599.12 |
| TOTAL: | $51,345,671.18 |

Obligation No. 22114181 (Real Estate Term Loan 1)

| | |
|---|---|
| Principal: | $187,759.63 |
| Interest: | $    107.77 |
| TOTAL: | $184,867.40 |

Obligation No. 22117432 (Real Estate Term Loan 2)

| | |
|---|---|
| Principal: | $179,379.62 |
| Interest: | $      96.67 |
| TOTAL: | $179,476.29 |

Obligation No. 22122951/0000030687 (Real Estate Term Loan 3)

| | |
|---|---|
| Principal: | $898,314.80 |
| Interest: | $     405.24 |
| TOTAL: | $898,720.04 |

**ALL LOAN PARTIES ARE ALSO HEREBY NOTIFIED THAT,** based on the foregoing Defaults/Events of Default and their failure to pay and satisfy the Loans in full, RAF is presently entitled to exercise any and all rights and remedies it may have concerning the Loans and the Collateral that was pledged to secure the Loans, including all rights recognized in the Loan Documents and all rights and remedies authorized or allowed by law or in equity.

**ALL LOAN PARTIES ARE ALSO HEREBY NOTIFIED THAT,** based on the foregoing Defaults/Events of Default and their failure to pay and satisfy the Loans in full, the Loan Parties are required to voluntarily surrender and turn over to RAF, or RAF's authorized agent, all Collateral, and to otherwise reasonably assist and cooperate with RAF in collecting, securing and liquidating all of the Collateral.

**ALL LOAN PARTIES ARE ALSO HEREBY NOTIFIED THAT,** based on the foregoing Defaults/Events of Default and their failure to pay and satisfy the Loans in full, RAF hereby withdraws any express or implied consent or approval of the Loan Parties, or any of them, to use, sell, transfer, encumber, pledge, hypothecate or otherwise deal in any way with any of the Collateral.  Any unauthorized use, sale, transfer, encumbrance, pledge or hypothecation by the Loan Parties of any Collateral shall hereafter be considered by RAF as theft or embezzlement of RAF's Collateral.

**FINALLY, THE LOAN PARTIES ARE HEREBY NOTIFIED THAT** RAF fully reserves all rights and remedies available to it regarding the Loans, the Loan Parties, the Collateral and all related matters, including but not limited to the right to pursue any and all legal or equitable claims against any or all of the Loan Parties, the right to seek a receiver over some or all of the Collateral, and the right to initiate judicial or non-judicial foreclosure proceedings against some or all of the Collateral, and the failure of RAF to exercise any such rights and remedies, either now or in the future, shall not be deemed a waiver by RAF of any rights or remedies that are or may become available to it, all of which are fully preserved.

Please govern yourselves accordingly, and please contact either the undersigned at 801-323-3363, or Jeff Hanson, RAF's Vice President and Senior Financial Restructuring Manager, at 763-244-7651, f you have any questions regarding this matter.  You also may contact either the undersigned or Mr. Hanson if you desire updated payoff statements for the Loans.

Please govern yourselves accordingly.

Sincerely,

RAY QUINNEY & NEBEKER P.C.

Michael R. Johnson

MRJ/mj

cc:   Jeff Hanson (via email only)
      Linda Kobliska (via email only)
      Kurt Leistikow (via email only)
      Brad Bakker (via email only)

EXHIBIT "B"

Obligation No. 22122952/22122953 (Operating Line of Credit 3)
Obligation No. 22114181 (Real Estate Term Loan 1)
Obligation No. 22117432 (Real Estate Term Loan 2)
Obligation No. 22122951/0000030687 (Real Estate Term Loan 3)

## AMENDED AND RESTATED FORBEARANCE AGREEMENT

This *Amended and Restated Forbearance Agreement* (the "**Agreement**") is made and entered into as of April ___, 2023 (the "**Closing Date**"), by and among each of MCCLAIN FEED YARD, INC., a Texas corporation ("**MFY**"), MCCLAIN FARMS, INC., a Kentucky corporation ("**MF**"), 7M CATTLE FEEDERS, INC., a Kentucky corporation ("**7M**"), and BRIAN KEITH MCCLAIN, a married person or member of a civil union or domestic partnership ("**B. McClain**"), each of which is a Borrower and/or Guarantor under the Loan and Security Documents identified below, on the one hand, and RABO AGRIFINANCE LLC, a Delaware limited liability company ("**RAF**" or "**Rabo**" or "**Lender**"), as the Lender under the Loan and Security Documents identified below, on the other hand. MFY, MF, 7M, and B. McClain shall be referred to herein collectively as the "**Loan Parties**," and individually as a "**Loan Party**." The Loan Parties and RAF shall be referred to herein collectively as the "**Parties**."

### Recitals

A.      RAF, B. McClain, MFY, MF and 7M are parties to that certain Forbearance Agreement that was executed by B. McClain, MFY, MF and 7M on April 9, 2023 (the "**Original Forbearance Agreement**"). This Agreement amends and restates the Original Forbearance Agreement. Except to the extent expressly modified by this Agreement, the terms of the Original Forbearance Agreement remain effective in all respects.

B.      RAF is the secured creditor of the Loan Parties in connection with the following extensions of credit by RAF (collectively the "**RAF Indebtedness**"):

1.      An Operating Line of Credit Loan in the original principal amount of a maximum amount of $54,000,000.00 through March 31, 2023, and $48,000,000.00 from April 1, 2023 to the Operating Line of Credit 3 Maturity Date, which is designated by RAF as Loan Obligation No. 22122952/22122953 (the "**Operating Line of Credit**").

2.      A Real Estate Term Loan 1 in the original principal amount of $332,500.00, designated by RAF as Loan Obligation No. 22114181 ("**Real Estate Term Loan 1**").

3.      A Real Estate Term Loan 2 in the original principal amount of $625,000.00, designated by RAF as Loan Obligation No. 221117432 ("**Real Estate Term Loan 2**").

4.      A Real Estate Term Loan 3 in the original principal amount of $1,019,800.00, designated by RAF as Loan Obligation No. 22122951/0000030687 ("**Real

Estate Term Loan 3").

    C.    As of the April 5, 2023 (the "**Payoff Calculation Date**"), the amount of the RAF Indebtedness owed to RAF on the Operating Line of Credit, Real Estate Term Loan, Real Estate Term Loan 2 and Real Estate Term Loan 3 (collectively the "**Loans**") was the total amount of **$52,608,734.91** (the "**Outstanding Amounts Due**") (plus attorney's fees and costs and any additional amounts as noted below), consisting of the following:

#### Obligation No. 22122952/22122953 (Operating Line of Credit 3)

| | |
|---|---|
| Principal: | $50,628,072.06 |
| Interest: | $ 717,599.12 |
| TOTAL: | $51,345,671.18 |

#### Obligation No. 22114181 (Real Estate Term Loan 1)

| | |
|---|---|
| Principal: | $187,759.63 |
| Interest: | $ 107.77 |
| TOTAL: | $184,867.40 |

#### Obligation No. 22117432 (Real Estate Term Loan 2)

| | |
|---|---|
| Principal: | $179,379.62 |
| Interest: | $ 96.67 |
| TOTAL: | $179,476.29 |

#### Obligation No. 22122951/0000030687 (Real Estate Term Loan 3)

| | |
|---|---|
| Principal: | $898,314.80 |
| Interest: | $ 405.24 |
| TOTAL: | $898,720.04 |

| | |
|---|---|
| **Grand Total:** | **$52,608,734.91** |

    The Outstanding Amounts Due set forth above do not include: (1) RAF's attorney's and consultant's fees and costs incurred as of the Payoff Calculation Date, together with contractual and default interest at the Default Rate to be owed on such attorney's and consultant's fees and costs from the date that they are paid by RAF, and (2) additional interest (both contractual non-default interest and default interest at the Default Rate), as well as attorney's and consultant's fees and costs and other charges allowed by the Loan Documents, that have and will continue to accrue since the Payoff Calculation Date, and would otherwise (in the absence of the forbearance waivers outlined in this Agreement) continue to be added to the Outstanding Amounts Due. The Loan Parties agree and acknowledge that they will not dispute RAF's right to be paid interest (both contractual and Default) and attorney's and consultant's fees and other costs and expenses as outlined in the Loan Documents (which interest, attorney's fees and other costs, consultant's fees and other costs and all other expenses that had been incurred but not yet booked by RAF as of the Payoff Calculation Dates are not included in the Outstanding Amounts Due set forth

above), including such costs and expenses related to the costs of collection of the Loans (including attorney's and consultant's fees, court costs and other out-of-pocket expenses) as well as the costs and expenses incurred by RAF in connection with negotiating and documenting this Agreement, and the documentation of all documents contemplated by this Agreement.

D.      The writings evidencing the Loans and the RAF Indebtedness and the agreements between the Parties with respect to the Loans and the collateral securing the Loans (the "**Collateral**") include (but are not limited to) the following, all of which are collectively referred to as the "**Loan Documents**":

1.      That certain *Master Credit Agreement*, dated May 11, 2018, by and between MFY and RAF;

2.      That certain *Joinder*, dated July 15, 2019, by and between 7M, MFY and RAF;

3.      That certain *Joinder*, dated August 27, 2021, by and between B. McClain, MFY, 7M and RAF;

4.      That certain *Addendum to Master Credit Agreement*, dated July 24, 2019, by and between MFY, 7M and RAF;

5.      That certain *Addendum to Master Credit Agreement*, dated January 13, 2023, by and between MF, MFY, 7M, B. McClain and RAF;

6.      That certain *Facility Sheet (Real Estate Term Loan 1)*, dated December 16, 2020, by and between MF, MFY, 7M, B. McClain and RAF;

7.      That certain *Facility Sheet (Real Estate Term Loan 2)*, dated December 16, 2020, by and between MF, MFY, 7M, B. McClain and RAF;

8.      That certain *Facility Sheet (Real Estate Term Loan 3)*, dated August 27, 2021, by and between MF, MFY, 7M, B. McClain and RAF;

9.      That certain *Facility Sheet (Operating Line of Credit 3)*, dated January 13, 2023, by and between MF, MFY, 7M, B. McClain and RAF;

10.     That certain *Master Loan Guaranty*, dated July 24, 2019, executed by B. McClain in favor of RAF;

11.     That certain *Master Loan Guaranty*, dated August 27, 2021, executed by MF in favor of RAF;

12.     That certain *Master Loan Guaranty*, dated July 24, 2019, executed by MF in favor of RAF;

3

13.    That certain *Master Loan Guaranty*, dated August 27, 2021, executed by MFY in favor of RAF;

14.    That certain *Master Loan Guaranty*, dated July 24, 2019, executed by MFY in favor of RAF;

15.    That certain *Master Loan Guaranty*, dated January 8, 2020, executed by 7M in favor of RAF;

16.    That certain *Real Estate Term Loan 1 Note*, dated May 11, 2018, in the principal amount of $332,500.00, executed by MFY in favor of RAF;

17.    That certain *Real Estate Term Loan 2 Note*, dated July 24, 2019, in the principal amount of $625,000.00, executed by 7M in favor of RAF;

18.    That certain *Real Estate Term Loan 3 Note*, dated August 27, 2021, in the principal amount of $1,019,800.00, executed by B. McClain in favor of RAF;

19.    That certain *Operating Line of Credit 3 Note*, dated January 13, 2023, in the principal amount of $54,000,000.00, executed by MFY, MFI and 7M in favor of RAF;

20.    That certain *Master Security Agreement*, dated August 27, 2021, executed by MFY, MFI and 7M, as Grantor, in favor of RAF;

21.    That certain *Master Security Agreement*, dated July 24, 2019, executed by MFY and 7M, as Grantor, in favor of RAF;

E.    The Loan Parties' Obligations under the Loans are secured by properly perfected liens on and security interests in essentially all personal property owned by MFY, MF, and 7M, including all of the following types or categories of personal property (hereinafter, the **"Personal Property Collateral"**):

1.    All accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, and deposit accounts;

2.    All inventory;

3.    All equipment;

4.    All fixtures;

5.    All farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in farming operations, and products of crops or livestock in their unmanufactured state;

6.    All general intangibles, including all Intellectual Property;

4

7.    All proceeds of any crop insurance, price support payment or other government program;

8.    All rights and interests under Hedging Agreements, including all rights to the payment of money from Secured Parties under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in the Hedging Agreements;

9.    Accessions, attachments and other additions to the foregoing;

10.    Substitutes or replacements for any of the foregoing, all proceeds, products, rents and profits of any of the foregoing, all rights under warranties and insurance contracts covering any of the foregoing, and any causes of actions relating to any of the foregoing; and

11.    All books and records pertaining to any of the foregoing, including but not limited to any computer-readable memory and any computer hardware and software necessary to process such memory.

F.    The Loan Parties' Obligations under the Loans also are secured by properly perfected liens on and security interests in various real property and related improvements, fixtures, personal property, easements, water rights, timber, leases, plantings, rents and other real property (collectively, the "**Real Property**") located in Deaf Smith and Parmer Counties, State of Texas, and in Marshall County, State of Kentucky, including the Real Property identified in the following Deeds of Trust and Mortgages (collectively, the "**Real Property Collateral**"):

1.    All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith County, Texas)*, dated May 11, 2018, executed by MFY, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith County, Texas;

2.    All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated July 24, 2018, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas;

3.    All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated July 24, 2019, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas;

4.    All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated January 8, 2020, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas;

5.      All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated March 16, 2021, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas;

6.      All Real Property identified in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated August 27, 2021, executed by MFY and 7M, as Grantor, in favor of RAF, as Beneficiary, and recorded in the Official Records of Deaf Smith and Parmer Counties, Texas; and

7.      All Real Property identified in that certain *Mortgage, Assignment of Rents and Security Agreement (Marshall County, Kentucky)*, dated August 27, 2021, executed by B. McClain, as Grantor and Mortgagor, in favor of RAF, as Mortgagee, and recorded in the Official Records of Marshall County, Kentucky.

G.      The Personal Property Collateral and the Real Property Collateral are collectively referred to herein as the **"Rabo Collateral."**

H.      MF, MFY and 7M currently own and maintain demand deposit bank accounts at Mechanics Bank including Account No. 3505283070 in the name of MF, Account No. 469420423 in the name of 7M, and Account 819150197 in the name of MFY (collectively, the **"Mechanics Bank Accounts"**). RAF has a perfected lien on all funds in the Mechanics Bank Accounts pursuant to Deposit Account Control Agreements that were duly executed by Mechanics Bank, RAF, and each of MF, MFY and 7M.

I.      Crystal D. McClain (**"Crystal McClain"**) is B. McClain's former spouse. Crystal McClain was formerly a guarantor of the Loans, and also was an owner and officer of MF, MFY and 7M. In or about September of 2020, B. McClain and Crystal McClain were officially divorced, and Crystal McClain thereafter (i) transferred all of her ownership interests in MF, MFY and 7M to B. McClain, and (ii) resigned her positions as an officer and/or director of MF, MFY, and 7M.

J.      RAF has since released Crystal McClain from the Master Loan Guaranty she signed under which she guaranteed the full performance and prompt payment when due of all Obligations owed on the Loans.

K.      Since no later than November of 2020, B. McClain has been the 100% shareholder of, and sole officer and director of, each of MF, MFY and 7M.

L.      B. McClain is currently married to Chelsea Marie McClain (**"Chelsea McClain"**). Chelsea McClain is not a borrower or guarantor of any of the Loans, has no ownership or other interest in any of MF, MFY or 7M, and is not a Loan Party under this Agreement. Chelsea McClain will sign this Agreement in the space provided below, however, to (a) acknowledge that she has no ownership or other legal or equitable interest in MF, MFY or 7M or any assets owned by MF, MFY or 7M, (b) provide her consent to the liens in the Rabo Collateral that have been granted to RAF under the Loan Documents to secure the Loan Parties' Obligations under the Loans, (c) subordinate any claims, rights or interests she has, if any, in MF, MFY, 7M or the

6

Rabo Collateral to the rights and claims of RAF against MF, MFY, 7M and the Rabo Collateral, and (d) agree that she is also a releasing party under the Release and Waiver of Claims provisions set forth in Section 5 of the Agreement.

M.     The Loan Parties acknowledge and agree that the Loans are cross-collateralized and cross-defaulted. The Loan Parties further acknowledge and agree that one or more Events of Default, as defined in the Loan Documents, has occurred with respect to the Loans, which Events of Default entitle RAF to exercise all legal, equitable and contractual rights against the Loan Parties and against the Rabo Collateral, including but not limited to the right to immediate liquidation, foreclosure and sale of the Rabo Collateral and the exercise of RAF's rights against all funds in the Mechanics Bank Accounts. The Loan Parties further acknowledge receipt of that certain *Notice of Default and Acceleration, Demand for Payment and Satisfaction in Full of all Obligations (Including but not Limited to all Secured Obligations and all Guaranteed Obligations, and Full Reservation of Rights* (the "**Notice**"), which was dated on April 6, 2023 and was delivered to them by RAF's outside counsel at Ray Quinney & Nebeker P.C.

N.     The Loan Parties acknowledge and agree that the Notice provided them with notice that Events of Default had occurred and are ongoing under the Loan Documents. The Loan Parties further acknowledge and agree that, pursuant to the Notice, all Obligations due under the Loan Documents have been accelerated, and are now due and payable in full.

O.     The Loan Parties further acknowledge that, as a result of the Events of Default that currently exist under the Loan Documents, RAF has frozen the Mechanics Bank Accounts pursuant to the Deposit Account Control Agreements between Mechanics Bank, RAF and each of MF, MFY and 7M.

P.     The Loan Parties have requested that RAF forbear from further exercising RAF's rights and remedies under the Loan Documents and against the Rabo Collateral.  RAF is willing to do so, but only in accordance with the terms and conditions of this Agreement, including specifically the release by the Loan Parties of any claims against RAF as outlined in this Agreement, such release to be effective upon the execution of this Agreement.  RAF's forbearance shall continue so long as the Loan Parties remain in full compliance with all of the terms and conditions of this Agreement.

Q.     The Loan Parties jointly and severally agree and acknowledge that (1) they do not dispute and will not dispute the Outstanding Amounts Due as of the Payoff Calculation Date, (2) they do not dispute and will not dispute the additional interest (both contractual interest and default interest at the Default Rate), as well as attorney's fees and costs and other charges allowed by the Loan Documents, that will accrue on the Loans after the Payoff Calculation Date until such time as the Loans are paid and satisfied in full, pursuant to this Agreement or otherwise, (3) in the event RAF elects in its sole discretion to make additional protective advances, either to the Loan Parties or directly to third parties, for livestock, feed, care, maintenance, transportation, insurance, rent or other charges related to the Rabo Collateral, they will not dispute that the Loan Parties will owe additional sums, in an amount to be determined in the future, in the amount of such additional protective advances, plus any interest or other charges that may be owed under the Loan Documents as a result of such additional protective advances, and (4) as of the date of this Agreement, they have no defenses, offsets or claims

7

related to RAF or the Notice or the Events of Default, or related to or arising under the Loan Documents, the Loans, or the administration or servicing of the Loans.

## Agreement

Now, therefore, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

1. <u>The Events of Default Related to the Loans Will Remain in Effect during the Forbearance Period, but Subject to the Forbearance Outlined in this Agreement</u>. The Loan Parties jointly and severally represent, acknowledge and agree as follows: (a) the Events of Default that currently exist under the Loan Documents, as outlined in the Notice, have occurred and are presently existing and cannot be cured, the Events of Default are material Events of Default under the Loan Documents, the Events of Default apply to all of the Loans, and RAF therefore has the immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity concerning the Loan Parties or the Rabo Collateral that was pledged to secure the Loans, (b) RAF is in full compliance with all of the terms and conditions of the Loan Documents and all other documents related to the Loans as of the Closing Date, and (c) all of the Loans are payable in full as of the Closing Date, and the Loan Parties are unable to pay the Loans in full on the Closing Date. The Loan Parties also jointly and severally represent, acknowledge and agree that they do not and will not contest the foregoing, that they do not contest RAF's immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity concerning the Loan Parties or the Rabo Collateral, and they will not assert any defenses or offsets to the fact that the Events of Default have occurred and are continuing material Events of Default under the Loan Documents. The Loan Parties also jointly and severally acknowledge and agree that RAF is entitled to take any and all actions under the Loan Documents or applicable law during the Forbearance Period that RAF deems necessary to protect its rights and interests in the Rabo Collateral.

2. <u>Immediate Appointment of Ampleo as CRO for MF, MFY and 7M</u>. By no later than Monday, April 10, 2023, the Loan Parties shall formally retain CFO Solutions, LLC dba Ampleo ("**Ampleo**") as the Chief Restructuring Officer for each of MF, MFY and 7M (individually and collectively, the "**Companies**"), and as the sole officer and director for each of the Companies (Ampleo acting in these capacities is referred to herein as the "**CRO**"), and CRO shall have sole authority to manage, control and oversee all of the funds of the Companies, including all funds dispersed or to be dispersed and all funds deposited or to be deposited, and all funds or proceeds from the sale or other liquidation of the Rabo Collateral. Further, the Loan Parties shall not sell, transfer, gift, encumber, hypothecate, move, or otherwise impair the value of any of Rabo Collateral, including without limitation any equipment, rolling stock, or farm products (including livestock and feed) of the Companies, without the express written consent of Ampleo. Additionally, any agreement between the Loan Parties and Ampleo, shall contain at least the following provisions:

A. Ampleo shall be authorized to perform the duties of the CRO of each of the Companies , and shall have sole and exclusive authority to manage, control and oversee all of the funds of the Companies, including all of the proceeds from the sale of the Rabo Collateral,

subject to oversight of RAF and in consultation with the Loan Parties. Further, Ampleo shall have exclusive authority and control over the Companies' bank accounts (including but not limited to the Mechanics Bank Accounts), and over all of the books and financial records of the Companies.

B.    The Loan Parties shall not purchase any assets (including any equipment or farm products, including livestock or feed) without the express written consent of Ampleo. Further, as noted above, the Loan Parties shall not sell, transfer, gift, encumber, hypothecate, move or otherwise impair the value of any Rabo Collateral without the express written consent of Ampleo.

C.    Glenn Karlberg of Ampleo shall be designated as the CRO. Other Ampleo associates may be called upon to assist if needed at the CRO's discretion. Mr. Karlberg and his Ampleo associates are referred to herein as the "**CRO Team**." Except as otherwise provided, the CRO Team shall have sole authority and control over the banking, financial, accounting, and record keeping needs of the Companies, and shall specifically endeavor to improve accounting, record keeping and financial controls at the Companies The CRO shall have authority to provide such periodic reports to RAF as the CRO deems appropriate or as requested by RAF. Neither the CRO nor the CRO Team shall have any responsibility to file any federal, state or local tax returns for any of the Loan Parties, but the CRO may provide oversight as needed for the reporting and filing of the returns by the appropriate employees of the Companies. In the event RAF requests the appointment of a receiver for one or more of the Companies, the Loan Parties stipulate, acknowledge and agree that Ampleo may serve as the receiver, and the Loan Parties shall not contest or challenge Ampleo's appointment.

D.    The CRO shall have sole authority, control and management of all of the funds of the Companies. The Loan Parties shall immediately turn over access to all bank accounts to the CRO, and shall provide to the CRO all of the financial and operating information and documentation concerning the Companies' business operations and the Rabo Collateral that the CRO shall request from the Loan Parties from time to time. Further, the CRO shall have sole and exclusive signature control of all of the Companies' bank and other financial accounts, including the Mechanics Bank Accounts.

E.    The CRO shall be authorized to purchase feed and other supplies and to pay salaries and to pay the ongoing expenses of running the Companies' businesses.

F.    The Companies may need additional cash (the "**Cash Shortfall**") to fund the Companies' operations during the forbearance period. To fund the Cash Shortfall, RAF may make additional over-advances and protective advances under RAF's Operating Line of Credit. If and to the extent RAF elects in its sole and absolute discretion to make such advances, then such advances shall be deemed to have been made under and pursuant to the terms of the Loan Documents and shall be further deemed to have been made as protective advances in order to protect the Rabo Collateral that secures the Loans (such advances being referred to herein as the "**Protective Advances**"). The timing, amount and frequency of any Protective Advances shall be in RAF's sole and absolute discretion. If and to the extent RAF agrees to make any Protective Advances, the Loan Parties each jointly and severally agree and acknowledge that they will not

9

dispute RAF's right to be repaid for the Protective Advances and that Default Interest shall accrue on the Protective Advances from the times that such funds are advanced until repaid in full.

G.   The CRO is authorized by the Loan Parties to communicate with RAF as requested by RAF, including providing written or oral status reports. If requested, the CRO is also authorized to provide to RAF copies of the Companies' Quick Books files. Further, if requested, the CRO is also authorized to provide RAF with copies of the Loan Parties' federal and state tax returns, including all schedules, for all tax years.

H.   The CRO is authorized to provide RAF with one or more rolling cash-flow budgets to cover anticipated expenses during the forbearance period, as well as such other banking, financial and accounting information concerning the Companies that RAF may request. Absent the express written consent of both RAF and the CRO, no cattle or other livestock will be purchased during the forbearance period.

I.   The Loan Parties shall at all times fully cooperate with the CRO Team and shall take no action which interferes, directly or indirectly, with the duties of the CRO as outlined in this Agreement or in any separate agreements between the Loan Parties and Ampleo..

J.   The Loan Parties shall at all times act in good faith to support the CRO Team in performing its duties, and shall provide the CRO Team with access to all books and records related to the Companies, including but not limited to, all banking and accounting records, contracts for services to be provided by Companies, union contracts, licenses, permits, applications, purchase and sale agreements, and insurance policies. The Loan Parties shall cooperate to ensure that books, records and accounts help by outside parties are turned over to the CRO. The Companies' owners, agents, and employees shall fully and timely cooperate with the CRO in connection with the performance of its duties, and shall not interfere with the CRO's performance of such duties. In the event a dispute arises between the CRO and the Loan Parties, or any existing or former owner, officer, agent, or employee of the Companies, regarding their compliance with this paragraph, the CRO shall have the right to seek a Court order, on five (5) business days' notice, enforcing the terms of this Agreement.

K.   The Companies shall indemnify the CRO Team on the same terms as provided to its other officers and directors under the Companies' articles, bylaws, operating agreements, company agreements or other company governing documents (e.g., board, manager, member or shareholder resolutions) (collectively, the **"Governing Documents"**) and applicable state law and can and will provide insurance coverage for the CRO and the CRO Team under its D&O policy. In the event the Companies do not currently have a D&O policy, the CRO may acquire a D&O policy which provides insurance coverage for the CRO and the CRO Team on terms typical in the industry in which the Companies operate.

L.   RAF may, in its sole discretion, but shall have no obligation to, advance to the Companies funds necessary to pay all amounts payable to the CRO. All such advances, if agreed to by RAF in the future, shall be considered by the Parties as Protective Advances made pursuant to the terms of the Loan Documents, and shall be secured by the Rabo Collateral.

M.    The Loan Parties may only terminate the CRO Team, with or without cause, upon giving no less than thirty (30) days advanced written notice to both RAF and the CRO.

3.    <u>Forbearance Period; Event of Termination; Preconditions to Forbearance.</u>

A.    Expressly conditioned upon the satisfaction of all of the conditions to the effectiveness of this Agreement before this Agreement becomes effective, and further subject to the continuing satisfaction of all of the terms and conditions set forth in this Agreement, RAF hereby agrees to forbear from the Closing Date until an Event of Termination (as defined below) occurs (referred to herein as the "**Forbearance Period**") from its immediate right to exercise all rights given to it under the Loan Documents, applicable law or in equity with respect to the Loans and concerning the Loan Parties and/or the Rabo Collateral. The forbearance provided by RAF pursuant to this Agreement is conditioned upon the following, the failure of any of which shall constitute an Event of Termination: (i) this Agreement has been fully executed by all of the Loan Parties, (ii) the Loan Parties provide RAF with all other documentation required by RAF to be provided in connection with this Agreement, and (iii) the Loan Parties shall cooperate fully with Ampleo and will immediately provide to Ampleo all of the financial and operating information and documentation concerning the Companies' business operations that Ampleo shall request from the Loan Parties from time to time, and RAF authorizes the Loan Parties to release to Ampleo all of the requested financial and operating information and documentation concerning the Companies' business operations.

B.    The Forbearance Period provided by this Agreement shall terminate, without notice to any of the Loan Parties, upon the occurrence of any Event of Termination. The term "**Event of Termination**" means the occurrence of any of the following events: (i) a Forbearance Default has occurred and has not been cured within the cure period outlined above, (ii) any of the Loan Parties fails to meet or satisfy any of the conditions to the effectiveness of this Agreement, or fails to satisfy any other agreement, covenant or condition outlined in this Agreement, or the occurrence of any other event outlined in this Agreement which is stated to be an Event of Termination, and any of the foregoing is not cured (if it can be cured) by the end of the cure period outlined above, or (iii) the end of the Forbearance Period, which is **May 1, 2023**.

C.    Upon the occurrence of any Event of Termination, without releasing, waiving, impairing, or otherwise affecting the Loan Parties' respective warranties, covenants, agreements, consents and waivers under this Agreement and the other Loan Documents, RAF may in its sole and absolute discretion, without any demand, presentment, protest or notice (all of which each of the Loan Parties hereby waives) exercise any and all of the rights, remedies, powers and privileges available to RAF under the Loan Documents, or pursuant to applicable law or in equity, with respect to the Loan Parties, the Loans, the RAF Indebtedness, and/or the Rabo Collateral.

3.    <u>The Loan Parties' Obligations Under the Loan Documents are Absolute and Unconditional.</u> Each of the Loan Parties hereby ratifies and confirms all of the Loan Documents and the RAF Indebtedness in all respects as of the Closing Date, except as expressly waived or modified by this Agreement. The Loan Parties hereby jointly and severally represent,

acknowledge and agree that their obligations to pay and perform all of their Obligations under the Loan Documents and to satisfy all of their duties under the Loan Documents are absolute and unconditional, and there exists no right of set-off or recoupment, counterclaim or defense of any kind or nature whatsoever to payment and performance of the RAF Indebtedness and fulfillment of the Loan Parties' duties under the Loan Documents.

4.      Notice of Occurrence of a Forbearance Default and Cure Period.  The term "**Forbearance Default**" shall mean the occurrence of any one or more of the following:  (a) the Loan Parties fail or refuse to comply with any of the obligations or duties or covenants imposed upon them under this Agreement and under the other Loan Documents (except to the extent such obligations or duties or covenants are expressly waived, modified or forgiven by this Agreement), (b) any representation or warranty made by any of the Loan Parties in this Agreement is deemed by RAF to be materially incorrect or misleading,  or (c) the occurrence of any event that will become an Event of Termination under this Agreement if not cured on a timely basis as outlined below.  Notwithstanding anything to the contrary in the Loan Documents, RAF shall provide to the Borrowers written notice of any Forbearance Default, and the Borrowers shall have five (5) calendar days to cure the Forbearance Default (if such Forbearance Default can be cured) before such Forbearance Default shall become an Event of Termination under this Agreement.

5.      Release and Waiver of Claims.  THE LOAN PARTIES, JOINTLY AND SEVERALLY, BOTH FOR THEMSELVES AND FOR ALL PERSONS OR ENTITIES CLAIMING BY, THROUGH OR UNDER THEM, HEREBY WAIVE, RELEASE AND FULLY DISCHARGE RAF, AND RAF'S PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS, ATTORNEYS, EMPLOYEES AND REPRESENTATIVES (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS, LIABILITIES, CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS, EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT ANY OF THE LOAN PARTIES HAVE OR MAY HAVE OR CLAIM AGAINST THE RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE DATE OF EXECUTION OF THIS AGREEMENT, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY TO THE LOANS, THE LOAN DOCUMENTS, THE RAF INDEBTEDNESS, THE NOTICE, RAF'S EXERCISE OF RIGHTS UNDER DEPOSIT ACCOUNT CONTROL AGREEMENTS, THE NEGOTIATIONS RELATING TO THIS AGREEMENT, OR ANY OTHER ACT OR OMISSION THAT HAS OCCURRED PRIOR TO THE EXECUTION OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

6.      Loan Parties' Representations and Warranties.  The Loan Parties hereby jointly and severally represent and warrant to RAF as follows:

12

A.    Recitals. The Recitals in this Agreement are true and correct in all material respects and are hereby incorporated into the binding agreements outlined in this Agreement.

B.    Incorporation of Representations. There has been no material change in the management or ownership structure of MF, MFY or 7M since January 1, 2023. No Loan Party is the subject of any Judgment (as defined in the Loan Documents), and there is no lawsuit, tax claim or other dispute pending against any Loan Party.

C.    Power and Authority. The execution, delivery, and performance of this Agreement by each of the Loan Parties has been duly authorized by all necessary action, and does not and will not contravene any governing documents of any of the Loan Parties, violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree of determination presently in effect having applicability to any of the Loan Parties, result in a breach of or constitute a default under any promissory note, mortgage, indenture, loan or credit agreement, or any other agreement, lease or instrument to which any of the Loan Parties is a party or by which its or his or her assets or properties may be bound or affected, or result in or require the creation or imposition of any Lien as defined in the Loan Documents (other than any Lien created in favor of RAF under the Loan Documents), upon or with respect to any of the properties now owned or hereafter acquired by such Loan Parties.

D.    Legally Enforceable Agreement. This Agreement is, and each other document delivered in connection with this Agreement, will be legal, valid and binding obligations of the Loan Parties, enforceable against each of the Loan Parties in accordance with their respective terms, except to the extent that the enforcement may be limited by applicable bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

E.    No Assignment or Transfer of Any Claim. There has been no assignment or other transfer of a claim, cause of action or other liability which might affect or impair the releases set forth in this Agreement, and no Loan Party has filed or asserted any claims concerning the subject matter of this Agreement that are not covered by this Agreement.

7.    Bankruptcy Waiver. IN THE EVENT ONE OR MORE OF THE LOAN PARTIES FILES A VOLUNTARY PETITION FOR RELIEF UNDER THE BANKRUPTCY CODE OR ANY STATE INSOLVENCY OR RECEIVERSHIP LAWS OR IN THE EVENT AN INVOLUNTARY PETITION IS FILED AGAINST ONE OR MORE OF THE LOAN PARTIES UNDER THE BANKRUPTCY CODE OR ANY STATE INSOLVENCY OR RECEIVERSHIP LAWS AND SUCH INVOLUNTARY PETITION IS NOT DISMISSED WITHIN THIRTY (30) DAYS OF FILING, EACH OF THE LOAN PARTIES HEREBY EXPRESSLY AND KNOWINGLY WAIVES ANY AND ALL PROTECTIONS UNDER THE AUTOMATIC STAY IMPOSED BY THE BANKRUPTCY CODE OR ANY STATE LAWS IMPOSING A STAY SIMILAR TO THAT CONTAINED IN THE BANKRUPTCY CODE, AND HEREBY AGREES NOT TO OPPOSE OR DEFEND AGAINST ANY MOTION OR PETITION BY RAF (WHICH MAY BE MADE EX PARTE) FOR AN IMMEDIATE MODIFICATION, TERMINATION, OR ANNULMENT OF THE AUTOMATIC STAY OR

OTHER RELIEF FROM THE AUTOMATIC STAY WITH RESPECT TO THE RABO COLLATERAL AND ANY OTHER COLLATEARL NOW OR HEREAFTER GRANTED IN CONNECTION WITH THE LOAN DOCUMENTS.

8. <u>Jury Waiver.</u> THE LOAN PARTIES HEREBY JOINTLY AND SEVERALLY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE RAF INDEBTEDNESS, THE LOANS, THE LOAN DOCUMENTS, THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

9. <u>No Commitment.</u> EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, RAF IS NOT COMMITTED, AND IS NOT COMMITTING, TO EXTEND, MODIFY OR OTHERWISE RESTRUCTURE THE LOANS, OR FORBEAR FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES UNDER THE LOAN DOCUMENTS OR UNDER APPLICABLE LAW OR IN EQUITY. NO PRIOR COURSE OF DEALING, NO USAGE OF TRADE, AND NO ORAL STATEMENTS OR COMMENTS BY RAF OR ITS OFFICERS, EMPLOYEES, ATTORNEYS OR OTHER AGENTS WILL BE DEEMED TO BE A COMMITMENT BY RAF TO EXTEND, MODIFY, OR OTHERWISE RESTRUCTURE THE LOANS OR FORBEAR FROM EXERCISING ANY OF RAF'S RIGHTS OR REMEDIES, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OR UNLESS THE SAME SHALL BE REDUCED IN WRITING AND SIGNED BY AUTHORIZED REPRESENTATIVES OF RAF.

10. <u>Document Understood.</u> BY THEIR SIGNATURES BELOW, EACH OF THE LOAN PARTIES ACKNOWLEDGES AND AGREES THAT: (A) THIS AGREEMENT CONTAINS A COMPLETE WAIVER AND RELEASE BY EACH OF THE LOAN PARTIES OF CERTAIN CLAIMS AND A WAIVER OF CERTAIN RIGHTS; AND (B) EACH OF THE LOAN PARTIES HAS READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY PRIOR TO SIGNING AND FULLY AGREES TO EACH, ALL AND EVERY PROVISION OF THIS AGREEMENT.

11. <u>Effectiveness.</u> Except to the extent specifically amended or modified or waived by the terms of this Agreement, all of the terms, conditions and provisions of the Loan Documents will remain unmodified, and the Loan Documents, to the extent amended or otherwise affected by the specific terms of this Agreement, remain in full force and effect. All references to the Loan Documents in this Agreement or in any other document or instrument between any of the Loan Parties and RAF will be construed to be references to the Loan Documents to the extent modified or waived by the specific terms of this Agreement.

12. <u>No Waiver.</u> The Loan Parties agree that nothing in this Agreement is intended, nor should it be construed, as (A) an extension of the Maturity Dates for the Loans, a commitment by RAF to make any new loan, or to grant or extend any financial accommodations to Loan Parties (other than those forbearance accommodations expressly stated in this Agreement), (B) a commitment by RAF to restructure the Loans or any of the other Loan Documents, or to grant any financial accommodations with respect to the same (other than those forbearance accommodations expressly stated in this Agreement), (C) a commitment by RAF to accept any future proposal submitted by the Loan Parties, whether in the form submitted or in

any negotiated or modified form, or (D) a waiver or a modification of or a forbearance from exercising any of RAF's rights, powers, remedies, and privileges in law and/or in equity under and with respect to the Loans or the Loan Documents, or otherwise (other than those forbearance accommodations expressly stated in this Agreement). This Agreement does not constitute a waiver of rights with respect to the existing Events of Default, but only constitutes a forbearance with respect to the existing Events of Default, and RAF shall be entitled to exercise all of its rights and remedies upon the occurrence of an Event of Termination under this Agreement. It is expressly understood and agreed in this Agreement that any actions required herein and the absence of any other action at this time or at any time or times hereafter, or not to otherwise require strict performance of any provision of this Agreement or any other of the Loan Documents, shall not waive, affect or diminish the rights of RAF to thereafter and that hereafter demand strict compliance and performance therewith, and shall not suspend, waive or affect any right, power or remedy granted to RAF under this Agreement or any other of the Loan Documents. RAF fully reserves all rights and remedies available to it regarding the Loans, the Loan Parties, all Rabo Collateral and any other property or assets that have been pledged to secure the Loans, and all related matters, including but not limited to the right to pursue any and all legal or equitable claims against the Loan Parties, the right to seek a receiver over some or all of the Rabo Collateral or any other property and assets that have been pledged to secure the Loans, and the right to otherwise enforce its liens and security interests in the Rabo Collateral and any other property and assets have been pledged to secure the Loans, and the failure of RAF to exercise any such rights and remedies, either now or in the future, shall not be deemed a waiver by RAF of any rights or remedies that are or may become available to it, all of which are fully preserved.

13. **Integration.** This Agreement supersedes any prior understandings or agreements between the Parties, whether written or verbal, respecting the subject matter of this Agreement and contains the entire understanding of the Parties with respect thereto.

14. **Governing Law, Jurisdiction and Venue.** This Agreement shall be subject to the governing law provisions found in the Loan Documents, which provisions are incorporated herein by reference.

15. **Effectuation of Agreement.** The Parties agree to perform any other or further acts, and execute and deliver any other or further documents, as may be necessary or appropriate to implement this Agreement.

16. **Construction of Agreement.** This Agreement shall be construed as a whole in accordance with its fair meaning and in accordance with governing law. This Agreement has been negotiated by each of the Parties (or their respective counsel) and the language of the Agreement shall not be construed for or against any particular Party.

17. **Counterparts.** This Agreement may be executed in any number of identical counterparts, each of which, once executed and delivered in accordance with the terms of this Agreement, will be deemed an original, with all such counterparts taken together constituting one and the same instrument. Delivery by facsimile, encrypted e-mail or e-mail file attachment of any such executed counterpart to this Agreement will be deemed the equivalent of the delivery

of the original executed agreement or instrument.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Forbearance Agreement as of the Closing Date first above written.

<u>**LOAN PARTIES:**</u>

**McCLAIN FEED YARD, INC.,** a Texas corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

**McCLAIN FARMS, INC.,** a Kentucky corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

**7M CATTLE FEEDERS, INC.,** a Kentucky corporation

By: _____
Name: Brian Keith McClain
Title: President & Owner

_____
**BRIAN KEITH McCLAIN,** an individual

<u>**RAF/LENDER/RABO:**</u>

**RABO AGRIFINANCE LLC,** a Delaware limited liability company

By: _____
Its: _____

16

## SPOUSAL CONSENT, WAIVER AND RELEASE OF CLAIMS

By her signature below, Chelsea Marie McClain hereby acknowledges and agrees as follows:

1.  That she is the current spouse of Brian Keith McClain;

2.  That she holds no ownership or other legal or equitable interest in, and is not an officer or director of, any of the Loan Parties;

3.  That she has no ownership interest in, or other legal or equitable rights or claims to, the property constituting the Rabo Collateral;

4.  That, to the extent required by contract or law, she consents to the liens granted to RAF under the Loan Documents to secure the Loan Parties' Obligations to RAF under the Loans, and agrees not to challenge the nature, extent, validity or priority of such liens in any legal proceeding;

5.  That, to the extent she has rights against, liens on or interests in any of Loan Parties or the Rabo Collateral, she hereby subordinates all such rights against, liens on or interests she may have in such assets and property to RAF's rights, claims, and liens against the Loan Parties and the Rabo Collateral; and

6.  THAT SHE HEREBY WAIVES, RELEASES AND FULLY DISCHARGES RAF, AND RAF'S PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS, ATTORNEYS, EMPLOYEES AND REPRESENTATIVES (COLLECTIVELY, THE **"RELEASED PARTIES"**) FROM ANY AND ALL MANNER OF CLAIMS, ACTIONS, CAUSES OF ACTION IN LAW OR IN EQUITY, SUITS, DEBTS, LIENS, CONTRACTS, LIABILITIES, CLAIMS, DEMANDS, DAMAGES, LOSSES, FEES, COSTS, EXPENSES, SET OFFS, OR CLAIMS FOR RECOUPMENT, OF ANY NATURE WHATSOEVER, KNOWN OR UNKNOWN, FIXED OR CONTINGENT THAT SHE HAS OR MAY HAVE OR CLAIM TO HAVE AGAINST THE RELEASED PARTIES, FROM THE BEGINNING OF TIME TO THE DATE OF EXECUTION OF THIS AGREEMENT, BASED UPON ANY CONDUCT, CLAIMS, ACTIONS OR OMISSIONS OF THE RELEASED PARTIES RELATING OR PERTAINING IN ANY WAY TO THE LOANS, THE LOAN DOCUMENTS, THE RAF INDEBTEDNESS, THE NOTICE, RAF'S EXERCISE OF RIGHTS UNDER DEPOSIT ACCOUNT CONTROL AGREEMENTS, THE NEGOTIATIONS RELATING TO THIS AGREEMENT, OR ANY OTHER ACT OR OMISSION THAT HAS OCCURRED PRIOR TO THE EXECUTION OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS OR CAUSES OF ACTION FOR USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR CONTRACT OR AT EQUITY, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION.

By: _Chelsea Marie McClain_

Name: Chelsea Marie McClain

Dated: April __11th__ 2023

EXHIBIT "C"

<table>
<tr><td colspan="2" align="center">UNITED STATES DISTRICT COURT<br>WESTERN DISTRICT OF KENTUCKY<br>PADUCAH DIVISION</td></tr>
</table>

| | |
|---|---|
| RABO AGRIFINANCE LLC | PLAINTIFF |
| v. | CASE #:     5:23CV-55-BJB |
| MCCLAIN FARMS, INC.,<br>7M CATTLE FEEDERS, INC.,<br>MCCLAIN FEED YARD, INC.,<br>CHELSEA WALTERS MCCLAIN,<br>AS PRESUMED HEIR AND<br>PERSONAL REPRESENTATIVE<br>OF THE ESTATE OF BRIAN<br>MCCLAIN,<br>WILDFOREST CATTLE<br>COMPANY, LLC<br>MAP ENTERPRISES, INC. | DEFENDANTS |

<strong>VERIFIED COMPLAINT</strong>

Plaintiff, Rabo AgriFinance LLC, a Delaware limited liability company ("Rabo" or "Lender"), by and through undersigned counsel, and for its Verified Complaint against Defendants, McClain Farms, Inc., 7M Cattle Feeders, Inc., McClain Feed Yard, Inc., Chelsea Walters McClain, Defendant in her capacity as presumed heir and personal representative of the estate of Brian McClain (the "McClain Defendants"), Wildforest Cattle Company, LLC, and MAP Enterprises, Inc. (collectively, along with the McClain Defendants, the "Defendants") states as follows:

## I.     PARTIES, JURISDICTION & VENUE

1.  Plaintiff, Rabo, is a Delaware limited liability company with its principal place of business located at 14767 North Outer 40 Road, Suite 400, Chesterfield, St. Louis County, Missouri 63017.

2.  Defendant, McClain Farms, Inc. is a Kentucky corporation with its principal place of

1

business located at 824 Mullins Lane, Benton, Marshall County, Kentucky 42025. It can be served

through its sole officer and director Glenn Karlberg at 3300 Triumph Blvd., Suite 100, Lehi, Utah

84043.

3.  Defendant, 7M Cattle Feeders, Inc. is a Kentucky corporation with its principal place of

business located at 824 Mullins Lane, Benton, Marshall County, Kentucky 42025. It can be served

through its sole officer and director Glenn Karlberg at 3300 Triumph Blvd., Suite 100, Lehi, Utah

84043.

4.  Defendant, McClain Feed Yard, Inc. is a Texas corporation with its principal place of

business located at 824 Mullins Lane, Benton, Marshall County, Kentucky 42025.  It can be served

through its sole officer and director Glenn Karlberg at 3300 Triumph Blvd., Suite 100, Lehi, Utah

84043.

5.  Defendant, Chelsea Walters McClain, in her capacity as presumed heir and personal

representative of the estate of Brian McClain, is the widow of Brian McClain, a deceased

individual resident of Kentucky.  Mrs. McClain can be served with process at 824 Mullins Lane,

Benton, Marshall County, Kentucky 42025.

6.  Defendant, Wildforest Cattle Company, LLC is a Kentucky limited liability company with

its principal place of business located at 1206 Paris Road, Mayfield, Graves County, Kentucky

42066. It can be served through its registered agent Samuel S. Brown at 3430 State Route 45 South,

Mayfield, Kentucky 42066.

7.  Defendant, MAP Enterprises, Inc., is a Kentucky corporation with its principal place of

business located at P.O. Box 1045, Mayfield, Graves County, Kentucky 42066. It can be served

through its registered agent Michael Gourley at 100 WK&T Technology Drive, Building 200,

Mayfield, Kentucky 42066.

8. This Court has subject matter jurisdiction over the claims asserted by Plaintiff against Defendants in this matter pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds the sum or value of Seventy-five Thousand Dollars ($75,000.00), exclusive of interest and costs, and the parties are citizens of different states. This Court has jurisdiction over the injunctive relief sought in accordance with Fed. R. Civ. P. 64.

9. Defendants are subject to the personal jurisdiction of this Court, because, *inter alia*, Defendants transact business in the State of Kentucky.

10. Venue is proper in this Court pursuant to 28 U.S.C § 1391 because all Defendants reside or maintain place of business in this district and the collateral and personal property that is the subject matter of this Verified Complaint are located in this district.

## II.    FACTS

**The Loans**

**(A) The Loan Documents, Personal Property Collateral, and Real Property Collateral**

1. Rabo and McClain Defendants are parties to those certain loan and security documents evidencing loans made by Rabo to the McClain Defendants. Rabo agreed to make credit facilities available to the McClain Defendants in connection with its livestock, cattle feeder, and cattle production businesses in return for payment by the McClain Defendants under certain terms and conditions.

2. The credit facilities are evidenced by, including but not limited to, that certain (a) *Master Credit Agreement* dated May 11, 2018, by and between McClain Feed Yard, Inc. ("**MFY**") and Rabo, (b) that certain *Joinder*, dated July 15, 2019, by and between 7M Cattle Feeders, Inc. ("**7M**"), MFY, and Rabo, (c) that certain *Joinder*, dated August 27, 2021, by and between Brian Keith McClain ("**B. McClain**"), MFY, 7M and Rabo, (d) that certain *Addendum to Master Credit Agreement*, dated July 24, 2019, by and between MFY, 7M and Rabo, (e) that certain *Addendum*

*to Master Credit Agreement*, dated January 13, 2023, by and between McClain Farms, Inc. ("**MFI**"), MFY, 7M, B. McClain and Rabo, True and correct copies of the Master Credit Agreement, Joinders, and Addendum to Master Credit Agreement(s) (collectively, the "**MCA**") are attached hereto as Exhibit A.

3.    Along with the execution of the MCA, the McClain Defendants executed and delivered to Rabo (a) that certain *Real Estate Term Loan 1 Note*, dated May 11, 2018, in the principal amount of $332,500.00, executed by MFY in favor of Rabo, (b) that certain *Real Estate Term Loan 2 Note*, dated July 24, 2019, in the principal amount of $625,000.00, executed by 7M in favor of Rabo, (c) that certain *Real Estate Term Loan 3 Note*, dated August 27, 2021, in the principal amount of $1,019,800.00, executed by B. McClain in favor of Rabo, (d) that certain *Operating Line of Credit 3 Note*, dated January 13, 2023, in the principal amount of $54,000,000.00, executed by MFY, MFI and 7M in favor of Rabo. Each Note was accompanied by those certain *Facility Sheets*, of various dates, by and between MFI, MFY, 7M, B. McClain and/or Crystal D. McClain ("**C. McClain**") in favor of Rabo. True and correct copies of the Real Estate Term Loan Note 1, Real Estate Term Loan Note 2, Real Estate Term Loan Note 3, Operating Line of Credit 3 Note, and accompanying Facility Sheets (collectively, the "**Notes**") are attached hereto as Exhibit B.

4.    To secure repayment of the indebtedness and obligations evidenced under and by the MCA and Notes, MFY, MFI and 7M, each as a Grantor, in favor of Rabo, executed that certain (a) *Master Security Agreement*, dated August 27, 2021, and (b) that certain *Master Security Agreement*, dated July 24, 2019, executed by MFY and 7M, as Grantor, in favor of Rabo. True and correct copies of the Master Security Agreement(s) (collectively, the "**MSA**") are attached hereto as Exhibit C.

5.    Under and pursuant to the MSA, MFY, MFI and 7M, each as a Grantor, pledged essentially

all of their personal property assets now owned or hereafter acquired, defined as the "***Collateral***"

(Exhibit C, MSA, ¶ 1, *The Collateral*), including but not limited to: all accounts, contract rights,

documents, documents of title, payment intangibles, investment property, chattel paper,

instruments, deposit accounts, inventory, equipment, fixtures, farm products (including crops

grown, growing or to be grown and livestock, born or unborn, supplies used in farming operations,

and products of crops and livestock), general intangibles, including all Intellectual Property, all

proceeds of crop insurance, price support payments, government program payments, rights and

interests under Hedging Agreements, and all accessions, attachments, additions to, substitutes or

replacements for any Collateral, and all proceeds, products, rents and profits of any Collateral, all

rights under warranties and insurance contracts covering the Collateral, and any causes of action

relating to the Collateral, and all Books and Records pertaining to any Collateral, including but not

limited to any computer-readable memory and any computer hardware or software necessary to

process such memory (the "**Personal Property Collateral**") in both Texas and Kentucky to secure

the Loan Obligations, as defined below, due and owing to Rabo under the Loan Documents.

6.   Rabo perfected its first priority security interest in the Personal Property Collateral by filing

UCC-1 Financing Statements ("**UCC-1's**") in Office of the Secretary of State of Kentucky and

Office of the Secretary of State of Texas.  True and correct copies of the UCC-1's of record with

the Kentucky Secretary of State's Office and Texas Secretary of State's Office are attached hereto

and incorporated herein as Exhibit D.

7.   In connection with the MCA, MSA, and to further secure the repayment of the indebtedness

and obligations due and owing to Rabo, Rabo was conveyed a lien on multiple parcels of real

property, fixtures, and improvements (the "**Real Property Collateral**") pursuant to that certain

*Mortgage, Assignments of Rents, and Security Agreement* (Marshall County, Kentucky) (the

"**Mortgage**") dated August 27, 2021, executed by B. McClain as Grantor, in favor of Rabo, as Mortgagee, recorded in the Marshall County, Kentucky Court Clerk's Office in Deed Book 987, Page 641. A true and correct copy of the Mortgage is attached hereto and incorporated herein as Exhibit E.

8.  To further secure the repayment of the indebtedness and obligations due and owing to Rabo under the MCA and Notes and to induce Rabo into making the Loans to the McClain Defendants, B. McClain, C. McClain, MFI, MFY and 7M executed and delivered those certain *Master Loan Guaranty Agreements*, of various dates, in favor of Rabo. True and correct copies of the Master Loan Guaranty Agreements (collectively, the "**MLG**" or "**Master Loan Guaranties**") are attached hereto as Exhibit F.

9.  The MCA, Facility Sheets, Notes, MSA, UCC-1's, Mortgage, MLG, and along with all other documents evidencing or securing payment of the indebtedness or obligations due and owing to Rabo by MFY, MFI, 7M, B. McClain, C. McClain, or any of the McClain Defendants, as each may be amended, modified, and/or assigned, are collectively referred to as the "**Loan Documents**" and all of the loans evidenced by the Loan Documents hereinafter referred to as the "**Loans**").

10. Rabo has been and is at the time of the filing of this Verified Complaint the owner and holder of the Loan Documents.

**(B) McClain Defendants' Continued Default Under the Loan Documents & Loan Obligations**

11. Events of Default are defined in the Schedule of Definitions and Covenants (the "**Schedules**"), attached as Exhibit A to the MCA, which are part of the Loan Documents. McClain Defendants are in default under the terms of the Loan Documents, as a result of, among other things: (i) monetary events of default by failing to make payments to Rabo as required under the

Loan Documents, including, but not limited to, the failure to make required payments in order for the aggregate, unpaid principal balance of the Operating Line of Credit 3 Note not exceed $48,000,000.00 on or before April 1, 2023 (Section 1.121(a), "*Non-Payment*"); (ii) providing financial information that is materially incorrect or misleading, making false representations to Rabo (Section 1.121(b), "*False Representation*"); (iii) the failure to comply with various Borrower Covenants contained in the Loan Documents (Section 1.121(c), "*Covenant Violation*"); (iv) the failure to maintain the Personal Property Collateral (or cause the Personal Property Collateral to be maintained) in good condition and repair (Section 1.121(c), "*Collateral Maintenance*"); (v) the failure to comply with the terms and conditions of the Borrowing Base (Section 1.121(a), "*Non-Payment*" & Section 1.121(c), "*Covenant Violation*"); (vi) death of (i) any Borrower or Guarantor who is an individual (Section 1.121(e), "*Death*"); (vii) diligently collect all Collateral, including proceeds thereof, or dispose of any Collateral or proceeds thereof in violation of the terms of the MSA (MSA, ¶ 5, *Grantor Covenants*) (Collectively, the "**Events of Default**").

12. On April 6, 2023, Rabo sent a Notice of Default and Acceleration, and Demand for Payment letter (the "**Default Notice**") to the McClain Defendants, notifying them that, because Defendants were in default under the Loan Documents, Rabo had accelerated and declared the entire amount of the Loan Obligations, as defined under the Loan Documents, immediately due and payable in full. A true and correct copy of the Default Notice is attached hereto as Exhibit G.

13. On or about April 11, 2023, Rabo and McClain Defendants entered into that certain *Amended and Restated Forbearance Agreement* as amended by the *First Amendment to Amended and Restated Forbearance Agreement* dated April 12, 2023, (collectively, the "**Forbearance Agreement**") wherein the McClain Defendants acknowledged the Events of Default, and Rabo agreed to forbear from exercising its rights and remedies under the Loan Documents until and

unless the occurrence of a Forbearance Default. Also, Chelsea Marie McClain confirmed no ownership interest in any of the McClain Defendant entities, asserted no claims in any of the Rabo Collateral, and subordinated any and all rights in and to the Rabo Collateral. A true and correct copy of the Forbearance Agreement is attached hereto as Exhibit H.

14. On April 18, 2023, B. McClain passed away unexpectedly at age 52. On or about April 20, 2023, Rabo discovered that the McClain Defendants has sold, transferred, and disposed no less than 20,000 head of livestock to MAP Enterprises, Inc. ("**MAP**") and Wildforest Cattle Company, LLC ("**WF**") without remitting the proceeds of Rabo's Collateral to Rabo. Both of these events constitute an Event of Default under the Loan Documents and a Forbearance Default under the Forbearance Agreement.

15. As of April 5, 2023, the outstanding indebtedness due and owing to Rabo pursuant to the terms of the Loan Documents, exclusive of attorneys' fees/professional fees and costs, default interest, and other charges as allowed under the Loan Documents (the "**Loan Obligations**") totals no less than the following amounts:

| Obligation No. 22122952/22122953 (Operating Line of Credit 3) | |
|---|---|
| Principal | $50,628,072.06 |
| Interest | $717,599.12 |
| **Total** | **$51,345,671.18** |

| Obligation No. 22114181 (Real Estate Term Loan 1) | |
|---|---|
| Principal | $187,759.63 |
| Interest | $107.77 |
| **Total** | **$184,867.40** |

| Obligation No. 22117432 (Real Estate Term Loan 2) | |
|---|---|
| Principal | $179,379.62 |
| Interest | $96.67 |
| **Total** | **$179,476.29** |

| Obligation No. 22122951/0000030687 (Real Estate Term Loan 3) | |
|---|---|
| Principal | $898,314.80 |
| Interest | $405.24 |

| Total | $898,720.04 |
|---|---|

16. Additionally, Rabo is owed further contractual and default interest thereafter at the rates set forth in the Loan Documents, both before and after judgment, until paid, together with costs and attorneys' fees incurred by Rabo in enforcement or collection of the Loan Obligations secured by Rabo's Personal Property Collateral and Real Property Collateral.

17. The initial Events of Default remain outstanding. McClain Defendants have failed to cure the Events of Default, as required by the Loan Documents, and the Loan Obligations remain unpaid despite being due and owing in full. Additional Events of Default have also occurred which also constitute a Forbearance Default.

18. Rabo holds all of the right, title, and interest in and to the Loan Documents. Rabo has performed all conditions precedent required of it pursuant to the Loan Documents.

19. Rabo holds a valid, properly perfected, and first priority security interest in and lien secured by the Personal Property Collateral, including, but not limited to, all of the "Livestock" in the possession of the McClain Defendants and all proceeds from the unauthorized sell, transfer and disposition of the Personal Property Collateral and Livestock.

20. It appears that Rabo's Personal Property Collateral, including and specifically the Livestock and proceeds thereof, has been and remains in imminent danger of being removed, sold, encumbered, disposed, or otherwise impaired, in violation of Rabo's rights under the Loan Documents.

21. Rabo has the right to immediate possession of all of its Personal Property Collateral and any proceeds thereof upon the occurrence of an Event of Default.

22. Specifically, the MSA provides, in relevant part, that: Upon the occurrence of an Event of Default, Collateral Agent [Rabo] may: (g) enter upon the property where any Collateral, including

Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including buildings and facilities) and any of Grantor's equipment … in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease or otherwise dispose of, any Collateral. *See* <u>Exhibit C</u>, Master Security Agreement, *Remedies*, at ¶8(g).

23. The MSA also provides, in relevant part, that: Upon the occurrence of an Event of Default, Collateral Agent [Rabo] may: (k) have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral which the McClain Defendants expressly consent to such an appointment and agree not to oppose any such appointment. *See* <u>Exhibit C</u>, Master Security Agreement, *Remedies*, at ¶8(k).

24. The McClain Defendants have sold, disposed, and transferred Personal Property Collateral including Livestock to MAP and WF and failed to remit the proceeds thereof to Rabo.

25. Rabo is informed and believes that the value of the Livestock and proceeds thereof that were sold, transferred and conveyed to MAP and WF totals no less than $20,000,000.

26. At the time the McClain Defendants sold the Livestock to MAP and WF, Rabo's security interest in the Livestock and proceeds thereof were of public record; therefore, the McClain Defendants, MAP, and WF knew or should have known of Rabo's security interest.

27. Rabo's security interest in the Livestock and proceeds of the Livestock under the MSA were at all times hereto perfected security interests of public record.

28. The proceeds from the sale of Livestock constituting Rabo's Personal Property Collateral are easily removed by MAP and WF. Both MAP and WF appear to be entities with no actual physical business locations or ongoing business operations rendering them unlikely to be forthcoming to answer the final judgment of the Court respecting the same.

29. It is likely that Rabo will obtain a final judgment against the McClain Defendants, MAP, and WF entitling Rabo to a judgment for the wrongful conversion of Rabo's Personal Property Collateral against MAP and WF as third party transferees and the McClain Defendants as Rabo's secured party debtor; however, if the McClain Defendants, MAP, and WF are not restrained from disposing of the proceeds of the collateral, Rabo's secured position will be completely eroded such that Rabo will be irreparably harmed.

30. Rabo, therefore, believes that there is an immediate danger that the proceeds from the sale of Livestock may become unavailable to levy by reason of the proceeds being further transferred, concealed, converted, wasted or otherwise transferred from the jurisdiction of this Court.

31. The McClain Defendants, MAP, and WF should be immediately restrained from dissipating, absconding with, selling or transferring any Personal Property Collateral, Livestock, or proceeds thereof in any manner pending entry of a final order entered by this Court.

## COUNT I
## BREACH OF CONTRACT

32. Rabo hereby realleges and incorporates its allegations contained in paragraphs 1 through 31 of the Verified Complaint as if fully set forth herein.

33. The Loan Documents are valid and enforceable contracts between Rabo and McClain Defendants.

34. McClain Defendants materially breached their obligations under the Loan Documents as evidenced by the Events of Default.

35. McClain Defendants' failure to timely pay the Loan Obligations due and owing to Rabo under the Loan Documents constitutes an Event of Default.

36. The Loan Obligations are currently due and owing to Rabo and have not been paid by McClain Defendants.

37. As a direct and proximate result of the Events of Default and Defendants failure to cure the Events of Default, Rabo has suffered damages in an amount no less than the Loan Obligations, plus professional fees, costs, and expenses, which are recoverable pursuant to the Loan Documents.

38. Pursuant to the terms of the Loan Documents McClain Defendants are indebted to Rabo for the entire amount of the Loan Obligations plus reasonable attorney's fees, costs, and expenses.

39. Accordingly, Rabo demands judgment against McClain Defendants, both jointly and severally, for breach of contract under the Loan Documents in an amount not less than the entire amount of the Loan Obligations together with all accruing interest and costs, including without limitation, default interest, attorneys' fees, and all expenses incurred by Plaintiff in collecting the Loan Obligations.

**COUNT II**
**BREACH OF SECURITY AGREEMENT & MORTGAGE – APPOINTMENT OF RECEIVER**

40. Rabo hereby realleges and incorporates its allegations contained in paragraphs 1 through 39 of the Verified Complaint as if fully set forth herein.

41. The McClain Defendants executed the MSA conveying Rabo a security interest in all Personal Property Collateral as more fully described in the MSA.

42. Upon information and belief, the Personal Property Collateral in the possession, custody, or control of the McClain Defendants, MAP Enterprises, Inc. Wildforest Cattle Company, LLC, and other known and unknown third parties.

43. The MSA also provides, in relevant part, that: Upon the occurrence of an Event of Default, Collateral Agent [Rabo] may: (k) have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral which the Grantor [McClain Defendants] expressly consent to

such an appointment and agree not to oppose any such appointment. *See* <u>Exhibit C</u>, Master Security Agreement, *Remedies*, at ¶8(k).

44. Pursuant to the Mortgage, after an Event of Default, Rabo may (c) make an *ex parte* application to any court of competent jurisdiction and obtain appointment of, a receiver … without notice; and (d) in person, by agent, or by court-appointed receiver, enter, take possession of, manage and operate all or any part of the Property. *See* <u>Exhibit E</u>, Mortgage, Remedies, at ¶ 21 (c) & (d).

45. Pursuant to KRS § 425.600, Fed. R. Civ. P. 66 and/or the terms of the MSA and Mortgage, Rabo hereby seeks the appointment of a receiver for the Personal Property Collateral and Real Property Collateral.

<u>**COUNT III**</u>
**CONVERSION**

46. Rabo hereby realleges and incorporates its allegations contained in paragraphs 1 through 45 of the Verified Complaint as if fully set forth herein.

47. The McClain Defendants executed the MSA conveying Rabo a security interest in all Personal Property Collateral, including the Livestock and proceeds thereof.

48. Rabo's security interest in all of the McClain Defendants' Personal Property Collateral, including the Livestock and proceeds thereof, were at all times relevant hereto a perfected security interest of public record. The McClain Defendants, MAP, and WF knew or should have known of Rabo's security interest.

49. In violation of the MSA and Loan Documents, the McClain Defendants sold, transferred, and disposed of Rabo's Personal Property Collateral and Livestock to MAP and WF without remitting the proceeds from the sale, disposition and transfer of said collateral to Rabo.

50. Rabo's security interest in the Personal Property Collateral, Livestock, and proceeds

thereof is superior to any interest acquired by MAP or WF, and said security interest continues

notwithstanding the sale, transfer or disposition of the Personal Property Collateral and Livestock

as Rabo did not authorize the disposition of its collateral free and of Rabo's security interest.

51. The McClain Defendants, MAP and WF's wrongful conversion of the Personal Property

Collateral, Livestock, and proceeds thereof deprived Rabo of the collateral that secures the Loan

Obligations as set forth in the Loan Documents.

52. As set forth herein, Rabo is the owner and holder of a first priority security interest in the

Personal Property Collateral, Livestock, and proceeds thereof.

53. Accordingly, Rabo demands judgment against McClain Defendants, MAP, and WF, both

jointly and severally, in an amount equal to the greater of: the fair market value of the Livestock

when the unauthorized transactions at issue took place, the $[X] sale price of the Livestock

between McClain Defendants and MAP and between McClain Defendants and WF, the sale price

and/or any compensation received by McClain  Defendants from MAP, WF, or others for the

selling, processing, or otherwise disposing of the Livestock, and the sale price and/or any other

value received by MAP or WF (or any subsequent transferee of both MAP and WF) upon said

party's use, selling, processing, transfer, and/or otherwise disposing of the Livestock.

## COUNT IV
## REPLEVIN

54. Rabo hereby realleges and incorporates its allegations contained in paragraphs 1 through

53 of the Verified Complaint as if fully set forth herein.

55. At all times MAP and WF purchased the Livestock from the McClain Defendants, Rabo

held and still holds valid, properly perfected, and first priority liens on and security interests in the

Livestock and proceeds thereof pursuant to the MSA, UCC-1's of public record, so MAP and WF

knew or should have known of Rabo's security interest in the Livestock.

14

56. Rabo's perfected security interest was first, prior, and superior to any interest that MAP or WF acquired by purchasing the Livestock from the McClain Defendants.

57. Pursuant to KRS 355.9-315, Rabo's security interest in the Livestock continues in the Livestock, and in any identifiable proceeds in the said collateral from the use, sale, processing, transfer and/or other disposition by MAP or WF.

58. As set forth herein, Rabo is the owner and holder of a first, priority perfected security interest in the Livestock continues in the Livestock, and in any identifiable proceeds of the Livestock.

59. Accordingly, Rabo requests that it be awarded immediate possession of the Livestock or any proceeds of the Livestock that are in the possession of MAP and WF as well as recover from MAP and WF jointly and severally the diminished value of the Livestock measured by the difference in value between the fair market value of the Livestock at the time when the unauthorized transactions at issue took place and the value of the Livestock or any proceeds from the Livestock ultimately delivered to Rabo.

## COUNT V
### TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

60. Rabo hereby realleges and incorporates its allegations contained in paragraphs 1 through 59 of the Verified Complaint as if fully set forth herein.

61. Events of Default have occurred under the Loan Documents which remain outstanding and uncured.

62. The MSA provides in relevant part that upon an Event of Default, Rabo shall have full power to enter upon the property of McClain Defendants to take possession of and remove the Personal Property Collateral, including Livestock and proceeds thereof.  The Mortgage provides

that after an Event of Default, Rabo may in person, by agent, or by court-appointed receiver, enter, take possession of, manage and operate all or any part of the Property.

63. Injunctive relief is warranted here and is necessary to ensure that the Personal Property Collateral is secured and is not subject to further dissipation, transfer, and waste.

64. The Personal Property Collateral, including Livestock and proceeds thereof are easily removed, relocated and subject to concealment, waste, conversion, conveyance, or removal by McClain Defendants to MAP, WF, other third parties or undisclosed locations.

65. Rabo has established substantive claims which have a strong likelihood of success on the merits as the Events of Default are not in dispute, the McClain Defendants have breached the terms of the Loan Documents, and Personal Property Collateral has not been accounted for, remains missing, or in the hands of various third parties.

66. Rabo has clearly ascertainable rights in the Personal Property Collateral in need of protection from further dissipation. Without preliminary relief, Rabo will be without adequate remedy at law to protect its current and future property rights from additional harm by the McClain Defendants and third parties.

67. Rabo will suffer immediate and irreparable harm if McClain Defendants, MAP, or WF sell, convey, convert, conceal, waste, or otherwise transfer Personal Property Collateral, Livestock and proceeds thereof from the jurisdiction of this Court. Injunctive relief is in the public interest, as public policy favors the enforcement of property rights and the protection of legitimate interests of secured creditors, like Rabo.

68. McClain Defendants, MAP, and WF should be restrained from dissipating, absconding with, selling or transferring the Personal Property Collateral, Livestock or proceeds thereof in any manner pending issuance of an order by this Court.

69. Accordingly, Rabo requests that, pending the issuance of further injunctive relief, that this Court issue a Temporary Restraining Order prohibiting McClain Defendants, MAP, WF or anyone acting on behalf of, in concert with or under the control of the McClain Defendants, MAP, or WF from transferring any interest in the Personal Property Collateral, Livestock or proceeds thereof, by sale, transfer, pledge, or otherwise disposing of the Livestock and proceeds thereof, concealing or otherwise removing the Personal Property Collateral, Livestock and proceeds thereof to make it less available for seizure by the levying officer or recovery by a receiver or by Rabo.

70. Upon notice and opportunity for hearing, Rabo requests that is Court issue a permanent injunction in order to preserve the Personal Property Collateral, Real Property Collateral, claims and interests of parties in interest in the action.

## COUNT VI
## VOIDABLE CONVEYANCE

71. Rabo hereby realleges and incorporates its allegations contained in paragraphs 1 through 70 of the Verified Complaint, as if fully set forth herein.

72. Rabo is a present creditor of the McClain Defendants and has been since May 11, 2018.

73. Instead of complying with the Grantor Covenants which required the McClain Defendants to sell Livestock in the ordinary course of business and remit the proceeds from the sale of said Livestock to Rabo in order to remain compliance with the Operating Line of Credit 3 Borrowing Base, McClain Defendants sold, transferred, and disposed of Livestock and proceeds thereof for other purposes, including without limitation, to pay other creditors or "investors" whose interest in the Livestock were inferior to Rabo's first priority security interest or non-existent.

74. As a result of the forgoing, the McClain Defendants have sold and transferred Livestock, and the proceeds of the same that were subject to Rabo's priority, perfected security interest, with actual intent to hinder, delay, and defraud Rabo.

75. The McClain Defendants were insolvent at the time the Livestock were sold and transferred.

76. Rabo is entitled to an avoidance of the transfers and any and all other rights afforded by Kentucky's Uniform Voidable Transactions Act as set forth in KRS Chapter 378A.

77. Rabo expressly reserves the right to join any and all other unknown transferees as they may be identified in the course of this proceeding.

## COUNT VII
## BREACH OF MASTER LOAN GUARANTIES

78. Rabo hereby realleges and incorporates its allegations contained in paragraphs 1 through 77 of the Verified Complaint, as if fully set forth herein.

79. B. McClain, MFI, MFY and 7M, as Guarantors, executed the MLG's wherein each as a Guarantor absolutely, unconditionally, and irrevocably guaranteed the full and prompt payment when due of the Guaranteed Obligations, as defined in the MLG's.

80. Rabo owns and is entitled to enforce the MLG's.

81. The Events of Default and subsequent failure to pay the Loan Obligations constitutes an Event of Default and breach of the MCA and Loan Documents by Defendants, and an Event of Default and breach of the MLG's by the Guarantors.

82. As a result of the Event of Default and breach of the MLG's, Rabo has been damaged in the amount of the Guaranteed Obligations, as defined in the MLG's.

83. Also as a result of the Events of Default and breach of the MLG's, it was necessary for Rabo to retain counsel to file this action, for which Rabo has incurred costs and attorneys' fees, as well as other expenses related to securing payment of the Loan Obligations. The Guarantors have agreed and are obligated to pay these fees and costs under the terms of the MLG's.

84. Accordingly, Rabo demands judgment against the Guarantors, both jointly and severally,

for breach of contract under the MLG's in the entire amount of the Guaranteed Obligations as defined in the MLG's.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff, Rabo AgriFinance LLC, respectfully requests that the Court:

1.   Enter a monetary judgment in favor of Rabo against the McClain Defendants, both jointly and severally, in the entire amount of the indebtedness due and owing, plus accruing interest, professional fees, costs, and expenses in an amount to be established, but in no event less than the amount of the Loan Obligations;

2.   That the Court, on Rabo's motion, appoint a receiver to take charge of the Real Property Collateral, Personal Property Collateral, Livestock, and proceeds thereof during the pendency of this action, to maintain and secure all of the collateral, prevent further dissipation of the Real Property Collateral, Personal Property Collateral, Livestock, and proceeds thereof, and generally do such acts respecting the Collateral and personal property, and proceeds thereof as this Court may authorize;

3.   Enter a Temporary Restraining Order and, and after notice and opportunity for hearing, permanent injunctive relief which said order be issued restraining the McClain Defendants, MAP, WF, and third parties from dissipating, absconding with, selling or transferring the Personal Property Collateral, Livestock, or proceeds thereof in any manner pending entry of further order by this Court;

4.   Enter a monetary judgment in favor of Rabo against McClain Defendants, MAP, and WF, both jointly and severally, damages in an amount to be determined at trial for wrongful conversion of Rabo's Personal Property Collateral, Livestock, and proceeds thereof;

5.   Grant and award Rabo immediate possession of the Personal Property Collateral,

Livestock, and Proceeds thereof that are in possession of the McClain Defendants, MAP, and WF, as well as recover from the McClain Defendants, MAP, and WF, jointly and severally, damages in the amount to be determined at trial;

6. Enter an order declaring and confirming that Rabo's security interest in the Personal Property, Livestock and proceeds thereof are a first priority security interest superior and entitled to priority over any other interest, and any voidable conveyance of the Personal Property, Livestock and proceeds thereof be declared void, *ab initio*, and judgment be entered against any transferee for the amounts received, along with interest at the applicable interest rate permitted by law;

7. Enter a monetary judgment in favor of Rabo against the Guarantors, both jointly and severally, in the entire amount of the Guaranteed Obligations; and

8. Grant Rabo any and all legal and equitable relief to which Rabo may be, and may become, or may appear to be entitled in this action.

Respectfully submitted,

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.

*/s/ Joy Boyd Longnecker*
Joy Boyd Longnecker, KY BPR No. 97151
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Tel: (615) 726-5600
jlongnecker@bakerdonelson.com
R. Spencer Clift, III, TN BPR #: 020445 (*Pro Hac Vice Pending*)
Suite 2000, 165 Madison Avenue
Memphis, Tennessee 38103
Email: sclift@bakerdonelson.com
Tel: (901) 526-2000
*Attorneys for Rabo AgriFinance LLC*

## VERIFICATION

I declare that the above statements are true to the best of my knowledge, information, and belief, under penalty of perjury.

**Rabo AgriFinance LLC,**
a Delaware limited liability company

By: _____
Name: _Jeff Hanson_____
Title: _VP-LFR_____

STATE OF Minnesota )
                   ) SS:
COUNTY OF Washington )

The foregoing instrument was acknowledged and signed before me this the 25 day of April_____, 2023, on behalf of **Rabo AgriFinance LLC,** a Delaware limited liability company, and after being first duly sworn to oath, deposes, and says that he/ she has read this document and that the foregoing is based on information within his/ her personal knowledge, and that he/ she has no reason to believe that the foregoing is not true and correct.

**IN WITNESS WHEREOF,** I have hereunto subscribed my name and affixed my hand and official seal this 25 day of April_____, 2023.

_____
Notary Public

My Commission Expires: 01 31 2026_____

TYLER D SCHOPF
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan 31 2026