UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney, SBN: 16935100
W. Heath Hendricks, SBN: 240556451
500 South Taylor, Suite 1200, LB 233
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
Email: tom.riney@uwlaw.com
Email: heath.hendricks@uwlaw.com

    -and-

Michael R. Johnson (*Pro Hac Vice*)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
Email:  mjohnson@rqn.com

*Attorneys for Rabo AgriFinance LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| IN RE:<br><br>McCLAIN FEED YARD, INC., McCLAIN FARMS, INC. and 7M CATTLE FEEDERS, INC.,<br><br>    Debtors.[1] | **CASE NO. 23-20084-7-rlj**<br><br>**(Jointly Administered Cases)**<br><br>**Chapter 7** |
|---|---|

---

[1] The Debtors in these jointly administered Chapter cases are: (a) McClain Feed Yard, Inc. (Case No. 23-20084), (b) McClain Farms, Inc. (Case No. 23-20885) and 7M Cattle Feeders, Inc. (Case No. 23-20886). All three cases are being jointly administered under the case number for McClain Feed Yard, Inc.

**RABO AGRIFINANCE LLC's RESPONSE TO THE TRUSTEE'S (A) MOTION FOR STATUS CONVERENCE ON TRUSTEE'S NOTICE OF USDA APPROVED TRUST CLAIMS, AND (B) NOTICE OF APPROVED TRUST CLAIMS**

Rabo AgriFinance LLC ("**Rabo**"), through counsel, hereby files this Response to the Chapter 7 Trustee's (a) *Motion for Status Conference on Trustee's Notice of USDA Approved Trust Claims* (the "**Motion**") [Dkt. 128], and (b) *Notice of USDA Approved Trust Claims* (the "**Notice**") [Dkt. 126], as follows:

1. Rabo concurs with and joins in the Trustee's request for a status conference. Rabo understands the Court has scheduled a status conference for October 11, 2023, at 1:30 p.m., to be held via WebEx. [Dkt. 129]

2. Rabo has concerns with some of the misstatements and allegations in the Trustee's Motion and Notice, and is providing this Response in advance of the status conference to make its position on certain items clear. Specifically:

   (a) <u>The Scope of a Dealer Trust Lien is Limited to Livestock and the Inventories, Receivables or Proceeds of Livestock</u>.

   On page 1 of the Notice the Trustee states that the "Act arguably creates a floating lien by the claimants on potentially all of the assets of the Debtors until such claims are paid in full." Further, on page 3 of the Notice, at paragraph 7, the Trustee states that "the USDA has asserted that any cattle proceeds, and possibly other assets in the Debtors' possession, are subject to a 'Dealer Trust' that arises under 7 U.S.C. § 217(b)."

   Rabo disagrees that the scope of the Act's dealer trust lien is as broad as claimed by the USDA (and perhaps by the Trustee). Under Section 217b(a)(1) of the Act, the trust is composed of "all livestock purchased by a dealer in cash sales and all inventories of, or receivables or

2

proceeds from such livestock," and the trust is for "the benefit of all unpaid cash sellers *of such livestock* until full payment has been received by such unpaid cash sellers."  See 7 U.S.C. §271b(a)1) (emphasis supplied).

Here, the tentatively approved dealer trust claims are set forth on page 23 of the Notice. Those claims total $2,687,968.77, there are four claimants whose claims have tentatively been allowed (Acey Livestock, Barrett's Livestock, Brooks Farms and Riley Livestock), and those four trust claimants purportedly delivered cattle to the Debtors between March 30, 2023 and April 17, 2023.

Simply put, pursuant to the plain language of the Act, the only "property" of the Debtors that could be impressed with a dealer trust are cattle that were acquired by the Debtors from and after March 30, 2023 (since March 30, 2023 was the earliest transaction noted in the USDA's claim analysis for approved claims), plus inventory and receivables or proceeds of such cattle. While the Trustee is correct that the dealer trust could include the $835,560.05 received from Lonestar Stockyards and the $1,638,772.29 received from Blue Grass Auctions as proceeds of cattle sales (because those were proceeds of cattle that could have been acquired by the Debtors on or after March 30, 2023), the dealer trust established by the Act clearly would not attach to (a) the $80,010.70 the Trustee received from Chase Bank on July 11, 2023 (those funds were wired *by Rabo* directly to the Debtors' CRO and placed by the CRO in the Chase Bank account), or (b) the $58,993.13 the Trustee received from Feed Logistics LLC to acquire feed that was on hand when the Debtors filed for bankruptcy protection (such feed was acquired prior to March 30, 2023).

Further, with respect to the $1,414,714.60 that Mechanics Bank sent to the Trustee on May 30, 2021 (which will be discussed further below), it appears that the great majority of

3

deposits into those accounts came from parties that were "investors" and who were not parties purchasing cattle from the Debtors (such as MAP Enterprises, Wildforest Cattle and 2B Farms). If funds that were deposited into the Mechanics Bank accounts came from investors and are not proceeds of third party cattle sales, those funds could not constitute dealer trust funds because the funds are not "receivables or proceeds" of cattle sales, which are the assets to which a dealer trust would attach (i.e, the corpus of any dealer trust is limited to cattle and the receivables or proceeds of cattle). *See, e.g., In re Fresh Approach, Inc.*, 51 B.R. 412, 422 (Bankr. N.D. Tex. 1985) (PACA case dealing with produce and explaining that the "floating characteristics" of the PACA lien meant that the lien attached to "all of Debtor's produce related inventory and proceeds thereof, regardless of whether SF&V or another produce supplier was the source of such inventory"); *Strube Celery & Vegetable Co. v. Zois (In re Zois),* 201 B.R. 501, 509 (Bankr.N.D.Ill.1996) (the PACA trust applies to the perishable goods, receivables, and sale proceeds thereof, but it does not extend to other assets); *Goldman Fruit & Produce Co. v. Lombardo Fruit & Produce Co. (In re Lombardo Fruit & Produce Co.),* 12 F.3d 110, 112 (8th Cir. 1993) ("The protection extends only to 'any receivables or proceeds from the sale of such commodities and food or products,' ... and proceeds from other sources are not within the trust's rubric.").

      Additionally, as a matter of law, the dealer trust could not attach to any assets or property of the Debtors that were acquired prior to March 30, 2023 (e.g., real estate, equipment, feed, equipment, etc.). Because the earliest delivery date for the allowed unpaid dealer trust claimants is March 30, 2023, any property acquired by the Debtors prior to March 30, 2023 factually could not have been acquired using funds impressed with a dealer trust (since trust funds would not come into existence until after cattle were delivered to the Debtors and then not paid for).

4

Finally, there would and could be no "dealer trust" imposed on Chapter 5 recoveries as a matter of law. To be sure, the existence of dealer trust issues in this case could impact the Trustee's ability to bring Chapter 5 avoidance claims against certain people who, had they not been paid, might have had a dealer trust claim (because in that instance the estate arguably would not have been depleted). But there are many persons and entities in these cases who received substantial monetary transfers from the Debtors' accounts and who are not unpaid cattle sellers who would have dealer trust rights. If the Trustee were to sue and obtain a recovery from those parties, then the funds paid either in settlement or pursuant to a judgment would not consist of "livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from such livestock" and therefore would not constitute property subject to any dealer trust claims. [2] *See, e.g., In re Churchfield*, 277 B.R. 769, 775 (Bankr. E.D. Cal. 2002) (PACA trust case where the court concluded that the preference recoveries were not subject to PACA trust claims, even if the recoveries were obtained from those who would have PACA trust rights had they not been paid; "[T]he court concludes that the Preference Recovery does not come within the scope of the PACA Trust, without regard to the Trustee's inability to trace the initial preference payments to non-trust assets. The Preference Recovery is not a perishable agricultural commodity, it is not an inventory of food or other product derived from an agricultural commodity, nor is it a receivable or proceed from the sale of such commodities or products. Assuming, *arguendo,* that the avoided preferential transfers were initially funded with 'proceeds from the sale of perishable agricultural commodities' it is implausible to assume that the funds paid to settle the adversary proceedings over two years later were traceable to the same

---

[2] It is also worth noting that, under the new dealer trust provisions of the Act, unpaid cattle sellers must provide written notice to the USDA within certain time periods after non-payment or they lose the benefit of a trust. In other words, in order to assert a dealer trust claim, the unpaid cattle seller must take an affirmative act, its rights are not fixed solely because of non-payment.

5

proceeds. By settling the adversary proceedings, the Trustee did not recover PACA Trust assets; he recovered a negotiated amount based upon the estimated 'value' of the avoidable transfers to the estate. (Section 550(a)). The PACA Trust did not extend to the general assets of the Preference Defendants, including the accounts from which the three Preference Recoveries were paid to the Trustee. As such, the Preference Recovery is not property of a PACA Trust pursuant to 7 U.S.C. § 499e(c)(2).").

      (b)    <u>The Act and its Dealer Trust Provisions Cannot be Applied Retroactively to Vitiate Rabo's Vested Rights</u>.

The Trustee notes on page 5 of the Notice that the Act and its dealer trust provisions "is barely over two years old." In fact, the Act was passed in December of 2020 as part of the various COVID relief bills, and became effective on January 13, 2021. *See* [https://www.federalregister.gov/documents/2023/06/23/2023-13418/preserving-trust-benefits-under-the-packers-and-stockyards-act](https://www.federalregister.gov/documents/2023/06/23/2023-13418/preserving-trust-benefits-under-the-packers-and-stockyards-act) ("Section 763 of the Consolidated Appropriations Act, 2021 (Pub. L. 116–260; December 27, 2020), amended the Packers and Stockyards Act, 1921, as previously amended (7 U.S.C. 181 *et seq.*), by adding a new sec. 318 (7 U.S.C. 217b) establishing a statutory trust for the benefit of unpaid cash sellers of livestock.").

As the Trustee correctly notes on page 5 of his Notice, however, "whether the Act even applies in this case given that at least some of the Rabo loan documents predate the Act is a legal issue certain to be raised." Specifically, Rabo made its first loans to the Debtors on or about May 11, 2018, and thereafter entered into amended loan documents. On July 24, 2019 (before the Act became effective), Debtors McClain Feed Yard, Inc. and 7M Cattle Feeders, Inc. executed a Master Security Agreement in favor of Rabo whereby, among other things, MFY and 7M granted Rabo a lien on essentially all of their personal property assets, including all

6

"accounts," "contract rights," "payment intangibles," "inventory," "farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in Grantor's farming operation, and products of crops and livestock in their unmanufactured state," all "substitutes or replacements for any Collateral," and all "proceeds, products, rents and profits of any Collateral." [*See* Case No. 23-20084, Proof of Claim 56, Part 7, Page 7 of 11] Thereafter, in August of 2021, Debtor McClain Farms, Inc. granted Rabo a lien on the same collateral. [*Id.*, Page 2 of 11] Rabo perfected its security interests in the Debtors' personal property assets by filing UCC-1 financing statements with the appropriate filing authorities (i.e., in Texas and Kentucky). [*See id.*, Part 8] Specifically, Rabo's UCC-1 against 7M was filed in Kentucky and its UCC-1 against MFY was filed in Texas in 2019. Its UCC-1 was filed in Kentucky against McClain Farms in 2021.

By virtue of the various loan and security documents that were executed between Rabo and the Debtors, Rabo acquired vested legal and contractual rights in the Debtors' assets prior to the Act becoming effective in January of 2021. To the extent possible, statutes should be interpreted by courts in a manner that avoids constitutional challenges. *See, e.g., Belotti v. Baird*, 428 U.S. 132, 148-49, 96 S. Ct. 2857, 49 L.Ed.2d 2857 (1976); *Clark v. Martinez*, 543 U.S. 371, 381, 125 S. Ct. 716, 160 L.Ed.2d 734 (2005) (the construction cannon of "constitutional avoidance" allows "courts to avoid the decision of constitutional questions" where there are competing plausible interpretations of statutory text).

A retroactive statute is one "which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty or attaches a new disability, in respect to transactions or considerations already past." 16A Am.Jur.2d Constitutional Law § 661, at 641 (1979). As a general rule of construction, " 'legislation must be considered as addressed to

7

the future, not to the past ... (and) a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be the unequivocal and inflexible import of the terms, and the manifest intention of the legislature'." *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964) (quoting *Union Pac. R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)). Here, there is no indication in the Act that its terms are to be applied retroactively. Further, a holding that the Act's dealer trust provisions apply retroactively to impair or eliminate Rabo's vested contractual rights and its vested liens against the Debtors' assets would result in an unconstitutional taking and violate Rabo's due process rights. *See, e.g., In re Pierce*, 4 B.R. 671, (W.D. Okla. 1980) (Bankruptcy Code could not be applied retroactively to avoid lien held by secured creditor that was in existence as of the date the Bankruptcy Code took effect); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589, 55 S. Ct. 854, 79 L.Ed 1593 (1935) (holding that original Frazier-Lemke Act, which applied to debts existing at the time Act became effective, was unconstitutional under the takings clause of the Fifth Amendment; "The bankruptcy power, like other great substantive powers of Congress, is subject to the Fifth Amendment"); *United States v. Security Indus. Bank*, 459 U.S. 70, 78-79, 103 S. Ct. 407, 74 L.Ed.2d 235 (1982) (Section 522(f)(2) of the Bankruptcy Code would not be applied retroactively to invalidate nonpossessory, nonpurchase money liens on household furnishings, since retroactively application of the statute would create "substantial doubt whether the retroactive destruction of the appellees' liens in these cases comports with the Fifth Amendment").

In short, Rabo's position is simple. No federal statute "shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress." *Id.*, at 81. Because it had vested contractual and lien rights in the Debtors'

assets and property when the Act became effective, the Act cannot impair those rights and any dealer trust claims are of necessity junior and inferior to Rabo's rights. Thus, unless and until Rabo's claims are paid in full from the proceeds of its collateral, no funds consisting of Rabo's collateral proceeds should be paid to any dealer trust claimants.[3]

      (c)      <u>The Trustee's Claim that Rabo's Liens do not Attach to the Funds he Received from Mechanics Bank and Chase Bank is Incorrect</u>.

On page 4 of the Notice, in paragraph 10, the Trustee asserts that he has "received the turnover of $80,010.70 from Chase Bank on July 11, 2023," and that he further "received the turnover of $1,414,714.60 on May 30, 2021, from Mechanics." The Trustee further asserts that "Rabo does not appear to have a perfected lien on these funds," and that the $1,414,714.60 sent by Mechanics Bank came "from a bank-controlled account, not on account of the Debtors . . ."

Rabo vehemently disputes the Trustee's assertion that Rabo does not have a lien on these funds. First, with respect to the $80,010.70 received from Chase Bank, after the CRO was appointed, the CRO opened the Chase Bank account and Rabo made a protective advance to the CRO to help fund the Debtors' operations pending the bankruptcy filings. Those funds are directly traceable to a protective advance made by Rabo, which protective advance was made directly from Rabo's bank account, and with the funds remaining encumbered by Rabo's blanket "all assets" security interest in the Debtors' personal property assets.

Second, with respect to the $1,414,714.60 in funds that Mechanics Bank sent to the Trustee, Rabo's perfected liens attach to those funds for two independent reasons. First, Rabo

---

[3] Section 217b(c) of the Act provides: "**Notice to lien holders.** When a dealer receives notice under subsection (b) of the unpaid cash seller's intent to preserve the benefits of the trust, the dealer shall, within 15 business days, give notice to all person who have recorded a security interest in, or lien on, the livestock held in such trust." Here, the Debtors did not provide Rabo with notice of any dealer trust claims. Rather, Rabo learned of their existence well after the fact, when the Trustee finally provided copies of the claims through informal discovery.

had perfection by "control" of all of the Debtors' accounts at Mechanics Bank because it entered into Deposit Account Control Agreements ("**DACAs**") with the Debtors and Mechanics Bank prior to the Petition Date. [*See* Case No. 23-20084, Proof of Claim 56, Part 9 (copies of the DACAs)] "A security interest . . . in [a] deposit account[] may be perfected by control of the collateral . . ." Tex. Bus. & Comm. Code § 9.314(a). A secured party has control of a deposit account if "the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent of the debtor." Tex. Bus. & Comm. Code § 9.104(a)(2). That is precisely what the DACAs did here.

Furthermore, on April 5, 2023, or prior to the Petition Date, Rabo exercised its rights under the DACAs by delivering to Mechanics Bank its *Written Instructions to Freeze MFI Account, 7M Account and MFY Account, and to Prevent Items from Being Withdrawn or Paid from the MFI Account, 7M Account and MFY Account* (the "**Freeze and Turnover Letter**"). After it received the Freeze and Turnover Letter, on information and belief, Mechanics Bank cleared certain items from the Debtors' accounts using a bank-controlled account, and then remitted the $1,414,714.60 to the Trustee. Significantly, the only accounts that the Debtors had at Mechanics Bank were the three accounts upon which Rabo had a DACA. Thus, the entirety of the $1,414,714.60 consists upon cash upon which Rabo had a perfected lien by control, and it does not matter that Mechanics Bank first placed the funds into a bank-controlled account before sending the funds to the Trustee. That bank-controlled account consisted entirely of the Debtors' funds upon which Rabo had a security interest perfected by control, and the funds are clearly traceable to the Debtors (why else would Mechanics Bank have turned them over).

Second, Rabo did not even need the DACAs in order to maintain its security interest in the funds in the Debtors' Mechanics Bank accounts. As noted above, and as shown by the contractual documents attached to Rabo's proofs of claim, Rabo's lien extended to essentially all assets of the Debtors, including all "accounts," "contract rights," "payment intangibles," "inventory," "farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in Grantor's farming operation, and products of crops and livestock in their unmanufactured state," all "substitutes or replacements for any Collateral," and all "proceeds, products, rents and profits of any Collateral." [*See, e.g.,* Case No. 23-20084, Proof of Claim 56, Part 7, Page 7 of 11] As the Court is aware, "(1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and (2) a security interest attaches to any identifiable proceeds of collateral." Tex. Bus. & Comm. Code § 9-315. Here, *all of the funds* that were deposited into the Debtors' Mechanics Bank accounts were the traceable proceeds of Rabo's collateral, because all of those funds were paid either as accounts receivable from cattle sales, or pursuant to some other contractual agreement, and Rabo clearly has a perfected lien on all of the Debtors' "accounts," "contract rights," "payment intangibles," "inventory," and "farm products." In short, none of the funds that were on deposit in the Mechanics Bank accounts were anything other than the direct proceeds of Rabo's collateral, even setting aside Rabo's perfected security interest in the Mechanics Bank accounts by "control" under the DACAs. Thus, the Trustee's assertion that Rabo did not and does not have a perfected lien on the $1,414,714.60 in funds he received from Mechanics Bank is simply not correct.

11

WHEREFORE, Rabo hereby joins in the Trustee's request for a status conference so that the parties and the Court can further discuss the myriad issues in this case, including how best to resolve the dealer trust issues, and whether it makes sense for Rabo to file a complaint for declaratory relief on the purely legal question of whether the Act and its dealer trust provisions can be applied retroactively to impair or vitiate Rabo's vested contractual and lien rights and also a complaint to determine the nature, extent and validity of any liens or other interests that any parties may assert in the cash assets that the Trustee is currently holding.

DATED this 5th day of October, 2023.

> UNDERWOOD LAW FIRM, P.C.
> Thomas C. Riney, SBN: 16935100
> W. Heath Hendricks, SBN: 240556451
> 500 South Taylor, Suite 1200, LB 233
> Amarillo, Texas 79101
> Telephone: (806) 376-5613
> Facsimile: (806) 379-0316
> Email: tom.riney@uwlaw.com
> Email: heath.hendricks@uwlaw.com
>
> --and--
>
> RAY QUINNEY & NEBEKER P.C.
> Michael R. Johnson *(Pro Hac Vice)*
> 36 South State, Suite 1400
> Salt Lake City, UT 84111
> Telephone: (801) 532-1500
> Facsimile: (801) 532-7543
> Email:  mjohnson@rqn.com
>
>
> */s/ Michael R. Johnson*
> Michael R. Johnson
> *Attorneys for Rabo AgriFinance LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2023, the foregoing document was filed with the Clerk of the Court in the above-entitled Chapter 7 case using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in the case.

*/s/ Michael R. Johnson*
Michael R. Johnson