Kent Ries, Attorney at Law
State Bar No.  16914050
PO Box 3100
Amarillo, Texas 79116
(806) 242-7437
(806) 242-7440 – Fax
kent@kentries.com

GENERAL COUNSEL FOR TRUSTEE

Hudson M. Jobe
Texas Bar No. 24041189
QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Facsimile)

SPECIAL COUNSEL TO THE TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **MCCLAIN FEED YARD, INC., et al.,**[1] | § | **CASE NO. 23-20084-RLJ-7** |
| | § | |
| | § | |
| **Debtors.** | § | **Jointly Administered** |

### TRUSTEE'S COMBINED REPLY TO OBJECTIONS TO 2004 EXAMINATIONS

COMES NOW, Kent Ries, Trustee ("**Trustee**") of the referenced Chapter 7 bankruptcy cases

the "**Bankruptcy Cases**"), and files this his Combined Reply to Objections to Rule 2004

Examinations and Brief in Support as follows:

### I.      BACKGROUND

1.      The Debtors filed for relief under Chapter 7 of the United States Bankruptcy Code on

April 28, 2023 (the "**Petition Date**").  Kent Ries was subsequently appointed and qualified to serve

---

[1] The Debtors in these Chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-RLJ), McClain Farms, Inc. (Case No. 23-20085-RLJ), and 7M Cattle Feeders, Inc. (Case No. 23-20086-RLJ)

as the Trustee over the bankruptcy estate.

2.      Each of the Debtors operated a cattle feedlot and/or growyard.  McClain Feed Yard, Inc. ("**MFY**") owned real property outside of Hereford, Texas; McClain Farms, Inc. ("**MF**") leased real property in Kentucky; and 7M Cattle Feeders, Inc. ("**7M**") owned real property outside of Friona, Texas (collectively, the "**Debtors**").

3.      The Debtors' business operations have significant overlap, including one major secured creditor (Rabo AgriFinance LLC) whose alleged claim exceeds $53,000,000.00 pursuant to its recent motion for relief from the automatic stay.  Rabo claims cross-collateralization and a blanket lien on substantially all of the Debtors' assets.  Further, many of the same vendors, customers and investors did business with all three Debtors.  Finally, the owner of all three Debtor entities was Brian McClain.

4.      All of the Debtors' business operations were shut down prior to their bankruptcy filings.  All cattle and other livestock were apparently sold by the Debtors or removed by their alleged owner's pre-petition.

5.      As discussed in prior pleadings, based upon the Trustee's investigation thus far, the Debtors' prebankruptcy operations appear to have constituted a massive fraud involving two cattle operations in Texas (Hereford and Friona) and one in Benton, Kentucky.  The asserted unpaid claims exceed $175M so far, and the Debtors' records show several hundred million dollars flowing through the Debtors in the 3 years before bankruptcy. These cases will involve over 100 parties and their attorneys based upon the service list thus far.

6.      The Debtors' owner, Mr. McClain, committed suicide on April 18, 2023, less than 2 weeks after the appointment of a Chief Restructuring Officer that was investigating the Debtors' financial affairs.  The Trustee's investigation thus far, including with the assistance of the pre-

bankruptcy CRO, has been considerable and will be ongoing for some time due to, among other things, the Debtors' poor and unreliable records.

7.      It appears that the Debtors' cattle operations included at least some actual cattle transactions whereby, in some instances, the Debtors' purchased cattle ("**Cattle Purchases**"), and in other instances, took possession of third-parties' cattle for the Debtors' to fatten/grow prior to sale ("**Feed Yard Services**"). In addition to Cattle Purchases and Feed Yard Services, it appears that Mr. McClain also raised money from many "investors" pursuant to "partnership agreements" whereby the "investors" would advance funds to one of the Debtors to "purchase" unspecified cattle from the Debtor (that were purportedly already under a contract for sale in the future at a higher weight and price), the Debtor would continue to hold and feed the cattle at its expenses, and the investor and applicable Debtor intended to split the later profit 1/3 to the Debtor and 2/3 to the investor (the "**Partnership Agreements**").

8.      Over 100 claimants have asserted claims exceeding $100 million with the United States Department of Agriculture ("**USDA**") under the Dealer Trust Statute for allegedly unpaid amounts for Cattle Purchases, cattle that were dropped off for Feed Yard Services, investments under the Partnership Agreement, and possibly other transactions not yet specified by the claimants. Additionally, upon belief many of these claimants and possibly other parties ostensibly "reclaimed" millions of dollars of cattle in the chaotic period following Mr. McClain's death.

9.      The Trustee has spent considerable time and resources investigating the Debtors' pre-bankruptcy financial affairs, and the investigation is ongoing.  Based upon his investigation thus far, the Trustee believes that the Debtors' estates may have claims against investors, lenders, and other agricultural entities.

## II.   DEALER TRUST ACT CLAIMS

10.    The Court will recall at prior hearings that certain of the parties that are the subject of this discovery are claiming rights under the Livestock Dealer Trust Amendment to the Packers and Stockyards Act signed into law on December 27, 2020 and codified at 7 U.S.C. § 217(b) (the "**Dealer Trust Act**" or the "**Act**")[2], which a trust for certain specified claimants:

§217b. Statutory trust established; dealer

(a) Establishment

(1) In general

All livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers.

(2) Exemption

Any dealer whose average annual purchases of livestock do not exceed $100,000 shall be exempt from the provisions of this section.

(3) Effect of dishonored instruments

For purposes of determining full payment under paragraph (1), a payment to an unpaid cash seller shall not be considered to have been made if the unpaid cash seller receives a payment instrument that is dishonored.

(b) Preservation of trust

An unpaid cash seller shall lose the benefit of a trust under subsection (a) if the unpaid cash seller has not preserved the trust by giving written notice to the dealer involved and filing such notice with the Secretary-

(1) within 30 days of the final date for making a payment under section 228b of this title in the event that a payment instrument has not been received; or

(2) within 15 business days after the date on which the seller receives notice that the payment instrument promptly presented for payment has been dishonored.

(c) Notice to lien holders

When a dealer receives notice under subsection (b) of the unpaid cash seller's intent to preserve the benefits of the trust, the dealer shall, within 15 business days, give notice to all persons who have recorded a security interest in, or lien on, the livestock held in such trust.

(d) Cash sales defined

---

[2] A regulation on the Dealer Trust Act can be found at:
https://www.federalregister.gov/documents/2023/06/23/2023-13418/preserving-trust-benefits-under-the-packers-and-stockyards-act.

For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer.

(e) Purchase of livestock subject to trust

(1) In general

A person purchasing livestock subject to a dealer trust shall receive good title to the livestock if the person receives the livestock-

> (A) in exchange for payment of new value; and
> (B) in good faith without notice that the transfer is a breach of trust.

(2) Dishonored payment instrument

Payment shall not be considered to have been made if a payment instrument given in exchange for the livestock is dishonored.

(3) Transfer in satisfaction of antecedent debt

A transfer of livestock subject to a dealer trust is not for value if the transfer is in satisfaction of an antecedent debt or to a secured party pursuant to a security agreement.

(f) Enforcement

Whenever the Secretary has reason to believe that a dealer subject to this section has failed to perform the duties required by this section or whenever the Secretary has reason to believe that it will be in the best interest of unpaid cash sellers, the Secretary shall do one or more of the following-

> (1) appoint an independent trustee to carry out the duties required by this section, preserve trust assets, and enforce the trust;
> (2) serve as independent trustee, preserve trust assets, and enforce the trust; or
> (3) file suit in the United States district court for the district in which the dealer resides to enjoin the dealer's failure to perform the duties required by this section, preserve trust assets, and to enforce the trust. Attorneys employed by the Secretary may, with the approval of the Attorney General, represent the Secretary in any such suit. Nothing herein shall preclude unpaid sellers from filing suit to preserve or enforce the trust.

11.     The result of the Dealer Trust Act is that certain property is subject to a trust claim until all valid Dealer Trust Act claims are paid in full.

12.     The Dealers Trust Act has analogous statutes, specifically 7 U.S.C.A. §181 et. seq., the Packers and Stockyards Act of 1921 (the "**PSA**") and 7 U.S.C.A. §499a et. seq., the Perishable Agricultural Commodities Act of 1930 (the "**PACA**"). *See* 7 U.S.C.A. § 196 and § 499e(c).   In general terms, all these acts protect certain claimants who sell their products for cash when the buyer fails to pay for such purchases.  Again, in general, the acts set up trusts to assure payment

to certain qualifying sellers, and the "buyer" or "dealer" is considered a trustee for the claimants until they are paid in full.

13.      In the case of *In re Delta Produce, L.P.*, 845 F.3d 609, 613–14 (5th Cir. 2016), the  Fifth Circuit described the bankruptcy implications of the PACA Act in Chapter 11 case:

> As intended by Congress, which was concerned that suppliers of produce were typically unsecured creditors who lost out when purchasers gave banks a security interest in their accounts receivable,[1] the PACA trust has had a significant effect in bankruptcy. *See In re Lombardo Fruit & Produce Co.*, 12 F.3d 806, 808–09 (8th Cir. 1993). Although buyers hold legal title to the assets in this "nonsegregated 'floating' trust in favor of unpaid sellers," *Bocchi Americas Assocs. Inc. v. Commerce Fresh Mktg. Inc.*, 515 F.3d 383, 388 (5th Cir. 2008), "the seller retains an equitable interest in the trust assets pending full payment." *C.H. Robinson Co. v. Alanco Corp.*, 239 F.3d 483, 487 (2d Cir. 2001). The trust assets are thus insulated from the buyer's bankruptcy estate. *See* 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, *only legal title and not an equitable interest*, ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." (emphasis added)). Sellers therefore have a "'superpriority' right that trumps the rights of the buyer's other secured and unsecured creditors." *Bocchi*, 515 F.3d at 388; *see also Golman–Hayden*, 217 F.3d at 351 ("We have recognized that PACA is a 'tough law.' ... An investor in a perishable commodities corporation 'should know at the beginning of his association with such a corporation that he is "buying into" a corporation which is strictly regulated by the federal government through PACA.'" (internal citations omitted)). To the extent PACA funds are insufficient to pay each seller in full, the assets are shared pro rata. *See Golman–Hayden*, 217 F.3d at 349.

14.      The Ninth Circuit also provided a useful illustration of how this works:

> Farmer sells oranges on credit to Broker. Broker turns around and sells the oranges on credit to Supermarket, generating an account receivable from Supermarket. Broker then obtains a loan from Bank and grants Bank a security interest in the account receivable to secure the loan. Broker goes bankrupt. Under PACA, Broker is required to hold the receivable in trust for Farmer until Farmer was paid in full; use of the receivable as collateral was a breach of the trust. Therefore, Farmer's rights in the Supermarket receivable are superior to Bank's. In fact, as a trust asset, the Supermarket receivable is not even part of the bankruptcy estate.

*Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc.*, 251 F.3d 1268, 1271 (9th Cir. 2001).

15.    In *Delta Produce,* the  Fifth Circuit evaluated whether special counsel retained by
the company on an hourly basis in a Chapter 11 to deal with PACA issues could be paid from the
PACA trust assets, and conducted a thorough review of the different types of proceedings that
could be involved in administering a PACA trust. *In re Delta Produce, L.P*., 845 F.3d at 620-23.
The court noted that typically by default a 'PACA trustee' cannot use the PACA trust assets for
any purpose other than paying claimants, including for payment of costs of administration. *Id.* at
619. The court ultimately held that Chapter 11 special counsel should be treated as the same as the
'PACA trustee' and not able to pay costs of administration from the PACA trust assets. *Id.* at 623.
The Court did not foreclosure, however, other mechanisms for administration of the trust with
costs to be paid from trust assets. *Id.*

## III.    PONZI SCHEME ISSUES AND POTENTIAL CLAIMS

16.    Based upon the Trustee's investigation thus far, the Debtors appear to have
operated an interconnected Ponzi scheme, and the Trustee is investigating potential claims in
connection with this scheme. The subject discovery is both relevant to the issue as to whether the
Debtors operated as a Ponzi scheme, and also who may have potential liability.

17.    A Ponzi scheme is "[a] fraudulent investment scheme in which money contributed
by later investors generates artificially high dividends or returns for the original investors, whose
example attracts even larger investments."  PONZI SCHEME, Black's Law Dictionary (11th ed.
2019); *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011).  In a Ponzi scheme, "a corporation operates
and continues to operate at a loss." *Alguire*, 647 F.3d at 597-98 (*quoting Hirsch v. Arthur Andersen
& Co*., 72 F.3d 1085, 1088 n. 3 (2d Cir.1995)).  It gives the appearance of being profitable by
obtaining new investors and using those investments to pay for the high premiums promised to
earlier investors.  *Id.*  "The effect of such a scheme is to put the corporation farther and farther into
debt by incurring more and more liability and to give the corporation the false appearance of

profitability in order to obtain new investors." *Id.*  As a matter of law, a Ponzi scheme is insolvent

from its inception.  *Id.*; *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 563 (Tex. 2016) ("a Ponzi

scheme … is driven further into insolvency with each transaction").   "While Ponzi schemes have

been defined in different ways, they are, at bottom, investment scams.  A Ponzi scheme is not a

legitimate business, and investment deals are different from debtor-creditor relations."  *In re

Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144 at 7 (Bankr. N.D. Tex. June

3, 2022).  .

18.     The existence of a Ponzi scheme satisfies some key elements for clawback claims

commonly brought against transferees.  The Bankruptcy Code and Texas Uniform Fraudulent

Transfer Act ("TUFTA") both generally permit recovery of transfers made with actual intent to

hinder, delay, or defraud creditors.  11 U.S.C. § 548(a)(1)(A); TEX. BUS. & COMM. CODE §

24.005(a)(1).  Fraudulent intent is established by the existence of a Ponzi scheme.  *In re Reagor-

Dykes Motors, LP*, 2022 WL 2046144, at *3–4 ("In this circuit, proving that [the transferor]

operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made") (*quoting

Sec. & Exch. Comm'n. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)).  "[T]ransfers

from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is,

'as a matter of law, insolvent from its inception.'  The burden then shifts to the recipient of Ponzi-

generated funds to prove an applicable TUFTA defense."  *Am. Cancer Soc. v. Cook*, 675 F.3d 524,

527 (5th Cir. 2012).

19.     With respect to the TUFTA, the Fifth Circuit has relied on the Ponzi scheme

presumption to establish actual intent to hinder, delay, or defraud creditors.  *See, e.g., Janvey v.

Brown*, 767 F.3d 430, 439 (5th Cir. 2014); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006)

("The Receiver's proof that RDI operated as a Ponzi scheme established the fraudulent intent

behind transfers made by RDI").

20.     Transfers made in furtherance of a Ponzi scheme may also be exempt from the ordinary course of business defense that otherwise applies to preference payments under 11 U.S.C. § 547(c)(2)(A) and similar provisions.  *See In re Am. Hous. Found.*, 785 F.3d 143, 160-61 (5th Cir. 2015), as revised (June 8, 2015) (collecting cases).  "The theory underlying the Ponzi exception to the ordinary course of business defense is that Ponzi schemes simply are not legitimate business enterprises which Congress intended to protect with section 547(c)(2)."  *Id.* at 161) (internal quotations omitted).

21.     This exception is "narrow" and only applies to a "true Ponzi scheme"—i.e., one where the "operations built on the collection of funds from new investments to pay off prior investors."  *Id.*  The Ponzi scheme exception does not apply when there are merely "some fraudulent or Ponzi-like transactions."  *Id.*; *see also In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *5.

22.     In *In re Reagor-Dykes Motors, LP*, this Court addressed § 547 claims against a secured lender in connection with an alleged Ponzi scheme.  In exchange for a security interest in all assets, Ford Credit provided floorplan financing to the Reagor-Dykes auto dealerships for the purchase of new and used vehicle inventory.  *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *1.  The trustee filed suit to recover fraudulent and preferential transfers to Ford Credit.  Although the bankruptcy court explained that Reagor-Dykes was not a Ponzi scheme, it denied Ford Credit's motion for summary judgment on the preferential transfer claim under § 547 because, among other things, the trustee's "evidence of commingling shows that at least *some* of the payments were sourced from funds besides Ford Credit's collateral" and "late loan repayments by debtors are inherently out of the ordinary."  *Id.* at *12, 15.

23.     In *In re Cohen*, the Fifth Circuit considered what portion of Ponzi payments to an investor could be recovered as preferential transfers under § 547.  It found $519,077.68 could be

---

recovered as preferential transfers, but the remaining $211,817.32 could not because that amount constituted fictitious profit that would have to be recovered as a fraudulent conveyance under § 548. *In re Cohen*, 875 F.2d 508, 511 (5th Cir. 1989).

24.    The core requirement of § 548(a)(1)(A) is that the trustee provide evidence that the debtor made each transfer with the actual intent to hinder, delay, or defraud creditors.  *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *3, 7.  If this element cannot be established through the Ponzi scheme presumption, several "badges of fraud" are used to establish intent, including:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of events and transactions under inquiry.

*Id.* at *8.

25.    In addition, "[e]vidence that the company operated as a fraudulent enterprise at the time of the transfer may be sufficient to establish actual intent."  *In re IFS Fin. Corp.*, 669 F.3d 255, 265 (5th Cir. 2012); *see also In re Tex. E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *10 (Bankr. N.D. Tex. July 13, 2022) (analyzing the *IFS* decision and explaining that "[t]he *Reagor-Dykes* court convincingly opined that the existence of a fraudulent business scheme should be treated *only as another badge of fraud*") (emphasis in original).  "Not all, or even a majority, of the 'badges of fraud' must exist to find actual fraud."  *In re Reagor-Dykes*

*Motors, LP*, 2022 WL 2046144, at *8.  However, "most courts hold two or three badges of fraud are insufficient for a plaintiff to carry his burden on actual intent."  *In re Tex. E&P Operating, Inc.*, 2022 WL 2719472, at *12.

26.     A transfer is not voidable as fraudulent under § 548 if the transferee received the transfer "for value and in good faith."  11 U.S.C. § 548(c).  For purposes of § 548, "value" means "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."  11 U.S.C. § 548(d)(2)(A).  Because value is measured from the transferee's perspective, whether the transfer had any actual value to the debtor is irrelevant.  *In re Positive Health Mgmt.*, 769 F.3d 899, 904 (5th Cir. 2014) (*citing In re Hannover Corp.*, 310 F.3d 796 (5th Cir.2002)).  A finding of value is reviewed for clear error, and that determination is largely a question of fact that is broadly construed, giving considerable latitude to the trier of fact.  *In re Am. Hous. Found.*, 785 F.3d 143, 163 (5th Cir. 2015), as revised (June 8, 2015).  The Fifth Circuit has noted that, unlike the Texas Supreme Court's objective analysis of value for TUFTA claims, determining value under § 548(c) looks at "whether the consideration provided in exchange for a transfer conferred a tangible economic benefit on the debtor, not whether the consideration … had objective value in the abstract."  *Janvey v. Golf Channel, Inc.*, 834 F.3d 570, 573 (5th Cir. 2016).  In the context of a Ponzi scheme, "[t]he 'general rule' is that while transfers to innocent investors are fraudulent, the 'defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal."  *In re Positive Health Mgmt.*, 769 F.3d 899, 908 (5th Cir. 2014) (*quoting Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011)).

27.     The recipient does not receive a transfer in good faith under § 548 when: (1) the recipient was on inquiry notice that the transferor was insolvent or that the transfer might be made

with a fraudulent purpose; and (2) if put on inquiry notice, the transferee failed to engage in a diligent investigation. *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144 at *11; *see also In re Am. Hous. Found.*, 785 F.3d at 164. Whether a party was on inquiry notice takes into account "the circumstances specific to the transfer at issue—that is, whether a transferee reasonably should have known ... of the fraudulent intent underlying the transfer." *In re Am. Hous. Found.*, 785 F.3d at 164.

28.     In *In re American Housing Found*ation, the Fifth Circuit addressed fraudulent transfer claims against an investor in an alleged Ponzi scheme. Robert Templeton and his wife invested over $5 million through limited partnership agreements with American Housing Foundation to develop residential properties. *In re Am. Hous. Found.*, 785 F.3d at147. The Fifth Circuit found that American Housing Foundation was not a Ponzi scheme and remanded the case for the bankruptcy court to resolve whether Templeton was on inquiry notice and if "at the time of each of his investments, Templeton gave value to AHF." *Id.* at 163-65.

29.     In *In re Reagor-Dykes Motors, LP*, this court addressed § 548 claims against a secured lender in connection with an alleged Ponzi scheme. In exchange for a security interest in all assets, Ford Credit provided floorplan financing to the Reagor-Dykes auto dealerships for the purchase of new and used vehicle inventory. *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *1. The trustee filed suit to recover fraudulent and preferential transfers to Ford Credit. Although the bankruptcy court explained that Reagor-Dykes was not a Ponzi scheme, it found that the trustee had offered sufficient evidence of the badges of fraud to survive Ford Credit's motion for summary judgment. *Id.* at *9. The court noted there was evidence that the debtor was insolvent when it made transfers to Ford Credit, had engaged in "an illegal 'course of conduct' after the onset of financial difficulties, as well as a 'general chronology of events' that include acts of fraud." *Id.*

30.     In *In re Texas E&P Operating, Inc.*, the bankruptcy court considered four badges of fraud in connection with § 548 and TUFTA claims relating to the purchase of airtime from a radio station.  The court did not find there was a fraudulent business scheme even though the debtor engaged in some fraudulent practices.  It noted that the debtor actually operated several oil fields with "real revenue and assets that were part of a real oil and gas business." *In re Tex. E&P Operating, Inc.*, 2022 WL 2719472, at *11 ("[t]his is similar to the *Reagor-Dykes* case where there was a real business, but there happened to be a CFO and others committing numerous fraudulent acts to keep the debtors operating").  The trustee's evidence was not sufficient to show that the debtor had "devolved into nothing more than a fraudulent business with no hope or intentions of drilling their way back to a viable enterprise." *Id.*  The court noted the next two badges of fraud—insolvency and pending litigation—were undisputed but "two of the least probative badges of fraud, as they are present in the majority of bankruptcy cases." *Id.* at *12.  It found the final badge of fraud—lack of reasonably equivalent value—was lacking because the payments at issue were for airtime at market rates, which conferred value at the time the transfer was made. *Id.* at *13-14.

31.     Likewise under the TUFTA state statute, the purpose is to prevent debtors from transferring property in bad faith before creditors received their equitable distribution of assets. *IFS Fin. Corp. v. Garcia Suarez*, No. H-09-CV-3059, 2010 WL 11652027, at *8 (S.D. Tex. Sept. 11, 2010), *aff'd sub nom. In re IFS Fin. Corp.*, 803 F.3d 195 (5th Cir. 2015) (*citing BMG Music v. Martinez*, 74 F.3d 87, 88 (5th Cir. 1996)).  As noted above, cases in the Fifth Circuit have relied on the Ponzi scheme presumption to establish actual intent under the TUFTA. *See, e.g., Janvey v. Brown*, 767 F.3d at 439. .  However, the Texas Supreme Court has recently suggested that whether the Ponzi Scheme Presumption applies to TUFTA claims is still an unresolved question. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d at 567 n.27.  If actual intent cannot be established

through the Ponzi Scheme Presumption, the court looks to a list of statutory badges of fraud. That

analysis takes the following into consideration "among other factors":

(1)  whether the transfer or obligation was to an insider;

(2)  whether the debtor retained possession or control of the property transferred after the
     transfer;

(3)  whether the transfer or obligation was concealed;

(4)  whether before the transfer was made or obligation was incurred, the debtor had been
     sued or threatened with suit;

(5)  whether the transfer was of substantially all the debtor's assets;

(6)  whether the debtor absconded;

(7)  whether the debtor removed or concealed assets;

(8)  whether the value of the consideration received by the debtor was reasonably
     equivalent to the value of the asset transferred or the amount of the obligation
     incurred;

(9)  whether the debtor was insolvent or became insolvent shortly after the transfer was
     made or the obligation was incurred;

(10) whether the transfer occurred shortly before or shortly after a substantial debt was
     incurred; and

(11) whether the debtor transferred the essential assets of the business to a lienor who
     transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b).

32.    Actual intent under the TUFTA is generally "a fact question uniquely within the

realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight

to be given to their testimony." *Hahn v. Love*, 321 S.W.3d 517, 525–26 (Tex. App.—Houston [1st

Dist.] 2009, pet. denied) (*quoting Flores v. Robinson Roofing & Const. Co., Inc*., 161 S.W.3d 750,

755 (Tex.App.—Fort Worth 2005, pet. denied)). Once actual intent is established, the burden then

shifts to the recipient to establish as an affirmative defense under the TUFTA. *Rotstain v.*

*Trustmark Nat'l Bank*, No. 3:09-CV-2384-N-BQ, 2020 WL 1513516, at *2 (N.D. Tex. Mar. 30, 2020).  TUFTA includes an affirmative defense for transferees "who took [the transfer] in good faith and for a reasonably equivalent value."  TEX. BUS. & COM. CODE § 24.009(a).

33.    Good faith under the TUFTA requires an objective assessment of what the recipient "should have known" rather than a subjective inquiry into what the recipient actually knew.  *GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 311–12 (5th Cir. 2014).  To establish good faith, the recipient must prove "its conduct was honest in fact, reasonable in light of known facts, and free from willful ignorance of fraud."  *Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 427 (5th Cir. 2020).  Good faith has been defined as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing ..., or (4) absence of intent to defraud or to seek unconscionable advantage." Good Faith, BLACK'S LAW DICTIONARY (11th ed. 2019).  *Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 129 (Tex. 2019).  It "requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand."  *Id.*

34.    Courts consider whether the recipient received fraudulent transfers with actual knowledge or inquiry notice of fraud or insolvency.  *Janvey v. GMAG, L.L.C.*, 977 F.3d at 427.  A transferee is on inquiry notice of a transferor's fraudulent purpose if it has "knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature" of a transfer.  *Janvey v. Alguire*, No. 3:09-CV-0724-N, 2016 WL 11271878, at *4 (N.D. Tex. Dec. 21, 2016) (*quoting Hahn v. Love*, 321 S.W.3d 517, 527 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  Courts apply an objective standard to determine whether the recipient had inquiry notice, which considers the facts available to the recipient and what state of mind those facts would elicit in a person of ordinary prudence.  *Id.*  The facts giving rise to the recipient's knowledge must relate to the specific transaction at issue.  *Id.*  A recipient on inquiry

notice of fraudulent behavior cannot satisfy the good faith defense without first diligently investigating his or her initial suspicions of fraud. *Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 427 (5th Cir. 2020).

35.     Under the TUFTA, reasonably equivalent value "includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TEX. BUS. & COM. CODE § 24.004(d).  It is determined as of the time of the transaction, not in hindsight. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 569 (Tex. 2016).  The transfer must confer some direct or indirect economic benefit to the debtor, as opposed to benefits conferred solely on a third-party, transfers that are purely gratuitous, and transactions that merely hold subjective value to the debtor or transferee. *Id.* at 574.  Economic benefit to the debtor, however, is not limited to "money or something else tangible or leviable that can be sold to satisfy the debtor's creditors' claims." *Id.* at 575.  The Texas Supreme Court has held that "value exists when the debtor took consideration that had *objective value at the time of the transfer*" and is "thus satisfied if a transferee performs objectively valuable services or transfers goods in an arm's-length transaction at market-value rates." *Id.* at 577 (emphasis added). Accordingly, consumable goods or services—like food, utilities, internet or telephone services, office supplies, and employee compensation or benefits—can be an exchange of reasonably equivalent value even if such consideration neither preserved the debtor's estate nor generated an asset or benefit that could be levied to satisfy unsecured creditors. *Id.*; *see also In re Tex. E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *13 (Bankr. N.D. Tex. July 13, 2022) (noting that radio airtime is reasonably equivalent value under TUFTA "when the transferee fully performs in an arm's-length transaction in the ordinary course of its business at market rates"). Courts are to make the same "value" and "reasonably equivalent value" determinations regardless of whether the entities were engaged in a Ponzi scheme. *Id.* at 581.

36.    In addition to statutory remedies, trustees/receivers can allege common law claims that accomplish the same thing.  For example, a constructive trust is an equitable remedy that may be imposed if the following elements are present: (1) actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing of the property over which the trust is placed to some identifiable *res* in which the plaintiff has an interest.  *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 529–30 (5th Cir. 2012).  Similarly, money had and received is an appropriate remedy to address unjust enrichment where a defendant holds money that in equity and good conscience belongs to plaintiff.  *See, e.g., Crawford v. Bleeden*, No. 3:21-CV-2181-X, 2023 WL 2414009, at *6 (N.D. Tex. Mar. 8, 2023); *Taylor v. Trevino*, 569 F. Supp. 3d 414, 436 (N.D. Tex. 2021); *Thomas v. Hopkins*, No. 3:20-CV-576-S (BK), 2021 WL 4268483, at *3 (N.D. Tex. Aug. 26, 2021), *report and recommendation adopted*, No. 3:20-CV-576-S-BK, 2021 WL 4267510 (N.D. Tex. Sept. 20, 2021).

37.    With respect to limitations. 11 U.S.C. 548(a)(1) applies to transfers within <u>two years</u> before the date of the filing of the petition; Tex. Bus. & Comm. Code 24.005(a)(1), Texas Uniform Fraudulent Transfer Act (TUFTA) – applies to transfers within <u>four years</u> after the transfer was made or the obligation was incurred or, if later, within <u>one year</u> after the transfer or obligation was or could reasonably have been discovered by the claimant.

38.    The Net Winner / Net Loser analysis comes into play when the transferee raises the affirmative defense that he or she took in good faith and for "reasonably equivalent value" and requires comparing the total amounts invested into and received from the Ponzi scheme.  Tex. Bus. & Comm. Code 24.009(a); *see, e.g., Janvey v. Alguire*, No. 3:09-CV-0724-N, 2015 WL 13729622, at *2 (N.D. Tex. Sept. 29, 2015) ("the Net Winner defendants had not provided 'value' to the Stanford entities for the interest payments they had received").

39.    The existence of a Ponzi scheme impacts the "look back" period through the discovery rule.  The Fifth Circuit addressed this issue in *Janvey v. Democratic Senatorial*

*Campaign Committee, Inc*., 712 F.3d 185 (5th Cir. 2013).  In that case, the defendants argued the receiver could not bring TUFTA claims to recover contributions to political committees going back nine years.  Defendants moved for summary judgment based on their argument that the receiver's claims were barred by TUFTA's four-year limitations period and/or the one-year period for filing suit after discovery of the fraudulent transfers.  The District Court denied summary judgment and the Fifth Circuit affirmed that decision.  The Fifth Circuit explained that "the evidence presented to the district court overwhelmingly established that, from at least as early as 1999, the Stanford corporations were nothing more than robotic tools of Stanford's elaborate Ponzi scheme and that the funds used to make the donations to the Committees were taken by Stanford and Davis, directly or indirectly, out of the Stanford corporations' proceeds from the sales of the fraudulent CDs."  *Id.* at 197.

### IV.    ARGUMENT AND AUTHORITIES – DISCOVERY ISSUES

#### A.  Scope of Rule 2004 discovery.

40.    Rule 2004 provides that, "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a) (emphasis added). *See also In re Fearn,* 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989) (the "examination is not limited to the debtor or his agents, but may properly extend to creditors and third parties who have had dealings with the debtor"); *In re GHR Energy Corp.,* 35 B.R. 534, 537 (Bankr. D. Mass. 1983); *In re Maidman,* 2 B.R. 18, 18-19 (Bankr. S.D. Fla. 1979). The scope of the Rule 2004 examination "may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b). "The purpose of a Rule 2004 examination is to determine the condition, extent, and location of the debtor's estate in order to maximize distribution to unsecured creditors." *In re Lufkin,* 255 B.R. 204, 208 (Bankr. E.D. Tenn. 2000).

41.     The scope of a Rule 2004 examination is "extremely broad," and has even been likened by some courts to a "lawful 'fishing expedition.'" *Id.* (*quoting Bank One, Columbus, N.A. v. Hammond (In re Hammond),* 140 B.R. 197, 201 (S.D. Ohio 1992)). "The scope of [a] Rule 2004 examination is 'unfettered and broad.' Its purpose is to facilitate the discovery of assets and the unearthing of frauds and has been likened to a quick 'fishing expedition' into general matters and issues regarding the administration of the bankruptcy case." *In re Bakalis,* 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996) (quoting *In re GHR Energy Corp.,* 33 B.R. 451, 453 (Bankr. D. Mass. 1983). The standard for granting a Rule 2004 examination is whether the movant has established "good cause." *In re Hammond,* 140 B.R. 197, 201 (S.D. Ohio 1992).

## B. Overly broad and unduly burdensome objections.

42.     An objection that a discovery request is overly broad, unduly burdensome, or oppressive must be supported by evidence revealing the nature of the burden. *Samsung Elecs. Am., Inc. v. Chung*, 321 F.R.D.250, 283 (N.D. Tex. 2017). The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *Id*; citing *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). A party resisting discovery must show how the requested discovery is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden. *Chung*, 321 F.R.D. at 283; citing *Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005) and *S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request."). "Failing to do so, as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate." *Heller v. City of Dallas*, 303 F.R.D. 466, 490 (N.D. Tex. 2014).

43.     *Heller* provides a useful example of the consequences where the respondent fails

to satisfy its burden to support its undue burden and overbreadth objections with evidence. *Heller,*

303 F.R.D. 466. In *Heller,* individuals who regularly engaged in political protests brought an action

challenging a city ordinance which prohibited the display of signs within seventy-five feet of a

highway under the First Amendment. The Plaintiffs moved to compel discovery responses and for

sanctions from the Defendant City of Dallas. Defendant, like the Respondents here, asserted

unsupported undue burden and overbreadth objections to the document requests and

interrogatories. The Court held that Defendant's unsupported undue burden and overbreadth

objections were merely boilerplate and were sanctionable. *Id.* at 490. The Court stated.

> Defendant opposes Plaintiffs' sanctions requests by arguing that, [w]here the City
> has objected to certain requests as unduly burdensome and overly broad, it has
> explained in writing and through multiple verbal conferences its reason for those
> objections. For the reasons explained above, the Court cannot and does not accept
> that position. As to almost every discovery request that Defendant objected was
> unduly burdensome and overbroad, particularly in Plaintiffs' First Set of Requests
> for Production, the Court adopts the findings and conclusions of another court faced
> with similar objections: Despite this District's well established authority on the level
> of detail needed to support an undue burden objection, [Defendant] did not submit
> an affidavit or otherwise attempt to describe how the discovery requests were
> unduly burdensome in terms of time, expense, or procedure. In short, [Defendant]
> provided the Court with no information about the burden involved in responding to
> these discovery requests.

> The circumstances here lead the Court to find that Defendant's undue burden and
> overbreadth objections, at least in response to most of the requests in Plaintiffs' First
> Set of Requests for Production, were simply boilerplate objections made without
> Defendant's counsel's pausing and considering whether, based on a reasonable
> inquiry, there is a factual basis for an objection. Although Defendant's response
> briefs and arguments at the hearing provided some factual detail applicable to the
> undue burden objections to a few document requests in Plaintiffs' First Set of
> Requests for Production—specifically, Plaintiffs' First Set of Requests for
> Production Nos. 6, 7, and 8—Defendant has never offered any factual support for
> its undue burden and overbreadth objections to most of the requests in Plaintiffs'
> First Set of Requests for Production. And, as such, there is no basis to find that
> Defendant's undue burden and overbreadth objections to most of the document
> requests in Plaintiffs' First Set of Requests for Production—other than the undue
> burden objections to Plaintiffs' First Set of Requests for Production Nos. 6, 7, and
> 8—was substantially justified. On the contrary, [Defendant's] reliance on what
> amounted to a boilerplate objection was not reasonable.

*Id*. at 490 (internal quotations and citations omitted).

44.    In contrast, *Brady* is an example where the parties from whom discovery was sought satisfied their burden to demonstrate the undue burden and overbreadth of the requests. *Brady*, 238 F.R.D. 429. In *Brady*, the S.E.C. asserted claims against software company i2's former CEO and two other former officers alleging they caused i2 to report revenue in violation of GAAP. The S.E.C. sought to obtain documents from i2 and its external law firm. In sustaining the objections to the undue burden and overbreadth of the S.E.C.'s request, the Court stated:

> In support of their assertion that the subpoena is overbroad and unduly burdensome, i2 and Baker Botts provide affidavits of two Baker Botts associates. (App. to Resp. at 30–34.) Therein, Gail Foster states that Baker Botts IT staff captured all documents from the firm's document management system using billing numbers for various i2 matters as well as the email boxes of all individuals who billed time to i2 matters. Foster estimates that the amount of potentially responsive electronic data amounts to 32,222,000 pages.  Stuart L. Cochran states that Baker Botts has 226 boxes containing evidence produced to the SEC, among other internal working files, and that individuals at the firm have additional personal files as well.  Cochran estimates that 226 hours to review the files for responsiveness and privilege.  In addition, Cochran estimates that 16,111 hours would be required to review the electronic data for responsiveness and privilege.

*Id*. at 438.

**C.  No Subpoena is required, especially from another District.**

45.    The Respondents request the Court to require the Trustee to not only personally serve them with a subpoena, but also require such subpoena to be issued by various other unspecified courts, and also afford Respondents another chance to evade discovery by lodging more objections later in connection with their subpoena response.  Notably, Respondents are asking for more onerous and formal service than required for service of an adversary complaint under Rule 7004, service of a contested matter under Rule 9013, or service of a request for production of documents on party under Rules 7024 and 9014(c) that would disrupt the entire efficiencies sought by this procedure which has already afforded them 36 days of prior notice.

46.     All of the objecting respondents on this point have filed USDA Claims or Proofs

of Claim, and in most cases, both.   Accordingly, they are already parties-in-interest to the

bankruptcy case.   Rule 2004(a) suggests that this Court can order their compliance, even without

notice and a hearing.   As discussed recently by Judge Jernigan, it is common practice in this district

for 2004 discovery to occur without utilizing a subpoena. *In re Correra*, 589 B.R. 76, 109 (Bankr.

N.D. Tex. 2018) ("It appears to this court (and this is a mere anecdotal observation) that,

oftentimes, parties in interest seeking Bankruptcy Rule 2004 examinations (and production of

documents) simply go forward with a motion and order and do not bother with obtaining and

serving a subpoena.").   *In Correra,* Judge Jernigan viewed Rule 2004 as requiring a subpoena on

a witness, "who [was] not a debtor and [was] not otherwise a party-in-interest—such as a creditor

who files a proof of claim" and therefore a true nonparty witness. *Id.* at 109-110. This Court should

likewise rule that a subpoena is not required on these parties who have all filed claims, especially

here since they have been afforded notice and a hearing, and an opportunity to lodge objections.

47.     To the extent the Court does require the issuance of a subpoena, Respondents are

incorrect in their assertion that the subpoena must issue from another Court, and are presumably

incorrectly referencing a prior version of Rule 45. *See* Federal Rule of Civil Procedure 45(a)(3).

**D.  Interrogatory.**

48.     Respondents are not being deprived of their rights to provide business records under

Rule 33(d). Rule 33(d) allows a party to answer an interrogatory by producing business records

from which the answer may be derived or ascertained. *See* Fed. R. Civ. P. 33 (d) However, Rule

33(d) can only be employed in limited circumstances. A party may use Rule 33 (d) to answer

interrogatories when: (i) "the answer to an interrogatory may be determined by examining,

auditing, compiling, abstracting, or summarizing a party's business records"; (ii) "the burden of

deriving or ascertaining the answer will be substantially the same for either party"; and (iii) "the

responding party ... specif[ies] the records that must be reviewed[ ] in sufficient detail to permit the interrogating party to locate and identify them as readily as the responding party could." *Id*; see also *Shintech, Inc. v. Olin Corp.*, 2023 WL 6807006, *6, (S.D. Tex. Oct. 16, 2023).

49.     A party's obligation to specify the records to be reviewed "generally requires an answering party to point to specific documents, by name or bates number, and not pointing the requesting party generally to document productions." *Shintech,* 2023 WL 6807006, *6, quoting **Samsung Elecs. Am., Inc. v. Chung**, 321 F.R.D.250, 282 (N.D. Tex. 2017); see also *Kaupelis v. Harbor Freight Tools USA, Inc*., No. SA CV 19-01203, 2021 WL 4816605, at *1 (C.D. Cal. Jan. 22, 2021) (Rule 33 (d) "requires a party to identify specific records, not just point to its document production in general and say, 'it's in there.'"); *United States ex. rel. Landis v. Tailwind Sports Corp*., 317 F.R.D. 592, 594 (D.D.C. 2016) ("When employing Rule 33 (d), a responding party must specifically identify the documents that contain the answers." (quotation omitted)); *Jacquez v. Compass Bank*, No. EP-15-cv-26, 2015 WL 11529918, at *1 (W.D. Tex. Dec. 17, 2015) (holding that responding to an interrogatory with " 'see documents produced' is not an appropriate response").

50.     *Shintech* provides an example where the responding party improperly invoked and failed to comply with Rule 33 (d). *Shintech,* 2023 WL 6807006, *6. In that case, respondents stated: "In further response to this Interrogatory, Defendants refer to the documents being produced in response to Plaintiff's Requests for Production of Documents."  The Court held that was improper, did not comply with Rule 33 (d), and failed to adequately specify by category and location the business records containing the answers to the interrogatories. *Id.* "The appropriate answer when documents are to be used [under Rule 33 (d)] is to list the specific document provided [to] the other party and indicat[e] the page or paragraphs that are responsive to the

interrogatory." *Id*., quoting *Colorado ex. rel. Woodward v. Schmidt-Tiago Constr. Co*., 108 F.R.D. 731, 735 (D. Col. 1985).

51.     Another example of an improper answer and attempted use of business records to respond to an interrogatory was provided recently in *VeroBlue Farms USA Inc. v. Wulf*, ---F.R.D.---, No. 3:19-cv-764-X, 2021 WL 5176839, *27-28 (N.D. Tex. Nov. 8, 2021). The Court held that if an answering party relied on Rule 33 (d), it "must specify the information that [the requesting party] should review in sufficient detail to enable [the requesting party] to locate and identify the information in the documents [at least] as readily as [an answering party] could. This generally requires an answering party to point to specific documents, by name or bates number, and not pointing the requesting party generally to document productions." *VeroBlue Farms USA Inc.*, 2021 WL 5176839, *27, quoting *Lopez v. Don Herring Ltd*., 327 F.R.D. 567, 579 (N.D. Tex. Aug. 1, 2018).  The Court also held that answers to interrogatories that "refers Plaintiff to the documents produced in relation to the above-captioned lawsuit," and, "refers Plaintiff to the documents within its own possession" and "to his deposition testimony" were not proper or adequate. *VeroBlue Farms USA Inc.*, 2021 WL 5176839, *28.

52.     Trustee provided an example chart to help Respondents comply with their obligations under Rule 33 (d) to specifically list the documents provided to Trustee and identify the page or paragraph that is responsive to the Interrogatory. It does not require Respondents to do anything they are not already required to do to sufficiently respond to the Interrogatory and attempts to bring some level of uniformity to answers from in excess of 100 Respondents.

Respectfully submitted,

By: */s/ Hudson M. Jobe*
Hudson M. Jobe
Texas Bar No. 24041189
QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Facsimile)

SPECIAL COUNSEL TO THE TRUSTEE