James D. Bradbury
State Bar No. 02814500
jim@bradburycounsel.com
Kyle K. Weldon
State Bar No. 24097192
kyle@bradburycounsel.com
**JAMES D. BRADBURY, PLLC**
201 Main Street, Suite 600
Fort Worth, Texas 76102
Telephone: (817) 339-1105

*ATTORNEYS FOR PRIEST CATTLE COMPANY, LTD*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| IN RE:<br><br>McCLAIN FEED YARD, INC., et al.,[1]<br><br>*Debtors.* | CASE NO. 23-20084-7-rlj<br><br>Chapter 7<br><br>Jointly Administered |

### PRIEST CATTLE COMPANY, LTD'S RESPONSE TO RABO'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR, ALTERNATIVELY, FOR ABANDONMENT OF CERTAIN CATTLE AND PROCEEDS OF CATTLE

**TO THE HONORABLE ROBERT L. JONES, BANKRUPTCY JUDGE:**

COMES NOW, Priest Cattle Company, Ltd ("Priest")[2] and files this Response to Rabo's Motion for Relief from the Automatic Stay or, Alternatively, For Abandonment of Certain Cattle and Proceeds of Cattle (the "Motion") [Dkt. 192], and in support thereof, respectfully shows the Court the following:

---

[1] The Debtors in these Chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-RLJ), McClain Farms, Inc. (Case No. 23-20085-RLJ), and 7M Cattle Feeders, Inc. (Case No. 23-20086-RLJ).

[2] Cory Priest, the principal of Priest Cattle Company, Ltd, is mentioned in the Motion, but individually, Mr. Priest is not involved in this matter.

1

I.  **SUMMARY OF ARGUMENT**

1. Rabo AgriFinance LLC's ("Rabo") claims that the Removed Cattle and Proceeds constitute part of Rabo's Personal Property Collateral, which Rabo asserts it has a perfected first priority security interest in. [*See* Dkt. 192 at ¶¶ 9, 21, & 23]. Rabo seeks by its Motion to avoid the complicated issues in this proceeding regarding 7 U.S.C. § 217b (the "Dealer Trust"), which have not been resolved, as well as the Trustee's role in making the determinations on behalf of the Debtors.

2. Priest responds to Rabo's Motion related to the 523 head of cattle owned by Priest that were removed from the McClain Feed Yard in Friona, Texas on April 18, 2023. [*See* Dkt. 192 at p. 3].

3. Under Texas law, a security interest is enforceable against the debtor and third parties with respect to the collateral only if "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party." Tex. Bus. & Com. Code § 9.203(b)(2).

4. Here, Brian McClain's three interconnected companies (McClain Feed Yard, Inc.; McClain Farms, Inc.; and 7M Cattle Feeders, Inc. (collectively, the "Debtors")) had no ownership rights in Priest's cattle or proceeds or the power to transfer rights in Priest's cattle or proceeds to Debtors' secured party. Therefore, Rabo has no security interest in Priest's cattle or proceeds.

5. Rabo has known for years (as early as April of 2020) that third parties owned cattle on feed at Debtors' feedyards. In fact, Rabo executed a Letter of Understanding with Priest in January of 2022 acknowledging that Debtors were feeding cattle owned by Priest. The cattle owned by Priest and on feed at Debtors' Friona, Texas feedyard, were branded with Priest's brand, had ear tags with lots that matched Priest's records, were segregated from the other cattle, and at all times, were owned by Priest.

6. The outcome, therefore, is not complicated. These cattle (at least those owned by Priest) were never owned by Debtors, so they are not collateral securing the >$50 million that Rabo loaned to Debtors. Rabo's Motion, at least regarding Priest's cattle and proceeds, must be denied.

7. In addition, as provided in more detail below, Priest disputes that Rabo has a first priority security interest in cattle that its funds were not used to purchase.

## II. STATEMENT OF FACTS

**A. Rabo knew that third-party owned cattle were on feed at Debtors' feedyards.**

8. During its relationship with Debtors, Rabo knew that the cattle on feed at Debtors' yards were owned by third parties.

9. In its April 27, 2020 report titled "Feedlot Collateral Inspection Report", Rabo identified that some of the cattle on feed at McClain's feedyards *were not owned by McClain*:[3]

> **The Client also custom backgrounds cattle that are owned by Friona Industries and a few other, smaller local ranchers.** As Friona ships cattle into the McClain facility, the Client provides feed and services, growing the cattle until ready to ship to one of Friona's yards, using the same care and expertise as he does with his own cattle. When the cattle are shipped, Friona pays the Client a feed bill. **These cattle are given a unique ear tag for identification as well as branded with the FI brand to differentiate between customer cattle and company cattle.**

*See* Exhibit A at RAF/AT Subpoena Response 001603 (emphasis added).

10. This exact statement is also found in Rabo's September 9, 2021 report titled "Feedlot Collateral Inspection Report", authored by Sean Johnstone (Rabo Agricultural Field Collateral Inspector) and Michelle Stockett (Rabo VP/Senior Agricultural Field Collateral Inspector) (the "2021 Report").[4]

---

[3] Attached hereto and incorporated herein as **"Exhibit A"** is a copy of Rabo's April 22, 2020 Feedlot Collateral Inspection Report.
[4] Attached hereto and incorporated herein as **"Exhibit B"** is a copy of Rabo's September 9, 2021 Feedlot Collateral Inspection Report produced by Rabo. *See* at RAF/AT Subpoena Response 001575.

3

**B.     In 2022, Rabo, Debtors, Priest and Priest's lender enter into Letter of Understanding.**

11.     When Priest and McClain entered into agreements related to Debtors' feeding of Priest's cattle at Debtors' feedyards, Priest and its lender, National Finance Credit Corporation of Texas ("NFCC"), understanding that Debtors had a lending relationship with Rabo, took action to have the parties acknowledge and agree that Priest's cattle, while fed at Debtors' feedyard, would not be subject to any lien Rabo might have on Debtors' property.

12.     Specifically, in January of 2022, Rabo, Priest, NFCC, and Debtors entered a Letter of Understanding (the "LOU").[5] Under the LOU, the parties acknowledged, among other things, that Priest owned cattle placed on feed with Debtors, that NFCC (not Rabo) has a security interest in these cattle,[6] and that the cattle would be permanently identified by Priest's brand and not comingled with other cattle.

**C.     Rabo's Collateral Inspections in early 2023 discovery head count discrepancies.**

13.     In early 2023, after a collateral inspection conducted by Rabo's Agricultural Field Collateral Inspection Department, Rabo asserts that it "discovered that representations made by the Debtors and McClain with respect to the collateral securing [Rabo's] loans were inaccurate."[7]

14.     Despite entering into the LOU and authoring reports for at least three years that contained statements by its inspectors that acknowledge that cattle owned by third parties were being fed at Debtors' feed yards, Rabo's March 10, 2023 "Beef Cattle Collateral Inspection Report" report states that:

> **"The other primary concern that Inspection Team has is that cattle at the yards could belong to someone else…. This would lead us to believe that these people had cattle on feed with McClain Feedyard and owned the cattle."[8]**

---

[5] Attached hereto and incorporated herein as **"Exhibit C"** is a copy of the Letter of Understanding.
[6] NFCC has filed a UCC Financing Statement on these cattle, which is attached hereto and incorporated herein as **"Exhibit D"**.
[7] *See* Dkt. 3 at ¶ 146, Adversary Proceeding Case No. 23-02005-rlj.
[8] Attached hereto and incorporated herein as **"Exhibit E"** is a copy of Rabo's March 10, 2023 Beef Cattle Collateral Inspection Report produced by Rabo. *See* RAF/AT Subpoena Response 001581.

15. For reference, Rabo's March 2023 report was authored by the same Michelle Stockett who authored the 2021 Report.

16. Rabo's internal communications recognized cattle were owned by others yet sought to control them. One example is the below text communications between Michelle Stockett (Rabo's VP/Senior Agricultural Field Collateral Inspector) and Sean Johnstone (Rabo Agricultural Field Collateral Inspector) on March 9, 2023 (the day before the dated March 10, 2023 report discussed above):[9]

> I think they'll have to. This house of cards is pretty well crashed.
>
> I hope. And if Brady is right and some/all of the cattle are customer cattle we need to impress upon someone that we need to be watching to make sure people aren't going in and loading our collateral out. Whether they are truly theirs or not we have priority lien on the cattle in that yard

17. Days after turning over control of the Debtors to a Chief Restructuring Officer ("CRO") selected by Rabo, Brian McClain committed suicide.

**D.     Rabo takes control of the Debtors' feedyards and auctions off the cattle.**

18. In early April of 2023, Rabo, through its CRO and a company hired by Rabo, Focus Management Group, took possession of thousands of head of cattle on feed in Debtors' yards, inventoried them, and sold them via auction.[10] **Again, this was despite the fact that Rabo knew some of these cattle were owned by third parties and not subject to its lending or security**

---

[9] Attached hereto and incorporated herein as **"Exhibit F"** is a copy of select text communications between Stockett and Johnstone, produced by Rabo. *See* RAF/AT Subpoena Response 002335.
[10] *See* Dkt. 48 at p. 8 (Case No. 23-20084-rlj7); Dkt. 56 at p. 11 (Case No. 23-20085-rlj7); and Dkt. 52 at p. 9 (Case No. 23-20086-rlj7).

**agreements with Debtors.** Rabo did not make any attempt to determine or contact the rightful owners of the cattle before the cattle were liquidated by Rabo. According to Debtors' Statements of Financial Affairs filed (at the time in the three separate bankruptcy proceedings), these cattle were sold for approximately $2.6 million.[11]

19. To date, no full reconciliation of these sales has been made available by Rabo, including specifics on what cattle were sold (what lots, whether the cattle were branded or had ear tags, etc.). For example, upon information and belief, at least several hundred head of Priest's branded cattle were sold to a feedyard in Kansas. Priest did not authorize this sale and has not been paid for the cattle that were sold.

20. Due to the suicide and lack of any independent control of the yards beyond Rabo's conflicted role, on April 18, 2023, Priest, coordinated with the Texas & Southwestern Cattle Raisers ("TSCRA") Special Ranger and the Parmer County Sheriff's Office to conduct a supervised inspection of the cattle that Priest owned at Debtors' Friona feedyard.[12]

21. Priest and the law enforcement officers verified Priest's Double Slash brand on the left hip of the animals and further confirmed the ear tags with lot numbers that corresponded with Priest's records. *See* Ex. G at p. 2. A total of 523 cattle were inspected and, upon Special Ranger Chris Ward's review, Priest, as the lawful owner of these animals, was allowed to load and remove these cattle from Debtors' feedyard. *See id*.

22. Rabo's CRO, acting for each of the Debtors, filed for bankruptcy in late April of 2023.

---

[11] *See* Dkt. 48 at p. 8 (Case No. 23-20084-rlj7); Dkt. 56 at p. 11 (Case No. 23-20085-rlj7); and Dkt. 52 at p. 9 (Case No. 23-20086-rlj7).

[12] Attached hereto and incorporated herein as **"Exhibit G"** is a copy of the Texas & Southwestern Cattle Raisers Association's Law Enforcement Division Report of Investigation, produced by TSCRA in response to a subpoena from Rabo.

### III. RESPONSE

**A.  The Removed Cattle and Proceeds are not part of the Debtors' Bankruptcy Estates.**

23. Rabo's first argument is that Court should terminate the Automatic Stay related to what it terms as the Removed Cattle and Proceeds. Such relief is not proper as the Removed Cattle and Proceeds, at least Priest's cattle, are not part of the Debtors' Bankruptcy Estate.

24. The bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541(d) of the Bankruptcy Code provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest … becomes property of the estate under subsection (a) of this section **only to the extent of the debtor's legal title to such property**, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (emphasis added).

25. Rabo, in its Motion, agrees that Debtor's Collateral includes only property owned by Debtors: "Under and pursuant to the MSA, the McClain Debtors, each as a Grantor, pledged essentially all of their personal property assets now owned or hereafter acquired, defined as the 'Collateral' . . . ." [*See* Dkt. 192 at ¶ 8].

26. Rabo has failed to provide any evidence as to how the Removed Cattle and Proceeds, specifically Priest's cattle, were ever owned by the Debtors or subject to the Debtors' Bankruptcy Estates.

27. Rather, as detailed above, under the LOU, Rabo previously acknowledged Priest had cattle it owned on feed at Debtors' feedyards. *See* Ex. C. In addition, TSCRA authorized Priest to remove the cattle as they were owned by Priest. *See* Ex. G. The cattle had Priest's Double Slash brand on the left hip and had ear tags with lot numbers that corresponded with Priest's records. *Id*.

7

A total of 523 cattle were inspected and, upon Special Ranger Chris Ward's review, Priest, as the lawful owner of these animals was allowed to remove them from Debtors' Friona feed yard. *Id*.

28. Had Priest not removed the cattle it owned, they would have been sold by Rabo (along with the other thousands of head of cattle) with no regard to Priest's rightful ownership and Rabo's estimated value on these animals ($523,000) would have been lost to either Rabo or other claimants under the Dealer Trust (which Rabo is contesting), just as occurred with other Priest cattle.

29. Because Priest's cattle were owned by Priest and are not part of the Debtors' Bankruptcy Estate, the Court should deny Rabo's requested relief.

**B.   Rabo does not have a perfected security interest in the Removed Cattle and Proceeds.**

30. Even if the cattle owned and removed by Priest were somehow considered part of the Debtors' Bankruptcy Estates, which Priest contests, the Court should not, as Rabo requests, authorize Rabo to "recover, repossess and foreclose upon, sell, or otherwise liquidate its interest in the Removed Cattle and Proceeds pursuant to non-bankruptcy law, without further order of the Court." [*See* Dkt. 192 at p. 11].

31. Contrary to Rabo's claim, Rabo has provided no evidence that Priest's cattle were "fully encumbered by Rabo's perfected liens." [*See* Dkt. 192 at ¶ 23]. Despite lengthy recitations regarding its many loan documents with Debtors, Rabo's Motion lacks any evidence that any of the $50 million loaned to Debtors were ever used to purchase Priest's cattle—the only way that Debtors (and therefore Rabo) might have an interest in Priest's cattle. Moreover, there is no proof that any loaned funds by Rabo were not commingled, which is an issue for the Trustee and further motions.

32. Rather, as stated in the LOU, Rabo agreed that Priest owned cattle at Debtors'

8

yards, these cattle were branded and ear tagged, segregated from the other cattle at the yard, and, a Special Ranger with TSCRA agreed Priest owned the cattle.

33. Because Rabo has no evidence that Priest's cattle are "fully encumbered by Rabo's perfected liens," the Court should not issue an order to Rabo authorizing it to recover, repossess and foreclose upon, sell, or otherwise liquidate property which it has no interest in. The Court should deny Rabo's requested relief.

**C.   The Motion should be denied because the Removed Cattle and Proceeds may be subject to the Dealer Trust Act.**

34. In addition, as stated by the Trustee over the Bankruptcy Estates in his Response to Rabo's Motion [*See* Dkt. 200 at ¶¶ 10 & 12], Rabo's motion is premature and conflicts with the Dealer Trust Act, as some of the Removed Cattle and Proceeds may be subject to the Dealer Trust Act (7 U.S.C. § 217(b)). While Priest maintains that the Priest cattle that it removed in April of 2023 were owned by Priest and not subject to Dealer Trust claims, the same is unclear regarding the other cattle that were removed by other parties.

35. To date, the Trustee has acted on behalf of USDA in administering the Dealer Trust outside of the Bankruptcy Estate. Until these Dealer Trust matters are finally resolved (including Rabo's adversary proceeding[13] containing Declaratory Judgment Actions related to the Dealer Trust Act), the Court should not permit Rabo to pursue its claims against any of the Removed Cattle and Proceeds.

**D.   The Court should decline to order the Trustee to Abandon the Estate's Interest in the Removed Cattle and Proceeds.**

36. Finally, Rabo argues that the Court should order the Trustee to abandon the Bankruptcy Estates' interests in the Removed Cattle and Proceeds.

---

[13] Adv. Proc. No. 23-02005-rlj.

9

37.  As discussed above, because (1) the Bankruptcy Estates have no interest in the Removed Cattle and Proceeds (at least Priest's cattle or proceeds), and (2) there exist many outstanding issues related to the status of cattle and proceeds subject to the Dealer Trust Act, which Trustee is assisting to administer, the Court should not order the Trustee to take any action related to the Removed Cattle and Proceeds.

## IV. PRAYER

WHEREFORE, PREMISES CONSIDERED, Priest Cattle Company, Ltd respectfully requests that the Court deny the Motion, and for such other relief, at law or in equity, to which it may show itself justly entitled.

DATED this 28th day of March, 2024.

Respectfully submitted,

/s/ James D. Bradbury
James D. Bradbury
State Bar No. 02814500
jim@bradburycounsel.com
Kyle K. Weldon
State Bar No. 24097192
kyle@bradburycounsel.com
**JAMES D. BRADBURY, PLLC**
201 Main Street, Suite 600
Fort Worth, Texas 76102
Telephone: 817-339-1105

***ATTORNEYS FOR PRIEST CATTLE COMPANY, LTD***

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2024, the foregoing document was filed with the Clerk of the Court in each of the foregoing Chapter 7 cases using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in each case.

                                                */s/ Kyle K. Weldon*
                                                Kyle K. Weldon