IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| McClain Feed Yard, Inc. | § | Case No. 23-20084-7-rlj |
|    *Debtor.* | § | Chapter 7 Case |
| | § | |
| and | § | |
| | § | |
| McClain Farms, Inc. | § | Case No. 23-20085-7-rlj |
|    *Debtor.* | § | Chapter 7 Case |
| | § | |
| and | § | |
| | § | |
| 7M Cattle Feeders, Inc. | § | Case No. 23-20086-7-rlj |
|    *Debtor.* | § | Chapter 7 Case |

**HTLF 'S OBJECTIONS TO RABO'S MOTION FOR RELIEF
FROM THE AUTOMATIC STAY OR, ALTERNATIVELY, FOR
ABANDONMENT OF CERTAIN CATTLE AND PROCEEDS OF CATTLE**

TO THE HON. ROBERT JONES, UNITED STATES BANKRUPTCY COURT JUDGE:

HTLF Bank, a creditor and party in interest in the above-referenced jointly administered cases, objects to Rabo's Motion for Relief from the Automatic Stay or, Alternatively, for Abandonment of Certain Cattle and Proceeds of Cattle (the "Lift Stay Motion") on the following grounds:

### I.    Summary of Arguments

1.    Rabo's Lift Stay Motion is premised upon the presumption that Rabo's borrowers undisputedly owned all the reclaimed cattle in question. This presumption is factually incorrect.

2.    Rabo's Lift Stay Motion is also premised upon the presumption that Rabo has a perfected first lien on all the reclaimed cattle and proceeds. This presumption is also factually incorrect.

3. Rabo incorrectly presumes that it can litigate in a non-bankruptcy court the ownership and lien priority of all the reclaimed cattle without the presence of the McClain bankruptcy trustee. The McClain bankruptcy trustee will be a necessary party in any ownership or lien priority litigation.

4. By incorrectly assuming that presumption one and presumption two are both correct, Rabo then incorrectly presumes that the McClain bankruptcy trustee has no interest in any of the cattle proceeds above Rabo's secured first lien (if any.)

5. Rabo incorrectly presumes that all the sales of the subject cattle were made in the ordinary course of business, thereby successfully releasing all pre-existing liens. Due to the highly irregular nature of the purchases and sales by McClain, it is highly unlikely that all the sales of these cattle will have all prior liens extinguished.

6. Rabo incorrectly presumes that none of the 19 lots of cattle involved are subject to the USDA "Dealer Trust" claims arising under 7 U.S.C. §217(b). Based upon the response of Trustee Kent Ries, that is incorrect. The dealer trust claims against these 19 lots of cattle have not yet been resolved.

7. Rabo has not disclosed how it proposes to resolve or adjudicate the many factual and legal questions regarding the ownership and lien priority of the 19 groups of cattle referenced in its Motion. Neither has Rabo disclosed how the interests and claims of the McClain bankruptcy trustee and the USDA dealer trust claims in these 19 groups of cattle are to be resolved or adjudicated. It is inappropriate to lift the automatic stay as to these 19 lots of cattle until such legal and factual questions are answered.

## II.  Response to Allegations of Rabo AgriFinance

8. HTLF acknowledges Rabo's identification of the cattle and proceeds which Rabo AgriFinance claims were improperly reclaimed, but denies Rabo's entitlement to the claimed relief.

9. HTLF admits the allegations of paragraphs 1–3 of Rabo's Statement of Facts.

10. HTLF has insufficient information to specifically admit or deny the allegations of paragraphs 4–22 of Rabo's Motion for Relief from the Automatic Stay, but is currently unaware of any reason to dispute any of those alleged facts.

11. HTLF denies the allegations of paragraphs 23 and 24 of Rabo's Motion for Relief from the Automatic Stay.

## III.  Background

12. Brian McClain's basic business model for his area customers was to acquire 4 to 5 weight calves from the Southeastern United States, and send them to Texas where they would be "straightened out" and fed at his two Texas feedyards until they were ready to be sold to area feed yards as feeder cattle. In Brian McClain's business model, he typically sold these calves to area customers shortly after they arrived in Texas. And, after these calves were "straightened out" and fed until they were ready for sale to area feedyards as feeder cattle, Brian McClain then arranged for the sale of these customer cattle to area feedyards and remitted the proceeds to the various cattle investors.

13. From the January 27, 2021 Intercreditor Agreement among Rabo AgriFinance, AgTexas Farm Credit Services, and McClain, as well as from Michelle Stockett's Rabo AgriFinance cattle inspection reports of May 2022 and February 28, 2023, it was absolutely clear to Rabo that McClain's feedyard entities sold cattle repeatedly to different customers, and fed cattle

belonging to local customers … cattle which did not belong to a McClain business entity. It now appears that on some level, McClain was also representing to Rabo AgriFinance that many of the cattle which he had "sold" to his customers were instead owned by one of McClain's business entities, and were pledged to secure Rabo's loans to the McClain business entities. In any event, it is now patently obvious that most of Brian McClain's sales of cattle were fraudulent or at a minimum, highly irregular. As this Court is aware from the case of *Lone Star State Bank v. Rabo AgriFinance*, under the Food Security Act, the sale of cattle not made in the ordinary course does not extinguish previously perfected liens. *Lone Star State Bank of W. Texas v. Rabo Agrifinance, LLC*, 644 B.R. 505, 515 (N.D. Tex. 2022).

14. In its motion to lift stay, Rabo identifies ten groups of cattle regarding which it seeks to have the stay lifted, and also lists nine other groups of cattle which it believes may be subject to Rabo's lien claims. It appears that Rabo seeks to litigate all 19 separate disputes in state or federal district courts. From discussions with Texas Special Rangers who were supervising the reclamation of cattle from the two McClain feedyards on April 18 and 19, 2023, the only cattle released by the Special Texas Rangers were those cattle where the reclaiming cattlemen had some documentary indicia of ownership. That, in turn, means that before any court can determine who is entitled to the proceeds of those 19 groups of cattle, some court will have to determine factual disputes on ownership and lien priority.

### IV. Argument

15. In seeking to have relief from the automatic stay so that it can litigate the ownership and lien priority claims in state or federal district courts, Rabo is making many unfounded and incorrect assumptions.

16. First, it appears that Rabo is presuming that the McClain entities owned all the cattle, so that Rabo's lien attached to all the cattle in these 19 groups. As one example where that is not the case, submitted herewith is the August 11, 2023 affidavit of Terry "Bo" Robinson. According to Mr. Robinson's affidavit, 2B Farms had a group of 251 heifers on feed at the 7M feedyard which had never been owned by McClain or any of his entities. All those cattle had been bought by 2B Farms at various West Texas auctions, were shipped to a McClain feedyard in order to feed them out, and that First Bank & Trust (now HTLF) held the perfected first lien upon them. On another lot of the subject cattle, 2B Farms did buy them from a McClain entity, but 2B paid for them and had ownership documentation. Presumably, the other 17 lots of cattle in question have similar factual disputes on ownership and lien priority.

17. With Rabo clearly having knowledge that the McClain entities were feeding customer cattle which the McClain entities did not own, and therefore clearly having knowledge of the existence of cattle in those feedyards upon which Rabo could not have a lien, neither Rabo, nor any court, can simply "presume" that the McClain entities owned all the cattle and that Rabo had the first lien upon all the cattle present in those feedyards.

18. Second, the cattle which were 'recovered' from the McClain feedyards are actually "reclaimed" cattle, where the seller or sellers were seeking to reclaim their cattle under the provisions of Section 2.702 of the Uniform Commercial Code and Section 546 of the Bankruptcy Code, or where owners (or putative owners) of cattle were trying to reclaim their livestock from failing feedyards which were no longer able to properly care for the cattle. The Texas & Southwestern Cattle Raisers' Association Special Rangers were only allowing cattle to be reclaimed by those with some documentary evidence of ownership. In any case, there remain factual and legal questions on whether or not these cattle were "properly" reclaimed.

19. Third, from the response of the McClain bankruptcy Trustee, Kent Ries, it is clear that these cattle and proceeds are subject to USDA "dealer trust" claims. Because those dealer trust claims are being administered by, or with, Kent Ries, it is clear that Kent Ries is a necessary party to any proceeding to determine ownership and lien priority. It appears that the lien claim of Rabo will be junior to the USDA "dealer trust claims", which apparently must be satisfied before any other lien claims, including Rabo's, can be paid.

20. Fourth, because of all the unresolved factual and legal questions outlined above, it cannot be presumed that there is no trustee equity in any of these cattle above a perfected Rabo first lien. It is possible, for example, that Kent Ries might have agister's lien claims against some of these 19 groups of cattle which will prime any perfected first lien.

21. Fifth, while Rabo's assertion of a lack of equity assumes that Rabo's lien status is unaltered, due to Rabo's knowledge of the McClain Debtors' conduct (detailed in the pleadings in other pending litigation) a case could be made for equitable subordination of Rabo's secured lien in favor of the unsecured creditors. Rabo should not be permitted to benefit from the McClain Debtor's Ponzi scheme merely because it obtained a security interest in the proceeds of that Ponzi scheme. The 5th Circuit has rejected such a result in the context of interest received by lenders who loaned money to a Ponzi scheme. *Janvey v. Brown*, 767 F.3d 430, 442 (5th Cir. 2014).

22. Sixth, because the sales to and by McClain were so irregular, it is likely that many of the sales of the questioned cattle did not extinguish pre-existing liens. (Tex. Bus. & Com. Code Section 9.315 and Food Security Act 7 U.S.C. 1631(d); *Lone Star v. Rabo AgriFinance, Id.*). As a result, it will be necessary to trace the cattle through all prior transactions, identify which transactions were in the ordinary course, and identify what prior liens would have survived.

## V.  Conclusion

23. Movant has not proposed a plan or process by which all the outstanding ownership and lien claims to these 19 groups of cattle may be resolved. Kent Ries (and the USDA) clearly have continuing interests in these cattle and their proceeds, so that his claims and interests cannot simply be ordered abandoned, especially not at this point. There are many factual and legal issues to be determined as to these 19 groups of cattle, so that the Court may not "simply presume" any ownership or lien claim. All these questions need to be adjudicated.

24. HTLF does agree that a process needs to be started to get the ownership and lien claims to these 19 groups of cattle resolved.

DATED this 29th day of March 2024.

Respectfully submitted,

LOVELL ISERN & FARABOUGH, LLP
John H. Lovell, SBN: 123609300
john@lovell-law.net
Matthew S. Merriott, SBN: 24100846
matthew@lovell-law.net
112 SW 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Phone: (806) 373-1515
Fax:   (806) 379-7176

By: /s/ *John H. Lovell*
    John H. Lovell

*Attorneys for HTLF Bank*

### Certificate of Service

I hereby certify that a true and correct copy of the foregoing document was delivered, as certified below, this 29th day of March 2024, to:

David L. LeBas                                           *Via ecf service:* dlebas@namanhowell.com
NAMAN HOWELL SMITH & LEE, PLLC
8310 N. Capital of Texas Hwy, Ste. 490
Austin, TX 78731
   *Attorney for AgTexas Farm Credit Services, AgTexas, PCA,*
   *and Thorlakson Diamond T Feeders, LP*

Timothy T. Pridmore        *Via ecf service: tpridmore@mcjllp.com*
Todd Johnston          *Via ecf service: tjohnston@mcjllp.com*
MCWHORTER COBB & JOHNSON, L.L.P.
1722 Broadway
Lubbock, TX 79408
  *Attorneys for Debtors/Defendants/Counterclaim Plaintiffs/*
  *Third-Party Plaintiffs/Third-Party Counterclaim Defendants,*
  *2B Farms and Terry & Rebecca Robinson*

Michael Johnson         *Via ecf service: mjohnson@rqn.com*
RAY QUINNEY & NEBEKER, P.C.
36 South State St., Ste. 1400
Salt Lake City, UT 84111
and
Thomas C. Riney         *Via ecf service: Tom.Riney@uwlaw.com*
W. Heath Hendricks       *Via ecf service: Heath.Hendricks@uwlaw.com*
UNDERWOOD LAW FIRM, P.C.
P.O. Box 9158
Amarillo, TX 79105-9158
  *Attorneys for Third-Party Defendant/Third-Party*
  *Counterclaim Plaintiff/Cross-Claim Plaintiff,*
  *Rabo AgriFinance, LLC*

Richard A. Illmer        *Via ecf service: Rick.Illmer@huschblackwell.com*
HUSCH BLACKWELL LLP
1900 N. Pearl St., Ste. 1800
Dallas, TX 75201
and
Lynn Hamilton Butler      *Via ecf service: Lynn.Butler@huschblackwell.com*
HUSCH BLACKWELL LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701
  *Attorneys for Third-Party Defendant, Mechanics Bank*

John F. Massouh        *Via ecf service: john.massouh@sprouselaw.com*
SPROUSE SHRADER SMITH
P.O. Box 15008
Amarillo, TX 79105-5008
  *Attorney for Intervenors in State Court Action*

               By: /s/ *John H. Lovell*
                  John H. Lovell