# EXHIBIT W

DocuSign Envelope ID: F236F05504EB-4537-9145-790890200CFB
Case 23-20084-rlj7  Doc 291-23  Filed 09/06/24  Entered 09/06/24 13:22:29  Desc
Exhibit W  Page 2 of 13

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

# SECURITY AGREEMENT

This Security Agreement (this "*Security Agreement*") is entered into as of January 25, 2021, by and between **Thorlakson Diamond T Feeders, LP**, a Texas limited partnership ("*Borrower*"), and **AgTexas Farm Credit Services**, as agent/nominee ("*Lender*").

Recitals

A.     Borrower has entered into a Loan Agreement dated of even date herewith with Lender (as the same may be amended or modified from time to time, including amendments and restatements thereof in its entirety, being hereinafter referred to as the "*Loan Agreement*"), pursuant to which Lender has agreed, subject to certain terms and conditions, to extend credit and make certain other financial accommodations available to Borrower.

B.     As a condition to extending credit to Borrower under the Loan Agreement, Lender has required, among other things, that Borrower grant to Lender a lien on and security interest in the personal property and fixtures of Borrower described herein subject to the terms and conditions hereof.

Agreement

In consideration of these premises and the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### 1.     DEFINITIONS

1.1     <u>Terms Defined in Loan Agreement</u>.  All capitalized terms used herein, unless such terms are otherwise defined herein, shall have the meanings assigned to such terms in the Loan Agreement.

1.2     <u>Terms Defined in UCC</u>.  Terms defined in the UCC which are not otherwise defined in this Security Agreement are used herein as defined in the UCC.

1.3     <u>Definitions of Certain Terms Used Herein</u>.  As used in this Security Agreement, the following terms shall have the following meanings:

(a)     "*Collateral*" shall have the meaning set forth in <u>Article II</u>.

(b)     "*Collateral Report*" means any certificate, report or other document delivered by the Borrower to the Lender with respect to the Collateral pursuant to any Loan Document.

(c)     "*Control*" shall have the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

(d)     "*Event of Default*" means an event described in <u>Section 5.1</u>.

(e)     "*Obligations*" shall have the meaning assigned to such term in the Loan Agreement.

(f)     "*Receivables*" means the accounts, chattel paper, documents, investment property, instruments and any other rights or claims to receive money which are general intangibles or which are otherwise included as Collateral.

DocuSign Envelope ID: F236D0E5-924E-4537-A145-79089020CCFB
Case 23-20084-rlj7  Doc 291-23  Filed 09/06/24  Entered 09/06/24 13:22:29  Desc
Exhibit W  Page 3 of 13

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

(g) "*Stock Rights*" means all dividends, instruments or other distributions and any other right or property which the Borrower shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Equity Interest constituting Collateral, any right to receive an Equity Interest and any right to receive earnings, in which the Borrower now has or hereafter acquires any right, issued by an issuer of such Equity Interest.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

## 2. GRANT OF SECURITY INTEREST

2.1 To secure the prompt and complete payment and performance of the Obligations, each Borrower hereby pledges, assigns and grants to the Lender, a security interest in all of its right, title and interest in, to all personal property assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrower (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Borrower, including, without limitation, all of each of the following (all of which will be collectively referred to as the "*Collateral*"):

(a) stock, participation certificates and/or other equity interests in Lender or any Affiliate of Lender, including but not limited to interest in dividends, whether paid in cash or in stock or participation certificates and in all allocated surplus or allocated equity in Lender or any Affiliate of Lender, including but not limited to exchanged or converted equity;
(b) all accounts, accounts receivable and other rights to the payment of money, whether earned by performance or otherwise;
(c) all cash or cash equivalents;
(d) all chattel paper;
(e) all commodity accounts;
(f) contract rights, including, without limitation, contracts for the future purchase or future sale or delivery of livestock, grain or other commodities;
(g) all deposit accounts;
(h) all documents;
(i) all equipment;
(j) all farm products, including, without limitation, livestock and the offspring, increase, and unborn young of livestock, grain and other agricultural commodities, and crops, whether growing or to be grown, now owned or hereafter acquired;
(k) all fixtures;
(l) all general intangibles;
(m) all goods;
(n) all instruments;
(o) all inventory, including, without limitation, inventories of grain and other agricultural commodities (and warehouse receipts evidencing the ownership of such commodities), seed, fertilizer, chemicals, fuel, oil, feed, feed supplements and additives, veterinary medicines, and supplies;
(p) all payment intangibles; and
(q) all accessions to, substitutions for and replacements, proceeds, insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto.

DocuSign Envelope ID: F236D050-94EF-4537-8145-79089020CCFB
Case 23-20084-rlj7    Doc 291-23    Filed 09/06/24    Entered 09/06/24 13:22:29    Desc
Exhibit W    Page 4 of 13

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

## 3. REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to the Lender that:

3.1 <u>Title, Perfection and Priority</u>. The Borrower has good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Liens permitted under <u>Section 4.1(e)</u> and has full power and authority to grant to the Lender the security interest in such Collateral pursuant hereto.

3.2 <u>Type and Jurisdiction of Organization</u>. Borrower is a limited partnership duly organized and validly existing under the laws of the State of Texas.

3.3 <u>Exact Names</u>. The Borrower's name in which it has executed this Security Agreement is the exact name as it appears in the Borrower's organizational documents. The Borrower has not, during the past five years, been known by or used any other corporate or fictitious name, or been a party to any merger or consolidation, or been a party to any acquisition.

3.4 <u>Accounts and Chattel Paper</u>.

(a) The names of the obligors, amounts owing, due dates and other information with respect to the accounts and chattel paper are and will be correctly stated in all records of the Borrower relating thereto and in all invoices and Collateral Reports with respect thereto furnished to the Lender by the Borrower from time to time. As of the time when each account or each item of chattel paper arises, the Borrower shall be deemed to have represented and warranted that such account or chattel paper, as the case may be, and all records relating thereto, are genuine and in all respects what they purport to be.

(b) With respect to accounts, except as specifically disclosed on the most recent Collateral Report, (i) all accounts represent bona fide sales of inventory or rendering of services to account debtors in the ordinary course of the Borrower's business and are not evidenced by a judgment, instrument or chattel paper; (ii) there are no setoffs, claims or disputes existing or asserted with respect thereto and the Borrower has not made any agreement with any account debtor for any extension of time for the payment thereof, any compromise or settlement for less than the full amount thereof, any release of any account debtor from liability therefor, or any deduction therefrom except a discount or allowance allowed by Borrower in the ordinary course of its business for prompt payment and disclosed to the Lender; (iii) to Borrower's knowledge, there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on the Borrower's books and records and any invoices, statements and Collateral Reports with respect thereto; (iv) the Borrower has not received any notice of proceedings or actions which are threatened or pending against any account debtor which might result in any adverse change in such account debtor's financial condition; and (v) the Borrower has no knowledge that any account debtor is unable generally to pay its debts as they become due.

## 4. COVENANTS

From the date of this Security Agreement, and thereafter until this Security Agreement is terminated, the Borrower agrees that:

4.1 <u>General</u>.

DocuSign Envelope ID: F236D05094EF-4537-A45-79030020CCFF

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

(a) <u>Collateral Records</u>.  The Borrower will maintain complete and accurate books and records with respect to the Collateral, and furnish to the Lender, such reports relating to the Collateral as the Lender shall from time to time request.

(b) <u>Authorization to File Financing Statements; Ratification</u>.  The Borrower hereby authorizes the Lender to file, and if requested will deliver to the Lender, all UCC financing statements and other documents and take such other actions as may from time to time be requested by the Lender in order to maintain a first perfected security interest in and, if applicable, Control of, the Collateral.

(c) <u>Further Assurances</u>.  The Borrower will, if so requested by the Lender, furnish to the Lender, as often as the Lender requests, statements and schedules further identifying and describing the Collateral and such other reports and information in connection with the Collateral as the Lender may reasonably request, all in such detail as the Lender may specify.  The Borrower also agrees to take any and all actions necessary to defend title to the Collateral against all Persons and to defend the security interest of the Lender in the Collateral and the priority thereof against any Lien not expressly permitted hereunder.

(d) <u>Disposition of Collateral</u>.  The Borrower will not sell, lease or otherwise dispose of the Collateral except for dispositions specifically permitted by the Loan Agreement.

(e) <u>Liens</u>.  The Borrower will not create, incur, or suffer to exist any Lien on the Collateral except (i) the security interest created by this Security Agreement, and (ii) Liens permitted under the Loan Agreement.

(f) <u>Compliance with Terms</u>.  The Borrower will perform and comply with all obligations in respect of the Collateral and all agreements to which it is a party or by which it is bound relating to the Collateral.

4.2 <u>Receivables</u>.

(a) <u>Certain Agreements on Receivables</u>.  The Borrower will not make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, prior to the occurrence of an Event of Default, the Borrower may reduce the amount of accounts arising from the sale of inventory in accordance with its present policies and in the ordinary course of business.

(b) <u>Collection of Receivables</u>.  Except as otherwise provided in this Security Agreement, the Borrower will collect and enforce, at the Borrower's sole expense, all amounts due or hereafter due to the Borrower under the Receivables.

(c) <u>Delivery of Invoices</u>.  Following the occurrence of, and during the continuation of an Event of Default, the Borrower will deliver to the Lender immediately upon its request duplicate invoices with respect to each account bearing such language of assignment as the Lender shall specify.

(d) <u>Disclosure of Counterclaims on Receivables</u>.  If (i) any discount, credit or agreement to make a rebate or to otherwise reduce the amount owing on a Receivable exists or (ii) if, to the knowledge of the Borrower, any dispute, setoff, claim, counterclaim or defense exists or has been asserted or threatened with respect to a Receivable, the Borrower will promptly disclose such fact to the Lender in writing.

(e) <u>Electronic Chattel Paper</u>.  If requested by the Lender, the Borrower shall take all steps necessary to grant the Lender Control of all electronic chattel paper in accordance with the UCC and

all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

  4.3 <u>Inventory and Equipment.</u>  The Borrower will do all things necessary to maintain, preserve, protect and keep the inventory and the equipment in good repair and working and saleable condition, except for damaged or defective goods arising in the ordinary course of the Borrower's business and except for ordinary wear and tear in respect of the equipment. The Borrower will promptly endorse and deliver to the Lender any and all certificates of title covering any equipment subject to a certificate of title.

  4.4 <u>Delivery of Instruments, Securities, Chattel Paper and Documents</u>. The Borrower will (a) deliver to the Lender immediately upon execution of this Security Agreement the originals of all chattel paper, Securities and instruments constituting Collateral (if any then exist), (b) hold in trust for the Lender upon receipt and immediately thereafter deliver to the Lender any chattel paper, Securities and instruments constituting Collateral, and (c) upon the Lender's request, following the occurrence of and while an Event of Default is continuing, deliver to the Lender (and thereafter hold in trust for the Lender upon receipt and immediately deliver to the Lender) any document, instrument or agreement evidencing or constituting Collateral.

  4.5 <u>Commercial Tort Claims</u>.  The Borrower shall promptly, and in any event within two Business Days after the same is acquired by it, notify the Lender of any commercial tort claim (as defined in the UCC) acquired by it and, unless the Lender otherwise consents, the Borrower shall enter into an amendment to this Security Agreement granting to Lender a first priority security interest in such commercial tort claim.

  4.6 <u>Farm Products</u>.  On Lender's request, within 10 days following any such request, Borrower shall furnish to Lender a list of the buyers, commission merchants, and selling agents to or through whom Borrower may sell farm products.  Such list shall contain only the names of such buyers, commission merchants, and selling agents to or through whom Borrower reasonably expects to sell such farm products and shall not be needlessly cumulative in such a way as to require Lender to give any notice required by law to an unreasonably large number of such persons.  Borrower hereby agrees that Lender is authorized to send notices pursuant to the Federal Food Security Act of 1985 to all buyers, commission merchants, and selling agents that the Lender in its sole discretion shall determine, including, but not limited to, filing effective financing statements in central filing systems. Borrower hereby agrees to execute such additional disclosures, financing statements, and notices as Lender may request.

  4.7 <u>Change of Name or Location</u>.  The Borrower shall not (a) change its name as it appears in official filings in the state of its organization, (b) change its chief executive office, principal place of business, mailing address, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral as set forth in this Security Agreement, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of organization, or (e) change its state of organization.

    5. **EVENTS OF DEFAULT AND REMEDIES**

  5.1 <u>Events of Default</u>.  The occurrence of any "Event of Default" under, and as defined in, the Loan Agreement shall constitute an "Event of Default" hereunder.

  5.2 <u>Remedies</u>.

    (a) Upon the occurrence of an Event of Default, the Lender may exercise any or all of the following rights and remedies:

(i) those rights and remedies provided in this Security Agreement, the Loan Agreement, or any other Loan Document; *provided that,* this Section 5.2(a) shall not be understood to limit any rights or remedies available to the Lender prior to an Event of Default;

(ii) those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law when a debtor is in default under a security agreement; and

(iii) without notice, demand or advertisement of any kind to the Borrower or any other Person, enter the premises of the Borrower where any Collateral is located (through self-help and without judicial process) to collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Collateral or any part thereof in one or more parcels at public or private sale or sales (which sales may be adjourned or continued from time to time with or without notice and may take place at the Borrower's premises or elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Lender may deem commercially reasonable.

(b) The Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c) The Lender shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of the Lender, the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption the Borrower hereby expressly releases.

(d) Until the Lender is able to effect a sale, lease, or other disposition of Collateral, the Lender shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Lender. The Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Lender's remedies, with respect to such appointment without prior notice or hearing as to such appointment.

(e) Notwithstanding the foregoing, except as expressly provided in the Guaranties, the Lender shall not be required to (i) make any demand upon, or pursue or exhaust any of its rights or remedies against, the Borrower, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any of its rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Obligations or to resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

5.3 <u>Borrower's Obligations Upon Default</u>. Upon the request of the Lender after the occurrence, and during the continuation, of an Event of Default, the Borrower will:

(a) assemble and make available to the Lender the Collateral and all books and records relating thereto at any place or places specified by the Lender, whether at the Borrower's premises or elsewhere;

(b) permit the Lender, by the Lender's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto,

or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Borrower for such use and occupancy; and

(c)    at its own expense, cause the independent certified public accountants then engaged by the Borrower to prepare and deliver to the Lender, at any time, and from time to time, promptly upon the Lender's reasonable request, the following reports with respect to the Borrower: (i) a reconciliation of all accounts; (ii) an aging of all accounts; (iii) trial balances; and (iv) a test verification of such accounts.

## 6. ACCOUNT VERIFICATION; ATTORNEY IN FACT; PROXY

6.1    Account Verification.  The Lender may, at any time after the occurrence of and while an Event of Default is continuing, in the Lender's own name, in the name of a nominee of the Lender, or in the name of the Borrower communicate (by mail, telephone, facsimile or otherwise) with the account debtors of the Borrower, parties to contracts with the Borrower and obligors in respect of instruments of the Borrower to verify with such Persons, to the Lender's satisfaction, the existence, amount, terms of, and any other matter relating to, accounts, instruments, chattel paper, payment intangibles and/or other Receivables.

6.2    Authorization for Secured Party to Take Certain Action.

(a)    Following the occurrence of and while an Event of Default is continuing, the Borrower irrevocably authorizes the Lender at any time and from time to time in the sole discretion of the Lender and appoints the Lender as its attorney in fact (i) to execute on behalf of the Borrower as debtor and to file financing statements necessary or desirable in the Lender's sole discretion to perfect and to maintain the perfection and priority of the Lender's security interest in the Collateral, (ii) to endorse and collect any cash proceeds of the Collateral, (iii) to file a carbon, photographic or other reproduction of this Security Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as the Lender in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Lender's security interest in the Collateral, (iv) to apply the proceeds of any Collateral received by the Lender to the Obligations as provided in the Loan Agreement, (v) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens as are specifically permitted hereunder), (vi) following the occurrence of, and during the continuation of an Event of Default, to contact account debtors for any reason, (vii) following the occurrence of, and during the continuation of an Event of Default, to demand payment or enforce payment of the Receivables in the name of the Lender or the Borrower and to endorse any and all checks, drafts, and other instruments for the payment of money relating to the Receivables, (viii) following the occurrence of, and during the continuation of an Event of Default, to sign the Borrower's name on any invoice or bill of lading relating to the Receivables, drafts against any account debtor of the Borrower, assignments and verifications of Receivables, (ix) to exercise all of the Borrower's rights and remedies with respect to the collection of the Receivables and any other Collateral, (x) following the occurrence of, and during the continuation of an Event of Default, to settle, adjust, compromise, extend or renew the Receivables, (xi) to settle, adjust or compromise any legal proceedings brought to collect Receivables, (xii) following the occurrence of, and during the continuation of an Event of Default, to prepare, file and sign the Borrower's name on a proof of claim in bankruptcy or similar document against any account debtor of the Borrower, (xiii) following the occurrence of, and during the continuation of an Event of Default, to prepare, file and sign the Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables, (xiv) following the occurrence of, and during the continuation of an Event of Default, to change the address for delivery of mail addressed to the Borrower to such address as the Lender may designate and to receive, open and dispose of all mail addressed to the Borrower, and (xv) to do all other

DocuSign Envelope ID: F236D05694EF-7537-D145-79089020CCFF
Case 23-20084-rlj7    Doc 291-23    Filed 09/06/24    Entered 09/06/24 13:22:29    Desc
Exhibit W    Page 9 of 13

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

acts and things necessary to carry out this Security Agreement; and the Borrower agrees to reimburse the Lender on demand for any payment made or any expense incurred by the Lender in connection with any of the foregoing; *provided that,* this authorization shall not relieve the Borrower of any of its obligations under this Security Agreement or under the Loan Agreement.

(b) All acts of said attorney or designee are hereby ratified and approved. The powers conferred on the Lender, under this Section 6.2 are solely to protect the Lender's interests in the Collateral and shall not impose any duty upon the Lender to exercise any such powers.

6.3    Nature of Appointment; Limitation of Duty.  THE APPOINTMENT OF THE LENDER AS ATTORNEY-IN-FACT IN THIS ARTICLE VI IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS SECURITY AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 7.11. NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE LENDER NOR ANY OF ITS RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, PARTNERS, MANAGERS, MEMBERS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

## 7.    GENERAL PROVISIONS

7.1    Limitation on the Lender's Duty with Respect to the Collateral.  The Lender shall have no obligation to clean-up or otherwise prepare the Collateral for sale. The Lender shall use reasonable care with respect to the Collateral in its possession or under its control.  The Lender shall not have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Lender, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. To the extent that applicable law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is commercially reasonable for the Lender (i) to fail to incur expenses deemed significant by the Lender to prepare Collateral for disposition or otherwise to transform raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against account debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against account debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as the Borrower, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of Collateral or to provide to the Lender a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Lender, to obtain the services of

other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any of the Collateral. The Borrower acknowledges that the purpose of this Section 7.1 is to provide non-exhaustive indications of what actions or omissions by the Lender would be commercially reasonable in the Lender's exercise of remedies against the Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7.1. Without limitation upon the foregoing, nothing contained in this Section 7.1 shall be construed to grant any rights to the Borrower or to impose any duties on the Lender that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section 7.1.

  7.2  Compromises and Collection of Collateral. The Borrower and the Lender recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to a Receivable. In view of the foregoing, the Borrower agrees that the Lender may at any time and from time to time, if an Event of Default has occurred and is continuing, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Lender in its sole discretion shall determine or abandon any Receivable, and any such action by the Lender shall be commercially reasonable so long as the Lender acts in good faith based on information known to it at the time it takes any such action.

  7.3  Secured Party Performance of Borrower Obligations. Without having any obligation to do so, the Lender may perform or pay any obligation which the Borrower has agreed to perform or pay in this Security Agreement and the Borrower shall reimburse the Lender for any amounts paid by the Lender pursuant to this Section 7.3. The Borrower's obligation to reimburse the Lender pursuant to the preceding sentence shall be an Obligation payable on demand.

  7.4  No Waiver; Amendments; Cumulative Remedies. No delay or omission of the Lender to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Default or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by the Lender and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to the Lender until the Obligations have been paid in full.

  7.5  Limitation by Law; Severability of Provisions. All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Security Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Security Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part. Any provision in this Security Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of this Security Agreement are declared to be severable.

  7.6  Reinstatement. This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Borrower for liquidation or reorganization, should the Borrower become insolvent or make an assignment for the benefit of any creditor or creditors or

should a receiver or trustee be appointed for all or any significant part of the Borrower's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

       7.7     <u>Benefit of Agreement</u>.  The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of the Borrower, the Lender and their respective successors and assigns (including all Persons who become bound as a debtor to this Security Agreement), except that the Borrower shall not have the right to assign its rights or delegate its obligations under this Security Agreement or any interest herein, without the prior written consent of the Lender.  No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to the Lender hereunder.

       7.8     <u>Survival of Representations</u>.  All representations and warranties of the Borrower contained in this Security Agreement shall survive the execution and delivery of this Security Agreement.

       7.9     <u>Taxes and Expenses</u>.  Any taxes (including income taxes) payable or ruled payable by Federal or State authority in respect of this Security Agreement shall be paid by the Borrower, together with interest and penalties, if any.  The Borrower shall reimburse the Lender for any and all out-of-pocket expenses and internal charges (including reasonable attorneys', auditors' and accountants' fees and reasonable time charges of attorneys, paralegals, auditors and accountants who may be employees of the Lender) paid or incurred by the Lender in connection with the preparation, execution, delivery, administration, collection and enforcement of this Security Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral).  Any and all costs and expenses incurred by the Borrower in the performance of actions required pursuant to the terms hereof shall be borne solely by the Borrower.

      7.10     <u>Headings</u>.  The title of and section headings in this Security Agreement are for convenience of reference only and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

      7.11     <u>Termination</u>.  This Security Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Obligations outstanding) until (a) the Loan Agreement has terminated pursuant to its express terms and (b) all of the Obligations have been indefeasibly paid and performed in full (or with respect to any outstanding letters of credit, a cash deposit has been delivered to the Lender as required by the Loan Agreement) and no commitments of the Lender which would give rise to any Obligations are outstanding.

      7.12     <u>Entire Agreement</u>.  This written Security Agreement and the other Loan Documents constitute the entire agreement between Lender and the other parties to the Loan Documents concerning the subject matter contained in this Security Agreement and the other Loan Documents and supersedes as of the date hereof all prior agreements between Lender and the other parties to the Loan Documents and may not be contracted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements among the parties.

DocuSign Envelope ID: F236D7C5-04EF-4537-9145-720890200CFB
Case 23-20084-rlj7   Doc 291-23   Filed 09/06/24   Entered 09/06/24 13:22:29   Desc
Exhibit W   Page 12 of 13

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

  7.13 <u>Governing Law, Jurisdiction and Venue</u>.  Except to the extent that federal law controls or as otherwise indicated therein, this Security Agreement will be governed by and construed in accordance with the laws of the State of Texas without regard to any choice of law, rules or principles to the contrary. Borrower and Lender agree that venue for any action arising from or relating to this Security Agreement will lie in Randall County, Texas, or in the United States District Court for the Northern District of Texas, Amarillo Division. In any litigation arising from or relating to this Security Agreement, Borrower irrevocably consents to and confers personal jurisdiction on the courts of the State of Texas or the United States courts located within the State of Texas.  Nothing contained herein will, however, prevent Lender from bringing any action or exercising any rights within any other state or jurisdiction or from obtaining personal jurisdiction by any other means available under applicable law or from pursuing any rights or remedies available to Lender under federal law.

  7.14 <u>WAIVER OF JURY TRIAL</u>. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES IRREVOCABLY AND EXPRESSLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY OR THE ACTIONS OF THE LENDER IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF.

  7.15 <u>Counterparts</u>.  This Security Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Security Agreement by signing any such counterpart.

  7.16 <u>Sending Notices</u>.  Any notice required or permitted to be given under this Security Agreement shall be sent in accordance with the notice provisions of the Loan Agreement.

  7.17 <u>AGENT/NOMINEE</u>. THIS SECURITY INSTRUMENT IS EXECUTED BY THE UNDERSIGNED IN FAVOR OF, AND THE TERMS "SECURED PARTY" "BENEFICIARY" AND "LENDER" AS USED HEREIN SHALL INCLUDE, AGTEXAS FARM CREDIT SERVICES FOR ITSELF AND/OR AS AGENT/NOMINEE FOR ANY PARTY PURSUANT TO A MASTER AGREEMENT AMONG IT AND ITS WHOLLY-OWNED SUBSIDIARIES AGTEXAS, FLCA AND AGTEXAS, PCA, AS THEIR INTERESTS MAY APPEAR.

  7.18 <u>Notice of Final Agreement</u>.  THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(remainder of page intentionally left blank)

DocuSign Envelope ID: F236D050-94EF-4537-A145-790B9020CCFB
Case 23-20084-rlj7 Doc 291-23 Filed 09/06/24 Entered 09/06/24 13:22:29 Desc
Exhibit W Page 13 of 13

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

The parties hereto have duly executed this Security Agreement as of the day and year first above written.

BORROWER: THORLAKSON DIAMOND T FEEDERS, LP,
a Texas limited partnership

By Thorlakson Diamond T Feeders Management, LLC,
a Texas limited liability company,
its general partner

By: _____
Benedict Thorlakson,
Manager

By: _____
Thomas Thorlakson,
Manager

LENDER: AGTEXAS FARM CREDIT SERVICES,
as agent/nominee

By: _____
Colton Long,
Vice President