Case 23-20084-rlj7   Claim 298-1 Filed 09/08/24 Desc Main Document Page 1 of 9
Case 23-20084-rlj7   Claim 298-1 Filed 09/08/24 Desc Main Document Page 1 of 9
Exhibit A   Page 1 of 204

**Fill in this information to identify your case:**

Debtor name   **McCLAIN FEED YARD, INC.**

United States Bankruptcy Court for the:   **Northern District of Texas**

Case number   **23-20084-7 rlj**
(if known)

Official Form 410

# Proof of Claim

**4/22**

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

**RABO AGRIFINANCE LLC**

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor   Rabo AgriFinance, Inc.

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Michael R. Johnson, Esq.
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, UT  84111

Name, Number, Street, City, State & Zip Code

Contact phone   **801-323-3363**

Contact email   **mjohnson@rqn.com**

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_____

**Where should payments to the creditor be sent?** (if different)

Rabo AgriFinance Payment Processing Center
14767 North Outer 40 Road, Suite 400
Chesterfield, MO 63017

Name, Number, Street, City, State & Zip Code

Contact phone   **(312) 833-1891**

Contact email   **mike.hayes@Raboag.com**

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____



Trustee's Exhibit

**A**

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes.  Last 4 digits of the debtor's account or any number you use to identify the debtor:

Loan Nos. X2953, X4481, X7432 and X2951

**7. How much is the claim?**

$53,516,988.13   Does this amount include interest or other charges?

☐ No

☑ Yes.  Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

**Unpaid Loan evidenced by, among other documents, a Master Credit Agreement, dated May 11, 2018, Real Estate Term Loans and Operating Line of Credit.    See attached Statement of Claim.**

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☑ Real Estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☑ Other. Describe:   **See attached Statement of Claim (Substantially all Personal Property)**

**Basis for perfection:**   **Trust Deeds in Texas, Mortgage in Kentucky, and UCC-1 Financing Statements Against All Debtors; DACAs with Mechanics Bank**

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $   Unknown-Estimated $4 to $7 Million

**Amount of claim that is secured:**   $   Estimated $4 to $7 Million

**Amount of claim that is unsecured:**   $   Substantially All   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $   53,516,988.33

**Annual Interest Rate** (when case was filed)   _____ %

☐ Fixed

☑ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes.   Amount necessary to cure any default as of the date of the petition:   $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes.   Identify the property: _____

**Proof of Claim**

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | |
|---|---|
| | ☑ No |
| | ☐ Yes.   *Check all that apply.* |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $ _____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $ _____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.   $ _____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. |

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   09 / 11 / 2023
MM/ DD / YYYY

*Signature*

Print the name of the person who is completing and signing this claim:

| Name | **Mike Hayes** |
|---|---|
| Title | **Vice President and Local Financial Restructuring Manager** |
| Company | **Rabo AgriFinance LLC** |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | **14767 North Outer 40 Road, Suite 400, Chesterfield, MO 63017** |
| | Number, Street, City, State and Zip Code |
| Contact phone | **(312) 833-1891**   Email   **mike.hayes@Raboag.com** |

## STATEMENT OF CLAIM OF RABO AGRIFINANCE LLC

### McCLAIN FEED YARD, INC.; Case # 23-20084-RLJ

This claim of Rabo AgriFinance LLC ("Rabo" or the "Claimant") arises out of various loan agreements (the "Loans") between Rabo, as lender, and the following Borrowers/Debtors:

McClain Feed Yard, Inc. ("MFY") (the Debtor in case no. 23-20084);
McClain Farms, Inc. ("MFI") (the Debtor in case no. 23-20085);
7M Cattle Feeders, Inc. ("7M") (the Debtor in case no. 23-20086); and
non-Debtor Brian McClain ("McClain")

(MFY, MFI and 7M, collectively, the "McClain Debtors," and the McClain Debtors and McClain, collectively, the "Borrowers"), which Loans are in default and remain unpaid.

The contractual documents (collectively, the "Loan Documents") evidencing the Loans include the following:

1.      That certain (a) Master Credit Agreement dated May 11, 2018, by and between MFY and Rabo, (b) that certain Joinder, dated July 15, 2019, by and between 7M, MFY, and Rabo, (c) that certain Joinder, dated August 27, 2021, by and between McClain, MFY, 7M and Rabo, (d) that certain Addendum to Master Credit Agreement, dated July 24, 2019, by and between MFY, 7M and Rabo, (e) that certain Addendum to Master Credit Agreement, dated January 13, 2023, by and between the Borrowers and Rabo. The Master Credit Agreement, Joinders, and Addendum to Master Credit Agreement(s) are collectively referred to herein as the "MCA" and are attached hereto as **Exhibit A**.

2.      Along with the execution of the MCA, the Borrowers executed and delivered to Rabo (a) that certain Real Estate Term Loan 1 Note, dated May 11, 2018, in the principal amount of $332,500.00, executed by MFY in favor of Rabo, (b) that certain Real Estate Term Loan 2 Note, dated July 24, 2019, in the principal amount of $625,000.00, executed by 7M in favor of Rabo, (c) that certain Real Estate Term Loan 3 Note, dated August 27, 2021, in the principal amount of $1,019,800.00 executed by McClain in favor of Rabo, and (d) that certain Operating Line of Credit 3 Note, dated January 13, 2023, in the principal amount of $54,000,000.00, executed by MFY, MFI and 7M in favor of Rabo. Each Note was accompanied by those certain Facility Sheets, of various dates, by and between the Borrowers and/or Crystal D. McClain ("C. McClain") in favor of Rabo. The Real Estate Term Loan Note 1, Real Estate Term Loan Note 2, Real Estate Term Loan Note 3, Operating Line of Credit 3 Note, and accompanying Facility Sheets are collectively referred to herein as the "Notes."

3.      The Borrowers are jointly and severally liable for all amounts owed under the Loans.   Further, the Loans are all cross-defaulted and cross-collateralized.

4.      To secure repayment of the indebtedness and obligations evidenced under the MCA, Notes and Facility sheets, the Borrowers pledged real and personal property in favor of Rabo evidenced by Deeds of Trust and Security Agreements as follows:

A.    Real Property.

1.    The real property, improvements, fixtures, water rights and other property described in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated August 27, 2021, executed by MFY and 7M, as Grantor, in favor of Rabo, as Beneficiary, a true and correct copy of which is attached as **Exhibit B**;

2.    The real property, improvements, fixtures, water rights and other property described in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated March 16, 2021, executed by MFY and 7M, as Grantor, in favor of Rabo as Beneficiary, a true and correct copy of which is attached as **Exhibit C;**

3.    The real property, improvements, fixtures, water rights and other property described in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated January 8, 2020, executed by MFY and 7M, as Grantor, in favor of Rabo as Beneficiary, a true and correct copy of which is attached as **Exhibit D**; and

4.    The real property, improvements, fixtures, water rights and other property described in that certain *Deed of Trust, Assignment of Rents and Security Agreement (Deaf Smith and Parmer Counties, Texas)*, dated July 24, 2019, executed by MFY and 7M, as Grantor, in favor of Rabo as Beneficiary, a true and correct copy of which is attached as **Exhibit E**.

On information and belief, based on appraisals that are somewhat stale, the value of the Texas real estate and related improvements, fixtures and water rights encumbered by the foregoing Deeds of Trust is and $1,715,000.00.

In addition to the real property, improvements, fixtures and water rights described in the aforementioned Deeds of Trust, the Borrowers' obligations to Rabo also are secured by certain real property, improvements, fixtures and water rights described in that certain *Mortgage, Assignment of Rents and Security Agreement* granted by non-debtor McClain, which mortgage was recorded on or about September 22, 2021, with the recorder of Marshall County, Kentucky.   On information and belief, based on a recent appraisal, the value of the Kentucky real property collateral pledged by non-debtor McClain is approximately $2,315,000.00.

B.    Personal Property.

1.    The Borrowers, each as a Grantor, in favor of Rabo, as secured party, executed and delivered that certain (a) *Master Security Agreement*, dated August 27, 2021, and (b) that certain *Master Security Agreement*, dated July 24, 2019. True and correct copies of the Master Security Agreement(s) (collectively, the "**MSA**")

are attached hereto as **Exhibit F**.    Under and pursuant to the MSA, the Borrowers, each as a Grantor, pledged essentially all of their personal property assets now owned or hereafter acquired, defined as the "**Collateral**" (MSA, ¶ 1, *The Collateral*), including but not limited to: all accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, deposit accounts, inventory, equipment, fixtures, farm products (including crops grown, growing or to be grown and livestock, born or unborn, supplies used in farming operations,and products of crops and livestock), general intangibles, including all Intellectual Property, all proceeds of crop insurance, price support payments, government program payments, rights and interests under Hedging Agreements, and all accessions, attachments, additions to, substitutes or replacements for any Collateral, and all proceeds, products, rents and profits of any Collateral, allrights under warranties and insurance contracts covering the Collateral, and any causes of action relating to the Collateral, and all Books and Records pertaining to any Collateral, including but notlimited to any computer-readable memory and any computer hardware or software necessary to process such memory (the "**Personal Property Collateral**") in both Texas and Kentucky to secure  the Loan Obligations, due and owing to Rabo under the Loan Documents.

2.  Rabo perfected its first priority security interest in the Personal Property Collateral by filing UCC-1 Financing Statements ("**UCC-1's**") in Office of the Secretary of State of Kentucky and Office of the Secretary of State of Texas. True and correct copies of the UCC-1's of record with the Kentucky Secretary of State's Office and Texas Secretary of State's Office are attached hereto  and incorporated herein as **Exhibit G**.

3.  In addition to the foregoing, and to further perfect its interest in the McClain Borrowers' personal property assets, Rabo, the McClain Borrowers and Mechanics Bank ("**Mechanics**") also entered into Deposit Account Control Agreements ("**DACAs**") regarding the McClain Debtors' bank accounts at Mechanics Bank (Account Nos. X3070, X0423 and X0197).   True and correct copies of the DACAs for each of the foregoing accounts are attached hereto and incorporated herein as **Exhibit H**.

4.  On April 5, 2023, Rabo exercised its rights under the DACAs by providing Mechanics with a written notice to freeze all of the McClain Borrowers' accounts, and to prevent items from being withdrawn or paid from those accounts.

5.     On or about April 11, 2023, Rabo and the Borrowers entered into that certain *Amended and Restated Forbearance Agreement* as amended by that certain *First Amendment to Amended and Restated Forbearance Agreement,* dated April 12, 2023 (collectively, the "**Forbearance Agreement**") wherein the McClain Defendants acknowledged the various Events of Default under the Loans, and Rabo agreed to forbear from exercising its rights and remedies under the Loan Documents. Also, Chelsea Marie McClain (McClain's wife at the

time and now his widow) confirmed no ownership interest in any of the McClain Debtors, asserted no claims in any of Rabo's Collateral and subordinated any and all rights she had in and to any of Rabo's Collateral.

6.      The Loan Documents are cross-defaulted and cross-collateralized such that all Collateral granted to Rabo under the Loan Documents secures the repayment of all Loan Obligations.

7.      Further, all of the McClain Debtors are jointly and severally liable, both as primary obligors and as guarantors, for the repayment of all Loan Obligations under the Loans.

## Claim Amount and Interest Rate

1.      As of May 1, 2023, the outstanding indebtedness due and owing to Rabo pursuant to the terms of the Loan Documents, exclusive of attorneys' fees/professional fees and costs, default interest, and other charges as allowed under the Loan Documents (the "**Loan Obligations**") totals no less than **$53,516,988.33**, broken down as follows:

(a)      $52,254,714.83 on Obligation No. 22122952/22122953 (Operating Line of Credit 3) itemized as follows:

| | |
|---|---|
| Principal: | $50,628,072.06 |
| Maintenance of assets fees | $198,000.42 |
| Interest on principal balance: | $1,002,984.95 |
| Interest on fees: | $1,664.96 |
| Default Interest: | $423,992.44 |

(b)      $183,521.61 on Obligation No. 22114181 (Real Estate Term Loan 1) itemized as follows:

| | |
|---|---|
| Principal: | $181,981.95 |
| Default Interest: | $1,539.66 |

(c)      $169,279.45 on Obligation No. 22117432 (Real Estate Term Loan 2) itemized as follows:

| | |
|---|---|
| Principal: | $167,784.62 |
| Default Interest: | $1,494.83 |

(d)      $909,472.44 on Obligation No. 22122951/0000030687 (Real Estate Term Loan 3) itemized as follows:

| | |
|---|---|
| Principal: | $890,991.72 |
| Legal fees: | $10,968.85 |
| Interest on legal fees: | $25.91 |

Default Interest:          <u>$7,485.96</u>

2.      Based on appraisals that Rabo obtained on the Real Property several years ago, Rabo is informed and believes that the value of the Real Property is not more than $2,000,000.00 (the Real Property appraised for the combined amount of $1,715,000.00 in 2019).

3.      As it relates to the Personal Property, Rabo is informed and believes that the fair market value of all the Personal Property is not less than $1,000,000.00.

4.      In addition to the foregoing real and personal property assets, Rabo also asserts a first priority lien on the following cash amounts held by the Chapter 7 Trustee (currently totaling $4,119,557.87), plus any additional amounts that the Trustee receives or obtains that are the proceeds of Rabo's collateral:

   a. The $91,507.10 paid by Cactus Cattle to the Trustee on or about May 3, 2023;
   b. The $1,638,772.29 in cattle proceeds paid by Bluegrass Auctions to the Trustee on or about April 24, 2023;
   c. The $835,560.05 in cattle proceeds paid by Lone Star Stock Yards to the Trustee on or about May 21, 2023;
   d. The $80,010.70 in funds that the Chief Restructuring Officer sent to the Trustee on or about June 27, 2023, which funds were directly advanced by Rabo to the CRO in April 2023 subject to Rabo's existing lien rights, and were not from cattle sales or funds from the Debtors' operations;
   e. The $1,414,714.60 that Mechanics Bank forwarded to the Trustee on or about May 27, 2023, which funds came from bank accounts upon which Rabo had a first priority lien pursuant to DACAs between Rabo, Mechanics Bank and the McClain Debtors;
   f. The $58,993.13 in payments that Feed Logistics LLC has made to the Trustee on various dates to purchase feed; and
   g. Any other funds received by the Trustee in this case from the use, sale or liquidation of real or personal property, other than recoveries on Chapter 5 claims which Rabo concedes would be unencumbered funds.

5.      Finally, as noted above, Rabo's claims are also secured by a first priority lien and security interest in real property in Kentucky pursuant to a mortgage granted by McClain on real property assets titled in McClain's name.   The Kentucky property is not property of the bankruptcy estate.

## <u>Reservation of Rights</u>

The filing of this Proof of Claim is not a concession or admission as to the correct characterization or treatment of Rabo's claims, nor a waiver of any rights or defenses of Rabo, all of which are expressly reserved.   The execution and filing of this Proof of Claim is not and shall not be deemed or construed as: (i) a waiver or release of Rabo's rights against any other entity or person liable for all or any part of the claim asserted herein; (ii) a consent by Rabo to

the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Rabo; (iii) a waiver or release of Rabo's right to mediate or arbitrate any dispute, as applicable, including the amount or nature of the claim; (iv) a waiver or release of Rabo's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution; (v) a consent by the Rabo to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. §157(e) or otherwise; (vi) a waiver or release of Rabo's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court Judge; (vii) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Amended Claim, any objection thereto, or other proceeding which may be commenced in this case against or otherwise involving the Rabo; (viii) a waiver or release of the Rabo's right to setoff under the Bankruptcy Code or recoupment; (ix) an election of remedies that waives or otherwise affects any other remedies; (x) a waiver of any right with respect to property of Rabo held by the Debtors; or (xi) a waiver of Rabo's right to assert any additional claims that may be entitled to administrative priority under sections 503 and 507 of the Bankruptcy Code.

Rabo also expressly reserves the right to amend and/or supplement this Proof of Claim at any time, and in any manner, and/or to file additional proofs of claim for any additional claim which may be based on the same or additional documents or grounds of liability.

# EXHIBIT A

# MASTER CREDIT AGREEMENT

This Master Credit Agreement (referred to herein as the "Agreement" or the "MCA") is dated as of May 11, 2018 between MCCLAIN FEED YARD, INC , a Texas corporation ("Party") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender")

## ARTICLE 1 - THE FACILITY SHEETS

**1 01    Facility Sheets**   Lender has agreed, subject to the terms of this Agreement, to make one or more credit facility(ies) available to Party under the terms and conditions of one or more Facility Sheet(s), which are incorporated herein   Lender may in the future and at its sole option make additional credit facilities available to Party which by their terms will be governed by this Agreement and a separate Facility Sheet(s)   Upon and in the event Lender enters into any Facility Sheet with any Party that specifically references this MCA, the term "Agreement" as used in the Facility Sheet or any exhibit or schedule in connection therewith, shall be deemed to include this MCA as well as such Facility Sheet

## ARTICLE 2 – SCHEDULE OF DEFINITIONS AND COVENANTS

**2.01    Schedule of Definitions and Covenants**   This Agreement is also entered with reference to a Schedule of Definitions and Covenants  Party hereby acknowledges Party has received and reviewed the Schedule of Definitions marked as Exhibit A via paper copy, electronic copy, electronic mail, or by accessing the Schedule of Definitions with the version number that matches the version number shown in the footer of this Agreement at https://www.raboag.com/about-us/schedule-definitions 167  Lender and Party agree the Schedule of Definitions is hereby incorporated by reference  The Applicable Obligor Covenants Schedule is attached hereto and incorporated herein by reference as Exhibit B  Party agrees to the Schedule of Definitions and Covenants and the Applicable Obligor Covenants Schedule  Capitalized terms contained in this Agreement are used as defined in the Schedule of Definitions and Covenants  Some of or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Agreement, the Applicable Obligor Covenants Schedule and the Facility Sheet(s)  To the extent any term is defined in the Schedule of Definitions and Covenants but is not used in this Agreement, the Applicable Obligor Covenants Schedule, any Facility Sheet, or any amendment, modification or supplement to this Agreement, such term shall be deemed to be disregarded, of no meaning and without any effect  Except as otherwise defined in this Agreement or in the Schedule of Definitions and Covenants, or unless the context otherwise requires, each term that is used in this Agreement which is defined in Article 9 of the UCC shall have the meaning ascribed to that term in Article 9 of the UCC  If a term is defined in an Applicable Obligor Covenants Schedule, Facility Sheet, Schedule of Covenants, or Other Schedule differently than in the Schedule of Definitions and Covenants, then the definition in each such Facility Sheet, Schedule of Covenants, or Other Schedule will control for the purposes of that schedule and that schedule only

## ARTICLE 3 - COVENANTS UNDER THE FACILITY SHEETS

**3 01    Computation of Interest**   All computations of accrued interest under all Loan Documents other than interest at the Maximum Rate, and all fees under all Loan Documents, will be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) elapsed   Except as set forth in a Facility Sheet, there is no limit on the amount that an Interest Rate subject to Adjustment by Lender may increase at any one time, or in the aggregate   Lender's determination of an Interest Rate will be conclusive, absent manifest error

**3 02    Adjustment of Long Term Adjustable Rate**   Lender shall notify Party of any Adjustment of a Long Term Adjustable Rate not less than 30 days before the Long Term Adjustable Rate Adjustment Date   At any time prior to that Long Term Adjustable Rate Adjustment Date, Party may deliver a Notice of Election to Prepay   If Lender receives an Election to Prepay, the entire amount of the principal indebtedness accruing interest at the Long Term Adjustable Rate shall be Prepaid without Prepayment Fee on or before that date which is 90 days after the Long Term Adjustable Rate Adjustment Date   If Lender does not receive a Notice of Election to Prepay, then Party may, but is not obligated to Prepay all or any part of the principal indebtedness accruing interest at the Long Term Adjustable Rate without Prepayment Fee, on or before the Long Term Adjustable Rate Adjustment Date

**3.03    Late Fee**   At Lender's option in each instance, to the extent permitted by Applicable Law, Party shall pay on demand a late fee in the amount of 5 000% of the amount of any scheduled payment due prior to the Maturity Date, which is not paid in full when due   The imposition and payment of a late fee will not constitute a waiver of Lender's rights with respect to an Event of Default as a result of that late payment

**3 04    Default Rate**   Upon the occurrence of an Event of Default, the principal balance of Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Default Rate, subject to the provisions of the Schedule of Definitions and Covenants, the Applicable Obligor Covenants Schedule and the applicable Facility Sheet   The provisions of this section may result in compounding of interest   The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default

**3 05    Maximum Rate**   Notwithstanding any provision of this Agreement to the contrary, (a) no interest will be due on any amount due under this Agreement if, under Applicable Law, Lender is not permitted to charge interest on that amount, and (b) in all other cases interest due under this Agreement will be calculated at a rate not to exceed the Maximum Rate   If Party is requested by Lender to pay interest on any amount due under this Agreement at a rate greater than the Maximum Rate, the amount of interest due on that amount will be deemed the Maximum Rate and all payments in excess of the Maximum Rate will be deemed to have been Prepayments without Prepayment Fee or penalty, and not interest   All amounts other than interest which are paid or agreed to be paid to Lender for the use, forbearance, or detention of Party's indebtedness to Lender under this Agreement shall, to the extent permitted by Applicable Law, be amortized over the full stated term of the indebtedness, so that the rate of interest on account of that indebtedness does not exceed the Maximum Rate for so long as the indebtedness is outstanding

**3.06    Method and Application of Payments**   All payments of principal, interest, and other amounts to be made under any Loan Documents shall be made to Lender in U S  dollars and in immediately available funds, without set-off, deduction, or counterclaim, not later than 2 00 pm (St  Louis, Missouri time) on the dates on which those payments will become due (any of those payments made after that time on the due date will be deemed to have been made on the next succeeding Business Day)   All payments received by Lender (including, to the extent permitted by Applicable Law, all proceeds received from the sale or other liquidation of the Collateral) will be applied to the Obligations in any order determined by Lender  The early or late date of making a regularly scheduled payment will be disregarded for purposes of allocating the payment between principal and interest  For this purpose, the payment will be treated as though made on the date due  In any legal action or proceeding, the entries made by Lender in an account or accounts maintained by Lender or Rabobank or any of their Affiliates in accordance with its usual practice and evidencing the Obligations, will be prima facie evidence of the existence and amounts of those Obligations

**3.07    Prepayments Generally.**   The Prepayment of principal on any Loan shall be subject to the Prepayment Options that are set forth in the Facility Sheet applicable to such Loan  Lender may refuse to accept any Prepayment not expressly permitted in the Loan Documents  If a Prepayment is conditioned upon a Notice of Election to Prepay or other prior notice to Lender, at the option of Lender, (a) that Notice of Election to Prepay or notice will be irrevocable, (b) Prepayment will be due in the amount and on the date specified in that Notice of Election to Prepay or notice, and (c) that Notice of Election to Prepay or notice will not affect Parties obligation to make all other payments required under the Loan Documents on the

date when due  If Lender receives any Prepayment which it is permitted to refuse, Lender may accept Prepayment, except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due whichever is earlier  Each Prepayment of a portion of a Loan will be applied to the most remote payment of the principal due under a Facility Sheet for which such Prepayment is designated and as may be permitted under such Facility Sheet

**3 08**     <u>Reporting Requirements</u>  Lender may, from time to time, ask for various reporting and other such documentation from each Party to the Agreement regarding the operations, business, corporate affairs and financial condition, including without limitation financial, tax, and other corporate records reporting  Said reporting and/or documentation requests will be made by Lender in its sole and absolute discretion  Except where such reports shall be delivered within a different time period, each Party will be required to provide Lender with the requested reporting within 30 days of the receipt of written notice from Lender  Financial reporting, if any, will be at least of the quality specified in the notice and may be (i) tax returns, (ii) self-prepared financial statements, (iii) CPA Compiled statements, (iv) CPA Reviewed statements and/or (v) CPA Audited statements each based upon either US GAAP or FFSC reporting as also specified in the notice

**3.09**     <u>Mandatory Repayments</u>  If at any time the unpaid principal balance of any Loan exceeds the Maximum Amount thereof under the terms of this Agreement, then, subject to a Permitted Over-Advance for such Loan, upon demand by Lender, Party shall repay that portion of the principal balance thereof in excess of that Maximum Amount, along with all unpaid accrued interest on that portion

**3.10**     <u>Aggregate Borrowing Base</u>  In no event shall any Borrowing Base Certificate submitted hereunder, include any Eligible Collateral (as such term is defined in a Facility Sheet) that are also included in another Facility Sheet Borrowing Base

### ARTICLE 4 - COLLATERAL

**4 01**     <u>Collateral Documents.</u>  The payment and performance of the Obligations are secured by those Liens in favor of Collateral Agent as agent for the Lender pursuant to the Collateral Agency Agreement created under (i) any Security Instrument now or hereafter entered into by Party in favor of Collateral Agent, which states that it secures all or any of the Obligations, (ii) any other instrument or agreement now or hereafter delivered to Lender and/or Collateral Agent in conjunction with this Agreement, which states that it secures all or any of the Obligations, and (iii) any Cross Collateralized Loan Documents, if applicable

**4 02**     <u>Due on Sale or Encumbrance Provisions</u>  Each Mortgage shall include a provision similar to the following, with applicable terms to be revised as the context requires  Parties shall not make or permit any Prohibited Transfer  Upon Lender's or Beneficiary's election, whichever is applicable, any Prohibited Transfer shall be an Event of Default, permitting Lender/Beneficiary and/or Collateral Agent to declare all of the Secured Obligations to be due and payable immediately

### ARTICLE 5 - LOAN OPENING AND FUNDING CONDITIONS

**5.01**     <u>Loan Opening Conditions.</u>  Lender's obligation to make a Loan is subject to satisfaction of the following Loan Opening Conditions and receipt by Lender of the following items, each as determined by Lender in Lender's sole and absolute discretion

(a)     <u>No Event of Default.</u>  No Event of Default or condition which with the giving of notice or passage of time would be an Event of Default exists under this Agreement,

(b)     <u>Fully Executed Agreement</u>  Lender shall have received a completed and executed Agreement,

(c)     <u>Fully Executed Facility Sheet.</u>  Lender shall have received a completed and executed Facility Sheet

(d)     <u>Fully Executed Loan Documents</u>  Loan Documents applicable to the Loan Type and executed by Party and any other Parties, all as set forth in this Agreement or the Facility Sheet applicable to the Loan Type,

(e)     <u>Amendments to Cross Collateralized Loan Documents.</u>  Amendments to Cross Collateralized Loan Documents to the extent, if any, required by Lender for purposes of securing the Loan Obligations,

(f)     <u>Organizational Evidence</u>  Evidence (i) of the formation, existence and good standing of all Parties to the Transaction Documents other than Lender which are anything other than an individual, if any, and authorization of the individuals executing the Transaction Documents on behalf of those Parties, (ii) to the extent required by Lender or by Applicable Law such information that Lender may require to determine who the ultimate beneficial owner of any or all the Parties, (iii) that there has been no material change in the management and/or ownership structure of any Party since the date on which the application for the applicable Loan was submitted,

(g)     <u>Financial Evidence</u>  Evidence there has been no Material Adverse Effect as to any Party since the effective date of the Financial Information provided to Lender

(h)     <u>Appraisals and Reports.</u>  All Appraisals and inspection reports required by Lender,

(i)     <u>Environmental Information.</u>  Environmental Information establishing compliance with all applicable Environmental Laws,

(j)     <u>Regulatory Compliance</u>  Evidence that all regulatory approvals, Permits and licenses required under Applicable Law for Party's business operations have been issued and are in full force and effect,

(k)     <u>Validity of Liens.</u>  Evidence that the Liens granted to Lender under the Collateral Documents are valid, enforceable, properly perfected, and prior to the rights and interests of all other Persons, except those rights and interests acceptable to Lender,

(l)     <u>Title Evidence</u>  Evidence that all policies of title insurance, opinions of title and endorsements required by Lender or under the Loan Documents have been issued and are in full force and all premiums and charges for those policies, opinions and endorsements have been paid,

(m)     <u>Representations and Warranties.</u>  All representations and warranties of all Parties in the Transaction Documents are true and correct,

(n)     <u>Legal Opinion</u>  To the extent required by Lender, a written opinion from Parties' and Guarantor's (if any) legal counsel acceptable to Lender, covering all issues required by Lender,

(o) **Payment of Fees and Costs** Payment to Lender of all fees and costs set forth in this Agreement,

(p) **Reimbursement of Appraisal Expenses.** Reimbursement of Lender's Appraisal Expenses,

(q) **Reimbursement of Closing Expenses** Reimbursement of Closing Expenses,

(r) **Collateral Ownership** If any Collateral is not owned by the Party, Party must cause all individuals or entities who own such Collateral to enter into this Agreement, and

(s) **Preconditions** All other documents, information and other preconditions required by Lender, including, but not limited to, confirmation that Party is in compliance with all covenants set forth in this Agreement

**5 02    Loan Funding Conditions.** Lender's obligation to disburse funds under a Loan is subject to satisfaction of all other requirements and conditions set forth in this Agreement, the Applicable Obligor Covenants Schedule and in the Facility Sheet in connection with the Loan, as determined by Lender in Lender's sole and absolute discretion

## ARTICLE 6 – PARTY REPRESENTATIONS

**6 01    Representations.** Party represents (collective, the "Party Representations") to Lender that

(a) **Good Standing** If Party is anything other than an individual, Party was duly formed, is validly existing and in good standing and qualified to do business in its state of organization and each state in which it conducts its business,

(b) **Due Power and Authority** The execution, delivery and performance by Party of each Transaction Document to which it is a Party, is within the powers and authority of Party and has been duly authorized,

(c) **No Conflict with Applicable Law** To Party's knowledge, the Transaction Documents do not conflict with any Applicable Law,

(d) **Enforceability.** Each Transaction Document is a legal, valid and binding obligation of Party, enforceable against Party in accordance with its terms, and any Transaction Document, instrument or agreement required thereunder, when executed and delivered to Lender, will be similarly legal, valid, binding and enforceable,

(e) **Financial Information** All Financial Information delivered to Lender in connection with Party's application for a Loan, Lender's underwriting and approval of the Loan, or this Agreement and the other Loan Documents, are accurate, correct and sufficiently complete in all material respects to provide Lender true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities,

(f) **Utilities** All Utilities necessary and appropriate for the conduct of the business of Party are available or Party has taken all steps necessary to assure that all utility services so required will be available upon commencement of the business of Party,

(g) **Roads.** All Roads necessary for the completion, occupancy and operation of Party's business have either been completed or the necessary easements or rights-of-way therefor have been acquired or dedicated to public use, and all necessary steps have been taken by Party to ensure their completion no later than the date they will be needed for operation of Party's business or any earlier date required by any Governmental Authority or Applicable Law,

(h) **Permits.** All Permits have been obtained, or, to the extent not obtained, no information or fact exists that would reasonably cause Party to believe that all Permits required to construct, occupy, and operate Party's business will not be readily obtainable prior to the commencement of Party's applicable business,

(i) **No Material Adverse Effect** There has been no Material Adverse Effect as to Party since the effective date of the Financial Information provided to Lender,

(j) **No Judgment** Party is not the subject of any Judgment, and there is no lawsuit, tax claim or other dispute pending or to Party's knowledge threatened against Party that, if determined adverse to Party, is reasonably likely to have a Material Adverse Effect,

(k) **No Conflicts** The Transaction Documents do not conflict with, nor is Party in default under any agreement or arrangement in effect providing for or relating to extensions of credit in respect of which Party is in any manner directly or contingently obligated,

(l) **Tax Returns.** Party has filed all tax returns (federal, state, and local) required to be filed by Party and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties,

(m) **Applicable Laws Compliance.** Party is in compliance with all Applicable Laws (including all Environmental Laws), and there is no claim, action, proceeding or investigation pending or to Party's knowledge threatened against Party with respect to a violation of Applicable Law by Party,

(n) **Non-Foreign Person** Party is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code of 1986, and

(o) **No Event of Default** There is no Event of Default or event which, with notice or lapse of time would be an Event of Default

**6 02    Information Accurate and Complete** Party's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of Party, from time to time, whether or not required under this Agreement, will be deemed accompanied by a representation by Party that the report, record or information is complete and accurate in all material respects as to the condition or operations of Party (and, if applicable, Party's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities

## ARTICLE 7 – PARTY COVENANTS

McClain MCA 2018
Master Credit Agreement

3

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under any Loan (if applicable), Party (or the Person or Persons as may be specifically named in any of the Covenants or Reporting Requirements) agrees to and makes the Covenants set forth in this MCA

**7.01    Books and Records**  Party shall maintain and cause each of its Subsidiaries to maintain proper books of record and account including full, true, and correct entries of all dealings and transactions relating to its and their business and activities, in all material respects in conformity with GAAP

**7.02    Change in Accounting**  Party shall not make any material change or modification of Party's manner and method of accounting except as required by the applicable accounting standard

**7.03    Maintenance of Assets**  Party shall maintain and preserve all rights, privileges, and franchises Party now has, and make any repairs, renewals, or replacements to keep Party's properties in good working condition

**7.04    Landlord Agreement**  Upon request by Lender, for any personal property Collateral located on real property which is not owned by Party (or the grantor of the security interest in favor of Lender), Party shall obtain an agreement in favor of Lender signed by the owner of the real property and the holder of any mortgage or deed of trust on the real property, waiving any of their rights in the Collateral and permitting Lender's removal thereof from the real property

**7.05    Mortgagee Agreement**  Upon request by Lender, for any personal property Collateral located on real property which is subject to a mortgage or deed of trust in favor of a Person other than Lender, Party shall obtain an agreement in favor of Lender signed by the holder of the mortgage or deed of trust on the real property, waiving any of their rights in the Collateral and permitting Lender's removal thereof from the real property

**7.06    Existence and Good Standing**  If Party is anything other than an individual, Party shall preserve and maintain its existence and good standing in the jurisdiction of its formation, and qualify and remain qualified to conduct its business in each jurisdiction in which such qualification is required,

**7.07    Change in Business or Organizational Structure.**  Party shall not engage in any material line of business substantially different from, or unrelated to, those lines of business conducted by Party and its Subsidiaries on the date hereof, and if Party is anything other than an individual, Party shall not (a) form or otherwise acquire any Subsidiary, unless that Subsidiary executes and delivers to Lender a Guaranty of all of the Obligations and all other instruments and agreements required by Lender, (b) merge, dissolve, liquidate, consolidate with or into another Person, or dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, or (c) change its name, identity or business structure or the location(s) of (A) Party's place of business or Party's chief executive office if Party has more than one place of business, (B) Party's state of organization

**7.08    Compliance with Laws**  Party shall comply in all respects with all Applicable Laws and pay before delinquency, all taxes, assessments, and governmental charges imposed upon Party or its property

**7.09    Inspections**  Party shall, at any reasonable time and from time to time, permit Lender or any of its agents or representatives to examine and make copies of and abstracts from the records and books of, and visit the properties of, Party and to discuss the affairs, finances, and accounts of Party with (if Party is other than an individual) officers, directors, partners, or managers or Party, as applicable, Party's independent accountants, and any other Person dealing with Party

**7.10    Insurance**  Party shall maintain, or cause to be maintained, all insurance policies and any such additional insurance as required by Lender or any Swap Counterparty from time to time  All policies of insurance required must be issued by companies approved by Lender and the Swap Counterparties, and must be acceptable to Lender and the Swap Counterparties as to amounts, forms, risk coverages, deductibles, expiration dates, and loss payable and cancellation provisions  In addition, each required policy must contain such endorsements as Lender or the Swap Counterparties may require and must provide that all proceeds be payable to Lender and the Swap Counterparties to the extent of their respective interests  If and whenever Lender or a Swap Counterparty believes that any required insurance is not in effect, Lender  or that Swap Counterparty may (but will not be obligated to) procure that insurance at Party's expense  Party shall reimburse Lender and the Swap Counterparties, on demand, for all premiums on that insurance paid by Lender or the Swap Counterparties, respectively  If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of 1) the full unpaid principal balance of the Loan, plus Swap Counterparties' derivative exposure under the Hedging Agreements as calculated by Swap Counterparties, plus any prior Lien on the property securing the Loan, 2) the total replacement value of any structure located in the flood hazard area, or 3) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan

**7.11    Arms' Length Dealing.**  Except for *de minimis* transactions, Party shall not enter into any transaction of any kind with any family member, Subsidiary or Affiliate of Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Party as would be obtainable by any Party at the time in a comparable arm's length transaction with a Person other than a family member, Subsidiary or Affiliate of Party

**7.12    Use of the Loan.**  Party shall not use the Loan (a) for personal, family or household purposes, or (b) to purchase or carry margin stock or to invest in other Persons for the purpose of carrying any such margin stock or to reduce or retire any indebtedness incurred for that purpose or for any illegal activity

**7.13    ERISA Plans.**  Party shall promptly pay and cause all Subsidiaries to pay contributions adequate to meet not less than the minimum funding standards under ERISA with respect to each and every Plan, file each annual report required to be filed pursuant to ERISA in connection with each Plan for each year, and notify Lender within ten days following the occurrence of any Reportable Event that might constitute grounds for termination of any capital Plan by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer any Plan  Capitalized terms in this section shall have the meanings defined within ERISA

**7.14    Legal Fees; Costs**  Party shall pay the following  (a) costs, expenses and Legal Fees paid or incurred in connection with the collection or enforcement of the Transaction Documents, whether or not suit is filed, (b) costs and Legal Fees paid or incurred in connection with any Insolvency Proceeding involving a claim under the Transaction Documents, (c) costs, expenses and Legal Fees incurred to protect the Lien and security interests under the Collateral Documents, including but not limited to appraisals, inspections, insurance premiums, and the prevention of waste, and (d) costs of suit and such sum as the court may adjudge as Legal Fees in any action to enforce payment of the Notes or any part thereof

McClain MCA 2018
Master Credit Agreement

**7.15** <u>Other Acts</u>  Upon request by Lender, Party shall cooperate with Lender for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien granted under this Agreement or the Collateral Documents, or to carry out the intent of the Transaction Documents

**7 16** <u>Reporting Requirements</u>  Party shall furnish to Lender notice of the occurrence of any of the following, promptly, but in any event no later than five days after such occurrence  (i) any lawsuit, tax claim or other dispute if filed or threatened against Party in an amount greater than $100,000 00, (ii) any substantial dispute between Party and any Governmental Authority, (iii) the failure by Party to comply with the terms and provisions of this Agreement, (iv) any Material Adverse Effect as to Party, or (vi) any change in Party's name, legal structure, place of business, or chief executive office

### ARTICLE 8 - REMEDIES

Upon the occurrence of an Event of Default, Lender may  (a) without notice to Party, decline any Request for Advance, (b) declare all Loan Obligations immediately due and payable, without presentment, notice of intent to accelerate or notice of acceleration, demand, protest or further notice of any kind, all of which are expressly waived by Party, and (c) exercise all other rights and remedies afforded to Lender under any or all Loan Document or Applicable Law or in equity, except that upon an actual or deemed entry of an order for relief with respect to Party or any of its Subsidiaries in any Insolvency Proceeding, (i) any obligation of Lender to make any additional advance under any Loan, other than all or any portion of any Loan already advanced by Lender pursuant to the terms and conditions herein, shall automatically be terminated and (ii) all Loan Obligations shall automatically become due and payable, without presentment, demand, protest or any notice of any kind, all of which are expressly waived by Party

### ARTICLE 9 - NOTICES

All Notices between the Parties must be in writing and mailed or delivered to the address specified in that Loan Document, or to the address designated by any Party in a notice to the other Parties, and in the case of any other Person, to the address designated by that Person in a notice to Party and Lender  All Notices will be deemed to be given or made upon the earlier to occur of (a) actual receipt by the intended recipient or (b) (i) if delivered by hand or by courier, upon delivery, or (ii) if delivered by mail, four Business Days after deposit in the mails, properly addressed, postage prepaid, except that Notices and other communications to Lender shall not be effective until actually received by Lender  Party requests that Lender accept, and Lender may, at its option, accept and is entitled to rely and act upon any Notices purportedly given by or on behalf of Party, even if not made in a manner specified herein (including Notices made verbally, by telephone, facsimile, email, or other electronic means of communication), were incomplete or were not preceded or followed by any other form of Notice specified herein, or the terms thereof, as understood by the recipient, varied from any confirmation thereof  All telephonic Notices to and other telephonic communications with Lender may be recorded by Lender, and each Party consents to such recording

### ARTICLE 10 – ACCOUNTING MATTERS AND DRAFTING CONVENTIONS

**10.01** <u>Accounting Matters.</u>  All accounting terms not specifically defined herein or in the Schedule of Definitions and Covenants will be construed in accordance with GAAP or FFSC, at Party's option  All financial covenants applicable to an individual will be calculated based on that individual's business, excluding personal assets and liabilities  Party will not change (a) the accounting standards used to prepare Party's financial statements or (b) the manner in which either the last day of its fiscal year or the last days of the first three fiscal quarters of its fiscal years is calculated  If at any time any change in GAAP or FFSC would affect the computation of any financial ratio or requirement set forth in any Loan Document, Lender may amend that ratio or requirement to preserve the original intent thereof in light of that change

**10 02** <u>Drafting Conventions.</u>  Unless expressly stated therein or the context otherwise requires, all Loan Documents will be interpreted in accordance with the Drafting Conventions

### ARTICLE 11 – GENERAL TERMS AND CONDITIONS APPLICABLE TO ANY LOAN AND LOAN TYPE

**11.01** <u>Loan Documents.</u>  Each Loan shall be evidenced by a Note and any other Loan Documents Lender so requires  The form, substance and enforceability (substantiated by an opinion of Party's counsel, if requested) of all Loan Documents required by Lender must also be satisfactory to Lender's counsel and all Loan Documents will contain terms and conditions not set forth in this Agreement and required by Lender for the Loan Type contemplated by this Agreement and the applicable Facility Sheet

**11 02** <u>Compliance With Conditions.</u>  Lender shall have received such evidence of compliance with the Loan Opening Conditions and such other due diligence items as Lender or its counsel may reasonably require

**11.03** <u>Obligation to Borrow and Lend</u>  Party's obligation to borrow and Lender's obligation to lend any Loan hereunder shall be conditioned upon the execution and delivery by Party and Lender of this Agreement, a Facility Sheet and the satisfaction of all Loan Opening Conditions set forth in this Agreement  Lender shall be under no obligation to lend and Party shall be under no obligation to borrow unless and until both this Agreement and a Facility Sheet are approved by Lender in Lender's sole and absolute discretion and executed by both Lender and Party

**11.04** <u>Requests for Advances</u>  Each Request for Advance will be irrevocable and is a representation by Party to Lender that, if applicable, the unpaid principal balance of that Loan after disbursement of the requested Loan will not exceed the Maximum Amount of such Loan under this Agreement  Each time Party makes a Request for Advance, Party reaffirms and re-makes all of the Party Representations and acknowledges and agrees to all of the Covenants and Reporting Requirements set forth in the Applicable Obligor Covenants Schedule, any Facility Sheet as of the date of the Request for Advance by Party  Lender may postpone making any advance on any Loan to the extent Lender is delayed by fire, earthquake or another circumstance outside Lender's reasonable control

**11 05** <u>Optional Rates</u>  If Party is granted such an option hereunder, Party may from time to time elect (i) a Rate Conversion, or (ii) a LIBOR Rate Continuation, subject to the Optional Rate Conditions

**11 06** <u>Designated Account</u>  So long as Lender has any obligation to make any advance on any Loan or any Loan Obligations or any portion of any Loan remains unpaid or unsatisfied, upon the request of Lender, Party shall maintain a Designated Account deposit account with RNA, or another bank approved by Lender in good standing  If all of the applicable conditions to a Loan have been fulfilled, Lender shall make the Loan available to Party as set forth herein by, at the option of Lender, (a) depositing the proceeds in the Designated Account, (b) if applicable, transferring the proceeds to an agent designated for purposes of an escrowed Closing of this transaction by wire or ACH transfer, or (c) paying or applying the proceeds as otherwise permitted under this Agreement, by any means appropriate under the circumstances

McClain MCA 2018
Master Credit Agreement

**11.07** <u>ACH Payments</u>  Party authorizes Lender to, at Lender's option in each instance, to initiate ACH Payments from the Designated Account  If Lender elects to initiate ACH Payments, Party will thereafter maintain sufficient funds in the Designated Account on the dates Lender enters debits for ACH Payment regularly scheduled payments of interest, principal, and fees, if any  If there are insufficient funds in the Designated Account on the date Lender enters any debit authorized by this Agreement, Lender may reverse the debit or may accept the partial payment without prejudice to Lender's right to receive all amounts due and owing  Party agrees to upon request by Lender, execute and deliver to Lender an ACH Payment authorization in form and content satisfactory to Lender

**11 08** <u>Prepayment Conditions.</u>  The Prepayment of principal on any Loan shall be subject to the Prepayment Conditions

**11.09** <u>LIBOR Rate Loan Indemnification</u>  Upon Lender's commitment or funding of any LIBOR Rate Loan to Party, Party agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender may sustain or incur as a consequence of (a) failure by Party to borrow pursuant to any such LIBOR Rate Loan, or to execute a LIBOR Rate Conversion or a LIBOR Rate Continuation after Party has requested any of the same in accordance with the provisions of this Agreement, (b) default by Party in a borrowing of a LIBOR Rate Loan, a LIBOR Rate Conversion, or a LIBOR Rate Continuation, (c) default by Party in making any Prepayment of a LIBOR Rate Loan after Party has given a notice thereof in accordance with the provisions of this Agreement or (d) the making of a Prepayment of a LIBOR Rate Loan on a day which is not the last day of an Interest Period with respect thereto  Such indemnification may encompass an amount equal to the excess, if any, of (i) the amount of interest which would have accrued on the amount so Prepaid, or borrowed, converted or continued, for the period from the time of such Prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of the failure to borrow, convert or continue, the Interest Period which would have commenced on the date of such failure) in each case the applicable rate of interest for such Loan provided herein over (ii) the amount of interest (as reasonably defined by the Lender) which would have accrued to the Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank LIBOR market  This covenant shall survive the termination of this Agreement and the payment of all Loans and all other Obligations due under this Agreement  Amounts payable pursuant to this subsection shall be paid to Lender upon request  A determination of Lender as to the amounts payable pursuant to this subsection shall be conclusive absent manifest error

**11 10** <u>Inability to Determine Rates</u>  If, in connection with any Loan bearing interest at a LIBOR Rate, Lender determines that (a) United States dollar deposits are not being offered to banks in the London interbank market for the applicable amount of such Loan, (b) adequate and reasonable means do not exist for determining the applicable LIBOR Rate, or (c) the applicable LIBOR Rate does not adequately and fairly reflect the cost to Lender of funding that Loan, Lender will promptly so notify the Party  Thereafter, the obligation of Lender to make or maintain any Loan bearing interest at the applicable LIBOR Rate shall be suspended until Lender revokes such notice, and any Loan which would otherwise bear interest at the applicable LIBOR Rate shall accrue interest at that rate, per annum, equal to a rate determined by Lender in Lender's reasonable discretion

## ARTICLE 12 - MISCELLANEOUS

**12 01** <u>Entire Agreement</u>  This Agreement and the other Loan Documents, collectively  (i) represent the sum of the understandings and agreements between Lender and Party concerning this credit, (ii) replace any prior oral or written agreements between Lender and Party concerning this credit, and (iii) are intended by Lender and Party as the final, complete and exclusive statement of the terms agreed to by them  In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail

**12.02** <u>Joint and Several Obligations.</u>  If Borrower consists of more than one Person on a Facility Sheet, each Borrower on such Facility Sheet (a) expressly acknowledges that it has benefited and will benefit, directly and indirectly, from each Loan contained in such Facility Sheet and acknowledges and undertakes, together with the other Borrowers on such Facility Sheet, joint and several liability for the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of each Facility Sheet, (b) acknowledges that this agreement is the independent and several obligation of each Borrower and may be enforced against each Borrower on such Facility Sheet, separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Borrower on such Facility Sheet, and (c) agrees that its liability hereunder and under any other Loan Document is absolute, unconditional, continuing and irrevocable  BORROWER EXPRESSLY WAIVES ANY REQUIREMENT THAT LENDER EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER BORROWERS UNDER THIS AGREEMENT, OR ANY OTHER LOAN DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE OBLIGATIONS

**12.03** <u>Authority to Bind Party.</u>  If Party is comprised of multiple Persons, any Person comprising Party is authorized to bind all Parties comprising Party  Without limitation of the foregoing, Lender may require any Request for Advance or other request, authorization, or other action by or on behalf of Party be by one or more Designated Person  Lender may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person

**12 04** <u>Binding Effect; Successors and Assigns</u>  All Loan Documents will inure to the benefit of and be binding upon the Parties and their respective successors and assigns

**12 05** <u>Assignment; Participations.</u>  Party shall not assign its rights or Obligations hereunder without Lender's consent in Lender's sole and absolute discretion  Lender may assign or sell participations in all or any portion of its interest in any Loan or under any Loan Documents to any Person  Lender may disclose to any actual or potential assignee or participant any information that Party has delivered to Lender in connection with any Loan Documents, and Party shall cooperate fully with Lender in providing that information  If Lender assigns or sells a participation in any Loan or any Loan Documents, the purchaser will have a right of set-off against Party

**12.06** <u>Severability.</u>  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Loan Document or affecting the validity or enforceability of that provision in any other jurisdiction, except that if such provision relates to the payment of any monetary sum, then Lender may, at its option, declare all Loan Obligations immediately due and payable

**12.07** <u>Amendments in Writing.</u>  The Loan Documents may not be amended, changed, modified, altered or terminated without the prior written consent of all Parties to the respective Loan Document

**12 08** <u>Governing Law</u>  (A) THIS MCA AND ALL LOAN DOCUMENTS HAVE BEEN NEGOTIATED, EXECUTED AND DELIVERED IN VARIOUS JURISDICTIONS  IN ORDER TO PROVIDE FOR A UNIFORM AND WELL ESTABLISHED BODY OF COMMERCIAL AND OTHER LAW TO DEFINE AND GOVERN THE RIGHTS AND DUTIES OF THE PARTIES, THE PARTIES AGREE THAT THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL SUBSTANTIVE LAWS OF THE GOVERNING LAW STATE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULES THEREOF, PROVIDED, HOWEVER, THAT (I) IF ANY OF THE COLLATERAL SHALL BE LOCATED IN ANY JURISDICTION OTHER THAN GOVERNING LAW STATE, THE LAWS OF SUCH JURISDICTION SHALL GOVERN THE

McClain MCA 2018
Master Credit Agreement

CREATION, PERFECTION AND/OR ENFORCEMENT OF THE LIENS, ASSIGNMENTS AND/OR SECURITY INTERESTS CREATED HEREIN OR IN ANY LOAN DOCUMENT IN CONNECTION HEREWITH AND TO THE ENFORCEMENT OF LENDER'S RIGHTS AND REMEDIES AGAINST THE COLLATERAL, WHICH MATTERS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE COLLATERAL IS LOCATED AND (II) IN THE EVENT THE LAWS OF THE UNITED STATES OF AMERICA AND ANY RULES, REGULATIONS, OR ORDERS ISSUED OR PROMULGATED THEREUNDER APPLICABLE TO THE AFFAIRS AND TRANSACTIONS OF LENDER AND/OR PARTY OTHERWISE PREEMPT GOVERNING LAW STATE LAW, SUCH FEDERAL LAW SHALL CONTROL  IN PARTICULAR, THE PARTIES HERETO AGREE THAT ALL ISSUES RELATING TO USURY, LIMITATIONS ON INTEREST, LOAN CHARGES AND COMMITMENT FEES PAYABLE UNDER THE OBLIGATIONS AND THE LOAN AGREEMENT SHALL BE GOVERNED BY THE LAWS OF GOVERNING LAW STATE  TO THE FULLEST EXTENT PERMITTED BY LAW, PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT AND/OR THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF GOVERNING LAW STATE  PARTY UNDERSTANDS, AGREES AND ACKNOWLEDGES THAT (A) THIS AGREEMENT AND THE TRANSACTION EVIDENCED HEREBY HAVE SIGNIFICANT AND SUBSTANTIAL CONTACTS WITH THE GOVERNING LAW STATE, (B) IT IS CONVENIENT TO PARTY AND LENDER TO SELECT THE LAW OF THE GOVERNING LAW STATE TO GOVERN THIS AGREEMENT AND THE TRANSACTIONS EVIDENCED HEREBY, (C) THE TRANSACTIONS EVIDENCED BY THIS AGREEMENT BEAR A REASONABLE CONNECTION TO THE LAWS OF THE GOVERNING LAW STATE, (D) THE CHOICE OF THE INTERNAL LAWS OF THE GOVERNING LAW STATE WAS MADE FOR GOOD AND VALID REASONS, AND (E) THE CHOICE OF THE GOVERNING LAW STATE CONSTITUTES GOOD AND VALUABLE CONSIDERATION FOR LENDER TO ENTER INTO THIS AGREEMENT AND LENDER HAS ENTERED INTO THIS AGREEMENT IN RELIANCE ON THIS CHOICE

**12.09**   **Governing Law State.**  The Governing Law State is Iowa

**12.10**   **Jurisdiction and Venue**  PARTY HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY PARTY AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN ANY CIRCUIT COURT OR UNITED STATES DISTRICT COURT OF THE GOVERNING LAW STATE, OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION  PARTY HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO PARTY AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT  PARTY WAIVES ANY CLAIM THAT THE GOVERNING LAW STATE IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE  SHOULD PARTY, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, PARTY SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST PARTY AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS   THE EXCLUSIVE CHOICE OF FORUM FOR PARTY SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND PARTY HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION

**12.11**   **Counterpart Execution and Signatures**   All Loan Documents may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document  An original signed counterpart f this Agreement in the form of paper with a signature in ink transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes, subject to the obligation, that Borrower shall within twenty (20) days of delivery of the copy, deliver an original signed copy of this Agreement to Lender   Failure to deliver the copy, deliver the original in accordance with this paragraph shall be a Non-Monetary Default After Notice

**12.12**   **Necessary Action**   Lender is authorized to execute any other documents or take any other actions necessary to effectuate any Loan Documents and the consummation of the transactions contemplated therein

**12.13**   **Credit Report.**  Lender is authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Party  Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Lender shall authorize third Persons to provide the information requested from time to time

**12.14**   **Consent to Disclosure.**  Party agrees and consents to the communication and disclosure of all information in respect of the transaction governed by this Agreement and all matters incidental hereto and thereto by Lender  (i) to the head office and all other branches and Affiliates of Lender, provided such communication and disclosure is for risk management and administrative purposes, and (ii) as required by any Applicable Law or regulation or any court or regulatory or other authority of competent jurisdiction

**12.15**   **No Construction Against Drafter.**  Each Party has participated in negotiating and drafting this Agreement, so if an ambiguity or a question of intent or interpretation arises, this Agreement is to be construed as if the Parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this Agreement

**12 16**   **Indemnification**   PARTY SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS (I) INCURRED AS A RESULT OF THE FAILURE BY PARTY TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN, (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY PARTY OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS, (III) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY PARTY OF ANY ENVIRONMENTAL LAW, (IV) RESULTING FROM THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF PARTY, (V) INCURRED BY LENDER UNDER ANY GUARANTY, INDEMNITY OR THE LIKE GIVEN TO RABOBANK, N A , WITH RESPECT TO INDEMNIFIED RNA LIABILITIES, AND (VI) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF LENDER BEING PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS AGREEMENT, THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PERSON, EXCEPT THAT PARTY SHALL HAVE NO

McClain MCA 2018
Master Credit Agreement

OBLIGATION TO AN INDEMNIFIED PERSON UNDER THIS SECTION WITH RESPECT TO LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IF AND TO THE EXTENT THAT ANY INDEMNITY UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES IS UNENFORCEABLE FOR ANY REASON, PARTY SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW   ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT

**12 17    Collateral Agency Agreement**   Parties hereby acknowledge Lender has entered in to the Collateral Agency Agreement which, as amended, modified, or restated, permits Rabo AgriFinance LLC to act as a Collateral Agent in serving the applicable Loan

**12 18    Waiver of Trial By Jury**   THE PARTIES (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO  (I) THIS AGREEMENT, OR (II) ANY COLLATERAL DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE, AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE  THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE COLLATERAL DOCUMENTS AND THE SWAP COUNTERPARTIES ENTERING INTO THE HEDGING AGREEMENTS

**12.19    Office of Foreign Assets Control; Patriot Act**   Without limiting the provisions of any other provision hereof above, each Party shall, and each Party shall cause each of its Subsidiaries and Affiliates to, (1) ensure that no Person who owns a controlling interest in or otherwise controls such Person shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the OFAC, the Department of the Treasury or included in any executive orders, (2) not use or permit the use of the proceeds of any Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or executive order relating thereto, (3) comply with the Bank Secrecy Act   and its implementing laws and regulations, as amended, including without limitation those related to anti-money laundering, and (4) ensure that it is and each of its Subsidiaries and Affiliates are not engaged in illegal activity or are a  recipient of proceeds of illegal activity,   As required by federal law and each Lender's policies and practices, each Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services

The Parties have signed this Agreement effective as of the day and year first written above and certify Parties have received and agree to the provisions set forth in the Schedule of Definitions as acknowledged and incorporated above.

**PARTY:**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.**, a Texas corporation

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Secretary

**LENDER:**

Address for Notices:

14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention: Loan Closing Department

**RABO AGRIFINANCE LLC**

By: _____
Name: W B Lawson II
Title: UP

McClain MCA 2018
Master Credit Agreement

9

Case 23-20084-nlj7 Claim 298-2 Part Filed 08/13/23 Entered 09/08/24 17:55:30 Master Credit Agreement Exhibit A Johnson 20 Page 11 of 30

**Exhibit A**

**SCHEDULE OF DEFINITIONS AND COVENANTS**

As further acknowledged in Section 2 01 of the Master Credit Agreement, Party has received the Schedule of Definitions via paper copy, electronic copy, electronic mail or by accessing the Schedule of Definitions with the version number that matches the version number shown in the footer of this Agreement at https://www.raboag.com/about-us/schedule-definitions_16/

.

## EXHIBIT B

## APPLICABLE OBLIGOR COVENANTS SCHEDULE

### Covenants

Until such time as all Obligations have been paid in full

**2 01**   **Reporting Requirements**

    (a)    as soon as available, but no later than 120 days after the end of each calendar year, a copy of CPA Compiled Consolidated financial statements of McClain Feed Yard  and McClain Farms for that period,

## JOINDER

THIS JOINDER AGREEMENT, by and between 7M CATTLE FEEDERS, INC., a Kentucky corporation ("New Party"), MCCLAIN FEED YARD, INC., a Texas corporation ("Party") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") is dated as of July 15, 2019 (this "Joinder Agreement"), to the Master Credit Agreement dated as of May 11, 2018 (as may be amended, modified, replaces or supplemented, referred to herein as the "MCA"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the MCA or Schedule of Definitions and Covenants.

The undersigned are executing this Joinder Agreement pursuant to terms of the MCA.

**1.01**     **Joinder.** New Party by its signature below joins in, assumes and agrees, jointly and severally, to become a party to and be bound in all respects by all of the terms and conditions of the MCA and the Schedule of Definitions and Covenants as if an original Party thereto and any Loan Documents related thereto (including without limitation any Note existing prior to the date hereof in connection with any Facility Sheet) that Party may enter as Borrower, Guarantor, Grantor, Pledgor, or otherwise on or after the date of this Joinder. Where New Party enters any such Facility Sheet as Borrower, New Party agrees to pay the Loan evidenced thereby and to be bound by and to perform all of the covenants and obligations of any other Transaction Documents executed by New Party in connection therewith at the time and in the same manner provided therein. New Party agrees that New Party has received and reviewed the MCA and Schedule of Definitions and Covenants. New Party hereby authorizes Lender, without obtaining the signature of New Party, to file financing statements or amendments to existing financing statements in order to perfect the lien, if any, granted by New Party under the Collateral Documents.

**1.02**     **Representations.** New Party makes the following Party Representations and represents to Lender that:

(a)     **Good Standing.** If 7M Cattle Feeders, Inc. is anything other than an individual, 7M Cattle Feeders, Inc. was duly formed, is validly existing and in good standing in its state of organization and each state in which it conducts its business;

(b)     **Due Power and Authority.** The execution, delivery and performance by New Party of each Transaction Document to which it is a New Party, is within the powers and authority of New Party and has been duly authorized;

(c)     **No Conflict with Applicable Law.** To New Party's knowledge, the Transaction Documents do not conflict with any Applicable Law;

(d)     **Enforceability.** Each Transaction Document is a legal, valid and binding obligation of New Party, enforceable against New Party in accordance with its terms, and any Transaction Document, instrument or agreement required thereunder, when executed and delivered to Lender, will be similarly legal, valid, binding and enforceable;

(e)     **Financial Information.** All Financial Information delivered to Lender in connection with New Party's application for a Loan, Lenders underwriting and approval of the Loan, or this Joinder Agreement and the other Loan Documents, are accurate, correct and sufficiently complete in all material respects to provide Lender true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities;

(f)     **Utilities.** All Utilities necessary and appropriate for the conduct of the business of New Party are available or New Party has taken all steps necessary to assure that all utility services so required will be available upon commencement of the business of New Party;

(g)     **Roads.** All Roads necessary for the completion, occupancy and operation of New Party's business have either been completed or the necessary easements or rights-of-way therefor have been acquired or dedicated to public use, and all necessary steps have been taken by New Party to ensure their completion no later than the date they will be needed for operation of New Party's business or any earlier date required by any Governmental Authority or Applicable Law;

(h)     **Permits.** All Permits have been obtained, or, to the extent not obtained, no information or fact exists that would reasonably cause New Party to believe that all permits, licenses and approvals required to construct, occupy, and operate New Party's business will not be readily obtainable prior to the commencement of New Party's applicable business;

(i)     **No Material Adverse Effect.** There has been no Material Adverse Effect as to New Party since the effective date of the Financial Information provided to Lender;

(j)     **No Judgment.** New Party is not the subject of any Judgment; and there is no lawsuit, tax claim or other dispute pending or to New Party's knowledge threatened against New Party that, if determined adverse to New Party, is reasonably likely to have a Material Adverse Effect;

(k)     **No Conflicts.** The Transaction Documents do not conflict with, nor is New Party in default under any agreement or arrangement in effect providing for or relating to extensions of credit in respect of which New Party is in any manner directly or contingently obligated;

(l)     **Tax Returns.** New Party has filed all tax returns (federal, state, and local) required to be filed by New Party and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties;

(m)     **Applicable Laws Compliance.** New Party is in compliance with all Applicable Laws (including all Environmental Laws), and there is no claim, action, proceeding or investigation pending or to New Party's knowledge threatened against New Party with respect to a violation of Applicable Law by New Party;

(n)     **Non-Foreign Person.** New Party is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code of 1986; and

(o)     **No Event of Default.** There is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

**1.03**     **Information Accurate and Complete.** New Party's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of New Party, from time to time, whether or not required under this Joinder Agreement, will be deemed accompanied by a representation by New Party that the report, record or information is complete and accurate in all material respects as to the condition or operations of New Party (and, if applicable, New Party's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities.

**1.04    Necessary Action.** Lender is authorized to execute any other documents or take any other actions necessary to effectuate this Joinder Agreement and the consummation of the transactions contemplated in the MCA. New Party agrees it shall undertake any additional action requested by Lender for any of the following purposes: (i) to effectuate this Joinder; (ii) to demonstrate New Party has the necessary authority and ability to enter in to this Joinder; and (iii) to meet all other requirements, terms and conditions of the MCA and Loan Documents.

**1.05    Governing Law.** The validity, enforcement and interpretation of this Joinder will be governed exclusively by the Applicable Laws of the Governing Law State as defined in the MCA, without regard or reference to its conflict of laws principles, except that at all times the provisions for the creation, perfection and enforcement of the Liens and security interests in Real Estate created pursuant to any Loan Document shall be governed by and construed according to the laws of the state in which the Real Estate is located, without regard or reference to its conflict of laws principles. New Party understands that the laws of the Governing Law State may differ from the laws of the State where New Party resides or otherwise is located or where the Collateral is located. New Party understands, agrees and acknowledges that (a) this Joinder evidenced hereby have significant and substantial contacts with the Governing Law state, (b) it is convenient to New Party and Lender to select the law of the Governing Law State to govern this Joinder, (c) the transactions evidenced by this Joinder bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons.

**1.06    Counterpart Execution and Signatures.** All Loan Documents may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. An original signed counterpart of this Joinder Agreement in the form of paper with a signature in ink transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Joinder Agreement for all purposes; subject to the obligation, that Borrower shall within twenty (20) days of delivery of the copy, deliver an original signed copy of this Joinder Agreement to Lender. Failure to deliver the original in accordance with this paragraph shall be a Non-Monetary Default After Notice.

IN WITNESS WHEREOF, the Parties have signed and delivered this Joinder as of the date first above written.

**NEW PARTY**

Address for Notices:
824 Mullins Lane
Benton, Kentucky 42055

**7M CATTLE FEEDERS, INC.**, a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Vice President

**PARTIES**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.**, a Texas corporation

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Secretary

## JOINDER

THIS JOINDER AGREEMENT, by and between MCCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms") and BRIAN KEITH MCCLAIN ("Brian McClain"), a married person or member of a civil union or domestic partnership (McClain Farms and Brian McClain are herein individually and collectively, "New Party"), MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard ") and 7M CATTLE FEEDERS, INC, a Kentucky corporation ("7M Cattle Feeders") (McClain Feed Yard and 7M Cattle Feeders are herein individually and collectively, "Party") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") is dated as of August 27, 2021 (this "Joinder Agreement"), to the Master Credit Agreement dated as of May 11, 2018 (as may be amended, modified, replaces or supplemented, referred to herein as the "MCA"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the MCA or Schedule of Definitions and Covenants.

The undersigned are executing this Joinder Agreement pursuant to terms of the MCA.

**1.01**    **Joinder.** New Party by its signature below joins in, assumes and agrees, jointly and severally, to become a party to and be bound in all respects by all of the terms and conditions of the MCA and the Schedule of Definitions and Covenants as if an original Party thereto and any Loan Documents related thereto (including without limitation any Note existing prior to the date hereof in connection with any Facility Sheet) that Party may enter as Borrower, Guarantor, Grantor, Pledgor, or otherwise on or after the date of this Joinder. Where New Party enters any such Facility Sheet as Borrower, New Party agrees to pay the Loan evidenced thereby and to be bound by and to perform all of the covenants and obligations of any other Transaction Documents executed by New Party in connection therewith at the time and in the same manner provided therein. New Party agrees that New Party has received and reviewed the MCA and Schedule of Definitions and Covenants. New Party hereby authorizes Lender, without obtaining the signature of New Party, to file financing statements or amendments to existing financing statements in order to perfect the lien, if any, granted by New Party under the Collateral Documents.

**1.02**    **Representations.** New Party makes the following Party Representations and represents to Lender that:

(a)    **Good Standing.** If McClain Farms is anything other than an individual, McClain Farms was duly formed, is validly existing and in good standing in its state of organization and each state in which it conducts its business;

(b)    **Due Power and Authority.** The execution, delivery and performance by New Party of each Transaction Document to which it is a New Party, is within the powers and authority of New Party and has been duly authorized;

(c)    **No Conflict with Applicable Law.** To New Party's knowledge, the Transaction Documents do not conflict with any Applicable Law;

(d)    **Enforceability.** Each Transaction Document is a legal, valid and binding obligation of New Party, enforceable against New Party in accordance with its terms, and any Transaction Document, instrument or agreement required thereunder, when executed and delivered to Lender, will be similarly legal, valid, binding and enforceable;

(e)    **Financial Information.** All Financial Information delivered to Lender in connection with New Party's application for a Loan, Lenders underwriting and approval of the Loan, or this Joinder Agreement and the other Loan Documents, are accurate, correct and sufficiently complete in all material respects to provide Lender true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities;

(f)    **Utilities.** All Utilities necessary and appropriate for the conduct of the business of New Party are available or New Party has taken all steps necessary to assure that all utility services so required will be available upon commencement of the business of New Party;

(g)    **Roads.** All Roads necessary for the completion, occupancy and operation of New Party's business have either been completed or the necessary easements or rights-of-way therefor have been acquired or dedicated to public use, and all necessary steps have been taken by New Party to ensure their completion no later than the date they will be needed for operation of New Party's business or any earlier date required by any Governmental Authority or Applicable Law;

(h)    **Permits.** All Permits have been obtained, or, to the extent not obtained, no information or fact exists that would reasonably cause New Party to believe that all permits, licenses and approvals required to construct, occupy, and operate New Party's business will not be readily obtainable prior to the commencement of New Party's applicable business;

(i)    **No Material Adverse Effect.** There has been no Material Adverse Effect as to New Party since the effective date of the Financial Information provided to Lender;

(j)    **No Judgment.** New Party is not the subject of any Judgment; and there is no lawsuit, tax claim or other dispute pending or to New Party's knowledge threatened against New Party that, if determined adverse to New Party, is reasonably likely to have a Material Adverse Effect;

(k)    **No Conflicts.** The Transaction Documents do not conflict with, nor is New Party in default under any agreement or arrangement in effect providing for or relating to extensions of credit in respect of which New Party is in any manner directly or contingently obligated;

(l)    **Tax Returns.** New Party has filed all tax returns (federal, state, and local) required to be filed by New Party and  has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties;

(m)    **Applicable Laws Compliance.** New Party is in compliance with all Applicable Laws (including all Environmental Laws), and there is no claim, action, proceeding or investigation pending or to New Party's knowledge threatened against New Party with respect to a violation of Applicable Law by New Party;

(n)    **Non-Foreign Person.** New Party is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code of 1986; and

(o)    **No Event of Default.** There is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

**1.03**    **Information Accurate and Complete.** New Party's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of New Party, from time to time, whether or not required under this Joinder Agreement, will be deemed accompanied by a representation by New Party that the report, record or information is complete and accurate in all material respects as to the condition or operations of New Party (and, if applicable, New Party's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities.

1.04    **Necessary Action.**  Lender is authorized to execute any other documents or take any other actions necessary to effectuate this Joinder Agreement and the consummation of the transactions contemplated in the MCA.  New Party agrees it shall undertake any additional action requested by Lender for any of the following purposes: (i) to effectuate this Joinder; (ii) to demonstrate New Party has the necessary authority and ability to enter in to this Joinder; and (iii) to meet all other requirements, terms and conditions of the MCA and Loan Documents.

1.05    **Governing Law.**  The validity, enforcement and interpretation of this Joinder will be governed exclusively by the Applicable Laws of the Governing Law State as defined in the MCA, without regard or reference to its conflict of laws principles, except that at all times the provisions for the creation, perfection and enforcement of the Liens and security interests in Real Estate created pursuant to any Loan Document shall be governed by and construed according to the laws of the state in which the Real Estate is located, without regard or reference to its conflict of laws principles.  New Party understands that the laws of the Governing Law State may differ from the laws of the State where New Party resides or otherwise is located or where the Collateral is located.  New Party understands, agrees and acknowledges that (a) this Joinder evidenced hereby have significant and substantial contacts with the Governing Law state, (b) it is convenient to New Party and Lender to select the law of the Governing Law State to govern this Joinder, (c) the transactions evidenced by this Joinder bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons.

1.06    **Counterpart Execution and Signatures.**  All Loan Documents may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document.  The counterparts of the Loan Documents may be executed by electronic signature and delivered by email or facsimile, so long as such method of execution and delivery is acceptable to Lender in Lender's sole discretion.

IN WITNESS WHEREOF, the Parties have signed and delivered this Joinder as of the date first above written.

**NEW PARTY**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FARMS, INC., a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

_____
**BRIAN KEITH MCCLAIN**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**PARTIES**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FEED YARD, INC., a Texas corporation

By: _____
BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

7M CATTLE FEEDERS, INC, a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

## ADDENDUM TO MASTER CREDIT AGREEMENT

This Addendum to Master Credit Agreement ("Addendum") is entered into and is dated and made effective as of July 24, 2019 between MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard ") and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("7M Cattle Feeders, Inc.") (McClain Feed Yard and 7M Cattle Feeders, Inc. are herein individually and collectively, "Party") and RABO AGRIFINANCE LLC, a Delaware limited liability company (the "Lender"). The Party and the Lender agree as follows:

PRELIMINARY STATEMENT. The Party and the Lender have entered into the Master Credit Agreement dated as of May 11, 2018 (said agreement as amended by any and all modifications or amendments thereto is hereinafter referred to as the "Credit Agreement." The terms defined in the Credit Agreement are used herein as therein defined).

Party and Lender wish to amend certain provisions of the Credit Agreement.

NOW, THEREFORE, Party and Lender agree as follows:

1.   **Amendment to Exhibit B Applicable Obligor Covenants**. Exhibit B to that certain Master Credit Agreement dated as of May 11, 2018 by and among Lender and McClain Feed Yard and 7M Cattle Feeders, Inc. is hereby deleted in its entirety and replaced with the following as attached to this Addendum dated July 24, 2019 hereto and incorporated herein by reference as Exhibit B Applicable Obligor Covenants Schedule.

2.   **Modification Agreement**. This Addendum does not release or extinguish the Loans under the Credit Agreement. All Collateral granted to or for the benefit of Lender for purposes of securing the Loans also secures the Loans under the Credit Agreement, as amended by this Addendum; and Party reaffirms the terms and provisions of all Collateral Documents.

3.   **Reference to and Effect on the Credit Agreement**.

(a)   On and after the date hereof, each reference in the Credit Agreement to "this agreement", "hereunder" "hereof", "herein" or words of like import shall mean and be a reference to the Credit Agreement as amended hereby.

(b)   Except as specifically amended by any prior amendments, the Credit Agreement shall remain in full force and effect and is hereby ratified and confirmed.

(c)   The execution, delivery and effectiveness of this Addendum shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of Lender under the Credit Agreement, nor constitute a waiver of any provision of the Credit Agreement.

4.   **Execution in Counterparts**. This Addendum may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.

5.   **Expenses**. The Party shall pay on demand all costs and expenses incurred by the Lender in connection with the preparation, execution, delivery, filing, and administration of this Addendum (including, without limitation, Legal Fees incurred in connection with the preparation of this Addendum and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Party's properties or books and records). The Party's Loans to the Lender under this Section shall survive termination of this Addendum and repayment of the Party's Loans to the Lender under the Credit Agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed as of the date first above written.

**PARTY:**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.**, a Texas corporation

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Secretary

Address for Notices:
824 Mullins Lane
Benton, Kentucky 42055

**7M CATTLE FEEDERS, INC.**, a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Vice President

Address for Notices:

14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention:  Loan Closing Department

**LENDER:**

**RABO AGRIFINANCE LLC**

By: _____

Name: _____ W B Lewson III _____

Title: _____ V.P. _____

## EXHIBIT B

### APPLICABLE OBLIGOR COVENANTS SCHEDULE

#### Covenants

Until such time as all Obligations have been paid in full:

**1.01   Financial Covenants.**

(a)      **Debt Service Coverage Ratio.** McClain Feed Yard and 7M Cattle Feeders, Inc. and guarantors shall maintain a Consolidated Debt Service Coverage Ratio of not less than 1.25:1.00, determined as of the end of each fiscal year.

**2.01   Reporting Requirements.**

(a)      as soon as available, but no later than 120 days after the end of each calendar year, a copy of CPA Reviewed financial statements of McClain Feed Yard and 7M Cattle Feeders, Inc. for that period;

3

DocuSign Envelope ID: 96B9E9B9-F632-4658-8FED-758E5C1E467D

THIS IS A COPY
An Authoritative Copy held by the designated custodian

COPY VIEW

## ADDENDUM TO MASTER CREDIT AGREEMENT

This Addendum to Master Credit Agreement ("<u>Addendum</u>") is entered into and is dated and made effective as of January 13, 2023 between MCCLAIN FEED YARD, INC., a Texas corporation ("<u>McClain Feed Yard</u>"); MCCLAIN FARMS, INC., a Kentucky corporation ("<u>McClain Farms</u>"); BRIAN KEITH MCCLAIN ("<u>Brian McClain</u>"), a married person or member of a civil union or domestic partnership; and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("<u>7M Cattle Feeders</u>") (McClain Feed Yard ; McClain Farms; Brian McClain; and 7M Cattle Feeders are herein individually and collectively, "<u>Party</u>") and RABO AGRIFINANCE LLC, a Delaware limited liability company (the "<u>Lender</u>"). The Party and the Lender agree as follows:

PRELIMINARY STATEMENT. The Party and the Lender have entered into the Master Credit Agreement dated as of May 11, 2018 (said agreement as amended by any and all modifications or amendments thereto is hereinafter referred to as the "<u>Credit Agreement</u>." The terms defined in the Credit Agreement are used herein as therein defined).

Party and Lender wish to amend certain provisions of the Credit Agreement.

NOW, THEREFORE, Party and Lender agree as follows:

1.     **Amendment to Exhibit B Applicable Obligor Covenants**. Exhibit B to the Credit Agreement is hereby deleted in its entirety and replaced with Exhibit B attached to this Addendum and incorporated herein and into the Credit Agreement by this reference as Exhibit B Applicable Obligor Covenants Schedule.

2.     **Modification Agreement**. This Addendum does not release or extinguish the Loans under the Credit Agreement. All Collateral granted to or for the benefit of Lender for purposes of securing the Loans also secures the Loans under the Credit Agreement, as amended by this Addendum; and Party reaffirms the terms and provisions of all Collateral Documents.

3.     **Reference to and Effect on the Credit Agreement**.

(a)     On and after the date hereof, each reference in the Credit Agreement to "this agreement", "hereunder", "hereof", herein or words of like import shall mean and be a reference to the Credit Agreement as amended hereby.

(b)     Except as specifically amended by any prior amendments, the Credit Agreement shall remain in full force and effect and is hereby ratified and confirmed.

(c)     The execution, delivery and effectiveness of this Addendum shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of Lender under the Credit Agreement, nor constitute a waiver of any provision of the Credit Agreement.

4.     **Execution in Counterparts**. This Addendum may be executed in any number of counterparts each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.

5.     **Expenses**. The Party shall pay on demand all costs and expenses incurred by the Lender in connection with the preparation, execution, delivery, filing, and administration of this Addendum (including, without limitation, Legal Fees incurred in connection with the preparation of this Addendum and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Party's properties or books and records). The Party's Loans to the Lender under this Section shall survive termination of this Addendum and repayment of the Party's Loans to the Lender under the Credit Agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed as of the date first above written.

**PARTY:**

Address for Notices:     **MCCLAIN FEED YARD, INC.**, a Texas corporation

824 Mullin
Benton, KY 42025

By: _____
BRIAN KEITH MCCLAIN
President

Address for Notices:     **MCCLAIN FARMS, INC.**, a Kentucky corporation

824 Mullins Lane
Benton, KY 42025

By: _____
BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**BRIAN KEITH MCCLAIN**

Address for Notices:     **7M CATTLE FEEDERS, INC.**, a Kentucky corporation

824 Mullins Lane
Benton, KY 42055

By: _____
BRIAN KEITH MCCLAIN
President

DocuSign Envelope ID: 9689E9B9-EC22-4658-8FED-758E4C15467B

THIS IS A COPY
of the original of the Authoritative Copy held
by the designated custodian

**LENDER:**

Address for notices:

14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention: Loan Operations

**RABO AGRIFINANCE LLC**

By: 

Name: W.B. Lawson III

Title: VP

2

DocuSign Envelope ID: 96B9E9B9-E622-4658-8FED-758F5C15467B

THIS IS A COPY
by the designated custodian

EXHIBIT A Supplement – Schedule of Definitions

**SOFR Terms and Definitions**

<u>**NEW TERMS -- DEFINITIONS.**</u>  The following terms and definitions ("<u>New Terms</u>") are added to the Credit Agreement.  To the extent that the New Terms conflict with any MCA Terms or Definitions, the New Terms set forth below shall control:

<u>**Daily Compounded SOFR**</u> means Daily Compounded SOFR (With Observation Shift) or Daily Compounded SOFR (Without Observation Shift), as applicable.

<u>**Daily Compounded SOFR (With Observation Shift)**</u> means an index rate per annum calculated as set forth in Attachment 1 hereto.  Daily Compounded SOFR (With Observation Shift) shall be increased by the Spread Adjustment, if any, and an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs, all comprising the Interest Rate with respect to each applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto.

<u>**Daily Compounded SOFR (Without Observation Shift)**</u> means an index rate per annum calculated as set forth in Attachment 2 hereto.  Daily Compounded SOFR (Without Observation Shift) shall be increased by the Spread Adjustment, if any, and an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs, all comprising the Interest Rate with respect to each applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto.

<u>**Daily Compounded SOFR Rate Continuation**</u> means the continuation of the Interest Rate on any Daily Compounded SOFR Rate Loan for another Interest Period.

<u>**Daily Compounded SOFR Rate Conversion**</u> means a Rate Conversion of a Daily Compounded SOFR Rate Loan.

<u>**Daily Compounded SOFR Rate Loan**</u> means a Loan which bears an Interest Rate indexed at Daily Compounded SOFR, as set forth in the MCA or any amendment, modification or supplement thereto.

<u>**Daily Simple SOFR**</u> means, for any day (a "<u>SOFR Interest Day</u>"), an index rate per annum equal to SOFR for the day (such day "i") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Interest Day is a U.S. Government Securities Business Day, such SOFR Interest Day or (ii) if such SOFR Interest Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Interest Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.  If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any day "i", the SOFR in respect of such day "i" has not been published on the SOFR administrator's website and Daily Simple SOFR has not been replaced pursuant to the MCA, then SOFR for such day "i" will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR administrator's website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than three (3) consecutive SOFR Interest Days.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.  Daily Simple SOFR shall be increased by the Spread Adjustment, if any, and an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs, all comprising the Interest Rate with respect to each applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto.

<u>**Daily Simple SOFR Rate Loan**</u> means a Loan which bears an Interest Rate indexed at Daily Simple SOFR, as set forth in the MCA or any amendment, modification or supplement thereto.

<u>**Daily Simple SOFR Rate Conversion**</u> means a Rate Conversion of any Daily Simple SOFR Rate Loan.

<u>**Index Rate**</u> shall be as set forth with respect to each applicable Loan in the MCA, or any amendment, modification or supplement thereto.

<u>**Payment Date**</u> means the date on which any payment of principal or other amount (other than interest) is due under any Loan, as set forth in the MCA or any amendment, modification or supplement thereto; provided, however, should any Payment Date fall on a date that is not a Business Day, the Payment Date shall be the next succeeding Business Day.  For the avoidance of doubt, for any SOFR Rate Loan, if any Payment Date would fall on a day which is not a Business Day such Payment Date shall be the next succeeding Business Day unless that Business Day falls in the next succeeding calendar month, in which case the Payment Date will be the preceding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

3

DocuSign Envelope ID: 96992FB0-5C22-4F78-8EED-758F4C1F467D

THIS IS A COPY
THE ORIGINAL AUTHORITATIVE COPY held
by the designated custodian

**SOFR** means a rate equal to the secured overnight financing rate published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York currently at http://www.newyorkfed.org, (or any successor source for the secured overnight financing rate identified as such by administrator of such secured overnight financing rate).

**SOFR Rate** means Term SOFR, Daily Simple SOFR or Daily Compounded SOFR, as applicable.

**SOFR Rate Continuation** means a Daily Compounded SOFR Rate Continuation or Term SOFR Rate Continuation, as applicable.

**SOFR Rate Conversion** means a Daily Compounded SOFR Rate Conversion, Daily Simple SOFR Rate Conversion or Term SOFR Rate Conversion, as applicable.

**SOFR Rate Loan** means a Daily Compounded SOFR Rate Loan, Term SOFR Rate Loan or Daily Simple SOFR Rate Loan, as applicable.

**SOFR Rate Prepayment Costs** means that amount as determined by Lender as its loss, cost or expense incurred as a result of: (a) the Prepayment of a Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan on a day other than the last day of the Interest Period for that Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan (whether voluntary, mandatory, automatic by reason of acceleration, or otherwise); (b) any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain that Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan or from fees payable to terminate the deposits from which those funds were obtained; or (c) the Prepayment of a Daily Simple SOFR Rate Loan on a day other than the Interest Payment Date.  Borrower shall also pay any administrative fees charged by Lender in connection with any event described in this paragraph.

**Spread Adjustment** means the applicable spread listed below that may be added to the relevant SOFR Rate in addition to the Interest Rate Margin or may be incorporated into the Interest Rate Margin:

(a) For Term SOFR, (i) 0.11448% (11.448 basis points) for an Interest Period of one-month's duration, (ii) 0.26161% (26.161 basis points) for an Interest Period of three-months' duration, (iii) 0.42826% (42.826 basis points) for an Interest Period of six-months' duration, and (iv) 0.71513% (71.513 basis points) for an Interest Period of twelve-months' duration; and

(b) For Daily Simple SOFR or Daily Compounded SOFR, (i) 0.11448% (11.448 basis points) if the Interest Payment Date is monthly, (ii) 0.26161% (26.161 basis points) if the Interest Payment Date is quarterly, (iii) 0.42826% (42.826 basis points) if the Interest Payment Date is semi-annual, and (iv) 0.71513% (71.513 basis points) if the Interest Payment Date is annual.

**Term SOFR** means, with respect to any SOFR Rate Loan for any Interest Period which may be agreed between the Lender and the Borrower, as set forth in the MCA or any amendment, modification or supplement thereto, a forward-looking term index rate per annum for a period comparable to the Interest Period based on SOFR that is published by an authorized benchmark administrator and is displayed on a screen or other information service, (as identified or selected by the Lender in its reasonable discretion at approximately a time and as of a date prior to the commencement of such Interest Period determined by the Lender in its reasonable discretion in a manner substantially consistent with market practice; provided that Term SOFR shall be increased by the Spread Adjustment, if any, and an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs, all comprising the Interest Rate with respect to each applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto.  Term SOFR Rate shall be Adjusted on the first day of the applicable Term SOFR Rate Interest Period.  Notwithstanding anything contained in the MCA or any other Loan Document, the Lender shall not be required to accept any Loan Request or Rate Request for a Term SOFR Rate Loan.

**Term SOFR Rate Continuation** means the continuation of the Interest Rate of any Term SOFR Rate Loan for another Interest Period.

**Term SOFR Rate Conversion** means a Rate Conversion of any Term SOFR Rate Loan.

**Term SOFR Rate Interest Period** means the Interest Period during which a Term SOFR Rate is applicable.

**Term SOFR Rate Loan** means a Loan which bears an Interest Rate indexed at Term SOFR as set forth in the MCA or any amendment, modification or supplement thereto.

4

DocuSign Envelope ID: 96B9E9B9-5C22-4678-8E5D-758E34C1F467E

THIS IS A COPY
by the designated custodian

**U.S. Government Securities Business Day** means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

**EXISTING TERMS – REVISED DEFINITIONS.**  The definitions for capitalized terms currently in the Credit Agreement are hereby revised and replaced with the following "Revised Definitions".  To the extent that the Revised Definitions conflict with those in the MCA Terms or Definitions, the Revised Definitions set forth below shall control:

> **Adjustment Date** means each date on which the Interest Rate is or may be Adjusted by Lender pursuant to the MCA or any amendment, modification, or supplement thereto.

> **Business Day** means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the Applicable Laws of the State of Iowa or Missouri, or are in fact closed in the State of Iowa or Missouri, provided that, when used in connection with a SOFR Rate Loan calculation, determination, prepayment or requests or notices from the Borrower involving a SOFR Rate Loan or a SOFR Rate borrowing, the term "Business Day" means any such day that is a U.S. Government Securities Business Day.

> **Consent and Waivers by Borrower and Non-Borrower Grantor** means Lender is authorized to perform any of the following acts at any time, all without Notice to Non-Borrower (whether designated in any Transaction Document as "Non-Borrower Grantor" or "Non-Borrower Pledgor") and, to the extent applicable to Borrower and the Loan Document permits an action without Notice, to Borrower, in each case to the extent permitted under any applicable law, without affecting the rights of Lender or Borrower or Non-Borrower's Obligations under the Loan Documents (and upon any such act Borrower and Non-Borrower confirms and agrees that such Non-Borrower's obligations and any accommodations, lien or security interests in or to its properties shall not in any way be novated, discharged or otherwise impaired), and shall continue, be ratified and be affirmed and shall remain in full force in effect): (i) alter any terms of the MCA or any part of (includ g renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Obligations; (ii) take and hold security for the Obligations, accept additional or substituted Collateral for the Obligation  and subo inate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such Collateral; (iii) apply ny Collateral now or later held for the Obligations in any order that Lender may choose, and direct the order and m nner of y sale of all o y part of it and bid at any such sale; (iv) release Borrower of its liability for the Obligations or any o them  (v) sub itute, add or release any one or more guarantors or endorsers of the Obligations; and (vi) extend other credit to Borrowe  and ta  and h ld security for he credit so extended, whether or not such security also secures the Obligations.  Furthermore, Non- Bor wer wa es: (i) a right t equire Lender to proceed against Borrower, proceed against or exhaust any Collateral held from Borrower, or ursue a  other m  y in Lender's power to pursue; (ii) any defense based on any legal disability of Borrower, any discharge or imitation of  e liability  f Borrower to Lender, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership,  solvenc  or debtor  lief proceeding, or from any other cause, or any claim that Non-Borrower's Obligations exceed or are m re burdensome th   tho   of Borrower; (iii) all presentments, demands for performance, Notices of nonperformance, protests, Notice  of protest, Notices of sh nor, Notices of acceptance of the Loan Documents and of the existence, creation, or incurring of new or additional  debtedness of Borrower, and demands and Notices of every kind; (iv) any defense based on or arising out of any defense th  Borr er may have to the payment or performance of the Obligations or any of them; (v) until the Obligations have been paid a p formed in f  ll rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwis , including any claim or ight of subrogation under the Bankruptcy Code or any successor statute, all rights to enforce any remedy that Len r may have against Borrow r, and all rights to participate in any Collateral now or later to be held by Lender for the Obligations; (vi) replace th  rate with n alternative rat  in accordance with the rights afforded to it under the MCA (including, without limitation, under th   entitle "In ility to Determine Rates") and (vii) make any technical, administrative, operational or consequential changes that th  Lender is p mitted o make under the MCA to the Loans or Loan Documentation. Borrower and Non-Borrower waive all rights and defe ses that Borro er or  on-Borrower may have because the Obligations may be secured by any particular Collateral.  This means, amon  other things:(i) L  der m y enforce the Loan Documents against Borrower or Non-Borrower without first foreclosing on any o   l or p rsonal property C llateral securing the Obligations; and (ii) if Lender forecloses on any particular Collateral securing the Obligations: (A)  e amount of t  Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is w th more th n the sale price, and (B) Lender may enforce the Loan Documents against Borrower or Non-Borrower even if Lender, by foreclosing  any Collateral, has destroyed any right between Borrower and Non-Borrower to collect from the other party.  This is an uncondit al and irrevocable waiver of any rights and defenses Borrower and Non-Borrower may have because the Obligations may be secured by  particular Collateral. Borrower and Non-Borrower waive any right or defense it may have at law or equity, to a fair market value aring or a tion to determine a deficiency Judgment after a foreclosure of any Collateral granted to Lender under the Loan Documents. Borro er and Non-Borrower assume full respons bility for keeping informed of Borrower's financial condition and business operations and all other circumstances affecting Borrower's ability to pay and perform its Obligations to Lender, and agrees that Lender will have no duty to disclose to Borrower or Non-Borrower any information which Lender may receive about the other party's financial condition, business operations, or any other circumstances bearing on its ability to perform.  No provision or waiver in the Loan Documents shall be construed as limiting the generality of any other provision or waiver contained in this consent.  Borrower and Non-Borrower each certify that as of the date hereof and after giving effect to the advance contemplated by the applicable Loan and Security Instrument to which the Consent and Waiver by Borrower or Non-Borrower Grantor applies, Borrower and Non-Borrower will be solvent.  Borrower and Non-Borrower represent that each party has determined that the terms available to the maker of the Note are in Borrower or Non-Borrower's best interests.  Each of Borrower and Non-Borrower acknowledges that it will derive substantial direct and indirect benefit from the transactions contemplated by the Note. Each of Borrower and Non-Borrower has determined that its execution, delivery and performance of the Security Instrument to which the Consent and Waiver by Borrower or Non- Borrower Grantor applies, directly benefits, and is within the corporate purposes and in the best interests of the Borrower or Non-Borrower, respectively.  Borrower and Non-Borrower certifies that as of the date hereof Borrower or Non-Borrower is not engaged in business or a transaction, or about to engage in business or a transaction for which any property remaining with Borrower or Non-Borrower will result in an unreasonably small amount of capital.

DocuSign Envelope ID: 96B9E9B9-5C22-4F58-8FFD-758E54C15467B

THIS IS A COPY by the designated custodian

**Drawdown Date** means in the case of the applicable Loan, the date on which that Loan is made, in the case of a Rate Conversion, the effective date of the Rate Conversion, and in the case of a LIBOR Rate Continuation, a Term SOFR Rate Continuation or a Daily Compounded SOFR Rate Continuation, the effective date of the LIBOR Rate Continuation, Term SOFR Rate Continuation or Daily Compounded SOFR Rate Continuation, respectively.

**Floor Rate** means the minimum per annum Interest Rate that may be charged on a Loan as stated in the MCA or any amendment, modification or supplement thereto.

**Interest Payment Date** means a date on which regularly scheduled payments of interest are due, as set forth in the MCA or any amendment, modification or supplement thereto. For the avoidance of doubt, for any SOFR Rate Loan, if any Interest Payment Date would fall on a day which is not a Business Day such Interest Payment Date shall be the next succeeding Business Day unless that Business Day falls in the next succeeding calendar month, in which case the Interest Payment Date will be the preceding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

**Interest Period** means (a) with respect to each applicable LIBOR Rate Loan, Term SOFR Rate Loan, Daily Compounded SOFR Rate Loan and Long Term Adjustable Rate Loan (to the extent applicable), each period commencing on the date that any initial LIBOR Rate Loan, Term SOFR Rate Loan, Daily Compounded SOFR Rate Loan or Long Term Adjustable Rate Loan (to the extent applicable) is made with respect to each applicable Loan Type, or the applicable rate is recalculated, until the next Adjustment Date or, if earlier, the respective Maturity Date; and (b) with respect to each applicable LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan, the period selected by Borrower or agreed to between Borrower and Lender, during which the applicable LIBOR Rate, Term SOFR Rate or Daily Compounded SOFR will be effective; except that Borrower may not select any Interest Period which would extend beyond the Maturity Date of the respective Loan, each LIBOR Rate Interest Period or Term SOFR Rate Interest Period which commences on the last business day of a month (or on any day for which there is no numerically corresponding day in the appropriate subsequent month) shall end on the last Business Day of the appropriate subsequent month, each LIBOR Rate Interest Period or Term SOFR Rate Interest Period which would otherwise end on a day which is not a Business Day shall end on the next succeeding Business Day, each Term SOFR Rate Interest Period which would otherwise end on a day which is not a Business Day shall end on the next succeeding Business Day unless that Business Day falls in the next succeeding calendar month, in which case the Interest Period will end on the preceding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension, and unless otherwise determined by Lender, no Interest Period for any LIBOR Rate Loan or Term SOFR Rate Loan shall have a duration of less than one month, and, if the Interest Period would otherwise be a shorter period, the related LIBOR Rate Loan or Term SOFR Rate Loan shall not be available. Unless the MCA or any amendment, modification or supplement thereto provides otherwise, if a Daily Compounded SOFR Rate Loan is outstanding, such Daily Compounded SOFR Rate Loan shall use one Interest Period as initially set forth therein and Daily Compounded SOFR Rate Continuations shall automatically continue in such Interest Period.

**Interest Rate** means with respect to each applicable Loan, the applicable index rate for such Loan increased by an Interest Rate Margin, if any, and, for any SOFR Rate Loan, the Spread Adjustment, if any, all as set forth in the MCA or any amendment, modification or supplement thereto.

**Interest Rate Margin** means with respect to each applicable Loan, the percentage margin set by Lender and added to an index rate or rate calculated based on an index rate to establish the Interest Rate set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.

**Optional Rate Conditions** shall mean the following:

    (a)    **Rate Request.** Lender must receive a Rate Request;

    (b)    **Time of Request.** At Lender's option, all Rate Requests must be received by Lender before 12:00 noon (St. Louis, Missouri time) on

        (i)    In the case of a LIBOR Rate Conversion, LIBOR Rate Continuation, SOFR Rate Conversion or SOFR Rate Continuation, a Business Day which is not less than two Business Days prior to the date of the LIBOR Rate Conversion, LIBOR Rate Continuation, SOFR Rate Conversion or SOFR Rate Continuation (except a SOFR Rate Continuation where the SOFR Rate Loan is automatically continued pursuant to the MCA) and

        (ii)    in the case all other Rate Conversions, a Business Day which is not less than one Business Day prior to the date of that Rate Conversion; and

    (c)    **LIBOR and Term SOFR Conversion.** A Rate Conversion of a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan may take place only on the last day of the respective Interest Period.

    (d)    **No Default.** Except for any Rate Conversions into any Base Rate Loan, no Rate Conversions, LIBOR Rate Continuations or SOFR Rate Continuations will be made (automatically or otherwise) while there exists an Event of Default or an event which, with the passage of time or the giving of Notice would be an Event of Default, or if the Interest Rate for that Loan would exceed the Maximum Rate.

    (e)    **Irrevocable.** Each Rate Request will be irrevocable.

    (f)    **Automatic Conversion.** If there is (i) an Event of Default, or (ii) if Borrower fails to select the Interest Rate applicable to a Loan or portion thereof or the duration of any Interest Period for any LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan within the time period and otherwise as provided in this section, that Loan (if other than a Base Rate Loan) will be, if not then outstanding, made as or, if then outstanding, automatically converted to, a Loan bearing interest at the

6

DocuSign Envelope ID: 96B9E9B0-E622-4578-8EED-758E1C1E467B

THIS IS A COPY
of the original held by the designated custodian

applicable Base Rate on the last day of the Interest Period for a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan and immediately for a Daily Simple SOFR Rate Loan.

        (g)    **Limitations on Number and Size.**  The unpaid principal amount of any Loan of any Loan Type must at no time be subject to more than five different rates of interest.  The portion of any Loan of any Loan Type initially subject to each rate other than the Base Rate must be no less than $200,000.00.

**Optional Rates** means one or more of the following selected by Borrower and approved by Lender as applicable to an advance or portions of a Loan:

        (a)    an Interest Rate based on an index rate, including without limitation
            i.    **Base Rate.**  The Base Rate;
            ii.    **LIBOR.**  The LIBOR Rate;
            iii.    **SOFR.**  The applicable SOFR Rate;

        (b)    **Long Term Adjustable.**  The Long Term Adjustable Rate; and

        (c)    **Fixed.**  The Fixed Rate.

**Prepayment Conditions** means the following:

        (a)    **Lender May Refuse.**  Lender may refuse to accept any Prepayment not expressly permitte in the MCA;

        (b)    **Effect of Notice of Prepayment.**  If a Prepayment is conditioned upon prior N ice to Le der, a the tion of Lender,

            (i)    That Notice will be irrevocable;

            (ii)    A Prepayment will be due in the amount and o the da specifie in that Notice a d

            (iii)    That Notice will not affect Borrower's oblig tion t make a ther payments required under the Loan Documents on the date when due;

        (c)    **Accrued Interest and Fee.**  Prepayme s of any app cable Lo must accompanied by unpaid accrued interest and the Prepayment Fee, if applicable;

        (d)    **All Amounts Due.**  Permitt Prepayments of a y app cable Loan are subject to payment of all amounts then due under such applicable Loan;

        (e)    **Application of P paymen**  Each Prepayment of a portion of any applicable Loan will be applied to the most remote payment of the principal due under ch oan;

        (f)    **Ef ct of Accep ance.**  If Le der receives any Prepayment which Lender is permitted to refuse, Lender may accept the Prepayme and Lende may, as a con tion of acceptance, require the payment of interest which would accrue on the amount Prepaid throug the dat hen Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid ould b due un r the MCA, whichever is earlier;

        (g)    **pplic tion of Fee.**  The Prepayment Fee shall apply to all Prepayments of any applicable Loan, including any pay ents or Prepaym nts m de upon the acceleration of the due date of such Loan because of default or otherwise, and such Prep yment Fee shal e payable in addition to any default interest and other sums required to be paid under such Loan;

        (h)    **surance and Condemnation.**  The application of the proceeds of insurance or of a Condemnation Award in reduction f the i ebtedness shall require payment of Prepayment Fee;

        (i)    **LIBOR and SOFR Prepayment.**  Borrower shall have no right to Prepay any LIBOR Rate Loan or SOFR Rate Lo bearing an Interest Period except at the end of an Interest Period;

        (j)    **Last 30 Days Free.**  Notwithstanding any provisions of the Loan Documents to the contrary, no Prepayment Fee shall be due if Borrower voluntarily Prepays a Loan in full within the period of thirty (30) days immediately preceding the Maturity Date; provided that on the date such Prepayment is made, no Event of Default (or event which, with the passage of time or the giving of Notice, or both, would be an Event of Default) shall have occurred and still be outstanding; and

        (k)    **Daily Compounded SOFR Rate Loan Prepayments**.

            (i)    No prepayment of a SOFR Rate Loan which computes interest using Daily Compounded SOFR shall be made on any day that is not a U.S. Government Securities Business Day, and if any prepayment to be made by the Borrowers shall fall due on such day, payment shall be made on the next succeeding U.S. Government Securities Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be

            (ii)    In the event of any repayment or prepayment of any Daily Compounded SOFR Rate Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any Daily Compounded SOFR Rate Conversion or Daily Compounded SOFR Rate Continuation of any borrowings computed by reference to Daily Compounded SOFR prior to the end of the Interest Period therefor, accrued interest on such Borrowing shall be payable on the effective date of such conversion or continuation.

7

DocuSign Envelope ID: 96995E9D9-E622-4658-8EED-758E4C15467B

THIS IS A COPY

by the designated custodian

**Rate Request** means the request that Borrower must submit to Lender to request a Rate Conversion, LIBOR Rate Continuation or SOFR Rate Continuation (other than a SOFR Rate Continuation where the SOFR Rate Loan is automatically continued pursuant to the MCA), which request must specify the amount of the applicable Loan subject to the Rate Conversion, LIBOR Rate Continuation or SOFR Rate Continuation, the rate to be applicable to the applicable Loan, and if a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan is selected, the applicable Interest Period, as more particularly described in the MCA or any amendment, modification or supplement thereto.

**Request for Advance** means each request made by Borrower, which request:

    (a)     **Irrevocable**.  Shall be irrevocable,

    (b)     **Amount of Request**.  Must specify the amount of the Request for Advance,

    (c)     **Specify Rate**.  If Borrower may select from Optional Rates of interest, must specify the rate to be applicable to the applicable Loan,

    (d)     **LIBOR or Term SOFR Period**.  If a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan is selected, the Interest Period requested therefore,

    (e)     **Time of Request**.  Must be received by Lender before 12:00 noon (St. Louis, Missouri time):

         (i)     If the applicable Loan is to be a LIBOR Rate Loan or SOFR Rate Loan, on a Business Day which is not less than two Business Days prior to the date of such Loan, and

         (ii)     In the case of any other applicable Loan, on a Business Day which is not less than one Business Day prior to the date of such Loan.

8

DocuSign Envelope ID: 96992E9B9-E622-4E58-8EED-758E4C1F467B

THIS IS A COPY
by the designated custodian

**Attachment 1 to EXHIBIT A Supplement – Schedule of Definitions**

**Daily Compounded SOFR With Observation Shift**

<u>**Daily Compounded SOFR (With Observation Shift)**</u> means, for any Observation Period (defined below) for a Daily Compounded SOFR Rate Loan (With Observation Shift) is the percentage rate per annum (rounded to the nearest one hundred thousandth of a percentage point) calculated as follows:

$$\left[ \prod_{i=1}^{d_o} \left( 1 + \frac{n_i \times FlooredSOFR_{i-[\_]Business\,Days}}{N} \right) - 1 \right] \times \frac{N}{d}$$

For purposes of calculating the rate in the above formula:

"$d_o$" is the number of U.S. Government Securities Business Days in the Observation Period;

"i" is a series of whole numbers from one to $d_o$, each representing the relevant U.S. Government Securities Business Day in chronological order from, and including, the first Business Day in the Observation Period to, but excluding, the last U.S. Government Securities Business Day in the Observation Period;

"Floored SOFR$_{i-[5]\,Business\,Days}$" is, for any U.S. Government Securities Business Day "i" during the Observation Period, the greater of, (a) SOFR for the U.S. Government Securities Business Day (such day, the "<u>SOFR Determination Day</u>") which is five (5) U.S. Government Securities Business Days prior to that U.S. Government Securities Business Day "i" and (b) the Floor Rate of zero.  If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Day, SOFR in respect of such SOFR Determination Day was not been published on the SOFR administrator's website and the benchmark has not been replaced pursuant to the LCA, then SOFR for such SOFR Determination Day will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which SOFR was published on the SOFR administrator's website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Compounded SOFR for no more than three (3) consecutive U.S. Government Securities Business Days.";

"$n_i$" is, for any U.S. Government Securities Business Day "i", the number of calendar days from, and including, that U.S. Government Securities Business Day "i" up to, but excluding, the following U.S. Government Securities Business Day;

"N" is 360; and

"d" is the number of calendar days in the Observation Period.

"Observation Period" means (a) for purposes of the calculation of interest for any Daily Compounded SOFR Rate Loan (or portion thereof) payable on the Interest Payment Date therefor, the period from, and including, the date that is five (5) U.S. Government Securities Business Days preceding the first date in such Interest Period to, but excluding, the date that is five (5) U.S. Government Securities Business Days preceding such Interest Payment Date and (b) for purposes of the calculation of interest for any such Daily Compounded SOFR Rate Loan (or portion thereof) that accrues on or after the Interest Payment Date therefor, the period from, and including, the date that is five (5) U.S. Government Securities Business Days preceding such Interest Payment Date and to, but excluding, the date that is five (5) U.S. Government Securities Business Days preceding the date on which such interest is actually paid to the L

9

DocuSign Envelope ID: 96292E9B9-E622-4678-8FED-758E4C15467B

THIS IS A COPY
that is not an approved or authoritative Copy held
by the designated custodian

Attachment 2 to EXHIBIT A Supplement – Schedule of Definitions

### Daily Compounded SOFR Without Observation Shift

**Daily Compounded SOFR (Without Observation Shift)** means, for any U.S. Government Securities Business Day m during an Interest Period, the rate per annum (rounded to the nearest one hundred thousandth of a percentage point) calculated as follows:

$$(CER_m - CER_{m-1}) \times \frac{N}{n_m}$$

For purposes of the above formula:

"$CER_m$" is the Compounded Effective Rate for that U.S. Government Securities Business Day "m";

"$CER_{m-1}$" is, in relation to that U.S. Government Securities Business Day "m", the Compounded Effective Rate for the immediately preceding U.S. Government Securities Business Day (if any) during such Interest Period;

"$n_m$" is, the number of calendar days from, and including, that U.S. Government Securities Business Day "m" up to, but excluding, the following U.S. Government Securities Business Day;

"N" is 360; and

"Compounded Effective Rate" is, for any U.S. Government Securities Business Day during an Interest Period (the "Calculation Business Day") the percentage rate per annum calculated as set out below:

$$\left[ \prod_{i=1}^{d_o} \left( 1 + \frac{n_i \times FlooredSOFR_{i-[5]Business\,Days}}{N} \right) \right] - 1$$

For purposes of calculating the Compounded Effective Rate:

"Calculation Period" means the period from the first U.S. Government Securities Business Day of that Interest Period to, and including, such Calculation Business Day;

"$d_o$" is the number of U.S. Government Securities Business Days in the Calculation Period;

"i" is a series of whole numbers from one to $d_o$, each representing the relevant U.S. Government Securities Business Day in chronological order in the Calculation Period;

"Floored SOFR$_{i-[5]Business\,Days}$" is, for any U.S. Government Securities Business Day "i" during the Calculation Period, the greater of: (a) SOFR for the U.S. Government Securities Business Day (such day, the "SOFR Determination Day") which is five (5) U.S. Government Securities Business Days prior to that U.S. Government Securities Business Day "i", as such SOFR is published by the SOFR administrator on their website and (b) the Floor Rate of zero. If by 5:00 p.m. (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Day, SOFR in respect of such SOFR Determination Day has not been published on the SOFR administrator's website and the benchmark has not been replaced pursuant to the MCA, then SOFR for such SOFR Determination Day will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which SOFR was published on the SOFR administrator's website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Compounded SOFR for no more than three (3) consecutive U.S. Government Securities Business Days "i";

"$n_i$" is, the number of calendar days from, and including, that U.S. Government Securities Business Day "i" up to, but excluding, the following U.S. Government Securities Business Day; and

"N" has the same meaning as the term above.

DocuSign Envelope ID: 96B9E9B9-EC22-4658-8EED-758E4C1E467B

THIS IS A COPY
that is a copy held by the authoritative copy held
by the designated custodian

**EXHIBIT B**

**APPLICABLE OBLIGOR COVENANTS SCHEDULE**

**Covenants**

Until such time as all Obligations have been paid in full:

**1.01**     **Financial Covenants.**

(a)     **Debt Service Coverage Ratio.**  McClain Feed Yard , McClain Farms, Brian McClain, and 7M Cattle Feeders shall maintain a Consolidated Debt Service Coverage Ratio which exceeds 1.25:1.00, determined as of the end of each fiscal year.

**2.01**     **Reporting Requirements.**  Party shall furnish to Lender:

(a)     as soon as available, but no later than 181 days after the end of each calendar year, a copy of CPA Reviewed Consolidated financial statements of McClain Feed Yard , McClain Farms, and 7M Cattle Feeders for that period;

(b)     as soon as available, but no later than 60 days after the end of each fiscal quarter (excluding the fourth quarter of each fiscal year), a copy of CPA Compiled Consolidated financial statements of McClain Feed Yard , McClain Farms, and 7M Cattle Feeders for that period;

(c)     As soon as available, but no later than 120 days after the end of each calendar year, a copy of the monthly cash flow budget for McClain Feed Yard, McClain Farms, and 7M Cattle Feeders for that calendar year.



# EXHIBIT B

PREPARED BY:
Randa Barton
Polsinelli PC
2950 N Harwood, Suite 2100
Dallas, TX 75201

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

RABO AGRIFINANCE LLC
14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attn: Loan Operations

Space above this line for Recorder's Use

McClain MCA 2018

Real Estate Term Loan 1: 22114481
Real Estate Term Loan 2: 22117432
Operating Line of Credit 3: 0000030682
Real Estate Term Loan 3: 0000030687

## DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

(Deaf Smith and Parmer Counties, Texas)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

THIS DEED OF TRUST ALSO CONSTITUTES A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER THE UCC.

This deed of trust ("Deed of Trust") is dated as of August 27, 2021. It is by MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard,") and 7M CATTLE FEEDERS, INC, a Kentucky corporation ("7M Cattle Feeders") (McClain Feed Yard and 7M Cattle Feeders are herein individually and collectively, "Grantor"), to and in favor of PHILIP R. KIRKPATRICK, an individual, as trustee ("Trustee"), whose address for purposes of this Deed of Trust is 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, for the benefit of RABO AGRIFINANCE LLC, a Delaware limited liability company, as agent for itself and the other Secured Parties (defined herein) under the Collateral Agency Agreement (defined herein; and Rabo AgriFinance LLC, in that capacity, "Beneficiary").

RABO AGRIFINANCE LLC, a Delaware limited liability company, as Lender ("Lender") has agreed to make up to $46,019,800.00 in loans to Borrower (as defined in the Facility Sheet(s)) under the terms and conditions of the Master Credit Agreement between Grantor and Lender dated May 11, 2018, as may be amended, modified, replaced, or supplemented from time to time (the "MCA"). Each capitalized term used in this Deed of Trust that is defined in the MCA and not defined in this Deed of Trust will have the meaning specified in the MCA. This Deed of Trust will be interpreted in accordance with the Drafting Conventions.

Doc      Bk          Vol      Pg
64214    OR         179      671

Grantor has or may also enter into certain derivatives transactions under Hedging Agreements with Swap Counterparties, under which Grantor has or may incur Hedging Obligations to Swap Counterparties.

The Loan Obligations (defined in the MCA) may be, from time to time, guaranteed by Guarantor under the terms and conditions of one or more guaranties in favor of Collateral Agent. The Hedging Obligations are guaranteed by Guarantor under the terms and conditions of the Hedging Agreements and/or a separate guaranty of the Hedging Obligations (the MCA, the Guaranty, and the Hedging Agreements and any separate guaranty of the Hedging Obligations are herein sometimes individually and collectively referred to as the "Debt Instrument").

Non-Obligor(s) have an economic interest in Borrower or will obtain some other material financial benefit as a result of Secured Parties' entering into the Secured Obligation Documents (defined herein). Secured Parties require that Non-Obligor execute this agreement as a condition of the Secured Obligation Documents.

TO SECURE repayment of the indebtedness evidenced by the Note (defined herein) and payment and performance of all other Secured Obligations (defined herein), Grantor irrevocably and unconditionally grants, bargains, sells, and conveys to Trustee, in trust, for the benefit of Beneficiary, WITH POWER OF SALE and right of entry and possession wherever located, whether now owned or hereafter acquired or arising, and, except as indicated, whether constituting real estate or personal property (collectively, the "Property"): (a) the real estate and any interest in the personal property and real estate located in Deaf Smith and Parmer Counties, Texas, and described in EXHIBIT A-1 and EXHIBIT A-2 (the "Land"); (b) all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the Land, including all wells, watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements"); (c) all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a means of access thereto ("Easements"); (d) the ground water on, under, pumped from or otherwise available to the Property or Land or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government ("Governmental Authority") and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Property or Grantor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Property, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity (collectively, "Water Rights"), including those rights, shares and other property (if any) described in EXHIBIT B; (e) all other tenements, hereditaments and appurtenances to the Land; (f) minerals, oil, gas, coal, metallic ores, other minerals and any other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Land and other oil, gas, coal, metallic ores and any other mineral interests with which any of the foregoing interests or estates are pooled or unitized, including surface damage awards or settlements (the "Mineral Rights"): (g) timber now or hereafter standing or cut; (h) leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property (collectively, the "Leases"); (i) all utility contracts, maintenance agreements, management agreements, rights under any and all nutrient/manure management plans, service contracts and other agreements directly related to the operation and maintenance of the Property; (j) all bushes, groves, trees, plants, vines or other plantings, upon or under the Land ("Plantings") including all varieties of Plantings that produce fruit, nuts, or other crops in more than one crop year ("Permanent Crop Plantings"); (k) all patents, trademarks, or other intellectual property, working drawings, instructional manuals, and rights in processes directly related to the operation of the Property; (l) other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment (except motor vehicles, trailers, and planting, tillage and harvesting equipment rolling stock) or which is in all cases (i) directly related to the operation of the Property or acquired in connection with any construction or maintenance of the Land or the Improvements or  and (ii) affixed or installed, or to be affixed or installed, in

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

2

Case 23-20084-jjt7   Doc 356   Filed 05/08/24   Entered 05/08/24 13:53:07   Desc
Exhibit Deed   Page 43 of 204

Doc
64214
Bk
OR
Vol
179
Pg
672

any manner on the Land or the Improvements or; (m) U.S. Forest Permits, Taylor Grazing Permits or Licenses, and State grazing leases, and other grazing rights, including (if any) the rights described in EXHIBIT B to any mortgage(s) and separate security agreement(s) securing the Note(s), from time to time; (n) all permits and licenses relating or pertaining to the use or enjoyment of the Property; (o) proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (the "Insurance Claims"); (p) all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Land or other Real Estate (the "Condemnation Awards"); (q) rights and interests under any Hedging Agreements, including all rights to the payment of money from Secured Parties or Trustee under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in any of the Hedging Agreements; (r) the right, in the name and on behalf of Grantor, upon notice to Grantor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Trustee, Beneficiary or Secured Parties in the Property; and (s) substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.  To have and to hold the Property onto Trustee, Trustee's successor in Trust, and Trustees assigns forever.

     1.     **Secured Obligations.**  Grantor makes the grant, conveyance, transfer and assignment herein, to secure payment and performance of the following obligations (the "Secured Obligations") in any order of priority that Beneficiary may choose:  (a) all Obligations (defined in the MCA), under one or more Facility Sheet(s) from time to time where Grantor is designated from time to time as Borrower, Guarantor or Non-Borrower, including (i) the Real Estate Term Loan 1 Note dated May 11, 2018, from Grantor to Lender in the original principal amount of $332,500.00; (ii) the Real Estate Term Loan 2 Note dated July 24, 2019, from Grantor to Lender in the original principal amount of $625,000.00; (iii) the Operating Line of Credit 3 Note dated as of the date of this Deed of Trust, from Grantor to Lender in the original principal amount of $45,000,000.00; (iv) the Real Estate Term Loan 3 Note dated as of the date of this Deed of Trust, from Brian Keith McClain to Lender guaranteed by Grantor in the original principal amount of $1,019,800.00 (the Real Estate Term Loan 1 Note, the Real Estate Term Loan 2 Note, the Operating Line of Credit 3 Note, and the Real Estate Term Loan 3 Note, together with all extensions, renewals, modifications, substitutions and amendments thereof are herein collectively, the "Note"); (v) all Hedging Obligations; and (vi) all other indebtedness, liabilities and obligations of Grantor to Lender and the Swap Counterparties arising pursuant to any of the Transaction Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several; (b) all obligations of Grantor under this Deed of Trust; (c) any obligations due to a Banking Counterparty with regard to Banking Obligations; (d) all obligations of Grantor to Lender, Coöperatieve Rabobank U.A., a foreign banking organization organized as a cooperative bank under the laws of The Netherlands ("Rabobank") or any other Affiliate of Lender (Lender, Rabobank and any other Affiliate of Lender or Rabobank are herein individually and collectively, "Secured Parties"), whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether obligatory or non-obligatory; whether due or not due, whether absolute or contingent, or whether incurred directly or acquired by assignment or otherwise, under the terms and conditions of any other written instrument or agreement executed by Grantor and which specifically recites that those obligations are secured by this Deed of Trust; and (e) any of the foregoing that arises after the filing of a petition by or against Grantor under an Insolvency Proceeding.  All Persons who have or acquire an interest in the Property will be deemed to have received notice of, and will be bound by, the terms of the MCA, the other Transaction Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (the Transaction Documents and those other agreements or instruments, the "Secured Obligation Documents").  These terms include any provisions in the Secured Obligation Documents which permit borrowing, repayment and reborrowing, or which provide that the rate of interest on one or more of the Secured Obligations may vary from time to time. This Deed of Trust secures one or more Obligations that contain a variable rate of interest according to a formula based on LIBOR, SOFR ("Secured Overnight Financing Rate") or a similar widely used index which is disclosed in the Loan Documents. This Deed of Trust does not secure any obligation which is unsecured pursuant to the express terms of the MCA or any other document, agreement or instrument.  Without limitation of the foregoing, this Deed of Trust does not secure the indebtedness, liabilities and obligations of Guarantor as guarantor under the terms and conditions of the Guaranty or any other guaranty given by Guarantor to secure the Hedging Obligations.

     2.     **Future Secured Obligations.**  The Secured Obligations include future advances and other future Secured Obligations made by Beneficiary or Secured Parties, at their option, and for any purpose, and all other future Secured

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

Case 23-20084-rlj7   Doc 2056   Filed 09/05/24   Entered 09/05/24 13:53:27   Desc
Exhibit D Deed   Page 44 of 204

Doc
64214

Bk
OR

Vol
179

Pg
673

Obligations. Those future advances and other future Secured Obligations are secured to the same extent as if made or incurred on the date of the execution of this Deed of Trust, and have priority as to third Persons with or without actual notice from the time this Deed of Trust is filed for record as provided by law. The total amount of Indebtedness secured by this Deed of Trust may decrease or increase from time to time. The unpaid balance of any Revolving Line of Credit or Hedging Obligations secured by this Deed of Trust may at certain times be zero. This Deed of Trust will remain in full force and effect notwithstanding any zero balance. Grantor shall not file for record any notice limiting the maximum amount secured by this Deed of Trust (a "Maximum Amount Notice"). A Maximum Amount Notice will be an Event of Default (defined herein). Nothing herein will constitute a commitment to make additional or future advances which are not specified by the other terms of the MCA or enter into future derivatives transactions in any amount. The unpaid balance of any revolving line of credit or Hedging Obligations secured by this Deed of Trust may at certain times be zero. This Deed of Trust will remain in full force and effect notwithstanding any zero balance.

3.    **Note Maturity Date.** The latest date on which any Note matures is August 1, 2031.

4.    **Assignment.** Grantor irrevocably and unconditionally assigns to Beneficiary and grants Beneficiary a security interest in, the Leases; all rents and other benefits derived from the Leases, and all other issues, profits, royalties, bonuses, income and other benefits derived from or produced by the Real Estate, including but not limited to, any monies, proceeds, damages, Judgments or payments in lieu thereof, received by or due to Grantor occasioned by any mineral or geothermal exploration, wind energy, solar energy or drilling activity on or under the Real Estate, all prepaid rents, security deposits and other supporting obligations (the "Rents"; and this assignment, the "Assignment of Rents"). Beneficiary may collect Rents with or without taking possession of the Property. Beneficiary confers upon Grantor a license to collect and retain the Rents as they become due and payable, so long as there is no Event of Default (the "License"). If an Event of Default has occurred, Beneficiary may terminate the License without notice to or demand upon Grantor. Beneficiary, by its acceptance of this Deed of Trust does not assume any duty or obligation under the Leases. The acceptance by Beneficiary of the assignment of Leases and Rents and profits with all the rights, powers, privileges and authority so granted will not obligate Beneficiary to assume any obligations in respect of the Leases and Rents and profits or under the Leases, or take any action thereunder or to expend any money or incur any expense or perform or discharge any obligation, duty or liability in respect of the Leases and Rents and profits or under the Leases or to assume any obligation or responsibility for the nonperformance of the provisions thereof by Grantor. The definition of Leases shall include all "Leases" as defined or described in Chapter 64 of the Assignment of Rents Act, and the definition of Rents shall include all "Rents" as defined in the Assignment of Rents Act. Furthermore, it is the intent of the parties to comply with the requirements of the Assignment of Rents Act in connection with the assignment of Leases and Rents. Accordingly, the enforcement of rights related to the assignment of Leases and Rents shall be subject to compliance with the provisions of the Assignment of Rents Act, including, without limitation, the notice requirements of Sections 64.054, 64.055(a) and 64.056 of the Texas Property Code.

5.    **Grant of Security Interest.** This Deed of Trust is a security agreement under the Uniform Commercial Code in effect in the State of Texas (the "UCC"); and Grantor grants Trustee and Beneficiary a security interest in and pledges and assigns to Trustee and Beneficiary all of Grantor's right, title and interest in the Property, to the extent characterized as personal property (the "Personalty"). The address of Grantor adjacent to its signature below is the mailing address of Grantor as debtor under the UCC. The address for Trustee specified in the first paragraph of this Deed of Trust is the address for Trustee as secured party under the UCC; and the address for Beneficiary specified herein is the address for Beneficiary as secured party under the UCC. As used in this Deed of Trust, the term "lien" is synonymous with the term "lien and security interest."

6.    **Warranty of Title.** Grantor represents and warrants that Grantor lawfully possesses and holds good and marketable fee simple title to all of the Land and the Improvements, that Grantor has the right, power and authority to grant, convey and assign the Property; and that the Property is unencumbered. Grantor covenants that Grantor will warrant and forever defend generally the title to, and ownership and possession of, the Property against all claims and demands, with all costs and expenses of defense to be borne by Grantor. Grantor especially agrees and declares that the separate estate of each of them, whether vested, contingent or in expectancy, is hereby conveyed and shall be bound for the payment and performance of the Secured Obligations.

7.    **Permanent Crop Plantings.** All Permanent Crop Plantings are real estate and will remain a part of the Land. Grantor represents and warrants that the Permanent Crop Plantings are not subject to intellectual property rights under U.S. or foreign patent, copyright or trademark laws, the Plant Variety Protection Act or similar laws or subject to license from the

holder of any such intellectual property rights (collectively "Permanent Crop Planting IP Rights"), other than (where applicable) the Permanent Crop Planting IP Rights described on EXHIBIT B.  To the extent the Land does contain or in the future is cultivated to grow any variety of Permanent Crop Plantings that are subject to Permanent Crop Planting IP Rights, (a) Grantor represents and warrants that Grantor is the owner of such IP Rights free and clear of any claim, right, title, interest or Lien of any other person; (b) Grantor shall notify Beneficiary in writing of the existence of any Permanent Crop Planting IP Rights and Grantor grants Beneficiary a security interest in and a Lien upon all of Grantor's present and future rights, title and interests in, to and under Permanent Crop Planting IP Rights; all cash and non-cash proceeds and products of Permanent Crop Planting IP Rights; and all causes of action, past, present and future for infringement, misappropriation or dilution of, or unfair competition regarding any of Permanent Crop Planting IP Rights.

8.       **Additional Representations.**  Grantor represents to Beneficiary and Secured Parties that:  (a) the Property does not represent the proceeds of unlawful activity under any state, federal or foreign law; (b) the Property includes all property and rights which may be reasonably necessary or desirable to enable Grantor to use, enjoy and operate the Land and the Improvements for the present uses thereof; (c) none of the Land or Improvements is subject to any Lien, offset or claim; (d) Grantor owns the Personalty free and clear of any security interests, reservations of title or conditional sales contracts, and there is no presently valid financing statement affecting the Personalty on file in any public office; (e) Grantor has title to, or (in the case of leased property) valid leasehold interests in, all of their properties and assets, real and personal, including the properties and assets and leasehold interests reflected in the Financial Information (other than any properties or assets disposed of in the ordinary course of business); (f) the legal name of Grantor is as appears in the first paragraph of this agreement; (g) Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this agreement; (h) if Grantor is anything other than a natural Person, it has complied with all Applicable Laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in which it conducts its business; (i) the execution, delivery and performance by Grantor of this Deed of Trust is within the powers and authority of Grantor and has been duly authorized; (j) to Grantor's knowledge, this Deed of Trust does not conflict with any Applicable Law; (k) this Deed of Trust is a legal, valid and binding agreement of Grantor, enforceable against Grantor in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable; (l) there has been no Material Adverse Effect as to Grantor since the effective date the Financial Information was provided to Beneficiary or Secured Parties; (m) there is no lawsuit, tax claim or other dispute pending or to Grantor's knowledge threatened against Grantor or the Property that, if determined adverse to Grantor, is reasonably likely to have a Material Adverse Effect; (n) Grantor is not the subject of any Judgment; (o) this Deed of Trust does not conflict with, nor is Grantor in default on any credit agreement, indenture, purchase agreement, guaranty, capital lease, or other investment, agreement, or arrangement presently in effect providing for or relating to extensions of credit in respect of which Grantor is in any manner directly or contingently obligated; (p) Grantor has filed all tax returns (federal, state, and local) required to be filed and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties; (q) before signing this Deed of Trust, Grantor researched, to the satisfaction of Grantor, and inquired into the previous uses and ownership of the Real Estate, and based on that due diligence, to the best of Grantor's knowledge, no Hazardous Substance has been disposed of or released or otherwise exists in, on, under or onto the Real Estate, except as Grantor has disclosed to Beneficiary or Secured Parties in the Environmental Information; (r) Grantor has complied with all current and future laws, regulations and ordinances or other requirements of any Governmental Authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or Hazardous Substances ("Environmental Laws"); (s) Grantor has not received any notices of violations of any Applicable Laws (including Environmental Laws); and Grantor is in compliance with all Applicable Laws; (t) there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Property with respect to any violations of Applicable Laws; (u) Grantor's place of business, or its chief executive office, if it has more than one place of business, is located at the address specified below; and (v) unless otherwise disclosed to Beneficiary, Grantor is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986; and there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

9.       **Information Accurate and Complete.**  All financial statements and other reports, documents, instruments, information and forms of evidence which have been delivered to Beneficiary or Secured Parties concerning Grantor, or the Property (the financial and other information supplied or to be supplied to Beneficiary or Secured Parties in connection with this Deed of Trust is herein referred to as the "Financial Information"), are accurate, correct and sufficiently complete in all material respects to provide Beneficiary and Secured Parties true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities.  Grantor's submission of any Financial Information or other report, record or

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

5

information pertaining to the condition or operations, financial or otherwise, of Grantor, from time to time, whether or not required under this Deed of Trust, will be deemed accompanied by a representation by Grantor that the Financial Information or other report, record or information is complete and accurate in all material respects as to the condition or operations of Grantor (and, if applicable, Grantor's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities and Grantor's business or organizational structure.

10.    **Performance of Secured Obligations**.  Grantor shall promptly pay and perform each Secured Obligation in accordance with its terms.

11.    **Maintenance and Preservation of Property**.  Grantor shall:  (a) immediately discharge any Lien on the Property which Beneficiary has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a Lien which now or hereafter encumbers or appears to encumber all or part of the Property, whether the Lien is or would be senior or subordinate to this Deed of Trust; (b) not alter, remove or demolish any portion of the Improvements, except as permitted by the MCA; (c) maintain (or cause to be maintained) all policies of insurance required under the MCA and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; (d) promptly and completely repair and/or restore any portion of the Property which becomes damaged or destroyed, in a good and workmanlike manner in accordance with sound building practices, whether or not Grantor has received the proceeds of any Insurance Claim; (e) not commit or allow any waste of the Property, nor do or suffer to be done any act whereby the value of any part of the Property may be lessened; (f) not initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except as permitted or required by the MCA; (g) if the Land is agricultural, keep the Property in good condition and repair; operate the Property, whether improved pastures, orchards, grazing, timber, or crop lands, in a good and husbandman like manner in accordance with accepted principles of sound agricultural and forestry practices; take all reasonable precautions to control wind and water erosion; fertilize improved pastures, if any, where necessary to maintain a good stand of desirable grasses; protect orchards and timber, if any, by reasonable precautions against loss or damage by fire including the maintenance of appropriate fire breaks; and neither to remove nor permit the removal of any timber, buildings, oil, gas, mineral, stone, rock, clay, fertilizer, gravel or top soil without the prior written consent of Beneficiary; (h) complete appropriation and all other requirements, if any, necessary to obtain the issuance of any license or water permit issued to Grantor, and take all other steps required or advisable for purposes of perfecting and maintaining in good status all other Water Rights; (i) keep all Permanent Crop Plantings cultivated, irrigated, fertilized, sprayed and fumigated, and shall replace all dead or unproductive trees, vines and other Permanent Crop Plantings with new ones; (j) not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Grantor on the Property or any part of it under this Deed of Trust; and (k) perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value and utility.

(a)    *TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE:  (A) GRANTOR IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE AS PROVIDED HEREIN; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF GRANTOR AT GRANTOR'S EXPENSE.*

12.    **Compliance with Applicable Law**.  Grantor shall not commit or allow any act upon or use of the Property which would violate any Applicable Law, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property;

13.    **Taxes and Assessments**.  Grantor shall pay (a) prior to delinquency, all taxes, levies, charges and assessments, including all ditch, canal, reservoir or other water charges, and assessments on appurtenant Water Stock, imposed by Applicable Law or any public or quasi-public authority or utility company which are (or if not paid, may become) a Lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it (individually and collectively "Impositions"); (b) any and all intangible taxes and documentary stamp taxes determined at any

time to be due on or as a result of the Secured Obligations, this Deed of Trust or any other Transaction Documents, together with any and all interest and penalties thereon; and (c) taxes, levies, charges and assessments on Beneficiary's or Secured Parties' interest therein or upon this Deed of Trust or the Secured Obligations (collectively, "Mortgage Taxes"); except that if the amount of Mortgage Taxes exceeds the Maximum Rate, Grantor will not be required to pay any such excess. If after the date of this Deed of Trust, the State of Texas passes any law deducting from the value of Land for the purpose of taxation any Lien thereon, or changing in any way the laws for the taxation of Mortgages or debts secured by Mortgage for state or local purposes, or the manner of the collection of any such taxes, so as to affect this Deed of Trust, then within 180 days after notice by Beneficiary to Grantor, Grantor shall pay all Secured Obligations. Notwithstanding the foregoing provisions of this section, Grantor may, at its expense, contest the validity or application of any Imposition by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, provided that Beneficiary is satisfied that neither the Property nor any part thereof or interest therein will be at risk of being sold, forfeited, or lost as a result of such contest, and Grantor has posted a bond equal to 115% of the contested amount or furnished such other security required from time to time by Beneficiary for purposes of payment of the contested amount.

      14.    **Damages and Insurance and Condemnation Proceeds.** Beneficiary may, at its option, (a) in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on warranty, or for damage, injury or loss to all or part of the Property, and it may make any compromise or settlement of the action or proceeding; (b) participate in any action or proceeding relating to any Condemnation Award; and (c) join Grantor in adjusting any Insurance Claim. All insurance proceeds, Condemnation Awards, and proceeds of any other claim based on warranty, or for damage, injury or loss to the Property which Grantor may receive or be entitled to must be paid to Beneficiary. In each instance, Beneficiary may apply those proceeds first toward reimbursement of all of Beneficiary's costs and expenses of recovering the proceeds or Condemnation Award, including Legal Fees. The balance shall, at Beneficiary's option, be applied to pay or Prepay some or all of the Secured Obligations in such order and proportions as it may choose. GRANTOR HEREBY SPECIFICALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ALL RIGHTS OF A PROPERTY OWNER WHICH PROVIDE FOR ALLOCATION OF CONDEMNATION PROCEEDS BETWEEN A PROPERTY OWNER AND A LIENHOLDER, AND ANY OTHER LAW OR SUCCESSOR STATUTE OF SIMILAR IMPORT.

      15.    **Site Visits, Observation and Testing.** Beneficiary and its agents and representatives may enter and visit the Property at any reasonable time for the purposes of observing it, performing Appraisals, taking and removing soil or groundwater samples, and conducting tests on any part of it, as provided in the MCA, and otherwise to determine Grantor's compliance with this Deed of Trust.

      16.    **Defense and Notice of Claims and Actions.** At Grantor's sole expense, Grantor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Deed of Trust and the rights and powers of Beneficiary and Trustee created under it, against all adverse claims. Grantor must give Beneficiary and Trustee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

      17.    **Prohibited Transfers.** Grantor agrees that a material factor in Secured Parties' decision to enter into the Secured Obligation Documents is the expertise, financial status and other characteristics of Grantor or Borrower. Grantor or Borrower shall not make or permit any Prohibited Transfer. Upon any Prohibited Transfer Beneficiary may declare all Secured Obligations to be due and payable immediately. "Prohibited Transfer" means: (a) any sale, contract to sell, conveyance, encumbrance, pledge, mortgage, lease of the Property to or for the benefit of a Person not the original Grantor under this instrument, not expressly permitted under this instrument or the other Secured Obligation Documents, or other transfer of all or any material part of the Property or any interest in it, including any transfer of Mineral Rights, Water Rights, or Water Stock, whether voluntary, involuntary, by operation of law or otherwise; (b) if Grantor or Borrower is a corporation, any transfer or transfers of shares of the voting power or the direct or indirect beneficial ownership of Grantor; (c) if Grantor or Borrower is a partnership, withdrawal or removal of any general partner, dissolution of the partnership under Applicable Law, or any transfer or transfers of the partnership interests; (d) if Grantor or Borrower is a limited liability company, withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of the voting power or the ownership of the economic interest in the Grantor or Borrower; or (e) if Grantor or Borrower is a trust, withdrawal or removal of any trustee or revocation of the trust.

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

Doc 64214
Bk OR
Vol 179
Pg 677

18.    **Compensation and Reimbursement of Costs and Expenses.** Grantor shall pay (a) fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Beneficiary or Trustee when the law provides no maximum limit, for any services that Beneficiary or Trustee may render in connection with this Deed of Trust, including Beneficiary's providing a statement or Trustee's rendering of services in connection with a reconveyance; (b) all of Beneficiary's or Trustee's costs and expenses which may be incurred in rendering any such services; and (c) all costs, expenses and other advances which may be incurred or made by Beneficiary or Trustee in any efforts to enforce any terms of this Deed of Trust or protect the Property, including any rights or remedies afforded to Beneficiary or Trustee herein, including but not limited to Appraisals, inspections, insurance premiums, and prevention of waste, whether any lawsuit is filed or not, including any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the Adjustment of debtor-creditor relationships, or in defending any action or proceeding arising under or relating to this Deed of Trust, including attorneys' fees and other legal costs, costs of any Foreclosure Sale (defined herein) and any cost of evidence of title.  If Beneficiary chooses to dispose of Property through more than one Foreclosure Sale, Grantor must pay all costs, expenses or other advances that may be incurred or made by Beneficiary or Trustee in each of those Foreclosure Sales.  GRANTOR SHALL INDEMNIFY TRUSTEE, BENEFICIARY AND SECURED PARTIES AGAINST AND SHALL HOLD THEM HARMLESS FROM ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COST OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER COSTS AND EXPENSES WHICH EITHER MAY SUFFER OR INCUR: (A) IN PERFORMING ANY ACT REQUIRED OR PERMITTED BY THIS DEED OF TRUST OR ANY OF THE OTHER SECURED OBLIGATION DOCUMENTS OR BY LAW; (B) BECAUSE OF ANY FAILURE OF GRANTOR TO PAY OR PERFORM ANY OF THE SECURED OBLIGATIONS; OR (C) BECAUSE OF ANY ALLEGED OBLIGATION OF OR UNDERTAKING BY BENEFICIARY OR SECURED PARTIES TO PERFORM OR DISCHARGE ANY OF THE REPRESENTATIONS, WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN ANY DOCUMENT RELATING TO THE PROPERTY (OTHER THAN SUCH WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN THE SECURED OBLIGATION DOCUMENTS).  THIS AGREEMENT BY GRANTOR TO INDEMNIFY TRUSTEE, BENEFICIARY AND SECURED PARTIES SURVIVES THE RELEASE AND CANCELLATION OF ANY OR ALL OF THE SECURED OBLIGATIONS AND THE FULL OR PARTIAL RELEASE AND/OR RECONVEYANCE OF THIS DEED OF TRUST.

19.    **Payments Due under this Deed of Trust**.  Grantor must pay all obligations to pay money arising under this Deed of Trust immediately upon demand by Trustee, Beneficiary or Secured Parties.  Each such obligation shall bear interest from the date the obligation arises at the Default Rate.

20.    **Events of Default**.  The following each shall be an event of default under this Deed of Trust (an "Event of Default"):  (a) an Event of Default under the MCA, including a default termination event or other similar event under any Hedging Agreement which is not cured within any grace or cure period specified therein, if any; (b) a Prohibited Transfer; (c) the Financial Information or any representation in this Deed of Trust is materially incorrect or materially misleading; (d) the filing of any notice limiting the maximum amount secured by this Deed of Trust to a sum less than the Maximum Amount Secured as specified herein, or if no such amount is specified, to any amount; (e) for more than ten days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this section, which can be cured by the payment of a sum of money; or (f) for 30 days after notice from Beneficiary or Secured Parties, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this section; provided that if (i) it is reasonably certain that the default cannot be cured by Grantor within that 30 day period and (ii) Grantor has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period shall be extended for so long as reasonably required by Grantor in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Grantor of the Event of Default.

21.    **Remedies**.  At any time after an Event of Default, Secured Parties, Beneficiary or Trustee may (a) declare any or all of the Secured Obligations to be due and payable immediately; (b) cure any breach or default of Grantor; (c) may, to the extent permitted by Applicable Law, make an ex parte application to any court of competent jurisdiction, and obtain appointment of, a receiver, trustee, liquidator or conservator of the Property, without notice, without giving bond, and without regard for the adequacy of the security for the Secured Obligations and without regard to the solvency of Borrower, any Guarantor, or of any Person liable for the payment of the Secured Obligations; (d) in person, by agent or by court-appointed receiver, enter, take possession of, manage and operate all or any part of the Property; (e) exercise any or all of the remedies granted to a secured party under the UCC; (f) bring an action in any court of competent jurisdiction to foreclose this Deed of

Trust or to obtain specific enforcement of any of the Covenants or agreements of this Deed of Trust; (g) under the power of sale granted under this Deed of Trust (the "Power of Sale"), at its option cause some or all of the Property, including the Personalty, to be sold or otherwise disposed of in any combination and in any manner permitted by Applicable Law; and (h) do any and all other things in connection with those actions that Beneficiary may consider necessary and appropriate to protect the security of this Deed of Trust.  GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS BENEFICIARY AS GRANTOR'S ATTORNEY-IN-FACT TO PERFORM SUCH ACTS AND EXECUTE SUCH DOCUMENTS AS BENEFICIARY CONSIDERS APPROPRIATE IN CONNECTION WITH TAKING THESE MEASURES, INCLUDING ENDORSEMENT OF GRANTOR'S NAME ON ANY INSTRUMENTS.  GRANTOR HEREBY WAIVES NOTICE OF THE APPLICATION FOR, AND CONSENTS TO THE APPOINTMENT OF A RECEIVER, TRUSTEE, LIQUIDATOR OR CONSERVATOR OF THE PROPERTY IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION (WHICH APPOINTMENT OF SUCH POWER OF ATTORNEY IS A POWER COUPLED WITH AN INTEREST); AND AGREES TO NOT OPPOSE SUCH APPOINTMENT.  Notwithstanding the foregoing, in no event will Trustee, Beneficiary or Secured Parties have any obligation to take any of the actions set forth in this Deed of Trust.  Beneficiary shall not be considered to have accepted any property other than cash or immediately available funds in satisfaction of any obligation of Grantor to Beneficiary, unless Beneficiary has given express written notice of its election of that remedy.  The proceeds of any receivership shall be applied by the receiver toward the payment of the Secured Obligations or toward the payment of such part of any Judgment thereupon which remains unsatisfied after the sale of the Property.  The receiver may make repairs and keep the Property in good condition and repair pending a sale, and pay all taxes and assessments accrued or accruing or redeem from sales therefore, pay all premiums of insurance required under this Deed of Trust, and pay all other charges as herein provided.

22. **Sales of Property.**  Beneficiary may elect to treat as Personalty any Property which is intangible or which can be severed from the Land or Improvements without causing structural damage.  Beneficiary may dispose of any Personalty separately from the sale of real property, in any manner permitted by the UCC or any other Applicable Law.  Any proceeds of any such disposition shall not cure any Event of Default or reinstate any Secured Obligation.  Beneficiary may choose to dispose of some or all of the Property which consists solely of real property in any manner then permitted by Applicable Law.  To the extent permitted by Applicable Law, Beneficiary may also or alternatively choose to dispose of some or all of the Property, in any combination consisting of both real and personal property, together in one sale to be held in accordance with the Law and procedures applicable to real property, as permitted by the UCC.  Grantor agrees that such a sale of Personalty together with real property constitutes a commercially reasonable sale of the personal property.  For purposes of the Power of Sale, either a sale of real property alone under the Power of Sale, or, to the extent permitted by Applicable Law, a sale of both real and personal property under the Power of Sale, together in accordance with the UCC, will sometimes be referred to as a "Non-Judicial Foreclosure Sale."  Before any Non-Judicial Foreclosure Sale, Beneficiary or Trustee must give such notice of default and election to sell as may then be required by law.  When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Beneficiary or Trustee, as required by Applicable Law, must sell the Property being sold at a public auction to be held at the time and place specified in the notice of sale.  Neither Beneficiary nor Trustee have any obligation to make demand on Grantor before any Non-Judicial Foreclosure Sale.  From time to time in accordance with then Applicable Law, Trustee may (and in any event at Beneficiary's request Trustee must), postpone any Non-Judicial Foreclosure Sale by public announcement at the time and place noticed for that sale.  Trustee or Beneficiary, as required by Applicable Law, shall execute and deliver to any purchaser(s) a deed(s) or bill(s) of sale conveying the Property being sold without any covenant or warranty whatsoever, express or implied.  The recitals in any such deed(s) or bill(s) of sale of any matters or facts, including any facts bearing upon the regularity or validity of any Non-Judicial Foreclosure Sale, will be conclusive proof of their truthfulness.  Any such deed(s) or bill(s) of sale shall be conclusive against all Persons as to the facts recited in it.  If the Land is located in more than one county, then to the extent permitted by Applicable Law, a judicial or non-judicial foreclosure sale of the Property may be maintained in any one or more of those counties.  If the Property consists of more than one lot, parcel or item of property, Beneficiary may: (i) designate the order in which the lots, parcels and/or items shall be sold or disposed of or offered for sale or disposition; and (ii) elect to dispose of the lots, parcels and/or items through a single consolidated sale or disposition to be held or made under the Power of Sale, or in connection with judicial proceedings, or by virtue of a Judgment and decree of foreclosure and sale; or through two or more such sales or dispositions; or in any other manner (including a Non-Judicial Foreclosure Sale) Beneficiary may deem to be in its best interests (any such sale or disposition, a "Foreclosure Sale;" any two or more, "Foreclosure Sales").  If it chooses to have more than one Foreclosure Sale, Beneficiary at its option may cause the Foreclosure Sales to be held simultaneously or successively, on the same day, or on such different days and at such different times and in such order as it may deem to be in its best interests.  No Foreclosure Sale will

Doc
64214   Bk
OR   Vol
179   Pg
679

terminate or affect the Lien of this Deed of Trust on any part of the Property which has not been sold, until all of the Secured Obligations have been paid in full. At any Foreclosure Sale, any person, including Grantor, Beneficiary, Secured Parties or to the extent permitted by Applicable Law, Trustee, may bid for and acquire the Property or any part of it to the extent permitted by then Applicable Law. Instead of paying cash for that property, Beneficiary or Secured Parties may settle for the purchase price by crediting the sales price of the Property against the Secured Obligations, unless Applicable Law mandates a specific order of application, in which event payments and collections will be applied as mandated by Applicable Law. Any such credit, and all other proceeds of any Foreclosure Sale shall be applied to the Secured Obligations in any order Beneficiary may choose.

23.   **Additional Rights**. In addition to the rights and powers given to Beneficiary under this Deed of Trust, Beneficiary shall have all such other rights both in law and equity for collection of the indebtedness secured hereby as it would have but for this Deed of Trust.

24.   **Guarantor and/or Non-Obligor Provisions**. (a) Guarantor and/or Non-Obligor authorize Trustee, Beneficiary and Secured Parties to perform any of the following acts at any time, all without notice to Guarantor and/or Non-Obligor and without affecting the rights of Trustee, Beneficiary or Secured Parties or the obligations of Guarantor and/or Non-Obligor under this Deed of Trust: (i) alter any terms of the MCA or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the MCA or any part of it; (ii) take and hold security for the MCA, accept additional or substituted security for the MCA, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security; (iii) apply any security now or later held for the MCA in any order that Trustee, Beneficiary and Secured Parties may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale; (iv) release Obligor/Borrower of its liability for the MCA or any part of it; (v) substitute, add or release any one or more guarantors or endorsers of the MCA; and (vi) extend other credit to Obligor/Borrower, and may take and hold security for the credit so extended, whether or not such security also secures the MCA.

(b)   Guarantor and/or Non-Obligor waive: (i) any right to require Trustee, Beneficiary or Secured Parties to proceed against Obligor/Borrower, proceed against or exhaust any security held from Obligor/Borrower, or pursue any other remedy in Trustee's, Beneficiary's and Secured Parties power to pursue; (ii) any defense based on any legal disability of Obligor/Borrower, any discharge or limitation of the liability of Obligor/Borrower to Trustee, Beneficiary or Secured Parties, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that the obligations of Guarantor and/or Non-Obligor exceed or are more burdensome than those of Obligor/Borrower; (iii) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Deed of Trust and of the existence, creation, or incurring of new or additional indebtedness of Obligor/Borrower, and demands and notices of every kind; (iv) any defense based on or arising out of any defense that Obligor/Borrower may have to the payment or performance of the MCA or any part of it; and (v) until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that Trustee, Beneficiary or Secured Parties may have against Obligor/Borrower, and all rights to participate in any security now or later to be held by Trustee, Beneficiary or Secured Parties for the MCA.

(c)   Guarantor and/or Non-Obligor waive all rights and defenses that Guarantor and/or Non-Obligor may have because the MCA may be secured by real property other than the Property hereby encumbered. This means, among other things: (i) Trustee, Beneficiary and Secured Parties may collect from Guarantor and/or Non-Obligor (including enforcing this Deed of Trust against Guarantor and/or Non-Obligor) without first foreclosing on any real or personal property collateral securing the MCA; and (ii) if Beneficiary forecloses on any real property collateral securing the MCA: (A) the amount of the MCA may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Trustee, Beneficiary and Secured Parties may collect from Guarantor and/or Non-Obligor (including enforcing this Deed of Trust against Guarantor and/or Non-Obligor) even if Trustee, Beneficiary or Secured Parties, by foreclosing on the real property collateral, has destroyed any right Guarantor and/or Non-Obligor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor and/or Non-Obligor may have because the MCA may be secured by real property other than the Property.

(d)    Guarantor and/or Non-Obligor waive any right or defense it may have at law or equity, to a fair market value hearing or action to determine a deficiency Judgment after a foreclosure of any real property other than the Property hereby encumbered.

(e)    Guarantor and/or Non-Obligor are solely responsible for keeping informed of the financial condition and business operations of Borrower and all other circumstances affecting the ability of Borrower to pay and perform Borrower's obligations to Trustee, Beneficiary and Secured Parties, and agrees that Trustee, Beneficiary and Secured Parties will have no duty to disclose to Guarantor and/or Non-Obligor any information which Trustee, Beneficiary or Secured Parties may receive about the financial condition, business operations, or any other circumstances bearing on the ability of Borrower to perform.

(f)    No provision or waiver in this Deed of Trust shall be construed as limiting the generality of any other provision or waiver contained in this Deed of Trust or the Guaranty.

25.    **Notices.**  All notices, approvals, consents, and other communications, under this Deed of Trust ("Notices") must be given in accordance with and will be subject to the terms and provisions of the MCA.  Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Trustee, to the address in the first paragraph of this Deed of Trust; if to Beneficiary or Lender, to 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, Attention: Loan Operations; if to Secured Parties other than Lender, c/o Rabobank, 245 Park Avenue, New York, NY 10167, Attention: Customer Service Representative; and in the case of any other Person, to the address designated by that Person in a notice to Grantor, Beneficiary, and Lender.

26.    **Request for Notice.**  Grantor requests that a copy of any notice of default and any notice of sale be mailed to it at the address specified adjacent to its signature below.

27.    **Trustee and Beneficiary.**  Without affecting the personal liability of any Person, including Grantor and Obligor/Borrower, for the payment of the Secured Obligations or the Lien of this Deed of Trust on the remainder of the Property for the unpaid amount of the Secured Obligations:  (a) Beneficiary and Secured Parties may from time to time and without notice: (i) release any Person liable for payment of any Secured Obligation; (ii) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation; (iii) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, Mortgages, Security Agreements or any other instruments of security; or (iv) alter, substitute or release any property securing the Secured Obligations; and (b) Trustee may perform any of the following acts when requested to do so by Beneficiary or a Secured Party in writing:  (i) consent to the making of any plat or map of the Property or any part of it; (ii) join in granting any easement or creating any restriction affecting the Property; (iii) join in any subordination or other agreement affecting this Deed of Trust or the Lien of it; or (iv) reconvey the Property or any part of it without any warranty.

28.    **Exculpation of Trustee and Beneficiary.**  None of Trustee, Beneficiary or Secured Parties will be directly or indirectly liable to Grantor or any other Person as a consequence of any of the following:  (a) the exercise of or failure to exercise any rights, remedies or powers granted to it in this Deed of Trust; (b) any failure or refusal to perform or discharge any obligation or liability of Grantor under any agreement related to the Property or under this Deed of Trust; or (c) any loss sustained by Grantor or any third party resulting from any failure to lease the Property or from any other act or omission in managing the Property after an Event of Default, unless the loss is caused by the willful misconduct and bad faith of Trustee, Beneficiary or Secured Parties, respectively. GRANTOR HEREBY EXPRESSLY WAIVES AND RELEASES ALL LIABILITY OF THE TYPES DESCRIBED ABOVE, AND AGREES THAT NO SUCH LIABILITY BE ASSERTED AGAINST OR IMPOSED UPON TRUSTEE, BENEFICIARY OR ANY SECURED PARTY.

29.    **Substitution of Trustee.**  Beneficiary may substitute a successor to any Trustee named in or acting under this Deed of Trust in any manner now or later to be provided at Applicable Law.

30.    **Waiver of Dower, Homestead, and Distributive Share.**  Grantor relinquishes all right of dower and waives all right of homestead and distributive share in and to the Property.  Grantor waives any right of exemption as to the Property. Grantor represents and agrees that no part of the Property constitutes or shall constitute any part of Grantor's homestead.  To the maximum extent permitted by law, Grantor hereby irrevocably and unconditionally waives, releases, and relinquishes any present or future benefits or rights as a result of any homestead, exemption or stay laws of the State of Texas.

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

11

Doc
64214    Bk
OR    Vol
179    Pg
681

**31.** <u>Waiver of Certain Other Laws</u>. To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor, and its representatives, successors and assigns, and for any and all Persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, or notice of election to mature or declare due the whole of the Secured Obligations in the event of foreclosure of the Lien created by this Deed of Trust.

**32.** <u>Reconveyance</u>. When all Secured Obligations have been paid in full, Lender has no obligation to make additional Loans and the Hedging Agreements have been terminated, Trustee shall execute and deliver an instrument reconveying the Property, or so much of it as is then held under this Deed of Trust, without warranty to the Person or Persons legally entitled to it. In the reconveyance, the grantee may be described as "the Person or Persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness. Trustee, Beneficiary and Secured Parties will have no duty to determine the rights of Persons claiming to be rightful grantees of any reconveyance of the Property.

**33.** <u>Additional Provisions</u>. The Secured Obligation Documents state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this Deed of Trust. The Secured Obligation Documents also grant further rights to Beneficiary and Secured Parties and contain further agreements and affirmative and negative covenants by Grantor which apply to this Deed of Trust and to the Property.

**34.** <u>Collateral Agency Agreement</u>. This Deed of Trust is subject to the terms of the collateral agency agreement between the Secured Parties (the "Collateral Agency Agreement").

**35.** <u>Entire Agreement</u>. This Deed of Trust and the other Secured Obligation Documents collectively: (i) represent the sum of the understandings and agreements between Beneficiary, Secured Parties and Grantor concerning this credit; (ii) replace any prior oral or written agreements between Beneficiary, Secured Parties and Grantor concerning this credit; and (iii) are intended by Beneficiary, Secured Parties and Grantor as the final, complete and exclusive statement of the terms agreed to by them. In the event of any conflict between this Deed of Trust and any other agreements required by this Deed of Trust, this Deed of Trust will prevail.

**36.** <u>Other Acts</u>. Grantor shall cooperate with Beneficiary for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this Deed of Trust or to carry out the intent of this agreement. Promptly (but in no event more than ten days) after request by Beneficiary, Grantor will execute, acknowledge and deliver any document which Beneficiary deems necessary or advisable for these purposes, and will, on demand, pay any expenses incurred by Beneficiary in the preparation, execution and filing of any such documents.

**37.** <u>No Waiver or Cure</u>. Each waiver by Trustee, Beneficiary or Secured Parties must be in writing, and no waiver is to be construed as a continuing waiver. No waiver is to be implied from any delay or failure by Trustee, Beneficiary or Secured Parties to take action on account of any default of Grantor. Consent by Trustee, Beneficiary or Secured Parties to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Trustee's, Beneficiary's or Secured Parties' consent to be obtained in any future or other instance. The exercise by Trustee, Beneficiary or Secured Parties of any right or remedy under this Deed of Trust or the other Secured Obligation Documents or under Applicable Law, shall not: cure or waive a breach, Event of Default or notice of default under this Deed of Trust or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents, including any Hedging Agreements, have been cured); or impair the security of this Deed of Trust; or prejudice Trustee, Beneficiary, Secured Parties or any receiver appointed in accordance with this Deed of Trust, in the exercise of any right or remedy afforded any of them under this Deed of Trust; or be construed as an affirmation by Beneficiary or Secured Parties of any tenancy, lease or option, or a subordination of the Lien of this Deed of Trust.

**38.** <u>Waivers</u>. Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require upon foreclosure sales of assets in a particular order. Grantor waives presentment, demand, protest, notice of protest and notice of dishonor and waives all exemptions as to the Secured Obligations. Each successor and assign of Grantor, including any holder of a Lien subordinate to this Deed of Trust, by acceptance of its interest or Lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

**39.** **Joint and Several Obligations.** If Grantor consists of more than one Person, each Grantor (a) acknowledges and undertakes, together with the other Grantors, joint and several liability for the indebtedness, liabilities and obligations of Grantor under this Deed of Trust; (b) acknowledges that this Deed of Trust is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor; and (c) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable. GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT BENEFICIARY OR SECURED PARTIES EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS DEED OF TRUST, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS.

**40.** **Binding Effect; Successors and Assigns.** The Secured Obligation Documents shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns; provided that Grantor shall not assign its rights or obligations hereunder without Secured Parties' consent. Beneficiary and Secured Parties may transfer all or any portion of its rights under the Secured Obligation Documents to any other Person. Beneficiary and Secured Parties may disclose to any actual or proposed transferee any information that Grantor has delivered to Beneficiary and Secured Parties in connection with the negotiation of this Deed of Trust or pursuant to the Secured Obligation Documents; and Grantor shall cooperate fully with Beneficiary and Secured Parties in providing that information to any actual or proposed transferee.

**41.** **Governing Law.** This Deed of Trust shall be governed exclusively by the Applicable Laws of the State of Texas (the "Governing Law State") without regard or reference to its conflict of laws principles. Grantor understands that the laws of the Governing Law State may differ from the laws of the state where Grantor resides or otherwise is located or where the Property is located. However, Grantor understands, agrees and acknowledges that (a) this Deed of Trust and the Secured Obligation Documents have significant and substantial contacts with the Governing Law State, (b) it is convenient to Grantor and Lender to select the law of the Governing Law State to govern this Deed of Trust and the transactions evidenced hereby, (c) the transactions evidenced by the MCA and this Deed of Trust bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the Governing Law State constitutes good and valuable consideration for Secured Parties to enter into the Secured Obligation Documents and Secured Parties have entered into the Secured Obligation Documents in reliance on this choice.

**42.** **JURISDICTION AND VENUE.** GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF BENEFICIARY, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA. GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

**43.** **Miscellaneous.** This Deed of Trust may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument. If Grantor is comprised of multiple Persons, any Person comprising Grantor is hereby authorized to bind all parties comprising Grantor. Beneficiary or Secured Parties may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person. Time is of the essence of this Deed of Trust. Each Party has participated in negotiating and drafting this Deed of Trust, so if an ambiguity or a question of intent or interpretation arises, this Deed of Trust is to be construed as if the parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this Deed of Trust. Beneficiary is authorized to execute any other documents or take any other actions necessary to effectuate this Deed of Trust and the consummation of the transactions contemplated herein. This Deed of Trust may not be amended, changed, modified, altered or terminated without the prior written consent of Beneficiary and Secured Parties. Any provision of any Secured Obligation Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Secured Obligation Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Beneficiary or Secured Parties may, at its option, declare all Secured Obligations immediately due and payable. No merger shall occur as a result of Beneficiary's or Secured Parties' acquiring any

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

Case 23-20084-11 Doc 356 Filed 09/06/24 Entered 09/06/24 13:55:27 Desc
Exhibit D Page 54 of 204

Doc
64214   Bk
OR    Vol
179    Pg
683

other estate in or any other Lien on the Property. All rights and remedies under this Deed of Trust and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

44.    **INDEMNIFICATION.** GRANTOR SHALL DEFEND, INDEMNIFY AND HOLD TRUSTEE, BENEFICIARY AND SECURED PARTIES AND THEIR OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS (THE "INDEMNIFIED PERSONS") HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS (A) ARISING OUT OF OR RESULTING FROM THE VIOLATION OF ANY ENVIRONMENTAL LAW; OR (B) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF TRUSTEE, BENEFICIARY OR SECURED PARTIES BEING PARTY TO THIS DEED OF TRUST OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS DEED OF TRUST; THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PERSON, except that Grantor shall have no obligation to an Indemnified Person under this section with respect to Losses resulting from the gross negligence or wilful misconduct of that Indemnified Person as determined by a court of competent jurisdiction. If and to the extent that an Indemnity is unenforceable for any reason, Grantor shall be obligated to make the maximum contribution to the payment and satisfaction thereof which is permissible under Applicable Law. THE PROVISIONS OF ALL INDEMNITIES SHALL SURVIVE THE TERMINATION OF THIS DEED OF TRUST.

45.    **WAIVER OF TRIAL BY JURY.** GRANTOR AND, BY ACCEPTANCE HEREOF, BENEFICIARY (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS DEED OF TRUST; OR (II) ANY SECURED OBLIGATION DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY, AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE SECURED OBLIGATION DOCUMENTS.

46.    <u>Acceleration; Remedies.</u> Notwithstanding any provision of this Deed of Trust to the contrary:

(a)    At any time following an Event of Default, Beneficiary, at Beneficiary's option, may declare the Secured Obligations to be immediately due and payable without further demand, and may invoke the Power of Sale and any other remedies permitted by Texas law or provided in this Deed of Trust or in any other Transaction Document. Grantor acknowledges that the Power of Sale granted in this Deed of Trust may be exercised by Beneficiary without prior judicial hearing. Beneficiary shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

(b)    If Beneficiary invokes the Power of Sale, Beneficiary may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Beneficiary may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction. Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least 21 days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Beneficiary has, at least 21 days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Secured Obligations according to Beneficiary's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Beneficiary's records, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. Any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. Further, any sale made by Trustee hereunder may, in lieu of

McClain MCA 2016
Deed of Trust, Assignment of Rents and Security Agreement

14

cash, be upon such other terms and conditions as Beneficiary may from time to time hereafter elect. The sale by Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Property shall be sold and, if the proceeds of such sale of less than the whole of the Property shall be less than the aggregate of the indebtedness secured hereby and the expense of executing this trust as provided herein, this Deed of Trust and the lien hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Property but Beneficiary shall have the right, at its sole election, to request Trustee to sell less than the whole of the Property. In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary, such sale shall not exhaust the power of sale hereunder and Beneficiary shall have the right to cause a subsequent sale or sales to be made hereunder.

(c)    At any time during the bidding of any sale conducted by Trustee under subparagraph (a) above, Trustee may require a bidding party (x) to disclose its full name, state and city of residence, occupation, and specific business office location, and the name and address of the principal the bidding party is representing (if applicable); and (y) to demonstrate reasonable evidence of the bidding party's financial ability (or, if applicable, the financial ability of the principal of such bidding party), as a condition to the bidding party submitting bids at the foreclosure sale. If any such bidding party (the "Questioned Bidder") declines to comply with Trustee's requirement in this regard, or if such Questioned Bidder does respond but Trustee, in Trustee's sole and absolute discretion, deems the information or the evidence of the financial ability of the Questioned Bidder (or, if applicable, the principal of such bidding party) to be inadequate, Trustee may continue the bidding with reservation; and in such event (i) Trustee shall be authorized to caution the Questioned Bidder concerning the legal obligations to be incurred in submitting bids, and (ii) if the Questioned Bidder is not the highest bidder at the sale, or if having been the highest bidder the Questioned Bidder fails to deliver the cash purchase price payment promptly to Trustee, all bids by the Questioned Bidder shall be null and void. Trustee may, in Trustee's sole and absolute discretion, determine that a credit bid may be in the best interest of Borrower and Beneficiary and elect to sell the Property for credit or for a combination of cash and credit; provided, however, that Trustee shall have no obligation to accept any bid except an all cash bid. In the event Trustee requires a cash bid and cash is not delivered within a reasonable time after conclusion of the bidding process, as specified by Trustee (but in no event later than 3:45 p.m. local time on the date of sale), then said contingent sale shall be null and void, the bidding process may be recommenced, and any subsequent bids or sale shall be made as if no prior bids were made or accepted.

(d)    Beneficiary shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor or by any receiver or public officer, and any Beneficiary purchasing at any sale shall have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the Debt owing to such Beneficiary, or if such Beneficiary holds less than all of the Debt the pro rata part thereof owing to such Beneficiary, accounting to all other beneficiaries of this Deed of Trust not joining in such bid in cash for the portion of such bid or bids apportionable to such non-bidding beneficiaries.

(e)    Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Property so sold in fee simple with covenants of general warranty. Grantor covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements contained in those recitals. Trustee shall apply the proceeds of the sale in the following order: FIRST to all reasonable costs and expenses of the sale, including reasonable Trustee's fees and attorneys' fees and costs of title evidence; SECOND to the Secured Obligations in such order as Beneficiary, in Beneficiary's discretion, directs; and THIRD the excess, if any, to the person or persons legally entitled to the excess.

(f)    Uniform Commercial Code. Upon the occurrence of an Event of Default, Beneficiary may exercise its rights of enforcement under the Uniform Commercial Code with respect to the Property secured thereunder, and in conjunction with, in addition to or in substitution for those rights and remedies:

(i)    Beneficiary may enter upon the Property to take possession of, assemble and collect all Personalty or to render it unusable;

(ii)    Beneficiary may require Grantor to assemble the Personalty and make it available at a place Beneficiary designates which is mutually convenient to allow Beneficiary to take possession or dispose of such personal property;

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

Case 22-20084-jrj7   Doc 36   Filed 09/09/24   Entered 09/09/24 13:28:33   Desc Exhibit B-537/2021c
Exhibit Deed   Page 56 of 204
64214   Bk
OR
Vol
179
Pg
685

(iii)    written notice mailed to Grantor as provided herein ten (10) days prior to the date of public sale of Personalty or prior to the date after which private sale of Personalty will be made shall constitute reasonable notice;

(iv)    any sale made pursuant to the provisions of this paragraph shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the sale of the Property under power of sale as provided herein upon giving the same notice with respect to the sale of the Personalty hereunder as is required for such sale of the Property under power of sale;

(v)    in the event of a foreclosure sale, whether made by Trustee under the terms hereof, or under judgment of a court, the remainder of the Personalty and other Property may, at the option of Beneficiary, be sold as a whole;

(vi)    it shall not be necessary that Beneficiary take possession of the Personalty or any part thereof prior to the time that any sale pursuant to the provisions of this paragraph is conducted and it shall not be necessary that the Personalty or any part thereof be present at the location of such sale;

(vii)    prior to application of proceeds of disposition of the Personalty to the secured indebtedness, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Beneficiary;

(viii)    any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to non-payment of the indebtedness or as to the occurrence of any Event of Default, or as to Beneficiary having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by Beneficiary, shall absent manifest error be taken as conclusive evidence of the truth of the facts so stated and recited; and

(ix)    Beneficiary may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Beneficiary, including the sending of notices and the conduct of sale, but in the name and on behalf of Beneficiary.

(g)    In the event of a default in the payment of any part of the Debt, Beneficiary shall have the right to proceed with foreclosure of the liens and security interests evidenced hereby without declaring the entire Debt due, and in such event any such foreclosure sale may be made subject to the unmatured part of the Debt; and any such sale shall not in any manner affect the unmatured part of the Debt, but as to such unmatured part, this Deed of Trust shall remain in full force and effect just as though no sale had been made. The proceeds of any such sale shall be applied as provided in subsection (e) above except that the amount paid under subparagraph SECOND thereof shall be only the matured portion of the Debt and any proceeds of such sale in excess of those provided for in subparagraphs FIRST and SECOND (modified as provided above) shall be applied to installments of principal of and interest on the Note in the inverse order of maturity. Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Debt.

(h)    This Deed of Trust shall be effective as a mortgage as well as a Deed of Trust and upon the occurrence of an Event of Default may be foreclosed as to any of the Property in any manner permitted by the laws of the State of Texas or of any other state in which any part of the Property is situated, and any foreclosure suit may be brought by Trustee or by Beneficiary. In the event a foreclosure hereunder shall be commenced by Trustee or his substitute or successor, Beneficiary may at any time before the sale of the Property direct the said Trustee to abandon the sale, and may then institute suit for the collection of the Note and the other secured indebtedness, and for the foreclosure of this Deed of Trust. It is agreed that if Beneficiary should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Deed of Trust, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require Trustee, his substitute or successor to sell the Property in accordance with the provisions of this Deed of Trust.

(i)    If all or any part of the Property is sold pursuant to this section, Grantor will be divested of any and all interest and claim to the Property, including any interest or claim to all insurance policies, utility deposits, bonds, loan commitments and other intangible property included as a part of the Property. Additionally, after a sale of all or any part of the Land, Improvements, Fixtures and Personalty, Grantor will be considered a tenant at sufferance of the purchaser of the same, and the purchaser shall be entitled to immediate possession of such property. If Grantor fails to vacate the Property immediately, the

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

16

purchaser may and shall have the right, without further notice to Grantor, to go into any justice court in any precinct or county in which the Property is located and file an action in forcible entry and detainer, which action shall lie against Grantor or its assigns or legal representatives, as a tenant at sufferance. This remedy is cumulative of any and all remedies the purchaser may have under this Deed of Trust or otherwise.

(j)       In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Grantor agrees that notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Beneficiary shall be entitled to seek a deficiency judgment from Borrower and any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, and others against whom recovery of a deficiency is sought. Alternatively, in the event the waiver provided for in subsection (1) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable laws, the following shall be the basis of the court's determination of fair market value:  (i)  the Property shall be valued "as is" and in its condition as of the date of foreclosure, and no assumption of increased value because of post foreclosure repairs, refurbishment, restorations or improvements shall be made; (ii) any adverse effect on the marketability of title because of the foreclosure or because of any other title condition not existing as of the date of this Deed of Trust shall be considered; (iii) the valuation of the Property shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Property for cash within a six month period after foreclosure; (iv) although the Property may be disposed of more quickly by the foreclosure purchaser, the gross valuation of the Property as of the date of foreclosure shall be discounted for a hypothetical reasonable holding period (not to exceed 6 months) at a monthly rate equal to the average monthly interest rate on the Note for the twelve months before the date of foreclosure; (v) the gross valuation of the Property as of the date of foreclosure shall be further discounted and reduced by reasonable estimated costs of disposition, including brokerage commissions, title policy premiums, environmental assessment and clean up costs, tax and assessment, prorations, costs to comply with legal requirements and attorneys' fees; (vi) expert opinion testimony shall be considered only from a licensed appraiser certified by the State of Texas and, to the extent permitted under Texas law, a member of the Appraisal Institute, having at least five years' experience in appraising property similar to the Property in the county where the Property is located, and who has conducted and prepared a complete written appraisal of the Property taking into considerations the factors set forth in this Deed of Trust; no expert opinion testimony shall be considered without such written appraisal; (vii) evidence of comparable sales shall be considered only if also included in the expert opinion testimony and written appraisal referred to in the preceding paragraph; and (ix) an affidavit executed by Beneficiary to the effect that the foreclosure bid accepted by Trustee was equal to or greater than the value of the Property determined by Beneficiary based upon the factors and methods set forth in subparagraphs (a) through (g) above before the foreclosure shall constitute prima facie evidence that the foreclosure bid was equal to or greater than the fair market value of the Property on the foreclosure date.

(k)       Additional Waivers.

(i)       Subject to the provisions of this Deed of Trust, to the extent that Borrower, any partner thereof or any other entity responsible for the payment of the Debt is now, or at any time or from time to time hereafter is, a partnership, Borrower and Beneficiary expressly acknowledge and agree that Beneficiary is not required to comply with Section 3.05(d) of the Texas Revised Partnership Act, as same may be hereafter amended or modified, or any other or further laws, rules or regulations now or hereafter in effect which may limit the rights and remedies of a creditor to pursue partners of a partnership prior to the pursuit of such creditor's rights and remedies against such partnership.

(ii)       Borrower and Grantor hereby waive notice of intent to accelerate and notice of acceleration, and agrees that Beneficiary may foreclose the lien of this Deed of Trust without sending either of such notices.

(iii)       If any law referred to in this paragraph and now in force, of which Borrower or Borrower's heirs, devisees, representatives, successors, and assigns and such other persons claiming any interest in the Property might

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

17

take advantage despite this paragraph, shall hereafter be repealed and cease to be in force, such law shall not thereafter be deemed to preclude the application of this paragraph.

(l)  Beneficiary may, at Beneficiary's option, comply with these provisions in the manner permitted or required by Title 5, Section 51.002 of the Texas Property Code (relating to the sale of real estate) or by Chapter 9 of the Texas Business and Commerce Code (relating to the sale of collateral after default by a debtor), as those titles and chapters now exist or may be amended or succeeded in the future, or by any other present or future articles or enactments relating to same subject. Unless expressly excluded, the Property shall include Rents collected before a foreclosure sale, but attributable to the period following the foreclosure sale, and Grantor shall pay such Rents to the purchaser at such sale. At any such sale: (i) whether made under the power contained in this Deed of Trust, Section 51.002, the Texas Business and Commerce Code, any other legal requirement or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for Trustee to have physically present, or to have constructive possession of, the Property (Grantor shall deliver to Trustee any portion of the Property not actually or constructively possessed by Trustee immediately upon demand by Trustee) and the title to and right of possession of any such property shall pass to the purchaser as completely as if the property had been actually present and delivered to the purchaser at the sale; (ii) each instrument of conveyance executed by Trustee shall contain a general warranty of title, binding upon Grantor; (iii) the recitals contained in any instrument of conveyance made by Trustee shall conclusively establish the truth and accuracy of the matters recited in the Deed of Trust, including nonpayment of the Secured Obligations and the advertisement and conduct of the sale in the manner provided in this Deed of Trust and otherwise by law and the appointment of any successor Trustee; (iv) all prerequisites to the validity of the sale shall be conclusively presumed to have been satisfied; (v) the receipt of Trustee or of such other party or officer making the sale shall be sufficient to discharge to the purchaser or purchasers for such purchaser(s)' purchase money, and no such purchaser or purchasers, or such purchaser(s)' assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or nonapplication of such purchase money; (vi) to the fullest extent permitted by Applicable Law, Grantor shall be completely and irrevocably divested of all of Grantor's right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold, and such sale shall be a perpetual bar to any claim to all or any part of the property sold, both at law and in equity, against Grantor and against any person claiming by, through or under Grantor; and (vii) to the extent and under such circumstances as are permitted by law, Beneficiary may be a purchaser at any such sale.

(m)  The rights and remedies granted under this Section 46 are in addition to and shall not limit the rights and remedies available under other terms and provisions of this Deed of Trust.

47.  **Trustee.**  Notwithstanding any provision to the contrary in this Deed of Trust:

(a)  Trustee may resign by giving of notice of such resignation in writing to Beneficiary. If Trustee shall die, resign or become disqualified from acting under this Deed of Trust or shall fail or refuse to act in accordance with this Deed of Trust when requested by Beneficiary or if for any reason and without cause Beneficiary shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Deed of Trust or any prior successor or substitute trustee, Beneficiary shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Deed of Trust. Such appointment may be executed by an authorized officer, agent or attorney-in-fact of Beneficiary (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Beneficiary.

(b)  Any successor Trustee appointed pursuant to this section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Deed of Trust; but, nevertheless, upon the written request of Beneficiary or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)  Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Deed of Trust, including the transmittal and posting of any notices.

Doc
64214
Bk
OR
Vol
179
Pg
688

48. **Waiver of Consumer Rights.** TO THE EXTENT NOW OR HEREAFTER APPLICABLE, BORROWER HEREBY WAIVES BORROWER'S RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BORROWER'S OWN SELECTION, BORROWER VOLUNTARILY CONSENTS TO THIS WAIVER.

49. **No Fiduciary Duty.** Lender owes no fiduciary or other special duty to Secured Parties or Beneficiary.

50. **Additional Provisions Regarding Assignment of Rents.** In no event shall the Assignment of Rents or any other term of this Deed of Trust cause the Secured Obligations to be reduced by an amount greater than the Rents actually received by Beneficiary and applied by Secured Parties to the Secured Obligations, whether before, during or after (a) an Event of Default, or (b) a suspension or revocation of the License. Grantor and Beneficiary and Secured Parties specifically intend that the Assignment of Rents is not intended to result in a pro tanto reduction of the Secured Obligations. The Assignment of Rents is not intended to constitute a payment of, or with respect to, the Secured Obligations and, therefore, Grantor and Beneficiary and Secured Parties specifically intend that the Secured Obligations shall not be reduced by the value of the Rents and Leases assigned. Such reduction shall occur only if, and to the extent that, Beneficiary or a Secured Party actually receives Rents pursuant to the Assignment of Rents and applies those Rents to the Secured Obligations. Grantor agrees that the value of the License equals the value of the Assignment of Rents. The Assignment of Rents will terminate upon the release of this Deed of Trust.

51. **Loan Charges.** Secured Parties intend at all times to comply with the laws of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the Secured Obligations (or applicable United States federal law to the extent that it permits Secured Parties to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If Applicable Law is ever judicially interpreted so as to render usurious any amount payable under the Transaction Documents, or contracted for, charged, taken, reserved or received with respect to the Secured Obligations, or if acceleration of the maturity of the Secured Obligations, or if any prepayment by Grantor results in Grantor having paid any interest in excess of that permitted by any applicable law, then Grantor and Secured Parties expressly intend that all excess amounts collected by Secured Parties shall be applied to reduce the unpaid principal balance of the Secured Obligations (or, if the Secured Obligations have been or would thereby be paid in full, shall be refunded to Grantor), and the provisions of the Transaction Documents immediately will be deemed reformed and the amounts thereafter collectible under the Transaction Documents reduced, without the necessity of the execution of any new documents, so as to comply with any Applicable Law, but so as to permit the recovery of the fullest amount otherwise payable under the Transaction Documents. The right to accelerate the maturity of the Secured Obligations does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Secured Parties does not intend to collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Secured Parties for the use, forbearance or detention of the Secured Obligations shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated and spread throughout the full term of the Secured Obligations until payment in full so that the rate or amount of interest on account of the Secured Obligations does not exceed the applicable usury ceiling. Notwithstanding any provision contained in the Transaction Documents that permits the compounding of interest, including any provision by which any accrued interest is added to the principal amount of the Secured Obligations, the total amount of interest that Grantor is obligated to pay and Secured Parties is entitled to receive with respect to the Secured Obligations will not exceed the amount calculated on a simple (i.e., noncompounded) interest basis at the maximum rate on principal amounts actually advanced to or for the account of Borrower, including all current and prior advances and any advances made pursuant to the Instrument or any other Transaction Document (such as for the payment of Impositions and similar expenses or costs).

52. **Property And Liability Insurance - Delivery Of Policy to Beneficiary.** Notwithstanding any term or provision of the Transaction Documents to the contrary, Grantor will not be required to deliver the original (or a duplicate original) of any renewal policy of insurance to Lender more than 15 days prior to the expiration date of the policy then held by Beneficiary or Secured Parties.

53. **Reimbursement for Certain Taxes.** If, while the Secured Obligations are owned by a non-resident of the State of Texas, or by a corporation organized under the laws of a state other than Texas with its principal offices outside the State of Texas, any state, county or municipal tax or assessment is levied within the State of Texas against that owner of the Secured Obligations, either in terms or practical effect (whatever the legal incidence of such tax or assessment) on account of

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

the Secured Obligations or this Deed of Trust, or the right to enforce the same, or on account of that owner's receipt of interest or other payments thereunder, Grantor will reimburse that owner, promptly upon advice therefrom, the amount of each such tax or assessment, provided that if such tax or assessment shall be of such nature, in law, and of such amount for any year, that payment thereof, in its entirety, in addition to all other payments to be made by Grantor under the Transaction Documents, will constitute payment of "interest" in the statutory sense of that word, in excess of the Maximum Rate, Grantor's obligation to make reimbursement shall apply to only so much, if any, of each such tax or assessment as may be reimbursed without exceeding the Maximum Rate. If the passage of legislation imposing or authorizing the imposition of any such state, county or municipal tax or assessment, then at the option of Beneficiary, the Secured Obligations will be due within six months after notice to Grantor.

**54. Notice of Final Agreement. THIS WRITTEN DEED OF TRUST AND THE TRANSACTION DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Grantor is signing this Deed of Trust effective as of the day and year first written above.

**GRANTOR**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.,** a Texas corporation

By: _____

BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

**7M CATTLE FEEDERS, INC,** a Kentucky corporation

By: _____

BRIAN KEITH MCCLAIN
President

Doc
64214   Bk   Vol    Pg
       OR    179    69C

STATE OF _Kentucky_ )
                    ) SS
COUNTY OF _Marshall_ )

This instrument was acknowledged before me on _Sept. 22_, _2021_ by BRIAN KEITH MCCLAIN, President on behalf of MCCLAIN FEED YARD, INC., a Texas corporation.

_____
(Signature of officer)

_Notary_
(Title of officer)

My Commission Expires: _11-16-2023_

KIP C. MATHIS
NOTARY PUBLIC
STATE AT LARGE - KENTUCKY
ID # 634688
MY COMMISSION EXPIRES NOVEMBER 16, 2023

STATE OF _Kentucky_ )
                    ) SS
COUNTY OF _Marshall_ )

This instrument was acknowledged before me on _Sept. 22_, _2021_ by BRIAN KEITH MCCLAIN, President on behalf of 7M CATTLE FEEDERS, INC, a Kentucky corporation.

_____
(Signature of officer)

_Notary_
(Title of officer)

My Commission Expires: _11-16-2023_

KIP C. MATHIS
NOTARY PUBLIC
STATE AT LARGE - KENTUCKY
ID # 634688
MY COMMISSION EXPIRES NOVEMBER 16, 2023

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

21

Doc
64214   Bk
OR   Vol
179   Pg
691

EXHIBIT A-1

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

Legal Description of Real Estate

Deaf Smith County, Texas

**Tract 2:**

A 38.03 acre tract, more or less, out of the Southwest Part of Section 28, Block K-8, Abstract No. 1370, Certificate Number 128 of the T. T. R. R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a number 60 common nail found for the Southwest corner of Section 28, Block K-8 whence a 1-1/2 inch iron pipe found for the Southeast corner of said section bears North 89 degrees 55 minutes 00 seconds East 6321.58 feet;

THENCE North 89 degrees 58 minutes 00 seconds East along the South line of said section, 49.80 feet to a 1/2 inch iron rod set in the East physical line of Farm Road 1057 for the Southwest and beginning corner of this tract;

THENCE North 00 degrees 12 minutes 00 seconds West along the East physical line of Farm Road 1057, at 30.00 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2567.27 feet a 1/2 inch iron rod set for corner;

THENCE North 89 degrees 54 minutes 43 seconds East 808.84 feet to a 1/2 inch iron rod set in the East line of a tract known as the West 40 acres of the Southwest 1/4 of said section whence a 1/2 inch iron rod set for the Northeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section bears North 00 degrees 11 minutes 29 seconds West 71.78 feet;

THENCE South 00 degrees 11 minutes 29 seconds East at 2557.50 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2567.50 feet a 1/2 inch iron rod found in the South line of said section for the Southeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section;

THENCE South 89 degrees 58 minutes 00 seconds West along the South line of said section, 606.45 feet to the place of beginning.

**Tract 3:**

A 20.00 acre tract out of the Southwest part of Section 28, Block K-8, Certificate Number 128 of the T.T R.R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with cap marked "RPLS 1848" found in the South line of Section 28 for the Southwest corner and POINT OF BEGINNING of this tract, whence a number 60 common nail found for the Southwest corner of Section 28, Block K-8 bears South 89 degrees 55 minutes 00 seconds West 605.25 feet;

THENCE North 00 degrees 11 minutes 29 seconds West, a distance of 2567.50 feet a fence corner post for the Northwest corner of this tract;

THENCE North 89 degrees 54 minutes 43 seconds East, a distance of 339.00 feet to a 1/2 inch iron rod with cap marked "HBD" set for the Northeast corner of this tract;

THENCE South 00 degrees 11 minutes 29 seconds East, at a distance of 2557.62 feet pass a 1/2 inch iron rod with cap marked "HBD" set for reference, continue for a total distance of 2567.62 feet a point on the South line of Section 28, whence a 1-1/2 inch iron pipe found for the Southeast corner of Section 28 bears North 89 degrees 58 minutes 00 seconds East, 4329.04 feet;

THENCE South 89 degrees 55 minutes 00 seconds West, along the South line of Section 28, a distance of 336.60 feet to the POINT OF BEGINNING.

EXHIBIT A-2

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

Legal Description of Real Estate

Parmer County, Texas

**Tract 1:**

A tract of land being all of Section 25 and a portion of Section 24 of Charles E. Harding's Subdivision of Capitol League 473 and Parts of Capitol Leagues 459, 460, 461, 472 and 474 in Parmer County, Texas, as shown by the Map or plat thereof of record in Volume 8, Page 184, Deed Records of Parmer County, Texas, and being described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with cap stamped "Furman RPLS 1959" set for the southwest corner of said Section 25, being the common corner of Sections 25-36-35-26 from whence a 1/2 inch iron rod found for the common corner of sections 27-34-35-26, all in said subdivision bears North 89° 59' 32" West, 10,564.62 feet, the southwest corner of Section 36 and the southeast corner of Section 35 bears South

00° 11' 46" West, 5,281.61 feet, from this point a harrow tooth found as called for in that certain instrument recorded in Volume 225, Page 730, of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas, as shown by Plat thereof of record in Volume 2, Page 465 of said Deed Records bears West (Bearing Basis) 1,411.54 feet;

THENCE North 00° 11' 46" East along the common line of Sections 25 and 26, and the common line of Section 24 and 23, of said Charles E. Harding's Subdivision, and along the center of a road, at 5,281.61 feet pass the common line of Sections 25-26-23-24 a total distance of 8,503.54 feet to a 3/4 inch iron pipe found as called for in that certain instrument recorded in Volume 156, Page 603 of said Deed Records, and in Volume 2, Page 219 of the Field Note Records of Parmer County, Texas, from whence the common corner of Sections 24-23-14-13 of said Charles E. Harding's Subdivision bears North 00° 11' 46" East 8,261.61 feet and a 1 1/4 inch iron pipe with 5/8 inch rod adjacent found for the common corner of Sections 13-13-14-11 of said Charles E. Harding's Subdivision, as called for in that certain instrument recorded in Volume 2, Page 345, of said Field Note records bears North 00° 11' 46" East 7,341.28 feet;

THENCE South 89° 40' 56" East 2,100.54 feet along a fence line and along the North line of this tract of land and the North line of that certain tract of land described in said Volume 156, Page 603 and said Volume 2, Page 219 to a 3/4 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219, said North line being monumented and generally accepted on the ground for over 25 years, from whence the Northeast corner of Section 24 and the Southeast corner of Section 14 of said Charles E. Harding's Subdivision bears North 00° 11' 07" East 7,348.07 feet;

THENCE South 00° 11' 07" West at 3,157.40 feet pass a 3/4 inch iron Rod found, this iron pipe is a monument of record in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southeast corner of Section 24 of said Charles E. Harding's Subdivision. It is however the Professional opinion of this surveyor that this corner lies in the East line of this survey but 26.81 feet North of the actual section corner, at 3,214.21 feet pass what is in my Professional opinion the Southeast corner of Section 24 and the Northeast corner of Section 25 of said Charles E. Harding's Subdivision at 3,301.75 feet pass a 1 1/2 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southwest corner of Section 22 and the Northwest corner of Section 27 in Township 1 North, Range 3 East of a Capitol Syndicate Subdivision as shown by Plat thereof of record in Volume 5, Page 504 of said Deed Records, a total distance of 8,493.86 feet to a point being the Southeast corner of Section 25 and the Northeast corner of Section 36 of said Charles E. Harding's Subdivision from whence the Southeast corner of said Section 36 bears South 00° 11' 07" West 5,270.86 feet from this point a railroad spike found as called for in that certain instrument recorded in Volume 225, Page 730 of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas as shown by Plat thereof of record in Volume 2, Page 465 of said Deed Records bears East (Bearing Basis) 1,324.17 feet;

THENCE North 89° 58' 49" West 2,102.66 feet along the South line of Section 25 and the North line of Section 36 of said Charles E. Harding's Subdivision to the POINT OF BEGINNING and containing 416.0 acres of land, more or less.

Doc
64214  Bk
        OR    Vol
              179    Pg
                     693

### EXHIBIT B

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

**Additional Property**

associated with Deed of Trust by McClain Feed Yard and 7M Cattle Feeders on land located in Deaf Smith and Parmer
Counties, Texas

(list specific additional Property, if any)

**Fixtures**

Buildings, fixtures, and equipment associated with agricultural production or the production of farm products, including but not
limited to:

| Attached Equipment |
|---|
| 2 x Stationary Roto-Mixers |
| 6 x Liquid Storage Tanks |
| 9 x Hyd. Working Chutes (Snakes Not Included) |
| 1 x 12 x 70 Truck Scale |
| 2 x 12 x 70 Cattle Scales With Fencing and Gates |
| 1 x Grain Probe |

Doc
64214   Bk
OR        Vol
179      Pg
694

**All Water Rights related to but not limited to:**

**Subject Water Wells – 4160 Acre Feedyard Tract**

| Section | District Number | Permit Number | Permit Status | Comments | Recently Tested | Current GPM Estimate |
|---|---|---|---|---|---|---|
| 24 | 79667 | 3604 | Current | Yes | No | 40 |
| 24 | 79677 | 3974 | Current | Yes | Yes | 64 |
| 24 | 79680 | 3977 | Current | Yes | Yes | 53 |
| 24 | 79683 | 3978 | Current Destroyed | Yes | Yes | 0 |
| 25 | 12440 | 50134 | Current | None | No | 0 |
| 25 | 79138 | 3433 | Current | Yes | Yes | 40 |
| 25 | 59032 | 1399 | Abandoned | Yes | No | 0 |
| 25 | 79544 | 3831 | Current | Yes | No | 40 |
| 25 | 78540 | 2689 | Current | Yes Mill and Office | No | 40 |
| 25 | 79189 | 5424 | Current | Yes | No | 40 |
| 24 | 79719 | 4021 | Current | Yes | No | 40 |
| 25 | 83168 | 50610 | Current | None | No | 0 |
| Total | | | | | | 357 |
| Total Tested | | | | | | 157 |

CHG & RETURN
AA & R, L.L.P.

Doc 64214  Bk OR  Vol 179  Pg 695

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE
RENTAL OR USE OF THE DESCRIBED REAL PROPERTY
BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCIBLE
UNDER FEDERAL LAW

STATE OF TEXAS }
} OFFICIAL PUBLIC RECORDS
COUNTY OF PARMER }

I hereby certify that this instrument was FILED
on the date and at the time stamped hereon by
me and was duly RECORDED in the Volume and Page
of the RECORDS of Parmer County, Texas.

FILED FOR RECORD IN PARMER COUNTY
Susie Spring, COUNTY CLERK

ON: Sep 27,2021 AT 09:12A

Document Number:      64214

Receipt Number - 27321

By _Bre Ann Saenz_
Breann Saenz, Deputy

# EXHIBIT C

PREPARED BY:
Randa Barton
Polsinelli PC
2950 N Harwood, Suite 2100
Dallas, TX 75201

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

RABO AGRIFINANCE LLC
14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO  63017
Attn:  Loan Operations

Space above this line for Recorder's Use

McClain MCA 2018

Real Estate Term Loan 1: 22114481
Operating Line of Credit 1: 22114482
Real Estate Term Loan 2: 22117432
Operating Line of Credit 2: 22117434

## DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

(Deaf Smith and Parmer Counties, Texas)

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

THIS DEED OF TRUST ALSO CONSTITUTES A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER THE UCC.

This deed of trust ("Deed of Trust") is dated as of March 16, 2021.  It is by MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard ") and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("7M Cattle Feeders") (McClain Feed Yard  and 7M Cattle Feeders are herein individually and collectively, "Grantor"), to and in favor of PHILIP R. KIRKPATRICK, an individual, as trustee ("Trustee"), whose address for purposes of this Deed of Trust is 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, for the benefit of RABO AGRIFINANCE LLC, a Delaware limited liability company, as agent for itself and the other Secured Parties (defined herein) under the Collateral Agency Agreement (defined herein; and Rabo AgriFinance LLC, in that capacity, "Beneficiary").

RABO AGRIFINANCE LLC, a Delaware limited liability company, as Lender ("Lender") has agreed to make up to $2,500,000.00 in loans to Borrower (as defined in the Facility Sheet(s)) under the terms and conditions of the Master Credit Agreement between Grantor and Lender dated May 11, 2018, as may be amended, modified, replaced, or supplemented from time to time (the "MCA").  Each capitalized term used in this Deed of Trust that is defined in the MCA and not defined in this Deed of Trust will have the meaning specified in the MCA.  This Deed of Trust will be interpreted in accordance with the Drafting Conventions.

Grantor has or may also enter into certain derivatives transactions under Hedging Agreements with Swap Counterparties, under which Grantor has or may incur Hedging Obligations to Swap Counterparties.

Doc 63806     BK OR     Vol 176     Pg 462

The Loan Obligations (defined in the MCA) may be, from time to time, guaranteed by Guarantor under the terms and conditions of one or more guaranties in favor of Collateral Agent. The Hedging Obligations are guaranteed by Guarantor under the terms and conditions of the Hedging Agreements and/or a separate guaranty of the Hedging Obligations (the MCA, the Guaranty, and the Hedging Agreements and any separate guaranty of the Hedging Obligations are herein sometimes individually and collectively referred to as the "Debt Instrument").

Non-Obligor(s) have an economic interest in Borrower or will obtain some other material financial benefit as a result of Secured Parties' entering into the Secured Obligation Documents (defined herein). Secured Parties require that Non-Obligor execute this agreement as a condition of the Secured Obligation Documents.

TO SECURE repayment of the indebtedness evidenced by the Note (defined herein) and payment and performance of all other Secured Obligations (defined herein), Grantor irrevocably and unconditionally grants, bargains, sells, and conveys to Trustee, in trust, for the benefit of Beneficiary, WITH POWER OF SALE and right of entry and possession wherever located, whether now owned or hereafter acquired or arising, and, except as indicated, whether constituting real estate or personal property (collectively, the "Property"): (a) the real estate and any interest in the personal property and real estate located in Deaf Smith and Parmer Counties, Texas, and described in EXHIBIT A-1 and EXHIBIT A-2 (the "Land"); (b) all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the Land, including all wells, watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements"); (c) all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a means of access thereto ("Easements"); (d) the ground water on, under, pumped from or otherwise available to the Property or Land or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government ("Governmental Authority") and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Property or Grantor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Property, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity (collectively, "Water Rights", including those rights, shares and other property (if any) described in EXHIBIT B; (e) all other tenements, hereditaments and appurtenances to the Land; (f) minerals, oil, gas, coal, metallic ores, other minerals and any other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas, coal, metallic ores and any other mineral interests with which any of the foregoing interests or estates are pooled or unitized, including surface damage awards or settlements (the "Mineral Rights"); (g) timber now or hereafter standing or cut; (h) leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property (collectively, the "Leases"); (i) all utility contracts, maintenance agreements, management agreements, rights under any and all nutrient/manure management plans, service contracts and other agreements directly related to the operation and maintenance of the Property; (j) all bushes, groves, trees, plants, vines or other plantings, upon or under the Land ("Plantings") including all varieties of Plantings that produce fruit, nuts, or other crops in more than one crop year ("Permanent Crop Plantings"); (k) all patents, trademarks, or other intellectual property, working drawings, instructional manuals, and rights in processes directly related to the operation of the Property; (l) other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment (except motor vehicles, trailers, and planting, tillage and harvesting equipment rolling stock) or which is in all cases (i) directly related to the operation of the Property or acquired in connection with any construction or maintenance of the Land or the Improvements or and (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements or; (m) all U.S. Forest Permits, Taylor Grazing Permits or Licenses, and State grazing leases, and other grazing rights, including (if any) the rights described in EXHIBIT B to any mortgage(s) and separate security agreement(s) securing the Note(s), from time to time; (n) all permits and licenses relating or pertaining to the use or

enjoyment of the Property; (o) proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (the "Insurance Claims"); (p) all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Land or other Real Estate (the "Condemnation Awards"); (q) rights and interests under any Hedging Agreements, including all rights to the payment of money from Secured Parties or Trustee under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in any of the Hedging Agreements; (r) the right, in the name and on behalf of Grantor, upon notice to Grantor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Trustee, Beneficiary or Secured Parties in the Property; and (s) substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.  To have and to hold the Property onto Trustee, Trustee's successor in Trust, and Trustees assigns forever.

1.    **Secured Obligations.**  Grantor makes the grant, conveyance, transfer and assignment herein, to secure payment and performance of the following obligations (the "Secured Obligations") in any order of priority that Beneficiary may choose:  (a) all Obligations (defined in the MCA), under one or more Facility Sheets(s) from time to time where Grantor is designated from time to time as Borrower, Guarantor or Non-Borrower, including (i) the Real Estate Term Loan 1 Note dated as of May 11, 2018, from Grantor to Lender in the original principal amount of $332,500.00; (ii) the Operating Line of Credit 1 Note dated as of January 8, 2020, from Grantor to Lender in the original principal amount of $15,800,000.00; (iii) the Real Estate Term Loan 2 Note dated as of the date of July 24, 2019, from Grantor to Lender in the original principal amount of $625,000.00; (iv) the Operating Line of Credit 2 Note dated as of the date of this Deed of Trust, from Grantor to Lender in the original principal amount of $9,700,000.00 (the Real Estate Term Loan 1 Note, the Operating Line of Credit 1 Note, the Real Estate Term Loan 2 Note, and the Operating Line of Credit 2 Note, together with all extensions, renewals, modifications, substitutions and amendments thereof are herein collectively, the "Note");  (v) all Hedging Obligations; and (vi) all other indebtedness, liabilities and obligations of Grantor to Lender and the Swap Counterparties arising pursuant to any of the Transaction Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several; (b) all obligations of Grantor under this Deed of Trust; (c) any obligations due to a Banking Counterparty with regard to Banking Obligations; (d) all obligations of Grantor to Lender, Coöperatieve Rabobank U.A., (trading as Rabobank), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands ("Rabobank"), or any other Affiliate of Lender (Lender, Rabobank and any other Affiliate of Lender are herein individually and collectively, "Secured Parties"), whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether obligatory or non-obligatory; whether due or not due, whether absolute or contingent, or whether incurred directly or acquired by assignment or otherwise, under the terms and conditions of any other written instrument or agreement executed by Grantor and which specifically recites that those obligations are secured by this Deed of Trust; and (e) any of the foregoing that arises after the filing of a petition by or against Grantor under an Insolvency Proceeding.  All Persons who have or acquire an interest in the Property will be deemed to have received notice of, and will be bound by, the terms of the MCA, the other Transaction Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (the Transaction Documents and those other agreements or instruments, the "Secured Obligation Documents").  These terms include any provisions in the Secured Obligation Documents which permit borrowing, repayment and reborrowing, or which provide that the rate of interest on one or more of the Secured Obligations may vary from time to time.  This Deed of Trust does not secure any obligation which is unsecured pursuant to the express terms of the MCA or any other document, agreement or instrument.  Without limitation of the foregoing, this Deed of Trust does not secure the indebtedness, liabilities and obligations of Guarantor as guarantor under the terms and conditions of the Guaranty or any other guaranty given by Guarantor to secure the Hedging Obligations.

2.    **Future Secured Obligations.**  The Secured Obligations include future advances and other future Secured Obligations made by Beneficiary or Secured Parties, at their option, and for any purpose, and all other future Secured Obligations.  Those future advances and other future Secured Obligations are secured to the same extent as if made or incurred on the date of the execution of this Deed of Trust, and have priority as to third Persons with or without actual notice from the time this Deed of Trust is filed for record as provided by law.  The total amount of indebtedness secured by this Deed of Trust may decrease or increase from time to time.  The unpaid balance of any Revolving Line of Credit or Hedging Obligations secured by this Deed of Trust may at certain times be zero.  This Deed of Trust will remain in full force and effect notwithstanding any zero balance.  Grantor shall not file for record any notice limiting the maximum amount secured by this Deed of Trust (a "Maximum

DOC 63806    BK OR    Vol 176    Pg 464

Amount Notice"). A Maximum Amount Notice will be an Event of Default (defined herein). Nothing herein will constitute a commitment to make additional or future advances which are not specified by the other terms of the MCA or enter into future derivatives transactions in any amount. The unpaid balance of any revolving line of credit or Hedging Obligations secured by this Deed of Trust may at certain times be zero. This Deed of Trust will remain in full force and effect notwithstanding any zero balance.

3. **Note Maturity Date.** The latest date on which any Note matures is June 1, 2028.

4. **Assignment.** Grantor irrevocably and unconditionally assigns to Beneficiary and grants Beneficiary a security interest in, the Leases; all rents and other benefits derived from the Leases, and all other issues, profits, royalties, bonuses, income and other benefits derived from or produced by the Real Estate, including but not limited to, any monies, proceeds, damages, Judgments or payments in lieu thereof, received by or due to Grantor occasioned by any mineral or geothermal exploration, wind energy, solar energy or drilling activity on or under the Real Estate, all prepaid rents, security deposits and other supporting obligations (the "Rents"; and this assignment, the "Assignment of Rents"). Beneficiary may collect Rents with or without taking possession of the Property. Beneficiary confers upon Grantor a license to collect and retain the Rents as they become due and payable, so long as there is no Event of Default (the "License"). If an Event of Default has occurred, Beneficiary may terminate the License without notice to or demand upon Grantor. Beneficiary, by its acceptance of this Deed of Trust does not assume any duty or obligation under the Leases. The acceptance by Beneficiary of the assignment of Leases and Rents and profits with all the rights, powers, privileges and authority so granted will not obligate Beneficiary to assume any obligations in respect of the Leases and Rents and profits or under the Leases, or take any action thereunder or to expend any money or incur any expense or perform or discharge any obligation, duty or liability in respect of the Leases and Rents and profits or under the Leases or to assume any obligation or responsibility for the nonperformance of the provisions thereof by Grantor. The definition of Leases shall include all "Leases" as defined or described in Chapter 64 of the Assignment of Rents Act, and the definition of Rents shall include all "Rents" as defined in the Assignment of Rents Act. Furthermore, it is the intent of the parties to comply with the requirements of the Assignment of Rents Act in connection with the assignment of Leases and Rents. Accordingly, the enforcement of rights related to the assignment of Leases and Rents shall be subject to compliance with the provisions of the Assignment of Rents Act, including, without limitation, the notice requirements of Sections 64.054, 64.055(a) and 64.056 of the Texas Property Code.

5. **Grant of Security Interest.** This Deed of Trust is a security agreement under the Uniform Commercial Code in effect in the State of Texas (the "UCC"); and Grantor grants Trustee and Beneficiary a security interest in and pledges and assigns to Trustee and Beneficiary all of Grantor's right, title and interest in the Property, to the extent characterized as personal property (the "Personalty"). The address of Grantor adjacent to its signature below is the mailing address of Grantor as debtor under the UCC. The address for Trustee specified in the first paragraph of this Deed of Trust is the address for Trustee as secured party under the UCC; and the address for Beneficiary specified herein is the address for Beneficiary as secured party under the UCC. As used in this Deed of Trust, the term "lien" is synonymous with the term "lien and security interest."

6. **Warranty of Title.** Grantor represents and warrants that Grantor lawfully possesses and holds good and marketable fee simple title to all of the Land and the Improvements, that Grantor has the right, power and authority to grant, convey and assign the Property; and that the Property is unencumbered. Grantor covenants that Grantor will warrant and forever defend generally the title to, and ownership and possession of, the Property against all claims and demands, with all costs and expenses of defense to be borne by Grantor. Grantor especially agrees and declares that the separate estate of each of them, whether vested, contingent or in expectancy, is hereby conveyed and shall be bound for the payment and performance of the Secured Obligations.

7. **Permanent Crop Plantings.** All Permanent Crop Plantings are real estate and will remain a part of the Land. Grantor represents and warrants that the Permanent Crop Plantings are not subject to intellectual property rights under U.S. or foreign patent, copyright or trademark laws, the Plant Variety Protection Act or similar laws or subject to license from the holder of any such intellectual property rights (collectively "Permanent Crop Planting IP Rights"), other than (where applicable) the Permanent Crop Planting IP Rights described on EXHIBIT B. To the extent the Land does contain or in the future is cultivated to grow any variety of Permanent Crop Plantings that are subject to Permanent Crop Planting IP Rights, (a) Grantor represents and warrants that Grantor is the owner of such IP Rights free and clear of any claim, right, title, interest or Lien of any other person; (b) Grantor shall notify Beneficiary in writing of the existence of any Permanent Crop Planting IP Rights and Grantor grants Beneficiary a security interest in and a Lien upon all of Grantor's present and future rights, title and interests in, to

and under Permanent Crop Planting IP Rights; all cash and non-cash proceeds and products of Permanent Crop Planting IP Rights; and all causes of action, past, present and future for infringement, misappropriation or dilution of, or unfair competition regarding any of Permanent Crop Planting IP Rights.

8.  **Additional Representations.** Grantor represents to Beneficiary and Secured Parties that:  (a) the Property does not represent the proceeds of unlawful activity under any state, federal or foreign law; (b) the Property includes all property and rights which may be reasonably necessary or desirable to enable Grantor to use, enjoy and operate the Land and the Improvements for the present uses thereof; (c) none of the Land or Improvements is subject to any Lien, offset or claim; (d) Grantor owns the Personalty free and clear of any security interests, reservations of title or conditional sales contracts, and there is no presently valid financing statement affecting the Personalty on file in any public office; (e) Grantor has title to, or (in the case of leased property) valid leasehold interests in, all of their properties and assets, real and personal, including the properties and assets and leasehold interests reflected in the Financial Information (other than any properties or assets disposed of in the ordinary course of business); (f) the legal name of Grantor is as appears in the first paragraph of this agreement; (g) Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this agreement; (h) if Grantor is anything other than a natural Person, it has complied with all Applicable Laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in which it conducts its business; (i) the execution, delivery and performance by Grantor of this Deed of Trust is within the powers and authority of Grantor and has been duly authorized; (j) to Grantor's knowledge, this Deed of Trust does not conflict with any Applicable Law; (k) this Deed of Trust is a legal, valid and binding agreement of Grantor, enforceable against Grantor in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable; (l) there has been no Material Adverse Effect as to Grantor since the effective date the Financial Information was provided to Beneficiary or Secured Parties; (m) there is no lawsuit, tax claim or other dispute pending or to Grantor's knowledge threatened against Grantor or the Property that, if determined adverse to Grantor, is reasonably likely to have a Material Adverse Effect; (n) Grantor is not the subject of any Judgment; (o) this Deed of Trust does not conflict with, nor is Grantor in default on any credit agreement, indenture, purchase agreement, guaranty, capital lease, or other investment, agreement, or arrangement presently in effect providing for or relating to extensions of credit in respect of which Grantor is in any manner directly or contingently obligated; (p) Grantor has filed all tax returns (federal, state, and local) required to be filed and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties; (q) before signing this Deed of Trust, Grantor researched, to the satisfaction of Grantor, and inquired into the previous uses and ownership of the Real Estate, and based on that due diligence, to the best of Grantor's knowledge, no Hazardous Substance has been disposed of or released or otherwise exists in, on, under or onto the Real Estate, except as Grantor has disclosed to Beneficiary or Secured Parties in the Environmental Information; (r) Grantor has complied with all current and future laws, regulations and ordinances or other requirements of any Governmental Authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or Hazardous Substances ("Environmental Laws"); (s) Grantor has not received any notices of violations of any Applicable Laws (including Environmental Laws); and Grantor is in compliance with all Applicable Laws; (t) there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Property with respect to any violations of Applicable Laws; (u) Grantor's place of business, or its chief executive office, if it has more than one place of business, is located at the address specified below; and (v) unless otherwise disclosed to Beneficiary, Grantor is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986; and there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

9.  **Information Accurate and Complete.** All financial statements and other reports, documents, instruments, information and forms of evidence which have been delivered to Beneficiary or Secured Parties concerning Grantor, or the Property (the financial and other information supplied or to be supplied to Beneficiary or Secured Parties in connection with this Deed of Trust is herein referred to as the "Financial Information"), are accurate, correct and sufficiently complete in all material respects to provide Beneficiary and Secured Parties true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities.  Grantor's submission of any Financial Information or other report, record or information pertaining to the condition or operations, financial or otherwise, of Grantor, from time to time, whether or not required under this Deed of Trust, will be deemed accompanied by a representation by Grantor that the Financial Information or other report, record or information is complete and accurate in all material respects as to the condition or operations of Grantor (and, if applicable, Grantor's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities and Grantor's business or organizational structure.

Case 22-20084-hlj7    Doc 356    Filed 05/06/13    Entered 05/06/13 15:33:16    Desc
Exhibit Deed Page 73 of 204

Case 22-00041-jw7    Doc 356    Filed 09/08/13    Entered 09/08/13 15:33:16    Desc
Exhibit Deed Page 73 of 204                  BK        TC5531G/2021s    Pg
                                          83806    OR           176          466

10.  **Performance of Secured Obligations.**  Grantor shall promptly pay and perform each Secured Obligation in accordance with its terms.

11.  **Maintenance and Preservation of Property.**  Grantor shall:  (a) immediately discharge any Lien on the Property which Beneficiary has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a Lien which now or hereafter encumbers or appears to encumber all or part of the Property, whether the Lien is or would be senior or subordinate to this Deed of Trust; (b) not alter, remove or demolish any portion of the Improvements, except as permitted or required by the MCA; (c) maintain (or cause to be maintained) all policies of insurance required under the MCA and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; (d) promptly and completely repair and/or restore any portion of the Property which becomes damaged or destroyed, in a good and workmanlike manner in accordance with sound building practices, whether or not Grantor has received the proceeds of any Insurance Claim; (e) not commit or allow any waste of the Property, nor do or suffer to be done any act whereby the value of any part of the Property may be lessened; (f) not initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except as permitted or required by the MCA; (g) if the Land is agricultural, keep the Property in good condition and repair; operate the Property, whether improved pastures, orchards, grazing, timber, or crop lands, in a good and husbandman like manner in accordance with accepted principles of sound agricultural and forestry practices; take all reasonable precautions to control wind and water erosion; fertilize improved pastures, if any, where necessary to maintain a good stand of desirable grasses; protect orchards and timber, if any, by reasonable precautions against loss or damage by fire including the maintenance of appropriate fire breaks; and neither to remove nor permit the removal of any timber, buildings, oil, gas, mineral, stone, rock, clay, fertilizer, gravel or top soil without the prior written consent of Beneficiary; (h) complete appropriation and all other requirements, if any, necessary to obtain the issuance of any license or water permit issued to Grantor, and take all other steps required or advisable for purposes of perfecting and maintaining in good status all other Water Rights; (i) keep all Permanent Crop Plantings cultivated, irrigated, fertilized, sprayed and fumigated, and shall replace all dead or unproductive trees, vines and other Permanent Crop Plantings with new ones; (j) not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Grantor on the Property or any part of it under this Deed of Trust; and (k) perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value and utility.

(a)  _**TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE:  (A) GRANTOR IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE AS PROVIDED HEREIN; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF GRANTOR AT GRANTOR'S EXPENSE.**_

12.  **Compliance with Applicable Law**  Grantor shall not commit or allow any act upon or use of the Property which would violate any Applicable Law, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property;

13.  **Taxes and Assessments.**  Grantor shall pay (a) prior to delinquency, all taxes, levies, charges and assessments, including all ditch, canal, reservoir or other water charges, and assessments on appurtenant Water Stock, imposed by Applicable Law or any public or quasi-public authority or utility company which are (or if not paid, may become) a Lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it (individually and collectively "Impositions"); (b) any and all intangible taxes and documentary stamp taxes determined at any time to be due on or as a result of the Secured Obligations, this Deed of Trust or any other Transaction Documents, together with any and all interest and penalties thereon; and (c) taxes, levies, charges and assessments on Beneficiary's or Secured Parties' interest therein or upon this Deed of Trust or the Secured Obligations (collectively, "Mortgage Taxes"); except that if the amount of Mortgage Taxes exceeds the Maximum Rate, Grantor will not be required to pay any such excess.  If after the date of this Deed of Trust, the State of Texas passes any law deducting from the value of Land for the purpose of taxation any Lien thereon, or changing in any way the laws for the taxation of Mortgages or debts secured by Mortgage for state or local purposes, or the

manner of the collection of any such taxes, so as to affect this Deed of Trust, then within 180 days after notice by Beneficiary to Grantor, Grantor shall pay all Secured Obligations. Notwithstanding the foregoing provisions of this section, Grantor may, at its expense, contest the validity or application of any Imposition by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, provided that Beneficiary is satisfied that neither the Property nor any part thereof or interest therein will be at risk of being sold, forfeited, or lost as a result of such contest, and Grantor has posted a bond equal to 115% of the contested amount or furnished such other security required from time to time by Beneficiary for purposes of payment of the contested amount.

14. **Damages and Insurance and Condemnation Proceeds**. Beneficiary may, at its option, (a) in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on warranty, or for damage, injury or loss to all or part of the Property, and it may make any compromise or settlement of the action or proceeding; (b) participate in any action or proceeding relating to any Condemnation Award; and (c) join Grantor in adjusting any Insurance Claim. All insurance proceeds, Condemnation Awards, and proceeds of any other claim based on warranty, or for damage, injury or loss to the Property which Grantor may receive or be entitled to must be paid to Beneficiary. In each instance, Beneficiary may apply those proceeds first toward reimbursement of all of Beneficiary's costs and expenses of recovering the proceeds or Condemnation Award, including Legal Fees. The balance shall, at Beneficiary's option, be applied to pay or Prepay some or all of the Secured Obligations in such order and proportions as it may choose. GRANTOR HEREBY SPECIFICALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ALL RIGHTS OF A PROPERTY OWNER WHICH PROVIDE FOR ALLOCATION OF CONDEMNATION PROCEEDS BETWEEN A PROPERTY OWNER AND A LIENHOLDER, AND ANY OTHER LAW OR SUCCESSOR STATUTE OF SIMILAR IMPORT.

15. **Site Visits, Observation and Testing**. Beneficiary and its agents and representatives may enter and visit the Property at any reasonable time for the purposes of observing it, performing Appraisals, taking and removing soil or groundwater samples, and conducting tests on any part of it, as provided in the MCA, and otherwise to determine Grantor's compliance with this Deed of Trust.

16. **Defense and Notice of Claims and Actions**. At Grantor's sole expense, Grantor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Deed of Trust and the rights and powers of Beneficiary and Trustee created under it, against all adverse claims. Grantor must give Beneficiary and Trustee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

17. **Prohibited Transfers**. Grantor agrees that a material factor in Secured Parties' decision to enter into the Secured Obligation Documents is the expertise, financial status and other characteristics of Grantor or Borrower. Grantor or Borrower shall not make or permit any Prohibited Transfer. Upon any Prohibited Transfer Beneficiary may declare all Secured Obligations to be due and payable immediately. "Prohibited Transfer" means: (a) any sale, contract to sell, conveyance, encumbrance, pledge, mortgage, lease of the Property to or for the benefit of a Person not the original Grantor under this instrument, and not expressly permitted under this instrument or the other Secured Obligation Documents, or other transfer of all or any material part of the Property or any interest in it, including any transfer of Mineral Rights, Water Rights, or Water Stock, whether voluntary, involuntary, by operation of law or otherwise; (b) if Grantor or Borrower is a corporation, any transfer or transfers of shares of the voting power or the direct or indirect beneficial ownership of Grantor; (c) if Grantor or Borrower is a partnership, withdrawal or removal of any general partner, dissolution of the partnership under Applicable Law, or any transfer or transfers of the partnership interests; (d) if Grantor or Borrower is a limited liability company, withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of the voting power or the ownership of the economic interest in the Grantor or Borrower; or (e) if Grantor or Borrower is a trust, withdrawal or removal of any trustee or revocation of the trust.

18. **Compensation and Reimbursement of Costs and Expenses**. Grantor shall pay (a) fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Beneficiary or Trustee when the law provides no maximum limit, for any services that Beneficiary or Trustee may render in connection with this Deed of Trust, including Beneficiary's providing a statement or Trustee's rendering of services in connection with a reconveyance; (b) all of Beneficiary's or Trustee's costs and expenses which may be incurred in rendering any such services; and (c) all costs, expenses and other advances which may be incurred or made by Beneficiary or Trustee in any efforts to enforce any terms of this Deed of Trust or protect the Property, including any rights or remedies afforded to Beneficiary or Trustee herein, including but not limited to Appraisals,

inspections, insurance premiums, and prevention of waste, whether any lawsuit is filed or not, including any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the Adjustment of debtor-creditor relationships, or in defending any action or proceeding arising under or relating to this Deed of Trust, including attorneys' fees and other legal costs, costs of any Foreclosure Sale (defined herein) and any cost of evidence of title. If Beneficiary chooses to dispose of Property through more than one Foreclosure Sale, Grantor must pay all costs, expenses or other advances that may be incurred or made by Beneficiary or Trustee in each of those Foreclosure Sales. GRANTOR SHALL INDEMNIFY TRUSTEE, BENEFICIARY AND SECURED PARTIES AGAINST AND SHALL HOLD THEM HARMLESS FROM ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COST OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER COSTS AND EXPENSES WHICH EITHER MAY SUFFER OR INCUR: (A) IN PERFORMING ANY ACT REQUIRED OR PERMITTED BY THIS DEED OF TRUST OR ANY OF THE OTHER SECURED OBLIGATION DOCUMENTS OR BY LAW; (B) BECAUSE OF ANY FAILURE OF GRANTOR TO PAY OR PERFORM ANY OF THE SECURED OBLIGATIONS; OR (C) BECAUSE OF ANY ALLEGED OBLIGATION OF OR UNDERTAKING BY BENEFICIARY OR SECURED PARTIES TO PERFORM OR DISCHARGE ANY OF THE REPRESENTATIONS, WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN ANY DOCUMENT RELATING TO THE PROPERTY (OTHER THAN SUCH WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN THE SECURED OBLIGATION DOCUMENTS). THIS AGREEMENT BY GRANTOR TO INDEMNIFY TRUSTEE, BENEFICIARY AND SECURED PARTIES SURVIVES THE RELEASE AND CANCELLATION OF ANY OR ALL OF THE SECURED OBLIGATIONS AND THE FULL OR PARTIAL RELEASE AND/OR RECONVEYANCE OF THIS DEED OF TRUST.

19.     **Payments Due under this Deed of Trust**. Grantor must pay all obligations to pay money arising under this Deed of Trust immediately upon demand by Trustee, Beneficiary or Secured Parties. Each such obligation shall bear interest from the date the obligation arises at the Default Rate.

20.     **Events of Default**. The following each shall be an event of default under this Deed of Trust (an "Event of Default"): (a) an Event of Default under the MCA, including a default termination event or other similar event under any Hedging Agreement which is not cured within any grace or cure period specified therein, if any; (b) a Prohibited Transfer; (c) the Financial Information or any representation in this Deed of Trust is materially incorrect or materially misleading; (d) the filing of any notice limiting the maximum amount secured by this Deed of Trust to a sum less than the Maximum Amount Secured as specified herein, or if no such amount is specified, to any amount; (e) for more than ten days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this section, which can be cured by the payment of a sum of money; or (f) for 30 days after notice from Beneficiary or Secured Parties, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this section; provided that if (i) it is reasonably certain that the default cannot be cured by Grantor within that 30 day period and (ii) Grantor has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period shall be extended for so long as reasonably required by Grantor in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Grantor of the Event of Default.

21.     **Remedies**. At any time after an Event of Default, Secured Parties, Beneficiary or Trustee may (a) declare any or all of the Secured Obligations to be due and payable immediately; (b) cure any breach or default of Grantor; (c) may, to the extent permitted by Applicable Law, make an ex parte application to any court of competent jurisdiction, and obtain appointment of, a receiver, trustee, liquidator or conservator of the Property, without notice, without giving bond, and without regard for the adequacy of the security for the Secured Obligations and without regard for the solvency of Borrower, any Guarantor, or of any Person liable for the payment of the Secured Obligations; (d) in person, by agent or by court-appointed receiver, enter, take possession of, manage and operate all or any part of the Property; (e) exercise any or all of the remedies granted to a secured party under the UCC; (f) bring an action in any court of competent jurisdiction to foreclose this Deed of Trust or to obtain specific enforcement of any of the Covenants or agreements of this Deed of Trust; (g) under the power of sale granted under this Deed of Trust (the "Power of Sale"), at its option cause some or all of the Property, including the Personalty, to be sold or otherwise disposed of in any combination and in any manner permitted by Applicable Law; and (h) do any and all other things in connection with those actions that Beneficiary may consider necessary and appropriate to protect the security of this Deed of Trust. GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS BENEFICIARY AS GRANTOR'S ATTORNEY-IN-FACT TO PERFORM SUCH ACTS AND EXECUTE SUCH DOCUMENTS AS BENEFICIARY CONSIDERS APPROPRIATE IN CONNECTION WITH TAKING THESE MEASURES, INCLUDING ENDORSEMENT OF GRANTOR'S NAME

Doc 63806   Bk OR   Vol 176   Pg 469

ON ANY INSTRUMENTS. GRANTOR HEREBY WAIVES NOTICE OF THE APPLICATION FOR, AND CONSENTS TO THE APPOINTMENT OF A RECEIVER, TRUSTEE, LIQUIDATOR OR CONSERVATOR OF THE PROPERTY IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION (WHICH APPOINTMENT OF SUCH POWER OF ATTORNEY IS A POWER COUPLED WITH AN INTEREST); AND AGREES TO NOT OPPOSE SUCH APPOINTMENT. Notwithstanding the foregoing, in no event will Trustee, Beneficiary or Secured Parties have any obligation to take any of the actions set forth in this Deed of Trust. Beneficiary shall not be considered to have accepted any property other than cash or immediately available funds in satisfaction of any obligation of Grantor to Beneficiary, unless Beneficiary has given express written notice of its election of that remedy.  The proceeds of any receivership shall be applied by the receiver toward the payment of the Secured Obligations or toward the payment of such part of any Judgment thereupon which remains unsatisfied after the sale of the Property.  The receiver may make repairs and keep the Property in good condition and repair pending a sale, and pay all taxes and assessments accrued or accruing or redeem from sales therefore, pay all premiums of insurance required under this Deed of Trust, and pay all other charges as herein provided.

22.     **Sales of Property.**  Beneficiary may elect to treat as Personalty any Property which is intangible or which can be severed from the Land or Improvements without causing structural damage.  Beneficiary may dispose of any Personalty separately from the sale of real property, in any manner permitted by the UCC or any other Applicable Law.  Any proceeds of any such disposition shall not cure any Event of Default or reinstate any Secured Obligation.  Beneficiary may choose to dispose of some or all of the Property which consists solely of real property in any manner then permitted by Applicable Law.  To the extent permitted by Applicable Law, Beneficiary may also or alternatively choose to dispose of some or all of the Property, in any combination consisting of both real and personal property, together in one sale to be held in accordance with the law and procedures applicable to real property, as permitted by the UCC.  Grantor agrees that such a sale of Personalty together with real property constitutes a commercially reasonable sale of the personal property.  For purposes of the Power of Sale, either a sale of real property alone under the Power of Sale, or, to the extent permitted by Applicable Law, a sale of both real and personal property under the Power of Sale, together in accordance with the UCC, will sometimes be referred to as a "Non-Judicial Foreclosure Sale."  Before any Non-Judicial Foreclosure Sale, Beneficiary or Trustee must give such notice of default and election to sell as may then be required by law.  When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Beneficiary or Trustee, as required by Applicable Law, must sell the Property being sold at a public auction to be held at the time and place specified in the notice of sale.  Neither Beneficiary nor Trustee have any obligation to make demand on Grantor before any Non-Judicial Foreclosure Sale.  From time to time in accordance with then Applicable Law, Trustee may (and in any event at Beneficiary's request Trustee must), postpone any Non-Judicial Foreclosure Sale by public announcement at the time and place noticed for that sale.  Trustee or Beneficiary, as required by Applicable Law, shall execute and deliver to any purchaser(s) a deed(s) or bill(s) of sale conveying the Property being sold without any covenant or warranty whatsoever, express or implied.  The recitals in any such deed(s) or bill(s) of sale of any matters or facts, including any facts bearing upon the regularity or validity of any Non-Judicial Foreclosure Sale, will be conclusive proof of their truthfulness.  Any such deed(s) or bill(s) of sale shall be conclusive against all Persons as to the facts recited in it.  If the Land is located in more than one county, then to the extent permitted by Applicable Law, a judicial or non-judicial foreclosure sale of the Property may be maintained in any one or more of those counties.  If the Property consists of more than one lot, parcel or item of property, Beneficiary may: (i) designate the order in which the lots, parcels and/or items shall be sold or disposed of or offered for sale or disposition; and (ii) elect to dispose of the lots, parcels and/or items through a single consolidated sale or disposition to be held or made under the Power of Sale, or in connection with judicial proceedings, or by virtue of a Judgment and decree of foreclosure and sale; or through two or more such sales or dispositions; or in any other manner (including a Non-Judicial Foreclosure Sale) Beneficiary may deem to be in its best interests (any such sale or disposition, a "Foreclosure Sale;" any two or more, "Foreclosure Sales").  If it chooses to have more than one Foreclosure Sale, Beneficiary at its option may cause the Foreclosure Sales to be held simultaneously or successively, on the same day, or on such different days and at such different times and in such order as it may deem to be in its best interests.  No Foreclosure Sale will terminate or affect the Lien of this Deed of Trust on any part of the Property which has not been sold, until all of the Secured Obligations have been paid in full.  At any Foreclosure Sale, any person, including Grantor, Beneficiary, Secured Parties or to the extent permitted by Applicable Law, Trustee, may bid for and acquire the Property or any part of it to the extent permitted by then Applicable Law.  Instead of paying cash for that property, Beneficiary or Secured Parties may settle for the purchase price by crediting the sales price of the Property against the Secured Obligations, unless Applicable Law mandates a specific order of application, in which event payments and collections will be applied as mandated by Applicable Law.  Any such credit, and all other proceeds of any Foreclosure Sale shall be applied to the Secured Obligations in any order Beneficiary may choose.

**23.** **Additional Rights.** In addition to the rights and powers given to Beneficiary under this Deed of Trust, Beneficiary shall have all such other rights both in law and equity for collection of the indebtedness secured hereby as it would have but for this Deed of Trust.

**24.** **Guarantor and/or Non-Obligor Provisions.** (a) Guarantor and/or Non-Obligor authorize Trustee, Beneficiary and Secured Parties to perform any of the following acts at any time, all without notice to Guarantor and/or Non-Obligor and without affecting the rights of Trustee, Beneficiary or Secured Parties or the obligations of Guarantor and/or Non-Obligor under this Deed of Trust: (i) alter any terms of the MCA or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the MCA or any part of it; (ii) take and hold security for the MCA, accept additional or substituted security for the MCA, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security; (iii) apply any security now or later held for the MCA in any order that Trustee, Beneficiary and Secured Parties may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale; (iv) release Obligor/Borrower of its liability for the MCA or any part of it; (v) substitute, add or release any one or more guarantors or endorsers of the MCA; and (vi) extend other credit to Obligor/Borrower, and may take and hold security for the credit so extended, whether or not such security also secures the MCA.

(b)  Guarantor and/or Non-Obligor waive: (i) any right to require Trustee, Beneficiary or Secured Parties to proceed against Obligor/Borrower, proceed against or exhaust any security held from Obligor/Borrower, or pursue any other remedy in Trustee's, Beneficiary's and Secured Parties power to pursue; (ii) any defense based on any legal disability of Obligor/Borrower, any discharge or limitation of the liability of Obligor/Borrower to Trustee, Beneficiary or Secured Parties, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that the obligations of Guarantor and/or Non-Obligor exceed or are more burdensome than those of Obligor/Borrower; (iii) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Deed of Trust and of the existence, creation, or incurring of new or additional indebtedness of Obligor/Borrower, and demands and notices of every kind; (iv) any defense based on or arising out of any defense that Obligor/Borrower may have to the payment or performance of the MCA or any part of it; and (v) until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that Trustee, Beneficiary or Secured Parties may have against Obligor/Borrower, and all rights to participate in any security now or later to be held by Trustee, Beneficiary or Secured Parties for the MCA.

(c)  Guarantor and/or Non-Obligor waive all rights and defenses that Guarantor and/or Non-Obligor may have because the MCA may be secured by real property other than the Property hereby encumbered. This means, among other things: (i) Trustee, Beneficiary and Secured Parties may collect from Guarantor and/or Non-Obligor (including enforcing this Deed of Trust against Guarantor and/or Non-Obligor) without first foreclosing on any real or personal property collateral securing the MCA; and (ii) if Beneficiary forecloses on any real property collateral securing the MCA: (A) the amount of the MCA may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Trustee, Beneficiary and Secured Parties may collect from Guarantor and/or Non-Obligor (including enforcing this Deed of Trust against Guarantor and/or Non-Obligor) even if Trustee, Beneficiary or Secured Parties, by foreclosing on the real property collateral, has destroyed any right Guarantor and/or Non-Obligor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor and/or Non-Obligor may have because the MCA may be secured by real property other than the Property.

(d)  Guarantor and/or Non-Obligor waive any right or defense it may have at law or equity, to a fair market value hearing or action to determine a deficiency Judgment after a foreclosure of any real property other than the Property hereby encumbered.

(e)  Guarantor and/or Non-Obligor are solely responsible for keeping informed of the financial condition and business operations of Borrower and all other circumstances affecting the ability of Borrower to pay and perform Borrower's obligations to Trustee, Beneficiary and Secured Parties, and agrees that Trustee, Beneficiary and Secured Parties will have no duty to disclose to Guarantor and/or Non-Obligor any information which Trustee, Beneficiary or Secured Parties may receive about the financial condition, business operations, or any other circumstances bearing on the ability of Borrower to perform.

is not intended to constitute a payment of, or with respect to, the Secured Obligations and, therefore, Grantor and Beneficiary and Secured Parties specifically intend that the Secured Obligations shall not be reduced by the value of the Rents and Leases assigned. Such reduction shall occur only if, and to the extent that, Beneficiary or a Secured Party actually receives Rents pursuant to the Assignment of Rents and applies those Rents to the Secured Obligations. Grantor agrees that the value of the License equals the value of the Assignment of Rents. The Assignment of Rents will terminate upon the release of this Deed of Trust.

51.  **Loan Charges.**  Secured Parties intend at all times to comply with the laws of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the Secured Obligations (or applicable United States federal law to the extent that it permits Secured Parties to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If Applicable Law is ever judicially interpreted so as to render usurious any amount payable under the Transaction Documents, or contracted for, charged, taken, reserved or received with respect to the Secured Obligations, or if acceleration of the maturity of the Secured Obligations, or if any prepayment by Grantor results in Grantor having paid any interest in excess of that permitted by any applicable law, then Grantor and Secured Parties expressly intend that all excess amounts collected by Secured Parties shall be applied to reduce the unpaid principal balance of the Secured Obligations (or, if the Secured Obligations have been or would thereby be paid in full, shall be refunded to Grantor), and the provisions of the Transaction Documents immediately will be deemed reformed and the amounts thereafter collectible under the provisions of the Transaction Documents reduced, without the necessity of the execution of any new documents, so as to comply with any Applicable Law, but so as to permit the recovery of the fullest amount otherwise payable under the Transaction Documents. The right to accelerate the maturity of the Secured Obligations does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Secured Parties does not intend to collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Secured Parties for the use, forbearance or detention of the Secured Obligations shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated and spread throughout the full term of the Secured Obligations until payment in full so that the rate or amount of interest on account of the Secured Obligations does not exceed the applicable usury ceiling. Notwithstanding any provision contained in the Transaction Documents that permits the compounding of interest, including any provision by which any accrued interest is added to the principal amount of the Secured Obligations, the total amount of interest that Grantor is obligated to pay and Secured Parties is entitled to receive with respect to the Secured Obligations will not exceed the amount calculated on a simple (i.e., noncompounded) interest basis at the maximum rate on principal amounts actually advanced to or for the account of Borrower, including all current and prior advances and any advances made pursuant to the Instrument or any other Transaction Document (such as for the payment of Impositions and similar expenses or costs).

52.  **Property And Liability Insurance - Delivery Of Policy to Beneficiary.**  Notwithstanding any term or provision of the Transaction Documents to the contrary, Grantor will not be required to deliver the original (or a duplicate original) of any renewal policy of insurance to Lender more than 15 days prior to the expiration date of the policy then held by Beneficiary or Secured Parties.

53.  **Reimbursement for Certain Taxes.**  If, while the Secured Obligations are owned by a non-resident of the State of Texas, or by a corporation organized under the laws of a state other than Texas with its principal offices outside the State of Texas, any state, county or municipal tax or assessment is levied within the State of Texas against that owner of the Secured Obligations, either in terms or practical effect (whatever the legal incidence of such tax or assessment) on account of the Secured Obligations or this Deed of Trust, or the right to enforce the same, or on account of that owner's receipt of interest or other payments thereunder, Grantor will reimburse that owner, promptly upon advice therefrom, the amount of each such tax or assessment, provided that if such tax or assessment shall be of such nature, in law, and of such amount for any year, that payment thereof, in its entirety, in addition to all other payments to be made by Grantor under the Transaction Documents, will constitute payment of "interest" in the statutory sense of that word, in excess of the Maximum Rate, Grantor's obligation to make reimbursement shall apply to only so much, if any, of each such tax or assessment as may be reimbursed without exceeding the Maximum Rate. If the passage of legislation imposing or authorizing the imposition of any such state, county or municipal tax or assessment, then at the option of Beneficiary, the Secured Obligations will be due within six months after notice to Grantor.

54.  **Notice of Final Agreement.**  THIS WRITTEN DEED OF TRUST AND THE TRANSACTION DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

19

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Grantor is signing this Deed of Trust effective as of the day and year first written above.

**GRANTOR**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.**, a Texas corporation

By: _____

    BRIAN KEITH MCCLAIN
    President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

**7M CATTLE FEEDERS, INC.**, a Kentucky corporation

By: _____

    BRIAN KEITH MCCLAIN
    President

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

20

STATE OF ~~TEXAS~~ Kentucky )
                        ) SS
COUNTY OF Marshall )

     This instrument was acknowledged before me on April 1, 2021 by BRIAN KEITH MCCLAIN, President on behalf of MCCLAIN FEED YARD, INC., a Texas corporation.

_Susan Sedlock_
(Signature of officer)

_Notary Public_
(Title of officer)

My Commission Expires: 3-4-2023

> SUSAN SEDLOCK
> NOTARY PUBLIC
> STATE AT LARGE - KENTUCKY
> ID # 617673
> MY COMMISSION EXPIRES MARCH 04, 2023

STATE OF ~~TEXAS~~ Kentucky )
                        ) SS
COUNTY OF Marshall )

     This instrument was acknowledged before me on April 1, 2021 by BRIAN KEITH MCCLAIN, President on behalf of 7M CATTLE FEEDERS, INC., a Kentucky corporation.

_Susan Sedlock_
(Signature of officer)

_Notary Public_
(Title of officer)

My Commission Expires: 3-4-2023

> SUSAN SEDLOCK
> NOTARY PUBLIC
> STATE AT LARGE - KENTUCKY
> ID # 617673
> MY COMMISSION EXPIRES MARCH 04, 2023

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

Doc  Bk  Vol  Pg
63806  OR  176  482

## EXHIBIT A-1

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

### Legal Description of Real Estate

Deaf Smith County, Texas

TRACT 2:

A 36.03 acre tract, more or less, out of the Southwest part of Section 26, Block K-8, Abstract No. 1370, Certificate Number 128 of the T. T. R. R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a number 60 common nail found for the Southwest corner of Section 26, Block K-8 whence a 1-1/2 inch iron pipe found for the Southeast corner of said section bears North 89 degrees 56 minutes 00 seconds East 5321.58 feet;

THENCE North 89 degrees 56 minutes 00 seconds East along the South line of said section, 48.80 feet to a 1/2 inch iron rod set in the East physical line of Farm Road 1057 for the Southwest and beginning corner of this tract;

THENCE North 00 degrees 12 minutes 00 seconds West along the East physical line of Farm Road 1057, at 30.00 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.27 feet a 1/2 inch iron rod set for corner;

THENCE North 89 degrees 54 minutes 43 seconds East 606.84 feet to a 1/2 inch iron rod set in the East line of a tract known as the West 40 acres of the Southwest 1/4 of said section whence a 1/2 inch iron rod set for the Northeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section bears North 00 degrees 11 minutes 29 seconds West 71.78 feet;

THENCE South 00 degrees 11 minutes 29 seconds East at 2557.50 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.50 feet a 1/2 inch iron rod found in the South line of said section for the Southeast corner of the track known as the West 40 acres of the Southwest 1/4 of said section;

THENCE South 89 degrees 56 minutes 00 seconds West along the South line of said section, 606.45 feet to the place of beginning.

Doc
63806   Bk
OR   Vol
176   Pg
483

TRACT 3:

A 20.00 acre tract out of the Southwest part of Section 26, Block K-8, Certificate Number 128 of the T.T R.R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with cap marked "RPLS 1848" found in the South line of Section 26 for the Southwest corner and POINT OF BEGINNING of this tract, whence a number 60 common nail found for the Southwest corner of Section 26, Block K-8 bears South 89 degrees 56 minutes 00 seconds West 655.25 feet;

THENCE North 00 degrees 11 minutes 29 seconds West, a distance of 2587.50 feet a fence corner post for the Northwest corner of this tract;

THENCE North 89 degrees 54 minutes 43 seconds East, a distance of 336.69 feet to a 1/2 inch iron rod with cap marked "HBD" set for the Northeast corner of this tract;

THENCE South 00 degrees 11 minutes 29 seconds East, at a distance of 2557.62 feet pass a 1/2 inch iron rod with cap marked "HBD" set for reference, continue for a total distance of 2587.62 feet a point on the South line of Section 26, whence a 1-1/2 inch iron pipe found for the Southeast corner of Section 26 bears North 89 degrees 56 minutes 00 seconds East, 4329.64 feet;

THENCE South 89 degrees 56 minutes 00 seconds West, along the South line of Section 26, a distance of 336.69 feet to the POINT OF BEGINNING.

EXHIBIT A-2

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

**Legal Description of Real Estate**

Parmer County, Texas

TRACT 1:

A tract of land being all of Section 25 and a portion of Section 24 of Charles E. Harding's Subdivision of Capitol League 473 and parts of Capitol Leagues 459, 460, 461, 472 and 474 in Parmer County, Texas, as shown by the map or plat thereof of record in Volume 6, Page 164, Deed Records of Parmer County, Texas, and being described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with camp stamped "Furman RPLS 1959" set for the southwest corner of said Section 25, being the common corner of Sections 25-36-35-26 from whence a 1/2 inch iron rod found for the common corner of sections 27-34-33-28, all in said subdivision bears North 89º 56' 32" west, 10,564.82 feet, the southwest corner of Section 36 and the southeast corner of Section 35 bears South 00º 11' 46" West, 5,281.81 feet, from this point a harrow tooth found as called for in that certain instrument recorded in Volume 225, Page 730, of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas, as shown by Plat thereof of record in Volume 2, Page 495 of said Deed Records bears West (Bearing Basis) 1,411.64 feet;

THENCE North 00º 11' 46" East along the common line of Sections 25 and 26, and the common line of Section 24 and 23, of said Charles E. Harding's Subdivision, and along the center of a road, at 5,281.61 feet pass the common line of Sections 25-26-23-24 a total distance of 8,503.54 feet to a 3/4 inch iron pipe found as called for in that certain instrument recorded in Volume 156, Page 603 of said Deed Records, and in Volume 2, Page 219 of the Field Note Records of Parmer County, Texas, from whence the common corner of Sections 24-23-14-13 of said Charles E. Harding's Subdivision bears North 00º 11' 46" East 5,281.61 feet and 1 1/4 inch iron pipe with 5/8 inch rod adjacent found for the common corner of Sections 12-13-14-11 of said Charles E. Harding's Subdivision, as called for in that certain instrument recorded in Volume 2, Page 343, of said Field Note records bears North 00º 11' 46" East 7,341.28 feet;

THENCE South 89º 40' 58" East 2,100.84 feet along a fence line and along the North line of this tract of land and the North line of that certain tract of land described in said Volume 156, Page 603 and said Volume 2, Page 219 to a 3/4 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219, said North line being monumented and generally accepted on the ground for over 25 years, from whence the Northeast corner of Section 24 and the Southeast corner of Section 14 of said Charles E. Harding's Subdivision bears North 00º 11' 07" East 7,345.07 feet;

THENCE South 00º 11' 07" West at 3,187.40 feet pass a 3/4 inch iron pipe found, this iron pipe is a monument of record in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southeast corner of Section 24 of said Charles E. Harding's Subdivision, it is however the Professional opinion of this surveyor that this corner lies in the East line of this survey but 26.81 feet North of the actual section corner, at 3,214.21 feet pass what is in my Professional opinion the Southeast corner of Section 24 and the Northeast corner of Section 25 of said Charles E. Harding's Subdivision at 3,301.75 feet pass a 1 1/2 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southwest corner of Section 22 and the Northwest corner of Section 27 in Township 1 North, Range 3 East of a Capitol Syndicate Subdivision as shown by Plat thereof of record in Volume 5, Page 394 of said Deed Records, a total distance of 8,493.86 feet to a point being the Southeast corner of Section 25 and the Northeast corner of Section 36 of said Charles E. Harding's Subdivision from whence the Southeast corner of said Section 36 bears South 00º 11' 07" West 5,279.65 feet from this point a railroad spike found as called for in that certain instrument recorded in Volume 225, Page 730 of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas as shown by Plat thereof record in Volume 2, Page 495 of said Deed Records bears East (Bearing Basis) 1,324.17 feet;

THENCE North 89º 56' 48" West 2,102.46 feet along the South line of Section 25 and the North line of Section 36 of said Charles E. Harding's Subdivision to the POINT OF BEGINNING and containing 410.0 acres of land, more or less.

Doc 63806   Bk OR   Vol 176   Pg 486

## EXHIBIT B

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

**Additional Property**

associated with Deed of Trust by McClain Feed Yard and 7M Cattle Feeders on land located in Deaf Smith and Parmer Counties, Texas

(list specific additional Property, if any)

Fixtures

Buildings, fixtures, and equipment associated with agricultural production or the productions of farm products, including but not limited to:

| Attached Equipment |
| --- |
| 2 x Stationary Roto-Mixers |
| 6 x Liquid Storage Tanks |
| 9 x Hyd. Working Chutes (Snakes Not Included) |
| 1 x 12 x 70 Truck Scale |
| 2 x 12 x 70 Cattle Scales With Fencing and Gates |
| 1 x Grain Probe |

All Water Rights related to but not limited to:

| Subject Water Wells - 410.0 Acre Feedyard Tract | | | | | | |
|---|---|---|---|---|---|---|
| Section | District Number | Permit Number | Permit Status | Documents | Recently Tested | Current GPM Estimate |
| 24 | 79667 | 3694 | Current | Yes | No | 40 |
| 24 | 79677 | 3974 | Current | Yes | Yes | 64 |
| 24 | 79688 | 3977 | Current | Yes | Yes | 53 |
| 24 | 79681 | 3978 | Current Destroyed | Yes | Yes | 0 |
| 25 | 82449 | 40124 | Current | None | No | 0 |
| 25 | 79188 | 3423 | Current | Yes | Yes | 40 |
| 25 | 79072 | 3289 | Abandoned | Yes | No | 0 |
| 25 | 79544 | 3831 | Current | Yes | No | 40 |
| 25 | 78540 | 2689 | Current | Yes Mill and Office | No | 40 |
| 25 | 79189 | 3424 | Current | Yes | No | 40 |
| 24 | 79719 | 4021 | Current | Yes | No | 40 |
| 25 | 83148 | 50106 | Current | None | No | 0 |
| Total | | | | | | 357 |
| Total Tested | | | | | | 157 |

CHG & RETURN
AA & R, L.L.P.

Doc 63806 Bk OR Vol 176 Pg 488

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE
RENTAL OR USE OF THE DESCRIBED REAL PROPERTY
BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCIBLE
UNDER FEDERAL LAW

STATE OF TEXAS     }
                  }     OFFICIAL PUBLIC RECORDS
COUNTY OF PARMER }

I hereby certify that this instrument was FILED
on the date and at the time stamped hereon by
me and was duly RECORDED in the Volume and Page
of the RECORDS of Parmer County, Texas.

FILED FOR RECORD IN PARMER COUNTY
Susie Spring, COUNTY CLERK

ON: Jun 01,2021 AT 10:40A

Document Number:     63806

Receipt Number - 26856

By _____
Breann Saenz, Deputy


FILED and certified as RECORDED in the **Official Public Records** of Deaf Smith County on the date and time stamped.  Rachel Garman, County Clerk,
Deaf Smith County, Texas.

By: _____     Deputy     **June 14, 2021 (9:41am)**     21-1198

# EXHIBIT D

Prepared by;
Randa Barton
Polsinelli PC
Frost Bank Tower
2950 N. Harwood, Suite 2100
Dallas, TX 75201

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

RABO AGRIFINANCE LLC
14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attn: Closing Department

Space above this line for Recorder's Use

McClain MCA 2018

Real Estate Term Loan 1: 22114481
Operating Line of Credit 1: 22114482
Real Estate Term Loan 2: 22117432
Operating Line of Credit 2: 22117434

## DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

(Deaf Smith and Parmer Counties, Texas)

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

THIS DEED OF TRUST ALSO CONSTITUTES A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER THE UCC

This deed of trust ("Deed of Trust") is dated as of January 8, 2020.  It is by MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard ") and 7M CATTLE FEEDERS, INC, a Kentucky corporation ("7M Cattle Feeders") (McClain Feed Yard  and 7M Cattle Feeders are herein individually and collectively,  "Grantor"), to and in favor of PHILIP R. KIRKPATRICK, an individual, as trustee ("Trustee"), whose address for purposes of this Deed of Trust is 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, for the benefit of RABO AGRIFINANCE LLC, a Delaware limited liability company, as agent for itself and the other Secured Parties (defined herein) under the Collateral Agency Agreement (defined herein; and Rabo AgriFinance LLC, in that capacity, "Beneficiary").

RABO AGRIFINANCE LLC, a Delaware limited liability company, as Lender ("Lender") has agreed to make up to $23,957,500.00 in loans to Borrower (as defined in the Facility Sheet(s)) under the terms and conditions of the Master Credit Agreement between Grantor and Lender dated May 11, 2018, as may be amended, modified, replaced, or supplemented from time to time (the "MCA").  Each capitalized term used in this Deed of Trust that is defined in the MCA and not defined in this Deed of Trust will have the meaning specified in the MCA.  This Deed of Trust will be interpreted in accordance with the Drafting Conventions.

Grantor has or may also enter into certain derivatives transactions under Hedging Agreements with Swap Counterparties, under which Grantor has or may incur Hedging Obligations to Swap Counterparties.

The Loan Obligations (defined in the MCA) may be, from time to time, guaranteed by Guarantor under the terms and conditions of one or more guaranties in favor of Collateral Agent.  The Hedging Obligations are guaranteed by Guarantor under the terms and conditions of the Hedging Agreements and/or a separate guaranty of the Hedging Obligations (the MCA, the

Guaranty, and the Hedging Agreements and any separate guaranty of the Hedging Obligations are herein sometimes individually and collectively referred to as the "Debt Instrument").

Non-Obligor(s) have an economic interest in Borrower or will obtain some other material financial benefit as a result of Secured Parties' entering into the Secured Obligation Documents (defined herein). Secured Parties require that Non-Obligor execute this agreement as a condition of the Secured Obligation Documents.

TO SECURE repayment of the indebtedness evidenced by the Note (defined herein) and payment and performance of all other Secured Obligations (defined herein), Grantor irrevocably and unconditionally grants, bargains, sells, and conveys to Trustee, in trust, for the benefit of Beneficiary, WITH POWER OF SALE and right of entry and possession wherever located, whether now owned or hereafter acquired or arising, and, except as indicated, whether constituting real estate or personal property (collectively, the "Property"): (a) the real estate and any interest in the real estate located in Deaf Smith and Parmer Counties, Texas, and described in EXHIBIT A-1 and EXHIBIT A-2 (the "Land"); (b) all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the Land, including all wells, watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements"); (c) all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a means of access thereto ("Easements"); (d) the ground water on, under, pumped from or otherwise available to the Property or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any governmental authority and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Property or Grantor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Property, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity (collectively, "Water Rights"), including those rights, shares and other property described in EXHIBIT B; (e) all other tenements, hereditaments and appurtenances to the Land; (f) minerals, oil, gas, coal, metallic ores, other minerals and any other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas, coal, metallic ores and any other mineral interests with which any of the foregoing interests or estates are pooled or unitized, including surface damage awards or settlements (the "Mineral Rights"); (g) timber now or hereafter standing or cut; (h) leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property (collectively, the "Leases"); (i) all utility contracts, maintenance agreements, management agreements, service contracts and other agreements directly related to the operation and maintenance of the Property; (j) all bushes, groves, trees, plants, vines or other plantings, upon or under the Land ("Plantings"); (k) working drawings, instructional manuals, and rights in processes directly related to the operation of the Property; (l) other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment (except motor vehicles, trailers, and planting, tillage and harvesting equipment rolling stock) or which is in all cases (i) directly related to the operation of the Property or acquired in connection with any construction or maintenance of the Land or the Improvements (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements; (m) all permits and licenses relating or pertaining to the use or enjoyment of the Property; (n) proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (the "Insurance Claims"); (o) all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate (the "Condemnation Awards"); (p) money or other personal property of Grantor in addition to the foregoing deposited with or otherwise in Beneficiary's, Trustee's or Secured Parties' possession; (q) rights and interests under the Hedging Agreements, including all rights to the payment of money from Secured Parties or Trustee under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in any of the Hedging Agreements; (r) the right, in the name and on behalf of Grantor, upon notice to Grantor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Trustee, Beneficiary or Secured

Parties in the Property; and (s) substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data. To have and to hold the Property onto Trustee, Trustee's successor in Trust, and Trustees assigns forever.

1.      **Secured Obligations.** Grantor makes the grant, conveyance, transfer and assignment above, makes the irrevocable and absolute assignment in Section 4, and grants the security interest under Section 5, to secure payment and performance of the following obligations (the "Secured Obligations") in any order of priority that Beneficiary may choose: (a) all Obligations (defined in the MCA), including (i) the Real Estate Term Loan 1 Note dated as of May 11, 2018, from McClain Feed Yard to Lender in the original principal amount of $332,500.00; (ii) the Operating Line of Credit 1 Note dated as of the date of this Deed of Trust, from McClain Feed Yard to Lender in the original principal amount of $15,800,000.00; (iii) the Real Estate Term Loan 2 Note dated as of July 24, 2019, from 7M Cattle Feeders to Lender in the original principal amount of $625,000.00; (iv) the Operating Line of Credit 2 Note dated as of the date of this Deed of Trust, from 7M Cattle Feeders to Lender in the original principal amount of $7,200,000.00 (the Real Estate Term Loan 1 Note, the Operating Line of Credit 1 Note, the Real Estate Term Loan 2 Note, and the Operating Line of Credit 2 Note, together with all extensions, renewals, modifications, substitutions and amendments thereof are herein collectively, the "Note"); (v) all Hedging Obligations; and (vi) all other indebtedness, liabilities and obligations of Grantor to Lender and the Swap Counterparties arising pursuant to any of the Transaction Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several; (b) all obligations of Grantor under this Deed of Trust; (c) any obligations due to a Banking Counterparty with regard to Banking Obligations; (d) all obligations of Grantor to Lender, Coöperatieve Rabobank U.A., (trading as Rabobank), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands ("Rabobank"), or any other Affiliate of Lender (Lender, Rabobank and any other Affiliate of Lender are herein individually and collectively, "Secured Parties"), whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether obligatory or non-obligatory; whether due or not due, whether absolute or contingent, or whether incurred directly or acquired by assignment or otherwise, under the terms and conditions of any other written instrument or agreement executed by Grantor and which specifically recites that those obligations are secured by this Deed of Trust; and (e) any of the foregoing that arises after the filing of a petition by or against Grantor under an Insolvency Proceeding. All Persons who have or acquire an interest in the Property will be deemed to have received notice of, and will be bound by, the terms of the MCA, the other Transaction Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (the Transaction Documents and those other agreements or instruments, the "Secured Obligation Documents"). These terms include any provisions in the Secured Obligation Documents which permit borrowing, repayment and reborrowing, or which provide that the rate of interest on one or more of the Secured Obligations may vary from time to time. This Deed of Trust does not secure any obligation which is unsecured pursuant to the express terms of the MCA or any other document, agreement or instrument. Without limitation of the foregoing, this Deed of Trust does not secure the indebtedness, liabilities and obligations of Guarantor as guarantor under the terms and conditions of the Guaranty or any other guaranty given by Guarantor to secure the Hedging Obligations.

2.      **Future Secured Obligations.** The Secured Obligations include future advances made by Beneficiary or Secured Parties, at their option, and for any purpose, and all other future Secured Obligations. Those future advances and other future Secured Obligations are secured to the same extent as if made or incurred on the date of the execution of this Deed of Trust, and have priority as to third Persons with or without actual notice from the time this Deed of Trust is filed for record as provided by law. The total amount of indebtedness secured by this Deed of Trust may decrease or increase from time to time. The unpaid balance of any Revolving Line of Credit or Hedging Obligations secured by this Deed of Trust may at certain times be zero. This Deed of Trust will remain in full force and effect notwithstanding any zero balance. Grantor shall not file for record any notice limiting the maximum amount secured by this Deed of Trust (a "Maximum Amount Notice"). A Maximum Amount Notice will be an Event of Default (defined herein). Nothing in this Section 2 will constitute a commitment to make additional or future advances which are not specified by the other terms of the MCA or enter into future derivatives transactions in any amount. The unpaid balance of any revolving line of creditor Hedging Obligations secured by this Deed of Trust may at certain times be zero. This Deed of Trust will remain in full force and effect notwithstanding any zero balance.

3.      **Note Maturity Date.** The latest date on which any Note matures is June 1, 2028.

4.      **Assignment.** Grantor irrevocably and unconditionally assigns to Beneficiary and grants Beneficiary a security interest in, the Leases; all rents and other benefits derived from the Leases, and all other issues, profits, royalties,

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

3

bonuses, income and other benefits derived from or produced by the Real Estate, including but not limited to, any monies, proceeds, damages, Judgments or payments in lieu thereof, received by or due to Grantor occasioned by any mineral or geothermal exploration, wind energy, solar energy or drilling activity on or under the Real Estate, all prepaid rents, security deposits and other supporting obligations (the "Rents"; and this assignment, the "Assignment of Rents"). Beneficiary may collect Rents with or without taking possession of the Property. Beneficiary confers upon Grantor a license to collect and retain the Rents as they become due and payable, so long as there is no Event of Default (the "License"). If an Event of Default has occurred, Beneficiary may terminate the License without notice to or demand upon Grantor. Beneficiary, by its acceptance of this Deed of Trust does not assume any duty or obligation under the Leases. The acceptance by Beneficiary of the assignment of Leases and Rents and profits with all the rights, powers, privileges and authority so granted will not obligate Beneficiary to assume any obligations in respect of the Leases and Rents and profits or under the Leases, or take any action thereunder or to expend any money or incur any expense or perform or discharge any obligation, duty or liability in respect of the Leases and Rents and profits or under the Leases or to assume any obligation or responsibility for the nonperformance of the provisions thereof by Grantor. The definition of Leases shall include all "Leases" as defined or described in Chapter 64 of the Assignment of Rents Act, and the definition of Rents shall include all "Rents" as defined in the Assignment of Rents Act. Furthermore, it is the intent of the parties to comply with the requirements of the Assignment of Rents Act in connection with the assignment of Leases and Rents. Accordingly, the enforcement of rights related to the assignment of Leases and Rents shall be subject to compliance with the provisions of the Assignment of Rents Act, including, without limitation, the notice requirements of Sections 64.054, 64.055(a) and 64.056 of the Texas Property Code.

**5.       Grant of Security Interest.** This Deed of Trust is a security agreement under the Uniform Commercial Code in effect in the State of Texas (the "UCC"); and Grantor grants Trustee and Beneficiary a security interest in and pledges and assigns to Trustee and Beneficiary all of Grantor's right, title and interest in the Property, to the extent characterized as personal property (the "Personalty"). The address of Grantor adjacent to its signature below is the mailing address of Grantor as debtor under the UCC. The address for Trustee specified in the first paragraph of this Deed of Trust is the address for Trustee as secured party under the UCC; and the address for Beneficiary specified in Section 24 is the address for Beneficiary as secured party under the UCC. As used in this Deed of Trust, the term "lien" is synonymous with the term "lien and security interest."

**6.       Warranty of Title.** Grantor represents and warrants that Grantor lawfully possesses and holds good and marketable fee simple title to all of the Land and the Improvements, that Grantor has the right, power and authority to grant, convey and assign the Property; and that the Property is unencumbered. Grantor covenants that Grantor will warrant and forever defend generally the title to, and ownership and possession of, the Property against all claims and demands, with all costs and expenses of defense to be borne by Grantor. Grantor especially agrees and declares that the separate estate of each of them, whether vested, contingent or in expectancy, is hereby conveyed and shall be bound for the payment and performance of the Secured Obligations.

**7.       Additional Representations.** Grantor represents to Beneficiary and Secured Parties that:  (a) the Property does not represent the proceeds of unlawful activity under any state, federal or foreign law; (b) the Property includes all property and rights which may be reasonably necessary or desirable to enable Grantor to use, enjoy and operate the Land and the Improvements for the present uses thereof; (c) none of the Land or Improvements is subject to any Lien, offset or claim; (d) Grantor owns the Personalty free and clear of any security interests, reservations of title or conditional sales contracts, and there is no presently valid financing statement affecting the Personalty on file in any public office; (e) Grantor has title to, or (in the case of leased property) valid leasehold interests in, all of their properties and assets, real and personal, including the properties and assets and leasehold interests reflected in the Financial Information (other than any properties or assets disposed of in the ordinary course of business); (f) the legal name of Grantor is as appears in the first paragraph of this agreement; (g) Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this agreement; (h) if Grantor is anything other than a natural Person, it has complied with all Applicable Laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in which it conducts its business; (i) the execution, delivery and performance by Grantor of this Deed of Trust is within the powers and authority of Grantor and has been duly authorized; (j) to Grantor's knowledge, this Deed of Trust does not conflict with any Applicable Law; (k) this Deed of Trust is a legal, valid and binding agreement of Grantor, enforceable against Grantor in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable; (l) there has been no Material Adverse Effect as to Grantor since the effective date the Financial Information was provided to Beneficiary or Secured Parties; (m) there is no lawsuit, tax claim or other dispute pending

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

4

or to Grantor's knowledge threatened against Grantor or the Property that, if determined adverse to Grantor, is reasonably likely to have a Material Adverse Effect; (n) Grantor is not the subject of any Judgment; (o) this Deed of Trust does not conflict with, nor is Grantor in default on any credit agreement, indenture, purchase agreement, guaranty, capital lease, or other investment, agreement, or arrangement presently in effect providing for or relating to extensions of credit in respect of which Grantor is in any manner directly or contingently obligated; (p) Grantor has filed all tax returns (federal, state, and local) required to be filed and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties; (q) before signing this Deed of Trust, Grantor researched, to the satisfaction of Grantor, and inquired into the previous uses and ownership of the Real Estate, and based on that due diligence, to the best of Grantor's knowledge, no Hazardous Substance has been disposed of or released or otherwise exists in, on, under or onto the Real Estate, except as Grantor has disclosed to Beneficiary or Secured Parties in the Environmental Information; (r) Grantor has complied with all current and future laws, regulations and ordinances or other requirements of any Governmental Authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or Hazardous Substances ("Environmental Laws"); (s) Grantor has not received any notices of violations of any Applicable Laws (including Environmental Laws); and Grantor is in compliance with all Applicable Laws; (t) there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Property with respect to any violations of Applicable Laws; (u) Grantor's place of business, or its chief executive office, if it has more than one place of business, is located at the address specified below; and (v) unless otherwise disclosed to Beneficiary, Grantor is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986; and there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

**8.** **Information Accurate and Complete.** All financial statements and other reports, documents, instruments, information and forms of evidence which have been delivered to Beneficiary or Secured Parties concerning Grantor, or the Property (the financial and other information supplied or to be supplied to Beneficiary or Secured Parties in connection with this Deed of Trust is herein referred to as the "Financial Information"), are accurate, correct and sufficiently complete in all material respects to provide Beneficiary and Secured Parties true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities. Grantor's submission of any Financial Information or other report, record or information pertaining to the condition or operations, financial or otherwise, of Grantor, from time to time, whether or not required under this Deed of Trust, will be deemed accompanied by a representation by Grantor that the Financial Information or other report, record or information is complete and accurate in all material respects as to the condition or operations of Grantor (and, if applicable, Grantor's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities and Grantor's business or organizational structure.

**9.** **Performance of Secured Obligations.** Grantor shall promptly pay and perform each Secured Obligation in accordance with its terms.

**10.** **Maintenance and Preservation of Property.** Grantor shall: (a) immediately discharge any Lien on the Property which Beneficiary has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a Lien which now or hereafter encumbers or appears to encumber all or part of the Property, whether the Lien is or would be senior or subordinate to this Deed of Trust; (b) not alter, remove or demolish any portion of the Improvements, except as permitted or required by the MCA; (c) maintain (or cause to be maintained) all policies of insurance required under the MCA and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; (d) promptly and completely repair and/or restore any portion of the Property which becomes damaged or destroyed, in a good and workmanlike manner in accordance with sound building practices, whether or not Grantor has received the proceeds of any Insurance Claim; (e) not commit or allow any waste of the Property, nor do or suffer to be done any act whereby the value of any part of the Property may be lessened; (f) not initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except as permitted or required by the MCA; (g) if the Land is agricultural, keep the Property in good condition and repair; operate the Property, whether improved pastures, orchards, grazing, timber, or crop lands, in a good and husbandman like manner in accordance with accepted principles of sound agricultural and forestry practices; take all reasonable precautions to control wind and water erosion; fertilize improved pastures, if any, where necessary to maintain a good stand of desirable grasses; protect orchards and timber, if any, by reasonable precautions against loss or damage by fire including the maintenance of appropriate fire breaks; and neither to remove nor permit the removal of any timber, buildings, oil, gas, mineral, stone, rock, clay, fertilizer, gravel or top soil without the prior written consent of Beneficiary; (h) complete appropriation and all other requirements, if any, necessary to obtain the issuance of any license or water permit issued to Grantor, and take all other steps required or advisable for purposes of perfecting and maintaining in good status all other Water Rights; (i) not bring or keep any

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

5

Doc
×2194 UR
BM·
Vol
164
Pg
164

article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Grantor on the Property or any part of it under this Deed of Trust; and (j) perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value and utility.

(a)   *TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) GRANTOR IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE AS PROVIDED HEREIN; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF GRANTOR AT GRANTOR'S EXPENSE.*

11.   Compliance with Applicable Law  Grantor shall not commit or allow any act upon or use of the Property which would violate any Applicable Law, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property;

12.   Taxes and Assessments.  Grantor shall pay (a) prior to delinquency, all taxes, levies, charges and assessments, including all ditch, canal, reservoir or other water charges, and assessments on appurtenant Water Stock, imposed by Applicable Law or any public or quasi-public authority or utility company which are (or if not paid, may become) a Lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it (individually and collectively "Impositions"); (b) any and all intangible taxes and documentary stamp taxes determined at any time to be due on or as a result of the Secured Obligations, this Deed of Trust or any other Transaction Documents, together with any and all interest and penalties thereon; and (c) taxes, levies, charges and assessments on Beneficiary's or Secured Parties' interest therein or upon this Deed of Trust or the Secured Obligations (collectively, "Mortgage Taxes"); except that if the amount of Mortgage Taxes exceeds the Maximum Rate, Grantor will not be required to pay any such excess.  If after the date of this Deed of Trust, the State of Texas passes any law deducting from the value of Land for the purpose of taxation any Lien thereon, or changing in any way the laws for the taxation of Mortgages or debts secured by Mortgage for state or local purposes, or the manner of the collection of any such taxes, so as to affect this Deed of Trust, then within 180 days after notice by Beneficiary to Grantor, Grantor shall pay all Secured Obligations.  Notwithstanding the foregoing provisions of this section, Grantor may, at its expense, contest the validity or application of any Imposition by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, provided that Beneficiary is satisfied that neither the Property nor any part thereof or interest therein will be at risk of being sold, forfeited, or lost as a result of such contest, and Grantor has posted a bond equal to 115% of the contested amount or furnished such other security required from time to time by Beneficiary for purposes of payment of the contested amount.

13.   Damages and Insurance and Condemnation Proceeds.  Beneficiary may, at its option, (a) in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on warranty, or for damage, injury or loss to all or part of the Property, and it may make any compromise or settlement of the action or proceeding; (b) participate in any action or proceeding relating to any Condemnation Award; and (c) join Grantor in adjusting any Insurance Claim.  All insurance proceeds, Condemnation Awards, and proceeds of any other claim based on warranty, or for damage, injury or loss to the Property which Grantor may receive or be entitled to must be paid to Beneficiary.  In each instance, Beneficiary may apply those proceeds first toward reimbursement of all of Beneficiary's costs and expenses of recovering the proceeds or Condemnation Award, including Legal Fees.  The balance shall, at Beneficiary's option, be applied to pay or Prepay some or all of the Secured Obligations in such order and proportions as it may choose.  GRANTOR HEREBY SPECIFICALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ALL RIGHTS OF A PROPERTY OWNER WHICH PROVIDE FOR ALLOCATION OF CONDEMNATION PROCEEDS BETWEEN A PROPERTY OWNER AND A LIENHOLDER, AND ANY OTHER LAW OR SUCCESSOR STATUTE OF SIMILAR IMPORT.

14.   Site Visits, Observation and Testing.  Beneficiary and its agents and representatives may enter and visit the Property at any reasonable time for the purposes of observing it, performing Appraisals, taking and removing soil or

groundwater samples, and conducting tests on any part of it, as provided in the MCA, and otherwise to determine Grantor's compliance with this Deed of Trust.

**15.** **Defense and Notice of Claims and Actions.** At Grantor's sole expense, Grantor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Deed of Trust and the rights and powers of Beneficiary and Trustee created under it, against all adverse claims. Grantor must give Beneficiary and Trustee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

**16.** **Prohibited Transfers.** Grantor agrees that a material factor in Secured Parties' decision to enter into the Secured Obligation Documents is the expertise, financial status and other characteristics of Grantor or Borrower. Grantor or Borrower shall not make or permit any Prohibited Transfer. Upon any Prohibited Transfer Beneficiary may declare all Secured Obligations to be due and payable immediately. "Prohibited Transfer" means: (a) any sale, contract to sell, conveyance, encumbrance, pledge, mortgage, lease of the Property to or for the benefit of a Person not the original Grantor under this instrument, and not expressly permitted under this instrument or the other Secured Obligation Documents, or other transfer of all or any material part of the Property or any interest in it, including any transfer of Mineral Rights, Water Rights, or Water Stock, whether voluntary, involuntary, by operation of law or otherwise; (b) if Grantor or Borrower is a corporation, any transfer or transfers of shares of the voting power or the direct or indirect beneficial ownership of Grantor; (c) if Grantor or Borrower is a partnership, withdrawal or removal of any general partner, dissolution of the partnership under Applicable Law, or any transfer or transfers of the partnership interests; (d) if Grantor or Borrower is a limited liability company, withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of the voting power or the ownership of the economic interest in the Grantor or Borrower; or (e) if Grantor or Borrower is a trust, withdrawal or removal of any trustee or revocation of the trust.

**17.** **Compensation and Reimbursement of Costs and Expenses.** Grantor shall pay (a) fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Beneficiary or Trustee when the law provides no maximum limit, for any services that Beneficiary or Trustee may render in connection with this Deed of Trust, including Beneficiary's providing a statement or Trustee's rendering of services in connection with a reconveyance; (b) all of Beneficiary's or Trustee's costs and expenses which may be incurred in rendering any such services; and (c) all costs, expenses and other advances which may be incurred or made by Beneficiary or Trustee in any efforts to enforce any terms of this Deed of Trust or protect the Property, including any rights or remedies afforded to Beneficiary or Trustee under Section 20, including but not limited to Appraisals, inspections, insurance premiums, and prevention of waste, whether any lawsuit is filed or not, including any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the Adjustment of debtor-creditor relationships, or in defending any action or proceeding arising under or relating to this Deed of Trust, including attorneys' fees and other legal costs, costs of any Foreclosure Sale (defined herein) and any cost of evidence of title. If Beneficiary chooses to dispose of Property through more than one Foreclosure Sale, Grantor must pay all costs, expenses or other advances that may be incurred or made by Beneficiary or Trustee in each of those Foreclosure Sales. GRANTOR SHALL INDEMNIFY TRUSTEE, BENEFICIARY AND SECURED PARTIES AGAINST AND SHALL HOLD THEM HARMLESS FROM ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COST OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER COSTS AND EXPENSES WHICH EITHER MAY SUFFER OR INCUR: (A) IN PERFORMING ANY ACT REQUIRED OR PERMITTED BY THIS DEED OF TRUST OR ANY OF THE OTHER SECURED OBLIGATION DOCUMENTS OR BY LAW; (B) BECAUSE OF ANY FAILURE OF GRANTOR TO PAY OR PERFORM ANY OF THE SECURED OBLIGATIONS; OR (C) BECAUSE OF ANY ALLEGED OBLIGATION OF OR UNDERTAKING BY BENEFICIARY OR SECURED PARTIES TO PERFORM OR DISCHARGE ANY OF THE REPRESENTATIONS, WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN ANY DOCUMENT RELATING TO THE PROPERTY (OTHER THAN SUCH WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN THE SECURED OBLIGATION DOCUMENTS). THIS AGREEMENT BY GRANTOR TO INDEMNIFY TRUSTEE, BENEFICIARY AND SECURED PARTIES SURVIVES THE RELEASE AND CANCELLATION OF ANY OR ALL OF THE SECURED OBLIGATIONS AND THE FULL OR PARTIAL RELEASE AND/OR RECONVEYANCE OF THIS DEED OF TRUST.

**18.** **Payments Due under this Deed of Trust.** Grantor must pay all obligations to pay money arising under this Deed of Trust immediately upon demand by Trustee, Beneficiary or Secured Parties. Each such obligation shall bear interest from the date the obligation arises at the Default Rate.

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

7

**19.     Events of Default**. The following each shall be an event of default under this Deed of Trust (an "Event of Default"): (a) an Event of Default under the MCA, including a default termination event or other similar event under any Hedging Agreement which is not cured within any grace or cure period specified therein, if any; (b) a Prohibited Transfer; (c) the Financial Information or any representation in this Deed of Trust is materially incorrect or materially misleading; (d) the filing of any notice limiting the maximum amount secured by this Deed of Trust to a sum less than the Maximum Amount Secured as specified herein, or if no such amount is specified, to any amount; (e) for more than ten days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this Section 19, which can be cured by the payment of a sum of money; or (f) for 30 days after notice from Beneficiary or Secured Parties, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this Section 19; provided that if (i) it is reasonably certain that the default cannot be cured by Grantor within that 30 day period and (ii) Grantor has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period shall be extended for so long as reasonably required by Grantor in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Grantor of the Event of Default.

**20.     Remedies**. At any time after an Event of Default, Secured Parties, Beneficiary or Trustee may (a) declare any or all of the Secured Obligations to be due and payable immediately; (b) cure any breach or default of Grantor; (c) may, to the extent permitted by Applicable Law, make an ex parte application to any court of competent jurisdiction, and obtain appointment of, a receiver, trustee, liquidator or conservator of the Property, without notice, without giving bond, and without regard for the adequacy of the security for the Secured Obligations and without regard for the solvency of Borrower, any Guarantor, or of any Person liable for the payment of the Secured Obligations; (d) in person, by agent or by court-appointed receiver, enter, take possession of, manage and operate all or any part of the Property; (e) exercise any or all of the remedies granted to a secured party under the UCC; (f) bring an action in any court of competent jurisdiction to foreclose this Deed of Trust or to obtain specific enforcement of any of the Covenants or agreements of this Deed of Trust; (g) under the power of sale granted under this Deed of Trust (the "Power of Sale"), at its option cause some or all of the Property, including the Personalty, to be sold or otherwise disposed of in any combination and in any manner permitted by Applicable Law; and (h) do any and all other things in connection with those actions that Beneficiary may consider necessary and appropriate to protect the security of this Deed of Trust. GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS BENEFICIARY AS GRANTOR'S ATTORNEY-IN-FACT TO PERFORM SUCH ACTS AND EXECUTE SUCH DOCUMENTS AS BENEFICIARY CONSIDERS APPROPRIATE IN CONNECTION WITH TAKING THESE MEASURES, INCLUDING ENDORSEMENT OF GRANTOR'S NAME ON ANY INSTRUMENTS. GRANTOR HEREBY WAIVES NOTICE OF THE APPLICATION FOR, AND CONSENTS TO THE APPOINTMENT OF A RECEIVER, TRUSTEE, LIQUIDATOR OR CONSERVATOR OF THE PROPERTY IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION (WHICH APPOINTMENT OF SUCH POWER OF ATTORNEY IS A POWER COUPLED WITH AN INTEREST); AND AGREES TO NOT OPPOSE SUCH APPOINTMENT. Notwithstanding the foregoing, in no event will Trustee, Beneficiary or Secured Parties have any obligation to take any of the actions set forth in this Section 20. Beneficiary shall not be considered to have accepted any property other than cash or immediately available funds in satisfaction of any obligation of Grantor to Beneficiary, unless Beneficiary has given express written notice of its election of that remedy. The proceeds of any receivership shall be applied by the receiver toward the payment of the Secured Obligations or toward the payment of such part of any Judgment thereupon which remains unsatisfied after the sale of the Property. The receiver may make repairs and keep the Property in good condition and repair pending a sale, and pay all taxes and assessments accrued or accruing or redeem from sales therefore, pay all premiums of insurance required under this Deed of Trust, and pay all other charges as herein provided.

**21.     Sales of Property**. Beneficiary may elect to treat as Personalty any Property which is intangible or which can be severed from the Land or Improvements without causing structural damage. Beneficiary may dispose of any Personalty separately from the sale of real property, in any manner permitted by the UCC or any other Applicable Law. Any proceeds of any such disposition shall not cure any Event of Default or reinstate any Secured Obligation. Beneficiary may choose to dispose of some or all of the Property which consists solely of real property in any manner then permitted by Applicable Law. To the extent permitted by Applicable Law, Beneficiary may also or alternatively choose to dispose of some or all of the Property, in any combination consisting of both real and personal property, together in one sale to be held in accordance with the law and procedures applicable to real property, as permitted by the UCC. Grantor agrees that such a sale of Personalty together with real property constitutes a commercially reasonable sale of the personal property. For purposes of the Power of Sale, either a sale of real property alone under the Power of Sale, or, to the extent permitted by Applicable Law, a sale of both real and personal property under the Power of Sale, together in accordance with the UCC, will sometimes be referred to as a "Non-

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

8

Judicial Foreclosure Sale." Before any Non-Judicial Foreclosure Sale, Beneficiary or Trustee must give such notice of default and election to sell as may then be required by law. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Beneficiary or Trustee, as required by Applicable Law, must sell the Property being sold at a public auction to be held at the time and place specified in the notice of sale. Neither Beneficiary nor Trustee have any obligation to make demand on Grantor before any Non-Judicial Foreclosure Sale. From time to time in accordance with then Applicable Law, Trustee may (and in any event at Beneficiary's request Trustee must), postpone any Non-Judicial Foreclosure Sale by public announcement at the time and place noticed for that sale. Trustee or Beneficiary, as required by Applicable Law, shall execute and deliver to any purchaser(s) a deed(s) or bill(s) of sale conveying the Property being sold without any covenant or warranty whatsoever, express or implied. The recitals in any such deed(s) or bill(s) of sale of any matters or facts, including any facts bearing upon the regularity or validity of any Non-Judicial Foreclosure Sale, will be conclusive proof of their truthfulness. Any such deed(s) or bill(s) of sale shall be conclusive against all Persons as to the facts recited in it. If the Land is located in more than one county, then to the extent permitted by Applicable Law, a judicial or non-judicial foreclosure sale of the Property may be maintained in any one or more of those counties. If the Property consists of more than one lot, parcel or item of property, Beneficiary may: (i) designate the order in which the lots, parcels and/or items shall be sold or disposed of or offered for sale or disposition; and (ii) elect to dispose of the lots, parcels and/or items through a single consolidated sale or disposition to be held or made under the Power of Sale, or in connection with judicial proceedings, or by virtue of a Judgment and decree of foreclosure and sale; or through two or more such sales or dispositions; or in any other manner (including a Non-Judicial Foreclosure Sale) Beneficiary may deem to be in its best interests (any such sale or disposition, a "Foreclosure Sale;" any two or more, "Foreclosure Sales"). If it chooses to have more than one Foreclosure Sale, Beneficiary at its option may cause the Foreclosure Sales to be held simultaneously or successively, on the same day, or on such different days and at such different times and in such order as it may deem to be in its best interests. No Foreclosure Sale will terminate or affect the Lien of this Deed of Trust on any part of the Property which has not been sold, until all of the Secured Obligations have been paid in full. At any Foreclosure Sale, any person, including Grantor, Beneficiary, Secured Parties or to the extent permitted by Applicable Law, Trustee, may bid for and acquire the Property or any part of it to the extent permitted by then Applicable Law. Instead of paying cash for that property, Beneficiary or Secured Parties may settle for the purchase price by crediting the sales price of the Property against the Secured Obligations, unless Applicable Law mandates a specific order of application, in which event payments and collections will be applied as mandated by Applicable Law. Any such credit, and all other proceeds of any Foreclosure Sale shall be applied to the Secured Obligations in any order Beneficiary may choose.

    **22.**   **Additional Rights.** In addition to the rights and powers given to Beneficiary under this Deed of Trust, Beneficiary shall have all such other rights both in law and equity for collection of the indebtedness secured hereby as it would have but for this Deed of Trust.

    **23.**   **Guarantor and/or Non-Obligor Provisions.** (a) Guarantor and/or Non-Obligor authorize Trustee, Beneficiary and Secured Parties to perform any of the following acts at any time, all without notice to Guarantor and/or Non-Obligor and without affecting the rights of Trustee, Beneficiary or Secured Parties or the obligations of Guarantor and/or Non-Obligor under this Deed of Trust: (i) alter any terms of the MCA or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the MCA or any part of it; (ii) take and hold security for the MCA, accept additional or substituted security for the MCA, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security; (iii) apply any security now or later held for the MCA in any order that Trustee, Beneficiary and Secured Parties may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale; (iv) release Obligor/Borrower of its liability for the MCA or any part of it; (v) substitute, add or release any one or more guarantors or endorsers of the MCA; and (vi) extend other credit to Obligor/Borrower, and may take and hold security for the credit so extended, whether or not such security also secures the MCA.

    (b)   Guarantor and/or Non-Obligor waive: (i) any right to require Trustee, Beneficiary or Secured Parties to proceed against Obligor/Borrower, proceed against or exhaust any security held from Obligor/Borrower, or pursue any other remedy in Trustee's, Beneficiary's and Secured Parties power to pursue; (ii) any defense based on any legal disability of Obligor/Borrower, any discharge or limitation of the liability of Obligor/Borrower to Trustee, Beneficiary or Secured Parties, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that the obligations of Guarantor and/or Non-Obligor exceed or are more burdensome than those of Obligor/Borrower; (iii) all presentments, demands for performance, notices of nonperformance,

protests, notices of protest, notices of dishonor, notices of acceptance of this Deed of Trust and of the existence, creation, or incurring of new or additional indebtedness of Obligor/Borrower, and demands and notices of every kind; (iv) any defense based on or arising out of any defense that Obligor/Borrower may have to the payment or performance of the MCA or any part of it; and (v) until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that Trustee, Beneficiary or Secured Parties may have against Obligor/Borrower, and all rights to participate in any security now or later to be held by Trustee, Beneficiary or Secured Parties for the MCA.

(c)     Guarantor and/or Non-Obligor waive all rights and defenses that Guarantor and/or Non-Obligor may have because the MCA may be secured by real property other than the Property hereby encumbered. This means, among other things: (i) Trustee, Beneficiary and Secured Parties may collect from Guarantor and/or Non-Obligor (including enforcing this Deed of Trust against Guarantor and/or Non-Obligor) without first foreclosing on any real or personal property collateral securing the MCA; and (ii) if Beneficiary forecloses on any real property collateral securing the MCA: (A) the amount of the MCA may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Trustee, Beneficiary and Secured Parties may collect from Guarantor and/or Non-Obligor (including enforcing this Deed of Trust against Guarantor and/or Non-Obligor) even if Trustee, Beneficiary or Secured Parties, by foreclosing on the real property collateral, has destroyed any right Guarantor and/or Non-Obligor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor and/or Non-Obligor may have because the MCA may be secured by real property other than the Property.

(d)     Guarantor and/or Non-Obligor waive any right or defense it may have at law or equity, to a fair market value hearing or action to determine a deficiency Judgment after a foreclosure of any real property other than the Property hereby encumbered.

(e)     Guarantor and/or Non-Obligor are solely responsible for keeping informed of the financial condition and business operations of Borrower and all other circumstances affecting the ability of Borrower to pay and perform Borrower's obligations to Trustee, Beneficiary and Secured Parties, and agrees that Trustee, Beneficiary and Secured Parties will have no duty to disclose to Guarantor and/or Non-Obligor any information which Trustee, Beneficiary or Secured Parties may receive about the financial condition, business operations, or any other circumstances bearing on the ability of Borrower to perform.

(f)     No provision or waiver in this Deed of Trust shall be construed as limiting the generality of any other provision or waiver contained in this Deed of Trust or the Guaranty.

**24.     Notices.** All notices, approvals, consents, and other communications, under this Deed of Trust ("Notices") must be given in accordance with and will be subject to the terms and provisions of the MCA. Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Trustee, to the address in the first paragraph of this Deed of Trust; if to Beneficiary or Lender, to 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, Attention: Loan Closing Department; if to Secured Parties other than Lender, c/o Rabobank, 245 Park Avenue, New York, NY 10167, Attention: Customer Service Representative; and in the case of any other Person, to the address designated by that Person in a notice to Grantor, Beneficiary, and Lender.

**25.     Request for Notice.** Grantor requests that a copy of any notice of default and any notice of sale be mailed to it at the address specified adjacent to its signature below.

**26.     Trustee and Beneficiary.** Without affecting the personal liability of any Person, including Grantor and Obligor/Borrower, for the payment of the Secured Obligations or the Lien of this Deed of Trust on the remainder of the Property for the unpaid amount of the Secured Obligations: (a) Beneficiary and Secured Parties may from time to time and without notice: (i) release any Person liable for payment of any Secured Obligation; (ii) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation; (iii) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, Mortgages, Security Agreements or any other instruments of security; or (iv) alter, substitute or release any property securing the Secured Obligations; and (b) Trustee may perform any of the following acts when requested to do so by Beneficiary or a Secured Party in writing: (i) consent to the making of any plat or map of the Property or any part of it; (ii) join in granting any easement or creating any restriction affecting the Property; (iii) join in any

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

10

subordination or other agreement affecting this Deed of Trust or the Lien of it; or (iv) reconvey the Property or any part of it without any warranty.

**27.     Exculpation of Trustee and Beneficiary.** None of Trustee, Beneficiary or Secured Parties will be directly or indirectly liable to Grantor or any other Person as a consequence of any of the following: (a) the exercise of or failure to exercise any rights, remedies or powers granted to it in this Deed of Trust; (b) any failure or refusal to perform or discharge any obligation or liability of Grantor under any agreement related to the Property or under this Deed of Trust; or (c) any loss sustained by Grantor or any third party resulting from any failure to lease the Property or from any other act or omission in managing the Property after an Event of Default, unless the loss is caused by the willful misconduct and bad faith of Trustee, Beneficiary or Secured Parties, respectively. GRANTOR HEREBY EXPRESSLY WAIVES AND RELEASES ALL LIABILITY OF THE TYPES DESCRIBED ABOVE, AND AGREES THAT NO SUCH LIABILITY BE ASSERTED AGAINST OR IMPOSED UPON TRUSTEE, BENEFICIARY OR ANY SECURED PARTY.

**28.     Substitution of Trustee.** Beneficiary may substitute a successor to any Trustee named in or acting under this Deed of Trust in any manner now or later to be provided at Applicable Law.

**29.     Waiver of Dower, Homestead, and Distributive Share.** Grantor relinquishes all right of dower and waives all right of homestead and distributive share in and to the Property. Grantor waives any right of exemption as to the Property.

**30.     Waiver of Certain Other Laws.** To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor, and its representatives, successors and assigns, and for any and all Persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, or notice of election to mature or declare due the whole of the Secured Obligations in the event of foreclosure of the Lien created by this Deed of Trust.

**31.     Reconveyance.** When all Secured Obligations have been paid in full, Lender has no obligation to make additional Loans and the Hedging Agreements have been terminated, Trustee shall execute and deliver an instrument reconveying the Property, or so much of it as is then held under this Deed of Trust, without warranty to the Person or Persons legally entitled to it. In the reconveyance, the grantee may be described as "the Person or Persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness. Trustee, Beneficiary and Secured Parties will have no duty to determine the rights of Persons claiming to be rightful grantees of any reconveyance of the Property.

**32.     Additional Provisions.** The Secured Obligation Documents state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this Deed of Trust. The Secured Obligation Documents also grant further rights to Beneficiary and Secured Parties and contain further agreements and affirmative and negative covenants by Grantor which apply to this Deed of Trust and to the Property.

**33.     Collateral Agency Agreement.** This Deed of Trust is subject to the terms of the collateral agency agreement between the Secured Parties (the "Collateral Agency Agreement").

**34.     Entire Agreement.** This Deed of Trust and the other Secured Obligation Documents collectively: (i) represent the sum of the understandings and agreements between Beneficiary, Secured Parties and Grantor concerning this credit; (ii) replace any prior oral or written agreements between Beneficiary, Secured Parties and Grantor concerning this credit; and (iii) are intended by Beneficiary, Secured Parties and Grantor as the final, complete and exclusive statement of the terms agreed to by them. In the event of any conflict between this Deed of Trust and any other agreements required by this Deed of Trust, this Deed of Trust will prevail.

**35.     Other Acts.** Grantor shall cooperate with Beneficiary for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this Deed of Trust or to carry out the intent of this agreement. Promptly (but in no event more than ten days) after request by Beneficiary, Grantor will execute, acknowledge and deliver any document which Beneficiary deems necessary or advisable for these purposes, and will, on demand, pay any expenses incurred by Beneficiary in the preparation, execution and filing of any such documents.

**36.     No Waiver or Cure.** Each waiver by Trustee, Beneficiary or Secured Parties must be in writing, and no waiver is to be construed as a continuing waiver. No waiver is to be implied from any delay or failure by Trustee, Beneficiary or

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

11

Secured Parties to take action on account of any default of Grantor. Consent by Trustee, Beneficiary or Secured Parties to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Trustee's, Beneficiary's or Secured Parties' consent to be obtained in any future or other instance. The exercise by Trustee, Beneficiary or Secured Parties of any right or remedy under this Deed of Trust or the other Secured Obligation Documents or under Applicable Law, shall not: cure or waive a breach, Event of Default or notice of default under this Deed of Trust or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents, including any Hedging Agreements, have been cured); or impair the security of this Deed of Trust; or prejudice Trustee, Beneficiary, Secured Parties or any receiver appointed in accordance with this Deed of Trust, in the exercise of any right or remedy afforded any of them under this Deed of Trust; or be construed as an affirmation by Beneficiary or Secured Parties of any tenancy, lease or option, or a subordination of the Lien of this Deed of Trust.

**37.** **Waivers.** Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require upon foreclosure sales of assets in a particular order. Grantor waives presentment, demand, protest, notice of protest and notice of dishonor and waives all exemptions as to the Secured Obligations. Each successor and assign of Grantor, including any holder of a Lien subordinate to this Deed of Trust, by acceptance of its interest or Lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

**38.** **Joint and Several Obligations.** If Grantor consists of more than one Person, each Grantor (a) acknowledges and undertakes, together with the other Grantors, joint and several liability for the indebtedness, liabilities and obligations of Grantor under this Deed of Trust; (b) acknowledges that this Deed of Trust is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor; and (c) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable. GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT BENEFICIARY OR SECURED PARTIES EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS DEED OF TRUST, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS.

**39.** **Binding Effect; Successors and Assigns.** The Secured Obligation Documents shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns; provided that Grantor shall not assign its rights or obligations hereunder without Secured Parties' consent. However, this Paragraph does not waive the provisions of Section 16; and Grantor shall not assign its rights or obligations hereunder without Beneficiary's and Secured Parties' consent. Beneficiary and Secured Parties may transfer all or any portion of its rights under the Secured Obligation Documents to any other Person. Beneficiary and Secured Parties may disclose to any actual or proposed transferee any information that Grantor has delivered to Beneficiary and Secured Parties in connection with the negotiation of this Deed of Trust or pursuant to the Secured Obligation Documents; and Grantor shall cooperate fully with Beneficiary and Secured Parties in providing that information to any actual or proposed transferee.

**40.** **Governing Law.** This Deed of Trust shall be governed exclusively by the Applicable Laws of the State of Texas (the "Governing Law State") without regard or reference to its conflict of laws principles. Grantor understands that the laws of the Governing Law State may differ from the laws of the state where Grantor resides or otherwise is located or where the Property is located. However, Grantor understands, agrees and acknowledges that (a) this Deed of Trust and the Secured Obligation Documents have significant and substantial contacts with the Governing Law State, (b) it is convenient to Grantor and Lender to select the law of the Governing Law State to govern this Deed of Trust and the transactions evidenced hereby, (c) the transactions evidenced by the MCA and this Deed of Trust bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the Governing Law State constitutes good and valuable consideration for Secured Parties to enter into the Secured Obligation Documents and Secured Parties have entered into the Secured Obligation Documents in reliance on this choice.

**41.** **JURISDICTION AND VENUE.** GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF BENEFICIARY, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK

HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA. GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

    **42.**    **Miscellaneous.** This Deed of Trust may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument. If Grantor is comprised of multiple Persons, any Person comprising Grantor is hereby authorized to bind all parties comprising Grantor. Beneficiary or Secured Parties may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person. Time is of the essence of this Deed of Trust. Each Party has participated in negotiating and drafting this Deed of Trust, so if an ambiguity or a question of intent or interpretation arises, this Deed of Trust is to be construed as if the parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this Deed of Trust. Beneficiary is authorized to execute any other documents or take any other actions necessary to effectuate this Deed of Trust and the consummation of the transactions contemplated herein. This Deed of Trust may not be amended, changed, modified, altered or terminated without the prior written consent of Beneficiary and Secured Parties. Any provision of any Secured Obligation Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Secured Obligation Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Beneficiary or Secured Parties may, at its option, declare all Secured Obligations immediately due and payable. No merger shall occur as a result of Beneficiary's or Secured Parties' acquiring any other estate in or any other Lien on the Property. All rights and remedies under this Deed of Trust and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

    **43.**    **INDEMNIFICATION.** GRANTOR SHALL DEFEND, INDEMNIFY AND HOLD TRUSTEE, BENEFICIARY AND SECURED PARTIES AND THEIR OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS (THE "INDEMNIFIED PERSONS") HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS (A) ARISING OUT OF OR RESULTING FROM THE VIOLATION OF ANY ENVIRONMENTAL LAW; OR (B) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF TRUSTEE, BENEFICIARY OR SECURED PARTIES BEING PARTY TO THIS DEED OF TRUST OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS DEED OF TRUST; THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PERSON, except that Grantor shall have no obligation to an Indemnified Person under this section with respect to Losses resulting from the gross negligence or willful misconduct of that Indemnified Person as determined by a court of competent jurisdiction. If and to the extent that an Indemnity is unenforceable for any reason, Grantor shall be obligated to make the maximum contribution to the payment and satisfaction thereof which is permissible under Applicable Law. THE PROVISIONS OF ALL INDEMNITIES SHALL SURVIVE THE TERMINATION OF THIS DEED OF TRUST.

    **44.**    **WAIVER OF TRIAL BY JURY. GRANTOR AND, BY ACCEPTANCE HEREOF, BENEFICIARY (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS DEED OF TRUST; OR (II) ANY SECURED OBLIGATION DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY, AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE SECURED OBLIGATION DOCUMENTS.**

    **45.**    **Acceleration; Remedies.** Notwithstanding any provision of this Deed of Trust to the contrary:

    (a)    At any time following an Event of Default, Beneficiary, at Beneficiary's option, may declare the Secured Obligations to be immediately due and payable without further demand, and may invoke the Power of Sale and any other remedies permitted by Texas law or provided in this Deed of Trust or in any other Transaction Document. Grantor acknowledges that the Power of Sale granted in this Deed of Trust may be exercised by Beneficiary without prior judicial hearing. Beneficiary

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement



shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

(b)      If Beneficiary invokes the Power of Sale, Beneficiary may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Beneficiary may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction. Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least 21 days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Beneficiary has, at least 21 days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Secured Obligations according to Beneficiary's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Beneficiary's records, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. Any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. Further, any sale made by Trustee hereunder may, in lieu of cash, be upon such other terms and conditions as Beneficiary may from time to time hereafter elect. The sale by Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Property shall be sold and, if the proceeds of such sale of less than the whole of the Property shall be less than the aggregate of the indebtedness secured hereby and the expense of executing this trust as provided herein, this Deed of Trust and the lien hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Property but Beneficiary shall have the right, at its sole election, to request Trustee to sell less than the whole of the Property. In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary, such sale shall not exhaust the power of sale hereunder and Beneficiary shall have the right to cause a subsequent sale or sales to be made hereunder.

(c)      At any time during the bidding of any sale conducted by Trustee under subparagraph (a) above, Trustee may require a bidding party (x) to disclose its full name, state and city of residence, occupation, and specific business office location, and the name and address of the principal the bidding party is representing (if applicable); and (y) to demonstrate reasonable evidence of the bidding party's financial ability (or, if applicable, the financial ability of the principal of such bidding party), as a condition to the bidding party submitting bids at the foreclosure sale. If any such bidding party (the "Questioned Bidder") declines to comply with Trustee's requirement in this regard, or if such Questioned Bidder does respond but Trustee, in Trustee's sole and absolute discretion, deems the information or the evidence of the financial ability of the Questioned Bidder (or, if applicable, the principal of such bidding party) to be inadequate, Trustee may continue the bidding with reservation; and in such event (i) Trustee shall be authorized to caution the Questioned Bidder concerning the legal obligations to be incurred in submitting bids, and (ii) if the Questioned Bidder is not the highest bidder at the sale, or if having been the highest bidder the Questioned Bidder fails to deliver the cash purchase price payment promptly to Trustee, all bids by the Questioned Bidder shall be null and void. Trustee may, in Trustee's sole and absolute discretion, determine that a credit bid may be in the best interest of Borrower and Beneficiary and elect to sell the Property for credit or for a combination of cash and credit; provided, however, that Trustee shall have no obligation to accept any bid except an all cash bid. In the event Trustee requires a cash bid and cash is not delivered within a reasonable time after conclusion of the bidding process, as specified by Trustee (but in no event later than 3:45 p.m. local time on the date of sale), then said contingent sale shall be null and void, the bidding process may be recommenced, and any subsequent bids or sale shall be made as if no prior bids were made or accepted.

(d)      Beneficiary shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor or by any receiver or public officer, and any Beneficiary purchasing at any such sale shall have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the Debt owing to such Beneficiary, or if such Beneficiary holds less than all of the Debt the pro rata part thereof owing to such Beneficiary, accounting to all other beneficiaries



of this Deed of Trust not joining in such bid in cash for the portion of such bid or bids apportionable to such non-bidding beneficiaries.

(e)     Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Property so sold in fee simple with covenants of general warranty. Grantor covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements contained in those recitals. Trustee shall apply the proceeds of the sale in the following order: FIRST to all reasonable costs and expenses of the sale, including reasonable Trustee's fees and attorneys' fees and costs of title evidence; SECOND to the Secured Obligations in such order as Beneficiary, in Beneficiary's discretion, directs; and THIRD the excess, if any, to the person or persons legally entitled to the excess.

(f)     Uniform Commercial Code. Upon the occurrence of an Event of Default, Beneficiary may exercise its rights of enforcement under the Uniform Commercial Code with respect to the Property secured thereunder, and in conjunction with, in addition to or in substitution for those rights and remedies:

(i)     Beneficiary may enter upon the Property to take possession of, assemble and collect all Personalty or to render it unusable;

(ii)     Beneficiary may require Grantor to assemble the Personalty and make it available at a place Beneficiary designates which is mutually convenient to allow Beneficiary to take possession or dispose of such personal property;

(iii)     written notice mailed to Grantor as provided herein ten (10) days prior to the date of public sale of Personalty or prior to the date after which private sale of Personalty will be made shall constitute reasonable notice;

(iv)     any sale made pursuant to the provisions of this paragraph shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the sale of the Property under power of sale as provided herein upon giving the same notice with respect to the sale of the Personalty hereunder as is required for such sale of the Property under power of sale;

(v)     in the event of a foreclosure sale, whether made by Trustee under the terms hereof, or under judgment of a court, the remainder of the Personalty and other Property may, at the option of Beneficiary, be sold as a whole;

(vi)     it shall not be necessary that Beneficiary take possession of the Personalty or any part thereof prior to the time that any sale pursuant to the provisions of this paragraph is conducted and it shall not be necessary that the Personalty or any part thereof be present at the location of such sale;

(vii)     prior to application of proceeds of disposition of the Personalty to the secured indebtedness, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Beneficiary;

(viii)     any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to non-payment of the indebtedness or as to the occurrence of any Event of Default, or as to Beneficiary having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by Beneficiary, shall absent manifest error be taken as conclusive evidence of the truth of the facts so stated and recited; and

(ix)     Beneficiary may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Beneficiary, including the sending of notices and the conduct of sale, but in the name and on behalf of Beneficiary.

(g)     In the event of a default in the payment of any part of the Debt, Beneficiary shall have the right to proceed with foreclosure of the liens and security interests evidenced hereby without declaring the entire Debt due, and in such event any such foreclosure sale may be made subject to the unmatured part of the Debt; and any such sale shall not in any manner affect the unmatured part of the Debt, but as to such unmatured part, this Deed of Trust shall remain in full force and effect just as though no sale had been made. The proceeds of any such sale shall be applied as provided in subsection (e) above except that

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

15

the amount paid under subparagraph SECOND thereof shall be only the matured portion of the Debt and any proceeds of such sale in excess of those provided for in subparagraphs FIRST and SECOND (modified as provided above) shall be applied to installments of principal of and interest on the Note in the inverse order of maturity. Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Debt.

(h)     This Deed of Trust shall be effective as a mortgage as well as a Deed of Trust and upon the occurrence of an Event of Default may be foreclosed as to any of the Property in any manner permitted by the laws of the State of Texas or of any other state in which any part of the Property is situated, and any foreclosure suit may be brought by Trustee or by Beneficiary. In the event a foreclosure hereunder shall be commenced by Trustee or his substitute or successor, Beneficiary may at any time before the sale of the Property direct the said Trustee to abandon the sale, and may then institute suit for the collection of the Note and the other secured indebtedness, and for the foreclosure of this Deed of Trust. It is agreed that if Beneficiary should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Deed of Trust, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require Trustee, his substitute or successor to sell the Property in accordance with the provisions of this Deed of Trust.

(i)     If all or any part of the Property is sold pursuant to this section, Grantor will be divested of any and all interest and claim to the Property, including any interest or claim to all insurance policies, utility deposits, bonds, loan commitments and other intangible property included as a part of the Property. Additionally, after a sale of all or any part of the Land, Improvements, Fixtures and Personalty, Grantor will be considered a tenant at sufferance of the purchaser of the same, and the purchaser shall be entitled to immediate possession of such property. If Grantor fails to vacate the Property immediately, the purchaser may and shall have the right, without further notice to Grantor, to go into any justice court in any precinct or county in which the Property is located and file an action in forcible entry and detainer, which action shall lie against Grantor or its assigns or legal representatives, as a tenant at sufferance. This remedy is cumulative of any and all remedies the purchaser may have under this Deed of Trust or otherwise.

(j)     In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Grantor agrees that notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Beneficiary shall be entitled to seek a deficiency judgment from Borrower and any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, and others against whom recovery of a deficiency is sought. Alternatively, in the event the waiver provided for in subsection (1) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable laws, the following shall be the basis of the court's determination of fair market value: (i) the Property shall be valued "as is" and in its condition as of the date of foreclosure, and no assumption of increased value because of post foreclosure repairs, refurbishment, restorations or improvements shall be made; (ii) any adverse effect on the marketability of title because of the foreclosure or because of any other title condition not existing as of the date of this Deed of Trust shall be considered; (iii) the valuation of the Property shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Property for cash within a six month period after foreclosure; (iv) although the Property may be disposed of more quickly by the foreclosure purchaser, the gross valuation of the Property as of the date of foreclosure shall be discounted for a hypothetical reasonable holding period (not to exceed 6 months) at a monthly rate equal to the average monthly interest rate on the Note for the twelve months before the date of foreclosure; (v) the gross valuation of the Property as of the date of foreclosure shall be further discounted and reduced by reasonable estimated costs of disposition, including brokerage commissions, title policy premiums, environmental assessment and clean up costs, tax and assessment, prorations, costs to comply with legal requirements and attorneys' fees; (vi) expert opinion testimony shall be considered only from a licensed appraiser certified by the State of Texas and, to the extent permitted under Texas law, a member of the Appraisal Institute, having at least five years' experience in appraising property similar to the Property in the county where the Property is located, and who has conducted and prepared a complete written appraisal of the Property taking into considerations the factors set forth in this Deed of Trust; no

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

16



expert opinion testimony shall be considered without such written appraisal; (vii) evidence of comparable sales shall be considered only if also included in the expert opinion testimony and written appraisal referred to in the preceding paragraph; and (ix) an affidavit executed by Beneficiary to the effect that the foreclosure bid accepted by Trustee was equal to or greater than the value of the Property determined by Beneficiary based upon the factors and methods set forth in subparagraphs (a) through (g) above before the foreclosure shall constitute prima facie evidence that the foreclosure bid was equal to or greater than the fair market value of the Property on the foreclosure date.

(k)    Additional Waivers.

(i)    Subject to the provisions of this Deed of Trust, to the extent that Borrower, any partner thereof or any other entity responsible for the payment of the Debt is now, or at any time or from time to time hereafter is, a partnership, Borrower and Beneficiary expressly acknowledge and agree that Beneficiary is not required to comply with Section 3.05(d) of the Texas Revised Partnership Act, as same may be hereafter amended or modified, or any other or further laws, rules or regulations now or hereafter in effect which may limit the rights and remedies of a creditor to pursue partners of a partnership prior to the pursuit of such creditor's rights and remedies against such partnership.

(ii)    Borrower and Grantor hereby waive notice of intent to accelerate and notice of acceleration, and agrees that Beneficiary may foreclose the lien of this Deed of Trust without sending either of such notices.

(iii)    If any law referred to in this paragraph and now in force, of which Borrower or Borrower's heirs, devisees, representatives, successors, and assigns and such other persons claiming any interest in the Property might take advantage despite this paragraph, shall hereafter be repealed and cease to be in force, such law shall not thereafter be deemed to preclude the application of this paragraph.

(l)    Beneficiary may, at Beneficiary's option, comply with these provisions in the manner permitted or required by Title 5, Section 51.002 of the Texas Property Code (relating to the sale of real estate) or by Chapter 9 of the Texas Business and Commerce Code (relating to the sale of collateral after default by a debtor), as those titles and chapters now exist or may be amended or succeeded in the future, or by any other present or future articles or enactments relating to same subject. Unless expressly excluded, the Property shall include Rents collected before a foreclosure sale, but attributable to the period following the foreclosure sale, and Grantor shall pay such Rents to the purchaser at such sale. At any such sale: (i) whether made under the power contained in this Deed of Trust, Section 51.002, the Texas Business and Commerce Code, any other legal requirement or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for Trustee to have physically present, or to have constructive possession of, the Property (Grantor shall deliver to Trustee any portion of the Property not actually or constructively possessed by Trustee immediately upon demand by Trustee) and the title to and right of possession of any such property shall pass to the purchaser as completely as if the property had been actually present and delivered to the purchaser at the sale; (ii) each instrument of conveyance executed by Trustee shall contain a general warranty of title, binding upon Grantor; (iii) the recitals contained in any instrument of conveyance made by Trustee shall conclusively establish the truth and accuracy of the matters recited in the Deed of Trust, including nonpayment of the Secured Obligations and the advertisement and conduct of the sale in the manner provided in this Deed of Trust and otherwise by law and the appointment of any successor Trustee; (iv) all prerequisites to the validity of the sale shall be conclusively presumed to have been satisfied; (v) the receipt of Trustee or of such other party or officer making the sale shall be sufficient to discharge to the purchaser or purchasers for such purchaser(s)' purchase money, and no such purchaser or purchasers, or such purchaser(s)' assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or nonapplication of such purchase money; (vi) to the fullest extent permitted by Applicable Law, Grantor shall be completely and irrevocably divested of all of Grantor's right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold, and such sale shall be a perpetual bar to any claim to all or any part of the property sold, both at law and in equity, against Grantor and against any person claiming by, through or under Grantor; and (vii) to the extent and under such circumstances as are permitted by law, Beneficiary may be a purchaser at any such sale.

(m)    The rights and remedies granted under this <u>Section 45</u> are in addition to and shall not limit the rights and remedies available under other terms and provisions of this Deed of Trust.

46.    <u>Trustee</u>. Notwithstanding any provision to the contrary in this Deed of Trust:

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

17

(a)     Trustee may resign by giving of notice of such resignation in writing to Beneficiary. If Trustee shall die, resign or become disqualified from acting under this Deed of Trust or shall fail or refuse to act in accordance with this Deed of Trust when requested by Beneficiary or if for any reason and without cause Beneficiary shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Deed of Trust or any prior successor or substitute trustee, Beneficiary shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Deed of Trust. Such appointment may be executed by an authorized officer, agent or attorney-in-fact of Beneficiary (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Beneficiary.

(b)     Any successor Trustee appointed pursuant to this section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Deed of Trust; but, nevertheless, upon the written request of Beneficiary or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)     Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Deed of Trust, including the transmittal and posting of any notices.

**47.     Waiver of Consumer Rights. TO THE EXTENT NOW OR HEREAFTER APPLICABLE, BORROWER HEREBY WAIVES BORROWER'S RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BORROWER'S OWN SELECTION, BORROWER VOLUNTARILY CONSENTS TO THIS WAIVER.**

**48.     No Fiduciary Duty.** Lender owes no fiduciary or other special duty to Secured Parties or Beneficiary.

**49.     Additional Provisions Regarding Assignment of Rents.** In no event shall the Assignment of Rents or any other term of this Deed of Trust cause the Secured Obligations to be reduced by an amount greater than the Rents actually received by Beneficiary and applied by Secured Parties to the Secured Obligations, whether before, during or after (a) an Event of Default, or (b) a suspension or revocation of the License. Grantor and Beneficiary and Secured Parties specifically intend that the Assignment of Rents is not intended to result in a pro tanto reduction of the Secured Obligations. The Assignment of Rents is not intended to constitute a payment of, or with respect to, the Secured Obligations and, therefore, Grantor and Beneficiary and Secured Parties specifically intend that the Secured Obligations shall not be reduced by the value of the Rents and Leases assigned. Such reduction shall occur only if, and to the extent that, Beneficiary or a Secured Party actually receives Rents pursuant to the Assignment of Rents and applies those Rents to the Secured Obligations. Grantor agrees that the value of the License equals the value of the Assignment of Rents. The Assignment of Rents will terminate upon the release of this Deed of Trust.

**50.     Loan Charges.** Secured Parties intend at all times to comply with the laws of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the Secured Obligations (or applicable United States federal law to the extent that it permits Secured Parties to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If Applicable Law is ever judicially interpreted so as to render usurious any amount payable under the Transaction Documents, or contracted for, charged, taken, reserved or received with respect to the Secured Obligations, or if acceleration of the maturity of the Secured Obligations, or if any prepayment by Grantor results in Grantor having paid any interest in excess of that permitted by any applicable law, then Grantor and Secured Parties expressly intend that all excess amounts collected by Secured Parties shall be applied to reduce the unpaid principal balance of the Secured Obligations (or, if the Secured Obligations have been or would thereby be paid in full, shall be refunded to Grantor), and the provisions of the Transaction Documents immediately will be deemed reformed and the amounts thereafter collectible under the Transaction Documents reduced, without the necessity of the execution of any new documents, so as to comply with any Applicable Law, but so as to permit the recovery of the fullest amount otherwise payable under the Transaction Documents. The right to accelerate the maturity of the Secured Obligations does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Secured Parties does not intend to collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Secured Parties for the use, forbearance or detention of the Secured

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

18

Obligations shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated and spread throughout the full term of the Secured Obligations until payment in full so that the rate or amount of interest on account of the Secured Obligations does not exceed the applicable usury ceiling. Notwithstanding any provision contained in the Transaction Documents that permits the compounding of interest, including any provision by which any accrued interest is added to the principal amount of the Secured Obligations, the total amount of interest that Grantor is obligated to pay and Secured Parties is entitled to receive with respect to the Secured Obligations will not exceed the amount calculated on a simple (i.e., noncompounded) interest basis at the maximum rate on principal amounts actually advanced to or for the account of Borrower, including all current and prior advances and any advances made pursuant to the Instrument or any other Transaction Document (such as for the payment of Impositions and similar expenses or costs).

51.    **Property And Liability Insurance - Delivery Of Policy to Beneficiary.** Notwithstanding any term or provision of the Transaction Documents to the contrary, Grantor will not be required to deliver the original (or a duplicate original) of any renewal policy of insurance to Lender more than 15 days prior to the expiration date of the policy then held by Beneficiary or Secured Parties.

52.    **Reimbursement for Certain Taxes.** If, while the Secured Obligations are owned by a non-resident of the State of Texas, or by a corporation organized under the laws of a state other than Texas with its principal offices outside the State of Texas, any state, county or municipal tax or assessment is levied within the State of Texas against that owner of the Secured Obligations, either in terms or practical effect (whatever the legal incidence of such tax or assessment) on account of the Secured Obligations or this Deed of Trust, or the right to enforce the same, or on account of that owner's receipt of interest or other payments thereunder, Grantor will reimburse that owner, promptly upon advice therefrom, the amount of each such tax or assessment, provided that if such tax or assessment shall be of such nature, in law, and of such amount for any year, that payment thereof, in its entirety, in addition to all other payments to be made by Grantor under the Transaction Documents, will constitute payment of "interest" in the statutory sense of that word, in excess of the Maximum Rate, Grantor's obligation to make reimbursement shall apply to only so much, if any, of each such tax or assessment as may be reimbursed without exceeding the Maximum Rate. If the passage of legislation imposing or authorizing the imposition of any such state, county or municipal tax or assessment, then at the option of Beneficiary, the Secured Obligations will be due within six months after notice to Grantor.

53.    **Notice of Final Agreement. THIS WRITTEN DEED OF TRUST AND THE TRANSACTION DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Grantor is signing this Deed of Trust effective as of the day and year first written above.

**GRANTOR**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FEED YARD, INC., a Texas corporation

By: _____

BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

7M CATTLE FEEDERS, INC, a Kentucky corporation

By: _____

BRIAN KEITH MCCLAIN
President

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

Doc
62194

Bk
OR

Vol
164

Pg
180

STATE OF ~~TEXAS~~ Kentucky )
) SS
COUNTY OF Marshall )

This instrument was acknowledged before me on Feb 12 , 2020 by BRIAN KEITH MCCLAIN, President on behalf of MCCLAIN FEED YARD, INC., a Texas corporation.

(Signature of officer)

President
(Title of officer)

My Commission Expires: 01/19/23

OFFICIAL SEAL
ROBIN CUNNINGHAM
NOTARY PUBLIC, STATE OF KENTUCKY
MY COMMISSION EXPIRES JAN. 19 2023
NOTARY ID # 614891

STATE OF ~~TEXAS~~ Kentucky )
) SS
COUNTY OF Marshall )

This instrument was acknowledged before me on Feb 12 , 2020 by BRIAN KEITH MCCLAIN, President on behalf of 7M CATTLE FEEDERS, INC, a Kentucky corporation.

(Signature of officer)

President
(Title of officer)

My Commission Expires: 01/19/23

OFFICIAL SEAL
ROBIN CUNNINGHAM
NOTARY PUBLIC, STATE OF KENTUCKY
MY COMMISSION EXPIRES JAN. 19 2023
NOTARY ID # 614891

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

20

Doc
421194
BK
OR
Vol
164
Pg
181

## EXHIBIT A-1

### McClain MCA 2018
### DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

#### Legal Description of Real Estate

Deaf Smith County, Texas

Tract 2:

A 36.03 acre tract, more or less, out of the Southwest part of Section 26, Block K-8, Abstract No. 1370, Certificate Number 128 of the T. T. R. R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a number 60 common nail found for the Southwest corner of Section 26, Block K-8 whence a 1-1/2 inch iron pipe found for the Southeast corner of said section bears North 89 degrees 56 minutes 00 seconds East 6321.59 feet;

THENCE North 89 degrees 56 minutes 00 seconds East along the South line of said section, 48.80 feet to a 1/2 inch iron rod set in the East physical line of Farm Road 1057 for the Southwest and beginning corner of this tract;

THENCE North 00 degrees 12 minutes 00 seconds West along the East physical line of Farm Road 1057, at 30.00 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.27 feet a 1/2 inch iron rod set for corner;

THENCE North 89 degrees 54 minutes 43 seconds East 606.84 feet to a 1/2 inch iron rod set in the East line of a tract known as the West 40 acres of the Southwest 1/4 of said section whence a 1/2 inch iron rod set for the Northeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section bears North 00 degrees 11 minutes 29 seconds West 71.78 feet;

THENCE South 00 degrees 11 minutes 29 seconds East at 2557.50 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.50 feet a 1/2 inch iron rod found in the South line of said section for the Southeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section;

THENCE South 89 degrees 56 minutes 00 seconds West along the South line of said section, 606.45 feet to the place of beginning.

Tract 3:

A 20.00 acre tract out of the Southwest part of Section 26, Block K-8, Certificate Number 128 of the T.T R.R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with cap marked "RPLS 1848" found in the South line of Section 26 for the Southwest corner and POINT OF BEGINNING of this tract, whence a number 60 common nail found for the Southwest corner of Section 26, Block K-8 bears South 89 degrees 56 minutes 00 seconds West 855.25 feet;

THENCE North 00 degrees 11 minutes 29 seconds West, a distance of 2587.50 feet a fence corner post for the Northwest corner of this tract;

THENCE North 89 degrees 54 minutes 43 seconds East, a distance of 336.69 feet to a 1/2 inch iron rod with cap marked "HBD" set for the Northeast corner of this tract;

THENCE South 00 degrees 11 minutes 29 seconds East, at a distance of 2557.62 feet pass a 1/2 inch iron rod with cap marked "HBD" set for reference, continue for a total distance of 2587.62 feet a point on the South line of Section 26, whence a 1-1/2 inch iron pipe found for the Southeast corner of Section 26 bears North 89 degrees 56 minutes 00 seconds East, 4329.64 feet;

THENCE South 89 degrees 56 minutes 00 seconds West, along the South line of Section 26, a distance of 336.69 feet to the POINT OF BEGINNING.

Doc 421194 Bk BR    Vol 164    Pg 182

## EXHIBIT A-2

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

### Legal Description of Real Estate

Parmer County, Texas

Tract 1:

A tract of land being all of Section 25 and a portion of Section 24 of Charles E. Harding's Subdivision of Capitol League 473 and Parts of Capitol Leagues 459, 460, 461, 472 and 474 in Parmer County, Texas, as shown by the map or plat thereof of record in Volume 6, Page 164, Deed Records of Parmer County, Texas, and being described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with camp stamped "Furman RPLS 1959" set for the southwest corner of said Section 25, being the common corner of Sections 25-36-35-26 from whence a 1/2 inch iron rod found for the common corner of sections 27-34-33-26, all in said subdivision bears North 89° 56' 32" west, 10,564.82 feet, the southwest corner of Section 36 and the southeast corner of Section 35 bears South

00° 11' 46" West, 5,281.61 feet, from this point a harrow tooth found as called for in that certain instrument recorded in Volume 225, Page 730, of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas, as shown by Plat thereof of record in Volume 2, Page 495 of said Deed Records bears West (Bearing Basis) 1,411.64 feet;

THENCE North 00° 11' 46" East along the common line of Sections 25 and 26, and the common line of Section 24 and 23, of said Charles E. Harding's Subdivision, and along the center of a road, at 5,281.61 feet pass the common line of Sections 25-26-23-24 a total distance of 9,503.54 feet to a 3/4 inch iron pipe found as called for in that certain instrument recorded in Volume 156, Page 603 of said Deed Records, and in Volume 2, Page 219 of the Field Note Records of Parmer County, Texas, from whence the common corner of Sections 24-23-14-13 of said Charles E. Harding's Subdivision bears North 00° 11' 46" East 5,281.61 feet and 1 1/4 inch iron pipe with 5/8 inch rod adjacent found for the common corner of Sections 12-13-14-11 of said Charles E. Harding's Subdivision, as called for in that certain instrument recorded in Volume 2, Page 343, of said Field Note records bears North 00° 11' 46" East 7,341.28 feet;

THENCE South 89° 40' 58" East 2,100.84 feet along a fence line and along the North line of this tract of land and the North line of that certain tract of land described in said Volume 156, Page 603 and said Volume 2, Page 219 to a 3/4 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219, said North line being monumented and generally accepted on the ground for over 25 years, from whence the Northeast corner of Section 24 and the Southeast corner of Section 14 of said Charles E. Harding's Subdivision bears North 00° 11' 07" East 7,345.07 feet;

THENCE South 00° 11' 07" West at 3,187.40 feet pass a 3/4 inch iron pipe found, this iron pipe is a monument of record in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southeast corner of Section 24 of said Charles E. Harding's Subdivision, it is however the Professional opinion of this surveyor that this corner lies in the East line of this survey but 26.81 feet North of the actual section corner, at 3,214.21 feet pass what is in my Professional opinion the Southeast corner of Section 24 and the Northeast corner of Section 25 of said Charles E. Harding's Subdivision at 3,301.75 feet pass a 1 1/2 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southwest corner of Section 22 and the Northwest corner of Section 27 in Township 1 North, Range 3 East of a Capitol Syndicate Subdivision as shown by Plat thereof of record in Volume 5, Page 394 of said Deed Records, a total distance of 6,493.86 feet to a point being the Southeast corner of Section 25 and the Northeast corner of Section 36 of said Charles E. Harding's Subdivision from whence the Southeast corner of said Section 36 bears South 00° 11' 07" West 6,279.65 feet from this point a railroad spike found as called for in that certain instrument recorded in Volume 225, Page 730 of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas as shown by Plat thereof record in Volume 2, Page 495 of said Deed Records bears East (Bearing Basis) 1,324.17 feet;

THENCE North 89° 56' 48" West 2,102.46 feet along the South line of Section 25 and the North line of Section 36 of said Charles E. Harding's Subdivision to the POINT OF BEGINNING and containing 410.0 acres of land, more or less.

Doc                  Bk        Vol        Pg
      82194    OR          164        183

## EXHIBIT B

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

### Additional Property

associated with Deed of Trust by McClain Feed Yard  and 7M Cattle Feeders on land located in Deaf Smith and Parmer
Counties, Texas

(list specific additional Property, if any)

Fixtures

Buildings, fixtures, and equipment associated with agricultural production or the production of farm products, including but not
limited to:

| Attached Equipment |
| --- |
| 2 x Stationary Roto-Mixers |
| 6 x Liquid Storage Tanks |
| 9 x Hyd. Working Chutes (Snakes Not Included) |
| 1 x 12 x 70 Truck Scale |
| 2 x 12 x 70 Cattle Scales With Fencing and Gates |
| 1 x Grain Probe |


Doc
62194   Bk
OK   Vol
164   Pg
184

All Water Rights related to but not limited to:

| Subject Water Wells - 4180 Acre Feedyard Tract | | | | | | |
|---|---|---|---|---|---|---|
| Section | District Number | Permit Number | Permit Status | Comments | Recently Tested | Current GPM Estimate |
| 24 | 79667 | 3694 | Current | Yes | No | 40 |
| 24 | 79677 | 3974 | Current | Yes | Yes | 64 |
| 24 | 79680 | 3977 | Current | Yes | Yes | 53 |
| 24 | 79681 | 3978 | Current Destroyed | Yes | Yes | 0 |
| 25 | 82449 | 80124 | Current | None | No | 0 |
| 25 | 79188 | 3423 | Current | Yes | Yes | 40 |
| 23 | 79032 | 3239 | Abandoned | Yes | No | 0 |
| 25 | 79544 | 3831 | Current | Yes | No | 40 |
| 25 | 78540 | 2689 | Current | Yes Mill and Office | No | 30 |
| 25 | 79189 | 3474 | Current | Yes | No | 40 |
| 24 | 79719 | 4021 | Current | Yes | No | 40 |
| 25 | 83148 | 50106 | Current | None | No | 0 |
| Total | | | | | | 357 |
| Total Tested | | | | | | 137 |

CHG & RETURN
AA & R, L.L.P.



Doc 62194 BK OR     Vol 164     Pg 185

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE
RENTAL OR USE OF THE DESCRIBED REAL PROPERTY
BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCIBLE
UNDER FEDERAL LAW

STATE OF TEXAS
                    } OFFICIAL PUBLIC RECORDS
COUNTY OF PARMER }

I hereby certify that this instrument was FILED
on the date and at the time stamped hereon by
me and was duly RECORDED in the Volume and Page
of the RECORDS of Parmer County, Texas.

FILED FOR RECORD IN PARMER COUNTY
Susie Spring, COUNTY CLERK

ON: Mar 04,2020 AT 02:10P

Document Number:     62194

Receipt Number - 25159

By
Breann Saenz, Deputy



FILED and certified as RECORDED in the **Official Public Records** of Deaf Smith County on the date and time stamped. Rachel Garman, County Clerk,
Deaf Smith County, Texas.
By

Deputy     March 13, 2020 (9:13am)     20-0454

# EXHIBIT E

Doc 61507 Bk OR Vol 158 Pg 578

Prepared by:
John S. Bruzina
Polsinelli PC
Frost Bank Tower
2950 N. Harwood, Suite 2100
Dallas, TX 75201

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

RABO AGRIFINANCE LLC
14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attn: Closing Department

Space above this line for Recorder's Use

McClain MCA 2018

Real Estate Term Loan 1: 22114481
Operating Line of Credit 1: 22114482
Real Estate Term Loan 2: 22117432
Operating Line of Credit 2: 22117434

## DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

### (Deaf Smith and Parmer Counties, Texas)

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

THIS DEED OF TRUST ALSO CONSTITUTES A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER THE UCC

This deed of trust ("Deed of Trust") is dated as of July 24, 2019. It is by MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard ") and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("7M Cattle Feeders, Inc.") (McClain Feed Yard and 7M Cattle Feeders, Inc. are herein individually and collectively, "Grantor"), to and in favor of PHILIP R. KIRKPATRICK, an individual, as trustee ("Trustee"), whose address for purposes of this Deed of Trust is 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, for the benefit of RABO AGRIFINANCE LLC, a Delaware limited liability company, as agent for itself and the other Secured Parties (defined herein) under the Collateral Agency Agreement (defined herein; and Rabo AgriFinance LLC, in that capacity, "Beneficiary").

RABO AGRIFINANCE LLC, a Delaware limited liability company, as Lender ("Lender") has agreed to make up to $16,957,500.00 in loans to Borrower (as defined in the Facility Sheet(s)) under the terms and conditions of the Master Credit Agreement between Grantor and Lender dated May 11, 2018, as may be amended, modified, replaced, or supplemented from time to time (the "MCA"). Each capitalized term used in this Deed of Trust that is defined in the MCA and not defined in this Deed of Trust will have the meaning specified in the MCA. This Deed of Trust will be interpreted in accordance with the Drafting Conventions.

Doc 61507    Bk    Vol    Pg
             OR     158    579

Grantor has or may also enter into certain derivatives transactions under Hedging Agreements with Swap Counterparties, under which Grantor has or may incur Hedging Obligations to Swap Counterparties.

The Loan Obligations (defined in the MCA) may be, from time to time, guaranteed by Guarantor under the terms and conditions of one or more guaranties in favor of Collateral Agent. The Hedging Obligations are guaranteed by Guarantor under the terms and conditions of the Hedging Agreements and/or a separate guaranty of the Hedging Obligations (the MCA, the Guaranty, and the Hedging Agreements and any separate guaranty of the Hedging Obligations are herein sometimes individually and collectively referred to as the "Debt Instrument").

Non-Obligor(s) have an economic interest in Borrower or will obtain some other material financial benefit as a result of Secured Parties' entering into the Secured Obligation Documents (defined herein). Secured Parties require that Non-Obligor execute this agreement as a condition of the Secured Obligation Documents.

TO SECURE repayment of the indebtedness evidenced by the Note (defined herein) and payment and performance of all other Secured Obligations (defined herein), Grantor irrevocably and unconditionally grants, bargains, sells, and conveys to Trustee, in trust, for the benefit of Beneficiary, WITH POWER OF SALE and right of entry and possession wherever located, whether now owned or hereafter acquired or arising, and, except as indicated, whether constituting real estate or personal property (collectively, the "Property"): (a) the real estate and any interest in the real estate located in Deaf Smith and Parmer Counties, Texas, and described in EXHIBIT A-1 and EXHIBIT A-2 (the "Land"); (b) all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the Land, including all wells, watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements"); (c) all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a means of access thereto ("Easements"); (d) the ground water on, under, pumped from or otherwise available to the Property or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any governmental authority and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Property or Grantor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Property, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity (collectively, "Water Rights"), including those rights, shares and other property described in EXHIBIT B; (e) all other tenements, hereditaments and appurtenances to the Land; (f) minerals, oil, gas, coal, metallic ores, other minerals and any other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas, coal, metallic ores and any other mineral interests with which any of the foregoing interests or estates are pooled or unitized, including surface damage awards or settlements (the "Mineral Rights"); (g) timber now or hereafter standing or cut; (h) leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property (collectively, the "Leases"); (i) all utility contracts, maintenance agreements, management agreements, service contracts and other agreements directly related to the operation and maintenance of the Property; (j) all bushes, groves, trees, plants, vines or other plantings, upon or under the Land ("Plantings"); (k) working drawings, instructional manuals, and rights in processes directly related to the operation of the Property; (l) other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment (except motor vehicles, trailers, and planting, tillage and harvesting equipment rolling stock) or which is in all cases (i) directly related to the operation of the Property or acquired in connection with any construction or maintenance of the Land or the Improvements (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements; (m) all permits and licenses relating or pertaining to the use or enjoyment of the Property; (n) proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (the "Insurance Claims"); (o) all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate (the

Doc=                BK        Vol        Pg
         61507      OR         158        580

"Condemnation Awards"); (p) money or other personal property of Grantor in addition to the foregoing deposited with or otherwise in Beneficiary's, Trustee's or Secured Parties' possession; (q) rights and interests under the Hedging Agreements, including all rights to the payment of money from Secured Parties or Trustee under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in any of the Hedging Agreements; (r) the right, in the name and on behalf of Grantor, upon notice to Grantor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Trustee, Beneficiary or Secured Parties in the Property; and (s) substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.  To have and to hold the Property onto Trustee, Trustee's successor in Trust, and Trustees assigns forever.

      **1.**    **Secured Obligations.**  Grantor makes the grant, conveyance, transfer and assignment above, makes the irrevocable and absolute assignment in Section 4, and grants the security interest under Section 5, to secure payment and performance of the following obligations (the "Secured Obligations") in any order of priority that Beneficiary may choose:  (a) all Obligations (defined in the MCA), under one or more Facility Sheets(s) from time to time where Grantor is designated from time to time as Borrower, Guarantor or Non-Borrower, including (i) the Real Estate Term Loan 1 Note dated as May 11, 2018 from Grantor to Lender in the original principal amount of $332,500.00; (ii) the Operating Line of Credit 1 Note dated as of May 16, 2019, from Grantor to Lender in the original principal amount of $12,000,000.00; (iii) the Real Estate Term Loan 2 Note dated as of the date of this Deed of Trust, from Grantor to Lender in the original principal amount of $625,000.00; (iv) the Operating Line of Credit 2 Note dated as of the date of this Deed of Trust, from Grantor to Lender in the original principal amount of $4,000,000.00 (the Real Estate Term Loan 1 Note, the Operating Line of Credit 1 Note, the Real Estate Term Loan 2 Note, and the Operating Line of Credit 2 Note, together with all extensions, renewals, modifications, substitutions and amendments thereof are herein collectively, the "Note"); (v) all Hedging Obligations; and (vi) all other indebtedness, liabilities and obligations of Grantor to Lender and the Swap Counterparties arising pursuant to any of the Transaction Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several; (b) all obligations of Grantor under this Deed of Trust; (c) all obligations of Grantor to Lender, Coöperatieve Rabobank U.A., (trading as Rabobank), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands ("Rabobank"), and/or Rabobank, N.A., a national banking association ("RNA"), or any other Affiliate of Lender (Lender, Rabobank and RNA, and any other Affiliate of Lender are herein individually and collectively, "Secured Parties"), whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether obligatory or non-obligatory; whether due or not due, whether absolute or contingent, or whether incurred directly or acquired by assignment or otherwise, under the terms and conditions of any other written instrument or agreement executed by Grantor and which specifically recites that those obligations are secured by this Deed of Trust; and (d) any of the foregoing that arises after the filing of a petition by or against Grantor under an Insolvency Proceeding.  All Persons who have or acquire an interest in the Property will be deemed to have received notice of, and will be bound by, the terms of the MCA, the other Transaction Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (the Transaction Documents and those other agreements or instruments, the "Secured Obligation Documents").  These terms include any provisions in the Secured Obligation Documents which permit borrowing, repayment and reborrowing, or which provide that the rate of interest on one or more of the Secured Obligations may vary from time to time.  This Deed of Trust does not secure any obligation which is unsecured pursuant to the express terms of the MCA or any other document, agreement or instrument.  Without limitation of the foregoing, this Deed of Trust does not secure the indebtedness, liabilities and obligations of Guarantor as guarantor under the terms and conditions of the Guaranty or any other guaranty given by Guarantor to secure the Hedging Obligations.

      **2.**    **Future Secured Obligations.**  The Secured Obligations include future advances made by Beneficiary or Secured Parties, at their option, and for any purpose, and all other future Secured Obligations.  Those future advances and other future Secured Obligations are secured to the same extent as if made or incurred on the date of the execution of this Deed of Trust, and have priority as to third Persons with or without actual notice from the time this Deed of Trust is filed for record as provided by law.  The total amount of indebtedness secured by this Deed of Trust may decrease or increase from time to time.  The unpaid balance of any Revolving Line of Credit or Hedging Obligations secured by this Deed of Trust may at certain times be zero.  This Deed of Trust will remain in full force and effect notwithstanding any zero balance.  Grantor shall not file for record any notice limiting the maximum amount secured by this Deed of Trust (a "Maximum Amount Notice").  A Maximum Amount Notice will be an Event of Default (defined herein).  Nothing in this Section 2 will constitute a commitment to make additional or future advances which are not specified by the other terms of the MCA or enter into future derivatives transactions in any

DOC. 615507    BK OR    VOL 158    PG 581

amount  The unpaid balance of any revolving line of creditor Hedging Obligations secured by this Deed of Trust may at certain times be zero  This Deed of Trust will remain in full force and effect notwithstanding any zero balance

3.    **Note Maturity Date.**  The latest date on which any Note matures is June 1, 2028

4.    **Assignment.**  Grantor irrevocably and unconditionally assigns to Beneficiary and grants Beneficiary a security interest in, the Leases, all rents and other benefits derived from the Leases, and all other issues, profits, royalties, bonuses, income and other benefits derived from or produced by the Real Estate, including but not limited to, any monies, proceeds, damages, Judgments or payments in lieu thereof, received by or due to Grantor occasioned by any mineral or geothermal exploration, wind energy, solar energy or drilling activity on or under the Real Estate, all prepaid rents, security deposits and other supporting obligations (the "Rents", and this assignment, the "Assignment of Rents")  Beneficiary may collect Rents with or without taking possession of the Property  Beneficiary confers upon Grantor a license to collect and retain the Rents as they become due and payable, so long as there is no Event of Default (the "License").  If an Event of Default has occurred, Beneficiary may terminate the License without notice to or demand upon Grantor  Beneficiary, by its acceptance of this Deed of Trust does not assume any duty or obligation under the Leases  The acceptance by Beneficiary of the assignment of Leases and Rents and profits with all the rights, powers, privileges and authority so granted will not obligate Beneficiary to assume any obligations in respect of the Leases and Rents and profits or under the Leases, or take any action thereunder or to expend any money or incur any expense or perform or discharge any obligation, duty or liability in respect of the Leases and Rents and profits or under the Leases or to assume any obligation or responsibility for the nonperformance of the provisions thereof by Grantor  The definition of Leases shall include all "Leases" as defined or described in Chapter 64 of the Assignment of Rents Act, and the definition of Rents shall include all "Rents" as defined in the Assignment of Rents Act  Furthermore, it is the intent of the parties to comply with the requirements of the Assignment of Rents Act in connection with the assignment of Leases and Rents  Accordingly, the enforcement of rights related to the assignment of Leases and Rents shall be subject to compliance with the provisions of the Assignment of Rents Act, including, without limitation, the notice requirements of Sections 64.054, 64 055(a) and 64 056 of the Texas Property Code

5.    **Grant of Security Interest.**  This Deed of Trust is a security agreement under the Uniform Commercial Code in effect in the State of Texas (the "UCC"), and Grantor grants Trustee and Beneficiary a security interest in and pledges and assigns to Trustee and Beneficiary all of Grantor's right, title and interest in the Property, to the extent characterized as personal property (the "Personalty")  The address of Grantor adjacent to its signature below is the mailing address of Grantor as debtor under the UCC. The address for Trustee specified in the first paragraph of this Deed of Trust is the address for Trustee as secured party under the UCC, and the address for Beneficiary specified in Section 24 is the address for Beneficiary as secured party under the UCC  As used in this Deed of Trust, the term "lien" is synonymous with the term "lien and security interest "

6.    **Warranty of Title.**  Grantor represents and warrants that Grantor lawfully possesses and holds good and marketable fee simple title to all of the Land and the Improvements, that Grantor has the right, power and authority to grant, convey and assign the Property; and that the Property is unencumbered  Grantor covenants that Grantor will warrant and forever defend generally the title to, and ownership and possession of, the Property against all claims and demands, with all costs and expenses of defense to be borne by Grantor.  Grantor especially agrees and declares that the separate estate of each of them, whether vested, contingent or in expectancy, is hereby conveyed and shall be bound for the payment and performance of the Secured Obligations.

7.    **Additional Representations.**  Grantor represents to Beneficiary and Secured Parties that·  (a) the Property does not represent the proceeds of unlawful activity under any state, federal or foreign law, (b) the Property includes all property and rights which may be reasonably necessary or desirable to enable Grantor to use, enjoy and operate the Land and the Improvements for the present uses thereof; (c) none of the Land or Improvements is subject to any Lien, offset or claim; (d) Grantor owns the Personalty free and clear of any security interests, reservations of title or conditional sales contracts, and there is no presently valid financing statement affecting the Personalty on file in any public office; (e) Grantor has title to, or (in the case of leased property) valid leasehold interests in, all of their properties and assets, real and personal, including the properties and assets and leasehold interests reflected in the Financial Information (other than any properties or assets disposed of in the ordinary course of business), (f) the legal name of Grantor is as appears in the first paragraph of this agreement, (g) Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this agreement; (h) if Grantor is anything other than a natural Person, it has complied with all Applicable Laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in

Doc
61507    Bk
OR    Vol
158    Pg
582

which it conducts its business; (i) the execution, delivery and performance by Grantor of this Deed of Trust is within the powers and authority of Grantor and has been duly authorized; (j) to Grantor's knowledge, this Deed of Trust does not conflict with any Applicable Law; (k) this Deed of Trust is a legal, valid and binding agreement of Grantor, enforceable against Grantor in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable; (l) there has been no Material Adverse Effect as to Grantor since the effective date the Financial Information was provided to Beneficiary or Secured Parties; (m) there is no lawsuit, tax claim or other dispute pending or to Grantor's knowledge threatened against Grantor or the Property that, if determined adverse to Grantor, is reasonably likely to have a Material Adverse Effect; (n) Grantor is not the subject of any Judgment; (o) this Deed of Trust does not conflict with, nor is Grantor in default on any credit agreement, indenture, purchase agreement, guaranty, capital lease, or other investment, agreement, or arrangement presently in effect providing for or relating to extensions of credit in respect of which Grantor is in any manner directly or contingently obligated; (p) Grantor has filed all tax returns (federal, state, and local) required to be filed and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties; (q) before signing this Deed of Trust, Grantor researched, to the satisfaction of Grantor, and inquired into the previous uses and ownership of the Real Estate, and based on that due diligence, to the best of Grantor's knowledge, no Hazardous Substance has been disposed of or released or otherwise exists in, on, under or onto the Real Estate, except as Grantor has disclosed to Beneficiary or Secured Parties in the Environmental Information; (r) Grantor has complied with all current and future laws, regulations and ordinances or other requirements of any Governmental Authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or Hazardous Substances ("Environmental Laws"); (s) Grantor has not received any notices of violations of any Applicable Laws (including Environmental Laws); and Grantor is in compliance with all Applicable Laws; (t) there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Property with respect to any violations of Applicable Laws; (u) Grantor's place of business, or its chief executive office, if it has more than one place of business, is located at the address specified below; and (v) unless otherwise disclosed to Beneficiary, Grantor is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986; and there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

8.    **Information Accurate and Complete.** All financial statements and other reports, documents, instruments, information and forms of evidence which have been delivered to Beneficiary or Secured Parties concerning Grantor, or the Property (the financial and other information supplied or to be supplied to Beneficiary or Secured Parties in connection with this Deed of Trust is herein referred to as the "Financial Information"), are accurate, correct and sufficiently complete in all material respects to provide Beneficiary and Secured Parties true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities. Grantor's submission of any Financial Information or other report, record or information pertaining to the condition or operations, financial or otherwise, of Grantor, from time to time, whether or not required under this Deed of Trust, will be deemed accompanied by a representation by Grantor that the Financial Information or other report, record or information is complete and accurate in all material respects as to the condition or operations of Grantor (and, if applicable, Grantor's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities and Grantor's business or organizational structure.

9.    **Performance of Secured Obligations.** Grantor shall promptly pay and perform each Secured Obligation in accordance with its terms.

10.    **Maintenance and Preservation of Property.** Grantor shall: (a) immediately discharge any Lien on the Property which Beneficiary has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a Lien which now or hereafter encumbers or appears to encumber all or part of the Property, whether the Lien is or would be senior or subordinate to this Deed of Trust; (b) not alter, remove or demolish any portion of the Improvements, except as permitted or required by the MCA; (c) maintain (or cause to be maintained) all policies of insurance required under the MCA and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; (d) promptly and completely repair and/or restore any portion of the Property which becomes damaged or destroyed, in a good and workmanlike manner in accordance with sound building practices, whether or not Grantor has received the proceeds of any Insurance Claim; (e) not commit or allow any waste of the Property, nor do or suffer to be done any act whereby the value of any part of the Property may be lessened; (f) not initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except as permitted or required by the MCA; (g) if the Land is agricultural, keep the Property in good condition and repair; operate the Property, whether improved pastures, orchards, grazing, timber, or crop lands, in a good and husbandman like manner in accordance with accepted principles of sound agricultural and forestry practices; take all reasonable precautions

to control wind and water erosion; fertilize improved pastures, if any, where necessary to maintain a good stand of desirable grasses; protect orchards and timber, if any, by reasonable precautions against loss or damage by fire including the maintenance of appropriate fire breaks; and neither to remove nor permit the removal of any timber, buildings, oil, gas, mineral, stone, rock, clay, fertilizer, gravel or top soil without the prior written consent of Beneficiary; (h) complete appropriation and all other requirements, if any, necessary to obtain the issuance of any license or water permit issued to Grantor, and take all other steps required or advisable for purposes of perfecting and maintaining in good status all other Water Rights; (i) not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Grantor on the Property or any part of it under this Deed of Trust; and (j) perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value and utility.

    (a)    *TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE: (A) GRANTOR IS REQUIRED TO (i) KEEP THE MORTGAGED PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN; (ii) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER OR OTHERWISE AS PROVIDED HEREIN; AND (iii) NAME THE BENEFICIARY AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS PROVIDED HEREIN; (B) SUBJECT TO THE PROVISIONS HEREOF, GRANTOR MUST, IF REQUIRED BY BENEFICIARY, DELIVER TO BENEFICIARY A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) SUBJECT TO THE PROVISIONS HEREOF, IF GRANTOR FAILS TO MEET ANY REQUIREMENT LISTED IN THE FOREGOING SUBPARTS (A) OR (B), BENEFICIARY MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF GRANTOR AT GRANTOR'S EXPENSE.*

    **11.**    **Compliance with Applicable Law**. Grantor shall not commit or allow any act upon or use of the Property which would violate any Applicable Law, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property;

    **12.**    **Taxes and Assessments**. Grantor shall pay (a) prior to delinquency, all taxes, levies, charges and assessments, including all ditch, canal, reservoir or other water charges, and assessments on appurtenant Water Stock, imposed by Applicable Law or any public or quasi-public authority or utility company which are (or if not paid, may become) a Lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it (individually and collectively "Impositions"); (b) any and all intangible taxes and documentary stamp taxes determined at any time to be due on or as a result of the Secured Obligations, this Deed of Trust or any other Transaction Documents, together with any and all interest and penalties thereon; and (c) taxes, levies, charges and assessments on Beneficiary's or Secured Parties' interest therein or upon this Deed of Trust or the Secured Obligations (collectively, "Mortgage Taxes"); except that if the amount of Mortgage Taxes exceeds the Maximum Rate, Grantor will not be required to pay any such excess. If after the date of this Deed of Trust, the State of Texas passes any law deducting from the value of Land for the purpose of taxation any Lien thereon, or changing in any way the laws for the taxation of Mortgages or debts secured by Mortgage for state or local purposes, or the manner of the collection of any such taxes, so as to affect this Deed of Trust, then within 180 days after notice by Beneficiary to Grantor, Grantor shall pay all Secured Obligations. Notwithstanding the foregoing provisions of this section, Grantor may, at its expense, contest the validity or application of any Imposition by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, provided that Beneficiary is satisfied that neither the Property nor any part thereof or interest therein will be at risk of being sold, forfeited, or lost as a result of such contest, and Grantor has posted a bond equal to 115% of the contested amount or furnished such other security required from time to time by Beneficiary for purposes of payment of the contested amount.

    **13.**    **Damages and Insurance and Condemnation Proceeds**. Beneficiary may, at its option, (a) in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on warranty, or for damage, injury or loss to all or part of the Property, and it may make any compromise or settlement of the action or proceeding; (b) participate in any action or proceeding relating to any Condemnation Award; and (c) join Grantor in adjusting any Insurance Claim. All insurance proceeds, Condemnation Awards, and proceeds of any other claim based on warranty, or for damage, injury or loss to the Property which Grantor may receive or be entitled to must be paid to Beneficiary. In each instance, Beneficiary may apply those proceeds first toward reimbursement of all of Beneficiary's costs and expenses of recovering the proceeds or Condemnation Award, including Legal Fees. The balance shall, at Beneficiary's option, be applied to pay or Prepay some or all of the Secured Obligations in such order and proportions as it may choose. GRANTOR HEREBY SPECIFICALLY, UNCONDITIONALLY AND

Doc #   Bk   Vol   Pg
61307   OR   152   534

IRREVOCABLY WAIVES ALL RIGHTS OF A PROPERTY OWNER WHICH PROVIDE FOR ALLOCATION OF CONDEMNATION PROCEEDS BETWEEN A PROPERTY OWNER AND A LIENHOLDER, AND ANY OTHER LAW OR SUCCESSOR STATUTE OF SIMILAR IMPORT

**14.** **Site Visits, Observation and Testing.** Beneficiary and its agents and representatives may enter and visit the Property at any reasonable time for the purposes of observing it, performing Appraisals, taking and removing soil or groundwater samples, and conducting tests on any part of it, as provided in the MCA, and otherwise to determine Grantor's compliance with this Deed of Trust.

**15.** **Defense and Notice of Claims and Actions.** At Grantor's sole expense, Grantor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Deed of Trust and the rights and powers of Beneficiary and Trustee created under it, against all adverse claims. Grantor must give Beneficiary and Trustee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim

**16.** **Prohibited Transfers.** Grantor agrees that a material factor in Secured Parties' decision to enter into the Secured Obligation Documents is the expertise, financial status and other characteristics of Grantor or Borrower. Grantor or Borrower shall not make or permit any Prohibited Transfer  Upon any Prohibited Transfer Beneficiary may declare all Secured Obligations to be due and payable immediately  "Prohibited Transfer" means  (a) any sale, contract to sell, conveyance, encumbrance, pledge, mortgage, lease of the Property to or for the benefit of a Person not the original Grantor under this instrument, and not expressly permitted under this instrument or the other Secured Obligation Documents, or other transfer of all or any material part of the Property or any interest in it, including any transfer of Mineral Rights, Water Rights, or Water Stock, whether voluntary, involuntary, by operation of law or otherwise, (b) if Grantor or Borrower is a corporation, any transfer or transfers of shares of the voting power or the direct or indirect beneficial ownership of Grantor, (c) if Grantor or Borrower is a partnership, withdrawal or removal of any general partner, dissolution of the partnership under Applicable Law, or any transfer or transfers of the partnership interests; (d) if Grantor or Borrower is a limited liability company, withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of the voting power or the ownership of the economic interest in the Grantor or Borrower, or (e) if Grantor or Borrower is a trust, withdrawal or removal of any trustee or revocation of the trust

**17.** **Compensation and Reimbursement of Costs and Expenses.** Grantor shall pay (a) fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Beneficiary or Trustee when the law provides no maximum limit, for any services that Beneficiary or Trustee may render in connection with this Deed of Trust, including Beneficiary's providing a statement or Trustee's rendering of services in connection with a reconveyance; (b) all of Beneficiary's or Trustee's costs and expenses which may be incurred in rendering any such services, and (c) all costs, expenses and other advances which may be incurred or made by Beneficiary or Trustee in any efforts to enforce any terms of this Deed of Trust or protect the Property, including any rights or remedies afforded to Beneficiary or Trustee under Section 20, including but not limited to Appraisals, inspections, insurance premiums, and prevention of waste, whether any lawsuit is filed or not, including any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the Adjustment of debtor-creditor relationships, or in defending any action or proceeding arising under or relating to this Deed of Trust, including attorneys' fees and other legal costs, costs of any Foreclosure Sale (defined herein) and any cost of evidence of title  If Beneficiary chooses to dispose of Property through more than one Foreclosure Sale, Grantor must pay all costs, expenses or other advances that may be incurred or made by Beneficiary or Trustee in each of those Foreclosure Sales  GRANTOR SHALL INDEMNIFY TRUSTEE, BENEFICIARY AND SECURED PARTIES AGAINST AND SHALL HOLD THEM HARMLESS FROM ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COST OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER COSTS AND EXPENSES WHICH EITHER MAY SUFFER OR INCUR  (A) IN PERFORMING ANY ACT REQUIRED OR PERMITTED BY THIS DEED OF TRUST OR ANY OF THE OTHER SECURED OBLIGATION DOCUMENTS OR BY LAW; (B) BECAUSE OF ANY FAILURE OF GRANTOR TO PAY OR PERFORM ANY OF THE SECURED OBLIGATIONS, OR (C) BECAUSE OF ANY ALLEGED OBLIGATION OF OR UNDERTAKING BY BENEFICIARY OR SECURED PARTIES TO PERFORM OR DISCHARGE ANY OF THE REPRESENTATIONS, WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN ANY DOCUMENT RELATING TO THE PROPERTY (OTHER THAN SUCH WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN THE SECURED OBLIGATION DOCUMENTS)  THIS AGREEMENT BY GRANTOR TO INDEMNIFY TRUSTEE, BENEFICIARY AND SECURED PARTIES SURVIVES THE RELEASE AND CANCELLATION OF ANY OR ALL OF

Doc
61507
BK
OR
Vol
158
Pg
585

THE SECURED OBLIGATIONS AND THE FULL OR PARTIAL RELEASE AND/OR RECONVEYANCE OF THIS DEED OF TRUST.

    **18.**   **Payments Due under this Deed of Trust.** Grantor must pay all obligations to pay money arising under this Deed of Trust immediately upon demand by Trustee, Beneficiary or Secured Parties. Each such obligation shall bear interest from the date the obligation arises at the Default Rate.

    **19.**   **Events of Default.** The following each shall be an event of default under this Deed of Trust (an "Event of Default"): (a) an Event of Default under the MCA, including a default termination event or other similar event under any Hedging Agreement which is not cured within any grace or cure period specified therein, if any; (b) a Prohibited Transfer; (c) the Financial Information or any representation in this Deed of Trust is materially incorrect or materially misleading; (d) the filing of any notice limiting the maximum amount secured by this Deed of Trust to a sum less than the Maximum Amount Secured as specified herein, or if no such amount is specified, to any amount; (e) for more than ten days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this Section 19, which can be cured by the payment of a sum of money; or (f) for 30 days after notice from Beneficiary or Secured Parties, Grantor is in default under any term, covenant or condition of this Deed of Trust not previously described in this Section 19; provided that if (i) it is reasonably certain that the default cannot be cured by Grantor within that 30 day period and (ii) Grantor has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period shall be extended for so long as reasonably required by Grantor in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Grantor of the Event of Default.

    **20.**   **Remedies.** At any time after an Event of Default, Secured Parties, Beneficiary or Trustee may (a) declare any or all of the Secured Obligations to be due and payable immediately; (b) cure any breach or default of Grantor; (c) may, to the extent permitted by Applicable Law, make an ex parte application to any court of competent jurisdiction, and obtain appointment of, a receiver, trustee, liquidator or conservator of the Property, without notice, without giving bond, and without regard for the adequacy of the security for the Secured Obligations and without regard for the solvency of Borrower, any Guarantor, or of any Person liable for the payment of the Secured Obligations; (d) in person, by agent or by court-appointed receiver, enter, take possession of, manage and operate all or any part of the Property; (e) exercise any or all of the remedies granted to a secured party under the UCC; (f) bring an action in any court of competent jurisdiction to foreclose this Deed of Trust or to obtain specific enforcement of any of the Covenants or agreements of this Deed of Trust; (g) under the power of sale granted under this Deed of Trust (the "Power of Sale"), at its option cause some or all of the Property, including the Personalty, to be sold or otherwise disposed of in any combination and in any manner permitted by Applicable Law; and (h) do any and all other things in connection with those actions that Beneficiary may consider necessary and appropriate to protect the security of this Deed of Trust. GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS BENEFICIARY AS GRANTOR'S ATTORNEY-IN-FACT TO PERFORM SUCH ACTS AND EXECUTE SUCH DOCUMENTS AS BENEFICIARY CONSIDERS APPROPRIATE IN CONNECTION WITH TAKING THESE MEASURES, INCLUDING ENDORSEMENT OF GRANTOR'S NAME ON ANY INSTRUMENTS. GRANTOR HEREBY WAIVES NOTICE OF THE APPLICATION FOR, AND CONSENTS TO THE APPOINTMENT OF A RECEIVER, TRUSTEE, LIQUIDATOR OR CONSERVATOR OF THE PROPERTY IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION (WHICH APPOINTMENT OF SUCH POWER OF ATTORNEY IS A POWER COUPLED WITH AN INTEREST); AND AGREES TO NOT OPPOSE SUCH APPOINTMENT. Notwithstanding the foregoing, in no event will Trustee, Beneficiary or Secured Parties have any obligation to take any of the actions set forth in this Section 20. Beneficiary shall not be considered to have accepted any property other than cash or immediately available funds in satisfaction of any obligation of Grantor to Beneficiary, unless Beneficiary has given express written notice of its election of that remedy. The proceeds of any receivership shall be applied by the receiver toward the payment of the Secured Obligations or toward the payment of such part of any Judgment thereupon which remains unsatisfied after the sale of the Property. The receiver may make repairs and keep the Property in good condition and repair pending a sale, and pay all taxes and assessments accrued or accruing or redeem from sales therefore, pay all premiums of insurance required under this Deed of Trust, and pay all other charges as herein provided.

    **21.**   **Sales of Property.** Beneficiary may elect to treat as Personalty any Property which is intangible or which can be severed from the Land or Improvements without causing structural damage. Beneficiary may dispose of any Personalty separately from the sale of real property, in any manner permitted by the UCC or any other Applicable Law. Any proceeds of any such disposition shall not cure any Event of Default or reinstate any Secured Obligation. Beneficiary may choose to dispose of some or all of the Property which consists solely of real property in any manner then permitted by Applicable Law. To the extent

Doc   BK   Vol   Pg
61507   OR   158   586

permitted by Applicable Law, Beneficiary may also or alternatively choose to dispose of some or all of the Property, in any combination consisting of both real and personal property, together in one sale to be held in accordance with the law and procedures applicable to real property, as permitted by the UCC. Grantor agrees that such a sale of Personalty together with real property constitutes a commercially reasonable sale of the personal property. For purposes of the Power of Sale, either a sale of real property alone under the Power of Sale, or, to the extent permitted by Applicable Law, a sale of both real and personal property under the Power of Sale, together in accordance with the UCC, will sometimes be referred to as a "Non-Judicial Foreclosure Sale." Before any Non-Judicial Foreclosure Sale, Beneficiary or Trustee must give such notice of default and election to sell as may then be required by law. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Beneficiary or Trustee, as required by Applicable Law, must sell the Property being sold at a public auction to be held at the time and place specified in the notice of sale. Neither Beneficiary nor Trustee have any obligation to make demand on Grantor before any Non-Judicial Foreclosure Sale. From time to time in accordance with then Applicable Law, Trustee may (and in any event at Beneficiary's request Trustee must), postpone any Non-Judicial Foreclosure Sale by public announcement at the time and place noticed for that sale. Trustee or Beneficiary, as required by Applicable Law, shall execute and deliver to any purchaser(s) a deed(s) or bill(s) of sale conveying the Property being sold without any covenant or warranty whatsoever, express or implied. The recitals in any such deed(s) or bill(s) of sale of any matters or facts, including any facts bearing upon the regularity or validity of any Non-Judicial Foreclosure Sale, will be conclusive proof of their truthfulness. Any such deed(s) or bill(s) of sale shall be conclusive against all Persons as to the facts recited in it. If the Land is located in more than one county, then to the extent permitted by Applicable Law, a judicial or non-judicial foreclosure sale of the Property may be maintained in any one or more of those counties. If the Property consists of more than one lot, parcel or item of property, Beneficiary may: (i) designate the order in which the lots, parcels and/or items shall be sold or disposed of or offered for sale or disposition; and (ii) elect to dispose of the lots, parcels and/or items through a single consolidated sale or disposition to be held or made under the Power of Sale, or in connection with judicial proceedings, or by virtue of a Judgment and decree of foreclosure and sale; or through two or more such sales or dispositions; or in any other manner (including a Non-Judicial Foreclosure Sale) Beneficiary may deem to be in its best interests (any such sale or disposition, a "Foreclosure Sale;" any two or more, "Foreclosure Sales"). If it chooses to have more than one Foreclosure Sale, Beneficiary at its option may cause the Foreclosure Sales to be held simultaneously or successively, on the same day, or on such different days and at such different times and in such order as it may deem to be in its best interests. No Foreclosure Sale will terminate or affect the Lien of this Deed of Trust on any part of the Property which has not been sold, until all of the Secured Obligations have been paid in full. At any Foreclosure Sale, any person, including Grantor, Beneficiary, Secured Parties or to the extent permitted by Applicable Law, Trustee, may bid for and acquire the Property or any part of it to the extent permitted by then Applicable Law. Instead of paying cash for that property, Beneficiary or Secured Parties may settle for the purchase price by crediting the sales price of the Property against the Secured Obligations, unless Applicable Law mandates a specific order of application, in which event payments and collections will be applied as mandated by Applicable Law. Any such credit, and all other proceeds of any Foreclosure Sale shall be applied to the Secured Obligations in any order Beneficiary may choose.

22. **Additional Rights**. In addition to the rights and powers given to Beneficiary under this Deed of Trust, Beneficiary shall have all such other rights both in law and equity for collection of the indebtedness secured hereby as it would have but for this Deed of Trust.

23. **Guarantor and/or Non-Obligor Provisions**. (a) Guarantor and/or Non-Obligor authorize Trustee, Beneficiary and Secured Parties to perform any of the following acts at any time, all without notice to Guarantor and/or Non-Obligor and without affecting the rights of Trustee, Beneficiary or Secured Parties or the obligations of Guarantor and/or Non-Obligor under this Deed of Trust: (i) alter any terms of the MCA or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the MCA or any part of it; (ii) take and hold security for the MCA, accept additional or substituted security for the MCA, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security; (iii) apply any security now or later held for the MCA in any order that Trustee, Beneficiary and Secured Parties may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale; (iv) release Obligor/Borrower of its liability for the MCA or any part of it; (v) substitute, add or release any one or more guarantors or endorsers of the MCA; and (vi) extend other credit to Obligor/Borrower, and may take and hold security for the credit so extended, whether or not such security also secures the MCA.

Doc 61507   BK OR   Vol 158   Pg 587

(b)      Guarantor and/or Non-Obligor waive:  (i) any right to require Trustee, Beneficiary or Secured Parties to proceed against Obligor/Borrower, proceed against or exhaust any security held from Obligor/Borrower, or pursue any other remedy in Trustee's, Beneficiary's and Secured Parties power to pursue; (ii) any defense based on any legal disability of Obligor/Borrower, any discharge or limitation of the liability of Obligor/Borrower to Trustee, Beneficiary or Secured Parties, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that the obligations of Guarantor and/or Non-Obligor exceed or are more burdensome than those of Obligor/Borrower; (iii) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Deed of Trust and of the existence, creation, or incurring of new or additional indebtedness of Obligor/Borrower, and demands and notices of every kind; (iv) any defense based on or arising out of any defense that Obligor/Borrower may have to the payment or performance of the MCA or any part of it; and (v) until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that Trustee, Beneficiary or Secured Parties may have against Obligor/Borrower, and all rights to participate in any security now or later to be held by Trustee, Beneficiary or Secured Parties for the MCA.

(c)      Guarantor and/or Non-Obligor waive all rights and defenses that Guarantor and/or Non-Obligor may have because the MCA may be secured by real property other than the Property hereby encumbered.  This means, among other things: (i)  Trustee, Beneficiary and Secured Parties may collect from Guarantor and/or Non-Obligor (including enforcing this Deed of Trust against Guarantor and/or Non-Obligor) without first foreclosing on any real or personal property collateral securing the MCA; and (ii)  if Beneficiary forecloses on any real property collateral securing the MCA: (A) the amount of the MCA may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Trustee, Beneficiary and Secured Parties may collect from Guarantor and/or Non-Obligor (including enforcing this Deed of Trust against Guarantor and/or Non-Obligor) even if Trustee, Beneficiary or Secured Parties, by foreclosing on the real property collateral, has destroyed any right Guarantor and/or Non-Obligor may have to collect from Borrower.  This is an unconditional and irrevocable waiver of any rights and defenses Guarantor and/or Non-Obligor may have because the MCA may be secured by real property other than the Property.

(d)      Guarantor and/or Non-Obligor waive any right or defense it may have at law or equity, to a fair market value hearing or action to determine a deficiency Judgment after a foreclosure of any real property other than the Property hereby encumbered.

(e)      Guarantor and/or Non-Obligor are solely responsible for keeping informed of the financial condition and business operations of Borrower and all other circumstances affecting the ability of Borrower to pay and perform Borrower's obligations to Trustee, Beneficiary and Secured Parties, and agrees that Trustee, Beneficiary and Secured Parties will have no duty to disclose to Guarantor and/or Non-Obligor any information which Trustee, Beneficiary or Secured Parties may receive about the financial condition, business operations, or any other circumstances bearing on the ability of Borrower to perform.

(f)      No provision or waiver in this Deed of Trust shall be construed as limiting the generality of any other provision or waiver contained in this Deed of Trust or the Guaranty.

24.      **Notices.**  All notices, approvals, consents, and other communications, under this Deed of Trust ("Notices") must be given in accordance with and will be subject to the terms and provisions of the MCA.  Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Trustee, to the address in the first paragraph of this Deed of Trust; if to Beneficiary or Lender, to 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, Attention:  Loan Closing Department; if to Secured Parties other than Lender, c/o Rabobank, 245 Park Avenue, New York, NY 10167, Attention: Customer Service Representative; and in the case of any other Person, to the address designated by that Person in a notice to Grantor, Beneficiary, and Lender.

25.      **Request for Notice.**  Grantor requests that a copy of any notice of default and any notice of sale be mailed to it at the address specified adjacent to its signature below.

26.      **Trustee and Beneficiary.**  Without affecting the personal liability of any Person, including Grantor and Obligor/Borrower, for the payment of the Secured Obligations or the Lien of this Deed of Trust on the remainder of the Property for the unpaid amount of the Secured Obligations: (a) Beneficiary and Secured Parties may from time to time and without notice:

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

Doc 615907     Bk UR     Vol 158     Ps 588

(i) release any Person liable for payment of any Secured Obligation; (ii) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation, (iii) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, Mortgages, Security Agreements or any other instruments of security, or (iv) alter, substitute or release any property securing the Secured Obligations, and (b) Trustee may perform any of the following acts when requested to do so by Beneficiary or a Secured Party in writing· (i) consent to the making of any plat or map of the Property or any part of it, (ii) join in granting any easement or creating any restriction affecting the Property, (iii) join in any subordination or other agreement affecting this Deed of Trust or the Lien of it, or (iv) reconvey the Property or any part of it without any warranty

     **27.**    **Exculpation of Trustee and Beneficiary.** None of Trustee, Beneficiary or Secured Parties will be directly or indirectly liable to Grantor or any other Person as a consequence of any of the following  (a) the exercise of or failure to exercise any rights, remedies or powers granted to it in this Deed of Trust, (b) any failure or refusal to perform or discharge any obligation or liability of Grantor under any agreement related to the Property or under this Deed of Trust, or (c) any loss sustained by Grantor or any third party resulting from any failure to lease the Property or from any other act or omission in managing the Property after an Event of Default, unless the loss is caused by the willful misconduct and bad faith of Trustee, Beneficiary or Secured Parties, respectively.  GRANTOR HEREBY EXPRESSLY WAIVES AND RELEASES ALL LIABILITY OF THE TYPES DESCRIBED ABOVE, AND AGREES THAT NO SUCH LIABILITY BE ASSERTED AGAINST OR IMPOSED UPON TRUSTEE, BENEFICIARY OR ANY SECURED PARTY

     **28.**    **Substitution of Trustee.** Beneficiary may substitute a successor to any Trustee named in or acting under this Deed of Trust in any manner now or later to be provided at Applicable Law

     **29.**    **Waiver of Dower, Homestead, and Distributive Share.** Grantor relinquishes all right of dower and waives all right of homestead and distributive share in and to the Property  Grantor waives any right of exemption as to the Property

     **30.**    **Waiver of Certain Other Laws.** To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor, and its representatives, successors and assigns, and for any and all Persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, or notice of election to mature or declare due the whole of the Secured Obligations in the event of foreclosure of the Lien created by this Deed of Trust

     **31.**    **Reconveyance.** When all Secured Obligations have been paid in full, Lender has no obligation to make additional Loans and the Hedging Agreements have been terminated, Trustee shall execute and deliver an instrument reconveying the Property, or so much of it as is then held under this Deed of Trust, without warranty to the Person or Persons legally entitled to it.  In the reconveyance, the grantee may be described as "the Person or Persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness  Trustee, Beneficiary and Secured Parties will have no duty to determine the rights of Persons claiming to be rightful grantees of any reconveyance of the Property.

     **32.**    **Additional Provisions.** The Secured Obligation Documents state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this Deed of Trust.  The Secured Obligation Documents also grant further rights to Beneficiary and Secured Parties and contain further agreements and affirmative and negative covenants by Grantor which apply to this Deed of Trust and to the Property

     **33.**    **Collateral Agency Agreement.** This Deed of Trust is subject to the terms of the collateral agency agreement between the Secured Parties (the "Collateral Agency Agreement")

     **34.**    **Entire Agreement.** This Deed of Trust and the other Secured Obligation Documents collectively  (i) represent the sum of the understandings and agreements between Beneficiary, Secured Parties and Grantor concerning this credit; (ii) replace any prior oral or written agreements between Beneficiary, Secured Parties and Grantor concerning this credit, and (iii) are intended by Beneficiary, Secured Parties and Grantor as the final, complete and exclusive statement of the terms agreed to by them  In the event of any conflict between this Deed of Trust and any other agreements required by this Deed of Trust, this Deed of Trust will prevail

     **35.**    **Other Acts.** Grantor shall cooperate with Beneficiary for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this Deed of Trust or to carry out the intent of this agreement

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement



Promptly (but in no event more than ten days) after request by Beneficiary, Grantor will execute, acknowledge and deliver any document which Beneficiary deems necessary or advisable for these purposes, and will, on demand, pay any expenses incurred by Beneficiary in the preparation, execution and filing of any such documents

**36.** **No Waiver or Cure** Each waiver by Trustee, Beneficiary or Secured Parties must be in writing, and no waiver is to be construed as a continuing waiver No waiver is to be implied from any delay or failure by Trustee, Beneficiary or Secured Parties to take action on account of any default of Grantor Consent by Trustee, Beneficiary or Secured Parties to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Trustee's, Beneficiary's or Secured Parties' consent to be obtained in any future or other instance The exercise by Trustee, Beneficiary or Secured Parties of any right or remedy under this Deed of Trust or the other Secured Obligation Documents or under Applicable Law, shall not. cure or waive a breach, Event of Default or notice of default under this Deed of Trust or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents, including any Hedging Agreements, have been cured), or impair the security of this Deed of Trust, or prejudice Trustee, Beneficiary, Secured Parties or any receiver appointed in accordance with this Deed of Trust, in the exercise of any right or remedy afforded any of them under this Deed of Trust, or be construed as an affirmation by Beneficiary or Secured Parties of any tenancy, lease or option, or a subordination of the Lien of this Deed of Trust

**37.** **Waivers** Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require upon foreclosure sales of assets in a particular order Grantor waives presentment, demand, protest, notice of protest and notice of dishonor and waives all exemptions as to the Secured Obligations Each successor and assign of Grantor, including any holder of a Lien subordinate to this Deed of Trust, by acceptance of its interest or Lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself

**38.** **Joint and Several Obligations.** If Grantor consists of more than one Person, each Grantor (a) acknowledges and undertakes, together with the other Grantors, joint and several liability for the indebtedness, liabilities and obligations of Grantor under this Deed of Trust; (b) acknowledges that this Deed of Trust is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor, and (c) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable. GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT BENEFICIARY OR SECURED PARTIES EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS DEED OF TRUST, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS

**39.** **Binding Effect; Successors and Assigns.** The Secured Obligation Documents shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns, provided that Grantor shall not assign its rights or obligations hereunder without Secured Parties' consent However, this Paragraph does not waive the provisions of Section 16; and Grantor shall not assign its rights or obligations hereunder without Beneficiary's and Secured Parties' consent Beneficiary and Secured Parties may transfer all or any portion of its rights under the Secured Obligation Documents to any other Person Beneficiary and Secured Parties may disclose to any actual or proposed transferee any information that Grantor has delivered to Beneficiary and Secured Parties in connection with the negotiation of this Deed of Trust or pursuant to the Secured Obligation Documents, and Grantor shall cooperate fully with Beneficiary and Secured Parties in providing that information to any actual or proposed transferee

**40.** **Governing Law.** This Deed of Trust shall be governed exclusively by the Applicable Laws of the State of Texas (the "Governing Law State") without regard or reference to its conflict of laws principles. Grantor understands that the laws of the Governing Law State may differ from the laws of the state where Grantor resides or otherwise is located or where the Property is located. However, Grantor understands, agrees and acknowledges that (a) this Deed of Trust and the Secured Obligation Documents have significant and substantial contacts with the Governing Law State, (b) it is convenient to Grantor and Lender to select the law of the Governing Law State to govern this Deed of Trust and the transactions evidenced hereby, (c) the transactions evidenced by the MCA and this Deed of Trust bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

Doc 61507    Bk OR    Vol 158    Pg 590

Governing Law State constitutes good and valuable consideration for Secured Parties to enter into the Secured Obligation Documents and Secured Parties have entered into the Secured Obligation Documents in reliance on this choice.

**41.    JURISDICTION AND VENUE.** GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF BENEFICIARY, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA. GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

**42.    Miscellaneous.** This Deed of Trust may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument. If Grantor is comprised of multiple Persons, any Person comprising Grantor is hereby authorized to bind all parties comprising Grantor. Beneficiary or Secured Parties may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person. Time is of the essence of this Deed of Trust. Each Party has participated in negotiating and drafting this Deed of Trust, so if an ambiguity or a question of intent or interpretation arises, this Deed of Trust is to be construed as if the parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this Deed of Trust. Beneficiary is authorized to execute any other documents or take any other actions necessary to effectuate this Deed of Trust and the consummation of the transactions contemplated herein. This Deed of Trust may not be amended, changed, modified, altered or terminated without the prior written consent of Beneficiary and Secured Parties. Any provision of any Secured Obligation Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Secured Obligation Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Beneficiary or Secured Parties may, at its option, declare all Secured Obligations immediately due and payable. No merger shall occur as a result of Beneficiary's or Secured Parties' acquiring any other estate in or any other Lien on the Property. All rights and remedies under this Deed of Trust and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

**43.    INDEMNIFICATION.** GRANTOR SHALL DEFEND, INDEMNIFY AND HOLD TRUSTEE, BENEFICIARY AND SECURED PARTIES AND THEIR OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS (THE "INDEMNIFIED PERSONS") HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS (A) ARISING OUT OF OR RESULTING FROM THE VIOLATION OF ANY ENVIRONMENTAL LAW; OR (B) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF TRUSTEE, BENEFICIARY OR SECURED PARTIES BEING PARTY TO THIS DEED OF TRUST OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS DEED OF TRUST; THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PERSON, except that Grantor shall have no obligation to an Indemnified Person under this section with respect to Losses resulting from the gross negligence or willful misconduct of that Indemnified Person as determined by a court of competent jurisdiction. If and to the extent that an Indemnity is unenforceable for any reason, Grantor shall be obligated to make the maximum contribution to the payment and satisfaction thereof which is permissible under Applicable Law. THE PROVISIONS OF ALL INDEMNITIES SHALL SURVIVE THE TERMINATION OF THIS DEED OF TRUST.

**44.    WAIVER OF TRIAL BY JURY.** GRANTOR AND, BY ACCEPTANCE HEREOF, BENEFICIARY (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS DEED OF TRUST; OR (II) ANY SECURED OBLIGATION DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY, AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE SECURED OBLIGATION DOCUMENTS.

Doc 41507   BK OR   Vol 158   Pg 591

**45.** <u>Acceleration; Remedies.</u> Notwithstanding any provision of this Deed of Trust to the contrary:

(a)     At any time following an Event of Default, Beneficiary, at Beneficiary's option, may declare the Secured Obligations to be immediately due and payable without further demand, and may invoke the Power of Sale and any other remedies permitted by Texas law or provided in this Deed of Trust or in any other Transaction Document.  Grantor acknowledges that the Power of Sale granted in this Deed of Trust may be exercised by Beneficiary without prior judicial hearing.  Beneficiary shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

(b)     If Beneficiary invokes the Power of Sale, Beneficiary may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Beneficiary may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction.  Such sale shall be made at the courthouse door of the county in which all or any part of the Land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least 21 days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Land may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Beneficiary has, at least 21 days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Secured Obligations according to Beneficiary's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Beneficiary's records, in a post office or official depository under the care and custody of the United States Postal Service.  The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.  Any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law.  Further, any sale made by Trustee hereunder may, in lieu of cash, be upon such other terms and conditions as Beneficiary may from time to time hereafter elect.  The sale by Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Property shall be sold and, if the proceeds of such sale of less than the whole of the Property shall be less than the aggregate of the indebtedness secured hereby and the expense of executing this trust as provided herein, this Deed of Trust and the lien hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Property but Beneficiary shall have the right, at its sole election, to request Trustee to sell less than the whole of the Property.  In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary, such sale shall not exhaust the power of sale hereunder and Beneficiary shall have the right to cause a subsequent sale or sales to be made hereunder.

(c)     At any time during the bidding of any sale conducted by Trustee under subparagraph (a) above, Trustee may require a bidding party (x) to disclose its full name, state and city of residence, occupation, and specific business office location, and the name and address of the principal the bidding party is representing (if applicable); and (y) to demonstrate reasonable evidence of the bidding party's financial ability (or, if applicable, the financial ability of the principal of such bidding party), as a condition to the bidding party submitting bids at the foreclosure sale.  If any such bidding party (the "Questioned Bidder") declines to comply with Trustee's requirement in this regard, or if such Questioned Bidder does respond but Trustee, in Trustee's sole and absolute discretion, deems the information or the evidence of the financial ability of the Questioned Bidder (or, if applicable, the principal of such bidding party) to be inadequate, Trustee may continue the bidding with reservation; and in such event (i) Trustee shall be authorized to caution the Questioned Bidder concerning the legal obligations to be incurred in submitting bids, and (ii) if the Questioned Bidder is not the highest bidder at the sale, or if having been the highest bidder the Questioned Bidder fails to deliver the cash purchase price payment promptly to Trustee, all bids by the Questioned Bidder shall be null and void.  Trustee may, in Trustee's sole and absolute discretion, determine that a credit bid may be in the best interest of Borrower and Beneficiary and elect to sell the Property for credit or for a combination of cash and credit; provided, however, that Trustee shall have no obligation to accept any bid except an all cash bid.  In the event Trustee requires a cash bid and cash is not delivered within a reasonable time after conclusion of the bidding process, as specified by Trustee (but in no event later than 3:45 p.m.

local time on the date of sale), then said contingent sale shall be null and void, the bidding process may be recommenced, and any subsequent bids or sales shall be made as if no prior bids were made or accepted

    (d)    Beneficiary shall have the right to become the purchaser at any sale held by any Trustee or substitute or successor or by any receiver or public officer, and any Beneficiary purchasing at any such sale shall have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the Debt owing to such Beneficiary, or if such Beneficiary holds less than all of the Debt the pro rata part thereof owing to such Beneficiary, accounting to all other beneficiaries of this Deed of Trust not joining in such bid in cash for the portion of such bid or bids apportionable to such non-bidding beneficiaries.

    (e)    Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Property so sold in fee simple with covenants of general warranty  Grantor covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands  The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements contained in those recitals.  Trustee shall apply the proceeds of the sale in the following order   FIRST to all reasonable costs and expenses of the sale, including reasonable Trustee's fees and attorneys' fees and costs of title evidence, SECOND to the Secured Obligations in such order as Beneficiary, in Beneficiary's discretion, directs, and THIRD the excess, if any, to the person or persons legally entitled to the excess

    (f)    Uniform Commercial Code.  Upon the occurrence of an Event of Default, Beneficiary may exercise its rights of enforcement under the Uniform Commercial Code with respect to the Property secured thereunder, and in conjunction with, in addition to or in substitution for those rights and remedies

    (i)    Beneficiary may enter upon the Property to take possession of, assemble and collect all Personalty or to render it unusable,

    (ii)    Beneficiary may require Grantor to assemble the Personalty and make it available at a place Beneficiary designates which is mutually convenient to allow Beneficiary to take possession or dispose of such personal property,

    (iii)    written notice mailed to Grantor as provided herein ten (10) days prior to the date of public sale of Personalty or prior to the date after which private sale of Personalty will be made shall constitute reasonable notice,

    (iv)    any sale made pursuant to the provisions of this paragraph shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the sale of the Property under power of sale as provided herein upon giving the same notice with respect to the sale of the Personalty hereunder as is required for such sale of the Property under power of sale,

    (v)    in the event of a foreclosure sale, whether made by Trustee under the terms hereof, or under judgment of a court, the remainder of the Personalty and other Property may, at the option of Beneficiary, be sold as a whole,

    (vi)    it shall not be necessary that Beneficiary take possession of the Personalty or any part thereof prior to the time that any sale pursuant to the provisions of this paragraph is conducted and it shall not be necessary that the Personalty or any part thereof be present at the location of such sale,

    (vii)    prior to application of proceeds of disposition of the Personalty to the secured indebtedness, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Beneficiary,

    (viii)    any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to non-payment of the indebtedness or as to the occurrence of any Event of Default, or as to Beneficiary having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by Beneficiary, shall absent manifest error be taken as conclusive evidence of the truth of the facts so stated and recited, and

     (ix)    Beneficiary may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Beneficiary, including the sending of notices and the conduct of sale, but in the name and on behalf of Beneficiary

     (g)    In the event of a default in the payment of any part of the Debt, Beneficiary shall have the right to proceed with foreclosure of the liens and security interests evidenced hereby without declaring the entire Debt due, and in such event any such foreclosure sale may be made subject to the unmatured part of the Debt, and any such sale shall not in any manner affect the unmatured part of the Debt, but as to such unmatured part, this Deed of Trust shall remain in full force and effect just as though no sale had been made   The proceeds of any such sale shall be applied as provided in subsection (e) above except that the amount paid under subparagraph SECOND thereof shall be only the matured portion of the Debt and any proceeds of such sale in excess of those provided for in subparagraphs FIRST and SECOND (modified as provided above) shall be applied to installments of principal of and interest on the Note in the inverse order of maturity   Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Debt

     (h)    This Deed of Trust shall be effective as a mortgage as well as a Deed of Trust and upon the occurrence of an Event of Default may be foreclosed as to any of the Property in any manner permitted by the laws of the State of Texas or of any other state in which any part of the Property is situated, and any foreclosure suit may be brought by Trustee or by Beneficiary   In the event a foreclosure hereunder shall be commenced by Trustee or his substitute or successor, Beneficiary may at any time before the sale of the Property direct the said Trustee to abandon the sale, and may then institute suit for the collection of the Note and the other secured indebtedness, and for the foreclosure of this Deed of Trust   It is agreed that if Beneficiary should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Deed of Trust, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require Trustee, his substitute or successor to sell the Property in accordance with the provisions of this Deed of Trust.

     (i)    If all or any part of the Property is sold pursuant to this section, Grantor will be divested of any and all interest and claim to the Property, including any interest or claim to all insurance policies, utility deposits, bonds, loan commitments and other intangible property included as a part of the Property   Additionally, after a sale of all or any part of the Land, Improvements, Fixtures and Personalty, Grantor will be considered a tenant at sufferance of the purchaser of the same, and the purchaser shall be entitled to immediate possession of such property   If Grantor fails to vacate the Property immediately, the purchaser may and shall have the right, without further notice to Grantor, to go into any justice court in any precinct or county in which the Property is located and file an action in forcible entry and detainer, which action shall lie against Grantor or its assigns or legal representatives, as a tenant at sufferance   This remedy is cumulative of any and all remedies the purchaser may have under this Deed of Trust or otherwise.

     (j)    In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Grantor agrees that notwithstanding the provisions of Sections 51.003, 51 004, and 51 005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Beneficiary shall be entitled to seek a deficiency judgment from Borrower and any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this paragraph constitutes a waiver of the above-cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value   Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, and others against whom recovery of a deficiency is sought   Alternatively, in the event the waiver provided for in subsection (1) above is determined by a court of competent jurisdiction to be unenforceable, to the fullest extent not prohibited by applicable laws, the following shall be the basis of the court's determination of fair market value. (i) the Property shall be valued "as is" and in its condition as of the date of foreclosure, and no assumption of increased value because of post foreclosure repairs, refurbishment, restorations or improvements shall be made, (ii) any adverse effect on the marketability of title because of the foreclosure or because of any other title condition not existing as of the date of this Deed of Trust shall be considered, (iii) the valuation of the Property shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Property for cash within a six month period after foreclosure; (iv) although the Property may be disposed of more quickly by the foreclosure purchaser, the gross valuation of the Property as of the date of foreclosure shall be discounted for a hypothetical

Doc
61507
BK
OR
Vol
152
Pg
594

reasonable holding period (not to exceed 6 months) at a monthly rate equal to the average monthly interest rate on the Note for the twelve months before the date of foreclosure; (v) the gross valuation of the Property as of the date of foreclosure shall be further discounted and reduced by reasonable estimated costs of disposition, including brokerage commissions, title policy premiums, environmental assessment and clean up costs, tax and assessment, prorations, costs to comply with legal requirements and attorneys' fees, (vi) expert opinion testimony shall be considered only from a licensed appraiser certified by the State of Texas and, to the extent permitted under Texas law, a member of the Appraisal Institute, having at least five years' experience in appraising property similar to the Property in the county where the Property is located, and who has conducted and prepared a complete written appraisal of the Property taking into considerations the factors set forth in this Deed of Trust, no expert opinion testimony shall be considered without such written appraisal, (vii) evidence of comparable sales shall be considered only if also included in the expert opinion testimony and written appraisal referred to in the preceding paragraph, and (ix) an affidavit executed by Beneficiary to the effect that the foreclosure bid accepted by Trustee was equal to or greater than the value of the Property determined by Beneficiary based upon the factors and methods set forth in subparagraphs (a) through (g) above before the foreclosure shall constitute prima facie evidence that the foreclosure bid was equal to or greater than the fair market value of the Property on the foreclosure date.

  (k)  Additional Waivers

    (i)  Subject to the provisions of this Deed of Trust, to the extent that Borrower, any partner thereof or any other entity responsible for the payment of the Debt is now, or at any time or from time to time hereafter is, a partnership, Borrower and Beneficiary expressly acknowledge and agree that Beneficiary is not required to comply with Section 3 05(d) of the Texas Revised Partnership Act, as same may be hereafter amended or modified, or any other or further laws, rules or regulations now or hereafter in effect which may limit the rights and remedies of a creditor to pursue partners of a partnership prior to the pursuit of such creditor's rights and remedies against such partnership

    (ii)  Borrower and Grantor hereby waive notice of intent to accelerate and notice of acceleration, and agrees that Beneficiary may foreclose the lien of this Deed of Trust without sending either of such notices

    (iii)  If any law referred to in this paragraph and now in force, of which Borrower or Borrower's heirs, devisees, representatives, successors, and assigns and such other persons claiming any interest in the Property might take advantage despite this paragraph, shall hereafter be repealed and cease to be in force, such law shall not thereafter be deemed to preclude the application of this paragraph

  (l)  Beneficiary may, at Beneficiary's option, comply with these provisions in the manner permitted or required by Title 5, Section 51 002 of the Texas Property Code (relating to the sale of real estate) or by Chapter 9 of the Texas Business and Commerce Code (relating to the sale of collateral after default by a debtor), as those titles and chapters now exist or may be amended or succeeded in the future, or by any other present or future articles or enactments relating to same subject Unless expressly excluded, the Property shall include Rents collected before a foreclosure sale, but attributable to the period following the foreclosure sale, and Grantor shall pay such Rents to the purchaser at such sale At any such sale· (i) whether made under the power contained in this Deed of Trust, Section 51 002, the Texas Business and Commerce Code, any other legal requirement or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for Trustee to have physically present, or to have constructive possession of, the Property (Grantor shall deliver to Trustee any portion of the Property not actually or constructively possessed by Trustee immediately upon demand by Trustee) and the title to and right of possession of any such property shall pass to the purchaser as completely as if the property had been actually present and delivered to the purchaser at the sale, (ii) each instrument of conveyance executed by Trustee shall contain a general warranty of title, binding upon Grantor; (iii) the recitals contained in any instrument of conveyance made by Trustee shall conclusively establish the truth and accuracy of the matters recited in the Deed of Trust, including nonpayment of the Secured Obligations and the advertisement and conduct of the sale in the manner provided in this Deed of Trust and otherwise by law and the appointment of any successor Trustee, (iv) all prerequisites to the validity of the sale shall be conclusively presumed to have been satisfied, (v) the receipt of Trustee or of such other party or officer making the sale shall be sufficient to discharge to the purchaser or purchasers for such purchaser(s)' purchase money, and no such purchaser or purchasers, or such purchaser(s)' assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or nonapplication of such purchase money, (vi) to the fullest extent permitted by Applicable Law, Grantor shall be completely and irrevocably divested of all of Grantor's right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold, and such sale shall be a perpetual bar to any

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement



claim to all or any part of the property sold, both at law and in equity, against Grantor and against any person claiming by, through or under Grantor; and (vii) to the extent and under such circumstances as are permitted by law, Beneficiary may be a purchaser at any such sale.

(m)     The rights and remedies granted under this Section 45 are in addition to and shall not limit the rights and remedies available under other terms and provisions of this Deed of Trust.

46.     **Trustee**. Notwithstanding any provision to the contrary in this Deed of Trust:

(a)     Trustee may resign by giving of notice of such resignation in writing to Beneficiary. If Trustee shall die, resign or become disqualified from acting under this Deed of Trust or shall fail or refuse to act in accordance with this Deed of Trust when requested by Beneficiary or if for any reason and without cause Beneficiary shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Deed of Trust or any prior successor or substitute trustee, Beneficiary shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Deed of Trust. Such appointment may be executed by an authorized officer, agent or attorney-in-fact of Beneficiary (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Beneficiary.

(b)     Any successor Trustee appointed pursuant to this section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Deed of Trust; but, nevertheless, upon the written request of Beneficiary or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)     Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Deed of Trust, including the transmittal and posting of any notices.

47.     **Waiver of Consumer Rights**. TO THE EXTENT NOW OR HEREAFTER APPLICABLE, BORROWER HEREBY WAIVES BORROWER'S RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF BORROWER'S OWN SELECTION, BORROWER VOLUNTARILY CONSENTS TO THIS WAIVER.

48.     **No Fiduciary Duty**. Lender owes no fiduciary or other special duty to Secured Parties or Beneficiary.

49.     **Additional Provisions Regarding Assignment of Rents**. In no event shall the Assignment of Rents or any other term of this Deed of Trust cause the Secured Obligations to be reduced by an amount greater than the Rents actually received by Beneficiary and applied by Secured Parties to the Secured Obligations, whether before, during or after (a) an Event of Default, or (b) a suspension or revocation of the License. Grantor and Beneficiary and Secured Parties specifically intend that the Assignment of Rents is not intended to result in a pro tanto reduction of the Secured Obligations. The Assignment of Rents is not intended to constitute a payment of, or with respect to, the Secured Obligations and, therefore, Grantor and Beneficiary and Secured Parties specifically intend that the Secured Obligations shall not be reduced by the value of the Rents and Leases assigned. Such reduction shall occur only if, and to the extent that, Beneficiary or a Secured Party actually receives Rents pursuant to the Assignment of Rents and applies those Rents to the Secured Obligations. Grantor agrees that the value of the License equals the value of the Assignment of Rents. The Assignment of Rents will terminate upon the release of this Deed of Trust.

50.     **Loan Charges**. Secured Parties intend at all times to comply with the laws of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the Secured Obligations (or applicable United States federal law to the extent that it permits Secured Parties to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If Applicable Law is ever judicially interpreted so as to render usurious any amount payable under the Transaction Documents, or contracted for, charged, taken, reserved or received with respect to the Secured Obligations, or if acceleration of the maturity of the Secured Obligations, or if any prepayment by Grantor results in Grantor having paid any interest in excess of that permitted by any applicable law, then Grantor and Secured Parties expressly intend

Doc 61507    BK OR    Vol 158    Pg 596

that all excess amounts collected by Secured Parties shall be applied to reduce the unpaid principal balance of the Secured Obligations (or, if the Secured Obligations have been or would thereby be paid in full, shall be refunded to Grantor), and the provisions of the Transaction Documents immediately will be deemed reformed and the amounts thereafter collectible under the Transaction Documents reduced, without the necessity of the execution of any new documents, so as to comply with any Applicable Law, but so as to permit the recovery of the fullest amount otherwise payable under the Transaction Documents. The right to accelerate the maturity of the Secured Obligations does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Secured Parties does not intend to collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Secured Parties for the use, forbearance or detention of the Secured Obligations shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated and spread throughout the full term of the Secured Obligations until payment in full so that the rate or amount of interest on account of the Secured Obligations does not exceed the applicable usury ceiling. Notwithstanding any provision contained in the Transaction Documents that permits the compounding of interest, including any provision by which any accrued interest is added to the principal amount of the Secured Obligations, the total amount of interest that Grantor is obligated to pay and Secured Parties is entitled to receive with respect to the Secured Obligations will not exceed the amount calculated on a simple (i.e., noncompounded) interest basis at the maximum rate on principal amounts actually advanced to or for the account of Borrower, including all current and prior advances and any advances made pursuant to the Instrument or any other Transaction Document (such as for the payment of Impositions and similar expenses or costs).

51. **Property And Liability Insurance - Delivery Of Policy to Beneficiary.** Notwithstanding any term or provision of the Transaction Documents to the contrary, Grantor will not be required to deliver the original (or a duplicate original) of any renewal policy of insurance to Lender more than 15 days prior to the expiration date of the policy then held by Beneficiary or Secured Parties.

52. **Reimbursement for Certain Taxes.** If, while the Secured Obligations are owned by a non-resident of the State of Texas, or by a corporation organized under the laws of a state other than Texas with its principal offices outside the State of Texas, any state, county or municipal tax or assessment is levied within the State of Texas against that owner of the Secured Obligations, either in terms or practical effect (whatever the legal incidence of such tax or assessment) on account of the Secured Obligations or this Deed of Trust, or the right to enforce the same, or on account of that owner's receipt of interest or other payments thereunder, Grantor will reimburse that owner, promptly upon advice therefrom, the amount of each such tax or assessment, provided that if such tax or assessment shall be of such nature, in law, and of such amount for any year, that payment thereof, in its entirety, in addition to all other payments to be made by Grantor under the Transaction Documents, will constitute payment of "interest" in the statutory sense of that word, in excess of the Maximum Rate, Grantor's obligation to make reimbursement shall apply to only so much, if any, of each such tax or assessment as may be reimbursed without exceeding the Maximum Rate. If the passage of legislation imposing or authorizing the imposition of any such state, county or municipal tax or assessment, then at the option of Beneficiary, the Secured Obligations will be due within six months after notice to Grantor.

53. **Notice of Final Agreement.** THIS WRITTEN DEED OF TRUST AND THE TRANSACTION DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Grantor is signing this Deed of Trust effective as of the day and year first written above.

Doc 61507   BK OR   Vol 158   Ps 597

**GRANTOR**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.**, a Texas corporation

By: _____

BRIAN KEITH MCCLAIN
President

By: _____

CRYSTAL Ø MCCLAIN
Secretary

Address for Notices:
824 Mullins Lane
Benton, Kentucky 42055

**7M CATTLE FEEDERS, INC.**, a Kentucky corporation

By: _____

BRIAN KEITH MCCLAIN
President

By: _____

CRYSTAL D MCCLAIN
Vice President

McClain MCA 2018
Deed of Trust, Assignment of Rents and Security Agreement

20

Doc 61507   Bk OR   Vol 153   Pg 598

STATE OF TEXAS                    )
                                  ) SS
COUNTY OF _PARMER_____    )

    This instrument was acknowledged before me on _8/1/2019_____, by BRIAN KEITH MCCLAIN, President on behalf of MCCLAIN FEED YARD, INC., a Texas corporation.

PEGGY GOETTSCH
NOTARY PUBLIC - STATE OF TEXAS
ID # 487010-8
My Commission Expires 08-15-2023

_____
(Signature of officer)

_Notary Public, State of Texas_
(Title of officer)

My Commission Expires: _6/15/2023_____

STATE OF ~~TEXAS~~ Kentucky            )
                                       ) SS
COUNTY OF _Marshall_____            )

    This instrument was acknowledged before me on _July 30____, 2019 by CRYSTAL D MCCLAIN, Secretary on behalf of MCCLAIN FEED YARD, INC., a Texas corporation.

_Angela C Dixon_____
(Signature of officer)

_Notary Public_____
(Title of officer)

My Commission Expires: _8-15-2022___
                #606145

STATE OF TEXAS          )
                         ) SS

COUNTY OF _Parmer_     )

    This instrument was acknowledged before me on _8/1/2019_, by BRIAN KEITH MCCLAIN, President on behalf of 7M CATTLE FEEDERS, INC., a Kentucky corporation.

PEGGY GOETTSCH
NOTARY PUBLIC - STATE OF TEXAS
ID # 407010-6
My Commission Expires 06-15-2023

(Signature of officer)

_Notary Public, State of Texas_
(Title of officer)

My Commission Expires: _6/15/2023_

STATE OF ~~TEXAS~~ _Kentucky_     )
                         ) SS

COUNTY OF _Marshall_     )

    This instrument was acknowledged before me on _July 30_, _2019_ by CRYSTAL D MCCLAIN, Vice President on behalf of 7M CATTLE FEEDERS, INC., a Kentucky corporation.

(Signature of officer)

_Notary Public_
(Title of officer)

My Commission Expires: _8-15-2022_
_# 606145_

EXHIBIT A-1

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

**Legal Description of Real Estate**

Deaf Smith County, Texas

Tract 2:

A 36.03 acre tract, more or less, out of the Southwest part of Section 26, Block K-8, Abstract No. 1370, Certificate Number 128 of the T. T. R. R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a number 60 common nail found for the Southwest corner of Section 26, Block K-8 whence a 1-1/2 inch iron pipe found for the Southeast corner of said section bears North 89 degrees 56 minutes 00 seconds East 5321.58 feet;

THENCE North 89 degrees 56 minutes 00 seconds East along the South line of said section, 48.80 feet to a 1/2 inch iron rod set in the East physical line of Farm Road 1057 for the Southwest and beginning corner of this tract;

THENCE North 00 degrees 12 minutes 00 seconds West along the East physical line of Farm Road 1057, at 30.00 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.27 feet a 1/2 inch iron rod set for corner;

THENCE North 89 degrees 54 minutes 43 seconds East 606.84 feet to a 1/2 inch iron rod set in the East line of a tract known as the West 40 acres of the Southwest 1/4 of said section whence a 1/2 inch iron rod set for the Northeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section bears North 00 degrees 11 minutes 29 seconds West 71.78 feet;

THENCE South 00 degrees 11 minutes 29 seconds East at 2557.50 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.50 feet a 1/2 inch iron rod found in the South line of said section for the Southeast corner of the track known as the West 40 acres of the Southwest 1/4 of said section;

THENCE South 89 degrees 56 minutes 00 seconds West along the South line of said section, 606.45 feet to the place of beginning.

23

DOC 61507    BK OR    Vol 158    Pg 601

Tract 3:

A 20.00 acre tract out of the Southwest part of Section 26, Block K-8, Certificate Number 128 of the T.T R.R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with cap marked "RPLS 1848" found in the South line of Section 26 for the Southwest corner and POINT OF BEGINNING of this tract, whence a number 60 common nail found for the Southwest corner of Section 26, Block K-8 bears South 89 degrees 56 minutes 00 seconds West 655.25 feet;

THENCE North 00 degrees 11 minutes 29 seconds West, a distance of 2587.50 feet a fence corner post for the Northwest corner of this tract;

THENCE North 89 degrees 54 minutes 43 seconds East, a distance of 336.69 feet to a 1/2 inch iron rod with cap marked "HBD" set for the Northeast corner of this tract;

THENCE South 00 degrees 11 minutes 29 seconds East, at a distance of 2557.62 feet pass a 1/2 inch iron rod with cap marked "HBD" set for reference, continue for a total distance of 2587.62 feet a point on the South line of Section 26, whence a 1-1/2 inch iron pipe found for the Southeast corner of Section 26 bears North 89 degrees 56 minutes 00 seconds East, 4329.64 feet;

THENCE South 89 degrees 56 minutes 00 seconds West, along the South line of Section 26, a distance of 336.69 feet to the POINT OF BEGINNING.

Doc 61507   Bk
OR
Vol
158
Pg
602

**EXHIBIT A-2**

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

**Legal Description of Real Estate**

Parmer County, Texas

Tract 1:

A tract of land being all of Section 25 and a portion of Section 24 of Charles E. Harding's Subdivision of Capitol League 473 and parts of Capitol Leagues 459, 460, 461, 472 and 474 in Parmer County, Texas, as shown by the map or plat thereof of record in Volume 6, Page 164, Deed Records of Parmer County, Texas, and being described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with camp stamped "Furman RPLS 1959" set for the southwest corner of said Section 25, being the common corner of Sections 25-36-35-26 from whence a 1/2 inch iron rod found for the common corner of sections 27-34-33-28, all in said subdivision bears North 89° 56' 32" west, 10,564.82 feet, the southwest corner of Section 36 and the southeast corner of Section 35 bears South

00° 11' 46" West, 5,281.81 feet, from this point a harrow tooth found as called for in that certain instrument recorded in Volume 225, Page 730, of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas, as shown by Plat thereof of record in Volume 2, Page 495 of said Deed Records bears West (Bearing Basis) 1,411.64 feet;

THENCE North 00° 11' 46" East along the common line of Sections 25 and 26, and the common line of Section 24 and 23, of said Charles E. Harding's Subdivision, and along the center of a road, at 5,281.61 feet pass the common line of Sections 25-26-23-24 a total distance of 8,503.54 feet to a 3/4 inch iron pipe found as called for in that certain instrument recorded in Volume 156, Page 603 of said Deed Records, and in Volume 2, Page 219 of the Field Note Records of Parmer County, Texas, from whence the common corner of Sections 24-23-14-13 of said Charles E. Harding's Subdivision bears North 00° 11' 46" East 5,281.61 feet and 1 1/4 inch iron pipe with 5/8 inch rod adjacent found for the common corner of Sections 12-13-14-11 of said Charles E. Harding's Subdivision, as called for in that certain instrument recorded in Volume 2, Page 343, of said Field Note records bears North 00° 11' 46" East 7,341.28 feet;

THENCE South 89° 40' 58" East 2,100.84 feet along a fence line and along the North line of this tract of land and the North line of that certain tract of land described in said Volume 156, Page 603 and said Volume 2, Page 219 to a 3/4 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219, said North line being monumented and generally accepted on the ground for over 25 years, from whence the Northeast corner of Section 24 and the Southeast corner of Section 14 of said Charles E. Harding's Subdivision bears North 00° 11' 07" East 7,345.07 feet;

25

Doc 61507  Bk OR  Vol 158  Pg 603

THENCE South 00° 11' 07" West at 3,187.40 feet pass a 3/4 inch iron pipe found, this iron pipe is a monument of record in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southeast corner of Section 24 of said Charles E. Harding's Subdivision, it is however the Professional opinion of this surveyor that this corner lies in the East line of this survey but 26.81 feet North of the actual section corner, at 3,214.21 feet pass what is in my Professional opinion the Southeast corner of Section 24 and the Northeast corner of Section 25 of said Charles E. Harding's Subdivision at 3,301.75 feet pass a 1 1/2 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southwest corner of Section 22 and the Northwest corner of Section 27 in Township 1 North, Range 3 East of a Capitol Syndicate Subdivision as shown by Plat thereof of record in Volume 5, Page 394 of said Deed Records, a total distance of 8,493.86 feet to a point being the Southeast corner of Section 25 and the Northeast corner of Section 36 of said Charles E. Harding's Subdivision from whence the Southeast corner of said Section 36 bears South 00° 11' 07" West 5,279.65 feet from this point a railroad spike found as called for in that certain instrument recorded in Volume 225, Page 730 of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas as shown by Plat thereof record in Volume 2, Page 495 of said Deed Records bears East (Bearing Basis) 1,324.17 feet;

THENCE North 89° 56' 48" West 2,102.46 feet along the South line of Section 25 and the North line of Section 36 of said Charles E. Harding's Subdivision to the POINT OF BEGINNING and containing 410.0 acres of land, more or less.

2u

Doc     Bk     Vol     Pg
41507   OR     158     604

**EXHIBIT B**

McClain MCA 2018
DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

**Additional Property**

associated with Deed of Trust by McClain Feed Yard and 7M Cattle Feeders, Inc. on land located in Deaf Smith and Parmer Counties, Texas

(list specific additional Property, if any)

<u>Fixtures</u>

Buildings, fixtures, and equipment associated with agricultural production or the productions of farm products, including but not limited to:

| Attached Equipment |
|---|
| 2 x Stationary Roto-Mixers |
| 6 x Liquid Storage Tanks |
| 9 x Hyd. Working Chutes (Snakes Not Included) |
| 1 x 12 x 70 Truck Scale |
| 2 x 12 x 70 Cattle Scales With Fencing and Gates |
| 1 x Grain Probe |

27

Doc 61507    Bk OR    Vol 158    Pg 605

All Water Rights related to but not limited to:

| Section | District Number | Permit Number | Permit Status | Documents | Recently Tested | Current GPM Estimate |
|---|---|---|---|---|---|---|
| \multicolumn{7}{c}{Subject Water Wells - 410.0 Acre Feedyard Tract} ||||||
| 24 | 79667 | 3694 | Current | Yes | No | 40 |
| 24 | 79677 | 3974 | Current | Yes | Yes | 64 |
| 24 | 79680 | 3977 | Current | Yes | Yes | 53 |
| 24 | 79681 | 3978 | Current Destroyed | Yes | Yes | 0 |
| 25 | 82449 | 40124 | Current | None | No | 0 |
| 25 | 79188 | 3423 | Current | Yes | Yes | 40 |
| 25 | 79072 | 5289 | Abandoned | Yes | No | 0 |
| 25 | 79544 | 3831 | Current | Yes | No | 40 |
| 25 | 78540 | 2689 | Current | Yes Mill and Office | No | 40 |
| 25 | 79189 | 3424 | Current | Yes | No | 40 |
| 24 | 79719 | 4021 | Current | Yes | No | 40 |
| 25 | 83148 | 50106 | Current | None | No | 0 |
| Total |  |  |  |  |  | 357 |
| Total Tested |  |  |  |  |  | 157 |

28

Doc          Bk      Vol      Pg
      61507   OR        158      606

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE
RENTAL OR USE OF THE DESCRIBED REAL PROPERTY
BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCIBLE
UNDER FEDERAL LAW

STATE OF TEXAS        }
                      }  OFFICIAL PUBLIC RECORDS
COUNTY OF PARMER }

I hereby certify that this instrument was FILED
on the date and at the time stamped hereon by
me and was duly RECORDED in the Volume and Page
of the RECORDS of Parmer County, Texas.

FILED FOR RECORD IN PARMER COUNTY
Susie Spring, COUNTY CLERK

ON: Aug 01,2019 AT 03:40P

Document Number:       61507

Receipt Number - 24321

By
Breann Saenz, Deputy

env: Farwell Abstract Company INC, P.O. Box 284, Farwell Tx. 79325
FILED and certified as RECORDED in the **Official Public Records** of Deaf Smith County on the date and time stamped. Rachel Garman, County Clerk,
Deaf Smith County, Texas.
By: _____    Deputy    **August 5, 2019 (10:00am)**    19-1129    29

# EXHIBIT F

# MASTER SECURITY AGREEMENT

This security agreement ("Master Security Agreement") is dated as of August 27, 2021. It is between MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard "); MCCLAIN FARMS, INC., a Kentucky corporation ("McClain Farms"); and 7M CATTLE FEEDERS, INC, a Kentucky corporation ("7M Cattle Feeders") (McClain Feed Yard ; McClain Farms; and 7M Cattle Feeders are herein individually and collectively, "Grantor"), and RABO AGRIFINANCE LLC, a Delaware limited liability company, as agent for itself and the other Secured Parties (defined herein) under the Collateral Agency Agreement (defined herein; and Rabo AgriFinance LLC, in that capacity, "Collateral Agent").

RABO AGRIFINANCE LLC, a Delaware limited liability company, as Lender ("Lender") has extended credit to Borrower under the terms and conditions of the Master Credit Agreement between Borrower and Lender dated May 11, 2018 (the "MCA"). Each capitalized term used in this Master Security Agreement that is defined in the MCA and not defined in this Master Security Agreement will have the meaning specified in the MCA. This Master Security Agreement will be interpreted in accordance with the Drafting Conventions.

Grantor has or may also enter into certain derivatives transactions under Hedging Agreements with Swap Counterparties, under which Grantor has or may incur Hedging Obligations to Swap Counterparties.

The Loan Obligations (defined in the MCA) may be, from time to time, guaranteed by Guarantor under the terms and conditions of one or more guaranties in favor of Collateral Agent. The Hedging Obligations may be guaranteed by Guarantor under the terms and conditions of the Hedging Agreements and/or a separate guaranty of the Hedging Obligations (the MCA, the Guaranty, and the Hedging Agreements and any separate guaranty of the Hedging Obligations are herein sometimes individually and collectively referred to as the "Debt Instrument").

Non-Obligors(s) have an economic interest in Borrower or will obtain some other material financial benefit as a result of Secured Parties' entering into the Secured Obligation Documents (defined herein). Secured Parties require that Non-Obligor execute this agreement as a condition of the Secured Obligation Documents.

To induce Lender and Swap Counterparties to extend credit and provide other financial accommodations (including derivative transactions) to Grantor, and in consideration thereof, Grantor agrees as follows:

1. **The Collateral**. Grantor assigns and grants to Collateral Agent a security interest in all of the following property now owned or hereafter acquired by Grantor (collectively, the "Collateral"): (a) all accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, and deposit accounts; (b) all Inventory, (c) all equipment, (d) all fixtures (e) all farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in Grantor's farming operation, and products of crops and livestock in their unmanufactured state; (f) all general intangibles, including all Intellectual Property (defined herein); (g) all proceeds of any crop insurance, price support payment or other government program; (h) rights and interests under Hedging Agreements, including all rights to the payment of money from Secured Parties under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in the Hedging Agreements; (i) accessions, attachments and other additions to the Collateral; (j) substitutes or replacements for any Collateral, all proceeds, products, rents and profits of any Collateral, all rights under warranties and insurance contracts covering the Collateral, and any causes of action relating to the Collateral; and (k) Books and Records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

2. **Secured Obligations**. This Master Security Agreement is to secure the payment and performance of the following (collectively, the "Secured Obligations") in any order of priority that Collateral Agent or Secured Parties may choose: (a) all Obligations (defined in the MCA), under one or more Facility Sheet(s) from time to time where Grantor is designated from time to time as Borrower, Guarantor, or Non-Borrower, including this Master Security Agreement; (b) all Hedging Obligations; (c) all Guaranteed Obligations (defined in the Guaranty); (d) all obligations of Guarantor to the Swap Counterparties under the Hedging Agreements or any guaranty given by Guarantor to secure the Hedging Obligations; (e) all obligations of Grantor under this Master Security Agreement; (f) any obligations due to a Banking Counterparty with regard to Banking Obligations; all obligations of Grantor to Lender, Coöperatieve Rabobank U.A., a foreign banking organization organized as a cooperative bank under the laws of The Netherlands ("Rabobank") or any other Affiliate of Lender (Lender, Rabobank and any other Affiliate of Lender or Rabobank are herein individually and collectively, "Secured Parties"), whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether obligatory or non-obligatory; whether due or not due, whether absolute or contingent, or whether incurred directly or acquired by assignment or otherwise, under the terms and conditions of any other written instrument or agreement executed by Grantor; and (g) any of the foregoing that arises after the filing of a petition by or against Grantor under an Insolvency Proceeding.

3. **Grantor Representations**. Grantor represents to Collateral Agent and Secured Parties that: (a) the legal name of Grantor is as appears in the first paragraph of this Master Security Agreement; (b) Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this Master Security Agreement; (c) Grantor has its place of business, or its chief executive office, if it has more than one place of business, located at the address adjacent to its signature below; (d) except for Liens expressly permitted under the terms of the MCA, Grantor has not granted any security interest in any of the Collateral except to Collateral Agent or Secured Parties; and (e) there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Collateral with respect to any violations of Applicable Laws.

4. **Information Accurate and Complete**. Grantor's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of Grantor, from time to time, whether or not required under Borrower's application for the Loans, Lender's underwriting and approval of the Loans, or this Master Security Agreement and the other Loan Documents, will be deemed accompanied by a representation by Grantor that the report, record or information is complete and accurate in all material respects as to the condition or operations of Grantor (and, if applicable, Grantor's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities and Grantor's business or organizational structure.

5. **Grantor Covenants**. Until such time as all of the Secured Obligations have been paid in full, Lender has no obligation to make additional Loans and the Hedging Agreements have been terminated:

(a)       Grantor shall properly preserve, maintain and care for the Collateral; defend the Collateral against any adverse claims and demands; protect, diligently collect all accounts; and keep complete, current, and accurate Books and Records with respect to the Collateral and any proceeds or collections;

(b)       Grantor shall notify Collateral Agent in writing prior to any change in (i) Grantor's name, identity or business structure or (ii) the location(s) of (A) Grantor's place of business or Grantor's chief executive office if Grantor has more than one place of business, (B) Grantor's state of organization, or (C) Grantor's Books and Records concerning any Collateral;

(c)       Grantor shall promptly notify Collateral Agent in writing of any event which affects the value of the Collateral, the ability of Grantor or Collateral Agent to dispose of the Collateral, or the rights and remedies of Collateral Agent in relation thereto, including, but not limited to, the levy of any

legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise;

(d)       except for purchase money security interests related to normal trade credit and Liens expressly permitted under the terms of this Master Security Agreement or the MCA, Grantor will not grant any security interest in any of the Collateral except to Collateral Agent, and will keep the Collateral free of all Liens, claims, security interests and encumbrances of any kind or nature except the security interest of Collateral Agent and such permitted Liens;

(e)       Grantor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Collateral Agent's security interest. Without waiving Grantor's default for failure to make any such payment, Collateral Agent at its option may pay any such costs and expenses, discharge encumbrances on the Collateral, and pay for insurance of the Collateral, and such payments shall be a part of the Secured Obligations and bear interest at the rate set out in the Secured Obligations. Grantor agrees to reimburse Collateral Agent on demand for any costs so incurred;

(f)       until Collateral Agent exercises its rights to make collection, Grantor will diligently collect all Collateral;

(g)       if any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Grantor shall immediately deliver such document to Collateral Agent, together with any necessary endorsements;

(h)       Grantor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral, except that until an Event of Default or the revocation by Collateral Agent of Grantor's right to do so, and subject to the provision of this Master Security Agreement, Grantor may (i) sell or lease any Collateral constituting Inventory or farm products in the ordinary course of business at prices constituting the fair market value thereof; and (ii) use feed, seed, fertilizer, chemicals, medicines and other supplies used or produced in Grantor's farming operations in the ordinary course of Grantor's farming operations;

(i)       Grantor will execute and deliver such additional documents as may be reasonably requested by Collateral Agent in connection with Collateral Agent's security interest in the Collateral, including all assignments, transfers and other documents required by Collateral Agent to transfer to Collateral Agent, all federal and state government program payments, rights to payment, accounts, general intangibles and benefits; and

(j)       Grantor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Grantor first obtains the written consent of any owner, holder of any Lien on the real property or fixture, or other Person having an interest in such property to the removal by Collateral Agent of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Collateral Agent and shall provide that Collateral Agent has no liability to such owner, holder of any Lien, or any other Person.

6.      **Additional Optional Requirements**. Collateral Agent may at its option at any time, whether or not Grantor is in default:  (a) require Grantor to deliver to Collateral Agent (i) copies of or extracts from the Books and Records, (ii) records and schedules which show the status and condition of the Collateral and where it is located, and (iii) information on any contracts or other matters affecting the Collateral;  (b) permit Collateral Agent to inspect the Collateral;  (c) require Grantor to furnish to Collateral Agent a list of the buyers, processors, commission merchants, cooperatives, or selling agents to or through whom Grantor sells any farm product or other Collateral; and in the event that Grantor thereafter sells farm products or other Collateral to or through a Person or entity not identified in the list, Grantor shall notify Collateral Agent of the sale not less than seven (7) days prior to the sale;  (d) require Grantor to deliver to Collateral Agent any instruments or chattel paper;  (e) notify or require Grantor to notify any account debtors, any buyers of the Collateral, or any other Persons of Collateral Agent's interest in the Collateral;  (f) notify or require Grantor to notify any account debtor to forward all payments and proceeds of the Collateral to Collateral Agent; and  (g) endorse or sign Grantor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to Grantor and remove therefrom any payments and proceeds of the Collateral.

7.      **Events of Default**. The following each shall be an event of default under this Master Security Agreement (an "<u>Event of Default</u>"): (a) an Event of Default under the MCA, including a default termination event or other similar event under any Hedging Agreement which is not cured within any grace or cure period specified therein, if any; and (b) Grantor breaches any term, provision, warranty or representation under this Master Security Agreement.

8.      **Remedies**. Upon the occurrence of an Event of Default, Collateral Agent may:  (a) pursue any or all remedies as set forth in this Master Security Agreement, the MCA or the Hedging Agreements;  (b) enforce the security interest given hereunder or any other instrument or agreement pursuant to the UCC and any other Applicable Law; (c) enforce the security interest of Collateral Agent in any deposit account of Grantor maintained with any Secured Party by applying such account to the Secured Obligations;  (d) require Grantor to obtain Collateral Agent's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral;  (e) require Grantor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Collateral Agent in kind;  (f) require Grantor to assemble the Collateral, including the Books and Records, and make them available to Collateral Agent at a place designated by Collateral Agent;  (g) enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Grantor's equipment, if Collateral Agent deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral;  (h) demand and collect any payments on and proceeds of the Collateral;  (i) grant extensions and compromise or settle claims with respect to the Collateral for less than face value, upon reasonable prior notice to Grantor as may be required under the UCC;  (j) use or transfer any of Grantor's rights and interests in any Intellectual Property now owned or hereafter acquired by Grantor, if Collateral Agent deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.  Grantor agrees that any such use or transfer shall be without any additional consideration to Grantor (as used in this Master Security Agreement, "<u>Intellectual Property</u>" means all trade secrets, computer software, service marks, trademarks, trade names, trade styles, all goodwill of Grantor associated with the business now or hereafter conducted by Grantor connected with or symbolized by any service mark, trademark, trade name or trade style, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Grantor has any right or interest, whether by ownership, license, contract or otherwise);  (k) have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral.  Grantor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment or to demand or request the posting of any bond as a condition or term of such appointment;  (l) take such measures as Collateral Agent may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Grantor hereby irrevocably constitutes and appoints Collateral Agent as Grantor's attorney-in-fact to perform all acts and execute all documents in connection.therewith; and  (m) without notice or demand to Grantor, set off and apply against any and all of the Secured Obligations any and all deposits (general or special, time or demand, provisional or final) and any other Secured Obligations, at any time held or owing by Collateral Agent or any of Collateral Agent's agents or affiliates to or for the credit of the account of Grantor or any Guarantor or endorser of the Secured Obligations.

9. **Notices.** All notices, approvals, consents, and other communications, under this Master Security Agreement ("Notices") must be given in accordance with and will be subject to the terms and provisions of the MCA. Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Collateral Agent or Lender, to 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, Attention: Loan Closing Department; if to Secured Parties other than Lender, c/o Rabobank, 245 Park Avenue, New York, NY 10167, Attention: Customer Service Representative; and in the case of any other Person, to the address designated by that Person in a Notice to Grantor Collateral Agent and Secured Parties.

10. **Other Acts.** Grantor shall cooperate with Collateral Agent and Secured Parties for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this Master Security Agreement or to carry out the intent of this Master Security Agreement. Promptly (but in no event more than ten days) after request by Collateral Agent and Secured Parties, Grantor will execute, acknowledge and deliver any document which Collateral Agent and Secured Parties deems necessary or advisable for these purposes, and will, on demand, pay any expenses incurred by Collateral Agent and Secured Parties in the preparation, execution and filing of any such documents.

11. **POWER OF ATTORNEY.** TO FACILITATE THE PERFORMANCE OF THE AGREEMENTS OF GRANTOR UNDER THE LOAN DOCUMENTS, SECURED PARTY, IN THE NAME AND ON BEHALF OF GRANTOR OR, AT ITS OPTION, IN ITS OWN NAME, MAY (BEFORE OR AFTER AN EVENT OF DEFAULT) PERFORM OR OBSERVE ANY OBLIGATION OF GRANTOR TO SECURED PARTY AND TAKE ANY ACTION WHICH SECURED PARTY MAY DEEM NECESSARY OR DESIRABLE TO CURE OR CORRECT SUCH FAILURE. GRANTOR IRREVOCABLY AUTHORIZES SECURED PARTY AND GRANTS SECURED PARTY A POWER OF ATTORNEY IN THE NAME AND ON BEHALF OF THE GRANTOR OR, AT ITS OPTION, IN ITS OWN NAME, COUPLED WITH AN INTEREST, TO COLLECT, RECEIVE, RECEIPT FOR, CREATE, PREPARE, COMPLETE, EXECUTE, ENDORSE, DELIVER, AND FILE ANY AND ALL INSURANCE APPLICATIONS, REMITTANCES, INSTRUMENTS, DOCUMENTS, CHATTEL PAPER, AND OTHER WRITINGS, TO GRANT AN EXTENSION TO, COMPROMISE, SETTLE, WAIVE, NOTIFY, AMEND, ADJUST, CHANGE, AND RELEASE ANY OBLIGATION OF ANY ACCOUNT GRANTOR, OBLIGOR, INSURER, OR OTHER PERSON PERTAINING TO ANY COLLATERAL, AND TAKE ANY OTHER ACTION DEEMED BY SECURED PARTY TO BE NECESSARY OR DESIRABLE TO ESTABLISH, PERFECT, PROTECT, OR ENFORCE THE SECURED PARTY'S INTEREST IN THE COLLATERAL. Grantor shall execute FSA/CCC Power of Attorney forms and any other documents required to enable Secured Party to execute any and all documents necessary for application for, compliance or reporting of necessary information for all FSA/CCC programs. Secured Party has no duty to exercise any of the authority granted in this paragraph. Secured Party shall not be liable for any act or failure to act in connection with the collection of or the preservation of any rights with respect to the Collateral described in this paragraph.

12. **Miscellaneous.**

(a) Grantor hereby acknowledges Lender has entered into a collateral agency agreement between the Secured Parties (the "Collateral Agency Agreement") which, as amended, modified, or restated, permits Lender to act as a Collateral Agent in servicing the applicable Loan.

(b) The MCA, the other Transaction Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (collectively, the "Secured Obligation Documents"), collectively: (i) represent the sum of the understandings and agreements between Collateral Agent, Secured Parties and Grantor concerning this credit; (ii) replace any prior oral or written agreements between Collateral Agent, Secured Parties and Grantor concerning this credit; and (iii) are intended by Collateral Agent Secured Parties and Grantor as the final, complete and exclusive statement of the terms agreed to by them. The Secured Obligation Documents also grant further rights to Collateral Agent and Secured Parties and contain further agreements and affirmative and negative covenants by Grantor which apply to this Master Security Agreement and to the Collateral.

(c) Each waiver by Collateral Agent or Secured Parties must be in writing, and no waiver is to be construed as a continuing waiver. No waiver is to be implied from any delay or failure by Collateral Agent or Secured Parties to take action on account of any default of Grantor. Consent by Collateral Agent or Secured Parties to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Collateral Agent's or Secured Parties' consent to be obtained in any future or other instance. The exercise by Collateral Agent or Secured Parties of any right or remedy under this Master Security Agreement or the other Secured Obligation Documents or under Applicable Law, shall not: cure or waive a breach, Event of Default or Notice of default under this Master Security Agreement or invalidate any act performed pursuant to any such default or Notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents, including any Hedging Agreements, have been cured); or impair the security of this Master Security Agreement; or prejudice Collateral Agent or Secured Parties, or any receiver appointed in accordance with this Master Security Agreement, in the exercise of any right or remedy afforded any of them under this Master Security Agreement; or be construed as an affirmation by Collateral Agent or Secured Parties of any tenancy, lease or option, or a subordination of the Lien of this Master Security Agreement.

(d) Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require upon foreclosure sales of assets in a particular order. Each successor and assign of Grantor, including any holder of a Lien subordinate to this Master Security Agreement, by acceptance of its interest or Lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

(e) If Grantor consists of more than one Person, each Grantor (a) acknowledges that this Master Security Agreement is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor; and (b) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable. GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT COLLATERAL AGENT OR SECURED PARTIES EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS MASTER SECURITY AGREEMENT, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS.

(f) If Grantor is comprised of multiple Persons, any Person comprising Grantor is hereby authorized to bind all Parties comprising Grantor. Collateral Agent and Secured Parties may, at any time and without Notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

(g) This Master Security Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns; provided that Grantor shall not assign its rights or obligations hereunder without Secured Parties' consent. However, this Paragraph does not waive the provisions of Section (h); and Grantor shall not assign its rights or obligations hereunder without the consent of Collateral Agent and Secured Parties. Collateral Agent and Secured Parties may transfer all or any portion of its rights under the Secured Obligation Documents to any other Person. Collateral Agent and Secured Parties may disclose to any actual or proposed transferee any information that Grantor has delivered to Collateral Agent or Secured Parties in connection with the negotiation of this Master Security Agreement or pursuant to the Secured Obligation Documents; and Grantor shall cooperate fully with Collateral Agent and Secured Parties in providing that information to any actual or proposed transferee. Any individual signing this Master Security Agreement does so on his or her own behalf and on behalf of his or her marital community, and agrees that recourse may be had against community assets and against his or her separate property for the satisfaction of all indebtedness, liabilities and obligations of Indemnitor under this Master Security Agreement.

(h)      All rights and remedies under this Master Security Agreement and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

(i)      Any provision of any Secured Obligation Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Secured Obligation Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Collateral Agent may, at its option, declare all Secured Obligations immediately due and payable.

(j)      This Master Security Agreement may not be amended, changed, modified, altered or terminated without the prior written consent of Collateral Agent and Secured Parties.

(k)      This Master Security Agreement shall be governed exclusively by the applicable laws of the State of Iowa (the "Governing Law State") without regard or reference to its conflict of laws principles.  Grantor understands that the laws of the Governing Law State may differ from the laws of the State where Grantor resides or otherwise is located or where the Collateral is located.  However, Grantor understands, agrees and acknowledges that (a) this Master Security Agreement and the Secured Obligation Documents have significant and substantial contacts with the Governing Law State, (b) it is convenient to Grantor and Lender to select the law of the Governing Law State to govern this Master Security Agreement and the transactions evidenced hereby, (c) the transactions evidenced by this Master Security Agreement bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the Governing Law State constitutes good and valuable consideration for Secured Parties to enter into the Secured Obligation Documents and Secured Parties have entered into the Secured Obligation Documents in reliance on this choice.

(l)      GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF COLLATERAL AGENT, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS MASTER SECURITY AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA.  GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

(m)      This Master Security Agreement may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument.

(n)      Collateral Agent is authorized to execute any other documents or take any other actions necessary to effectuate this Master Security Agreement and the consummation of the transactions contemplated herein.

(o)      Collateral Agent is authorized to file in any Uniform Commercial Code jurisdiction, any such financing statement or amendment as Collateral Agent deems necessary or desirable to perfect its security interest, including but not limited, to a financing statement or amendment indicating the collateral as "all assets," "all personal property," or "all personal property and fixtures" of Grantor.

(p)      Collateral Agent and Secured Parties are authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Grantor.  Without limitation, a copy of this consent for release of information, general authorization or similar document on file with Collateral Agent or Secured Parties shall authorize third Persons to provide the information requested from time to time.

(q)      Each Party has participated in negotiating and drafting this Master Security Agreement, so if an ambiguity or a question of intent or interpretation arises, this Master Security Agreement is to be construed as if the Parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this Master Security Agreement.

(r)      GRANTOR, AND BY ACCEPTANCE HEREOF, COLLATERAL AGENT (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS MASTER SECURITY AGREEMENT; OR (II) ANY SECURED OBLIGATION DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY; AND ARE A MATERIAL INDUCEMENT FOR THE SECURED PARTIES ENTERING INTO THE SECURED OBLIGATION DOCUMENTS.

13.      IMPORTANT:  READ BEFORE SIGNING.  THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

THIS SECURITY AGREEMENT COVERS CROPS NOW GROWING.  THIS SECURITY AGREEMENT ALSO COVERS FUTURE CROPS TO BE GROWN IN CURRENT YEAR OR ANY YEAR HEREAFTER.

Grantor is signing this Master Security Agreement effective as of the day and year first written above.

**GRANTOR**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**MCCLAIN FEED YARD, INC.**, a Texas corporation

By: _____

BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42025

**MCCLAIN FARMS, INC.**, a Kentucky corporation

By: _____

BRIAN KEITH MCCLAIN
President

Address for Notices:
824 Mullins Lane
Benton, KY 42055

**7M CATTLE FEEDERS, INC.**, a Kentucky corporation

By: _____

BRIAN KEITH MCCLAIN
President

## MASTER SECURITY AGREEMENT

This security agreement ("Master Security Agreement") is dated as of July 24, 2019. It is between MCCLAIN FEED YARD, INC., a Texas corporation ("McClain Feed Yard ") and 7M CATTLE FEEDERS, INC., a Kentucky corporation ("7M Cattle Feeders, Inc.") (McClain Feed Yard and 7M Cattle Feeders, Inc. are herein individually and collectively, "Grantor"), and RABO AGRIFINANCE LLC, a Delaware limited liability company, as agent for itself and the other Secured Parties (defined herein) under the Collateral Agency Agreement (defined herein; and Rabo AgriFinance LLC, in that capacity, "Collateral Agent").

RABO AGRIFINANCE LLC, a Delaware limited liability company, as Lender ("Lender") has extended credit to Borrower under the terms and conditions of the Master Credit Agreement between Borrower and Lender dated May 11, 2018 (the "MCA"). Each capitalized term used in this Master Security Agreement that is defined in the MCA and not defined in this Master Security Agreement will have the meaning specified in the MCA. This Master Security Agreement will be interpreted in accordance with the Drafting Conventions.

Grantor has or may also enter into certain derivatives transactions under Hedging Agreements with Swap Counterparties, under which Grantor has or may incur Hedging Obligations to Swap Counterparties.

The Loan Obligations (defined in the MCA) may be, from time to time, guaranteed by Guarantor under the terms and conditions of one or more guaranties in favor of Collateral Agent. The Hedging Obligations are guaranteed by Guarantor under the terms and conditions of the Hedging Agreements and/or a separate guaranty of the Hedging Obligations (the MCA, the Guaranty, and the Hedging Agreements and any separate guaranty of the Hedging Obligations are herein sometimes individually and collectively referred to as the "Debt Instrument").

Non-Obligors(s) have an economic interest in Borrower or will obtain some other material financial benefit as a result of Secured Parties' entering in the Secured Obligation Documents (defined herein). Secured Parties require that Non-Obligor execute this agreement as a condition of the Secured Obligation Documents.

To induce Lender and Swap Counterparties to extend credit and provide other financial accommodations (including derivative transactions) to Grantor, and in consideration thereof, Grantor agrees as follows:

**1.     The Collateral.** Grantor assigns and grants to Collateral Agent a security interest in all of the following property now owned or hereafter acquired by Grantor (collectively, the "Collateral"): (a) all accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, and deposit accounts; (b) all Inventory, (c) all equipment, (d) all fixtures (e) all farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in Grantor's farming operation, and products of crops and livestock in their unmanufactured state; (f) all general intangibles, including all Intellectual Property (defined herein); (g) all proceeds of any crop insurance, price support payment or other government program; (h) rights and interests under Hedging Agreements, including all rights to the payment of money from Secured Parties under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in the Hedging Agreements; (i) accessions, attachments and other additions to the Collateral; (j) substitutes or replacements for any Collateral, all proceeds, products, rents and profits of any Collateral, all rights under warranties and insurance contracts covering the Collateral, and any causes of action relating to the Collateral; and (k) Books and Records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

**2.     Secured Obligations.** This Master Security Agreement is to secure the payment and performance of the following (collectively, the "Secured Obligations") in any order of priority that Collateral Agent or Secured Parties may choose: (a) all Obligations (defined in the MCA), under one or more Facility Sheet(s) from time to time where Grantor is designated from time to time as Borrower, Guarantor, or Non-Borrower, including this Master Security Agreement; (b) all Hedging Obligations; (c) all Guaranteed Obligations (defined in the Guaranty); (d) all obligations of Guarantor to the Swap Counterparties under the Hedging Agreements or any guaranty given by Guarantor to secure the Hedging Obligations; (e) all obligations of Grantor under this Master Security Agreement; (f) all obligations of Grantor to Lender, Coöperatieve Rabobank U.A., (trading as Rabobank), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands ("Rabobank") and/or Rabobank, N.A., a national banking association ("RNA"), or any other Affiliate of Lender (Lender, Rabobank and RNA, and any other Affiliate of Lender are herein individually and collectively, "Secured Parties"), whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether obligatory or non-obligatory; whether due or not due, whether absolute or contingent, or whether incurred directly or acquired by assignment or otherwise, under the terms and conditions of any other written instrument or agreement executed by Grantor; and (g) any of the foregoing that arises after the filing of a petition by or against Grantor under an insolvency Proceeding.

**3.     Grantor Representations.** Grantor represents to Collateral Agent and Secured Parties that: (a) the legal name of Grantor is as appears in the first paragraph of this Master Security Agreement; (b) Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this Master Security Agreement; (c) Grantor has its place of business, or its chief executive office, if it has more than one place of business, located at the address adjacent to its signature below; (d) except for Liens expressly permitted under the terms of the MCA, Grantor has not granted any security interest in any of the Collateral except to Collateral Agent or Secured Parties; and (e) there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Collateral with respect to any violations of Applicable Laws.

**4.     Information Accurate and Complete.** Grantor's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of Grantor, from time to time, whether or not required under Borrower's application for the Loans, Lender's underwriting and approval of the Loans, or this Master Security Agreement and the other Loan Documents, will be deemed accompanied by a representation by Grantor that the report, record or information is complete and accurate in all material respects as to the condition or operations of Grantor (and, if applicable, Grantor's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities and Grantor's business or organizational structure.

**5.     Grantor Covenants.** Until such time as all of the Secured Obligations have been paid in full, Lender has no obligation to make additional Loans and the Hedging Agreements have been terminated:

(a)     Grantor shall properly preserve, maintain and care for the Collateral; defend the Collateral against any adverse claims and demands; protect, diligently collect all accounts; and keep complete, current, and accurate Books and Records with respect to the Collateral and any proceeds or collections;

(b)     Grantor shall notify Collateral Agent in writing prior to any change in (i) Grantor's name, identity or business structure or (ii) the location(s) of (A) Grantor's place of business or Grantor's chief executive office if Grantor has more than one place of business, (B) Grantor's state of organization, or (C) Grantor's Books and Records concerning any Collateral;

(c)     Grantor shall promptly notify Collateral Agent in writing of any event which affects the value of the Collateral, the ability of Grantor or Collateral Agent to dispose of the Collateral, or the rights and remedies of Collateral Agent in relation thereto, including, but not limited to, the levy of any

legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise;

(d)        except for purchase money security interests related to normal trade credit and Liens expressly permitted under the terms of this Master Security Agreement or the MCA, Grantor will not grant any security interest in any of the Collateral except to Collateral Agent, and will keep the Collateral free of all Liens, claims, security interests and encumbrances of any kind or nature except the security interest of Collateral Agent and such permitted Liens;

(e)        Grantor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Collateral Agent's security interest. Without waiving Grantor's default for failure to make any such payment, Collateral Agent at its option may pay any such costs and expenses, discharge encumbrances on the Collateral, and pay for insurance of the Collateral, and such payments shall be a part of the Secured Obligations and bear interest at the rate set out in the Secured Obligations. Grantor agrees to reimburse Collateral Agent on demand for any costs so incurred;

(f)        until Collateral Agent exercises its rights to make collection, Grantor will diligently collect all Collateral;

(g)        if any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Grantor shall immediately deliver such document to Collateral Agent, together with any necessary endorsements;

(h)        Grantor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral, except that until an Event of Default or the revocation by Collateral Agent of Grantor's right to do so, and subject to the provision of this Master Security Agreement, Grantor may (i) sell or lease any Collateral constituting Inventory or farm products in the ordinary course of business at prices constituting the fair market value thereof; and (ii) use feed, seed, fertilizer, chemicals, medicines and other supplies used or produced in Grantor's farming operations in the ordinary course of Grantor's farming operations;

(i)        Grantor will execute and deliver such additional documents as may be reasonably requested by Collateral Agent in connection with Collateral Agent's security interest in the Collateral, including all assignments, transfers and other documents required by Collateral Agent to transfer to Collateral Agent, all federal and state government program payments, rights to payment, accounts, general intangibles and benefits; and

(j)        Grantor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Grantor first obtains the written consent of any owner, holder of any Lien on the real property or fixture, or other Person having an interest in such property to the removal by Collateral Agent of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Collateral Agent and shall provide that Collateral Agent has no liability to such owner, holder of any Lien, or any other Person.

**6.        Additional Optional Requirements.** Collateral Agent may at its option at any time, whether or not Grantor is in default: (a) require Grantor to deliver to Collateral Agent (i) copies of or extracts from the Books and Records, (ii) records and schedules which show the status and condition of the Collateral and where it is located, and (iii) information on any contracts or other matters affecting the Collateral; (b) permit Collateral Agent to inspect the Collateral; (c) require Grantor to furnish to Collateral Agent a list of the buyers, processors, commission merchants, cooperatives, or selling agents to or through whom Grantor sells any farm product or other Collateral; and in the event that Grantor thereafter sells farm products or other Collateral to or through a Person or entity not identified in the list, Grantor shall notify Collateral Agent of the sale not less than seven (7) days prior to the sale; (d) require Grantor to deliver to Collateral Agent any instruments or chattel paper; (e) notify or require Grantor to notify any account debtors, any buyers of the Collateral, or any other Persons of Collateral Agent's interest in the Collateral; (f) notify or require Grantor to notify any account debtor to forward all payments and proceeds of the Collateral to Collateral Agent; and (g) endorse or sign Grantor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to Grantor and remove therefrom any payments and proceeds of the Collateral.

**7.        Events of Default.** The following each shall be an event of default under this Master Security Agreement (an "Event of Default"): (a) an Event of Default under the MCA, including a default termination event or other similar event under any Hedging Agreement which is not cured within any grace or cure period specified therein, if any; and (b) Grantor breaches any term, provision, warranty or representation under this Master Security Agreement.

**8.        Remedies.** Upon the occurrence of an Event of Default, Collateral Agent may: (a) pursue any or all remedies as set forth in this Master Security Agreement, the MCA or the Hedging Agreements; (b) enforce the security interest given hereunder or any other instrument or agreement pursuant to the UCC and any other Applicable Law; (c) enforce the security interest of Collateral Agent in any deposit account of Grantor maintained with any Secured Party by applying such account to the Secured Obligations; (d) require Grantor to obtain Collateral Agent's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral; (e) require Grantor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Collateral Agent in kind; (f) require Grantor to assemble the Collateral, including the Books and Records, and make them available to Collateral Agent at a place designated by Collateral Agent; (g) enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Grantor's equipment, if Collateral Agent deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral; (h) demand and collect any payments on and proceeds of the Collateral; (i) grant extensions and compromise or settle claims with respect to the Collateral for less than face value, upon reasonable prior notice to Grantor as may be required under the UCC; (j) use or transfer any of Grantor's rights and interests in any Intellectual Property now owned or hereafter acquired by Grantor, if Collateral Agent deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Grantor agrees that any such use or transfer shall be without any additional consideration to Grantor (as used in this Master Security Agreement, "Intellectual Property" means all trade secrets, computer software, service marks, trademarks, trade names, trade styles, all goodwill of Grantor associated with the business now or hereafter conducted by Grantor connected with or symbolized by any service mark, trademark, trade name or trade style, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Grantor has any right or interest, whether by ownership, license, contract or otherwise); (k) have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Grantor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment or to demand or request the posting of any bond as a condition or term of such appointment; (l) take such measures as Collateral Agent may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Grantor hereby irrevocably constitutes and appoints Collateral Agent as Grantor's attorney-in-fact to perform all acts and execute all documents in connection therewith; and (m) without notice or demand to Grantor, set off and apply against any and all of the Secured Obligations any and all deposits (general or special, time or demand, provisional or final) and any other Secured Obligations, at any time held or owing by Collateral Agent or any of Collateral Agent's agents or affiliates to or for the credit of the account of Grantor or any Guarantor or endorser of the Secured Obligations.

**9.** **Notices.** All notices, approvals, consents, and other communications, under this Master Security Agreement ("**Notices**") must be given in accordance with and will be subject to the terms and provisions of the MCA. Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Collateral Agent or Lender, to 14767 N. Outer 40 Rd., Suite 400, Chesterfield, MO 63017, Attention: Loan Closing Department; if to Secured Parties other than Lender, c/o Rabobank, 245 Park Avenue, New York, NY 10167, Attention: Customer Service Representative; and in the case of any other Person, to the address designated by that Person in a Notice to Grantor Collateral Agent and Secured Parties.

**10.** **Other Acts.** Grantor shall cooperate with Collateral Agent and Secured Parties for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this Master Security Agreement or to carry out the intent of this Master Security Agreement. Promptly (but in no event more than ten days) after request by Collateral Agent and Secured Parties, Grantor will execute, acknowledge and deliver any document which Collateral Agent and Secured Parties deems necessary or advisable for these purposes, and will, on demand, pay any expenses incurred by Collateral Agent and Secured Parties in the preparation, execution and filing of any such documents.

**11.** **POWER OF ATTORNEY.** TO FACILITATE THE PERFORMANCE OF THE AGREEMENTS OF GRANTOR UNDER THE LOAN DOCUMENTS, SECURED PARTY, IN THE NAME AND ON BEHALF OF GRANTOR OR, AT ITS OPTION, IN ITS OWN NAME, MAY (BEFORE OR AFTER AN EVENT OF DEFAULT) PERFORM OR OBSERVE ANY OBLIGATION OF GRANTOR TO SECURED PARTY AND TAKE ANY ACTION WHICH SECURED PARTY MAY DEEM NECESSARY OR DESIRABLE TO CURE OR CORRECT SUCH FAILURE. GRANTOR IRREVOCABLY AUTHORIZES SECURED PARTY AND GRANTS SECURED PARTY A POWER OF ATTORNEY IN THE NAME AND ON BEHALF OF THE GRANTOR OR, AT ITS OPTION, IN ITS OWN NAME, COUPLED WITH AN INTEREST, TO COLLECT, RECEIVE, RECEIPT FOR, CREATE, PREPARE, COMPLETE, EXECUTE, ENDORSE, DELIVER, AND FILE ANY AND ALL INSURANCE APPLICATIONS, REMITTANCES, INSTRUMENTS, DOCUMENTS, CHATTEL PAPER, AND OTHER WRITINGS, TO GRANT AN EXTENSION TO, COMPROMISE, SETTLE, WAIVE, NOTIFY, AMEND, ADJUST, CHANGE, AND RELEASE ANY OBLIGATION OF ANY ACCOUNT GRANTOR, OBLIGOR, INSURER, OR OTHER PERSON PERTAINING TO ANY COLLATERAL, AND TAKE ANY OTHER ACTION DEEMED BY SECURED PARTY TO BE NECESSARY OR DESIRABLE TO ESTABLISH, PERFECT, PROTECT, OR ENFORCE THE SECURED PARTY'S INTEREST IN THE COLLATERAL. Grantor shall execute FSA/CCC Power of Attorney forms and any other documents required to enable Secured Party to execute any and all documents necessary for application for, compliance with or reporting of necessary information for all FSA/CCC programs. Secured Party has no duty to exercise any of the authority granted in this paragraph. Secured Party shall not be liable for any act or failure to act in connection with the collection of or the preservation of any rights with respect to the Collateral described in this paragraph.

**12.** **Miscellaneous.**

(a) Grantor hereby acknowledges Lender has entered in to a collateral agency agreement between the Secured Parties (the "Collateral Agency Agreement") which, as amended, modified, or restated, permits Lender to act as a Collateral Agent in servicing the applicable Loan.

(b) The MCA, the other Transaction Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (collectively, the "**Secured Obligation Documents**"), collectively: (i) represent the sum of the understandings and agreements between Collateral Agent, Secured Parties and Grantor concerning this credit; (ii) replace any prior oral or written agreements between Collateral Agent, Secured Parties and Grantor concerning this credit; and (iii) are intended by Collateral Agent Secured Parties and Grantor as the final, complete and exclusive statement of the terms agreed to by them. The Secured Obligation Documents also grant further rights to Collateral Agent and Secured Parties and contain further agreements and affirmative and negative covenants by Grantor which apply to this Master Security Agreement and to the Collateral.

(c) Each waiver by Collateral Agent or Secured Parties must be in writing, and no waiver is to be construed as a continuing waiver. No waiver is to be implied from any delay or failure by Collateral Agent or Secured Parties to take action on account of any default of Grantor. Consent by Collateral Agent or Secured Parties to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Collateral Agent's Secured Parties' consent to be obtained in any future or other instance. The exercise by Collateral Agent or Secured Parties of any right or remedy under this Master Security Agreement or the other Secured Obligation Documents or under Applicable Law, shall not: cure or waive a breach, Event of Default or Notice of default under this Master Security Agreement or invalidate any act performed pursuant to any such default or Notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents, including any Hedging Agreements, have been cured); or impair the security of this Master Security Agreement; or prejudice Collateral Agent or Secured Parties, or any receiver appointed in accordance with this Master Security Agreement, in the exercise of any right or remedy afforded any of them under this Master Security Agreement; or be construed as an affirmation by Collateral Agent or Secured Parties of any tenancy, lease or option, or a subordination of the Lien of this Master Security Agreement.

(d) Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require upon foreclosure sales of assets in a particular order. Each successor and assign of Grantor, including any holder of a Lien subordinate to this Master Security Agreement, by acceptance of its interest or Lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

(e) If Grantor consists of more than one Person, each Grantor (a) acknowledges that this Master Security Agreement is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor; and (b) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable. GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT COLLATERAL AGENT OR SECURED PARTIES EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS MASTER SECURITY AGREEMENT, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS.

(f) If Grantor is comprised of multiple Persons, any Person comprising Grantor is hereby authorized to bind all Parties comprising Grantor. Collateral Agent and Secured Parties may, at any time and without Notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

(g) This Master Security Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns; provided that Grantor shall not assign its rights or obligations hereunder without Secured Parties' consent. However, this Paragraph does not waive the provisions of Section (h); and Grantor shall not assign its rights or obligations hereunder without the consent of Collateral Agent and Secured Parties. Collateral Agent and Secured Parties may transfer all or any portion of its rights under the Secured Obligation Documents to any other Person. Collateral Agent and Secured Parties may disclose to any actual or proposed transferee any information that Grantor has delivered to Collateral Agent or Secured Parties in connection with the negotiation of this Master Security Agreement or pursuant to the Secured Obligation Documents; and Grantor shall cooperate fully with Collateral Agent and Secured Parties in providing that information to any actual or proposed transferee. Any individual signing this Master Security Agreement does so on his or her own behalf and on behalf of his or her marital community, and agrees that recourse may be had against community assets and against his or her separate property for the satisfaction of all indebtedness, liabilities and obligations of Indemnitor under this Master Security Agreement.

(h)     All rights and remedies under this Master Security Agreement and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

(i)     Any provision of any Secured Obligation Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Secured Obligation Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Collateral Agent may, at its option, declare all Secured Obligations immediately due and payable.

(j)     This Master Security Agreement may not be amended, changed, modified, altered or terminated without the prior written consent of Collateral Agent and Secured Parties.

(k)     This Master Security Agreement shall be governed exclusively by the applicable laws of the State of Iowa (the "Governing Law State") without regard or reference to its conflict of laws principles. Grantor understands that the laws of the Governing Law State may differ from the laws of the State where Grantor resides or otherwise is located or where the Collateral is located. However, Grantor understands, agrees and acknowledges that (a) this Master Security Agreement and the Secured Obligation Documents have significant and substantial contacts with the Governing Law State, (b) it is convenient to Grantor and Lender to select the law of the Governing Law State to govern this Master Security Agreement and the transactions evidenced hereby, (c) the transactions evidenced by this Master Security Agreement bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the Governing Law State constitutes good and valuable consideration for Secured Parties to enter into the Secured Obligation Documents and Secured Parties have entered into the Secured Obligation Documents in reliance on this choice.

(l)     GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF COLLATERAL AGENT, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS MASTER SECURITY AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA. GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

(m)     This Master Security Agreement may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument.

(n)     Collateral Agent is authorized to execute any other documents or take any other actions necessary to effectuate this Master Security Agreement and the consummation of the transactions contemplated herein.

(o)     Collateral Agent is authorized to file in any Uniform Commercial Code jurisdiction, any such financing statement or amendment as Collateral Agent deems necessary or desirable to perfect its security interest, including but not limited, to a financing statement or amendment indicating the collateral as "all assets," "all personal property," or "all personal property and fixtures" of Grantor.

(p)     Collateral Agent and Secured Parties are authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Grantor. Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Collateral Agent or Secured Parties shall authorize third Persons to provide the information requested from time to time.

(q)     Each Party has participated in negotiating and drafting this Master Security Agreement, so if an ambiguity or a question of intent or interpretation arises, this Master Security Agreement is to be construed as if the Parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this Master Security Agreement.

(r)     **GRANTOR, AND BY ACCEPTANCE HEREOF, COLLATERAL AGENT (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS MASTER SECURITY AGREEMENT; OR (II) ANY SECURED OBLIGATION DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY; AND ARE A MATERIAL INDUCEMENT FOR THE SECURED PARTIES ENTERING INTO THE SECURED OBLIGATION DOCUMENTS.**

13.     **IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

THIS SECURITY AGREEMENT COVERS CROPS NOW GROWING. THIS SECURITY AGREEMENT ALSO COVERS FUTURE CROPS TO BE GROWN IN CURRENT YEAR OR ANY YEAR HEREAFTER.

Grantor is signing this Master Security Agreement effective as of the day and year first written above.

**GRANTOR**

Address for Notices:
824 Mullins Lane
Benton, KY 42025

MCCLAIN FEED YARD, INC., a Texas corporation

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Secretary

Address for Notices:
824 Mullins Lane
Benton, Kentucky 42055

**7M CATTLE FEEDERS, INC.**, a Kentucky corporation

By: _____
BRIAN KEITH MCCLAIN
President

By: _____
CRYSTAL D MCCLAIN
Vice President

# EXHIBIT G

## UCC FINANCING STATEMENT

**2019-3035893-63.01**
**Kentucky Secretary of State**
File Date   7/31/2019 1:21:41 PM
Status   Active
Fee   $5.00

Name and address of filer:

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

**This document is a representation of a filing made electronically at the Kentucky Secretary of State's web site**

DEBTOR'S EXACT FULL LEGAL NAME

| a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7M Cattle Feeders, Inc. | | | |

| b. NDIV DUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| c. MAILING ADDRESS | CITY | | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 824 Mullins Lane | Benton | KY | 42055 | USA |

SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY)

| a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Rabo AgriFinance LLC | | | |

| b. NDIV DUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| c. MAILING ADDRESS | CITY | | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| P.O. Box 411995 | St. Louis | MO | 63141 | USA |

4. This FINANCING STATEMENT covers the following collateral:

**All Assets**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| --- | --- |
| Phone: (800) 331-3282 Fax: (818) 662-4141 | |

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    8477 - RABO

```
Lien Solutions                       71038283
P.O. Box 29071
Glendale, CA 91209-9071              KYKY
```

File with: Secretary of State, KY

**2019-3036274-97.01**
Alison Lundergan Grimes
Kentucky Secretary of State
File Date    8/1/2019 4:30:00 PM
Status    Active
Fee    $20.00
Filer    dwilliams

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| 7M Cattle Feeders, Inc. | | | | |
| OR   1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 824 Mullins Lane | Benton | KY | 42055 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| McClain Feed Yard, Inc. | | | | |
| OR   2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 824 Mullins Lane | Benton | KY | 42055 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| Rabo AgriFinance LLC | | | | |
| OR   3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. Box 411995 | St. Louis | MO | 63141 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
See attached Exhibit "A", "B", and "C"

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative | |
| --- | --- |
| 6a. Check only if applicable and check only one box: <br> ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box: <br> ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | |
| 8. OPTIONAL FILER REFERENCE DATA: <br> 71038283     22117434 | 7M Cattle Feeders, Inc. |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## EXHIBIT A

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

(a)   ~all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the real estate and any interest in the real estate located in Deaf Smith and Parmer Counties, Texas, and described in EXHIBIT B-1 and EXHIBIT B-2 (the "Land"), including all wells, watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements");

(b)   all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a means of access thereto ("Easements");

(c)   the ground water on, under, pumped from or otherwise available to the Collateral or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government ("Governmental Authority") and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Collateral or Debtor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Collateral, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Collateral by virtue of the Collateral being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity (collectively, "Water Rights")

(d)   all other tenements, hereditaments and appurtenances to the Land;

(e)   minerals, oil, gas, coal, metallic ores, other minerals and any other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas, coal, metallic ores and any other mineral interests with which any of the foregoing interests or estates are pooled or unitized, including surface damage awards or settlements (the "Mineral Rights");

(f)   timber now or hereafter standing or cut;

(g)   leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Collateral (collectively, the "Leases");

(h)   all utility contracts, maintenance agreements, management agreements, service contracts and other agreements directly related to the operation and maintenance of the Collateral;

(i)   all bushes, groves, trees, plants, vines or other plantings, upon or under the Land ("Plantings");

(j)   working drawings, instructional manuals, and rights in processes directly related to the operation of the Collateral, and all other general intangibles described in EXHIBIT C;

(k)   other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment (except motor vehicles, trailers, and planting, tillage and harvesting equipment rolling stock) or which is in all cases (i) directly related to the operation of the Collateral or acquired in connection with any construction or maintenance of the Land or the Improvements, (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements, or  (iii) described in EXHIBIT C;

McClain MCA 2018
UCC-1 Financing Statement
Information

(l)      all permits and licenses relating or pertaining to the use or enjoyment of the Collateral;

(m)      proceeds of and any unearned premiums on any insurance policies covering the Collateral, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Collateral (the "Insurance Claims");

(n)      all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate (the "Condemnation Awards");

(o)      money or other personal property of Debtor in addition to the foregoing deposited with or otherwise in Beneficiary's, Trustee's or Secured Parties possession;

(p)      rights and interests under any interest rate swap, interest rate caps, interest rate collars or other similar agreement between Debtor and a Swap Counterparty, for the purpose of fixing or limiting interest expense, or any foreign exchange, currency hedging, commodity hedging, security hedging or other agreement between Debtor and Secured Parties or any of their affiliates, for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets, including all rights to the payment of money from Secured Parties or trustee under any deed of trust granted to Secured Parties (the "Trustee") Trustee under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in any of the Hedging Agreements;

(q)      the right, in the name and on behalf of Debtor, upon notice to Debtor, to appear in and defend any action or proceeding brought with respect to the Collateral and to commence any action or proceeding to protect the interest of Trustee, Beneficiary or Secured Parties in the Collateral; and

(r)      substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.

McClain MCA 2018
UCC-1 Financing Statement
Information

## EXHIBIT B-1"

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

Legal Description of Real Estate

Deaf Smith County, Texas

Tract 2:

A 36.03 acre tract, more or less, out of the Southwest part of Section 26, Block K-8, Abstract No. 1370, Certificate Number 128 of the T. T. R. R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a number 60 common nail found for the Southwest corner of Section 26, Block K-8 whence a 1-1/2 inch iron pipe found for the Southeast corner of said section bears North 89 degrees 56 minutes 00 seconds East 5321.58 feet;

THENCE North 89 degrees 56 minutes 00 seconds East along the South line of said section, 48.80 feet to a 1/2 inch iron rod set in the East physical line of Farm Road 1057 for the Southwest and beginning corner of this tract;

THENCE North 00 degrees 12 minutes 00 seconds West along the East physical line of Farm Road 1057, at 30.00 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.27 feet a 1/2 inch iron rod set for corner;

THENCE North 89 degrees 54 minutes 43 seconds East 606.84 feet to a 1/2 inch iron rod set in the East line of a tract known as the West 40 acres of the Southwest 1/4 of said section whence a 1/2 inch iron rod set for the Northeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section bears North 00 degrees 11 minutes 29 seconds West 71.78 feet;

THENCE South 00 degrees 11 minutes 29 seconds East at 2557.50 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.50 feet a 1/2 inch iron rod found in the South line of said section for the Southeast corner of the track known as the West 40 acres of the Southwest 1/4 of said section;

THENCE South 89 degrees 56 minutes 00 seconds West along the South line of said section, 606.45 feet to the place of beginning.

McClain MCA 2018
UCC-1 Financing Statement
Information

Tract 3:

A 20.00 acre tract out of the Southwest part of Section 26, Block K-8, Certificate Number 128 of the T.T R.R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with cap marked "RPLS 1848" found in the South line of Section 26 for the Southwest corner and POINT OF BEGINNING of this tract, whence a number 60 common nail found for the Southwest corner of Section 26, Block K-8 bears South 89 degrees 56 minutes 00 seconds West 655.25 feet;

THENCE North 00 degrees 11 minutes 29 seconds West, a distance of 2587.50 feet a fence corner post for the Northwest corner of this tract;

THENCE North 89 degrees 54 minutes 43 seconds East, a distance of 336.69 feet to a 1/2 inch iron rod with cap marked "HBD" set for the Northeast corner of this tract;

THENCE South 00 degrees 11 minutes 29 seconds East, at a distance of 2557.62 feet pass a 1/2 inch iron rod with cap marked "HBD" set for reference, continue for a total distance of 2587.62 feet a point on the South line of Section 26, whence a 1-1/2 inch iron pipe found for the Southeast corner of Section 26 bears North 89 degrees 56 minutes 00 seconds East, 4329.64 feet;

THENCE South 89 degrees 56 minutes 00 seconds West, along the South line of Section 26, a distance of 336.69 feet to the POINT OF BEGINNING.

Case 23-20084-rlj7   Claim 256-1 Part 1   Filed 08/08/23   Desc Exhibit A   Page 162 of 204
Exhibit A   Page 162 of 204

**EXHIBIT B-2"**

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

**Legal Description of Real Estate**

Parmer County, Texas

Tract 1:

A tract of land being all of Section 25 and a portion of Section 24 of Charles E. Harding's Subdivision of Capitol League 473 and parts of Capitol Leagues 459, 460, 461, 472 and 474 in Parmer County, Texas, as shown by the map or plat thereof of record in Volume 6, Page 164, Deed Records of Parmer County, Texas, and being described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with camp stamped "Furman RPLS 1959" set for the southwest corner of said Section 25, being the common corner of Sections 25-36-35-26 from whence a 1/2 inch iron rod found for the common corner of sections 27-34-33-28, all in said subdivision bears North 89° 56' 32" west, 10,564.82 feet, the southwest corner of Section 36 and the southeast corner of Section 35 bears South

00° 11' 46" West, 5,281.81 feet, from this point a harrow tooth found as called for in that certain instrument recorded in Volume 225, Page 730, of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas, as shown by Plat thereof of record in Volume 2, Page 495 of said Deed Records bears West (Bearing Basis) 1,411.64 feet;

THENCE North 00° 11' 46" East along the common line of Sections 25 and 26, and the common line of Section 24 and 23, of said Charles E. Harding's Subdivision, and along the center of a road, at 5,281.61 feet pass the common line of Sections 25-26-23-24 a total distance of 8,503.54 feet to a 3/4 inch iron pipe found as called for in that certain instrument recorded in Volume 156, Page 603 of said Deed Records, and in Volume 2, Page 219 of the Field Note Records of Parmer County, Texas, from whence the common corner of Sections 24-23-14-13 of said Charles E. Harding's Subdivision bears North 00° 11' 46" East 5,281.61 feet and 1 1/4 inch iron pipe with 5/8 inch rod adjacent found for the common corner of Sections 12-13-14-11 of said Charles E. Harding's Subdivision, as called for in that certain instrument recorded in Volume 2, Page 343, of said Field Note records bears North 00° 11' 46" East 7,341.28 feet;

THENCE South 89° 40' 58" East 2,100.84 feet along a fence line and along the North line of this tract of land and the North line of that certain tract of land described in said Volume 156, Page 603 and said Volume 2, Page 219 to a 3/4 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219, said North line being monumented and generally accepted on the ground for over 25 years, from whence the Northeast corner of Section 24 and the Southeast corner of Section 14 of said Charles E. Harding's Subdivision bears North 00° 11' 07" East 7,345.07 feet;

THENCE South 00° 11' 07" West at 3,187.40 feet pass a 3/4 inch iron pipe found, this iron pipe is a monument of record in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southeast corner of Section 24 of said Charles E. Harding's Subdivision, it is however the Professional opinion of this surveyor that this corner lies in the East line of this survey but 26.81 feet North of the actual section corner, at 3,214.21 feet pass what is in my Professional opinion the Southeast corner of Section 24 and the Northeast corner of Section 25 of said Charles E. Harding's Subdivision at 3,301.75 feet pass a 1 1/2 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southwest corner of Section 22 and the Northwest corner of Section 27 in Township 1 North, Range 3 East of a Capitol Syndicate Subdivision as shown by Plat thereof of record in Volume 5, Page 394 of said Deed Records, a total distance of 8,493.86 feet to a point being the Southeast corner of Section 25 and the Northeast corner of Section 36 of said Charles E. Harding's Subdivision from whence the Southeast corner of said Section 36 bears South 00° 11' 07" West 5,279.65 feet from this point a railroad spike found as called for in that certain instrument recorded in Volume 225, Page 730 of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas as shown by Plat thereof record in Volume 2, Page 495 of said Deed Records bears East (Bearing Basis) 1,324.17 feet;

THENCE North 89° 56' 48" West 2,102.46 feet along the South line of Section 25 and the North line of Section 36 of said Charles E. Harding's Subdivision to the POINT OF BEGINNING and containing 410.0 acres of land, more or less.

## EXHIBIT C

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

### Additional Collateral

associated with DEED OF TRUST by McClain Feed Yard  and 7M Cattle Feeders, Inc. on land located in Deaf Smith and Parmer
Counties, Texas

(list specific additional Collateral, if any)

Fixtures

Buildings, fixtures, and equipment associated with agricultural production or the productions of farm products, including but not
limited to:

| Attached Equipment |
| --- |
| 2 x Stationary Roto-Mixers |
| 6 x Liquid Storage Tanks |
| 9 x Hyd. Working Chutes (Snakes Not Included) |
| 1 x 12 x 70 Truck Scale |
| 2 x 12 x 70 Cattle Scales With Fencing and Gates |
| 1 x Grain Probe |

All Water Rights related to but not limited to:

| Subject Water Wells – 410.0 Acre Feedyard Tract | | | | | | |
|---|---|---|---|---|---|---|
| Section | District Number | Permit Number | Permit Status | Documents | Recently Tested | Current GPM Estimate |
| 24 | 79667 | 3694 | Current | Yes | No | 40 |
| 24 | 79677 | 3974 | Current | Yes | Yes | 64 |
| 24 | 79680 | 3977 | Current | Yes | Yes | 53 |
| 24 | 79681 | 3978 | Current Destroyed | Yes | Yes | 0 |
| 25 | 82449 | 40124 | Current | None | No | 0 |
| 25 | 79188 | 3423 | Current | Yes | Yes | 40 |
| 25 | 79072 | 3289 | Abandoned | Yes | No | 0 |
| 25 | 79544 | 3831 | Current | Yes | No | 40 |
| 25 | 78540 | 2689 | Current | Yes Mill and Office | No | 20 |
| 25 | 79189 | 3424 | Current | Yes | No | 40 |
| 24 | 79719 | 4021 | Current | Yes | No | 40 |
| 25 | 83148 | 50106 | Current | None | No | 0 |
| Total | | | | | | 357 |
| Total Tested | | | | | | 157 |

McClain MCA 2018
UCC-1 Financing Statement
Information

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER** (optional)<br>Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141 | **2021-3171512-95.01**<br>**Michael G. Adams**<br>**Kentucky Secretary of State**<br>File Date    9/23/2021 4:30:00 PM<br>Status    Active<br>Fee    $10.00<br>Filer    ADevine |
| **B. E-MAIL CONTACT AT FILER** (optional)<br>uccfilingreturn@wolterskluwer.com | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**    8477 - RABO<br><br>Lien Solutions    **82554671**<br>P.O. Box 29071<br>Glendale, CA  91209-9071    **KYKY** | |

File with: Secretary of State, KY    **THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 7M Cattle Feeders, Inc. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 824 Mullins Lane | Benton | KY | 42025 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| McClain Farms, Inc. | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 824 Mullins Lane | Benton | KY | 42025 | USA |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Rabo AgriFinance LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. Box 411995 | St. Louis | MO | 63141 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All Assets

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:    **6b.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility    ☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION** (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
82554671    0000030682    McClain Feed Yard, Inc.

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**    Prepared by Lien Solutions, P.O. Box 29071,<br>Glendale, CA 91209-9071 Tel (800) 331-3282

# Commonwealth of Kentucky
## Michael G. Adams, Secretary of State

9/27/2021

Michael G. Adams
Secretary of State
P. O. Box 718
Frankfort, KY 40602-0718
(502) 564-3490
http://www.sos.ky.gov

## UCC Acknowledgement
## 2021-3171512-95.1

**LIEN SOLUTIONS**
**P.O. BOX 29071**
**GLENDALE CA 91209-9071**

| | |
|---|---|
| **Filing number:** | **2021-3171512-95.1** |
| **File date and time:** | **9/23/2021 4:30:00 PM** |
| **Status of filing:** | **Active** |

## Actions

| Sequence | Filing Type | File Date | Status |
|---|---|---|---|
| 1 | Initial financing Statement | 9/23/2021 4:30:00 PM | Active |

## Debtors

| Org/Individual | Date Added | Name |
|---|---|---|
| Organization | 9/23/2021 4:30:00 PM | McClain Feed Yard, Inc. 824 Mullins Lane Benton, KY 42025 |
| Organization | 9/23/2021 4:30:00 PM | McClain Farms, Inc. 824 Mullins Lane Benton, KY 42025 |
| Organization | 9/23/2021 4:30:00 PM | 7M Cattle Feeders, Inc. 824 Mullins Lane Benton, KY 42025 |

## Secured Parties

| Org/Individual | Date Added | Name |
|---|---|---|
| Organization | 9/23/2021 4:30:00 PM | Rabo AgriFinance LLC P.O. Box 411995 St. Louis, MO 63141 |

**This acknowledgement shows the information for the filing as entered into the Kentucky Secretary of State's index.**

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| 7M Cattle Feeders, Inc. |

OR

| 9b. INDIVIDUAL'S SURNAME |
| --- |
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only <u>one</u> additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
| --- |
| McClain Feed Yard, Inc. |

OR

| 10b. INDIVIDUAL'S SURNAME |
| --- |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| 824 Mullins Lane | Benton | KY | 42025 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME <u>or</u> ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
| --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS: 82554671-KY-0  8477 - RABO AGRIFINANCE      Rabo AgriFinance LLC      File with: Secretary of State, KY      0000030682   McClain Feed Yard, Inc.

**FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)**

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# iLien Cover Page

Date Printed:  05/21/2018

Debtor:
McClain Feed Yard, Inc.
824 Mullins Lane
Benton, KY  42025

Obligation Number:  22114481
Primary Obligor:  McClain Feed Yard, Inc
Collateral ID:
Department:
Cost Center Name:  East
Region:
REF7:
Law Firm Bill Code:

iLien File #:  67968081
Order Confirmation #:  64213201

UserID:  265381
UserName:  KATHY JOLY
Number of Collateral Pages Attached:  0

Transaction Type:  Original
Jurisdiction:  TX, Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Phone: Fax: | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)** 8477 - RABO | |

Rabo AgriFinance
P.O. Box 411995
St. Louis, MO 63141

64213201

TXTX

File with: Secretary of State, TX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| McClain Feed Yard, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 824 Mullins Lane | Benton | KY | 42025 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Rabo AgriFinance LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. Box 411995 | St. Louis | MO | 63141 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Assets

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
64213201            22114481                                                        McClain Feed Yard, Inc

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Phone: (800) 331-3282 Fax: (818) 662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**  8477 - RABO

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

RECEIVED
AUG 17 2019
CLK SO

66105954

TXTX

NS

File with: Secretary of State, TX

**18-0029152240**

**08/17/2018 05:00 PM**

FILED
TEXAS
SECRETARY OF STATE
SOS

831711440006

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| McClain Feed Yard, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 624 Mullins Lane | Benton | KY | 42025 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Rabo AgriFinance LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. Box 411995 | St. Louis | MO | 63141 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
See attached Exhibit "A, B , C"

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
66105954          22114481                                    McClain Feed Yard, Inc

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## EXHIBIT A

McClain MCA 2018
*UCC-1 FINANCING STATEMENT FILING INFORMATION*

(a)    all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the real estate and any interest in the real estate located in Deaf Smith County, Texas, and described in  EXHIBIT B  (the "Land"), including all wells, watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements");

(b)    all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a *means of access thereto ("Easements");*

(c)    the ground water on, under, pumped from or otherwise available to the Collateral or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government ("Governmental Authority") and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Collateral or Debtor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or *other rights necessary or convenient to convey any water to the Collateral, water storage right, or other water-related entitlement* appurtenant to or otherwise applicable to the Collateral by virtue of the Collateral being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity (collectively, "Water Rights");

(d)    all other tenements, hereditaments and appurtenances to the Land;

(e)    minerals, oil, gas, coal, metallic ores, other minerals and any other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas, coal, metallic ores and any other mineral interests with which any of the foregoing interests or estates are pooled or unitized, including surface damage awards or settlements (the "Mineral Rights");

(f)    timber now or hereafter standing or cut;

(g)    leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Collateral (collectively, the "Leases");

(h)    all utility contracts, maintenance agreements, management agreements, service contracts and other agreements directly related to the operation and maintenance of the Collateral;

(i)    all bushes, groves, trees, plants, vines or other plantings, upon or under the Land ("Plantings");

(j)    working drawings, instructional manuals, and rights in processes directly related to the operation of the Collateral, and all other general intangibles described in EXHIBIT C;

(k)    other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment (except motor vehicles, trailers, and planting, tillage and harvesting equipment rolling stock) or which is in all cases (i) directly related to the operation of the Collateral or acquired in connection with any construction or maintenance of the Land or the Improvements, (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements, or (iii) described in EXHIBIT C;

(l)    all permits and licenses relating or pertaining to the use or enjoyment of the Collateral;

McClain MCA 2018
UCC-1 Financing Statement
Information

(m)     proceeds of and any unearned premiums on any insurance policies covering the Collateral, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Collateral (the "Insurance Claims");

(n)     all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate (the "Condemnation Awards");

(o)     money or other personal property of Debtor in addition to the foregoing deposited with or otherwise in Beneficiary's, Trustee's or Secured Parties possession;

(p)     rights and interests under any interest rate swap, interest rate caps, interest rate collars or other similar agreement between Debtor and a Swap Counterparty, for the purpose of fixing or limiting interest expense, or any foreign exchange, currency hedging, commodity hedging, security hedging or other agreement between Debtor and Secured Parties or any of their affiliates, for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets, including all rights to the payment of money from Secured Parties or trustee under any deed of trust granted to Secured Parties (the "Trustee") Trustee under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in any of the Hedging Agreements;

(q)     the right, in the name and on behalf of Debtor, upon notice to Debtor, to appear in and defend any action or proceeding brought with respect to the Collateral and to commence any action or proceeding to protect the interest of Trustee, Beneficiary or Secured Parties in the Collateral; and

(r)     substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.

## EXHIBIT B"

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

### Legal Description of Real Estate

Deaf Smith County, Texas

TRACT 1:

A 36.03 acre tract, more or less, out of the Southwest part of Section 26, Block K-8, Abstract No. 1370, Certificate Number 128 of the T. T. R.R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a number 60 common nail found for the Southwest corner of Section 26, Block K-8 whence a 1-1/2 inch iron pipe found for the Southeast corner of said section bears North 89 degrees 56 minutes 00 seconds East 5321.58 feet;
THENCE North 89 degrees 56 minutes 00 seconds East along the South line of said section, 48.80 feet to a 1/2 inch iron rod set in the East physical line of Farm Road 1057 for the Southwest and beginning corner of this tract;
THENCE North 00 degrees 12 minutes 00 seconds West along the East physical line of Farm Road 1057, at 30.00 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.27 feet a 1/2 inch iron rod set for corner;
THENCE North 89 degrees 54 minutes 43 seconds East 606.84 feet to a 1/2 inch iron rod set in the East line of a tract

known as the West 40 acres of the Southwest 1/4 of said section whence a 1/2 inch iron rod set for the Northeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section bears North 00 degrees 11 minutes 29 seconds West 71.78 feet;
THENCE South 00 degrees 11 minutes 29 seconds East at 2557.50 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.50 feet a 1/2 inch iron rod found in the South line of said section for the Southeast corner of the track known as the West 40 acres of the Southwest 1/4 of said section;
THENCE South 89 degrees 56 minutes 00 seconds West along the South line of said section, 606.45 feet to the place of beginning.

TRACT 2:

A 20.00 acre tract out of the Southwest part of Section 26, Block K-8, Certificate Number 128 of the T.T R.R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with cap marked "RPLS 1848" found in the South line of Section 26 for the Southwest corner and POINT OF BEGINNING of this tract, whence a number 60 common nail found for the Southwest corner of Section 26, Block K-8 bears South 89 degrees 56 minutes 00 seconds West 655.25 feet;
THENCE North 00 degrees 11 minutes 29 seconds West, a distance of 2587.50 feet a fence corner post for the Northwest corner of this tract;
THENCE North 89 degrees 54 minutes 43 seconds East, a distance of 336.69 feet to a 1/2 inch iron rod with cap marked "HBO" set for the Northeast corner of this tract;
THENCE South 00 degrees 11 minutes 29 seconds East, at a distance of 2557.62 feet pass a 1/2 inch iron rod with cap marked "HBO" set for reference, continue for a total distance of 2587.62 feet a point on the South line of Section 26, whence a 1-1/2 inch iron pipe found for the Southeast corner of Section 26 bears North 89 degrees 56 minutes 00 seconds East, 4329.64 feet;
THENCE South 89 degrees 56 minutes 00 seconds West, along the South line of Section 26, a distance of 336.69 feet to the POINT OF BEGINNING.

## EXHIBIT C

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

### Additional Collateral

associated with DEED OF TRUST by McClain Feed Yard  on land located in Deaf Smith County, Texas

(list specific additional Collateral, if any)

All irrigation equipment; of whatever kind; now owned or hereafter acquired

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**Lien Solutions**
Representation of filing

| A. NAME & PHONE OF CONTACT AT FILER (optional) Phone: Fax: |
|---|

| B. E-MAIL CONTACT AT FILER (optional) |
|---|

**This filing is Completed**
File Number : 190029038537
File Date : 31-Jul-2019

C. SEND ACKNOWLEDGMENT TO: (Name and Address)  8477 - RABO

Rabo AgriFinance
P.O. Box 411995
St. Louis, MO  63141

71038435

TXTX

File with: Secretary of State, TX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 1a. ORGANIZATION'S NAME  7M Cattle Feeders, Inc. | | | |
|---|---|---|---|---|
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | 1c. MAILING ADDRESS  824 Mullins Lane | CITY  Benton | STATE  KY | POSTAL CODE  42055 | COUNTRY  USA |

2. DEBTOR'S NAME: Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| OR | 3a. ORGANIZATION'S NAME  Rabo AgriFinance LLC | | | |
|---|---|---|---|---|
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | 3c. MAILING ADDRESS  P.O. Box 411995 | CITY  St. Louis | STATE  MO | POSTAL CODE  63141 | COUNTRY  USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Assets

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

| 8. OPTIONAL FILER REFERENCE DATA:  71038435            22117434 | 7M Cattle Feeders, Inc. |
|---|---|

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

**19-0029287664**

**08/01/2019 05:00 PM**

**FILED**
TEXAS
SECRETARY OF STATE

SOS

904172580002

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Phone: (800) 331-3282 Fax: (818) 662-4141 |

| B. E-MAIL CONTACT AT FILER (optional) |
| CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   8477 - RABO

Lien Solutions           71038284
P.O. Box 29071
Glendale, CA 91209-9071      TXTX

RECEIVED
AUG - 1 2019

File with: Secretary of State, TX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 7M Cattle Feeders, Inc. | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 824 Mullins Lane | Benton | KY | 42055 | | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| McClain Feed Yard, Inc. | | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 824 Mullins Lane | Benton | KY | 42055 | | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Rabo AgriFinance LLC | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| P.O. Box 411995 | St. Louis | MO | 63141 | | USA |

4. COLLATERAL: This financing statement covers the following collateral:
See attached Exhibit "A", "B", and "C"

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
71038284      22117434                                    7M Cattle Feeders, Inc.

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## EXHIBIT A

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

    (a)    all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the real estate and any interest in the real estate located in Deaf Smith and Parmer Counties, Texas, and described in EXHIBIT B-1 and EXHIBIT B-2 (the "Land"), including all wells, watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements");

    (b)    all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a means of access thereto ("Easements");

    (c)    the ground water on, under, pumped from or otherwise available to the Collateral or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government ("Governmental Authority") and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Collateral or Debtor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Collateral, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Collateral by virtue of the Collateral being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity (collectively, "Water Rights")

    (d)    all other tenements, hereditaments and appurtenances to the Land;

    (e)    minerals, oil, gas, coal, metallic ores, other minerals and any other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas, coal, metallic ores and any other mineral interests with which any of the foregoing interests or estates are pooled or unitized, including surface damage awards or settlements (the "Mineral Rights");

    (f)    timber now or hereafter standing or cut;

    (g)    leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Collateral (collectively, the "Leases");

    (h)    all utility contracts, maintenance agreements, management agreements, service contracts and other agreements directly related to the operation and maintenance of the Collateral;

    (i)    all bushes, groves, trees, plants, vines or other plantings, upon or under the Land ("Plantings");

    (j)    working drawings, instructional manuals, and rights in processes directly related to the operation of the Collateral, and all other general intangibles described in EXHIBIT C;

    (k)    other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment (except motor vehicles, trailers, and planting, tillage and harvesting equipment rolling stock) or which is in all cases (i) directly related to the operation of the Collateral or acquired in connection with any construction or maintenance of the Land or the Improvements, (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements, or (iii) described in EXHIBIT C;

McClain MCA 2018
UCC-1 Financing Statement
Information

(l) all permits and licenses relating or pertaining to the use or enjoyment of the Collateral;

(m) proceeds of and any unearned premiums on any insurance policies covering the Collateral, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Collateral (the "Insurance Claims");

(n) all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate (the "Condemnation Awards");

(o) money or other personal property of Debtor in addition to the foregoing deposited with or otherwise in Beneficiary's, Trustee's or Secured Parties possession;

(p) rights and interests under any interest rate swap, interest rate caps, interest rate collars or other similar agreement between Debtor and a Swap Counterparty, for the purpose of fixing or limiting interest expense, or any foreign exchange, currency hedging, commodity hedging, security hedging or other agreement between Debtor and Secured Parties or any of their affiliates, for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets, including all rights to the payment of money from Secured Parties or trustee under any deed of trust granted to Secured Parties (the "Trustee") Trustee under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in any of the Hedging Agreements;

(q) the right, in the name and on behalf of Debtor, upon notice to Debtor, to appear in and defend any action or proceeding brought with respect to the Collateral and to commence any action or proceeding to protect the interest of Trustee, Beneficiary or Secured Parties in the Collateral; and

(r) substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.

EXHIBIT B-1"

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

Legal Description of Real Estate

Deaf Smith County, Texas

Tract 2:

A 36.03 acre tract, more or less, out of the Southwest part of Section 26, Block K-8, Abstract No. 1370,
Certificate Number 128 of the T. T. R. R. Co. Surveys in Deaf Smith County, Texas, described by metes
and bounds as follows:

BEGINNING at a number 60 common nail found for the Southwest corner of Section 26, Block K-8 whence
a 1-1/2 inch iron pipe found for the Southeast corner of said section bears North 89 degrees 56 minutes
00 seconds East 5321.58 feet;

THENCE North 89 degrees 56 minutes 00 seconds East along the South line of said section, 48.80 feet to
a 1/2 inch iron rod set in the East physical line of Farm Road 1057 for the Southwest and beginning corner
of this tract;

THENCE North 00 degrees 12 minutes 00 seconds West along the East physical line of Farm Road 1057,
at 30.00 feet pass a 1/2 inch iron rod set for reference and at a total distance of 2587.27 feet a 1/2 inch
iron rod set for corner;

THENCE North 89 degrees 54 minutes 43 seconds East 606.84 feet to a 1/2 inch iron rod set in the East
line of a tract known as the West 40 acres of the Southwest 1/4 of said section whence a 1/2 inch iron rod
set for the Northeast corner of the tract known as the West 40 acres of the Southwest 1/4 of said section
bears North 00 degrees 11 minutes 29 seconds West 71.78 feet;

THENCE South 00 degrees 11 minutes 29 seconds East at 2557.50 feet pass a 1/2 inch iron rod set for
reference and at a total distance of 2587.50 feet a 1/2 inch iron rod found in the South line of said section
for the Southeast corner of the track known as the West 40 acres of the Southwest 1/4 of said section;

THENCE South 89 degrees 56 minutes 00 seconds West along the South line of said section, 606.45 feet
to the place of beginning.

Tract 3:

A 20.00 acre tract out of the Southwest part of Section 26, Block K-8, Certificate Number 128 of the T.T
R.R. Co. Surveys in Deaf Smith County, Texas, described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with cap marked "RPLS 1848" found in the South line of Section 26 for
the Southwest corner and POINT OF BEGINNING of this tract, whence a number 60 common nail found
for the Southwest corner of Section 26, Block K-8 bears South 89 degrees 56 minutes 00 seconds West
655.25 feet;

THENCE North 00 degrees 11 minutes 29 seconds West, a distance of 2587.50 feet a fence corner post
for the Northwest corner of this tract;

THENCE North 89 degrees 54 minutes 43 seconds East, a distance of 336.69 feet to a 1/2 inch iron rod
with cap marked "HBD" set for the Northeast corner of this tract;

THENCE South 00 degrees 11 minutes 29 seconds East, at a distance of 2557.62 feet pass a 1/2 inch iron
rod with cap marked "HBD" set for reference, continue for a total distance of 2587.62 feet a point on the
South line of Section 26, whence a 1-1/2 inch iron pipe found for the Southeast corner of Section 26 bears
North 89 degrees 56 minutes 00 seconds East, 4329.64 feet;

THENCE South 89 degrees 56 minutes 00 seconds West, along the South line of Section 26, a distance of
336.69 feet to the POINT OF BEGINNING.

EXHIBIT B-2"

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

Legal Description of Real Estate

Parmer County, Texas

Tract 1:

A tract of land being all of Section 25 and a portion of Section 24 of Charles E. Harding's Subdivision of Capitol League 473 and parts of Capitol Leagues 459, 460, 461, 472 and 474 in Parmer County, Texas, as shown by the map or plat thereof of record in Volume 6, Page 164, Deed Records of Parmer County, Texas, and being described by metes and bounds as follows:

BEGINNING at a 1/2 inch iron rod with camp stamped "Furman RPLS 1959" set for the southwest corner of said Section 25, being the common corner of Sections 25-36-35-26 from whence a 1/2 inch iron rod found for the common corner of sections 27-34-33-28, all in said subdivision bears North 89° 56' 32" west, 10,564.82 feet, the southwest corner of Section 36 and the southeast corner of Section 35 bears South

00° 11' 46" West, 5,281.81 feet, from this point a harrow tooth found as called for in that certain instrument recorded in Volume 225, Page 730, of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas, as shown by Plat thereof of record in Volume 2, Page 495 of said Deed Records bears West (Bearing Basis) 1,411.64 feet;

THENCE North 00° 11' 46" East along the common line of Sections 25 and 26, and the common line of Section 24 and 23, of said Charles E. Harding's Subdivision, and along the center of a road, at 5,281.61 feet pass the common line of Sections 25-26-23-24 a total distance of 8,503.54 feet to a 3/4 inch iron pipe found as called for in that certain instrument recorded in Volume 156, Page 603 of said Deed Records, and in Volume 2, Page 219 of the Field Note Records of Parmer County, Texas, from whence the common corner of Sections 24-23-14-13 of said Charles E. Harding's Subdivision bears North 00° 11' 46" East 5,281.61 feet and 1 1/4 inch iron pipe with 5/8 inch rod adjacent found for the common corner of Sections 12-13-14-11 of said Charles E. Harding's Subdivision, as called for in that certain instrument recorded in Volume 2, Page 343, of said Field Note records bears North 00° 11' 46" East 7,341.28 feet;

THENCE South 89° 40' 58" East 2,100.84 feet along a fence line and along the North line of this tract of land and the North line of that certain tract of land described in said Volume 156, Page 603 and said Volume 2, Page 219 to a 3/4 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219, said North line being monumented and generally accepted on the ground for over 25 years, from whence the Northeast corner of Section 24 and the Southeast corner of Section 14 of said Charles E. Harding's Subdivision bears North 00° 11' 07" East 7,345.07 feet;

THENCE South 00° 11' 07" West at 3,187.40 feet pass a 3/4 inch iron pipe found, this iron pipe is a monument of record in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southeast corner of Section 24 of said Charles E. Harding's Subdivision, it is however the Professional opinion of this surveyor that this corner lies in the East line of this survey but 26.81 feet North of the actual section corner, at 3,214.21 feet pass what is in my Professional opinion the Southeast corner of Section 24 and the Northeast corner of Section 25 of said Charles E. Harding's Subdivision at 3,301.75 feet pass a 1 1/2 inch iron pipe found as called for in said Volume 156, Page 603 and said Volume 2, Page 219 for the Southwest corner of Section 22 and the Northwest corner of Section 27 in Township 1 North, Range 3 East of a Capitol Syndicate Subdivision as shown by Plat thereof of record in Volume 5, Page 394 of said Deed Records, a total distance of 8,493.86 feet to a point being the Southeast corner of Section 25 and the Northeast corner of Section 36 of said Charles E. Harding's Subdivision from whence the Southeast corner of said Section 36 bears South 00° 11' 07" West 5,279.65 feet from this point a railroad spike found as called for in that certain instrument recorded in Volume 225, Page 730 of the Deed Records of Parmer County, Texas, for the Northwest corner of Section 1, Block C of Capitol Syndicate Subdivision in Parmer County, Texas as shown by Plat thereof record in Volume 2, Page 495 of said Deed Records bears East (Bearing Basis) 1,324.17 feet;

THENCE North 89° 56' 48" West 2,102.46 feet along the South line of Section 25 and the North line of Section 36 of said Charles E. Harding's Subdivision to the POINT OF BEGINNING and containing 410.0 acres of land, more or less.

McClain MCA 2018
UCC-1 Financing Statement
Information

## EXHIBIT C

McClain MCA 2018
UCC-1 FINANCING STATEMENT FILING INFORMATION

**Additional Collateral**

associated with DEED OF TRUST by McClain Feed Yard and 7M Cattle Feeders, Inc. on land located in Deaf Smith and Parmer
Counties, Texas

(list specific additional Collateral, if any)

Fixtures

Buildings, fixtures, and equipment associated with agricultural production or the productions of farm products, including but not
limited to:

| Attached Equipment |
| --- |
| 2 x Stationary Roto-Mixers |
| 6 x Liquid Storage Tanks |
| 9 x Hyd. Working Chutes (Snakes Not Included) |
| 1 x 12 x 70 Truck Scale |
| 2 x 12 x 70 Cattle Scales With Fencing and Gates |
| 1 x Grain Probe |

All Water Rights related to but not limited to:

| Subject Water Wells - 410.0 Acre Feedyard Tract | | | | | | |
|---|---|---|---|---|---|---|
| Section | District Number | Permit Number | Permit Status | Document | Recently Tested | Current GPM Estimate |
| 24 | 79667 | 3694 | Current | Yes | No | 20 |
| 24 | 79677 | 3974 | Current | Yes | Yes | 64 |
| 24 | 79680 | 3977 | Current | Yes | Yes | 53 |
| 24 | 79681 | 3978 | Current Destroyed | Yes | Yes | 0 |
| 25 | 82150 | 50124 | Current | None | No | 0 |
| 25 | 79168 | 3423 | Current | Yes | Yes | 40 |
| 25 | 79072 | 3259 | Abandoned | Yes | No | 0 |
| 25 | 79544 | 3831 | Current | Yes | No | 40 |
| 25 | 79540 | 2659 | Current | Yes Mill and Office | No | 30 |
| 25 | 79189 | 3424 | Current | Yes | No | 20 |
| 24 | 79719 | 4021 | Current | Yes | No | 40 |
| 25 | 83143 | 50106 | Current | None | No | 0 |
| Total | | | | | | 357 |
| Total Tested | | | | | | 157 |

McClain MCA 2018
UCC-1 Financing Statement
Information

# iLien Cover Page

Date Printed:  09/22/2021

Debtor:
7M Cattle Feeders, Inc.
824 Mullins Lane
Benton, KY  42025

Obligation Number:  0000030682
Primary Obligor:  McClain Feed Yard, Inc.
Collateral ID:
Department:  closing
Cost Center Name:  east/northeast
Region:
REF7:
Law Firm Bill Code:

iLien File #:  80307204
Order Confirmation #:  82554657

UserID:  276553
UserName:  DAN TRAPP
Number of Collateral Pages Attached:  0

Transaction Type:  Original
Jurisdiction:  TX, Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER** (optional)<br>Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141 | |
| **B. E-MAIL CONTACT AT FILER** (optional)<br>uccfilingreturn@wolterskluwer.com | |
| **C. SEND ACKNOWLEDGMENT TO:** (Name and Address)   8477 - RABO<br><br>Lien Solutions<br><br>P.O. Box 29071<br>Glendale, CA  91209-9071<br><br>File with: Secretary of State, TX | **82554657**<br>**TXTX** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only **one** Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7M Cattle Feeders, Inc. | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 824 Mullins Lane | Benton | KY | 42025 | USA |

2. **DEBTOR'S NAME:** Provide only **one** Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| McClain Farms, Inc. | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 824 Mullins Lane | Benton | KY | 42025 | USA |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only **one** Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Rabo AgriFinance LLC | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| P.O. Box 411995 | St. Louis | MO | 63141 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:
All Assets

5. Check **only** if applicable and check **only** one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check **only** if applicable and check **only** one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check **only** if applicable and check **only** one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
82554657          0000030682                                        McClain Feed Yard, Inc.

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| 7M Cattle Feeders, Inc. | |

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only *one* additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME
McClain Feed Yard, Inc.

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
|---|---|---|---|---|

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 824 Mullins Lane | Benton | KY | 42025 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME  *or*  ☐ ASSIGNOR SECURED PARTY'S NAME:  Provide only *one* name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the
REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16
(if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:   82554657-TX-0   8477 - RABO AGRIFINANCE        Rabo AgriFinance LLC          File with: Secretary of State, TX        0000030682   McClain Feed Yard, Inc.

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# EXHIBIT H

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement ("Agreement") is entered into and made effective this 23 day of March, 2023, among McClain Farms, Inc. (collectively, the "Debtor"), Rabo AgriFinance LLC, (the "Secured Party") and Mechanics Bank (the "Deposit Bank").

### PRELIMINARY STATEMENTS:

(A) The Debtor and the Secured Party have entered into the Master Security Agreement ("Security Agreement") dated as of August 27, 2021 (as amended, modified, or supplemented from time to time, the "Security Agreement").

(B) It is a condition of the obligation to make the loans secured by the Security Agreement that the Debtor pledge certain collateral to the Secured Party.

(C) The Debtor has established with the Deposit Bank a checking account with account number 3070 in the name of McClain Farms, Inc. (the "Account");

(D) The Deposit Bank has agreed to act in such capacity.

NOW THEREFORE, in consideration of the premises, the parties hereto hereby agree as follows:

1. Definitions. Unless otherwise defined herein, all capitalized terms used herein and defined in the Security Agreement shall be used herein as therein defined.

2. Pledge. The Debtor hereby grants, pledges and assigns to the Secured Party, and hereby creates a continuing first priority lien and security interest in favor of the Secured Party in, and transfers to the Secured Party all dominion and control over, all of its right, title and interest in and to the following:

(a) the Account, including, without limitation, all documents, passbooks, and similar evidence representing such Account, together with all deposits made from time to time therein and all funds and other property standing to the credit of such Account from time to time; and

(b) all cash and non-cash Proceeds of any and all of the foregoing, including, without limitation, any and all Instruments and Investment Property constituting any such Proceeds.

All of the foregoing shall constitute "Collateral" hereunder and under the Security Agreement.

3. Security for Obligations; Terms of Pledge. The Collateral hereunder secures the payment and performance of the obligations in accordance with the Security Agreement. The rights and obligations of the Secured Party and the Debtor in respect of the Collateral hereunder shall be as provided in the Security Agreement.

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

4.     Representations and Warranties of Debtor.  The Debtor represents and warrants as follows:

(a)     The Debtor is the sole beneficial owner of the Collateral subject to this Agreement and the Security Agreement, free and clear of any lien, option or other encumbrance except for the lien created by this Agreement and the Security Agreement.  The Account is not a consumer deposit account.

(b)     The pledge of the Collateral pursuant to this Agreement and the Security Agreement creates a valid and perfected first priority lien in the Collateral, securing the payment and performance when due of the obligations.

(c)     McClain Farms, Inc. is a corporation duly organized under the Laws of the State of Kentucky and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties.  7M Cattle Feeders, Inc. is a corporation duly organized under the Laws of the State of Kentucky and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties.  McClain Feed Yard, Inc. is a corporation duly organized under the Laws of the State of Texas and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties.

(d)     The Debtor has full power, authority and legal right to pledge all the Collateral pursuant to this Agreement and the Security Agreement.

(e)     This Agreement has been duly authorized, executed and delivered by the Debtor and constitutes a legal, valid and binding obligation of the Debtor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and subject to general equitable principles (regardless of whether such principles are considered in a proceeding in equity or at law).

(f)     No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the pledge by the Debtor of the Collateral pursuant to this Agreement or the Security Agreement or for the execution, delivery or performance of this Agreement by the Debtor.

(g)     The execution, delivery and performance of this Agreement will not violate any provision of any applicable law or regulation or of any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Debtor, or of the company documents of the Debtor.

5.     Covenants of the Deposit Bank.  The Deposit Bank covenants and agrees as follows:

(a) The Deposit Bank acknowledges the lien and security interest hereunder and under the Security Agreement. Until the Deposit Bank has received instructions from the Secured Party to the contrary, the Debtor shall be entitled to present items to be drawn on or otherwise to withdraw or direct the disposition of funds from the Account. The Deposit Bank waives any right to offset any claim which it might have against the Deposit Account or the Collateral hereunder and subordinates any security interest it may have in the Deposit Account and the Collateral hereunder to the lien and security interest granted to the Secured Party.

(b) The Deposit Bank may resign from its obligations under this Agreement at any time after twenty (20) days prior written notice to the other parties hereto, but in no event shall the Deposit Bank be released of its obligations hereunder unless and until a substitute bank has been designated and assumed the obligations hereunder of the Deposit Bank and all monies in the Deposit Account and Collateral relating thereto have been transferred to the substitute bank in compliance with written instructions from the Secured Party. The Secured Party shall designate a substitute Deposit Bank, in its sole discretion, promptly after receipt of notice of resignation by the Deposit Bank and shall take all reasonable actions necessary to cause such designated successor promptly to assume the obligations of the Deposit Bank hereunder.

(c) The Deposit Bank agrees that it shall take all actions reasonably necessary and shall cooperate with the Secured Party to facilitate any transfer of its obligations, duties and rights hereunder.

(d) The Deposit Bank represents and warrants that it has no knowledge of any claim to, security interest in or lien upon any of the Collateral hereunder, other than the lien hereunder and under the Security Agreement.

(e) The Deposit Bank has not entered into, nor will it enter into, any agreement with any third party regarding any of the Collateral hereunder or agreeing that it will comply with any instructions or orders concerning such Collateral originated by any such third party, nor has the Deposit Bank entered into, nor will it enter into, any arrangement with the Debtor or any third party by which the Deposit Bank agrees to limit or qualify its undertakings to comply with the instructions and orders of the Secured Party as set forth herein.

6. Termination by Secured Party. The Secured Party may terminate this Agreement at any time after thirty (30) days prior written notice to the other parties hereto.

7. Notices. All notices and other communications provided for hereunder shall be in writing addressed to the respective parties at their addresses as specified with their signatures below or as to any party at such other address as shall be designated by such party in a written notice to each other party. All such notices and other communications shall be effective upon receipt.

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

8.  Governing Law. This Agreement (including the establishment and maintenance of the Deposit Account and all interests, duties and obligations related thereto) shall be governed by and construed in accordance with the laws of the State of Iowa without reference to its conflicts of laws principles.

9.  Venue and Jurisdiction. Subject only to the exception in the next sentence, the parties hereto hereby agree to the jurisdiction of the federal court of the District of Northern District of Iowa and the state courts of Iowa located in Black Hawk County and waive any objection based on venue or forum non conveniens with respect to any action instituted therein, and agree that any dispute concerning the relationship between the parties or the conduct of any of them in connection with this Agreement or otherwise shall be heard only in the courts described above. Notwithstanding the foregoing: (1) Secured Party shall have the right to bring any action or proceeding against Debtor or its property in any courts of any other jurisdiction Secured Party deems necessary or appropriate in order to realize on the property, or other security for the loan obligations, and (2) each of the parties hereto acknowledges that any appeals from the courts described in the immediately preceding sentence may have to be heard by a court located outside those jurisdictions.

10. Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. The Debtor, Secured Party, and the Deposit Bank acknowledge and agree this Agreement may be electronically signed and such electronic signature shall have the same force and effect as a handwritten signature.

**IN WITNESS WHEREOF**, the Debtor, the Secured Party and the Deposit Bank have caused this Agreement to be duly executed and delivered as of the date first above written.

**MCCLAIN FARMS, INC.**

Address for notices:

824 Mullins Lane
Benton, KY 42025

By: _____

DocuSigned by:
A7AAE79C2FBC4EF...

Name:  Brian Keith McClain
Title   President

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Address for notices:

14767 N. Outer 40 Rd
Suite 400
Chesterfield, MO 63017

**SECURED PARTY**
Rabo AgriFinance LLC

DocuSigned by:

*W.B. Lawson III*

By: _____
F6C57425830B492...

Name: W.B. Lawson III

Title VP

Address for notices:

18400 Von Karman Ave
Suite 1100
Irvine, CA 92612

**DEPOSIT BANK:**
Mechanics Bank

DocuSigned by:

*Jamie Rabatin*

By: _____
F8D99C209A3244C...

Name: Jamie Rabatin

Title SVP/Director of Commercial Servicing

DocuSign Envelope ID: 5ECBD44B-522C-423D-9D5C-4C...

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement ("Agreement") is entered into and made effective this 23 day of March, 2023, among 7M Cattle Feeders, Inc. (collectively, the "Debtor"), Rabo AgriFinance LLC, (the "Secured Party") and Mechanics Bank (the "Deposit Bank").

### PRELIMINARY STATEMENTS:

(A) The Debtor and the Secured Party have entered into the Master Security Agreement ("Security Agreement") dated as of August 27, 2021 (as amended, modified, or supplemented from time to time, the "Security Agreement").

(B) It is a condition of the obligation to make the loans secured by the Security Agreement that the Debtor pledge certain collateral to the Secured Party.

(C) The Debtor has established with the Deposit Bank a checking account with account number 0423 in the name of 7M Cattle Feeders, Inc. (the "Account");

(D) The Deposit Bank has agreed to act in such capacity.

NOW THEREFORE, in consideration of the premises, the parties hereto hereby agree as follows:

1.      Definitions. Unless otherwise defined herein, all capitalized terms used herein and defined in the Security Agreement shall be used herein as therein defined.

2.      Pledge. The Debtor hereby grants, pledges and assigns to the Secured Party, and hereby creates a continuing first priority lien and security interest in favor of the Secured Party in, and transfers to the Secured Party all dominion and control over, all of its right, title and interest in and to the following:

(a)     the Account, including, without limitation, all documents, passbooks, and similar evidence representing such Account, together with all deposits made from time to time therein and all funds and other property standing to the credit of such Account from time to time; and

(b)     all cash and non-cash Proceeds of any and all of the foregoing, including, without limitation, any and all Instruments and Investment Property constituting any such Proceeds.

All of the foregoing shall constitute "Collateral" hereunder and under the Security Agreement.

3.      Security for Obligations; Terms of Pledge. The Collateral hereunder secures the payment and performance of the obligations in accordance with the Security Agreement. The rights and obligations of the Secured Party and the Debtor in respect of the Collateral hereunder shall be as provided in the Security Agreement.

DocuSign Envelope ID: 5ECBD44B-522C-423D-9D5C-4CXXXXX

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

    4.    <u>Representations and Warranties of Debtor</u>. The Debtor represents and warrants as follows:

    (a)    The Debtor is the sole beneficial owner of the Collateral subject to this Agreement and the Security Agreement, free and clear of any lien, option or other encumbrance except for the lien created by this Agreement and the Security Agreement. The Account is not a consumer deposit account.

    (b)    The pledge of the Collateral pursuant to this Agreement and the Security Agreement creates a valid and perfected first priority lien in the Collateral, securing the payment and performance when due of the obligations.

    (c)    McClain Farms, Inc. is a corporation duly organized under the Laws of the State of Kentucky and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties. 7M Cattle Feeders, Inc. is a corporation duly organized under the Laws of the State of Kentucky and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties. McClain Feed Yard, Inc. is a corporation duly organized under the Laws of the State of Texas and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties.

    (d)    The Debtor has full power, authority and legal right to pledge all the Collateral pursuant to this Agreement and the Security Agreement.

    (e)    This Agreement has been duly authorized, executed and delivered by the Debtor and constitutes a legal, valid and binding obligation of the Debtor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and subject to general equitable principles (regardless of whether such principles are considered in a proceeding in equity or at law).

    (f)    No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the pledge by the Debtor of the Collateral pursuant to this Agreement or the Security Agreement or for the execution, delivery or performance of this Agreement by the Debtor.

    (g)    The execution, delivery and performance of this Agreement will not violate any provision of any applicable law or regulation or of any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Debtor, or of the company documents of the Debtor.

    5.    <u>Covenants of the Deposit Bank</u>. The Deposit Bank covenants and agrees as follows:

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

(a)     The Deposit Bank acknowledges the lien and security interest hereunder and under the Security Agreement. Until the Deposit Bank has received instructions from the Secured Party to the contrary, the Debtor shall be entitled to present items to be drawn on or otherwise to withdraw or direct the disposition of funds from the Account. The Deposit Bank waives any right to offset any claim which it might have against the Deposit Account or the Collateral hereunder and subordinates any security interest it may have in the Deposit Account and the Collateral hereunder to the lien and security interest granted to the Secured Party.

(b)     The Deposit Bank may resign from its obligations under this Agreement at any time after twenty (20) days prior written notice to the other parties hereto, but in no event shall the Deposit Bank be released of its obligations hereunder unless and until a substitute bank has been designated and assumed the obligations hereunder of the Deposit Bank and all monies in the Deposit Account and Collateral relating thereto have been transferred to the substitute bank in compliance with written instructions from the Secured Party. The Secured Party shall designate a substitute Deposit Bank, in its sole discretion, promptly after receipt of notice of resignation by the Deposit Bank and shall take all reasonable actions necessary to cause such designated successor promptly to assume the obligations of the Deposit Bank hereunder.

(c)     The Deposit Bank agrees that it shall take all actions reasonably necessary and shall cooperate with the Secured Party to facilitate any transfer of its obligations, duties and rights hereunder.

(d)     The Deposit Bank represents and warrants that it has no knowledge of any claim to, security interest in or lien upon any of the Collateral hereunder, other than the lien hereunder and under the Security Agreement.

(e)     The Deposit Bank has not entered into, nor will it enter into, any agreement with any third party regarding any of the Collateral hereunder or agreeing that it will comply with any instructions or orders concerning such Collateral originated by any such third party, nor has the Deposit Bank entered into, nor will it enter into, any arrangement with the Debtor or any third party by which the Deposit Bank agrees to limit or qualify its undertakings to comply with the instructions and orders of the Secured Party as set forth herein.

6.     Termination by Secured Party. The Secured Party may terminate this Agreement at any time after thirty (30) days prior written notice to the other parties hereto.

7.     Notices. All notices and other communications provided for hereunder shall be in writing addressed to the respective parties at their addresses as specified with their signatures below or as to any party at such other address as shall be designated by such party in a written notice to each other party. All such notices and other communications shall be effective upon receipt.

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

8.      Governing Law.  This Agreement (including the establishment and maintenance of the Deposit Account and all interests, duties and obligations related thereto) shall be governed by and construed in accordance with the laws of the State of Iowa without reference to its conflicts of laws principles.

9.      Venue and Jurisdiction.  Subject only to the exception in the next sentence, the parties hereto hereby agree to the jurisdiction of the federal court of the District of Northern District of Iowa and the state courts of Iowa located in Black Hawk County and waive any objection based on venue or forum non conveniens with respect to any action instituted therein, and agree that any dispute concerning the relationship between the parties or the conduct of any of them in connection with this Agreement or otherwise shall be heard only in the courts described above. Notwithstanding the foregoing: (1) Secured Party shall have the right to bring any action or proceeding against Debtor or its property in any courts of any other jurisdiction Secured Party deems necessary or appropriate in order to realize on the property, or other security for the loan obligations, and (2) each of the parties hereto acknowledges that any appeals from the courts described in the immediately preceding sentence may have to be heard by a court located outside those jurisdictions.

10.     Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  The Debtor, Secured Party, and the Deposit Bank acknowledge and agree this Agreement may be electronically signed and such electronic signature shall have the same force and effect as a handwritten signature.

**IN WITNESS WHEREOF**, the Debtor, the Secured Party and the Deposit Bank have caused this Agreement to be duly executed and delivered as of the date first above written.

**7M CATTLE FEEDERS, INC.**

Address for notices:

824 Mullins Lane
Benton, KY 42025

DocuSigned by:

By: _____
A7AAE79C2FBC4EE...

Name:   Brian Keith McClain
Title   President

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Address for notices:

14767 N. Outer 40 Rd
Suite 400
Chesterfield, MO 63017

**SECURED PARTY**
Rabo AgriFinance LLC

By:  W.B. Lawson III

Name: W.B. Lawson III

Title  VP

Address for notices:

18400 Von Karman Ave
Suite 1100
Irvine, CA 92612

**DEPOSIT BANK:**
Mechanics Bank

By:  Jamie Rabatin

Name: Jamie Rabatin

Title  SVP/Director of Commercial Servicing

COPY VIEW

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement ("Agreement") is entered into and made effective this 23 day of March, 2023, among McClain Feed Yard, Inc. (collectively, the "Debtor"), Rabo AgriFinance LLC, (the "Secured Party") and Mechanics Bank (the "Deposit Bank").

### PRELIMINARY STATEMENTS:

(A) The Debtor and the Secured Party have entered into the Master Security Agreement ("Security Agreement") dated as of August 27, 2021 (as amended, modified, or supplemented from time to time, the "Security Agreement").

(B) It is a condition of the obligation to make the loans secured by the Security Agreement that the Debtor pledge certain collateral to the Secured Party.

(C) The Debtor has established with the Deposit Bank a checking account with account number 0197 in the name of McClain Feedyard, Inc. (the "Account");

(D) The Deposit Bank has agreed to act in such capacity.

NOW THEREFORE, in consideration of the premises, the parties hereto hereby agree as follows:

1.    Definitions. Unless otherwise defined herein, all capitalized terms used herein and defined in the Security Agreement shall be used herein as therein defined.

2.    Pledge. The Debtor hereby grants, pledges and assigns to the Secured Party, and hereby creates a continuing first priority lien and security interest in favor of the Secured Party in, and transfers to the Secured Party all dominion and control over, all of its right, title and interest in and to the following:

(a)    the Account, including, without limitation, all documents, passbooks, and similar evidence representing such Account, together with all deposits made from time to time therein and all funds and other property standing to the credit of such Account from time to time; and

(b)    all cash and non-cash Proceeds of any and all of the foregoing, including, without limitation, any and all Instruments and Investment Property constituting any such Proceeds.

All of the foregoing shall constitute "Collateral" hereunder and under the Security Agreement.

3.    Security for Obligations; Terms of Pledge. The Collateral hereunder secures the payment and performance of the obligations in accordance with the Security Agreement. The rights and obligations of the Secured Party and the Debtor in respect of the Collateral hereunder shall be as provided in the Security Agreement.

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

4. <u>Representations and Warranties of Debtor</u>. The Debtor represents and warrants as follows:

(a) The Debtor is the sole beneficial owner of the Collateral subject to this Agreement and the Security Agreement, free and clear of any lien, option or other encumbrance except for the lien created by this Agreement and the Security Agreement. The Account is not a consumer deposit account.

(b) The pledge of the Collateral pursuant to this Agreement and the Security Agreement creates a valid and perfected first priority lien in the Collateral, securing the payment and performance when due of the obligations.

(c) McClain Farms, Inc. is a corporation duly organized under the Laws of the State of Kentucky and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties. 7M Cattle Feeders, Inc. is a corporation duly organized under the Laws of the State of Kentucky and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties. McClain Feed Yard, Inc. is a corporation duly organized under the Laws of the State of Texas and is in good standing in each jurisdiction where the failure to so would have a material adverse effect on its business or properties.

(d) The Debtor has full power, authority and legal right to pledge all the Collateral pursuant to this Agreement and the Security Agreement.

(e) This Agreement has been duly authorized, executed and delivered by the Debtor and constitutes a legal, valid and binding obligation of the Debtor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and subject to general equitable principles (regardless of whether such principles are considered in a proceeding in equity or at law).

(f) No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the pledge by the Debtor of the Collateral pursuant to this Agreement or the Security Agreement or for the execution, delivery or performance of this Agreement by the Debtor.

(g) The execution, delivery and performance of this Agreement will not violate any provision of any applicable law or regulation or of any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Debtor, or of the company documents of the Debtor.

5. <u>Covenants of the Deposit Bank</u>. The Deposit Bank covenants and agrees as follows:

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

(a)     The Deposit Bank acknowledges the lien and security interest hereunder and under the Security Agreement. Until the Deposit Bank has received instructions from the Secured Party to the contrary, the Debtor shall be entitled to present items to be drawn on or otherwise to withdraw or direct the disposition of funds from the Account. The Deposit Bank waives any right to offset any claim which it might have against the Deposit Account or the Collateral hereunder and subordinates any security interest it may have in the Deposit Account and the Collateral hereunder to the lien and security interest granted to the Secured Party.

(b)     The Deposit Bank may resign from its obligations under this Agreement at any time after twenty (20) days prior written notice to the other parties hereto, but in no event shall the Deposit Bank be released of its obligations hereunder unless and until a substitute bank has been designated and assumed the obligations hereunder of the Deposit Bank and all monies in the Deposit Account and Collateral relating thereto have been transferred to the substitute bank in compliance with written instructions from the Secured Party. The Secured Party shall designate a substitute Deposit Bank, in its sole discretion, promptly after receipt of notice of resignation by the Deposit Bank and shall take all reasonable actions necessary to cause such designated successor promptly to assume the obligations of the Deposit Bank hereunder.

(c)     The Deposit Bank agrees that it shall take all actions reasonably necessary and shall cooperate with the Secured Party to facilitate any transfer of its obligations, duties and rights hereunder.

(d)     The Deposit Bank represents and warrants that it has no knowledge of any claim to, security interest in or lien upon any of the Collateral hereunder, other than the lien hereunder and under the Security Agreement.

(e)     The Deposit Bank has not entered into, nor will it enter into, any agreement with any third party regarding any of the Collateral hereunder or agreeing that it will comply with any instructions or orders concerning such Collateral originated by any such third party, nor has the Deposit Bank entered into, nor will it enter into, any arrangement with the Debtor or any third party by which the Deposit Bank agrees to limit or qualify its undertakings to comply with the instructions and orders of the Secured Party as set forth herein.

6.     Termination by Secured Party. The Secured Party may terminate this Agreement at any time after thirty (30) days prior written notice to the other parties hereto.

7.     Notices. All notices and other communications provided for hereunder shall be in writing addressed to the respective parties at their addresses as specified with their signatures below or as to any party at such other address as shall be designated by such party in a written notice to each other party. All such notices and other communications shall be effective upon receipt.

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

8.      Governing Law. This Agreement (including the establishment and maintenance of the Deposit Account and all interests, duties and obligations related thereto) shall be governed by and construed in accordance with the laws of the State of Iowa without reference to its conflicts of laws principles.

9.      Venue and Jurisdiction. Subject only to the exception in the next sentence, the parties hereto hereby agree to the jurisdiction of the federal court of the District of Northern District of Iowa and the state courts of Iowa located in Black Hawk County and waive any objection based on venue or forum non conveniens with respect to any action instituted therein, and agree that any dispute concerning the relationship between the parties or the conduct of any of them in connection with this Agreement or otherwise shall be heard only in the courts described above. Notwithstanding the foregoing: (1) Secured Party shall have the right to bring any action or proceeding against Debtor or its property in any courts of any other jurisdiction Secured Party deems necessary or appropriate in order to realize on the property, or other security for the loan obligations, and (2) each of the parties hereto acknowledges that any appeals from the courts described in the immediately preceding sentence may have to be heard by a court located outside those jurisdictions.

10.     Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. The Debtor, Secured Party, and the Deposit Bank acknowledge and agree this Agreement may be electronically signed and such electronic signature shall have the same force and effect as a handwritten signature.

IN WITNESS WHEREOF, the Debtor, the Secured Party and the Deposit Bank have caused this Agreement to be duly executed and delivered as of the date first above written.

MCLAIN FEED YARD, INC.

Address for notices:

824 Mullins Lane
Benton, KY 42025

By: _____
Name:   Brian Keith McClain
Title   President

DocuSign Envelope ID: 5ECBD44B-522C-423D-9D5C-4C...

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Address for notices:

14767 N. Outer 40 Rd
Suite 400
Chesterfield, MO 63017

**SECURED PARTY**

Rabo AgriFinance LLC

By: _W.B. Lawson III_

Name: W.B. Lawson III

Title VP

Address for notices:

18400 Von Karman Ave
Suite 1100
Irvine, CA 92612

**DEPOSIT BANK:**

Mechanics Bank

By: _Jamie Rabatin_

Name: Jamie Rabatin

Title SVP/Director of Commercial Servicing

COPY VIEW