HUDSON M. JOBE
JOBE LAW PLLC
6060 NORTH CENTRAL EXPRESSWAY,
SUITE 500
DALLAS, TEXAS 75206

ALAN DABDOUB
LYNN PINKER HURST & SCHWEGMANN LLP
2100 ROSS AVENUE, SUITE 2700
DALLAS, TEXAS 75201

SPECIAL COUNSEL TO THE TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| IN RE:<br><br>MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br><br>    *Debtors.*[1] | Chapter 7<br><br>CASE NO. 23-20084-rlj<br><br>Jointly Administered |
| KENT RIES, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATES OF MCCLAIN FEED YARD, INC., MCCLAIN FARMS, INC., AND 7M CATTLE FEEDERS, INC.,<br>    *Plaintiff,*<br>v.<br><br>COMMUNITY FINANCIAL SERVICES BANK; HTLF BANK; MECHANICS BANK; and RABO AGRIFINANCE, LLC,<br>    *Defendants.* | ADV. PROC. NO. _____<br><br>Honorable Robert L. Jones |

## <u>TRUSTEE'S ORIGINAL ADVERSARY COMPLAINT</u>

---

[1] The Debtors in these chapter 7 cases are: McClain Feed Yard, Inc. (Case No. 23-20084-RLJ), McClain Farms, Inc. (Case No. 23-20085-RLJ), and 7M Cattle Feeders, Inc. (Case No. 23-20086-RLJ).

Kent Ries, the Chapter 7 Trustee of the bankruptcy estates of McClain Feed Yard, Inc. (Case No. 23-20084-RLJ), McClain Farms, Inc. (Case No. 23-20085-RLJ), and 7M Cattle Feeders, Inc. (Case No. 23-20086-RLJ) (the "**Trustee**"), files his Original Adversary Complaint with knowledge as to his own acts and otherwise upon information and belief as follows:

## SUMMARY

1.      This case seeks justice and recompense for the victims of a massive Ponzi scheme operated by the Debtors' owner, Brian McClain, that would not have been possible without the Defendants' lawless conduct. A Ponzi scheme is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." PONZI SCHEME, Black's Law Dictionary (11th ed. 2019); *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011). In a Ponzi scheme, "a corporation operates and continues to operate at a loss." *Alguire*, 647 F.3d at 597-98 (*quoting Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)). It gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors. *Id.* "The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors." *Id.* As a matter of law, a Ponzi scheme is insolvent from its inception. *Id.*; *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 563 (Tex. 2016) ("a Ponzi scheme … is driven further into insolvency with each transaction"). "While Ponzi schemes have been defined in different ways, they are, at bottom, investment scams. A Ponzi scheme is not a legitimate business, and investment deals are different from debtor-creditor relations." *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144 at 7 (Bankr. N.D. Tex. June 3, 2022).

2.      The Debtors' owner, Brian McClain, operated a massive Ponzi scheme involving

purported investments in cattle. The ultimate purpose of this bankruptcy case will be to make the

maximum distribution possible to innocent parties that suffered net losses by properly adjusting

allowed claims and maximizing the pool of assets that will be available for distribution.

3.      The Trustee may avoid transfers made with the actual intent to hinder, delay, or

defraud creditors. "[T]ransfers made from a Ponzi scheme are presumptively made with intent to

defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v.

Schonsky*, 247 F. App'x 583, 586 (5th Cir. 2007); *see also Warfield v. Byron*, 436 F.3d 551, 558

(5th Cir. 2006). Because McClain operated a massive Ponzi scheme through Debtors, transfers

from the Debtors are conclusively presumed to have been made with the requisite fraudulent intent.

As the Fifth Circuit held in the *Brown* appeal:

> TUFTA provides that "a transfer made or obligation incurred
> by a debtor is fraudulent as to a creditor . . . if the debtor
> made the transfer or incurred the obligation . . . with actual
> intent to hinder, delay, or defraud any creditor of the debtor."
> Thus, "TUFTA requires that the debtor *transferor* make the
> transfer 'with actual intent to . . . defraud any creditor of the
> debtor.'" "In this circuit, proving that [a transferor] operated
> as a Ponzi scheme establishes the fraudulent intent behind
> the transfers it made." . . . It is well-established that the
> Stanford principles operated the Stanford entities as a Ponzi
> scheme, and the existence of the Ponzi scheme establishes
> fraudulent intent. In other words, this is not the case of an
> innocent debtor preferring one creditor over another; instead,
> this was an insolvent Ponzi scheme perpetuated by paying
> old investors with new investors' investments. We agree
> with the district court that the Receiver established that the
> Stanford principles transferred monies to the investor-
> defendants with fraudulent intent.

767 F.3d at 438-39 (quoting TEX. BUS. & COM. CODE ANN. § 24.005(a)(1); *Alguire*, 647
F.3d at 598 (emphasis in original)).[2]

---

[2] The existence of a Ponzi scheme satisfies some key elements for clawback claims commonly brought against
transferees. The Bankruptcy Code and Texas Uniform Fraudulent Transfer Act ("TUFTA") both generally permit

4.        This is an adversary proceeding asserting various tort and avoidance claims against Defendants Community Financial Services Bank ("**CFSB**"), HTLF Bank, as Successor to First Bank & Trust ("**HTLF**"), Mechanics Bank ("**Mechanics Bank**"), and Rabo AgriFinance, LLC ("**Rabo**") (collectively, the "**Defendants**") to hold them accountable for their unlawful conduct in assisting and facilitating McClain's Ponzi scheme, and to recover the transfers that Defendants received from the Debtors to provide meaningful returns to the Debtors' innocent investors and other creditors.

## JURISDICTION AND VENUE

5.        On April 28, 2023, McClain Feed Yard, Inc. ("**MFY**"), McClain Farms, Inc. ("**MFI**"), and 7M Cattle Feeders, Inc. ("**7M**") (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code with this Court. The Trustee is the appointed and acting Chapter 7 Trustee in each of the Debtors' bankruptcy cases.

6.        This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§157(a)- (b) and 1334. This is a core proceeding as defined under 28 U.S.C. § 157(b). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## PARTIES

7.        The Debtors filed for Chapter 7 bankruptcy on April 28, 2023 (the "**Petition Date**").

---

recovery of transfers made with actual intent to hinder, delay, or defraud creditors. 11 U.S.C. § 548(a)(1)(A); Tex. Bus. & Comm. Code § 24.005(a)(1). Fraudulent intent is established by the existence of a Ponzi scheme. *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *3–4 ("In this circuit, proving that [the transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made") (*quoting Sec. & Exch. Comm'n. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)). "[T]ransfers from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.' The burden then shifts to the recipient of Ponzi-generated funds to prove an applicable TUFTA defense." *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012).

8.      Kent David Ries was appointed and qualified to serve as Chapter 7 Trustee for the Debtors' bankruptcy estate.

9.      Defendant CFSB is a corporation formed and existing under the laws of the State of Kentucky. Publicly available online records maintained by the Kentucky Secretary of State indicate that CFSB hosts its principal office at 221 West Fifth Street, P.O. Box 467, Benton, Kentucky, 42025. CFSB can be served with this lawsuit through its registered agent for service of process, Michael Radcliffe, at 221 West Fifth Street, P.O. Box 467, Benton, Kentucky 42025.

10.      Defendant HTLF is a corporation formed and existing under the laws of the State of Colorado. Publicly available online records maintained by the Colorado Secretary of State indicate that HTLF hosts its principal place of business at 1800 Larimer Street, Suite 100, Denver, Colorado 80202. HTLF can be served with this lawsuit through its registered agent for service of process in Colorado, Corporation Service Company, at 1900 West Littleton Boulevard, Littleton, Colorado 80120.

11.      Defendant Mechanics Bank is a corporation formed and existing under the laws of the State of California. Publicly available online records maintained by the California Secretary of State indicate that Mechanics Bank hosts its principal place of business at 1111 Civic Drive, Walnut Creek, California, 94596. Mechanics Bank can be served with this lawsuit through its registered agent for service of process, Glenn Shrader, at 17785 Center Court Drive North, Suite 400, Cerritos, California 90703.

12.      Defendant Rabo is a limited liability company formed and existing under the laws of the State of Delaware. Rabo can be served with this lawsuit through its registered agent for service of process in Texas, Corporate Creations Network, Inc., at 5444 Westheimer #1000, Houston, Texas 77056.

13.    Nationwide service of process by first-class mail postage prepaid is available to the Trustee pursuant to Federal Rules of Bankruptcy Procedure 7004(b) and (d).

## HISTORY OF THE MCCLAIN DEBTORS

14.    Brian McClain was well-known throughout the cattle and rodeo industries and primarily based out of Benton, Kentucky. He formed, owned, and operated each of the Debtors—which he used for various functions in the cattle industry.

15.    Through Debtors, McClain's primary "legitimate" business was to acquire and aggregate cattle from many different sources throughout Kentucky, the Southeast United States, Texas, and Oklahoma to fulfill large purchase orders for two primary buyers, both of which were located in Texas – Cactus Feeders and Riley/Friona. With respect to Riley/Friona, during certain periods the Debtors operated as essentially a subcontractor for Riley Livestock, Inc. in acquiring cattle for its fulfillment of large purchase orders for Friona Industries, Inc., and at other times the Debtors acquired cattle independently from various small sources in order to fulfill large purchase orders to Riley Livestock, Inc.

16.    To fill these large purchase orders for their two Texas customers, the Debtors acquired livestock from a wide variety of sources. With respect to the livestock acquired in Kentucky and the Southeast, including Florida, the Debtors would transport the cattle to their locations in Kentucky for "straightening out" whereby the cattle would be evaluated for health, size, and other issues, then sorted and kept (where they would be grown and their medical issues would be addressed) until they were transported to the Debtors' Texas facilities or to the Debtors' Texas buyers. Similarly, with respect to the livestock acquired in Texas and Oklahoma, the Debtors would take possession of the cattle and transport that cattle to and between the Debtors' Texas locations—where the cattle would be "straightened out," and delivered to the Debtors' Texas

buyers. In summary, the Debtors would obtain, transport, hold, and deliver cattle to buyers within 1-3 months of acquisition.

17.    In addition to the above model, the Debtors also provided feedyard services in a much smaller capacity. In some instances, Debtors would take possession of third-party cattle to feed and grow on behalf of the third party.

18.    In connection with these cattle activities, the Debtors had, at any given time, a meaningful amount of cattle on hand. McClain used the cattle to attract investors for a massive Ponzi scheme that McClain operated through Debtors.

## THE PONZI SCHEME

19.    Starting by at least 2018, McClain, through the Debtors, procured passive investments from hundreds of parties pursuant to "partnership agreements" where the investor intended to invest money with the Debtors in return for a purported split of profits from the Debtors' grown cattle. The investors were not banks, hedge funds, private equity firms, or large companies. Rather, they were private individuals and entities that for one reason or another came to know McClain and decided to invest money with him to profit in the cattle industry.

20.    Those investors did not: (i) actually take possession of cattle; (ii) visually confirm the actual existence of "their" cattle; (iii) require or confirm that they were segregated and not the subject of other investor deals; (iv) obtain unique identifiers on "their" cattle that would enable a party to confirm any of the foregoing; or (v) actively participate in the management, growth, and sale of cattle. Instead, the investors' participation in these "cattle" was limited to sending the Debtors money and waiting for a return on their invested funds.

21.    In many cases, the investor arrangements were based upon a written "partnership" agreement that varied somewhat in form, but generally contained terms like the following example:

### Cattle Feeding agreement

This agreement exists to identify the partnership of Brian McClain/McClain Feedyard/7M feeders, 2548 CR 15 Friona Tx. 79035, and Thorlakson Diamond T feeders who are involved in cattle feeding arrangement. The arrangement allows for Thorlakson Diamond T Feeder LP to purchase the calves from Brian McClain/Mclain Feedyard/7M feeders. At the time of purchase the cattle have also been contracted for sale at a pre-determined price. Brian McClain will grow the cattle to the desired weight and will cover the costs incurred to do so. These costs will include the feed and supplements provided by McClain Feedyard or 7M feeders, as well as all processing, medicine, trucking, and yardage expenses related to the cattle. Once the cattle have reached the desired weight, the profit will be determined as such:

*Sale price of the feeder cattle*

*Minus*

*Cost stated above that McClain incurs.*

*Minus*

*Original cost of the calves returned to Thorlakson Diamond T Feeders LP*

*Equals profit.*

*Profit divided 1/3 McClain and 2/3 Thorlakson Diamond T Feeders LP*

This agreement is for **408** head of heifer calves at a total weight of **237,292** lbs. at a price of **163.14** per pound. They are lots **946** and located at 7M feeders or McClain feeders.

Total cost for this group of calves is $ **390,330.00** which Thorlakson Diamond T Feeders has paid to McClain Feedyard or 7M feeders.

These feeder cattle are forward contracted to sell at $ **160.00** per lb. at an average weight of **775** lbs.

Tom Thorlakson

Thorlakson Diamond T Feeders LP

Date Signed    **Dec 1, 2022**

Brian McClain

McClain Feedyard's/7M Feeders

22.      In other instances, the investor did not have a written "partnership agreement" and instead invested money with the Debtors on verbal terms similar to the above written agreement. Those investors sent the Debtors money for cattle already purportedly owned by, and in the possession of, the Debtors under an arrangement whereby the Debtors would retain the cattle, grow

them, and split the profit with the investor. In many cases, McClain suggested to the investor they had a futures contract for the sale of cattle at a certain price per pound, when, in reality, McClain did not have such guaranteed future price.

23.      In addition to promised profits, McClain attracted investors through his participation in the rodeo circuit. McClain offered a "side-benefit" to certain investors by providing "their" cattle to rodeo events where the cattle would be used for roping and similar activities. McClain handled transportation to and from the events. In reality, there was no record or other way to suggest that the cattle being used for a rodeo was one particular investor's cattle or another. But this ability to use cattle provided by McClain at rodeo was an attractive benefit to certain investors in investing in McClain's cattle operation.

24.      Some parties may posit the investors did not "invest" but instead "purchased" cattle under these arrangements. The substance of the relationship, however, dictates otherwise. A financial arrangement constitutes an "investment contract" if the contract comprises: (1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party. *SEC v. W.J. Howey Co*., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Here, the parties clearly invested money with McClain, through Debtors, in a common enterprise that expected profits to be derived solely from Debtors' efforts.

25.      Moreover, the investors did not obtain sufficient information about, or take possession of, their specific cattle to arguably establish transfer of title and ownership. *See, e.g.*, UCC §§ 2-501, 2-401, 2-601, 2-105, 2-305, 2-308 (all applicable in both Kentucky and Texas); TEXAS AG. CODE 146.001.

26.     In several instances, the "investor" even had possession of blank checks from the Debtors that the investor filled in on their own to more quickly facilitate the flow of funds from McClain and the Debtors.

27.     In each case, the investor expected an annualized profit of approximately 30% on each transaction based on specific stated growth rates and future sale weight and price per pound. the Debtors consistently provided each investor with a return on their investments.

28.     In many cases the investors would receive a full return on their investment. In other cases, investors "pressed" their money with the Debtors by allowing them to retain some or all of either the principal or profit component of their transaction for future deals.

29.     But the investors' purported "profits" were fictitious. In addition to the unrealistic returns, the volume of cattle that the Debtors purportedly acquired with investor money far exceeded: (i) the volume of cattle that the Debtors were capable of handling; (ii) the actual head of cattle that the Debtors were selling to third parties (even assuming that all cattle on hand with the Debtors were acquired with investor funds rather than the Rabo Loan); and (iii) the head of cattle actually on hand, as verified by independent third parties. Accordingly, the Debtors did not repay with actual profits from Debtors' cattle operations because the unique cattle backing up every agreement did not exist.

30.     Further, based upon the Debtors' bank statements and sources of funds, it is clear the Debtors repaid investors with other investors' funds. Accordingly, the investors' profits were fictitious and exclusively reliant upon a stream of new investor funds.

31.     The size of McClain's Ponzi scheme relative to the Debtors' actual cattle operations was staggering. The volume of funds in and out of the Debtors' bank accounts for investors exceeded the volume of funds of cattle actually acquired and sold by the Debtors by a 10x multiple.

32.     Moreover, the Debtors resorted to check kiting between at least two banks to keep his Ponzi scheme afloat and cover investor checks when available funds were insufficient to cover investment returns. As further irregular business practices, McClain generally accepted all investor money into one of the Debtors' three bank accounts, paid out all investor money out of a different Debtor bank account, and the Debtors' bank statements are replete with intercompany transfers.[3]

33.     The expected "turn" for the acquisition and sale of cattle in the purported business operations of the Debtors was 60-90 days. In the months leading up to the downfall of McClain's Ponzi scheme, the "turns" between investment and repayment to many investors sped up to a completely unrealistic matter of weeks, and in some instances, days.

34.     The demise of McClain's Ponzi scheme occurred when: (i) Rabo performed onsite inspections and confirmed that the reported head of cattle on hand grossly exceeded actual cattle on hand; (ii) Rabo then insisted that McClain hire an independent Chief Restructuring Officer ("CRO"), and (iii) McClain committed suicide on April 18, 2023, within days of the CRO beginning his financial investigation.

## THE USDA CLAIMS

35.     The presence (and size) of McClain's Ponzi scheme is further illustrated by the parties that remained unpaid at the conclusion of the case. According to records provided by the United States Department of Agriculture ("**USDA**"), over 100 claimants filed claims with the USDA under the Dealer Trust Statute (7 U.S.C. § 217(b)) for allegedly unpaid amounts for cattle sales to the Debtors in the total amount of $122,295,867.46.

---

[3] The Debtors' funds were so commingled that the Trustee is taking the position in this lawsuit that the funds should be treated as one single unit for purposes of avoidance claims. The Trustee reserves the right to amend to further delineate claims against parties based upon payments received or value given with respect to any one particular Debtor.

36.     Of that total amount, only $2,930,940.33 were considered by the USDA to be "qualified" USDA claims resulting from unpaid sales of cattle to the Debtors. The remaining $119,364,927.13 of claims all appear to be investor claims described above. Accordingly, when the Debtors' operations froze, the parties allegedly stiffed on actual cattle purchases comprised a miniscule percentage of the alleged claims of the passive investors.

## CHECK KITING SCHEME

37.     The Debtors' cash activity constituted a Ponzi scheme because he was repaying investors with fictitious profits. The Debtors' cash activity was also a massive check kiting scheme. Check kiting is the process of recording the deposit of an interbank transfer before recording the associated disbursement, thus briefly double counting the amount of cash. In a kiting scheme, multiple bank accounts are opened, often at different bank institutions. Money is transferred between accounts by the writing of a check out of one account for deposit into another. The period between when credit is given to an account holder by the depositing bank versus when a payment clears from the disbursing bank is referred to as the "float" period. This float period allows the check kiting perpetrator to use credit for money which did not exist at the time. In essence, check kiting results in the creation of fictitious funds.

38.     The Debtors were in an overdraft or overdrawn position from 2018 through 2023 a staggering number of days—as summarized below:

| Number of Days in Overdraft Position | | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| CFSB | 43 | 13 | 6 | 32 | 18 | 1 |
| Mechanics Bank - all accounts | 62 | 54 | 51 | 193 | 87 | 44 |

39.     As shown above, in 2021, the Debtors' accounts with Mechanics Bank were overdrawn 193 days out of the year, often by hundreds of thousands of dollars. Normal business accounts are not managed in this fashion.

40.     To remedy the overdrafts, the Debtors resorted to, among other tactics, a pervasive check-kiting scheme.

41.     The Debtors consistently used massive intercompany transfers between the Debtors' bank accounts to artificially inflate the value of those accounts. Those intercompany transfers comprise over 5,000 transactions in the hundreds of millions of dollars on an annual basis, as summarized below:

**Intercompany Activity at Community Financial Services Bank – Receipts and Withdrawals:**



**Intercompany Activity at Mechanics Bank – Receipts and Withdrawals:**



42.    Despite the Debtors' extensive check-kiting, the Debtors' accounts remained over-drawn and materially so; for example:





43.    The Debtors' intercompany transactions totaled in the tens of millions per month and $2 billion in 5 years, thus illustrating the fraudulent volume required to, among other things, fund the Debtors' check kiting scheme and the Debtors' desperate attempts to cover the checks due to their investors:

McClain Feed Yard Inc. et al - Intercompany Receipts & Withdrawals

| Sum of Amount | Column Labels | |
|---|---|---|
| Row Labels | 1 - Receipt | 2 - Withdrawal |
| **2018** | **$    28,799,906.85** | **$    (42,578,079.08)** |
| Mar | | $    (120,606.18) |
| Apr | | $    (1,102,234.18) |
| May | $    146,573.79 | $    (1,048,273.03) |
| Jun | $    1,275,971.53 | $    (3,188,532.73) |
| Jul | $    2,562,453.77 | $    (5,464,406.33) |
| Aug | $    1,675,873.37 | $    (3,245,090.82) |
| Sep | $    2,753,048.17 | $    (4,083,191.72) |
| Oct | $    5,830,610.41 | $    (8,956,661.89) |
| Nov | $    6,016,724.16 | $    (6,023,534.01) |
| Dec | $    8,538,651.65 | $    (9,345,548.19) |
| **2019** | **$    448,755,804.77** | **$    (447,266,806.85)** |
| Jan | $    11,406,551.72 | $    (10,214,012.52) |
| Feb | $    9,035,585.37 | $    (9,958,011.42) |
| Mar | $    13,507,255.16 | $    (13,366,797.87) |
| Apr | $    9,528,393.61 | $    (9,245,315.75) |
| May | $    14,190,456.11 | $    (14,884,104.41) |
| Jun | $    12,067,530.22 | $    (10,475,451.61) |
| Jul | $    32,560,973.94 | $    (32,020,103.42) |
| Aug | $    31,788,005.91 | $    (32,253,124.89) |
| Sep | $    33,039,934.10 | $    (32,664,003.90) |
| Oct | $    69,584,908.77 | $    (67,146,406.24) |
| Nov | $    95,485,372.06 | $    (92,906,363.95) |
| Dec | $    116,560,837.80 | $    (122,133,110.87) |
| **2020** | **$    173,132,814.32** | **$    (174,078,533.25)** |
| Jan | $    14,398,853.35 | $    (15,904,950.35) |
| Feb | $    14,288,131.35 | $    (14,118,523.03) |
| Mar | $    4,766,643.68 | $    (4,655,972.80) |
| Apr | $    8,193,392.90 | $    (8,473,672.10) |
| May | $    11,028,095.69 | $    (9,295,385.58) |
| Jun | $    7,249,828.82 | $    (8,358,770.56) |
| Jul | $    13,849,616.14 | $    (13,872,438.72) |
| Aug | $    18,141,555.45 | $    (17,826,752.34) |
| Sep | $    8,486,514.39 | $    (9,197,216.08) |
| Oct | $    18,138,808.75 | $    (18,163,254.64) |
| Nov | $    18,320,750.78 | $    (18,501,352.10) |
| Dec | $    36,270,623.02 | $    (35,710,244.95) |
| **2021** | **$    416,025,913.53** | **$    (417,358,816.84)** |
| Jan | $    26,537,170.61 | $    (26,348,992.02) |
| Feb | $    26,685,832.35 | $    (26,754,845.44) |
| Mar | $    41,131,031.22 | $    (40,472,278.10) |
| Apr | $    38,548,390.25 | $    (37,372,100.97) |
| May | $    33,596,805.59 | $    (36,028,391.68) |

**McClain Feed Yard Inc. et al - Intercompany Receipts & Withdrawals**

| Sum of Amount | Column Labels | |
|---|---|---|
| Row Labels | 1 - Receipt | 2 - Withdrawal |
| Jun | $ 59,539,625.14 | $ (55,696,330.24) |
| Jul | $ 54,110,182.17 | $ (53,445,359.37) |
| Aug | $ 46,069,823.40 | $ (50,443,529.31) |
| Sep | $ 23,296,228.75 | $ (24,511,755.05) |
| Oct | $ 24,952,921.47 | $ (23,918,897.87) |
| Nov | $ 17,222,070.58 | $ (17,079,197.03) |
| Dec | $ 24,335,832.00 | $ (25,287,139.76) |
| **2022** | **$ 435,475,256.98** | **$ (433,750,503.55)** |
| Jan | $ 25,886,808.85 | $ (26,368,590.70) |
| Feb | $ 25,274,613.19 | $ (24,020,306.10) |
| Mar | $ 12,120,432.21 | $ (12,095,222.16) |
| Apr | $ 17,466,813.62 | $ (17,492,023.67) |
| May | $ 25,845,302.81 | $ (25,845,302.81) |
| Jun | $ 29,948,402.76 | $ (29,948,402.76) |
| Jul | $ 28,330,608.91 | $ (28,330,608.91) |
| Aug | $ 17,636,490.02 | $ (17,636,490.02) |
| Sep | $ 34,651,502.15 | $ (34,662,976.75) |
| Oct | $ 30,052,862.40 | $ (30,052,862.40) |
| Nov | $ 81,358,824.75 | $ (81,358,824.75) |
| Dec | $ 106,902,595.31 | $ (105,938,892.52) |
| **2023** | **$ 551,667,798.99** | **$ (552,631,501.74)** |
| Jan | $ 106,266,784.61 | $ (107,230,487.40) |
| Feb | $ 189,891,717.00 | $ (189,891,717.00) |
| Mar | $ 228,932,748.79 | $ (228,932,748.79) |
| Apr | $ 26,576,548.55 | $ (26,576,548.55) |
| Jun | $ 0.04 | |
| **Grand Total** | **$ 2,053,857,495.44** | **$ (2,067,664,241.31)** |

## DEFENDANTS' PARTICIPATION IN THE PONZI SCHEME

44.     Defendants were lynchpins of McClain's Ponzi scheme. McClain, through the

Debtors, secured $70 million in loans from Rabo to facilitate the Debtors' too-good-to-be-true

growth, which allowed McClain to massively expand his Ponzi scheme to the detriment of

innocent investors and other creditors. Rabo ignored countless red flags during the loan application

process and ignored many more red flags when it repeatedly extended and increased the Debtors'

supersized line of credit—even sidelining a discerning credit officer to keep funding McClain's Ponzi scheme—while at the same time receiving millions of dollars of interest, fees, and principal payments from the Debtors.

45.    Apart from Rabo, CFSB, Mechanics Bank, and HTLF were necessary components of McClain's Ponzi and check kiting schemes. They allowed the Debtors to thwart acceptable banking practices by improperly floating hundreds of millions of dollars of checks and blithely ignoring numerous red flags. And, perhaps most egregiously, HTLF actively participated in the Debtors' fraudulent cattle investment scheme by holding blank, pre-signed checks from the Debtors, filling in the information for investor payments and then directly depositing those fraudulent checks to facilitate the flow of funds and perpetuate McClain's runaway shell game.

### A.    Rabo lent the Debtors $70 million after next to no due diligence.

50.    The Debtors share a major secured creditor, Rabo AgriFinance LLC, whose alleged claim exceeds $53 million. Rabo is one of the largest lenders in the American agricultural industry and has over 100 years of experience in the agricultural lending industry. Rabo touts its in-depth understanding of all segments of the agricultural industry, including cattle feeding, with a nationwide team of agricultural lenders, financial analysts, and other leading professionals in the agricultural finance space. Rabo's own website explains that its "Relationship Managers are agricultural specialists with global networks and local knowledge, on-farm experience and financial expertise . . . ."[4]

51.    Rabo's claim in this proceeding is troubling given its outsized role in furthering McClain's Ponzi scheme. From the inception of its relationship with Debtors, Rabo ignored many

---

[4] *See* https://www.raboag.com/financing/overview-132#:~:text=Our%20Relationship%20Managers%20are%20agricultural,term%20relationships%20with%20their%20clients.

red flags in originating, extending, and increasing the $70 million line of credit on which Rabo now seeks to recover. That funding allowed McClain to expand his network and Ponzi scheme to the detriment of innocent investors and other creditors, now left unpaid in the wake of the Ponzi scheme.

52.    Rabo gave the Debtors the opportunity to expand his cattle feeding operations from Kentucky into the Texas Panhandle in 2017. Later that year, Rabo formally rejected the Debtors' line of credit application after an initial approval because, among other things, "[o]verall, documented information risk was much higher than anticipated at time of approval." Specifically, Rabo found that "systems were lacking to provide accurate trial balance, ability to generate adequate verification of accounts receivable and accounts payable, and could not document interrelated activity between" the three Debtors. Rabo ultimately concluded that "[r]isk is deemed too high as borrower does not meet minimum financial system and reporting standards to enter into relationship at this time." Rabo noted in its due diligence that the Debtors could have possession of cattle that would not be subject to Rabo's lien in connection with the Debtors' feedyard operations yet did nothing to require sorting or identification of cattle by the Debtors.

53.    Rabo employees Chip Lawson ("**Lawson**") and Jason Dunn ("**Dunn**") worked feverishly to reverse that rejection of Debtors' application. And their internal campaign was relentless. Lawson and Dunn sidelined other Rabo employees to ensure the Debtors' line of credit was approved. For example, when a senior Rabo credit officer voiced concerns about the Debtors and pushed back against Lawson and Dunn, they complained that the resistant credit officer was "giving us sh*t on this deal." Worse, Dunn threatened to "explode and get myself fired" if the Debtors' line of credit application was not approved. This was because, as testified to by former

Rabo employees, the Debtors' loan facility would be the largest loan with that region of the lender and allow Rabo to make millions in profit.

54.    After Dunn's initial sentiments waned, he admitted that the Debtors' line of credit application "definitely has red flags." He said that "the big negative is [Debtors'] record keeping is not up to par." Dunn further concluded that not "having a good record keeping system is probably not wise" and could pose serious problems for the loan.

55.    However, Lawson (who oversaw the Debtors' loan application) did not go down without a fight. Despite acknowledging that the resistant credit officer found "[t]here was too much information risk and in 6 months [Rabo] would have a problem," Lawson derisively suggested the credit manager "make a $1,000 bet with" Lawson on the strength of the Debtors' application. Lawson even suggested that Rabo's internal underwriting policies should be subject to more flexibility "to bring a deal to an approvable status."

56.    Lawson, Dunn, and other Rabo bankers who championed the Debtors' risky application finally browbeat Rabo's underwriters into approving the Debtors' loan in mid-2018. From that point forward, Rabo relaxed its underwriting policies to repeatedly and routinely increase and extend Debtors' line of credit.

57.    A Rabo representative would periodically prepare and submit a collateral inspection report to the Rabo finance team. On multiple occasions, those internal Rabo reports raised questions and concerns regarding the Debtors' operations, including the actual ownership of the cattle in the Debtors' yards, the number of cattle present in the yards, and a concerning lack of operational safeguards and procedures.

58.    In May 2019, Rabo extended a $12 million line of credit to the Debtors. Later in 2019, Rabo increased the Debtors' line of credit to $16 million. In January 2020, Rabo again raised

the Debtors' line of credit to $23 million. The expansion and extension of credit to the Debtors continued unabated, with Rabo making another $2 million in operating capital available to the Debtors in March 2021, bringing the Debtors' original lines of credit with Rabo to $25 million.

59.     Rabo approved extensions of Debtors' line of credit despite internal misgivings. In 2020, Rabo listed the Debtors as a "Client of Key Concern" because the Debtors' claimed projections of their performance "seem[ed] too good to be true." Worse, Rabo sidelined the credit manager who had consistently voiced concerns about the Debtors, with Lawson (the Debtors' relationship manager) "making sure [the resistant credit manager] doesn't try to get on the credit committee and kill it there." Other evidence from Rabo's internal communications that shows Rabo turning a blind eye to the Debtors' ongoing Ponzi scheme includes:

a)      Disbelief at the Debtors' ability to fund cattle feed ("I still can't grasp how he feeds all that cattle, and his feed costs are $5[ million] through 6 months")[5];

b)      Concern over the Debtors' cash flow ("I think Brian [the Debtors] is in more cash trouble than we think ….");

c)      Fear that the Debtors were not being forthright about who actually owned the cattle ("He is now changing his story on customer cattle.");

d)      Worry that Rabo had not conducted a cattle headcount in years ("It has come to my attention that a full headcount/inspection has not been done for over 4 yrs.");

---

[5] In the same email chain, Lawson, the Debtors' constant champion at Rabo, said: "if it ain't broke, don't fix it is what I say ...."

e)    Uncertainty about the Debtors' accounting of the cattle in the Debtors' possession ("[I]f the cattle were sold, where is the money? If they bought new cattle, where are they?"); and finally

f)    Downright alarm that the Debtors may not even own all the cattle they purport to and for Rabo to—finally—take immediate action ("Recommendation to downgrade immediately and take control of cattle as soon as possible, due to concerns related to cattle being owned by other parties.").

60.    Notwithstanding the huge red flags above, in August 2021, Rabo gave the Debtors a $45 million operating line of credit and a $1.02 million real estate note. Rabo lent those funds despite its mounting internal concerns about the Debtors. And Rabo lent those funds despite the Debtors consistently being overdrawn on their bank accounts. Those new funds pushed the Debtors' borrowings from Rabo well beyond the $70 million mark and allowed McClain to continue his Ponzi scheme unabated through 2023.

61.    In short, Rabo's failure to abide by its own internal controls, negligent underwriting policies, desire to perpetuate McClain's Ponzi scheme for years, and dereliction of its obligations to investigate and report fraud, allowed the Debtors' loans with Rabo to turn into a $70 million runaway train that increased the Debtors' debt load by 500% in only two years.

**B.    Much too late, Rabo finally heeds the massive red flags in Debtors' finances.**

62.    Not until February 2023 did Rabo take its obligations seriously and delve into the Debtors' operations in detail. Only then did Rabo inspect the collateral for the Debtors' supersized line of credit. That inspection substantiated the pre-lending concerns raised internally by Rabo employees opposed to loaning the Debtors money. Rabo's belated investigation further revealed that the Debtors had been giving Rabo false reports about the number of cattle allegedly held by

them. Despite the Debtors' claims that they possessed approximately 80,000 head of cattle, Rabo's too little, too late collateral inspection revealed that only *8,000* cattle were present at the Debtors' facilities in Texas. Rabo's inspection also revealed the cattle in these were subject to claims of third parties and not subject to Rabo's security interest.

63.    All of the Debtors' operations were shut down before their bankruptcy filings. Rabo worked quickly and quietly to salvage its $70 million mistake. After years of turning a blind eye to the Debtors' operations and financial situation, Rabo speedily took action to protect its own interests and presented a forbearance agreement to the Debtors to keep the operation afloat. Rabo then took control of Debtors' cattle.

### C.  CFSB, HTLF, and Mechanics Bank entangled themselves in the Ponzi scheme.

64.    Even worse, the Trustee's ongoing investigation suggests HTLF, Mechanics Bank, and CFSB entangled themselves in the Debtors' fraud through cash and check kiting activity.

65.    HTLF's role in McClain's Ponzi scheme was as follows. HTLF housed the bank accounts of prominent investors (Bo Robinson and 2B Farms) who entrusted the Debtors with many millions of dollars. To facilitate McClain's Ponzi scheme, HTLF banker Shawn Ragland ("**Ragland**") accepted delivery of pre-signed blank checks from the Debtors that would be drawn on the Debtors' accounts at Mechanics Bank. When the Debtors' investors who housed their accounts at HTLF presented claims for payment, Ragland or his assistant, Rebecca Fernandez ("**Fernandez**") would undertake the following steps for the Debtors:

a)    Accept delivery of a falsified cattle statement directly from the Debtors that purportedly reflected cattle sales and profits earned on behalf of the Debtors' investors who banked at HTLF.

b)      Fill out the Debtors' pre-signed blank Mechanics Bank checks for the amounts owed to the Debtors' investors who banked at HTLF.

c)      Deposit those kited checks into the investors' accounts at HTLF without the required endorsements by the investors.

d)      Grant the Debtors immediate credit for those payments before the associated funds arrived via wire transfer from the Debtors' accounts at Mechanics Bank.

e)      Wire funds out of the investors' HTLF accounts to the Debtors' Mechanics Bank account before incoming funds from Mechanics Bank had cleared.

66.     Based on those facts, HTLF was acting as a shadow or pseudo-lender to the Debtors in at least two ways. First, HTLF used kited checks as a means of loaning the Debtors the money necessary to pay investors before the underlying funds arrived from the Debtors' accounts at CFSB or Mechanics Bank. Those investors effectively got paid out of HTLF's own funds before the Debtors supplied the needed funds from CFSB and Mechanics Bank. Second, HTLF loaned the Debtors money by pre-paying the Debtors out of investor bank accounts before the Debtors' previous payments to those investors cleared. Here, HTLF was diverting money from investors back to the Debtors before payments to those investors settled. HTLF accomplished this shadow lending through check kiting undertaken by Ragland and Fernandez on behalf of the Debtors.

67.     At all times, HTLF knew or should have known there was no legitimate mechanism by which it could give the Debtors immediate credit for the millions of dollars of kited checks (that HTLF filled out for the Debtors) deposited into investor accounts at HTLF. But HTLF still chose to give the Debtors immediate credit for those fraudulent payments and allowed millions of dollars in wire transfers to happen before the necessary funds cleared. And HTLF violated its own internal

policies and procedures because HTLF never required the Debtors' funds to clear before executing outbound wire transfers back to the Debtors.

68.    In summary, HTLF controlled pre-signed blank checks that it received directly from the Debtors, HTLF kited those blank checks to pay the Debtors' investors who housed bank accounts at HTLF, HTLF deposited those checks into investor accounts absent endorsements, HTLF immediately credited the Debtors for funds yet to arrive from Mechanics Bank, and HTLF loaned the Debtors by pre-paying them out of investor bank accounts before the underlying funds cleared. HTLF was indisputably an essential component of the Debtors' massive and long-running Ponzi scheme.

69.    Worse, in a pre-bankruptcy-filing conversation with the Trustee, Mechanics Bank's Chief Operating Officer ("COO") made troubling admissions about $1.4 million in the Debtor funds still housed at Mechanics Bank immediately before the Petition Date. When the Trustee asked how Mechanics Bank ended up with that $1.4 million, Mechanics Bank's COO told the Trustee that Mechanics Bank knew "things were going bad" with the Debtors well before Mechanics Bank learned about the planned receivership of Debtors. At that point, Debtors' accounts at Mechanics Bank were overdrawn by $7 million to $8 million, meaning Mechanics Bank stood to lose that money. Mechanics Bank's COO contemporaneously admitted to the Trustee that—for years—CFSB and HTLF "sent Mechanics Bank millions of dollars all day," and Mechanics Bank would just send that money right back to CFSB and HTLF absent investigation. Based on that freely flowing money, Mechanics Bank "knew it was in the middle of a check kiting operation" with CFSB, HTLF, and Rabo, and Mechanics Bank did not want to be left with the inevitable short end of the stick. Put differently, Mechanics Bank did not want to be left holding the bag when the Debtors' financial merry-go-round eventually ground to an unwelcome halt.

Mechanics Bank began withholding funds from its remittances to CFSB and HTLF such that Mechanics Bank housed $1.4 million of Debtors' funds when Debtors filed for bankruptcy. Mechanics Bank did not put that $1.4 million into Debtors' accounts, but instead diverted that money to other accounts in the hopes of preserving those funds for future legal proceedings.

**D.  Defendants exerted excessive control over Debtors.**

70.     The Trustee's position is that Defendants used their control over Debtors' accounts to pay investors who requested compensation in connection with the Debtors' Partnership Agreements. Defendants paid those investors regardless of how much money was in Debtors' bank accounts. CFSB and Mechanics Bank overcame any shortfalls due to overdrafts on Debtors' accounts by working directly with Rabo via the DACA—and HTLF—to secure additional funds even when it was uncertain whether Debtors were in a financial position to pay back the loans.

71.     That misconduct by Defendants facilitated and perpetuated McClain's Ponzi scheme, causing Debtors and their creditors to cumulatively suffer hundreds of millions of dollars in losses. A cursory examination of Debtors' financial records in Defendants' possession would have revealed McClain's Ponzi scheme fraud.

**E.     Lawson throws Defendants under the bus during his deposition.**

72.     The unraveling of McClain's Ponzi scheme quickly spawned a host of adversary proceedings, including investor claims against Rabo.

73.     Lawson was deposed as part of those adversary proceedings. During his deposition, Lawson identified and described in detail how Defendants enabled, facilitated, and perpetuated McClain's $200 million Ponzi scheme.

74.     Under oath, Lawson testified that, in December of 2019, internal Rabo documents (including an email from Lawson to McClain) showed that Debtor 7M was overdrawn on its Rabo loans by $4.8 million and had $1.1 million in inbound funds—a deficit of more than $3.5 million.

At that time, the Debtors had housed their depository accounts at CFSB and Mechanics Bank, and Rabo knew the Debtors were feeding cattle for third parties.

75.     That was not an isolated incident. Lawson testified that the Debtors' accounts had "significant amounts" of overdrafts "on a regular basis."

76.     McClain brushed off those overdrafts by telling Lawson that "people owed him money." Lawson and Rabo took McClain's word at face value and assumed that others were buying cattle from the Debtors such that payment was forthcoming.

77.     Despite the Debtors' constant overdrafts, Rabo steadily increased its lending to the Debtors over the next two years, including a massive new loan of $45 million to the Debtors in 2021. That supersize loan was directly approved by Rabo's head office in the Netherlands. At all times, Rabo knew the Debtors were planning to use part of the $45 million loan to pay off existing debts.

78.     Simultaneously with Rabo's rapidly increasing loans to the Debtors, Rabo knew that the Debtors was abusing intercompany transfers between them to access additional funds from Rabo. Per Lawson, Rabo knew the Debtors were "robb[ing] Peter to pay Paul" such that Rabo "ha[d] no idea who owes who and how much."

79.     In October of 2022, the Debtors' overdrafts had reached the point where Dunn told Lawson that "[m]aybe wires were received and then used to cover other checks that had been written [but] never did come in. I think Brian is in more cash trouble than we think." Stated differently, Rabo indisputably knew the Debtors had become mired in an inescapable check kiting and Ponzi scheme thanks to Rabo's funding.

> Maybe wires were received and then used to cover other checks that had been written
> never did come in.  I think Brian is in more cash trouble than we think...

80.    Lawson spoke with Dunn about his statements that: (1) the Debtors were using wired funds to "cover" phantom checks; and (2) the Debtors were "in more cash trouble than we think." During that discussion, Dunn voiced concerns that the Debtors were running a check kite. But Rabo seemingly took no internal corrective or remedial action.

81.    Despite Rabo's failure to take corrective or remedial action, Lawson testified that Rabo had an obligation to notify Mechanics Bank about the Debtors' check kiting. Lawson further testified that, between October and December of 2022, he personally had multiple discussions with Jamie Rabatin ("Rabatin") and other Mechanics Bank personnel about the Debtors' suspected check kiting and fraudulent activity.

82.    Rabatin told Lawson that Mechanics Bank was concerned about the Debtors' "unusual activity" because "checks are coming in as they're being covered," *i.e.*, Mechanics Bank was well aware that it was facilitating the Debtors' ongoing check kiting activity. Rabatin also told Lawson that the Debtors' check kiting was "happening daily" such that Rabatin "didn't think anything was right" with the Debtors' Mechanics Bank accounts. Finally, Rabatin told Lawson: "I don't know what to do" about the Debtors' check kiting. And Mechanics Bank failed to do anything to stop McClain's known fraudulent activity.

83.    By December 11, 2022, Lawson and Rabo reached a breaking point about the state of the Debtors' loans. That day, Lawson told McClain that the Debtors' operation "was getting very large" such that it was "unmanageable" without additional help. According to Lawson's sworn testimony, the Debtors' "books were in such disarray that he could not tell what money he was taking from cattle sales." Yet Rabo had seen fit to loan the Debtors $70 million based on those very same books that were "in disarray." Lawson also told McClain that "you need to hire a CFO" and "obtain more professional bookkeeping help."

84.     In early 2023, the Debtors still did not have a CFO, and, in Lawson's own words, "the cattle count was huge." Lawson asked McClain about what prompted the seemingly "infinite growth" in the Debtors' operation. In the same breath, Lawson told McClain that he needed to "slow the growth down." Despite that resounding alarm bell, Lawson inexplicably gave the Debtors an additional $4.5 million in loans to cover his existing overdrafts.

85.     At the same time, internal Rabo documents showed that the Debtors were using their loans from Rabo to cover overdrafts created by payments to third parties. But Lawson and Rabo never bothered to conduct due diligence on those payments. Any competent bank would have taken that step and discovered that McClain was running a Ponzi scheme by making payments to existing investors with funds received from new investors under fraudulent Partnership Agreements that guaranteed profits on future cattle sales.

86.     By February 2023, Lawson and Rabo determined that Rabo needed to have a physical yard sheet to conduct a proper inspection of the Debtors' operations. The basic idea was that the Debtors' borrowing base certificates would have the lot and pen numbers of cattle securing his Rabo loans—and those lot and pen numbers needed to match the physical yard sheet. Rabo's new emphasis on inspection of the Debtors' cattle was odd because, until then, Rabo had apparently never bothered to verify the existence of the cattle securing its $70 million in loans to the Debtors. That lack of verification is troubling because Rabo's head office in the Netherlands approved much of the lending to the Debtors—and Lawson testified under oath that the yard sheet was crucial because it detailed Rabo's collateral for its $70 million in loans to Debtors.

87.     When Rabo actually inspected the Debtors' operation on or around February 28, 2023, Rabo learned that the Debtors had 72,000 **_less_** cattle on hand than what was being represented to Rabo. Instead of 80,000 cattle, the Debtors had just 8,000 on hand. Lawson

recounted that discovery based on his personal participation in Rabo's inspection of the Debtors' operations in Texas.

88.     Contemporaneous with Rabo's inspection, Lawson and "everyone else at Rabo" believed that McClain was a "fraud case." In a March 9, 2023, email chain, Frank Oliver, a top Rabo North America executive, conceded that the Debtors were involved in a check kiting fraud. The individuals copied on that email chain included Chris Olson, Rabo's second-in-command for North America. But it took Rabo over five weeks to stop the movement of funds through the Debtors' depository accounts at CFSB and Mechanics Bank.

89.     While Rabo dithered on the movement of millions of dollars through the Debtors' bank accounts, Rabo immediately downgraded the Debtors' loans and seized control of his cattle without bothering to determine who all might have claims to the cattle. Rabo did that to short-circuit the bankruptcy process to its own advantage.

90.     Lawson concluded his deposition testimony by explaining that Rabo originally denied the Debtors' loan in 2017 because of his "inadequate accounting records." But Rabo nevertheless approved the the Debtors' loan the following year despite his unsatisfactory accounting records that had killed the loan the prior year.

91.     Lawson also noted that, while Rabo was funding the Debtors, Rabo was "controlling" the Debtors despite Dunn's running criticism of the Debtors' numbers. Because the Debtors constantly moved hundreds of millions of dollars between the Debtors' bank accounts at CFSB and Mechanics Bank—which Rabo controlled through its DACA—Rabo could not ascertain whether the Debtors were making or losing money. Rabo nevertheless loaned the Debtors $70 million because it was "hoping" the Debtors were involved in legitimate cattle transactions that inexplicably yielded hundreds of millions of dollars. According to Lawson, Rabo should have

caught on to the fact that Rabo's borrowing base certificates for the Debtors showed a huge cattle inventory that exceeded Debtors' feedyard capacity several times over.

92. Finally, Lawson testified under oath that Mechanics Bank and Rabo could—and should—have caught McClain's fraud before he ran up $70 million in loans from Rabo. According to Lawson, if Rabo and Mechanics Bank had done their jobs and caught McClain's fraud, his Ponzi scheme would have been far less damaging to the creditors that lost huge sums of money because of CFSB, HTLF, Mechanics Bank, and Rabo's lawless conduct.

**F. Debtors' bankruptcy estate includes almost $200 million in claims.**

93. The Trustee's position is that Defendants used their control over Debtors' accounts to pay investors who requested compensation in connection with the Debtors' Partnership Agreements. Defendants paid those investors regardless of how much money was in Debtors' bank accounts. CFSB and Mechanics Bank overcame any shortfalls due to overdrafts on Debtors' accounts by working directly with Rabo via the DACA—and HTLF—to secure additional funds even when it was uncertain whether Debtors were in a financial position to pay back the loans.

94. That misconduct by Defendants facilitated and perpetuated McClain's Ponzi scheme, causing Debtors and their creditors to cumulatively suffer hundreds of millions of dollars in losses. A cursory examination of Debtors' financial records in Defendants' possession would have revealed McClain's Ponzi scheme fraud.

95. At present, over 100 claimants have asserted claims exceeding $120 million with the United States Department of Agriculture ("**USDA**") under the Dealer Trust Statute for: (1) allegedly unpaid amounts for Cattle Purchases; (2) cattle that were dropped off for Feed Yard Services and sold without any returns flowing to their owners; (3) unpaid Partnership Agreement investments; and (4) other miscellaneous transactions. Many of these claimants likely "reclaimed" millions of dollars of cattle from Debtors in the chaos following McClain's death.

96.    The Trustee now asserts common-law tort and avoidance claims against Defendants to hold them accountable for their roles in McClain's Ponzi scheme.

## CAUSES OF ACTION

### Count I: Knowing Participation In Breach Of Fiduciary Duties
(AGAINST ALL DEFENDANTS)

97.     The Trustee incorporates by reference the factual allegations stated in all other paragraphs for all purposes.

98.    "Under Texas law, 'where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such.'" *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)). "To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Id.*

99.    The Trustee alleges each element of a knowing participation in the breach of a fiduciary duty claim against Defendants as follows.

### A.    Brian McClain had a fiduciary relationship with Debtors.

100.    McClain was both a director and officer of Debtors, so he owed fiduciary duties of loyalty, care, and obedience to Debtors. *See Ritchie v. Rupe*, 443 S.W.3d 856, 858 (Tex. 2014) ("Directors, or those acting as directors, owe a fiduciary duty to the corporation in their directorial actions, and this duty includes the dedication of their uncorrupted business judgment for the sole benefit of the corporation."); *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 569-70 (N.D. Tex. 2024) (explaining that the "fiduciary status" of corporate directors and officers "gives rise to three broad duties: the duty of due care, loyalty, and obedience" (cleaned up)).

101.    Alternatively, McClain was an employee of Debtors and "owe[d] a fiduciary duty to [his] employer to act primarily for [his] employer's benefit." *Centennial*, 2024 WL 733649, at *15 (citing *Nat'l Plan Adm'rs Inc v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007)).

## B. Defendants knew McClain was a fiduciary of Debtors.

102.    Defendants knew about McClain's fiduciary relationship with Debtors because Defendants dealt directly with McClain in his capacity as a director, officer, or employee of Debtors.

103.    CFSB and Mechanics Bank used their control over Debtors' bank accounts to help McClain satisfy investor claims for payment on Partnership Agreements and other instruments executed by Debtors. With Rabo's assistance by way of the DACA, CFSB and Mechanics Bank bypassed Debtors and sought additional funds directly from Rabo when Debtors were overdrawn. In response, Rabo would increase and extend its lending facilities with Debtors despite clear internal warnings and red flags against loaning Debtors more money.

104.    HTLF controlled pre-signed blank checks that it received directly from McClain, kited those blank checks to pay the the Debtors' investors who housed bank accounts at HTLF out of HTLF's own funds, deposited those kited checks into an investor's account absent endorsements generally, immediately credited the Debtors for funds yet to arrive from Mechanics Bank, and acted as a "shadow lender" to McClain  by pre-paying him out of investor bank accounts housed at HTLF before the underlying funds from CFSB or Mechanics Bank cleared. HTLF was indisputably an essential component of McClain's massive and long-running Ponzi scheme.

105.    Rabo worked directly with McClain to: (a) process Debtors' application for credit; (b) secure documents and paperwork needed for the original application and future increases and extensions; and (c) overcome Rabo's own internal controls, policies, and procedures to force through approval of the Rabo loan and subsequent increases.

C.  **McClain breached fiduciary duties to Debtors and their stakeholders.**

106.    McClain breached his fiduciary duties to Debtors and their stakeholders by using Debtors to operate a billion-dollar Ponzi scheme for many years. That Ponzi scheme was accomplished primarily through execution of fraudulent Partnership Agreements between McClain and third-party investors. McClain induced his investors to sign those contracts under the false pretense that the subject cattle (some of which were apparently fictional) were already under contract for sale at a higher weight and price—and the investor would receive two-thirds of all sale profits, with the balance going to McClain. In reality, McClain used funds from new investors to pay off his old investors. This Ponzi scheme eventually spiraled out of control to such an extent that McClain committed suicide, and the Debtors were forced to declare Chapter 7 bankruptcy, sparking this litigation.

107.    McClain's Ponzi scheme caused Debtors to suffer over $100 million in damages, as evidenced by the fact that more than 100 creditors have asserted over $120 million in claims against Debtors with the USDA under the Dealer Trust Statute and Rabo asserts a claim of approximately $50 million. Those damages were a foreseeable consequence of McClain's decision to operate a massive Ponzi scheme fraud in two states over multiple years, and Defendants' facilitation of that Ponzi scheme.

D.  **Defendants knowingly participated in McClain's breaches of his fiduciary duties to Debtors.**

108.    Defendants knew they were participating in McClain's breach of his fiduciary duties to Debtors. Even worse, Defendants took an active role in McClain's Ponzi scheme through cash and check kiting activity.

109.    CFSB, Mechanics Bank and Rabo used their control over Debtors' bank accounts to make on-the-spot payments to investors who presented claims for payment on Partnership Agreements with McClain. When Debtors' accounts would go into overdraft, CFSB and Mechanics Bank worked in tandem with Rabo, utilizing the DACA and other processes to bypass Debtors and seek additional funding. Rabo would relax its internal controls, policies, and procedures, and approve extensions and increases to the credit faculties despite clear warnings and red flags that Debtors were unable to afford the debt. As a result, Rabo, CFSB, and Mechanics Bank loaned Debtors any account shortfalls resulting from cash and check kiting to perpetuate McClain's Ponzi scheme. Defendants' misconduct in connection with Debtors' bank account and $70 million line of credit led to huge volumes of money moving in and out of Debtors' accounts on a monthly basis. For example, Debtors' December 2022 statements from Mechanics Bank show $102 million in debits and $102 million in credits for the month. That point is underscored by the charts of Debtors' banking activity in Paragraphs 42–46 above, which show massive and pervasive overdrafts on Debtors' bank accounts at CFSB and Mechanics Bank for the duration of McClain's long-running Ponzi scheme. Any competent bank would have investigated those overdrafts and discovered McClain's fraud.

110.    HTLF controlled pre-signed blank checks that it received directly from McClain, kited those blank checks to pay the the Debtors' investors who housed bank accounts at HTLF, deposited those checks into investor accounts absent endorsements, immediately credited the Debtors for funds yet to arrive from Mechanics Bank, and acted as a "shadow lender" to McClain by pre-paying him out of investor bank accounts housed at HTLF before the underlying funds from Mechanics Bank or CFSB cleared. HTLF was indisputably an essential component of McClain's massive and long-running Ponzi scheme. And, at all times, HTLF knew that it was engaging in

fraudulent activity on behalf of McClain when it performed the instant banking actions for McClain.

## Count II: Breach of Fiduciary Duty
### (AGAINST CFSB, MECHANICS BANK, AND RABO)

111.    The Trustee incorporates by reference the factual allegations stated in all other paragraphs for all purposes.

112.    Under Texas tort law, the four elements for a breach of fiduciary duty claim are: "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

113.    The Trustee alleges each essential element of a breach of fiduciary duty claim against CFSB, Mechanics Bank, and Rabo as follows.

### A.    Defendants owed fiduciary duties to Debtors.

114.    Defendants used their positions to control the outflow of funds from Debtors' bank accounts, and to increase and extend Debtors' line of credit with Rabo. As a result, Defendants owed fiduciary duties to Debtors because Defendants asserted excessive control over Debtors. *See Wil-Roye Inv. Co. II v. Washington Mut. Bank, FA*, 142 S.W.3d 393, 410 (Tex. App.—El Paso 2004, no pet.); *Martinez v. Capital One*, Civil Action No. H-22-2767, 2022 WL 17085938, at *4 (S.D. Tex. Nov. 18, 2022). Lawson confirmed as much during his deposition when he testified that Rabo was "controlling" McClain and Debtors.

### B.    Defendants breached their fiduciary duties to Debtors.

115.    CFSB and Mechanics Bank breached their fiduciary duties to Debtors by facilitating McClain's Ponzi scheme through cash and check kiting activity. CFSB and Mechanics Bank used their control over Debtors' bank accounts to make on-the-spot payments to investors who presented claims for payment on Partnership Agreements with the Debtors. Those payments

were made by CFSB and Mechanics Bank absent any meaningful verification of Debtors' available funds—or the legitimacy of the Partnership Agreements in the first place.

116.    At the same time, Rabo further perpetuated McClain's Ponzi scheme by loaning Debtors any financial shortfalls caused by CFSB and Mechanics Bank's check kiting—specifically overdrafts from Debtors' accounts to pay investors under Partnership Agreements. Defendants sidestepped Debtors and routinely increased and extended the Rabo loan to wipe away overdrafts that Rabo knew Debtors could not pay. Absent the relaxed underwriting policies that led to the loan extensions and line increases, McClain's Ponzi scheme would have unraveled far earlier, saving Debtors and their creditors hundreds of millions of dollars.

117.    At all times, Defendants knew—or should have known—about McClain's Ponzi scheme. Debtors' statements from Mechanics Bank were replete with suspicious activity because they showed hundreds of millions of dollars passing through Debtors' bank accounts at CFSB and Mechanics Bank on a regular basis. And Rabo's internal communications show coordination with Mechanics Bank to fund these transactions through CFSB and Mechanics Bank. As illustration, Debtors' December 2022 statements from Mechanics Bank reflect $102 million in debits and $102 million in credits for the month. And Lawson testified during his deposition that Defendants were uniquely positioned such that they "should have" detected McClain's fraud well before his Ponzi scheme spiraled out of control.

## C.    Defendants' breaches of their fiduciary duties damaged Debtors.

118.    Defendants' breaches of their fiduciary duties inflicted hundreds of millions of dollars in financial losses on Debtors. But for CFSB and Mechanics Bank's cash and check kiting—and Rabo's unrestrained loan extensions and line of credit increases to Debtors— McClain's years-long Ponzi scheme would have collapsed sooner, saving Debtors and their creditors untold sums in misappropriated funds. In fact, Lawson testified that Defendants could

have, but did not, stop McClain's fraud in its tracks. And such damages to Debtors and their creditors were a foreseeable consequence of Defendants' kiting and loans in connection with McClain's Ponzi scheme.

119.    The Trustee quantifies Debtors' damages from Defendants' breaches of their fiduciary duties as exceeding $170 million, and that figure may increase as the Trustee gathers more information about the Debtors' operations. As explained above, more than 100 claimants have asserted claims exceeding $120 million for: (1) allegedly unpaid amounts for Cattle Purchases; (2) cattle that were dropped off for Feed Yard Services and sold without returns to their owners; (3) unpaid Partnership Agreement investments; and (4) other miscellaneous transactions.

## Count III: Common-Law Civil Conspiracy
### (AGAINST ALL DEFENDANTS)

120.    The Trustee incorporates by reference the factual allegations in all other paragraphs herein for all purposes.

121.    In Texas, "[a] civil conspiracy is composed of two or more persons combining to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 623 F. Supp. 2d 798, 808–09 (S.D. Tex. 2009). The essential elements of a civil conspiracy claim are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id*.

122.    Critically, the agreement or meeting of the minds necessary for civil conspiracy liability "need not be formal; rather, the understanding may be tacit; and it is not essential that each conspirator have knowledge of the details of the conspiracy; inferences of concerted action may be drawn from participation in the transactions." *Id*. (cleaned up). And "it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *Id*.

123.    '[T]he fact that a conspirator is not present at, or does not participate in, all of the conspiratorial activities does not, by itself, exonerate him." *Id*. "A changing cast of characters does nothing to lessen the fact of one conspiracy. Once the existence of a common scheme of conspiracy is shown, slight evidence is all that is required to connect a particular defendant with the conspiracy." *Id*.

124.    The Trustee alleges each essential element of a civil conspiracy claim against all Defendants as follows.

### A.    McClain and Defendants formed an illegal conspiracy to operate a Ponzi scheme.

125.    McClain, Defendants, and their employees engaged in joint action in furtherance of a civil conspiracy against Debtors.

126.    CFSB, HTLF, and Mechanics Bank violated their own policies and procedures for fraud review and analysis (and their internal controls for verification of deposits received) and ignored federal and state laws regarding money laundering and other such fraudulent schemes to grease the wheels of McClain's Ponzi scheme, to the detriment of the Debtors. By the same token, Rabo deviated from its policies, procedures, and internal controls to bend over backwards to approve, extend, and increase its lending facilities to Debtors despite clear red flags and alarm bells sounding due to Debtors' precarious financial situation. Moreover, Mechanics Bank executed the DACA with Rabo that gave Rabo the ability to control Debtors' access to funds, and outflows from Debtors' bank accounts at CFSB and Mechanics Bank.

127.    HTLF controlled pre-signed blank checks that it received directly from McClain, kited those blank checks to pay the Debtors' investors who housed bank accounts at HTLF, deposited those checks into investor accounts absent endorsements, immediately credited the Debtors for funds yet to arrive from Mechanics Bank, and acted as a "shadow lender" to McClain

by pre-paying him out of investor bank accounts housed at HTLF before the underlying funds from

CFSB or Mechanics Bank cleared. HTLF was an essential component of McClain's massive and

long-running Ponzi scheme.

128.    The Trustee reserves the right to amend his pleadings if he identifies any additional

co-conspirators during discovery.

### B.  The object of this conspiracy was to operate a Ponzi scheme.

129.    The object of the conspiracy between McClain and Defendants was the unlawful

operation of a billion-dollar Ponzi scheme. Through a coordinated policy of disregarding

applicable bank policies, procedures, and controls, as well as ignoring state and federal laws,

Defendants facilitated over a billion dollars in transactions with little to no oversight to

authenticate or verify the funds. In so doing, Defendants aided in McClain's concerted effort to

prioritize windfalls for McClain at the expense of the Debtors. Defendants never conducted

necessary due diligence on Debtors' financial condition and McClain's ability to repay Rabo's

loans or cover his hundreds of millions of dollars in wire transfers.

### C.  McClain and Defendants had the requisite meeting of the minds, as shown by their overt acts in furtherance of the Ponzi scheme.

130.    McClain and Defendants had the meeting of the minds on the object of operating a

fraudulent Ponzi scheme.

131.    That meeting of the minds manifested through several overt acts. ***First***, McClain

housed all of Debtors' bank accounts at CFSB and Mechanics Bank and utilized Rabo as a lending

facility for Debtors' operations. ***Second***, Mechanics Bank executed Deposit Account Control

Agreements with Rabo that gave Rabo the ability to control Debtors' access to funds, and outflows

from Debtors' bank accounts at CFSB and Mechanics Bank. ***Third***, Rabo lent the Debtors $70

million to facilitate "growth" of McClain's fraudulent Ponzi scheme. ***Fourth***, Defendants used

their control over Debtors' accounts at CFSB and Mechanics Bank to make on-the-spot payments to so-called "investors" who demanded payment on "Partnership Agreements" with the Debtors— without any regard as to the amount of money in Debtors' bank account or the sources of those funds. Defendants made those payments despite knowing that the Debtors were embroiled in check kiting. **_Fifth_**, Rabo, CFSB, and Mechanics Bank lent Debtors any fund shortfalls caused by overdrafts on Debtors' bank accounts at CFSB and Mechanics Bank to perpetuate the fraudulent Ponzi scheme. **_Sixth_**, CFSB and Mechanics Bank accepted deposits for new Partnership Agreements when they knew such funds were the "new investments" required to prop up a Ponzi scheme. **_Seventh_**, HTLF controlled pre-signed blank checks that it received directly from McClain, kited those blank checks to pay the Debtors' investors who housed bank accounts at HTLF, deposited those checks into investor accounts absent endorsements, immediately credited the Debtors for funds yet to arrive from Mechanics Bank, and acted as a "shadow lender" to McClain by pre-paying him out of investor bank accounts housed at HTLF before the underlying funds from CFSB or Mechanics Bank cleared.

### D. The conspiracy between McClain and Defendants directly and proximately inflicted $200 million in losses on Debtors.

132.     The above overt acts directly and proximately damaged Debtors. The Ponzi scheme perpetuated by McClain and Defendants caused Debtors and their creditors to lose nearly $200 million. When Defendants conspired to commit the Ponzi scheme, they should have foreseen the fraud would collapse, leaving Debtors and their creditors with massive financial losses.

### Count IV: Professional Negligence
#### (AGAINST ALL DEFENDANTS)

133.     The Trustee incorporates the factual allegations in all other paragraphs herein by reference for all purposes.

134.    Negligence "consists of three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately caused by the breach of that duty." *Kinnie Ma Individual Retirement Account v. Ascendant Capital, LLC*, No. 1:19-CV-1050-LY, 2021 WL 11963051, at *5 (W.D. Tex. Aug. 25, 2021).

135.    The Trustee alleges each essential element of a negligence claim against CFSB, Mechanics Bank, and Rabo as follows.

**A.      Defendants owed a legal duty of care to Debtors.**

136.    CFSB, HTLF, Mechanics Bank, and Rabo owed a duty of ordinary care to Debtors at all relevant times. "The Uniform Commercial Code (the UCC) … regulates a bank's relationship with its Texas customers, and imposes a duty of ordinary care on a bank with regard to various situations, such as" bank deposits and collections, fund transfers, and negotiable instruments. *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 873 n.5 (Tex. App.—El Paso 2021, no pet.) (citations omitted). Because Debtors were customers of Defendants, Texas law imposes a duty of due care on Defendants in their dealings with Debtors.

**B.      Defendants breached their duty of care to Debtors by facilitating McClain's billion-dollar Ponzi scheme.**

137.    CFSB and Mechanics Bank breached their duty of ordinary care to Debtors by engaging in cash and check kiting activity where CFSB and Mechanics Bank used their control over Debtors' accounts to make on-the-spot payments to investors demanding payment under fraudulent Partnership Agreements.

138.    Rabo breached its duty of ordinary care to Debtors by perpetuating McClain's Ponzi scheme through continuous and repeated relaxation of its internal controls, policies, and procedures to approve extensions and increases in its lending facilities to Debtors to cover

shortfalls in Debtors' CFSB and Mechanics Bank accounts because of overdrafts in connection with Partnership Agreement payments, as confirmed by Lawson.

139.   HTLF controlled pre-signed blank checks that it received directly from McClain, kited those blank checks to pay the Debtors' investor(s) who housed bank accounts at HTLF, deposited those checks into investor accounts absent endorsements, immediately credited the Debtors for funds yet to arrive from Mechanics Bank, and acted as a "shadow lender" to McClain by pre-paying him out of investor bank accounts housed at HTLF before the underlying funds from CFSB or Mechanics Bank cleared.

140.   Defendants further breached their duty of ordinary care to Debtors by allowing hundreds of millions of dollars to flow through Debtors' bank accounts at CFSB and Mechanics Bank on a monthly basis—which is a red flag for fraudulent activity. As set out above, Debtors' December 2022 statements from Mechanics Bank show $102 million in credits and $102 million in debits for the month. Lawson's deposition testimony confirms that any competent bank would have taken notice of—and investigated—that highly suspicious activity. That point is underscored by the charts of Debtors' banking activity in Paragraphs 39–44 above, which show massive and pervasive overdrafts on Debtors' bank accounts at CFSB and Mechanics Bank for the duration of McClain's long-running Ponzi scheme. Any competent bank would have investigated those overdrafts and discovered McClain's fraud.

## C.   **Defendants' professional negligence proximately caused significant damage to Debtors.**

141.   Defendants' breaches of their duty of ordinary care to Debtors directly and proximately damaged Debtors. Defendants facilitated McClain's fraudulent Ponzi scheme by: (1) engaging in cash and check kiting; (2) lending Debtors money to cover shortfalls caused by account overdrafts in connection with Partnership Agreement payouts; and (3) ignoring obviously

suspicious financial activity in Debtors' accounts and loan application. At the outset, Defendants should have foreseen that their unlawful actions would cause Debtors and their creditors to lose untold sums of money. Those damages exceed $170M, as evidenced by the volume of claims asserted by creditors against the Debtors.

## Count V: Punitive Damages
### (AGAINST ALL DEFENDANTS)

142.    Plaintiff incorporates by reference the factual allegations in all other paragraphs for all purposes.

143.    Defendants' conduct, as described in the above paragraphs, was outrageous, malicious, fraudulent, grossly negligent, or otherwise morally culpable and reprehensible such that imposition of punitive damages would both punish Defendants for their conduct and deter others from committing similar acts in the future. Such punitive damages are available under the common law of torts in Texas. *See Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 660 (Tex. 2012) (explaining that "punitive damages are generally available for common law torts").

144.    Accordingly, the Trustee seeks punitive damages against all Defendants in an amount to be determined by the finder of fact at trial.

## Count VI: Determination of Extent, Validity, and Priority of Lien
### (AGAINST RABO)

145.    The Trustee is currently holding funds that are asserted to be the collateral of Rabo. The Trustee disputes that this property is the collateral of Rabo due to, among other things, the fact that the Debtors' property is all proceeds of commingled investor funds, and the avoidance of the DACA Agreement below. The Trustee requests the Court to declare that the estate funds are not the proceeds of Rabo's asserted security interest pursuant to 11 U.S.C. § 506.

## Count VII: Avoidance of Deposit Account Control Agreement
### (AGAINST RABO)

146.     Rabo asserts a blanket lien secured by virtually all of the assets of the Debtors its

asserted debt of $53,516.998.13 as of the Petition Date. *See* Proof of Claim No. 57, Case No. 23-

20085. It is undisputed that Rabo is under-secured on this debt.

147.     On March 23, 2023, Rabo obtained a Deposit Account Control Agreement that

purported to perfect Rabo's asserted lien on certain funds of the Debtors with Mechanics Bank in

connection with a prior security agreement.

148.     Pursuant to 11 U.S.C. § 547(b): [e]xcept as provided in subsections (c) and (i) of

this section, the trustee may, based on reasonable due diligence in the circumstances of the case

and taking into account a party's known or reasonably knowable affirmative defenses under

subsection (c), avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was
   made;
(3) made while the debtor was insolvent;
(4) made—
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between ninety days and one year before the date of the filing of the petition, if
      such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the
      provisions of this title.

149.     The Deposit Account Control Agreement constitutes a transfer of an interest in the

Debtors' in property for the benefit of Rabo on account of an antecedent debt owed by the Debtors

before the transfer was made. At the time of the transfer, the Debtors were decidedly insolvent

given the amount of the asserted Rabo debt, other claims of investors, and other debts, against the

asset value of the Debtors. The transfer was made within 90 days of the petition date.

150.    All payments to Rabo during relevant time period were from Rabo sweeps or payments from the Debtors' bank accounts at banks other than Rabo for which Rabo otherwise did not have a security interest absent the Deposit Account Control Agreement. Absent the Deposit Account Control Agreement, Rabo did not otherwise have a lien on funds at other bank accounts because any such funds are not the traceable proceeds to other collateral of Rabo (like cattle). Such funds were commingled with investor funds and cannot reasonably be traced. *See, e.g.,* Texas Business and Commerce Code Sec. 9.315(b).[6] Accordingly, to the extent Rabo relies upon the Deposit Account Control Agreement to establish its lien on funds received on its under-secured loan during the preference period (which it must), the Deposit Account Control Agreement allows Rabo to receive more in this case had the Deposit Account Control Agreement not been made.

151.    This case will not be a 100% case. The Trustee is currently only holding less than $10M of assets against over $150M of asserted debt, other than litigation claims. The majority of the litigation claims consist of avoidance actions that entitle the defendant to a resulting claim under section 502(h) of the bankruptcy code.

152.    The Trustee is entitled to avoid the Deposit Account Control Agreement pursuant to 11 U.S.C. §§ 547 and 550, and to preserve the Deposit Account Control Agreement for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

---

[6] Texas Business and Commerce Code section 9-314(a) provides: "A security interest in investment property, deposit accounts, letter-of-credit rights, or electronic chattel paper may be perfected by control of the collateral under Section 9-104 [regarding deposit accounts], 9- 105 [regarding electronic chattel paper], 9-106 [regarding investment property], or 9-107 [regarding letters of credit]." In turn, Texas Business and Commerce Code section 9-104(a)(2) provides: "A secured party has control of a deposit account if: . . . (2) the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor . . . ."

## Count VIII: Preferential Payments
### (AGAINST RABO)

153.    As discussed above, Rabo is under-secured and its loan was paid with cash that was not Rabo's collateral because, among other things, the funds are the commingled proceeds of investor funds.

154.    During the preference period, Rabo improved its position (reduced its debt) by approximately $4,000,000.00.

155.    The Trustee is entitled to avoid all payments made to Rabo during the 90-day period before bankruptcy, including this improvement in position, pursuant to 11 U.S.C. §§ 547 and 550, and to preserve such payments for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551, including but not limited to the payments attached as Exhibit A hereto, for the benefit of Debtors' innocent creditors, who suffered at Rabo's behest.

## Count IX: Fraudulent Transfer
### (AGAINST RABO)

156.    All transfers made to Rabo before bankruptcy, including but not limited to the Deposit Account Control Agreement and the schedule of payments attached as Exhibit A, constitute transfers of an interest in property of the Debtors, that were made with the actual intent of the Debtors to hinder, defraud or delay their existing and/or subsequent creditors. Those transfers were all part of an ongoing Ponzi scheme were in violation of 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

157.    The transfers are recoverable from Rabo as the party that received the transfers or benefited from the transfers, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial

transferee, pursuant to 11 U.S.C. §§ 550 and 551 of the Bankruptcy Code. Accordingly, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 548(a)(l)(B), 550, and 551, Texas Business and Commerce Code §§ 24.005 and 24.006, and/or Kentucky Uniform Voidable Transactions Act §§ 378A.040 and .050 the Trustee is entitled to judgments:(a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof. The Trustee is further entitled to a judgment awarding his attorney's fees. TEX. BUS. & COM. CODE ANN. § 24.013.

### Count X: Disallowance of Claim
### (AGAINST RABO)

158.  Bankruptcy Code section 502(d) provides: "Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." The Trustee requests the Court to disallow all claims of Rabo against the Debtors until such time as Rabo has paid the amount of the foregoing avoidable transfers.

159.  Moreover, under section 502(b)(1) of the Bankruptcy Code, the Court shall disallow a claim to the extent, "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." In connection with a Ponzi-scheme, a claimant is only entitled to a claim for their net loss suffered by the scheme after netting all gains and losses from the scheme (and backing out prior receipt of income or other profits). In the alternative, a claimant is only entitled to a claim for the amount of their claim that represents principal amounts lost (and not interest or

other profits). The Trustee requests the Court to only allow Rabo's claim to the extent of actual principal losses.

### Count XI: Money Had and Received
### (AGAINST RABO)

160.    In the alternative, given the circumstances of this case it would be inequitable to allow Rabo to retain the interest, fees, and profit that it made off of the loans to the Debtors.

### Count XII: Equitable Subordination
### (AGAINST RABO)

Rabo's conduct with respect to its handling of the loan and its borrowers resulted in injury to creditors or the conferring of an unfair advantage on Rabo. This inequitable conduct has resulted in hardship to the Debtors' estates and the entire creditor body. Accordingly, pursuant to 11 U.S.C. §§ 510(c)(1) and 105(a), Rabo's claims against the Debtors' estates, including any that arise pursuant to 11 U.S.C. § 502(h), should be equitably subordinated to the allowed claims of legitimate general unsecured creditors for distribution purposes.

### Count XIII: Fraudulent Transfer
### (AGAINST HTLF)

161.    A major investor and active participant in the Debtors' Ponzi scheme were 2B Farms and Terry "Bo" Robinson. The Debtors transferred a total of $264,945,582.72 to 2B Farms on account of its investments with the Debtors, including $104,354,798.76 during the preference period, as detailed on Exhibit B hereto. The Debtors transferred a total of $9,653,108.15 to Terry "Bo" Robinson on account of his investments with the Debtors as detailed on Exhibit C hereto. All these funds were deposited into the bank accounts of 2B or Terry Robinson at HTLF and utilized as borrowing base for the HTLF secured credit facility. Further, HTLF itself orchestrated many of the payments through pre-signed and otherwise blank Debtor checks that it filled out and deposited at its bank at the direction of the Debtors, 2B Farms, and/or Terry Robinson. Given

Case 23-20084-rlj7   Doc 334   Filed 03/14/25   Entered 03/14/25 12:24:14   Desc Main
Document      Page 51 of 56

HTLF's active participation and control over the Debtors' funds, HTLF should be considered a transferee and/or beneficiary of the fraudulent transfers.

162.    Accordingly, all of the transfers of the Debtors to 2B Farms and Terry Robinson should be recoverable from HTLF under 11 U.S.C. §547; 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

163.    Accordingly, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 548(a)(l)(B), 550, and 551, Texas Business and Commerce Code §§ 24.005 and 24.006, and/or Kentucky Uniform Voidable Transactions Act §§ 378A.040 and .050 the Trustee is entitled to judgments:(a) avoiding and preserving the transfers as to HTLF; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from HTLF. The Trustee is further entitled to a judgment awarding his attorney's fees. TEX. BUS. & COM. CODE ANN. § 24.013.

## Count XIV:  Preferential Payments
### (AGAINST MECHANICS BANK)

164.    Each overdraft with CFSB and Mechanics Bank created a debt of the Debtors that was subsequently repaid by covered funds, usually from investors. The covering of the prior overdraft constituted a transfer of an interest in property of the Debtors.

165.    The overdrafts to Mechanics during the 90-day[7] preference period total $55,762,464.56 as further detailed on Exhibit D.

166.    Pursuant to 11 U.S.C. § 547(b): [e]xcept as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case

---

[7] The Trustee reserves the right to seek to enlarge the 90-day preference period to the 1-year insider period as to any party as appropriate.

and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

167.    Each repayment to Mechanics was a transfer of an interest belonging to the Debtors for the benefit of Mechanics on account of an antecedent debt owed by the Debtors before the transfer was made. The antecedent debt was the prior overdraft. At the time of the transfers, the Debtors were decidedly insolvent given the amount of the asserted Rabo debt, other claims of investors, and other debts, against the asset value of the Debtors. The transfers were made within 90 days of the Petition Date.

168.    This case will not be a 100% case. The Trustee is currently only holding less than $10M of assets against over $150M of asserted debt, other than litigation claims. The majority of the litigation claims consist of avoidance actions that expose the defendant to a resulting claim under section 502(h) of the Bankruptcy Code.

169.    The Trustee is entitled to avoid the payments to Mechanics Bank pursuant to 11 U.S.C. §§ 547 and 550, and to preserve the value of the payments for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

## Count XV: Fraudulent Transfer
### (AGAINST CFSB AND MECHANICS BANK)

170.    The overdrafts to CFSB repaid by the Debtors totals $33,277,959.91 as detailed on the schedule attached as Exhibit E hereto.

171.    The overdrafts to Mechanics repaid by the Debtors totals $176,204,076.19 as detailed on the schedule attached as Exhibit F hereto.

172.    Accordingly, all of the transfers of the Debtors to CFSB and Mechanics were in violation of 11 U.S.C. §548(a)(1)(A) and (a)(1)(B); Sections 24.005 and .0006 of the Texas Fraudulent Transfer Act; and Sections 378A.040 and .050 of the Kentucky Uniform Voidable Transactions Act.

173.    Pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 548(a)(l)(B), 550, and 551, Texas Business and Commerce Code §§ 24.005 and 24.006, and/or Kentucky Uniform Voidable Transactions Act §§ 378A.040 and .050, the Trustee is entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof. The Trustee is further entitled to a judgment awarding his attorney's fees. Tex. Bus. & Com. Code Ann. § 24.013.

## RESERVATION OF RIGHTS

174.    During this Adversary Proceeding, the Trustee may learn through discovery (or otherwise) additional facts and circumstances regarding the relationships among the Debtors, their affiliates, defendants herein, and other third parties that were unknown to the Trustee as of the date of this Complaint.

175.    The allegations in this Complaint are formed on the Trustee's ongoing investigation to date regarding the Debtors' transactions.

176.     The Trustee reserves all rights to supplement and amend this Complaint, including, without limitation, the right to (a) further state, allege, or aver additional facts and information; (b) seek to avoid additional obligations, transfers, or conveyances; (c) seek to recover additional transfers; (d) modify, add, subtract, revise, or otherwise amend the parties; (e) allege additional defendant parties; or (f) allege additional causes of action that may become known to the Trustee at any time during this Adversary Proceeding through discovery or otherwise, and for the all such amendments to this Complaint to relate back to the same.

## **PRAYER**

The Trustee respectfully requests the Court to award a judgment:

a.     Entering judgment in favor of the Trustee against all Defendants;

b.     Awarding actual damages;

c.     Awarding compensatory damages, jointly and severally, in an amount to be determined at trial against Defendants as pleaded;

d.     Disgorging all profits Defendants received, directly or indirectly, as a result of breaches of fiduciary duty;

e.     Ordering and imposing a constructive trust over all property that any Defendant created or acquired with proceeds traceable to any breaches of fiduciary duty;

f.     Awarding exemplary damages;

g.     Determining the extent, validity, and priority of liens of Rabo against estate funds;

h.     Subordinating the lien of Rabo against any estate property;

i.     Subordinating the claims of Rabo to other general unsecured creditors;

j.     Voiding and preserving the DACA agreement for the benefit of the estate;

k.     Avoiding, preserving, and awarding a money judgment against Rabo for the value of its improvement in position and all payments received during the preference period;

l.     Avoiding, preserving, and awarding a money judgment against Rabo for the value all payments from the Debtors and/or on account of any loans with the Debtors;

m.     Disallowing Rabo's claims in these bankruptcy cases to the extent Rabo does not satisfy as judgment on the foregoing avoidance claims;

n.     Avoiding, preserving, and awarding a money judgment against HTLF for the value of all payments from the Debtors to Terry "Bo" Robinson and/or 2B Farms;

o.     Avoiding, preserving, and awarding a money judgment against Mechanics Bank and CFSB for the value of all overdraft payments;

p.     Disallowing the Proofs of Claim of each of the defendants herein who are liable for an avoidable transfer and not remitted payment, and subordinating any claim to the extent of other inequitable conduct;

q.     Awarding prejudgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law against each of the defendants to this action;

r.     Awarding the Trust his reasonable attorneys' fees and expenses, together with all costs and expenses of court in this suit against each of the defendants to this action; and

s.     Awarding the Trustee such further relief, general or special, at law or in equity, to which the Trustee may be rightfully entitled.

Respectfully submitted,


/s/ Alan Dabdoub
Alan Dabdoub
State Bar No. 24056836
adabdoub@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:     214-981-3800
Facsimile:     214-981-3839


/s/ Hudson M. Jobe
Hudson M. Jobe
Texas Bar No. 24041189
**JOBE LAW PLLC**
6060 North Central Expressway, Suite 500
Dallas, Texas 75206
(214) 807-0563
hjobe@jobelawpllc.com
**SPECIAL COUNSEL TO THE TRUSTEE**