UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE SCOTT W. EVERETT

| | |
|---|---|
| In Re:<br><br>MCCLAIN FEED YARD, INC.,<br><br>Debtor. | ) Case No. 23-20084-swe7<br>)<br>) <u>CERTIFIED TRANSCRIPT</u><br>) <u>STATUS CONFERENCE</u><br>)<br>) June 30, 2025<br>) Dallas, Texas |

<u>Appearances</u>:

For Mechanics Bank:    Buffey E. Klein
                             Javon Johnson (via WebEx)
                             Husch Blackwell
                             1900 North Pearl Street, Suite 1800
                             Dallas, Texas  75201

For Kent Ries, the    Hudson M. Jobe
Chapter 7 Trustee:    Jobe Law PLLC
                             6060 North Central Expressway, Suite 500
                             Dallas, Texas  75206

                             Alan Dabdoub
                             Steven G. Gersten (via WebEx)
                             Farsheed Fozouni (via WebEx)
                             Campbell Sode (via WebEx)
                             Lynn Pinker Hurst & Schwegmann
                             2100 Ross Avenue, Suite 2700, Floor 27
                             Dallas, Texas  75201

<u>Appearances via WebEx</u>:

For the Jones Group,    Steven Lee Hoard
Creditor:             Mullin, Hoard & Brown, L.L.P.
                             Post Office Box 31656
                             Amarillo, Texas 79120-1656

Appearances continued on next page.

2

<u>Appearances via WebEx continued:</u>

| | |
|---|---|
| Chapter 7 Trustee: | Kent Ries, Trustee<br>Quilling, Selander, Lownds, et al.<br>2001 Bryan Street, Suite 1800<br>Dallas, Texas  75201 |
| For Rabo AgriFinance,<br>LLC, Creditor: | Matthew M. Cannon<br>Ray Quinney & Nebeker P.C.<br>36 South State Street, Suite 1400<br>Salt Lake City, Utah  84111 |
| For 2B Farms and Terry<br>and Rebecca Robinson,<br>Creditors: | Timothy T. Pridmore<br>Todd Jeffrey Johnston<br>McWhorter Cobb & Johnson, LLP<br>1722 Broadway<br>Lubbock, Texas  79401 |
| For Community<br>Financial Service<br>Bank (CFSB): | Aaron Michael Kaufman<br>Gray Reed LLP<br>1601 Elm Street, Suite 4600<br>Dallas, Texas  75201 |
| For AgTexas and<br>Thorlakson Diamond<br>T Feeders, LP,<br>Creditors: | David L. LeBas<br>Naman, Howell, Smith & Lee, PLLC<br>8310 Capitol of Texas Highway,<br>Suite 490<br>Austin, Texas  78731 |
| For Open A Arena,<br>LLC; and Edward Lewis<br>and Rieta May<br>Dufurrena, Creditors: | Kenneth R. Netardus<br>Stockton Johnston Broan & Netardus, P.C.<br>Post Office Box 3280<br>1030 North Western<br>Amarillo, Texas 79116-3280 |
| For Dennis Buss, et<br>al, Creditors: | John F. Massouh<br>Sprouse Shrader Smith, P.C.<br>701 South Taylor, Suite 500<br>Box 15008<br>Amarillo, Texas 79101 |
| | Abel Angel Leal<br>Simmons Smith Brown, PLLC<br>400 Thirteenth Street<br>Post Office Box 180<br>Canyon, Texas 79015 |

Appearances continued on next page.

3

Appearances via WebEx continued:

| | |
|---|---|
| For HTLF Bank, successor in interest to First Bank & Trust, Interested Party: | Matthew S. Merriott<br>Mullin Hoard & Brown, LLP<br>500 South Taylor<br>Suite 800, LB# 213<br>Amarillo, Texas  79101 |
| | John H. Lovell<br>Lovell Isern & Farabough, LLP<br>112 Southwest Eighth Avenue, Suite 1000<br>Amarillo, Texas 79101-2314 |
| For Priest Cattle Company, Ltd., et al, Creditors: | Kyle Weldon<br>James D. Bradbury, PLLC<br>201 Main Street, Suite 600<br>Fort Worth, Texas 76102 |
| For the Debtor: | Max Ralph Tarbox<br>Tarbox Law, P.C.<br>2301 Broadway<br>Lubbock, Texas 79401 |
| For Community Financial Services Bank, Interested Party: | Keith James Larson<br>Morgan Pottinger McGarvey<br>401 S. Fourth Street, Suite 1200<br>Louisville, Kentucky 40202 |
| For AC's Livestock And Barrett Livestock: | Joseph Mattingly |
| For John Ragland: | Matthew Muckleroy<br>Crawford Wishnew Lang<br>1700 Pacific Avenue, Suite 2390<br>Dallas, Texas 75201 |
| Digital Court Reporter: | United States Bankruptcy Court<br>Northern District of Texas<br>Sara Ferrufino, Judicial Support<br> Specialist<br>Earle Cabell Building, U.S. Courthouse<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242 |
| Certified Electronic Transcriber: | Susan Palmer, CERT 00124<br>Palmer Reporting Services |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Monday, June 30, 2025                          10:07 o'clock a.m.

P R O C E E D I N G S

THE JUDICIAL SUPPORT SPECIALIST:  All rise.

THE COURT:  Thank you.  Please be seated.

All right.  Good morning.  We're here on the ten o'clock docket.  We have a status conference in the McClain Feed Yard case, 23-20084.  I'll take appearances in a minute.

I just want to clear up some potential confusion because we had some parties reach out at the last minute who were under the impression that some of the motions to dismiss were going forward today in Adversary 24-2007.  And we can chat about it if anybody had a different recollection, but my recollection at the last hearing was that the hearing today was going to be a status conference in the main case.  We had penciled in, I think, potentially July 15th for the hearing, what I called the who owns what hearing.  And we'll talk about that date, and that that was going to be decided first before we teed up any of the motions to dismiss.

I think the parties were going to work on some form of a scheduling order in connection with the hearing on who owns what.  I haven't seen a scheduling order, so we'll chat more today about the date for that hearing and the scheduling order for that hearing.  But we had potentially penciled it in on the 15th.  That might get pushed back.  But, anyway, that's my understanding what we were doing here today.

*Status Conference*                                          5

So with that said, I will start with appearances and then we'll chat about whether anybody has a different recollection of the last hearing.  So I'll take appearances starting in the courtroom.

MS. KLEIN:  Good morning, Your Honor.  Buffey Klein, Husch Blackwell, on behalf of Mechanics Bank.  And I have on the line with me Javon Johnson.

THE COURT:  Good morning.

MR. DABDOUB:  Good morning, Your Honor.  Alan Dabdoub, with Pinker Hurst & Schwegmann, here on behalf of the Trustee Kent Ries.

THE COURT:  Good morning.

MR. JOBE:  Good morning, Your Honor.  Hudson Jobe for Kent Ries, Chapter 7 Trustee.  And Mr. Ries is on remotely as well.

THE COURT:  All right.  Good morning.

MR. DABDOUB:  Your Honor, I also have two colleagues from my office on the line, Farsheed Fozouni is one of my colleagues and the other one is Steve Gersten.  They're both present as well on behalf of the Trustee Kent Ries.

THE COURT:  All right.

All right, I will take other WebEx appearances.

MR. LEBAS:  Your Honor, David LeBas for A-g Texas, AgTexas and Thorlakson Diamond T Feeders, plaintiffs.

THE COURT:  Good morning.

MR. MATTINGLY:  Your Honor, Joseph Mattingly for AC's Livestock and Barrett Livestock.

THE COURT:  Good morning.

MR. PRIDMORE:  Your Honor, good morning.  Tim Pridmore and Todd Johnston with McWhorter Cobb & Johnson, on behalf of 2B Farms, a Texas general partnership; and Terry and Rebecca Robinson.  Good morning — good afternoon.

THE COURT:  Good morning.

MR. MASSOUH:  Your Honor, John Massouh and Abel Leal on behalf of intervenor-plaintiffs in the adversary and creditors in the bankruptcy, Dennis Buss, et al.

THE COURT:  All right.  Good morning.

MR. LARSON:  Your Honor, Keith Larson on behalf of Community Financial Services Bank.

THE COURT:  Good morning.

MR. MERRIOTT:  Your Honor, —

MR. HOARD:  Your —

MR. MERRIOTT:  — Matthew Merriott on behalf of HTLF Bank.

MR. HOARD:  Your Honor, Steve Hoard on behalf of 2 Terrace (phonetic) and the Jones Group.

MR. LOVELL:  Your Honor, John Lovell on behalf of HTLF Bank and UMB Bank, successor.

MR. WELDON:  Your Honor, Kyle Weldon on behalf of plaintiff-intervenor and Creditor Priest Cattle Company, et al.

MR. TARBOX: Your Honor, Max Tarbox, attorney for the debtors. I have another hearing around eleven o'clock. So I will probably, with the Court's permission, get off the line at around 10:30. I'm just — I don't think I'm an active participant in this hearing.

THE COURT: All right. Thank you.

MR. CANNON: Good morning, Your Honor. Matt Cannon on behalf of Rabo AgriFinance, LLC.

THE COURT: Good morning.

(Simultaneous talking.)

MR. [SPEAKER]: Your Honor, David —

MR. [SPEAKER]: — trustee —

MR. [SPEAKER]: — Department of Justice, on behalf of the Interested Party, Department of Agriculture.

THE COURT: All right, welcome.

MR. NETARDUS: Your Honor, Kenneth Netardus on behalf of the Dufurrena parties, Ed, Rieta, and Brandon.

THE COURT: Good morning.

(Sounds of static. Simultaneous talking.)

MR. MUCKLEROY: Good morning, Your Honor. Matt Muckleroy on behalf of John Ragland.

THE COURT: Good morning.

I saw somebody was speaking. Is it Mr. Campbell? You were muted, but I saw your mouth moving. If you were making an appearance, we didn't hear it.

MR. SODE: Sorry about that. Good morning, Your Honor. Campbell Sode for the Trustee Kent Ries.

THE COURT: All right. Good morning.

All right, any other appearances?

(No audible response.)

THE COURT: All right. So I guess before we kick off the status conference, — part of the confusion might have been when we were getting ready for the docket this morning, we noticed on what we call our CHAP system, a lot of the motions to dismiss still showed up as being set, so we might have been at fault, I guess, for not taking those off. But at least I thought it was clear from the last hearing that this was just going to be a status conference today.

So let me start with Mr. Jobe. Is your recollection the same as mine?

MR. JOBE: Yes, Your Honor. I believe how we concluded the last hearing was all of those motions to — well, the trustee's standing motion and any standing issues and motions to dismiss were going to be set for July 15th. And we had kind of internally discussed and agreed upon a response date of today for those motions and a reply date of the 11th in front of the July 15th setting.

There's quite a few parties involved. An order on the motion to continue the motions to dismiss have been circulated. I think that should get uploaded at any time. We filed a notice

of hearing for the 15th, moving the trustee's motion to the 15th, and have informed the parties that they needed to file their own notices of hearing for the 15th as well.  So that's my recollection of how we left the final hearing and what's happened since then, Your Honor.

MR. LEBAS:  Your Honor, David LeBas for plaintiffs, and I may have a slightly different view of what happened.  We circulated a proposed order that I thought everyone had signed off on, on June 24th, at 9:09 a.m.  Now I'm looking at the confirmation that it was uploaded and related to Document 160.  I'm hoping that it got sent in the right slot, perhaps not.  But my understanding was that we, as Mr. Jobe says, we did agree to move hearings on motions to dismiss for today, but the only thing I understood we were going to discuss on the 15th was some selected sections in those motions to dismiss that pertained to standing.  In other words, as the Court has addressed it, what is the — who owns the causes of action or how owns the claims. I think that's what we're going to talk about on the 15th. That's what we thought we were going to discuss on the 15th and that's what we thought our deadline to respond on that issue was.  With other issues on the motions to dismiss, such as failure to state a claim or not enough particularity, to be deferred following the Court's ruling on who owns the causes of action.  That's our understanding.

THE COURT:  All right.  For some reason, I'm my order

*Status Conference*                                                          10

queue, I'm not seeing — I cleared out my order queue on Friday and I don't recall seeing it.  But I'm looking through my order queue right now.  Let me pause and make sure it's not in the Clerk's Office queue, because I remember hearing, I remember discussing the scheduling order, and so I was, I guess, a little surprised I hadn't seen anything yet.

MR. LEBAS:  It took us a while to get everyone to sign off on the form.  I'll check with my paralegal offline and make sure that — what I'm looking at.  I just see the confirmation on the screen, so I want to make sure I got it, if that's it.

THE COURT:  Well, Mr. Jobe, is that correct, has everybody signed off on an order and you all are just waiting for me to sign it?

MR. JOBE:  I'm not sure whether it has been uploaded or not, Your Honor, but otherwise yes, what Mr. LeBas has said is correct.  I think everyone has chimed in on an order that moves everything to the 15th and then has some dates for those responses to standing and ownership issues between now and then.

THE COURT:  All right.

MR. JOBE:  I just don't know if it's been uploaded or not.

THE COURT:  Okay, so that was kind of what I was expecting.  I'm still not seeing it.  But we'll, I guess, track it down after the hearing.  Let me pause for a minute and ask Ms. Ferrufino.

*Status Conference*                                                11

By chance, is it in the Courtroom Deputy queue?

(The Judicial Support Specialist confers with the Court.)

MR. LEBAS:  We're having trouble tracking down the order that was sent on the McClain case on June 24th with the order upload for the standing question.  It's called Order, Proposed Order Granting Motion for a Continuance.  Can you confirm that?  I'm looking at the document, but for some reason the Judge isn't seeing it in his queue?

(The Judicial Support Specialist confers with the Court.)

MR. JOBE:  David, you're not muted.

THE COURT:  This is not on the docket, so it hasn't been —

(The Judicial Support Specialist confers with the Court.)

THE COURT:  Okay.  So, all right, it's been a long weekend, but apparently I did sign an order.  It has not been entered on the docket yet, so.

MR. LEBAS:  Okay, he did sign it.  All right, okay, thank you.

THE COURT:  All right.  Well, that's what happens with long weekends.  All right, well, hopefully it will be entered on the docket here this morning.  But it was setting everything for the 15th then, right?

MR. JOBE:  Yes, Your Honor.

THE COURT:  Okay, all right.  All right.

MR. JOBE:  And what Mr. LeBas described was correct

with respect to kind of only the standing, ownership issues, those portions of the motions to dismiss being set for the 15th, and then subject to today's response date and the reply date that we agreed to at the 11th.  So I think we're all on track —

THE COURT:  All right.

MR. JOBE:  — and everybody's on the same page.  We did not see any emails over the weekend with any confusion on this morning, or we could have — our understanding was all the parties were kind of on the same page and generally aware coming into this morning.

THE COURT:  All right, very good.

MR. PRIDMORE:  Your Honor, this is Tim Pridmore for the 2B parties.  If I may ask one other question with you speaking of orders.  The parties, Mr. Johnston with Mechanics Bank, had uploaded a protective order that I believe all parties have signed off on.

And, Javon, I don't think it's been signed yet, has it?

THE COURT:  When was that one uploaded?

MR. PRIDMORE:  I believe it was early mid last week.

Javon, we could hardly hear you.

MR. JOHNSON:  June 23rd, it's the Docket Number 173.

(The Judicial Support Specialist confers with the Court.)

THE COURT:  Okay, we're not seeing that one.  But I guess the order that I did sign related to the 15th, I guess I

was expecting a little more in it, but I don't have it in front of me.

So, Ms. Ferrufino, could you send to me the order that is not yet entered?

Well, while we're tracking that down, Mr. Jobe, why don't you just go ahead with the status conference.

MR. JOBE: Thank you, Your Honor.

Your Honor, we appreciate the Court getting us in and appreciate all the Court's efforts in transitioning this case and getting up to speed. I understand that you have a number of cases that have been transferred from the Panhandle, and we have appreciated those efforts thus far and being able to coordinate folks remotely to make appearances easier for the parties.

Your Honor, part of today was — to be made more efficient in further hearings and save us some time by just making some introductions today, laying out just some of the kind of major, undisputed moving pieces so that, yeah, everybody is kind of on the same page and can kind of start from a common discussion, maybe at any further hearings on discrete items.

Your Honor, Mr. Ries is the Chapter 7 Trustee out of Amarillo, Texas. He did want to take a first shot at a few items this morning. So with the Court's permission, I will open it up to him.

THE COURT: That's fine.

MR. RIES: Thank you, Your Honor. And I do appreciate

*Status Conference*                                                    14

the Court's June 12th hearing.  I was on the line for that and I have encouraged my counsel to speak with other counsel about what agreement can be reached on who owns what claims and where there are actual disputes.  I'm sorry I will not be able to attend the July 15th hearing, but I didn't want to hold up that hearing and I appeared to be the only one that has a problem.  And I don't specifically need to be there.  I have obviously hired counsel for the adversaries that are at issue.

And certainly today I don't want to waste the Court's time.  I did want to give some context to this case, that I certainly heard the Court talk on June 12th.  I believe it was quite obvious that the Court has spent significant time to get up to speed on all the legal issues, all the things that have been filed, the vast variety of agreements and fights that have happened in the case.  But there are some other things that I thought that might be helpful for the Court to know, just to keep some context of where this case is.  And, again, if at any time I'm rambling and wasting your time, just let me know and I will stop.  But I do think it's important to know kind of how this case has arrived and where it's gotten to today, so maybe a little of what I'm doing is history.

Just for the Court's edification, I do have an accounting background, a CPA background.  I spent a couple years auditing and a couple years in pure accounting work prior to law school.  That's relevant in this case because of at least two

reasons.  One we had, as the Court knows, a very significant settlement with the CPA firm that was supposedly representing the debtors prior to filing.  That has been resolved now, completely and paid.  There has also been what can be called enormous accounting issues throughout this case, and I will get into that in just a minute.

As far as just, again, for me, I have practiced in this field for 10 years before Judge Aker (phonetic) drafted me to get on the panel, which I did in 1997.  I do generally do my own legal work in cases, although I keep to my lane in staying in the bankruptcy practice and I try to keep to my lane of ability and what I can actually handle.

It became very obvious in this case early, almost immediately, that it was going to be substantially more than anything I had staff for the ability to handle.  And so I knew I was going to have to hire outside counsel.  Again just to let the Court know, I did spend several dozen hours getting ready for this case with people who had similar cases, mainly leaders of our trade association NABT and how a game plan kind of would work and choosing professionals.

I did want to just give some numbers to all of this.  So far in this case the estate has spent right at about a million and a quarter in professional fees.  Those are pretty deeply among the forensic accountants and then the three accounting firms — or three law firms that I have hired

*Status Conference*                                                    16

primarily for adversaries in this case.  That's obviously an enormous amount of money.  I think it was a fair amount of money, based on the work that was done.  And, quite frankly, the game plan that I was given by other people who had experience in similar cases was an investigation would need to be had.  Most people would want to do that on an hourly basis, and then hopefully you can move those counsel to a contingency basis when you actually get to figure out if there are lawsuits to pursue them.  And that's exactly what's happened in this case.

The reason why that much in fees, in my view what's happened and where I think it was somewhat helpful for me to have an accounting background and I think it's important for the Court to know, when we walked into this case, I got bank statements from the main bank in the case, Mechanics, that was the three debtor cases' banks.  That's pretty much the extent of the accounting work that we were able to get.  It doesn't appear that the debtors really have much of an accounting system.  The people they used were Mr. McClain's two daughters, mainly one daughter.  Tax returns were filled out by a local H&R Block person.

We basically had no accounting records, and that obviously made this more complicated than even the normal case where you would examine the records that are in hand.  In this case, our accountant had to go back and put flesh on every single entry, and multiple bank statements were obviously a

significant number of years backwards to figure out what has happened.

The parties cooperated some. We had some disputes. I think it's mostly done, if not completely done, that documents were turned over so that our accountants could do that. I tried my best to keep, to herd all those cats in order and keep everybody moving.

I would mention one thing I heard in the June 12th hearing, that this is probably the only thing I would — and I don't mean to get into an argument obviously here today, but I heard a comment about how the trustee kind of sat back and let all these other adversaries go on and waited until they were done and now he's jumping in the middle, I can assure the Court that we have worked pretty tirelessly from the first part of this case, from the first day of this case forward to get to where we are. It just took a whole long time to get where we are, to where we could file litigation on the road and be confident of the facts that we would be able to assert in those lawsuits. And I do take very seriously the role that when we file a lawsuit, we have facts to back up what we're filing. So the context of the lack of records in this case really can't be understated.

THE COURT: Mr. Ries, we —

MR. RIES: Sure.

THE COURT: — pause for just a minute. I guess I

*Status Conference*                                    18

should have asked for this clarification at the beginning, but I will just state that this is a status conference, so I'm taking everything that Mr. Ries says as not evidence.  I haven't sworn him in, so I'm not contemplating that people are going to be cross-examining Mr. Ries.  This is just attorney talk for a status conference.

Are we all on the same page on that?

MR. JOBE:  Yes, Your Honor.

THE COURT:  All right.  All right, go ahead, Mr. Ries.

MR. RIES:  Yeah.  I'm sure hoping to not be cross-examined today.

THE COURT:  All right.

MR. RIES:  So — and I don't mean to be testifying in any way.

A couple of side issues before I jump into the one issue I do have in one of the adversaries today.  Because of the accounting issues, this estate has not been able to file tax returns.  I think that's not a significant — and that would be for '23 and '24 at least.  I don't think that's a significant issue because I think there are enormous losses in the debtor entries, and so we're probably not having any tax due.  But we, frankly, just didn't have the records to file.  So that was — that's been the issue.

This case, as the Court notes, has been administratively consolidated, which happened early on in the

case, about two months after the filing in April of '23 and June of '23, administratively consolidated.  That became obviously necessary because people were filing the same things in all three cases, motions to lift stay, et cetera.  It was just a waste of everyone's time, so we did do that.  But I would advise the Court that I think at some point, maybe at some point soon, we need to seriously consider substantively consolidating this case.

And, again, because of the lack of accounting records and my concern and my accountant's concerns over what the tax effects of that would be, we have not done that to date, but I think that's an issue that the Court will see.  Again, it doesn't have to do too much with the adversaries at issue and where you're going forward in litigation, but just for administrative purposes, I think that is coming down the line.

I would mention, and I will just go into, again just for context, some real brief issues, the creditors in all three of these cases are very similar.  If the Court looks at the claim registers, they vary from — the '7 end case has right at a $160 million claims.  The claims bar case is the highest at $176 million and McClain Feed Yard is in the middle, with $161 million.

The claims are pretty similar throughout the case.  We basically in real rough numbers have a little over $120 million in the other creditors, as I'll say, column, and then $50

million, a little over $50 million in Rabo's claims.  Those are numbers that the Court is also going to see when I get into the USDA issues.

The case itself has — the three cases themselves have approximately $8,765,000 in them at this point.  We do have fee apps.  Well, and will just mention to the Court that that's primarily from two settlements, the accounting settlement, the CPA firm settlement of four or five million dollars, and then a settlement that happened fairly early on in the case, the $3 million with Mr. McClain's family, some of his family members, with regard to life insurance.  But of that $8.765 million, there is a motion outstanding, the Court should know, of a little over a million and a half dollars that would be the contingency fee that my counsel have, I believe, earned for the accounting firm settlement.  If that is paid, at this point there would be then just under seven and a quarter million dollars in the case at this point.

With that, I just would like to — well, I will stop for a second and see if the Court has any questions, but I'd like to talk for just a minute about the USDA portion of this case, and then turn it over to my counsel on the other part, adversaries.

THE COURT:  All right.  I don't have any questions right now.

MR. RIES:  All right.  So there is an adversary that

*Status Conference*                                                21

Rabo filed relating to the USDA portion of this case.  That is an obviously fairly unique part of this case.  It relates to a USDA trust, that arises by statute.  The statute itself is virtually brand new.  What I found with a significant amount of help and work from USDA field personnel as well as counsel in the first six months especially of this case, we will be somewhat of a case of first impression as to how that trust works.

There are some comparable or similar USDA trusts with respect to farmers.  This is more related obviously to ranchers because this is a cattle case.  That trust, the trust funds are generally treated as separate trusts not related to the bankruptcy case.  If they are considered part of the trust, they are — they avoid any liens that any parties would have, even if Rabo would normally have liens on cattle.  Someone else would normally have liens on cattle, because the money is really held with respect to — for owners of those cattle that were sold right before filing.

And let me just stop and mention this again for context.  As I mentioned, we have over $50 million owed to Rabo, who felt they had a lien on the number of cattle of the McClain entities.  We have over $120 million of other parties who felt like they actually owned cattle that Mr. McClain had possession of.  When this case was filed, there were zero cattle in the case.  That's obviously fairly stunning.  You would think that

there would be less than 170 million but more than zero, but there were zero.

So the only thing we did catch, which was mostly with the help of USDA counsel, was we tracked about $2.474 million in funds of cattle that had been sold shortly before the bankruptcy filing.  That money has been held by me, again, in separate bank accounts because it's considered separate from the bankruptcy estate.  They are trust funds for specific approved USDA claimants.

The USDA claimants in this case are very similar to the creditors in the bankruptcy case, but for Rabo, of course because they're purely a lender.  But there is a substantial amount of overlap between the USDA claimants and the creditors in this case.  I think the USDA claimants totaled about — a little over $122 million.  So on its face, that sounds like a really bad payout because we're looking at less than two and a half million dollars and $122 million in claims.  That's not quite the way this works.

The USDA has gone through and reviewed those claims and has approved just over $2.9 million of those claims.  And when I say approved, this is one of the issues that's not resolved, and I'm open to press it one way or the other, but there's obviously, I think, going to be some presumption that what the USDA did with their expertise in their review has some merit, but whether we call it a rebuttable presumption or

something else, clearly that is not a final determination.  I don't think they take it as a final determination.  I don't take it as a final determination.

I think we're going to ask this Court to make the final determination on the actual claims that are to be paid.  But it would appear, and again this is just primarily for context, it would appear that we might be able to pay most or maybe even all of those actual, the true claimants in the case if the USDA numbers are correct.

Again I will go back to — this is one of the — what I would call one of the four main adversaries.  I'm going to punt on the other three and let Mr. Jobe handle those, the two I filed and then one that the creditors filed.  But there is a lawsuit, there is an adversary filed by Rabo that did a fair amount of this work early on in the case looking at these parties.  There were reasons why we had Rabo take the lead in filing that adversary, but the bottom line is I think the Court, kind of like substantive consolidation, I'm giving you a heads-up, but at some point, maybe fairly soon, there will be a motion that comes from me handling this as the, essentially, successor trustee of Mr. McClain to approve claims and pay claims so that these parties can get whatever money they're going to get, that actually are due this money, separate and apart from what they're entitled to in the bankruptcy case, which is probably a lot further time away than what we could do

*Status Conference*                                                24

with the USDA money.

I don't want to hammer too much on the USDA litigation.  There's obviously issues because it is a brand new statute, and parties certainly can make their arguments when we get to that point.  That's not for today.  But I do think it's important to know that that exists.

Mr. McClain would have been, had he not committed suicide before filing, would have been the natural trustee in that case under the statute.  Because he obviously was not available, the USDA has looked to me to kind of take charge because it's a fairly similar role to what I do as a Chapter 7 trustee in holding this money and eventually paying it out to parties.  So they have been a very workable partner throughout this case to try and get that adversary reasoned properly.

And that's all I have for the Court today, I think.

THE COURT:  All right.

Thank you, Mr. Jobe.

MR. JOBE:  Thank you, Your Honor.

Judge, to follow up on the accounting items and the USDA items referenced by Mr. Ries, this case was filed on April 28th, 2023, just kind of the major events that led up to that.

In early that month, in early April of '23, the debtor, at the requirement of the secured lender Rabo, had hired a CRO.  And within less than two weeks of that CRO coming onboard, Mr. McClain did commit suicide.  And these are —

they're referenced in initial filings and I think undisputed points, but there were parties that immediately upon Mr. McClain's death did show up and kind of exercise some self-help remedies to some cattle.  And then Rabo — the CRO and Rabo coordinated taking the limited records of the debtor that were there and sending them to Rabo's consultant in Chicago, Focus.

When Mr. Ries came into this in late April, you know as he discussed, it took him about a month to kind of get a feel for the case and decide on counsel and accountants.  We came in, and the records were in a really difficult spot, Judge.

With respect to the USDA issue, Judge, that was a significant issue in this case.  And, just looking at some of the filings in the main case, you've got filings starting in July 1st of 2023.  We ultimately had a hearing on October 11th of '23 and really during that whole time, the parties, everybody was really focused on the USDA trust issue.

As I'm sure Your Honor has had experience with PACA, you know a lot of people are saying that it's similar to PACA, the Perishable Agricultural Commodities Act, that for certain types of qualified claimants that have provided, in this case cattle, and in other cases perishable goods, certain sellers of cattle are entitled to certain trust fund treatment on certain dollars of the debtor.  And that was a very significant issue because arguably any property that is the subject of that trust is not property of the bankruptcy estate.

Your Honor, may I approach?

THE COURT:  Sure.  Whatever you're handing up, does everybody online have access to whatever you're handing up?

MR. JOBE:  Yes.  This is an agenda, Your Honor, that I filed yesterday.

THE COURT:  Oh, all right.  Oh, I have it up, I have it up on mine.

MR. JOBE:  I thought a hard copy might be handy, Your Honor.

THE COURT:  If you think I need the paper, I usually work — I have it right here digitally, so I'm going to —

MR. JOBE:  Perfect.

THE COURT:  — get rid of the paper.  Go ahead.

MR. JOBE:  Your Honor, we have copied the relevant statute into the agenda.  And some of the — I italicized the major moving points.  So the trust, Your Honor, is meant to protect cash sellers of livestock selling to dealers.  That's in the first part of the statute.

The way that filing a claim works, it works a little differently here.  Under (b), the parties have 30 days, some cases, 15, but they have 30 days to file their claims with the USDA.  So what happened was, was immediately following Mr. McClain's death, it appears that there was a number of checks that were bounced.  And so there was a flurry of filings with the USDA in that 30-day period after that that was at the very

beginning of this bankruptcy case. So the USDA was the repository of those claims, again over a hundred claims, roughly $122 million worth of claims. So we definitely spent a lot of time at the beginning of the case focused on that issue.

Your Honor, it was — it then became pretty clear that there was some different natures of different claims, folks that were filing USDA claims. There appears to be a couple of clear sellers of cattle to the McClain debtors that were clearly selling cattle and got stiffed either in a bounced check or because payment was never made. It appears that that is the roughly $2.9 million of the $122 million that the USDA has approved. The other parties are some variation of parties that were investing money with McClain. In some cases, cattle was changing hands and, in some cases, very limited cases, those parties may have been taking their cattle to McClain for feed yard services. So we've got a whole kind of bucket of potential claimants with disputes whether those are qualified USDA claims or not.

Your Honor, after kind of that first hearing that we had on that issue on October 11th, 2023, we felt like we had at least kind of a common, maybe at a level of understanding between the parties as to the USDA claims, the different nature of the people's claims, the effects, and how that was going to kind of work in the bankruptcy case. And that kind of tied into the forensic accounting, Judge, because you could look at the

kind of docket entries as well as the time sheets for the fee apps that have been filed.

And the forensic accounting, although it's been occurring in some respects from day one and is still ongoing, the need of the forensic accounting was really in earnest from about October of 2023 until October of 2024, I think that's fair to call that the focus of that.

Judge, we dealt with the motion to transfer venue filed by — if I could back up for just a second, Judge, and it's a good reminder that I maybe should kind of hit on some of the primary parties first.

So you have Ryan McClain, who was the kind of owner-operator of the three debtors.  His primary two employees were his daughters.  Their last names now are Goad and Moreland.  And, as we've talked about in some other pleadings, Judge, McClain banked at Mechanics Bank.  That's where some deposit accounts were.  He banked at CFSB and that Rabo was the major secured lender.  And then we have a whole host of other parties that kind of fall under this umbrella of investors, partners, cattle sellers, or, in some case, feed yard services.

Judge, early on in the case, the two daughters Goad and Moreland filed a motion to transfer venue.  And so from July of '23 until late December of '23, we were also dealing with that contested motion to transfer venue and maybe even the possibility of these cases getting moved.

*Status Conference*                                                    29

A very significant event occurred on the docket, Judge, on December 28th of '23.  We reached that initial settlement with those two daughters regarding some avoidance claims against some life insurance that they had received.  The gist of that being that the debtors paid a significant amount of money for term value life insurance that paid out following Mr. McClain's death.  Our position was that the estate was entitled to the proceeds.  They felt otherwise.  Our settlement, I believe — it's been some time, I believe our settlement was 50 cents on the dollar, maybe give or take, maybe as low as 40 percent, I can't remember exactly, but we resolved that avoidance claim with them, as well as the motion to transfer venue.

And, Judge, that was a really key moment to Mr. Ries' point about the records in this case as well as the USDA issues. You know on day one we had a case with really difficult records that was going to be a really uphill battle with the forensic accounting.  We also had — it was essentially a no-asset case because any asset in the case was being claimed either by Rabo or by these USDA trust claimants as their trust fund property. So this settlement of that avoidance claim for kind of free and clear funds for the estate, that was a really key event, Judge, that was used to finance significant discovery efforts and forensic accounting efforts after that.

Your Honor, this is also on the main case docket.

After that, from February of '24 until April of '24, so for about two months, we sought and had hearings regarding discovery on who I call all of the investor parties. You know the hundred plus parties that have filed USDA claims that invested or transacted other business with McClain. That was all very contested. We had significant hearings about that. The Court took it under advisement and ultimately ordered those parties to provide all of their documents, all of their transactional documents and communications with McClain from the beginning of time, not just a one-year period or a two-year period or a four-year period.

So that discovery was ordered in April of '24 by, again, roughly a hundred parties. That discovery has been significant both with respect to everyone's efforts involved as well as it being helpful and insightful about McClain's operations, specifically including with this pool of investors, which during some months exceeds over $100 million a month in certain months of investor money in and out.

Judge, we do have some — in kind of talking about the future, we do have some kind of lingering issues from that, discovery-compliance issues, but that has been a critical component of our forensic accounting and how we have gotten to where we've been able to get to today.

The other major event from the main case, Judge, is May 1st of '24. That's basically when we began discovery on the

*Status Conference*                                                31

banks' two fairly large outfits that were buying cattle from McClain, as well as from Carr, Riggs, the accounting firm that was hired by the McClain entities to do their financial statements and tax work, and things like that.

Judge, if we could go just very briefly to a point Mr. Ries made about the similarities between the proofs of claim filed in the three cases, as well as how much of a percent of our total claims in these cases are made up by Rabo on its asserted $50-plus million claim as well as the $122 million claims of the USDA claimants.

Your Honor, on page — so Exhibit A to the agenda that we filed, Judge, is kind of a running spreadsheet that we have been using at various points throughout this case, but it is a spreadsheet that has all of the parties that filed USDA claims. It has their contact information for their attorneys. And then it has the information on the proofs of claim that they filed in each one of the three bankruptcy cases.

A few takeaways here, Judge, that you will see. Most of the USDA claimants are represented by counsel, not all of them are. There are certainly a couple of kind of larger groups. I think Mr. Leal, Mr. Massouh's client groups are a major chunk.

The other takeaway, Judge, is just the significance of what percent Rabo and these investor claimants, what percent their claims constitute all of the claims in the bankruptcy case

as well as how kind of similar the three proofs of claim

registers are.  Just looking at the first page, Judge, and

looking at some examples, you will see many instances where

these USDA claimants filed identical proofs of claim in all

three of the bankruptcy cases for the amount of their USDA claim

and the amount of their claim in all three cases.

          The takeaway, Judge, can be found on page 13 of this

Exhibit A, which it looks like we had a runover problem with

half of these documents are blank, but —

          THE COURT:  So the Bates-labeled top is page how many

of 26?  Page 13 of 26?

          MR. JOBE:  Page 13 of 26, yes, Your Honor.

          THE COURT:  All right.

          MR. JOBE:  So here at the bottom you have total amount

of claims.  So in the first case, in the claim of Feed Yard

Inc., we have $101 million of claims filed in that case.  In the

claim Farms Inc., $112 million.  And then in 7M, we've got $95

million.  Those differences, Judge, are in some cases, some USDA

claimants have chosen to file in not all three cases, or just

one case.

          With respect to the documentation we've seen so far,

we're not aware of much a rhyme or reason why they would have a

claim against one debtor or another, just because of the

paperwork or lack thereof involved.  But, Judge, we've got 90

percent plus similarity between the total claims at each case

asserted by these USDA parties.  This does not include the $50 million plus Rabo secured claim.  Once you add that in, Judge, you get very close to the total claim numbers that Mr. Ries was talking about in each case.  And so Rabo plus USDA parties will be 90 plus percent of the total claims in each case.  So there is less than kind of 10 percent additional claims filed in addition to Rabo and these USDA claims.  And those are going — those are just vendor claims, essentially.

So, Judge, some of the significance of — or the interplay of the lawsuits and then these different camps and parties.  Your Honor, as you know, we've got Adversary Proceeding 24-02007, that was the one with — that's the one with the standing issues set in that and then the motions to dismiss that were set for today.  That lawsuit is kind of like this Frankenstein combination of many other prior lawsuits that you may have seen from the docket, three different lawsuits.

One, a state court lawsuit filed by First Bank against 2B, and 2B was a major, what we call, investor, one of the biggest investors or parties doing business with McClain.  So First Bank versus 2B.  And, as I'm sure you know, 2B is also in bankruptcy in its own Chapter 12.  So there was First Bank versus 2B, removed to this Court.

There was a second lawsuit, HTLF versus 2B.  HTLF is 2b's lender.  That was another state court lawsuit removed to this Court.

And then we have the third lawsuit, which is what we call kind of the investors versus Rabo, HTLF, Mechanics Bank, and Goad, one of the daughters.  That was filed by some investors in state court, also removed to this Court.

Judge Jones put all three of those together and created this new '07 case number.  And the most significant prior proceedings with that judge were the investors did move for remand of that lawsuit back to state court.  Judge Jones denied remand, ordered the consolidation, and then ordered essentially an abatement through December of '24.  And that was to get the trustee kind of the rest of his time on his forensic accounting before he would be able to then be in a position to whip back around and get his claims on file by the time this lawsuit kind of woke back up.

Judge, we have the Adversary Proceeding 23-02005. That is the lawsuit — that's the USDA lawsuit that Mr. Ries was referencing.  That's the lawsuit filed by Rabo against all of the parties that filed USDA claims to adjudicate Rabo and the USDA claimants' entitlement to, among other things, some funds that Mr. Ries had onhand at the beginning of the case from some cattle auctions.  So in that case we've got the determination of do those parties have valid USDA claims or not and, if so, how does that work with respect to Rabo's lien priority.

Judge, we've got Adversary Proceeding 25-02003. That's the trustee's recent adversary proceeding of his

avoidance claims. That was filed in March. The primary parties to that again, Judge, are parties that we call investors as well as some other family members, not Ms. Goad and Ms. Moreland, but some other family members that received life insurance and other transfers from the debtor.

Judge, the last lawsuit that we have is 25-02005. That is the trustee's lawsuit against Rabo and Mechanics Bank and CFSB. And that's the debtor's secured lender and two depository banks.

Looking forward towards the future, Judge, there is significant overlap between some of the parties and issues in these different lawsuits. How they're currently arranged makes some sense and allows us to kind of cat herd as well as get things in front of the Court in a compartmentalized basis on maybe discrete issues. On discrete issues, that makes sense but at the same time, Judge, longer term, we do have some possible claim preclusion, issue preclusion, *res judicata* concerns such that later on, once maybe things get closer to a trial or a final judgment, we may be asking Your Honor to further consolidate and move those around to ensure that we don't go to a final judgment against a party in one case that could cause problems in another case.

For example, in the Rabo-USDA lawsuit you have whether or not a party has a valid USDA claim. The trustee has another avoidance claim lawsuit against some of those same parties. And

then another issue to be sorted out on another day is the claim allowance of some of those parties as far as their claims in the bankruptcy case.

Also looking further to things that we believe are coming down the pike, Judge, we do have some outstanding discovery issues that have been unresolved of some prior main case discovery orders as well as some subpoenas.  We're working on that right now and we may be back in front of you on that. We are actively discussing with the parties scheduling orders in these adversary proceedings, as well as what new discovery may look like.

The other items, Judge, that will be coming down the pike is the trustee already has and will continue to be further retaining experts for these lawsuits.  Your Honor, one issue that we've run into is some experts' payment term requirements and what they will find acceptable to be retained.  Almost kind of like a financial advisor in a Chapter 11 case, or something like that.  I mean something a little bit different than just kind of your normal hourly under Rule 2019.

There is case law out there saying that a consulting or testifying expert is arguably not a professional under Rule 2019.  At the same time, we understand that the Bankruptcy Court would still absolutely be part of any approval of those people's engagement and their payment.  But we expect to be back in front of Your Honor on kind of fashioning some additional expert-

retention payment terms in the future.

And then as Mr. Ries mentioned, substantive consolidation is an issue that is being evaluated, and you may see us back on that.

And, with that, Your Honor, that would kind of conclude of what we have done and how the timing has been influenced by these major factors and what we have going on now and what we plan to be doing in the future.  I would pass the podium unless the Court has any questions.

THE COURT:  No questions at this time.  I did track down an order that I had signed that is not yet entered, and so it should be on the docket shortly if it isn't already.  But I guess I did have a couple extra features that I hadn't recalled. You did have reply deadlines and for the other parties gearing up for the hearing on the 15th.

One thing, though, I thought we discussed at this prior status conference was that the parties were going to try to work on some type of an exhibit or a stipulation, whether there's any agreements on any of the counts.  I don't know if you have made any progress on that.  I guess that was what I was thinking of, but I didn't see it in the order.  Do you have any updates on that?

MR. JOBE:  Absolutely, Your Honor.

THE COURT:  All right.

MR. JOBE:  After the last hearing, we have emailed —

*Status Conference*                                                    38

and, Your Honor, this will be our second time to do this.  We have had a full-blown formal conference on this same thing a year ago, but we are setting up and I believe we have finalized either maybe July 1st or 2nd, there are active email discussions pinning down everybody's date to take a second stab at that, to go party by party and claim by claim and see is this something that is agreed, the trustee has agreed, not the trustee's.  Can we fit it into one of the three buckets.

THE COURT:  All right, fair enough.

MR. JOBE:  Thank you, Your Honor.

THE COURT:  All right.  So I will just say this.  It's a status conference and I invite anybody to tell me anything you want.  We're just chatting.  I don't consider anybody's silence to anything that Mr. Jobe said be deemed an admission, that because you didn't stand up and object to what either Mr. Ries or Mr. Jobe said that you're somehow going to be bound.  We're all just chatting, I guess that's how I'm viewing the status conference.  I'm getting a preview of sub con issues. I know everybody is not going to agree with everything that's already been said.  So you're welcome to tell me whatever you'd like. You don't have to, but you're welcome to, again, just kind of a free-flowing status conference.

MR. JOBE:  Thank you, Your Honor.

MR. LEBAS:  Your Honor, David LeBas for plaintiffs, if I may be heard briefly —

*Status Conference*                                                          39

THE COURT:  Sure.

MR. LEBAS:  — in response to the request for comments.

The first comment is that I understand the trustee's wish to call us all investors.  We don't believe we fit into that bucket and we call ourselves cattlemen or cattle claimants.  And that's on the chart, so I wanted to speak to that.  It's sort of a way to look at it as a shorthand term, and we don't agree with that characterization.  Otherwise, procedural history, I think, is related by Mr. Jobe, and Mr. Ries is accurate.

I did want to alert the Court and counsel to one issue that was raised by Mr. Jobe, actually he pre thought this, and that is a concern about what effect orders in one of the cases may have on others.  That is, will there be some issue preclusion.

In the Court's order that's at Docket 349, which is the order approving the settlement of claims with the Carr, Riggs accounting firm, we noticed some language that we think was too broad.  And we don't think it will be argued as having preclusive effect, but we will file an objection to the use of some of that language as preclusive on other issues that we think are currently before the Court, mainly ownership of the claims.

THE COURT:  So —

MR. LEBAS:  And we'll file it in the next day or two.

*Status Conference*                                        40

THE COURT:  Sorry, pause for just a minute.  You're referring to docket entries in the main case?

MR. LEBAS:  Yes.  I believe it's in the main case, Docket 349 is my note.

THE COURT:  All right.

MR. LEBAS:  I think that it —

THE COURT:  Give me just a minute to pull it up.

MR. LEBAS:  I'm checking the style right now to see.  Entered on June 2.

THE COURT:  I have it up now.  I'm just — I show that it was entered on the 4th.

MR. LEBAS:  Oh, okay.

THE COURT:  Docket 349 in the main case?

MR. LEBAS:  That's my understanding, yes.

THE COURT:  Signed on June 4th, entered on June 4th.

MR. LEBAS:  Okay, I had my note wrong.  And I had just wanted to advise the Court of what's coming or pending.  We will circulate a proposed order and proposed objection with respect to some language in that order.  And I expect maybe we can come to an agreement on that, I don't know, but we'll set that.  If we can, we'll set it for a hearing on the 15th.  I think it deals — the objection that we had deals with the language in that order pertaining to ownership of claims.  And so it's a limited issue, but I wanted to call it to the Court's attention while —

THE COURT: So you —

MR. LEBAS: — we were talking about *res judicata*.

THE COURT: — you have piqued my interest, so what is the language?

MR. LEBAS: In paragraphs 15, 16, and 17, there is language to the effect that — let's see — in 15, when the fraudulent-transfer claim is settled, it is exhausted for the benefit of creditors, and no creditor may maintain a fraudulent-transfer claim of its own.

I don't want to argue the matter, but our position is that while that may be true with respect to the statutory fraudulent-transfer claim, it does not bind claimants with respect to their own fraudulent-transfer claims that are outside those claims reserved to the trustee. There are similar statements in paragraphs 16 and 17, and those are the points that we're going to address.

THE COURT: All right. Give me just a minute.

So we don't have to decide it today. Is the proposed order that I signed the same one that was attached to the motion?

MR. JOBE: Absolutely, Your Honor, that's —

MR. LEBAS: Yes. Yes, it —

MR. JOBE: That's the one —

THE COURT: All right.

MR. LEBAS: It —

MR. JOBE:  And those findings are also discussed in the 9019 motion itself.

THE COURT:  All right.  So at least I'm aware that someone has some concern about some of the language that was in the order.  And so I understand, Mr. LeBas, you're going to be discussing that with Mr. Jobe and see if there is anything you need to do about that.

MR. LEBAS:  Yes, Your Honor.  We'll do our best to come to resolution.  And if we can't, we'll present it to you.

THE COURT:  All right.

MR. LEBAS:  That's all I had.  Thank you.

THE COURT:  All right.  Thank you.

MR. MASSOUH:  Your Honor, this is John Massouh on behalf of intervenor-plaintiffs.  Just one additional note I wanted to add.  I do think Mr. Jobe did a good job of going through the procedural history of the case, as well as Mr. Ries.  Given the fact — I apologize I was not able to make the prior hearing a couple weeks ago, taking kids to camp.  But it's my understanding, and I think the Court confirmed again today that the Court wants the parties to sit down and discuss if there is the ability to come to an agreement on which claims are owned by the trustee or which claims are not owned by the trustee.

And, as Mr. Jobe said, we have been circulated days to have that discussion, which is looking like maybe tomorrow or Wednesday.  We haven't finalized it yet.  But my only concern is

I don't think that's a short discussion to be had among all the parties.  And just questioning whether or not the timeframe in which we're all working under in terms of our response to the trustee's motion is due today, the trustee's reply to our response is due on the 11th, and we have a hearing on the 15th, whether within that timeframe it makes sense that we have enough time to go through these discussions, most likely we're going to have to have a hearing no matter what.  I just have a question in my mind on whether or not a hearing on the 15th makes the most sense or whether we need a little bit more time to engage with the trustee and to see what we can do to narrow the scope of that hearing in the future.

THE COURT:  All right.  So why don't I hear from Mr. Jobe on that as well, because that's something I've been wondering whether — I know we've talked about the 15th.  When I signed the order, I guess one of the things I was thinking about not having seen was what you're talking about now, the paragraph, by paragraph, count by count, if it's possible to have an agreement on any of that, if you think that's a worthwhile endeavor still, Mr. Jobe, are you wed to the hearing on the 15th?

MR. JOBE:  Your Honor, we're not wed to the hearing on the 15th.

THE COURT:  So I know it's hard, when you're dealing with this many people, to figure out dates and times that work

*Status Conference*                                    44

for everybody, so I'm not pushing you all to push the hearing. But if it makes sense to push it, to see if there is any agreement on any of the counts.  I didn't do that, review again myself before this hearing, but I do recall looking at the counts before the last status conference and thinking that it seems like potentially there are a number of those where the parties might be able to reach an agreement, but...

MR. JOBE:  So, Your Honor, and some of this we deal — some of this is apparent on the docket, some of it's not, but we are perpetually dealing with at least one party not wanting to move something along or to call time out on something.  So it's been a big effort to try to move things along how we have.  And this case is big enough to where there has generally not been one hearing that's been entirely agreed to because there always kind of some outliers.

We have filed our pleadings putting forth our position on the matters.  We would very much like to see their written response.  I think that that would be helpful for the discussion.  Because what you're being asked for right now is to let them off of the response date that is today.  And we have already had this conference once.  We would like to see their responses in connection with further formalizing any kind of proposed or charter stip for the Court, Judge.

THE COURT:  So I guess let me button that issue up. Maybe he said it and I didn't catch it, but is there a —

MR. MASSOUH:  I was not asking — yeah, Your Honor. I'm sorry, I apologize.  I was not asking —

THE COURT:  Let me get my question out first.

MR. MASSOUH:  Sure.

THE COURT:  I didn't hear that you were asking for an extension of today's deadline.  It was more of to have that discussion, you were going to need more time before the 15th. Did I catch that correctly?

MR. MASSOUH:  That is correct.  We fully intended on filing our response today in accordance with the deadline we agreed to.  And we do think it's important for the trustee and Mr. Jobe and his counsel to see our response prior to having that discussion.  So we are not asking to extend any deadlines to respond, or anything of that nature.

I was just bringing up the matter of given the timeframe of the hearing on the 15th and at least starting our initial discussions with the trustee maybe tomorrow or Wednesday, is there enough time to have those discussions prior to the hearing, I just have a question about that.  And that's what I raised.  We fully intend on filing our response today and we're not seeking an extension of that deadline whatsoever.

THE COURT:  So with that clarification, would a somewhat short continuance of the 15th hearing be productive or not, from the trustee's perspective?

MR. JOBE:  Your Honor, whether it's the 15th or the

20th or the 25th, there is nothing magical about when we have that setting.  We're not married to the 15th.  I don't think pushing the 15th is necessary.  Again, this is going to be our second full discussion on this.  I know which ones — I kind of know where everybody's at because we have talked about it before.  Hopefully maybe some minds will change and we'll be able to circle a few more as being agreed, but —

THE COURT:  Let me —

MR. JOBE:  — I see this as like a two-hour conference. I don't see it as —

THE COURT:  So there is one other thing I haven't told you yet.  If it goes forward on the 15th, I can be ready.  It's an important hearing, I want to spend the time it takes to really be prepared, if I have to, to go through count by count, and I can do it on the 15th.  We slotted in a family vacation from July 3rd to the 11th, and I might be getting back on the Monday before.  The hearing falls on a Wednesday, does it not?

MR. JOBE:  That sounds correct.

MR. MASSOUH:  Your Honor, the 15th is a Tuesday.

THE COURT:  It's a Tuesday, so —

MR. JOBE:  So to bump it out at least a week, or whatever, to give the Court time, absolutely acceptable.

THE COURT:  All right.  So if everybody was going to be in agreement that the 15th still made the most sense, I would suck it up and be ready.  But if there is some flexibility with

the parties, I think it would be helpful for me to have a little more time after I get back from vacation to see whatever pleadings or exhibits, or whatever is the result of your conference, I think that will be helpful, and to have a little bit more time for me really before that hearing would be appreciated.  But, again, it sounds like there is a little bit of wiggle room on that hearing date?

MR. JOBE:  Yes, Your Honor.  We had talked about a reply deadline of the 11th to try to get our materials on file so you could digest before the 15th.  If we want to move to the 21st, the week of the 21st, the week of the 28th, all that's up for grabs.  And to Mr. Massouh's comment, if we do need this extended time for this conference to schedule and to process, then what would make sense would be let's have the parties focus over the next two weeks on this conference and then we'll reset, assuming we don't hook up on an agreement, then we can have a reply date to get everything in in advance of this new hearing date.  That makes sense.

THE COURT:  All right.  I hate to ask this.  Do you guys want to pencil it in now or do you want to chat after the hearing about coming up with another hearing date?

MR. LEBAS:  Your Honor, it would probably be helpful if you could give us some ideas about what dates you might have available.  I know I've got some stuff scheduled in July.  I'm sure everyone does.  It depends on flexibility and the matter

that we might have to move around.

THE COURT:  All right.  I heard Mr. Jobe say — was the two-hour time for your conference with the people or for the hearing?  That was the conference, wasn't it?

MR. JOBE:  The hearing is — I have to —

THE COURT:  So what's your best guesstimate on the — if you can.  If we're going to go through this count by count, which I don't know how else to do it, it could be at least a couple-hour hearing, I would imagine.

MR. JOBE:  Yes, Your Honor.  I think we're going to really try to have some demonstratives aids and charts.  I think on the low end, it would be four hours, maybe as much as five or six.

And I believe when we were scheduling last time, I think we took the week of July 21st off because of me.  I do have a trip planned for that week.  It will be — I will be doing some work remotely.  And so I'm actually probably not taking the lead for the trustee at that hearing, so I could come in remote the week of the 21st, if that week worked for parties.

THE COURT:  It's up to you.  Since I'm asking for grace on my vacation schedule, I'm not going to make you work on your vacation either.  So if —

MR. JOBE:  Given that I'm not running the lead, Judge, I'm more — and that's kind of a change since we were hear last time.  I'm more than happy to remote pipe in for that hearing.

*Status Conference*                                           49

THE COURT:  Give me a minute to look at the calendar.

MR. LEBAS:  Your Honor, for me, I anticipate I will take some active role in participation in the hearing.  I've got a two-day mediation with multiple parties set in Amarillo on July 21 and 22.  If you've got something later that week, perhaps we could arrange that.  But I'd ask you, if you don't mind, Your Honor, to look maybe at the following week for possible date.

THE COURT:  Yeah.  Later that same week is problematic because I go to Wichita Falls for my live Wichita Falls docket, so I will be out on the afternoon of the 23rd and then most of the day on the 24th.

The week of July 28th.

MR. PRIDMORE:  Your Honor, if I may ask one clarification.  Would this be an in-person hearing?  I believe you had indicated earlier, those of us who would be traveling, I'm just trying to check on travel dates.

THE COURT:  It's up to you all.  I don't anticipate this is going to be an evidentiary hearing.  This is going to be looking at the pleadings, figuring out who owns what, so I will leave it up to you.  Anybody that wants to be in the courtroom can.  There's no disadvantage from my perspective if you want to attend by WebEx.  I don't give high-fives to the attorneys that are in the courtroom as they walk in, so it's really up to you all.  If you would rather do it remotely, that's perfectly fine.

If you want to be here, that's fine as well.

MR. PRIDMORE:  Thank you, Your Honor.

Your Honor, I believe on the 28th, to the 2B Farms parties, I believe we are available for that week.

THE COURT:  All right.  Bear with me.  I'm just trying to get a feel for — we have some sporadic hearings throughout the week.  I'm not seeing anything that's a huge time suck so far.

MR. JOBE:  The trustee is generally available the week of the 28th.

THE COURT:  All right.

MR. LEAL:  Your Honor, this is Abel Leal.  I'm here in Dallas.  I'd like to appear in person.  And I'm out during the week of the 28th.

THE COURT:  You're out the whole week?

MR. LEAL:  Yes, sir.  I have a trip planned to Belize. It's been planned for about six months.  My kids broke their piggybanks to go, so.

THE COURT:  All right.  Give me a minute.

MR. LEAL:  I mean I get back on the 31st, so August. And I'd hate to come back and have a hearing right after that trip, but that trip is scheduled from the 24th through the 31st.

MR. JOBE:  And just to confirm, Mr. Leal, because you and Mr. Massouh are co-counsel.  Are you taking the lead at the hearing or Mr. Massouh?

MR. LEAL:  I'm probably going to take the lead at the hearing.

Do we have the Thursday or Friday before that, the 24th or 25th of July?  I think Mr. LeBas said he would be through by then.  Mr. Jobe —

MR. LEBAS:  I will be done by the end — yeah — yes, —

MR. LEAL:  I know that —

MR. LEBAS:  — I will be available then.

MR. LEAL:  And Mr. Jobe, I think had mentioned that he would not be taking the leave, so he could handle it remotely.

MR. JOBE:  I think it was the Court's wish to —

MR. LEBAS:  I'm out on the 24th and 25th.

THE COURT:  All right.  The 24th —

MR. LEBAS:  Which would be —

THE COURT:  — I'm going to be in Wichita Falls or returning from Wichita Falls, so the 24th is out.  I wasn't looking up to see who said he was unavailable on the 25th, but who was that that was unavailable on the 25th?

MR. LEAL:  That is me, Your Honor, Abel Leal.

THE COURT:  Okay.

MR. LEAL:  On behalf of the plaintiff-intervenors.

THE COURT:  Well, the week of August 4th, at least currently things change every week, I have a potential three-day trial starting on August 4th.  So really the next week that's fairly wide open is the week of August 11th, so I know that's a

*Status Conference*                                                        52

month delay, but then what about —

MR. LEAL:  This is Abel Leal again, Your Honor.  That week is good.  I'm open at this point, I believe.

MR. LEBAS:  David LeBas, Your Honor.  I have a conflict on Wednesday, the 13th, in the afternoon, hearing on a motion for summary judgment set in — I think it's — Travis County, I'm not sure.  I don't remember.

THE COURT:  All right.  What about the afternoon of the 12th?  Tuesday, August 12th, right now — let me double check.  We have a Hooter's case block in the morning at 9:30.  I don't believe that's confirmation, but if somebody could help me verify that.  The afternoon of the 12th might work.

MR. JOBE:  Your Honor, I'm sorry.  The trustee has a trustee setting either — I'm not sure, it's either a 341 or his docket day is the 12th.  His 341s are that day.

MR. LEBAS:  If the 13th is the only possible day within reason, I can see if I could get my motion moved.  I don't know if I can do that while we're on the phone, but I can certainly ask counsel about that, I'm sure, by the end of the day.  I'm representing the movant, so presumably the respondent would be pleased.

THE COURT:  So the only thing I have on the 13th is at some point in the afternoon I have to travel again to Wichita Falls for my Wichita Falls docket on the 14th.  But right now, the 13th.

*Status Conference*                                                      53

Ms. Ferrufino, can you see, we have a self-calendar docket at 9:30, can you check to see if there is anything set?

(The Judicial Support Specialist responds.)

THE COURT:  Okay, that will be a short one.

MR. MERRIOTT:  Your Honor, Matthew Merriott for HTLF. I've got a trial setting for the week of the 11th that I think is — I doubt we're going to go and I think that it would probably less than a two-day trial, but there is a possibility that it does go and spills over into Wednesday.

MR. LOVELL:  This is John Lovell, co-counsel with Matthew.  I'm open that week.

MR. PRIDMORE:  2B Farms can be ready on the 13th, Your Honor.

MR. JOBE:  Your Honor, I believe the trustee can do the 13th or the 15th.

THE COURT:  How about Friday, the 15th?

MR. LEBAS:  No objection from plaintiffs to the 15th.

MR. MERRIOTT:  The 15th should work for HTLF.

THE COURT:  Anybody have a conflict?

Ms. Klein, are you good on the 15th?

MS. KLEIN:  Thank you, Your Honor.  The 15th will work for me.  The 13th was problematic.  I appreciate that.

MR. PRIDMORE:  The 15th is good for the 2B parties, Your Honor.

MR. DABDOUB:  Your Honor, I hate to be the bearer of

bad news, but Mr. Gersten and I are counsel on a separate case. We are representing a defendant in a matter.  The plaintiff's experts are set for deposition on August the 13th and the 15th. I would be happy to take those depositions.  Mr. Gersten would normally take that deposition, but I anticipate that Mr. Gersten will take the lead for the trustee in the hearing here on the standing issue.

I also intend to participate in the hearing, so it looks like we have conflicts from the Lynn Pinker firm for August 13th and August 15th.

MR. JOBE:  We've got to do this on Saturday.

THE COURT:  The short continuance is turning into potentially over a month.  What about August 22nd?  Friday, August 22nd?

MR. DABDOUB:  Excuse me one second, Your Honor.

MR. LEBAS:  Your Honor, what about going back the other way.  If the 15th of July was bad, what about the couple of days after that, the rest of that week?

Because I am concerned a little bit, Your Honor, with the — you know we're starting to get into going on a six- to eight-week delay.  That really delays a lot of things trying to get some stuff done by — through the following, and everything.

MR. DABDOUB:  Your Honor, on behalf of the trustee, we would be interested in doing what we can to accommodate the Court, of course number one, and of course your vacation

*Status Conference*                                                                      55

schedule.  But we would be interested in having an earlier hearing date as opposed to pushing it out four to five weeks.

THE COURT:  All right.  Can you remind me July 18th, did anybody have a conflict on Friday, July 18th?

MR. DABDOUB:  Your Honor, for the Lynn Pinker firm, Mr. Gersten is on the line and he can speak up as to any conflict he has, but that is open for me, July the 18th.

MR. MERRIOTT:  That works for HTLF.

MR. PRIDMORE:  That works for 2B.

MR. LEBAS:  For plaintiffs, I have a hearing on the 18th that just got set in a condemnation matter that I am confident I can move.

MR. JOBE:  Your Honor, I'm sorry, —

THE COURT:  Say again, Mr. LeBas.  Confident that you said you can move?

MR. LEBAS:  Yes, Your Honor.  I will undertake that effort immediately on the close of this hearing and I will just tell them we get set in another court.

MR. JOBE:  Your Honor, Mr. Ries has three 341s that day —

MR. GERSTEN:  Steven —

MR. JOBE:  — and he can't move those.  It's his whole 341 docket.

THE COURT:  So this is legal argument.  Is Mr. Ries — not that Mr. Ries isn't important, but is he going to have a

role other than watching?

MR. RIES:  I do not need to be there, Your Honor.

THE COURT:  I'm not trying to shove the trustee out, but it's just — it is just legal argument, right?

MR. JOBE:  Yes, Your Honor.

THE COURT:  So — but I understand he's your client. If you want him there,...

MR. JOBE:  I will defer to Mr. Ries on that call.

MR. RIES:  Your Honor, I do not need to be there.  I would like to be there to hear, but I am not going to participate, I don't believe, in any way.

THE COURT:  The 17th is also — Ms. Ferrufino, we don't have anything going to trial that week, do we?  We had docket call this morning and we didn't have anything on docket call. So unless I'm totally missing something, we should not have anything at all during trial week, correct?  So do we have anything on the self-calendar docket currently on July 17th?

(The Judicial Support Specialist confers with the Court.)

THE COURT:  Motion to approve?

(The Judicial Support Specialist confers with the Court.)

THE COURT:  Okay, before I look and see what that is, what about July 17th?

MR. DABDOUB:  Your Honor, I have a motion for summary judgment hearing that morning at 9:00, but I can see about trying to move that.  That is in state court, and I am happy to

work to try to move that hearing or have someone else cover that for me.

(The Judicial Support Specialist confers with the Court.)

THE COURT:  So really any time that day other than —
and that's at 9:30, right, whatever that motion is?

(Court staff confer with the Court.  Counsel confer off record.)

MR. DABDOUB:  Your Honor, would the Court have any availability on the 16th?  I know that's just one day, a difference, and I'm not sure if — we certainly want the Court to have enough time and not infringe on your vacation, trying to get back and get up to speed on things since you will have been gone, but maybe the 16th is an option?

MR. JOBE:  I think we're — the trustee can do the 17th.  I think we can focus on that.

THE COURT:  Yeah, I think either the 17th or the 18th are going to work better on my end.

MR. DABDOUB:  Okay.

MR. LEAL:  Your Honor, this is Abel Leal for the plaintiffs-intervenors.  The 17th or 18th, I'm available. Either of those dates work for me.

THE COURT:  All right, so let's do —

MR. LEBAS:  Will be fine —

THE COURT:  — it this way, anybody that has a problem with the 17th or 18th, speak up now.

*Status Conference*                                    58

MR. DABDOUB:  Your Honor, the 18th looks great.  But is that good?

MR. JOBE:  Yeah.

MR. DABDOUB:  Okay, the 18th looks great.

THE COURT:  Well, the 18th means you won't have Mr. Ries here, but the 18th is fine for me if it's fine for you, it depends.

MR. JOBE:  Mr. Ries will do the 17th or 18th.  Either way on those two days.

THE COURT:  All right, it doesn't matter to me. Depends on whatever works best for you.  I know you want your client to be there.  If you want him to be there, it's going to be the 17th.  If the 18th works better, that's fine for me. That just means that Mr. Ries won't be able to participate.  We can always put the audio of the hearing on the docket, if you wanted to go back and listen to it without getting a transcript. That's an option.

MR. DABDOUB:  Your Honor, let's — our client wants to be there, so I'd like for him to be there, so let's do the 17th, and I will work on my docket to accommodate that.

THE COURT:  So why don't we pencil in the 17th at ten o'clock.  We do have one matter set at 9:30.  Just looking at it, I don't think it's going to take more than 30 minutes.  So that potentially gives us most of the day on the 17th if we need it.

Last call.

(No audible response.)

THE COURT:  All right, sold on July 17th, at ten o'clock.

So, Mr. Jobe, the thing that really locks that in is the notice of hearing.  That's what gets it set up on our system.  So if you could file an amended notice of hearing.  If you want to repeat what you did in the order that I already signed, that's fine, or if you just want to say that the date has been bumped to the 17th, that's fine also.

Are you moving the other deadlines or are you keeping the 11th?  I think you had the 11th for your reply; is that correct?

MR. JOBE:  Your Honor, you're back in town on the 14th?

THE COURT:  I should be back in the office on the 14th.

MR. JOBE:  So, Your Honor, and since we're moving that, we would ask to move the reply from the 11th to the 14th, and then everything will get on file for the hearing for your return.

THE COURT:  That's fine.  So do you want to —

MR. JOBE:  So I will reference that in the notice as well, Your Honor.

THE COURT:  All right.

*Status Conference*                                                    60

MR. JOBE:  Are the parties free to go ahead and do amended notices of everything and file those?

THE COURT:  So tell me, for the ownership issues that are in each of the motions to dismiss, is that what you're talking about, or what notices —

MR. JOBE:  Yes.  Yes, Your Honor.  Procedurally, I've only got one motion, I've got the trustee's standing motion that I did a notice of hearing on.  So the other motions to dismiss are on your calendar.

THE COURT:  If you all could work together and do a single notice of hearing that whatever docket entries that relates to, the ownership issues, whether it's your motion, the other motions to dismiss, I think it will just help declutter the docket if you all work on a single notice of hearing for everything that's going to be set that date, rather than having multiple notices of hearing.

MR. JOBE:  Understood, Your Honor.

THE COURT:  Will that work?

MR. JOBE:  Yes.

MR. LEAL:  Your Honor, this is Abel Leal.  Just on that point, if we can keep the briefing the same, because I think we're going to have to review several replies from the trustee and the other defendants who filed motions to dismiss as well, maybe filed in reply.  So we'd like to have some time before the actual hearing to see the replies.

*Status Conference*                                    61

THE COURT:  Hold on.

MR. LEBAS:  We're still going to make our reply on the 11th today — I mean we're still going to file our response to date, as if the hearing were going to be held on the 15th.

THE COURT:  Hold on just a minute.

All right, so your prior — well, the order, you already picked up all the docket entries for the matters that are also being set, right?  So you just provide that into the notice of hearing.  If the trustee needs that weekend and if everybody else is planning on filing their replies on the 11th, if you need till the 14th, I don't have a problem with that.

All right, any questions or are we all in agreement?

MR. LEAL:  That will be fine.

THE COURT:  All right.  So the 17th at ten o'clock, right?  Everybody else's replies are due on the 11th.  The trustee's is due on the 14th.  You will memorialize all that in the next, I guess, — do we need another order?

We already have an order on the docket that says everybody's is due on the 11th.  If you could just do a notice of hearing setting out the date of the hearing, hopefully everybody can just rely on my pronouncement from the bench that the trustee has until Monday, the 14th.  Unless somebody wants a separate order for that, I will do it, but otherwise from the bench, I'm authorizing the trustee to file his reply on the 14th.

*Status Conference*                                                    62

MR. JOBE:  Thank you, Your Honor.  I will fix all that up with one notice of hearing and we will address it that way.

THE COURT:  All right.  Any other questions on the scheduling?  And then I will ask if anybody else has anything else generally on the status conference?

With respect to scheduling the matters that are heard, going to be heard on the 17th, does anybody else have any questions, clarifications?

MR. LEBAS:  Your Honor, David LeBas.  We may set for a hearing on the 17th, the motion for reconsideration of the order on the settlement agreement with the accounting firm, if we are unable to reach agreement on that.  But we're not prepared to do that at this time because they haven't seen our response.

THE COURT:  All right.  And you're saying that whatever delays that you were concerned with has to do with the ownership issue?

MR. LEBAS:  It may.

THE COURT:  All right.

MR. LEBAS:  On its face, it certainly could.

THE COURT:  All right.  Well, I guess you can chat with Mr. Jobe about that issue.  If it ties to that issue, I'm fine hearing it on the date.

MR. LEBAS:  We will talk about it.  Thank you.

THE COURT:  All right.  Anybody else have any questions, concerns about the hearing that is now on the 17th?

(No audible response.)

THE COURT:  All right, well, that was a long roundabout way to bump the hearing two days, but we got there.

Ms. Klein.

MS. KLEIN:  I just wanted to confirm, Your Honor, that you — I know that you've already made a pronouncement that remote attendance is acceptable since this is going to be merely a legal argument.  I just wanted to confirm that in the event that Mechanics Bank does have argument with regards to the requests on the standing issues that remote attendance is fine?

THE COURT:  Sure, yeah, for everybody.

MS. KLEIN:  Okay.  Thank you.

THE COURT:  You bet.

All right, last call for comments about the scheduling on the 17th?

(No audible response.)

THE COURT:  All right, very good.  Anybody else have anything you want to say generally about the status conference, what Mr. Jobe had to say, what Mr. Ries had to say?

MR. JOBE:  Yes, Your Honor, —

MR. PRIDMORE:  Your Honor, Tim Pridmore for 2B Farms. I just wanted to circle back, Your Honor.  I don't know if your core matter is able to find the protective order, the agreed protective order related to the Mechanics Bank that Javon Johnson has filed?

*Status Conference*                                                  64

MS. KLEIN:  Uploaded.

MR. PRIDMORE:  or uploaded?

MS. KLEIN:  Excuse me again.  I may be able to clarify that situation.  It was filed, the motion, the order was not separately uploaded, I have been able to confirm.  So that's being done right now.

THE COURT:  Okay.

MS. KLEIN:  So that will be in the queue for Your Honor to review.

THE COURT:  All right, very good.  I'll —

MS. KLEIN:  Thank you.

THE COURT:  — when I see it, I will sign it unless there is anything in there that gives me heartburn, but I doubt it.

MR. PRIDMORE:  Thank you, Your Honor.

MR. MERRIOTT:  Your Honor, Matthew Merriott for HTLF.  This isn't really something that needs to be addressed now, but I want to raise the issue of dispositive motions with Your Honor, motions for summary judgment.  Just because of the number of issues we have among all these parties, we might want to think about allowing multiple motions for summary judgment to allow narrowing issues down one by one as opposed to trying to do everything all at once.  I know the default rule is one motion for summary judgment, but I just wanted to kind of put that idea up on everyone's radar.

THE COURT:  All right.  Well, I won't be able to decide that issue today, but I think you all can be chatting about that.  And then after — so I guess I would imagine that we'll rule on the 17th or some time shortly after the 17th about who owns what claims.  And then at that point, hopefully everything will begin to crystallize as far as scheduling.  And then whatever claims that the trustee owns, we'll have to figure out at that point a revised scheduling order.  And then you all can chat in the meantime about whether you want to agree to multiple rounds of summary judgment, which makes me want to cringe, but I understand the request.  And there might be some logic to it.

Anything else, Mr. Merriott?

MR. MERRIOTT:  No, Your Honor.  Thank you.

MR. DABDOUB:  Your Honor, may I address a housekeeping item, please?

THE COURT:  Sure.

MR. DABDOUB:  So during the hearing we received, we being myself, Aaron Kaufman from Gray Reed who represents CFSB, John Lovell who represents HTLF, Mrs. Klein who represents Mechanics Bank, and Mr. Johnson who represents Rabo, received an email from Ms. Jenni Bergreen, the Courtroom Deputy, stating that the case had been reassigned to you, Your Honor, that currently the trial docket call is set on July 16th, 2025, ask — Judge, and she says Judge Everett's trial docket call is

*Status Conference*                                                                66

scheduled for July 28th, 2025 at 9:30.  And then she asks:  Will that work for the parties.  So I think what we would like to do is confer with counsel on that — and that's with respect to — this email is with respect to Adversary Proceeding Number 25-02005, the trustee's lawsuit against Rabo, Mechanics, CFSB, and HTLF.  So what we intend to do is confer with counsel for the defendants on that and enter into a scheduling order.

There has been one hiccup so far, which we don't need to brief or address the merits of this dispute today, but the hiccup has been I believe the defendants wish — I'm not sure about all of them, I think perhaps they wish to have a stay of discovery pending the disposition of the motions to dismiss. The trustee opposes that.  So that may be one hiccup if we can't reach a resolution on a scheduling order.  But we can address that at the appropriate time.

THE COURT:  All right.  Well, I know Mr. Jobe asked for a status conference on that one and I punted because I wanted to see things play out a little bit.  But I appreciate the heads-up on that.

MR. JOBE:  Yes, Your Honor.  And the short on that is in the absence of an agreement, and especially in light of how the docket call needed to fix that up, I think in the next 10 days or so we will either resolve that by agreement or we will be filing a motion asking for the Court to hold a hearing and enter a scheduling order in that case and address the discovery

issue.

THE COURT:  That's fine.  I know Ms. Bergreen has been out on medical leave.  She's getting back and getting back up to speed.  I will relay to her what we have talked about with respect to that adversary number.

MR. JOBE:  Great.  Thank you.

MR. DABDOUB:  Okay.  Thank you, Your Honor.

THE COURT:  Sure.

All right, the floor is open if anybody else has anything else for the status conference.

(No audible response.)

THE COURT:  All right.  Well, sorry for some of the confusion, which I probably caused about the hearing on the 15th, but I'm glad we've landed on a new date.  The two extra days, I think, will be helpful to me.  And if you're able to reach an agreement in the meantime on ownership of any of the counts, great.  If not, we'll just knock it out on the 17th.  Anything else for this morning?

MR. JOBE:  No, Your Honor.  Thank you.

MS. KLEIN:  Thank you, Your Honor.

THE COURT:  All right, very good.  The Court will be in recess.

MR. LEBAS:  Thank you, Your Honor.

THE JUDICIAL SUPPORT SPECIALIST:  All rise.

(The hearing was adjourned at 11:59 o'clock a.m.)  —o0o—

State of California          )
                             )     SS.
County of Stanislaus         )


        I, Susan Palmer, certify that the foregoing is a true

and correct transcript, to the best of my ability, of the above

pages, of the digital recording provided to me by the United

States Bankruptcy Court, Northern District of Texas, Office of

the Clerk, of the proceedings taken on the date and time

previously stated in the above matter.

        I further certify that I am not a party to nor in any

way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber

by the American Association of Electronic Reporters and

Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer

Reporting Services is approved by the Administrative Office of

the United States Courts to officially prepare transcripts for

the U.S. District and Bankruptcy Courts.


                        Susan Palmer
                        Palmer Reporting Services
                        2129 Golden West Lane
                        Modesto, California  95350
                        (209) 915-3065

                        Dated November 20, 2025