IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (AMARILLO)

| | |
|---|---|
| IN RE: | Case No.: 23-20084 |
| | (Jointly Administered) |
| MCCLAIN FEED YARD, INC., ET AL., | |
| Debtors. | March 18, 2024 |
| | 10:25 A.M. |

TRANSCRIPT OF MOTIONS HEARING
**BEFORE THE HONORABLE ROBERT JONES**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Chapter 7 Trustee, Kent Ries:

Jobe Law PLLC
BY: HUDSON M. JOBE, ESQUIRE
6060 North Central Expressway, Suite 500
Dallas, Texas 75206

For Thorlakson Diamond T Feeders:

Naman, Howell, Smith & Lee, PLLC
BY: DAVID L. LeBAS, ESQUIRE
RACHEL BARR, ESQUIRE
8310 North Capital of Texas Highway
Suite 490
Austin, Texas 78731

APPEARANCES ON THE NEXT PAGE.

Audio Recorder: J. Marvin Jones Federal Building
205 Southeast Fifth Avenue
Amarillo, Texas 79101

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For AJ Jacques Living Trust and Various Cattle Creditors:

Sprouse Shrader Smith, P.C.
BY: JOHN F. MASSOUH, ESQUIRE
701 South Taylor, Suite 500
Amarillo, Texas 79101

Simmons & Brown PLLC
BY: ABEL LEAL, ESQUIRE
400 13th Street, P.O. Box 180
Canyon, Texas 79015

For Priest Cattle Group:

James D. Bradbury, PLLC
BY: KYLE WELDON, ESQUIRE
201 Main Street, Suite 600
Fort Worth, Texas 76102

For the Ridgefield Group:

Crenshaw, Dupree & Miliam, LLP
BY: AMBER MILLER, ESQUIRE
4411 98th Street, Suite 400
Lubbock, Texas 79424

For Curtis Jones Farms and Various Creditors:

Mullin Hoard & Brown, LLP
BY: STEVEN HOARD, ESQUIRE
Amarillo National Plaza Two
500 South Taylor, Suite 800
Lobby Box #213
Amarillo, Texas 79101

For Creditor MAP Enterprises:

Forshey Prostok LLP
BY: HARRISON PAVLASEK, ESQUIRE
301 Commerce Street, #2200
Fort Worth, Texas 76102

INDEX


| WITNESSES | | Page |
|---|---|---|
| KENT REIS | | |
| Cross-Examination by Mr. LeBas | | 78 |
| Cross-Examination by Mr. Massouh | | 79 |

| EXHIBITS | ID | EVD |
|---|---|---|
| A through H | 8 | 8 |
| I through J | 9 | 11 |
| K | 13 | 13 |
| U | 13 | 13 |
| V | 13 | 13 |
| W | 13 | 13 |

(Proceedings commenced at 10:25 a.m.)

THE COURT: All right, good morning. This is Judge Jones. I apologize for the delay. I was still going through some of the filings in connection with the matter set this morning. So in any event, we have in the McClain Feed Yard, Inc. case the Trustee's motion for 2004 examination with responses filed by several parties.

It's actually two docketed matters. One concerns a group of claimants, if you will, that are identified as USDA Dealer Trust Claimants. The second docketed matter is non-USDA Claimants. And I don't know if there's any reason why we need to separate these two categories out for purposes of the hearing today.

But before we get into that, let me go ahead and get everybody's appearances. First, for the Trustee?

MR. JOBE: Thank you, Your Honor.

Hudson Jobe on behalf of Kent Reis, Chapter 7 Trustee. And Mr. Reis has appeared via Zoom, as well.

THE COURT: Okay. For Thorlakson Diamond T Feeders, is that Mr. LeBas?

THE CLERK: He's muted.

THE COURT: You're muted, Mr. LeBas.

MR. LeBAS: Thank you, Your Honor.

David LeBas for Thorlakson Diamond T Feeders. Rachel Barr, also.

THE COURT: Okay. Next, AJ Jacques Living Trust, et al.

MR. MASSOUH: Yes, Your Honor.

John Massouh and Abel Leal for AJ Jacques Living Trust among, as well as several other cattle creditors.

THE COURT: Okay. Priest Cattle Company Limited and Ridgefield Cattle Group and others on those, as well.

MR. WELDON: Good morning, Your Honor.

Kyle Weldon on behalf of the Priest Cattle Company.

THE COURT: Okay, Mr. Weldon.

THE COURT: Curtis --

MS. MILLER: Good morning, Your Honor.

Amber Miller on behalf of the Ridgefield Group. That was a joint filing. But here on behalf of Ridgefield, along with six other creditors.

THE COURT: Okay. Thank you, Ms. Miller.

All right. Curtis Jones Farms and others.

MR. HOARD: Steve Hoard for those particular creditors, Your Honor.

THE COURT: Creditor MAP Enterprises, Inc.?

MR. PAVLASEK: Good morning, Your Honor.

This is Harrison Pavlasek with Forshey Prostok appearing on behalf of MAP Enterprises, Inc.

THE COURT: Let me see, we've already taken -- okay, ee have Mr. Hoard already on the separately docketed matter,

which is the non-USDA claimant.

So, all right, I guess, Mr. Jobe, you want to tell us -- start us off here?

MR. JOBE: Thank you, Your Honor. Your Honor, I'm a bit under the weather, so I'm going to try to mute myself if I cough, but please bear with me.

We are here on Docket Number 174 and 179. The only objection to 179 is by Mr. Hoard's clients saying that they should have been part of the 174 group. The requests are essentially the same. So with Your Honor's permission, we will treat both of those together as jointly.

THE COURT: Okay. I assume, Mr. Hoard, you don't have any issue with that?

MR. HOARD: (No audible response).

THE COURT: You're muted, Mr. Hoard. I assume, if you -- do we have Mr. Hoard?

(Pause)

THE CLERK: I can't see --

MR. LeBAS: I'll just call him, Your Honor.

THE CLERK: I can't see him, but he's not muted.

THE COURT: Okay, we can't see Mr. Hoard now on the video, so we can't determine if he's muted or not, I guess.

THE CLERK: He's not muted. He may be calling in.

THE COURT: Okay, now we can see Mr. Hoard. Can you hear us, Mr. Hoard?

MR. LeBAS: Steve Hoard, please.

Steve, this is David LeBas. For some reason, your voice is not coming through on the video. It's about 10:30.

THE COURT: All right. I think we're going to take a couple minutes unless we see if we can get Mr. Hoard connected with us, so we'll take just a short recess.

(Recess at 10:31 a.m./Reconvened at 10:38 a.m.)

THE COURT: All right. This is Judge Jones. I understand we have Mr. Hoard now, is that right? I see Mr. Hoard.

MR. HOARD: Yeah, I think I see myself. I'm sorry about that. I don't really know what the problem was.

THE COURT: Well, I could relay many stories about technology issues that we've had over the last three or four years. But in any event, I had just raised the question about taking up both the docketed items together, and Mr. Jobe had actually stated that that was his intent. I just had asked you the question if you had any problem with that because you represent the parties that are involved in the second docketed item.

MR. HOARD: Yeah, I represent two of those parties in the non-USDA claimant motion, and I don't have any problem with taking it up at the same time.

THE COURT: Okay. So, Mr. Jobe, if you want to go ahead and proceed, then.

MR. JOBE: Thank you, Your Honor.

As a further housekeeping matter, in an effort to streamline the hearing for today, I visited with the parties regarding admission of exhibits, and I think this is going to work. I haven't heard any objections to this proposal.

Your Honor, the Trustee is seeking to admit Exhibits A through H, which are all proofs of claim filed in one of the three Debtors' bankruptcy cases, not for the purpose of proving the truth of the claims asserted, i.e., the existence or non-existence of a claim, but instead for the limited purpose of showing the claims asserted by the parties and supporting documentation behind the claims.

THE COURT: Okay. And so you're offering A through H. From what you've said, I understand there's been some discussions about this. Are there any objections to A through H for the limited purpose of just showing, as I understand it, the claims that have been filed.

Is that a fair statement, Mr. Jobe?

MR. JOBE: Yes, and the supporting documentation.

THE COURT: Okay. Any objections to A through H?

(No audible response)

THE COURT: Okay. I take the silence that there are no objections, so A through H will be admitted for the limited purpose proposed by Mr. Jobe.

(Trustee's Exhibits A through H admitted into evidence)

MR. JOBE: Thank you, Your Honor.

Your Honor, Exhibits I through J are similar. Those are -- Exhibit I is a summary of the claims that have been filed with the USDA. That is a document that was provided by the USDA. We're admitting that, again, not to prove the truth of the matter asserted, the existence or non-existence of claims or the allowance, disallowance, but instead the limited purpose of showing the claims that have been asserted.

And then the same thing for J. J is basically a summary comparison of the claims that have been filed with the USDA and the proofs of claim filed in the case.

THE COURT: Okay. Any objection to Exhibits I and J for the limited purpose proposed by Trustee's Counsel?

MR. LeBAS: Your Honor, David LeBas for Thorlakson, as to both, I should say all three exhibits, that is -- I guess two, I and J. We don't object for some of the information that's reflected on the document to come in as a summary of what the USDA records may show about the dates of filing. But the documents themselves contain a summary of analysis prepared by USDA.

We're not in a position to accept or reject the USDA analysis that's reflected on those documents. And we don't think it's appropriate for today's discussion to have any admission of what USDA thinks or doesn't think about the merits of the claims that are described on Exhibits I through J. So

we agree to a partial admission on a limited basis, but not a partial admission of the entirety of the records or summaries shown on those documents.

THE COURT: Do you want to respond to that, Mr. Jobe?

MR. JOBE: Your Honor, again, we're not admitting these for the purpose of litigating or determining today the allowance or disallowance of a claim, including by the USDA, why those claims may or may not have been slated for allowance or disallowance. Again, merely to show what's been filed with the USDA and what the USDA has provided us in the form of the information on those claims and how it has currently slated those claims.

I don't know that there's a dispute, though, Judge.

THE COURT: I don't have any issues.

MR. JOBE: I think those two (indiscernible) are the same.

THE COURT: I have no issue with admitting I and J for the limited purpose. And I don't -- and Mr. LeBas, of course, you recited here on the record the issues you have, the information that I guess is in the exhibits, but I don't know if I have those exhibits. Are they -- were they filed or do we? So I'm not really sure what I'm going to be looking at is my point.

MR. LeBAS: Let me describe I and I can show you what it looks like on the screen. I know that's not very clear for

you, but it contains a summary of claimant names, claim amounts, what are described as apparently non-valid amounts and apparently valid amounts with some descriptions of other events depicted thereon. And our objection is not to the fact that these were filed, but that there may be a conclusion to be reached by looking at the document. We don't think today is the day to have that discussion, and it's not before the Court anyway.

And we have a similar statement as to J. J is a, what's called a list of USDA claimants, and it has information about other claimants. Thorlakson can't agree as to what the other claimants say or don't say. And that goes to I, also. But for the limited purpose of establishing what claims the USDA believes it has on file, we don't object to that. We just object to the conclusions.

THE COURT: All right. The Court will admit the Exhibits I and J on the limited purpose of simply showing the summary of the claims that have been filed with the USDA. And as I understand it, J apparently is a comparison between those that have been filed with USDA and those that have also filed proofs of claim in the bankruptcy cases.

Is that correct, Mr. Jobe?

MR. JOBE: Yes, Your Honor. And Your Honor, these are all filed. These were filed exhibits for this hearing. I have them all electronically that I can share. Is J on the

screen right now?

THE COURT: Well, it may be, but I don't --

THE CLERK: He's not sharing the screen. That's what is --

MR. JOBE: One second. I'm sorry.

(Counsel and Clerk confer briefly)

THE COURT: Okay. We have pulled up, I guess, Exhibits -- okay. We have Exhibit J, and I guess we have Exhibit I as well that we've pulled up.

MR. JOBE: Thank you, Your Honor. And is share-screen enabled for me that I can share documents on the screen?

THE COURT: Yes, it should be.

THE CLERK: It is.

MR. JOBE: There we go. Yes, Your Honor. So this is J, which is claimant name, address, email, counsel information. This is the information from the USDA other spreadsheet that you've seen, and then it just cross-references the information of those particular claimants' proofs of claim. Again, this is just introduced for just a summary of what's been filed.

THE COURT: Okay. All right. Well, the Court's admitted it for the limited purpose, so if you can proceed.

(Trustee's Exhibits I and J admitted into evidence)

MR. JOBE: Thank you, Your Honor.

Your Honor, Exhibits L through T, those will fall off

because those were in connection with the life insurance motion for which there were no objections. So that just leaves K and then U, V, and W, which we believe there are no objections to the admission of those documents generally.

THE COURT: Okay. And that's Exhibits K and what are the others?

MR. JOBE: U, V, and W.

THE COURT: U, V, and W. Any objections to Exhibits K, U, V, and W?

(No audible response)

THE COURT: Okay. Court hearing none, the Exhibits K, U, V, and W will be admitted.

(Trustee's Exhibits K, U, V, and W admitted into evidence)

MR. JOBE: Thank you, Your Honor.

Judge, my thought and plan for today was to have an opening. As we discussed last week, I do have limited testimony to proffer regarding kind of the status of the Debtors' records and then closing, and my hope and plan is to not duplicate myself. And so I've tried to kind of divide this up in a manner that would be most efficient.

And, Judge, what I plan on hitting is kind of, number one, just some brief background. Number two, what are we asking for and why? Three, why is it important? And then four, dealing with some of the objections.

Your Honor, with respect to what we are asking for,

six weeks ago we filed these discovery motions and attached the proposed order. So the parties have been in possession of both the request and the specifics regarding the discovery request for almost six weeks. Judge, on the screen should be a copy of the proposed order that we are seeking. That asks that the Court determine a date of production for that blank there that we are going to ask be weeks and not months, given that the parties have already had almost six weeks' notice of this motion.

Judge, the order has a list of producing parties. These are the parties that have either filed claims with the USDA or proofs of claim with this Court. And for what it's worth, Judge, the vast, vast, vast majority, pursuant to the summary that I showed you earlier, the J, that shows that the vast, vast, vast majority of these parties have filed both. Judge, we've asked for you to approve a discovery request. That is essentially two requests for production and one interrogatory.

Judge, this order includes language that the production is limited to the items in the responding party's possession, custody, or control and shall be subject to the other applicable limits of the Federal Rules of Civil Procedure. And we've self-put in there a proposed line in that order that the Trustee will work in good faith with the responding parties to coordinate production.

And, Judge, big picture, the reason for this proposed procedure because, as the Court may recall, there has been a number of ex parte '04 exam requests made in this case where folks have gotten orders within, you know, a number of days and served subpoenas. Given the importance of this information, Judge, given the number of parties that we're dealing with, this procedure is to allow these parties five to six weeks of an opportunity to voice objections to the request and for us to finalize this as to everybody versus, you know, the alternative procedure, which is to deal with 105, 106 different subpoenas, 105 different, 106 different discovery objections, 105, 106 different partial production, negotiation for those partial production, and then, you know, possibly 100-plus motions to compel.

Judge, there's some, we really worked hard to strip this down to just the bare minimum as far as kind of instructions and definitions. And essentially this asks for two categories of documents. One, documents or ESI concerning transfers of property by the responding parties to the Debtors or from the Debtors or Debtor affiliates to the responding parties. Two, Judge, is looking for communications, communications referencing the Debtors and those dealings. The third item, Judge, is an interrogatory asking for the claimants to identify each and every transfer and to provide the date, dollar amount, who the parties were, and if there is a

referenced contract. And in the order provides an example of what that could look like.

Your Honor, as just some brief background, as the Court will recall from prior hearings, the three Debtors in this case operated three different facilities operating cattle grow yards and feed yards. Two were in Texas, one of which was in Hereford, the other in Friona, another location in Kentucky. The Debtor was owned and operated by Brian McClain.

And Judge, from what we've seen, as well as what you will see in the documents today, the documents that we're seeing, including these claimants' particular dealings with the Debtor, appears to have dealt primarily possibly almost exclusively with Brian McClain and then his adult daughter in her, I believe she's in her 20s, Meagan Goad, who signed a number of checks.

Judge, Rabo AgriFinance is the secured lender in this case, asserting a $50 million secured claim and credit facility, claiming a lien on the assets of all three entities. As the Court will recall, Mr. McClain, within just a couple of weeks of the retention of a CRO at the insistence of Rabo, Mr. McClain committed suicide on or about April 18th of 2023, and these bankruptcy cases were filed shortly thereafter. Judge, a major focus, and what you've seen in some prior proceedings in this case, some of the main big case components have certainly included the USDA claimants.

And Judge, these are, depending on how you count them up, because some of the claims and dealings were in an individual or entity capacity. But I believe it's approximately 106 unique claimants have filed claims with the USDA for a total of approximately $122 million.

Judge, under the USDA statute, the parties have 30 days to file those claims. And based upon the documentation behind those claims, Judge, it appears that those claims largely focus on the last three to four months of dealings of them and the McClain Debtors and their claims for being shorted either money or cattle at the end there. And again, that's an important fact, that the documentation behind these claims for the most part is anywhere from a 30-day to four-month period.

THE COURT: Wait, when you --

MR. JOBE: Judge, we put this in filed proceedings --

THE COURT: Just a second. When you say a 30-day to four-month period, does that correspond basically with 30 days to four months prior to the bankruptcy filing or some period that stretches out beyond that?

MR. JOBE: Judge, for the most part, yes. That is 30 days to four months before the bankruptcy filing.

THE COURT: Okay.

MR. JOBE: And I think one of the conclusions that you reached there is if you're going just based upon the documentation and the claims asserted by the USDA parties,

either on their USDA claim or on their proof of claim, that's giving you at most a three- to four-month look at those parties' particular dealings.

Judge, and we've characterized it this way for quite some time in our pleadings. From what we're seeing with these claimants, we generally have segregated and categorized these claimants in kind of three different buckets. One is, just for lack of a better term, what I call traditional cattle sales. These are claimants who in fact sold their cattle to the McClain Debtors and are claiming that either the check bounced or they didn't get payment for whatever reason on the actual cattle that they raised and provided to and sold to the McClain Debtors. And that's a transaction where title was clearly intended to transfer to the McClain Debtors and then either the check bounced or payment was not made.

Second, Judge, in the second category of what I call traditional feed yard services, and these are instances where claimants were bringing their cattle to one of the three McClain Debtors' feed yards for the McClain Debtors to patent them up, take them to auction, and essentially handle that aspect of the tail end cattle sale as feed yard services for the claimant. Those are claimants where they provided possession of their cattle to one of the McClain Debtors and either the check bounced coming back or they had not received payment.

The third category, Judge, and this is just, again, lack of a better term, I call these the investor claimants.

THE COURT: Whoa, whoa, whoa. Wait.

MR. JOBE: There is a large --

THE COURT: Let me -- just a second, let me stop you. On the second category, you said these feed yard services, and the -- you noted that possession was with the Debtors because they were delivered by third parties to the Debtors for the feed yard services. And then you commented that it was not paid. Who's paying whom here in this second category? Because these would not be sales of cattle, as I understand it. These would ostensibly be cattle that were placed on the feed yard for, as you describe it, the feed yard services to fatten up the cattle and whatever.

MR. JOBE: That's a great question, Judge. So your question about who was paying who there is not entirely clear. So what we do know is these are folks that are claiming to have dropped off their cattle for feed yard services, not in connection with a sale transaction to the McClains. I think it appears in some cases that the McClain Debtors were taking either those cattle to auction or taking them to a seller who was cutting a check back to the McClain Debtors.

The McClain Debtors were then to cut a check back to the feed yard client. But that has not been in any way uniformly established. I mean, really all we know at our basic

level is there are folks that claim that they dropped off cattle for feed yard services, and there is no documentation suggesting that the McClain Debtors were taking title to those cattle.

Could be instances where the McClain Debtors were going to be getting the money back from the buyer and kind of acting as a middleman. Could be that the buyers were going to be, you know, paying directly back to the cattle owner.

THE COURT: Okay, so we just don't know the implications of where payments were flowing in connection with these cattle, which I guess the main point is, is just that these are cattle that were delivered and were in the possession of the Debtor but not as part of a sale of those cattle from the third parties to the Debtor.

MR. JOBE: Exactly, Judge.

THE COURT: All right. Go ahead.

MR. JOBE: Thank you, Judge. So, Judge, yeah, first category, you know, traditional kind of actual cattle sales. Two would be feed yard services. And then the third category, Judge, is what I call the investor claimants. And we'll go through this in a minute.

But, Judge, these are folks that big picture, I mean, were investing money with the McClain Debtors on essentially more of a passive basis. They were not actually providing their cattle to the McClain Debtors. They were sending the

McClain Debtors money for cattle that the McClain Debtors already had. And then there was an agreement by which these cattle would get fattened up and sold for profit and the McClain Debtors would split the profit with the investor, two-thirds to the investor, one-third to the McClain Debtors.

And, Judge, from our review thus far, it appears that there are some parties that claim and appear to have some documentation supporting that they may have been more than one of these three types, that they had both, in some instances, provided some of their cattle, in some instances -- I'm sorry, sold their cattle, in some instances, you know, provide their cattle just for feed yard services but didn't intend to sell. And then in a third instance, you know, fall under the category of what I call investors.

And I think one of our -- a good example of someone who fits that mold, Judge, is per the USDA claim spreadsheet, the largest USDA claimant is 2B Bo Robinson, who's in another bankruptcy case in front of Your Honor. They're the biggest USDA claimant, I think for, I think it's 10 or 12 million dollars. And they're claiming to kind of be wearing more than one of just those -- of each of those three hats there.

So, Judge, this is a good -- I'm going to go a little bit out of order and I think this is a good segue to go into a few of these claims. Judge, in our exhibits, we've designated a number of proofs of claim. And essentially what we've done

is, is we've picked at least one claim of each of the objecting attorneys of kind of their client group. There's not a whole lot besides that as to rhyme or reason to it.

Judge, this first document is our Exhibit F, which is proof of claim 64 in the main case filed by Thorlakson. And this is a good example of several things we have going on here. Judge, this is a claim by Thorlakson. And this has been highlighted by me, not the version that's been filed. Judge, you have clean copies, but just for purposes of our hearing today, for what I'm going to share on the screen has a few highlights of what I'd like to kind of note and go through.

So Thorlakson's claim here is for $10 million. Scrolling down, Thorlakson as well as a number of these claimants have filed an addendum to their proof of claim. And just to provide some helpful context for what they are claiming, here, Judge, it says, Under the agreements, Debtor would act as dealer and procure cattle on behalf of claimant and claimant would pay Debtor for the procured cattle, that it would place the cattle in Debtors' facility for care and feeding for a period of 90 to 120 days on average, Once the cattle gained enough weight to be sold to a feed yard, Debtor, again, acting as dealers would sell the cattle on claimant's behalf to a feed yard.

Debtor would, one, remit the purchase price of the cattle to claimant and pay claimant the agreed-upon portion of

the profit from the sale of cattle or, two, pay the claimant only the agreed-upon portion of the profit from the sale of the cattle and use the proceeds to pay for other cattle.

Time out for a second, Judge. And this is important. So that second, that number two right there, that's basically describing the claimant pressing the principal amount of what I call their investment. So what they're saying is under number one, they would either get -- the claimant would get the entire amount back or, two, the claimant would press and keep on with the McClain Debtors the principal amount of their initial investment and only get back from one particular transaction, the profit component. Or three, Judge, use the proceeds and profit from the sale of cattle towards another purchase of cattle made by the Debtor.

So Judge, that's suggesting there's a third category of transaction where the claimant never actually gets the money back from one transaction. It just stays on hand with the McClain Debtors and gets rolled into the next deal. Judge, it says this proof of claim represents the amounts owed to claimant for cattle that should have been on hand at Debtors' facility but were not, are amounts due to claimant for the sale of the cattle without the remittance of sale proceeds.

Judge, the next paragraph is a good kind of overview of what some of these documents are looking like. So the backup documents may include invoices for the purchase of

cattle, the projected closeout, the closeout reflecting the sales price of the cattle, the cost of the profit and proof of payment, including banking documents, documenting claimant's payments made to the Debtors. In addition, the transactional documents show the purchase price for cattle rolled over into the subsequent purchases of cattle during claimant's business dealings with the Debtors.

Your Honor, scrolling down to the actual backup documents. So here Thorlakson, this appears to be a spreadsheet that it has created summarizing the lot ID, dates, head, weight, count weight, total weight, total end cost of it's again, what I call, quote/unquote, investments. The spreadsheet here adds up to the same $9.9 million figure asserted in its proof of claim.

Judge, scrolling down, this is a representative example and there are variations. So it's not just one standard-standard form. But this this appears to be the agreement behind any one particular transaction. Does this agreement exist to identify the partnership of Brian McClain/McClain Feed Yard/Seven M Feeders at its address and Thorlakson who are involved in cattle feeding arrangement. The arrangement allows for Thorlakson to purchase the calves from Brian McClain/McClain Feed Yard/Seven M Feeders. At the time of purchase, the cattle have also been contracted for sale to predetermined price.

So, timeout, Judge. At the time of this contract, the Debtor is suggesting it has a futures contract to sell these same cattle to a third party.

Time back in. These costs will include the feed and supplements provided by McClain Feed Yard or Seven M Feeders as well as processing, medicine, trucking, yardage expenses related to the cattle. Once the cattle have reached the desired weight, the profit will be determined as such. The sale price of the feeder cattle at the end minus the cost stated above that McClain incurs minus the original cost of calved returned to Thorlakson equals profit, profit divided one-third by McClain and two-thirds to Thorlakson Diamond T Feeders.

Judge, you'll see also on this contract, it references a lot. It says Lot 945, and this is an important aspect of these agreements. Judge, some of these agreements reference a particular lot for cattle and some don't. So under this agreement, presumably you can at least go look at Lot 945 and if there were cattle there, you can physically see cattle that were at least under this agreement promised only to you. But Judge, we have a number of contracts that don't have lots.

So Judge, this is what I call the contract for one of the investor transactions. Essentially under this contract, Thorlakson was going to send $224,000 to the McClain Debtors for cattle the McClain Debtors already had, and Thorlakson was

standing to receive a two-thirds/one-third split of the profit of the money that was later realized from those cattle, less feeding costs.

Judge, the next page is a document that I call the invoice. And it's a common document behind these investor transactions. But this is an invoice from in this instance, McClain Feed Yard, Inc. to Thorlakson for the $224,000 called for under the agreement.

Judge, going to the next page, this is the projection. That's just what I call it, projection. This is the projection document for that particular transaction. And here, Judge, it's highlighted kind of the same figures that are in that contract. So we have the $224,000 cost. We have the math done for the $291,000 projected later sale proceeds. The 42,000 represents the projected cost for the gain in weight. And the last number here is the projected $24,000 profit. And again, that $24,000 profit that under that contract is to be split two-thirds to Thorlakson, one-third to the Debtors.

Judge, next page. This is presumably Thorlakson's proof of payment showing, I guess it's two payments on the same day, but the proof of payment for the $224,000. And here is a copy of their bank statement showing that total amount of those two transactions coming out of Thorlakson's bank account. And the next document is another -- is the next transactional document.

So Judge, this is a pretty representative example of what appears to be one set of transactional documents. So again, Thorlakson details $10 million of claims between November. There's two here for November, or there's a few here for November, the majority here in January, and then a few -- and also some in March. But Thorlakson's $10 million claim is approximately 28 -- these are 28 different transactions. Each transaction has a contract, has an invoice, projected, or the projection sheet, and then proof of payment.

And Judge, you'll see some commonality here, but Thorlakson's entire proof of claim is 127 pages. If you subtract off the initial proof of claim pages, it's 119 pages of backup documents behind $9.9 million of transactions. It comes down to roughly four-and-a-half, five pages per clear six-figure transaction.

Judge, going to another example. This is our Exhibit A, which is proof of claim filed by Mr. Hoard's client, Kenzie Jones. This is an example of one that's of a smaller dollar amount claim. So this claim is for $353,000. So there's an invoice attached, which is an invoice from McClain Feed Yards to the Jones. Well, that's actually the only backup document we have here. Judge, this is an example of one where we don't -- the contract was not provided.

And also incidentally, this is another good example of where the invoice, the $353,000 invoice does not clearly

match even one of these three dollar amounts in this invoice for $707,000. Judge, you will recall that we went through kind of an explanation of how some of these dealings work. I mean, in some instances, these folks paid $707,000 and got back the entire $707,000 plus their profit component. In some instances, they got back their $707,000, but they -- I'm sorry, they got back the profit component and then plus the $707,000. And in some instances, you know, left the entire amount on file.

One thing that we're seeing, Judge, and we filed an extensive brief on this, on just kind of some background issues. But, Judge, the USDA statute, the USDA Dealer Trust statute is specific and intended to cover actual sales of cattle in the traditional sense in the marketplace. These contracts are not good for these claimants' position that they have a USDA claim. And so it appears that, you know, either some of these contracts, for whatever reason, they haven't been provided, but I would venture to guess that some folks are not providing these because they just, they don't bode well for the USDA claim.

And so among other things, Judge, I mean, it's important for us to sort out where the Debtors were invoicing a claimant, was that in connection with an investor contract or was that -- that's something else? Because, Judge, remember in a traditional cattle sale, it would not be the Debtors

invoicing the claimant. It would be the opposite. It would be -- and I think like, like Riley Livestock is, is what appears to be -- and, again, we don't know a hundred percent for sure sitting here today. I think like Riley Livestock appears to be a claimant who was in fact providing like their cattle to the Debtors. And in that instance, there would be an invoice from Riley to the Debtors for the Debtors to pay for the cattle that they purchased.

Judge, this is Exhibit B, which is proof of claim filed by Riley Livestock who I just referenced. Their claim is for $694,000. And so differently here, I mean, this is an invoice from Riley Livestock to McClain, which is what you would expect to see in a party that was in the traditional sense, selling cattle to McClain. And then this just will be relevant to some larger period discussion, Judge. But for $694,000, the entire supporting documentation for that $694,000 claim, Judge, is nine pages.

Judge, Exhibit C, which is the AJ Jacques Living Trust, one of Mr. Massouh's clients. This is proof of claim number 26. This is a claim filed for $365,000. There's a similar addendum here, as we went through with Thorlakson at the beginning. We have a similar, you know, amount of supporting documentation, which is about five pages. We have the invoice from the McClain Debtors to AJ Jacques for $183,000. We have a projection here, I guess related to

$183,000. Another invoice, another projection. We have proof of payment. And these are presumably checks that bounced from the McClain Entities signed by Meagan Goad.

These are presumably payments that bounced. And we know what we don't have here, Judge, again is a copy of the cattle feeding agreement, which may or may not be, you know, being selectively included in these or not.

Judge, similar to the other ones, we have a $365,000 claim here with five pages of supporting documentation. And again, these are, you know, just limited to the transactions that like this particular claimant claims that they got stepped on.

Judge, Exhibit D is a claim filed by Mr. Braun, sorry, for 345,000. Similar addendum, similar cattle feeding agreement, a similar invoice and proof of payment, seven pages backing up a $345,000 claim.

Judge, this is Exhibit E filed by MAP Enterprises. This claim is for $9 million. A similar addendum. This one actually goes maybe a little bit further in connection with its allegations regarding essentially kind of alter ego and lack of corporate formalities and alleged Ponzi scheme of the Debtor. Here's some interesting kind of just backup context says, you know,

"From July 2022 to April 2023, MAP engaged in a series of cattle feeding transactions with McClain

whereby MAP would pay MFY -- that's one of the three Debtors -- for the purchase of cattle for the benefit of MAP with the agreement that when the cattle were sold, MAP would receive the gain from the sale plus the original cost less McClain's commission. Each transaction was initiated by communication from McClain to MAP regarding the number and weight of the cattle for which the funds are being solicited on or about the time MAP made the payment in reliance on the claims representation that funds paid by MAP were to be used for the purchase and sale of cattle. MAP paid $9 million, but it is not recovered as set forth in the attached schedule."

That further alleges, I guess maybe possibly that, one, no such cattle existed; two, McClain had no intent to use the funds paid by MAP as represented to MAP by McClain; and/or three, that McClain misappropriated the funds paid by MAP and McClain while acting on behalf of the Debtors made intentional misrepresentations to MAP or acted with reckless disregard for the truth in his dealings with MAP and MAP was harmed as a proximate result of such misrepresentations.

Your Honor, scrolling down, MAP has prepared essentially, you know, like Thorlakson a spreadsheet that essentially served as the template for the requested interrogatory. And it itemizes out the dates of the

transactions, the dollar amount, and then this next column here, presumably what they claim happened in this case is many return checks that didn't clear.

And again, Judge, the relevant time period here if you look here, this is all March and April of 2023. So we've got essentially, I mean, we've got MAP doing $10 million worth of investor transactions with McClain in just a two-month period. This claimant like some others, Judge, has not attached a copy of their cattle claim agreement -- I'm sorry, their cattle investor agreement. They have attached various records regarding proof of payment and then invoices. Similarly, Judge, the backup documents to this $9.9 million claim are about 50 pages; 50 pages for $9 million.

Judge, this is Exhibit G filed by Ridgefield, one of Ms. Miller's clients. This is the claim for $2.1 million. This claimant attaches the cattle feeding agreement that we've gone through invoice. This one in particular has a lot of numbers which, Judge, time out for a second. You know, among other things, what's important for us to evaluate is if folks were being given the same lot numbers.

Time back into this claim, there's the invoice and the projected closeout. And similar to the others, we've got about 25 pages of transactional documents backing up $2.1 million worth of claims.

Judge, this is Exhibit H filed by another one of

Ms. Miller's clients, Big Seven Capital, just as another representative example that it's a claim for $594,000. There is a similar, what we call the investor agreements, invoice, and projected closeout. And this proof of claim has five pages backing up $594,000 worth of transactions.

Your Honor, before I close this out, is there anything that the Court would like me to go back and hit on any of these exhibits?

THE COURT: No, I don't believe so. Are you through going through those exhibits? I may have a couple of questions for you about the exhibits. Let me see here. And I don't know, this may be a question that's premature, but I'm trying to figure out, you've got these exhibits and you've pointed out different aspects in going through the exhibits that identifies ultimately their claims.

I guess, kind of big picture, these are just proofs of claim and you've raised the issue. I think this is an issue you're alluding to is that, well, it's unclear with respect to some of these claims whether they would truly constitute claims under the trust act or not because these are investor type claims. But if that's the case, what is the significance of that in what the Trustee is pursuing here?

MR. JOBE: Yes, Your Honor. Judge, these documents and information are relevant to many aspects of what we are investigating and maybe doing in this case, specifically with

respect to whether these claims qualify as USDA Dealer Trust claims or not. That's certainly one of the issues. But Judge, that's separate apart from some other issues that we're investigating.

But big picture, Judge, and I know you have experience with this in Reagor-Dykes and some other cases. And we will talk about in a minute what other documents and information we have that we're working with. But first and foremost, Judge, is we need to fully understand the Debtors' business operations, both legitimate and apparently possibly illegitimate, and understand the operations and how they split between traditional buying and selling of cattle who the operations with respect to just feed yard services where title was not intended to be transferred, and then need to understand both on a macro and a micro level how essentially the apparent Ponzi scheme from its inception through its evolution to how we got to where things sat a month before bankruptcy, which is both Rabo claiming it is out $50 million and these other claimants claiming that they are out $122 million.

Judge, on a macro level, one, it's fully understanding the Debtors' operations between these different lines of business and the both illegitimate and possibly illegitimate lines of business. We have folks, Judge, that again are possibly even kind of a combination of one of those three items. And, Judge, essentially we need this -- what

we're looking for is information sufficient to fully understand and, if applicable, establish that the Debtor was a Ponzi scheme and for what periods of time it was operating that way.

Your Honor on a -- and that is -- Judge, that's an important aspect of many potential things that can happen in the future on this case. But whether or not and to what extent this was a Ponzi scheme and when and who was involved is globally very important. And that is important for whomever may eventually end up having any liability in this case.

Judge, specifically, and this was part of the briefing that we filed last week. And again, Judge, I know you've had these cases in the past. In a Ponzi scheme, first and foremost, one of the goals is to get innocent investors paid back up to the amount of their principal investment. It is possible that folks that were either not acting in good faith and/or massively profited from this enterprise could have liability. The relevant time period Judge, as you know, is four years for fraudulent transfer. The discovery act, the discovery rule applies. And the kind of who's a net winner and who's a net loser analysis could arguably go back quite a bit in time.

Additionally, Judge, what's critically important is to know who was operating in good faith here and truly an innocent investor, maybe who wasn't and maybe how that changed over time, how close were those parties to these operations,

what were their knowledge or lack thereof of when, for instance, this thing went off the rails and there stopped being actual cattle backing up, actual different identified cattle backing up each one of these contracts.

Judge, those same issues could have legal significance to the involvement and potential liability of a number of third parties of intermediary banks that were involved in this case. Of other recipients of funds from the Debtors.

Judge, as Your Honor knows, we recently settled a claim for life insurance and that was an avoidance claim where the Trustee contended that the money that went to pay for this life insurance was essentially ill-gotten gains and money from a Ponzi scheme that was used to pay the premiums. And the premiums on the policies, Judge, were like mid six figures and to such an extent that the Trustee should have a fraudulent transfer claim for the proceeds of that life insurance. And roughly, I think it was $6-1/2 million worth of life insurance proceeds there, Judge, was settled for $3 million.

So I don't -- I want to make sure to do two things, Judge, or three things. One is answer your question, you know, about the relevance of kind of, are these folks Dealer Trust claimants or not. That is an issue. It is an item being looked at. It's just not -- it's not necessarily the only issue or what should be driving the ship here. Two, generally

speaking for like many purposes in this case is the Trustee's need to fully be able to investigate, understand, and prove up the Debtors' operations, both legitimate and illegitimate.

And then third is there is the potential and, and sitting here today, Judge, I can't tell you who it may be. I don't even know, maybe if the attorneys know which ones their clients are or not. But Judge, there are potential claimants here and investors that may have some liability here for either not --being in good faith as part of the investment scheme or massively profiting big picture in their dealings with the Debtor.

All of that, Judge, is to get us to our goal, which is to figure out among other things, who is the pool of, in fact, innocent investors and trying to get them money back in this case to get them back to zero.

Your Honor, that was maybe 15 different directions more than you were asking, but that was kind of --

THE COURT: No, that's helpful. So --

MR. JOBE: -- maybe I thought the appropriate time to lay out the scope for all --

THE COURT: Let me just pose this question then, because I don't want to get too hung up on this Dealer Trust Act if I don't have to. But is it fair to say that whomever is paid by filing claims under this act probably has little bearing on these kind of larger issues that y'all are looking

at.

MR. JOBE: I would say, yes, Judge. Probably two-thirds to three-quarters of what I've just described is present in this case, irrespective of the assertion of USDA Dealer Trust claims. These are separate, mutually exclusive things that we're looking at. And these would be going forward, whether we had USDA Dealer Trust claims being asserted or not, I guess maybe might be a better way for me to say that.

Maybe, maybe more precisely, Judge, these issues that we're looking at and their importance and their significance applies, whether you allow 250 or a hundred million dollars of USDA trust claims in this case. These are independent issues that we're looking at.

THE COURT: All right. And I think that resolves my kind of basic big-picture question.

MR. JOBE: Yes, Your Honor. Turning now to the volume of what we're dealing with. Judge, Exhibits U, V, and W is just one -- it's a one-month example of three bank statements of these three different Debtors.

Your Honor, Exhibit U, which is the McClain Far. Inc.'s bank statement. This is in one month showing a total of, and I'm just going to hit some highlights, $95 million of transfers in 34 transactions, 366 debits out for $95 million, essentially zeroing out this account.

Among other highlights, Judge, is one of many

challenges is figuring out exactly where this money was coming from. At least per the bank statements, Judge, I mean, this is an example of kind of remote deposit line items that don't give you necessarily the detail of where the money was coming from.

Judge, we've got massive intercompany kind of sloughing back and forth of money between these three bank accounts. And then this is like a representative listing of, of maybe what the checks or wires out of this account would have looked like. And again on each month, this is just a good summary here, we're looking at hundreds of transactions each month in this one account for almost $100 million. That extrapolated out, Judge, is about -- what is that, almost 1.1 -- almost one-point -- one billion and change annually.

Similarly for Seven M during this same period, Judge, we've got 22 transactions in for $15 million, 118 out for $15 million. Many of these transactions being noted by remote detail without the specifics of, of where that money was coming from. Significant intercompany transferring of money to the other two bank accounts during that time period.

Same month, Judge, from McClain Feed Yard, Inc., 114 transactions for 120 -- or I'm sorry, $102 million for this account, 119 out for the same $102 million figure and at least as far as these bank statements go, some level of detail with respect to the payee or payor of these funds. But in many cases, remote deposit details that doesn't give you the

indication of the payor or payee in many instances.

And you know what? I'm sorry. I was not sharing any of those screens, was I?

THE COURT: Not on those, no.

MR. JOBE: I'm sorry. Let me just hit that -- because this is important. My technical error. Sorry about that, Judge.

Just briefly, Exhibit U, which was the first one, $95 million in, $95 million out, 34 transactions in, 366 out. These remote deposit designations that don't give you the detail as to the payor or payee, just giving you a sense of the volume about the dollar amount and then volume of number of transactions per month.

V, which is the second bank account we just went through, Judge, 22 transactions in for 15, 118 transactions out for 15. Issues with remote deposit detail. Same thing with the third account, 114 transactions in for $102 million, 119 out for 102. Some information with respect to payor or payee on some of these wires but, in many instances, the issues with kind of the remote deposit, lack of detail on the money in, money out.

And, Judge, this is important and I'll hit this later, but the issue is, number one, what all does the Trustee need to look into in this case? Number two, what do we have to work with? And then number three, what do we need? And the

importance of these documents is this is a large -- this is a representative example of the volume as well as like what we have to work with as far as our own Debtor records.

Your Honor, and in a moment after giving parties an opportunity I guess for their opening, I will be suggesting a proffer. Judge, the gist of the state of the Debtors' records, Judge, is the package of transactional documents that we went through on those proofs of claim -- the cattle feeding agreement, the invoice, the projected closeout and a proof of payment by the claimant, as well as, as proofs of payment back out from the Debtor to the claimant -- the gist of it is, Judge, is that the Debtors' records in this case are not well-kept, not sophisticated, don't appear to be complete.

This isn't a case like Reagor-Dykes where this was a company operating with controllers and chief financial officers and stuff like that and records were maintained electronically. And the gist of it is, Judge, we have yet to identify what we believe is a reliable and complete set of the transactional documents with these, with these claimants sufficient to fully analyze, again, the Debtors' legitimate, illegitimate dealings on a macro level to fully investigate and understand the beginning, middle, progression, and end of the apparent Ponzi scheme as well as on a micro level, Judge, to evaluate each particular claimant's dealings to see, among other things, do they have net -- are we dealing with net winners, net losers,

any sort of net winner liability there? And do they have any liability for their dealings with the Debtor that goes to good faith?

Well, before getting to, to some of the technical objections, I have been just thinking about if there was a materiality component or something like that, I mean, to the extent that you did feel -- which again, Judge, the order that we attach to the motion we believe is appropriate, and we are requesting entry of that order as it sits.

With respect to if the, Judge, does feel that maybe a materiality limitation should be put on, maybe either the time period, or the communications, one item that that seemed to maybe make some sense is to distinguish between parties that had total dealings of a million dollars, more or less, with the McClain Debtors.

Again, Judge, at the end of the day, I mean, it is, it is critically important to this case that the Trustee fully understand, investigate, appreciate, and be able to prove up all of the different aspects that we've talked about for almost potential time periods. But at least as an initial matter, perhaps if some of these were going to be curtailed, possibly just for claimants that had, again, in total transactions with the McClain Debtors and the affiliates of less than $1 million.

And Judge, this kind of gets us to a big part of the, maybe kind of the argument about the objections and maybe the

overly broad, unduly burdensome. Judge, the proof of claim that we went through --

THE COURT: But before you get to that, and I do want to hear that, but before you get to that, I'm going to come back to this point you just made about the -- well, I guess I'm trying to understand what the point is you're making about where the dealings, as you call them, are less than a million dollars for a particular investor or claimant. What's your point about that? I didn't follow that.

MR. JOBE: So Judge, I'm anticipating that folks are going to say, we don't want to go back that far in time. We don't want to have to do the work to get -- you know, to provide the Trustee with communications. And first and foremost, we believe that given the evidence in front of Your Honor, it supports each of these claimants providing the information requested.

My point there was, was, Judge, that if you were going to recognize that, well, possibly there are such small players that at least at this juncture, I'm not going to require them to produce maybe as far back in time or to produce maybe any or as many communications, our suggestion would be, would be that an appropriate kind of materiality level to put on that would be total dealings of less than a million dollars.

So if you are going to trim down any of the discovery, that you do it only for folks that have total

transactions with the McClain Debtors of less than a million dollars. That would be our sense of potentially the group of people that were maybe such kind of smaller players in this deal as to not be 110 percent essential in our discovery and investigation but that certainly that we do get this from everybody that had total dealings of a million dollars or less.

And when I say dealings, I mean the total of any deal they did where either cattle were provided, money was provided under any of those three categories, exceeding in total $1 million on a collective basis.

THE COURT: All right, go ahead.

MR. JOBE: Thank you, Judge. And that was maybe getting out of order. I was maybe getting a little bit of out of order on the primary objection I guess that we're seeing, which is that this is overly broad and unduly burdensome and just too much of a time constraint on these claimants.

Judge, we briefed this. Judge, in connection with seeking discovery, a party resisting discovery is only entitled to trim down that discovery if they meet a burden to show with specifics what compliance would look like. That would be introducing into evidence how many pages we're dealing with, how many records, how many different places those are stored, how many different people would be involved in obtaining those records and the number of hours and costs required.

That is their burden to give us that sort of details

to work with today, to come up with any sort of a meaningful revision to what we're requesting, Judge. And Judge, I don't think we're going to be getting that today, at least in any sort of admissible format.

What the record suggests, Judge, is instead, this is not a significant burden. We have behind those claims that we looked at, Judge, we have, with Thorlakson, we have 119 pages that back up $9.9 million worth of claims. A lot of those transactional packages, Judge. I mean, we're talking about five documents for a strong six-figure transaction.

Doing the math, Judge, that works out to be, and I'm just using Thorlakson as an example, 119 pages on $9.9 million. That's $83,000 of transaction per page, which is the exact opposite of, you know. what this instance often looks like is maybe like in a consumer case where you've got a credit card, proof of claim that's on a $2,500 charge where you've got 20 pages of backup documents.

In the grand scheme of things, Judge, I think in your extensive 20-plus year history, in a discovery dispute with document production, this is on the very low end of documents, given the amounts in controversy. Judge, the proofs of claim that we already went through, these folks, they already know exactly what we're looking for and how to produce it. We're just looking for these folks to provide more in time documents and detail that they've already provided in proofs of claim.

There's not another source for these documents that have been identified. And the significance, Judge, we went through one month with three different bank accounts with a collective, probably $220 million flowing through these three bank accounts in one month and five pages per transaction. A hundred pages per roughly $10 million, that sort of effort and production in connection with analyzing a $220 million situation that we're trying to make the most of for everybody's benefit, including especially the innocent investors, we just don't believe balance, especially on the record that you're going to have before you today is a problem.

With respect to some of the technical arguments like on subpoena, Judge, 2004(a) does not require notice, does not require a hearing. We've given the parties both of those two things. We've given them a five to six week opportunity lead time on this request. We we're not trying to jam them up with an ex parte order and instead give them the benefit of the time to date so we can walk out of here with one order that applies to everybody that we can have a uniform production again, Judge, in hopefully a matter of weeks and not months to help us move this case along.

Judge, in our briefing, we talk about, among other things, Rule 2004(c) and that discussion of a subpoena. We discussed a recent Judge Jernigan case where at least she goes through it and she says that 2004(c) and its focus there on

compelling non-party attendance at trial and those rules, that those don't apply to '04 exams on parties in interest in the Northern District, either just kind of a matter of general local practice as well as technically under the rules.

Judge, her view is that if we were seeking a true third party, a true non-party witness, not a party that's filed a proof of claim, not a party that's filed a USDA claim, but a true stranger to this bankruptcy case, that in that instance, a subpoena may be required under '04(c). But here, dealing with these parties that are parties in interest, our position, Judge, is that a subpoena is not required.

And, Judge, bigger picture, a subpoena is not required for serving an adversary complaint under, I mean, personal service of a subpoena is not required to serve an adversary complaint under 7004, to initiate a contested matter under 9013, or to serve a request for production or interrogatory on a party in either an adversary proceeding or contested matter. So I don't think all of the parties, and I've clarified this on some phone calls earlier, not all of the parties are claiming that we need to go the subpoena route, but I think some of them still are.

But our position, Judge, is that we provided more than enough notice and opportunity in connection with today's hearing and should not have to go through the same procedure as compelling the attendance of a true non-party witness at trial.

Judge, one of the points raised by some of the parties in their objections is kind of on splitting costs. Judge, there's no basis in Rule 7004 to require the estate to pay costs. Number two, no level of detail has been provided again on what even the burden or time or cost would look like on finding the five backup pages on each of the transactions with the McClain Debtors.

And another point, Judge, I mean made by the parties is at least it appears to be some of these USDA claimants' positions that we -- the estate may not even have funds right now that can pay those sort of costs.

So again, Judge, based upon the record that you have today, based upon the high dollar amount, the significance of this information, the relatively minor number of documents backing up very large dollar transactions, our position is, is that that the order can and should be entered as-is against these parties to get this information. If the Judge feels differently, we would ask that the Judge maybe turn some things on parties that have less than total -- less than $1 million of total dealings with the Debtors.

Last, Judge, with respect to the interrogatory. And again, that interrogatory is seeking the same information kind of already prepared, for example, by Thorlakson in its proof of claim. And I think one of the other parties that we looked at, I think it was MAP. Judge, the parties object and claim that

they are losing their Rule 33(d) protection on interrogatories and business records. And that's just not true.

One, Judge, you and I, we went through the order. The order preserves their rights of the Federal Rules of Civil Procedure. And then two, we're not asking in the motion of the order for them not to have their Rule 33(d) rights. And we briefed this, Judge, and I know the Court's familiar with this.

In connection with a request for production of documents or an interrogatory, if the information sought is apparent from the face of the record, the responding party can say, you know, see this page of this document for that information. If for some reason they don't want to prepare the interrogatory but the records are produced with a roadmap that shows us that information for each one of the transactions, then I don't think we're going to have a problem. I don't think we would have a problem if basically there was a production of the complete transactional documents in the exact same way that these folks have already done it in connection with their proof of claim.

What I just want to make sure, make clear that we're not suggesting is that we can receive just a randomized mismatch of all sorts of responsive and non-responsive documents and the party just says, see documents produced. Again, I don't think that that's what's being being sought by the responding parties. I think that we're actually maybe

either aligned or very close to the same page there, which is we're just seeking production of the same information, either apparent on the face of the document or in interrogatory format, and/or with the roadmap to find that key information from the documents produced.

THE COURT: Okay. Before I hear from -- well, I'm not sure exactly, were you wanting to proffer something, as well?

MR. JOBE: Your Honor, so that would certainly conclude my opening and the majority of my argument. Yes, Judge. I do have a limited proffer to make on the state of the Debtors' records that I could do now or later after other parties have had their opportunity, however the Court prefers.

THE COURT: Okay. Yeah. I think I want to hear from the other parties first. But I do have a -- I guess my first question is, are you, I mean, you've used the proof of claim filed by Mr. LeBas's client, I believe it's his client, the Thorlakson Diamond T Feeders. And that's I guess we'd call that a large claim. What is it, ten million, is that right, or -- as I recall?

MR. JOBE: Yes, Your Honor.

THE COURT: And you use that as an example. Are you suggesting that what they've produced under their proof of claim is probably all that would be necessary to comply with your basic request? I guess I'm a little confused as to your

point in using that as an example.

MR. JOBE: Thank you, Your Honor. Yeah, this is important for me to clarify. We're seeking all of the transactional documents from these parties from the beginning of their dealings with the McClain Debtors. I think in some instances, that could be a couple of years. In some instances it could be five. In some instances it could be 10. Kind of getting to who has the burden on undue burden and scope, I mean, setting that aside, we don't -- it's one thing that hasn't been provided by the parties to kind of allow us to evaluate what exactly, maybe how much of a burden or how helpful that information would be, would be their time periods.

But in bringing up the Thorlakson proof of claim, let me, I'll just pull that up really quick.

(Pause)

MR. JOBE: So Judge, this is the Thorlakson proof of claim. This is their summary sheet, summarizing the transactions in their proof of claim. So I think it was 25 or 28 transactions itemized here on this list that add up to the $9.9 million. And then their claim has attached to it the contract, the invoice, the projected closeout and proof of payment.

Judge, my point there was, was that this may be all that is responsive by Thorlakson to the discovery order. It's that this is exactly what we're looking for, just for a longer

time period.

THE COURT: Okay. For example, tell me on the various transactions, how far back in time did they go on that proof of claim?

MR. JOBE: Judge, the transactions on this particular proof of claim go back to mid-November 2022. So six months before the petition date. About five, six months.

THE COURT: You said November of '22 or is it '23? When was this --

MR. JOBE: Judge, I don't have it at the top of my head. The petition date I think is like May 1st, 2023, give or take a week or two.

THE COURT: Okay. Let me get my notes here.

All right, yeah, this case was filed. Okay, I got you. So this case was filed in April, late April of last year. So you're saying these go back to November of '22. But what you're suggesting is that you want to go back, I guess beyond November the 22nd, which is the beginning date of that proof of claim, because it's through those transactions that give us the number, I suppose that they assert as owing.

And I don't know what that really means, but having not seen it except for the first time here today this morning. But in any event, there could be numerous more transactions, to say the least, over the years that precede or preceding the time of that begins in November of 2022, assuming they've had

dealings with the Debtor going back several years.

MR. JOBE: Yes, Your Honor. Presumably the transactions on this proof of claim are just the ones that Thorlakson got stepped on. What we are seeking is both the complete package, because we went through some of these other claimants don't attach all the documents to their claim. So we'd like a complete package of the documents underlying those claims.

But Judge, we just want to see this exact same detail on all of the prior transactions that Thorlakson is not claiming are unpaid and it's proof of claim so we can evaluate the dealings of the parties on a macro level and micro level, especially in connection with the, what we refer to as the investor agreements.

THE COURT: Okay. And then I would assume, although I don't really know this, that part of the problem is the reason for the objections would be just the general notion of communications between the Debtor and the each of these claimants. And I haven't studied your definition of communications, but I assume like we see under normal discovery, it's probably pretty broad.

And I don't know if anything that's part of what is part of the proof of claim would be an example of a communication with it. Or am I not understanding that fully?

MR. JOBE: Yes, Judge, that is correct. The

communications that we're seeking would not be included already in these claims. And with respect to communications, Judge, and we bring some of the myriad issues that we're looking at, but it is very relevant to the claims that we're looking at, what was being communicated to these parties with respect to which cattles were theirs or lack thereof, if they were in a particular lot or lack thereof, whether these parties were asking to come see their cattle or not, whether the parties are claiming some issues with lack of identification of their particular cattle or not to get us to, among other things, Judge, I mean, to show the extent of the claimants' involvement and how it worked in what appeared to be a scheme where not actual physical cattle backing up these contract.

That's on a macro level. Judge, what's potentially very relevant on a micro level on some of these claimants was are there same communications along those lines and knowledge or lack thereof of some of the problematic aspects of this cattle investor arrangement.

THE COURT: Okay. Let me ask you this, then. In your pleadings, as I recall, you identify the I guess three different ways in which the Debtors were engaging with their clientele, if you will, or customers or sellers, whatever you want to call them.

But first is kind of a simple, I would call the basic and very simple transaction of sellers who sold cattle to the

Debtors on cash sales. And that would be, I assume just means sales that weren't financed in some fashion. They're credit sales. And so I take it that the cattle were delivered before they were paid for. But I don't know that. I mean, I'm just kind of surmising from the descriptions and maybe that's not knowable right now. I don't know.

But then then there's this issue concerning the feed yard services as you define them, where I interpreted that to mean that's mostly third parties who placed their cattle at the Debtors' facilities to be serviced while they were there. And then they would be charged for that service. And that's tied to different, I guess, the progress that was made and so forth. And I think you've raised previously that, well, that's kind of hard to describe that as a dealer claim of some sort because the paying party there is the third party, I assume.

Does that second issue morph into some of these investor claims as well, which is it's extended out and then it results in where we're splitting the profit, if you will, that was realized when the cattle were ultimately sold and I guess sold under the agency of the Debtor or -- that's kind of confusing. Believe me, I've had enough cattle cases to know that I can have an infinite number of cattle cases and we never fully understand how the cattle world works.

But in any event, I guess the first scenario seems relatively simple. The second, and then it gets gradually more

complicated as you go through the two other scenarios. And from what you've shown me, as far as your example exhibits on these proofs of claim, those seem to be in each instance, these that fall within the second or third category. Is that a fair assumption?

MR. JOBE: Your Honor, each of the claims that we went through, with the exception of Riley, appear to be the third category.

THE COURT: Okay. All right. So with those, your presentation, which has been lengthy, and in response to my questions, I guess I will -- Mr. LeBas, you seem to be the first party that's mentioned, your client is, on each one of these or on this motion here. Do you want to respond or maybe we ought to take about a ten-minute break? We've been going for a while here.

And then Mr. LeBas, will you be prepared to kind of tell me where you're at as far as your response and objection?

MR. LeBAS: Yes, I will, Your Honor.

THE COURT: Okay. And then we'll just go down the list and see if -- obviously I would invite counsel that if your objection is already covered by another lawyer, then by all means feel free to let me know that as a way to shorten it. But in any event, we'll take a short recess.

(Recess at 12:19 p.m.; recommencing at 12:44 p.m.)

THE COURT: All right, this is Judge Jones back. I

assume we have everybody still on the line.

(Pause)

THE COURT: All right. We've had Mr. Jobe tell us, I guess, both the background and the basis for the information he's requesting on behalf of the Trustee in this case. And I think I've got a decent handle on that.

So, Mr. LeBas, if you want to go first as far as the opposing parties.

MR. LeBAS: Yes. Thank you, Your Honor. I'm going to begin very briefly with one of the first questions that the Court raised about the interaction between the current disputes. It originally begun as one with the Dealer Trust Act and later modified into a claim under a claim of a Ponzi scheme with the result if the Court makes a finding of a Ponzi scheme presumption, which creates all kinds of difficulties for creditors who are in the crosshairs.

With respect to the Dealer Trust Act claim, that was a limited request by the Debtor. There was a motion filed February 7, 2024, that's Document 174. There's been a suggestion either in the pleading or not perhaps so much by counsel's statements, but some suggestion that the parties have not been cooperating.

I want the record to reflect a couple of communications. First is a telephone call I had on February 2 with Mr. Reis personally, that's two days after the date that

the motion was filed, to discuss concerns that we had about the unlimited time period that was requested in the documents and as to whether the complaint made for -- or the request made for the interrogatories impeded on our rights to produce business records instead of hatching a statement in a way that the Trustee requested. There was no response to that.

I followed up with an email on February 19, '24, which expressed the same concerns and requested a discussion, but no discussion was had. I didn't get any response to that. And as a result, we filed our objection on March 4, which is now Document 185. And shortly after that, we received, we did 10 days later, we received the Trustee's response on the 14th, on March 14 at Docket 195. And in Docket 195 for the first time, we see a large expansion of the rationale for the Trustee's request for documents and some rationale attempted with respect to the unlimited time and scope of the requests.

And so I say those things to start with to say our original goal in trying to respond to the request was based on what the request was at the time. And we actually mentioned something about this in our response, which is Docket 185, that we were willing to produce records concerning transactions between the Thorlaksons and the Debtor. We proposed a date of January 1, 2021, thinking that would be satisfactory to pick up the possible claims by the Trustee under the under the two-year preference period or statute of limitations.

Perhaps maybe that's what it was. We didn't know what the claim was. And we continue to stand behind that. We will do that. An the type of information that we would propose would follow the outline contained in the proof of claim that the Court's now seen, which describes the transactions by date, headcount, consideration, and amount owed, if there is some amount owed.

With respect to characterization of the transactions that the Trustee has asked the Court to adopt, we don't think it's near as simple as the Trustee has indicated to put the transactions into these three buckets of pure sales of what are called investor contracts and what are feed yard service agreements. The fact is, and as the Court saw with respect to some of the documents that were now before the Court, there were transactions in which one or more of the transactions are described as sales and described as the provision for feed yard services.

In particular, with respect to the transactions, the written documents that were reviewed by Thorlakson, there was a sale of cattle by the Debtor to Thorlakson, an agreement by Thorlakson to pay the Debtor to feed and care for those animals and after they were ready for sale to a buyer, typically a feed yard. And the difference between the amount that was purchased, the purchase price, and the amount of the feed and care charges would be split between the parties.

Cattle headcounts were described, lot counts were described. And it's beyond the scope of today's hearing, but there were inspections also to ascertain that there were real cattle there. And so we object to the description that any transaction that is not a sale of cattle to the Debtor or one that involves feed yard services is what's called an investor agreement, because that's an attempt to try to characterize the relationship of one as one that could be the subject of a Ponzi scheme argument.

Now, with respect to the actual requests themselves, there's no time limit in the request. It doesn't say all documents from January 1, 2022 or 2021. It says all documents for all time. And as the Court noted, the reference in the definitions to communications is extremely broad. It includes communications with the Debtor, which makes sense, but then it doesn't say communications with the Debtor. It says any communications. So presumably that includes, there's an exception for communications with attorneys. But nevertheless, what else could be involved?

All kinds of transactional documents or communication documents can occur that don't involve the Debtor but might mention the Debtor in some way. And there's no way to decide whether something's in or something's out without producing every text message, email, or scrap of paper that anybody had anything to do with. I think I'm speaking more broadly for

others than for ourselves but, nevertheless, that's the objection.

And with respect to the argument, the suggested argument that, gosh, Judge, there's only five pieces of paper to support this $200,000 cattle deal, I know the Court's sat in many cattle transactions over the years and is very aware that it's commonplace in the cattle business for deals to be made with much less paperwork than that. People buy and sell cattle on the phone with no more paperwork exchange and a check in the old days, and now maybe a wire transfer.

So the suggestion that there's few pieces of paper and therefore there must be some big smoking gun out there beside the few pieces of paper is simply, that's not correct. We dispute that. We don't agree with it. We have offered to produce the business records for the time period that I indicated. But we reserve the right and we object to providing the document in the form of an answer to an interrogatory.

We have the right under Rule 33 to produce business records that identify the transactions and that would be our request, so we can organize them in a way that is helpful to us rather than expending more product to provide that to the Debtor.

Your Honor, those are my remarks in response. I'll be happy to answer any questions the Court may have.

THE COURT: Okay. Yeah, I assume, Mr. LeBas, that

you have a good handle on your client's history with the Debtors. And this is just from my understanding and, again, keep in mind that I've just seen kind of a summary of what's in your proof of claim. But is it fair for me to assume, and you may have already kind of said this, but that there would be significantly more documentation, if you will, whether we want to talk about documents.

And really, the Trustee's request concerns transfers. And I know there's a definition of that in the proposed order. Let me check that real quick.

(Pause)

MR. LeBAS: Your Honor, it's that the term "transfer" is defined in Document 174, which is actually the motion. I'm not sure it's on -- I don't have the order in front of me, but it's Page 174, or Document 174-1 at the top of Page 4, Paragraph 4.

THE COURT: That would be the -- is that not the exhibit?

MR. LeBAS: Yes, sir. I believe it is. I believe it's probably Exhibit --

THE COURT: Oh, yeah, here it is. Yeah.

MR. LeBAS: Yeah.

THE COURT: Well, in this definition, this definition is, I think probably is similar to the definition you'd see, for example, in the Bankruptcy Code or maybe as a transfer and

perhaps under state law fraudulent transfer provisions.

But I guess my question is, am I safe to assume that transfers, if you will, as defined would have taken place over the entire lifespan of the relationship that your client had with the Debtors here? Or do you know?

MR. LeBAS: Yes, sir. It's my understanding that the, I won't say all of them because I don't know for certain, but it's my understanding that at least the vast majority of the transactions between the Thorlaksons and the Debtor Entities involved transactions that were structured in the same way as those that are attached in the proof of claim.

THE COURT: Okay. And those would be multiple different transactions over the years?

MR. LeBAS: Yes, sir.

THE COURT: Okay. And so you may have said this, but I don't recall. Well, I guess you've proposed to go back to, was it 2021, a date in 2021? Is that right?

MR. LeBAS: Yes, sir. Yes, Your Honor. Our pleading says let's start on January 1, 2021.

THE COURT: Oh yeah, here it is. So what we're looking at then, at least insofar as transfers are concerned, it would go back to January of 2021. And then is that true also with respect to communications?

MR. LeBAS: I think that it would make sense at the same time period would apply to those two categories of

requests. But our concern about is based on the definition of "communications," which it doesn't contain a limitation. It's on the same page we were just looking at with the order, it's actually Paragraph 7.

And if the term "communications" is one that refers to communications between the Thorlaksons and the Debtor, then that would make sense to me. And concerns transfers of properties, that would make sense to me. But it's open ended.

THE COURT: Okay. And then insofar as the interrogatory, I believe I understood you to say that you had suggested kind of the right to refer to the documents, but I assume you would refer -- that any reference made to documents would be specific enough where they can be found in short order. Is that a fair assumption?

MR. LeBAS: Yes, sir. Yes, yes, Your Honor, it is. It would be helpful for them as well as helpful for me to try to find it. So we'd certainly do that.

THE COURT: All right then, I think that's all the questions I have. Did you have anything further, Mr. LeBas, for right now?

MR. LeBAS: No, Your Honor.

THE COURT: Okay. I'll just go down the list here. Mr. Massouh, anything you wish to add?

MR. MASSOUH: Yes, Your Honor. A couple of things. I don't want to rehash anything that Mr. LeBas went over, and I

agree with all his comments.

I do want to kind of start with the rule, Rule 2004. And I think this whole process is quite frankly teed up inappropriately under the rule. Under Rule 2004(c), and I know Mr. Jobe mentioned and talked about 2004(c), but in terms of a compelling production of documents from third parties, here creditors, it requires or it has a reference to Rule 9016, which incorporates Rule 45 of the Federal Rules of Civil Procedure, which is the subpoena rule, i.e., he needs to issue a subpoena in order for us to properly respond.

And I know we're working through the types of production that may or may not be ordered by the Court, but Mr. Jobe, in his presentation, assumed that, well, you know, none of these creditors have filed affidavits or any specifics regarding the burden upon these parties to produce these documents. Well, there hasn't been the opportunity to file that because there's nothing to respond to other than a motion for the entry of a proposed order. And so, there's nothing in the rules that requires the parties to file affidavits in response to objecting to a proposed order. And that's all really all we have here.

And so, when you're talking about some of these requests, and I agree with Mr. LeBas that the transactional type documents, you know, they are what they are. And we don't have an issue with producing transactional type documents for a

set period of time. Like Mr. LeBas stated, there is no set period of time here.

But with regard to communications, if you look at the definition of communications set forth in the proposed order, the definition states that communications, "shall be construed as broadly as possible and shall include literally everything." And so, then when you look down to the actual request for communications, it says all communications with or referencing any of the Debtors.

So, if one of my clients had a text message with a friend of hers, friend of theirs that may have mentioned Brian McClain, technically that's, we have to produce that. And, again, it's for an unlimited period of time, as well. And that's where the burdensome aspect of these requests come into play. It's not only the time aspect of it, but it's now having to search through all text messages, all emails, everything on anything that may reference Brian McClain or McClain Feed Yard or Seven M Feeders or what have you. And we've seen nothing from the Trustee that in any way proposes to limit those requests and those communications.

What we're talking about here, you'll see online here, Judge, we have about a half a dozen lawyers. Granted, there may be 105 or 106 actual claimants, as Mr. Jobe mentioned, but each of us represent large groups of various claimants. And, you know, we're willing to accept service of

subpoenas on their behalf. And so, Mr. Jobe is not dealing with 100 different claimants. He's dealing with a half dozen lawyers in terms of working through these issues. And so I just wanted to point that out.

Further, Judge, you know, as you may know, I was heavily involved in Reagor-Dykes and as were you, and we had many a hearing. And there's a lot of similarities between this case and the Reagor-Dykes case. And one of the things that is similar is, and I think just about every Reagor-Dykes hearing we went to, or at least three out of four hearings we went to, Judge, the Debtors complained about the content of the records, the lack of records, the organization of the records, and things of that nature, which is exactly what the Trustee in this case is referring to.

It's my understanding that there are hundreds of boxes of various Debtor records in this case were seized or taken by Rabo and are in a warehouse in Chicago or somewhere. I don't know the current status of those records, but there are Debtor records, not like they don't exist.

And in Reagor-Dykes, in a similar type of circumstance, the Reagor-Dykes Debtors did not go to each of the creditors and request this information separately. They relied on the Debtor records, they relied on the bank statements relating to transfers to determine who they may have claims against and, as you well know, certainly brought those

claims against many and many different creditors in form of adversary proceedings.

And so to put the burden on the creditors to go back through files for years upon years of dealings with Mr. McClain, when they certainly may have those records, and I don't know whether they've looked at those boxes of documents or not, but I think that's at least the starting point before you go and ask the creditors to fill in the gaps.

And so, Judge, like Mr. LeBas said, we don't -- if it's a set period of time and we propose a two-year period of time prior to the filing of bankruptcy, which would be end of April of '21 as the relevant time period here to produce documents.

And with regard to the transactional type documents, my clients do not have an issue as long as that is narrow in the scope and the time frame. However, with communications, Judge, we've got to figure out how to narrow down the definition of communications, what communications they're really looking for. If they're just simply looking for communications that our clients had with Mr. McClain or with the Debtor Entities, that's one thing.

But to broaden the scope in accordance with their own definition to define communications, quote, as broadly as possible, that can encompass many a different things, which puts a huge burden on our clients to have to search through

their records for needles in a haystack to produce to the Trustee.

So, with that, I'll cede the floor to the other creditors. But these requests, if the Court were to order the production of documents absent subpoenas under Rule 2004(c), the production needs to be extremely pared down, limited in time, and limited in scope, Your Honor.

THE COURT: Okay. Let's see, Mr. Weldon, I believe, for Priest Cattle Company, et al.

MR. WELDON: Yes, Your Honor. Very briefly, and I'll just adopt everything that was said by Mr. LeBas and Mr. Massouh, but just two quick points.

First, the creditors, these cattle claimants, cattle creditors, the majority of whom are unsecured creditors, have filed their proof of claims, not in a vacuum. We have this adversary complaint proceeding that Rabo has filed, and so that is going on in the background, I guess, of this 2004 motion that's been filed. So that's, I think, just has not been brought up today, but that's another piece of this that I think that is important related to Rabo's issues with Dealer Trust, as well as the Trustee's role, as we've, I think, discussed and heard in prior conferences that the Trustee in this matter is acting on behalf, in some way, for USDA in analyzing and determining who gets paid under the Dealer Trust.

So as these objections and responses have been filed,

at least for my clients, that is something that is of concern and we are aware of, is that this is not a, we're not operating just in a bankruptcy vacuum here. We have these other matters that are present.

So with that, I'll see if Ms. Miller may have a few comments, because she also filed with our motion, or with our response.

THE COURT: Okay, thank you. Ms. Miller?

MS. MILLER: Thank you, Your Honor. Fully adopt the arguments of the three gentlemen in front of me. Particularly, I want to highlight for the Court that the categories or buckets that have been mentioned, I'll just reiterate, I don't think those are particularly helpful for the Court, nor do I believe that they're accurate to group the 80, 70 to 80 claimants here into just those mere three groups, and don't think that's helpful for the Court today.

And Judge, you're right, at the beginning of this hearing, as you were asking questions of Mr. Jobe, that the claims show that the claimants provided information to the Court to support their proof of claim. That's the information in front of you. It certainly, admittedly, is a claim for your purposes. It's unsecured. Like any unsecured claim, it may not be as many pieces of paper as we'd like, but that's what we've got for the transaction issue and the transaction that wasn't paid.

To the extent that we are discussing providing additional documents, I think what you've heard from everyone is that we're willing to provide additional documents to support and to show arm's-length third-party transactions that were paid prior in time. But that request can't be unlimited in time, Your Honor. And so that's why, collectively, what you've heard today is a request for a time frame on those documents to support the transactions that were third-party arms-length transactions between these cattle creditors and the Debtors at issue.

We'll just reiterate the challenge and the scope of the definition of the term "communications" and also join the objection to the interrogatory request. Rather, as you've heard, we're willing to provide the documents provided that there is a backstop on the date for what that document request is. We had said in our objection, Judge, just to be clear, I think even a shorter time frame than two years.

For clarity, for today's purposes, Kyle and I had visited before, Mr. Weldon and I had visited. We're willing to also produce in that two-year time frame and so would amend our written objection accordingly and would be willing to provide those documents in the two-year time frame prior to the date of filing. That would end my comments.

THE COURT: Thank you, Ms. Miller.

Let's see, Mr. Hoard for --

MR. HOARD: Yes, Your Honor.

THE COURT: -- Curtis Jones Farms and others.

MR. HOARD: Yeah, before, so to make sure I don't forget this, I want to address the Trustee's motion directed at the non-USDA claimant. Two of my clients were included in that motion, Kenzie Jones and Curtis Jones Farms. They're also included in the USDA claimants' motion, and I just want to make sure we don't leave that hanging out there. I think that motion should either be denied or withdrawn with respect to Kenzie Jones and Curtis Jones Farms.

THE COURT: Let me be sure I understand --

MR. HOARD: With regard --

THE COURT: Before you move on from that, let me be sure I understand what you just said because, are you saying then that on the motion for 2004 exam that is Docket Number 174 includes Curtis Jones Farms and Kenzie Jones as one of the USDA Dealer Trust claimants?

MR. HOARD: Yes.

THE COURT: And then they're under 179 included as a non-USDA claimant?

MR. HOARD: Yes.

THE COURT: Okay, so you're just saying that's just a mistake. They either are or they weren't?

MR. HOARD: They definitely are USDA claimants. And

I'm assuming that Mr. Jones just made an inadvertent error.

THE COURT: Okay.

MR. HOARD: They're also -- they're included in both motions. And the requests are essentially identical.

THE COURT: Okay, so your claimant or your clients, those two parties have in fact asserted a claim against the Dealer Trust Fund or Dealer Trust arrangement?

MR. HOARD: Yes.

THE COURT: Okay. All right, go ahead.

MR. HOARD: And then with regard to the main motion directed at the USDA claimants, in our response we asked for two years, which I think Mr. Massouh suggested a start date of May 1, 2021.

And then with respect to the interrogatory, the interrogatory is simply inappropriate. It asked us to prepare a chart summarizing the contents of documents that were being requested to produce. And that seems unnecessary and inappropriate. I think we should just not even have to answer the interrogatory and just produce the records and then the Trustee and his counsel can produce their own summary chart. So we objected to the time limit and to the interrogatory.

We did not object regarding the subpoena. And I guess I differ with my fellow creditor counsel here on that. We don't want to unnecessarily cause the estate to spend more money than it needs to. And so whatever order gets entered, we

will comply and produce the documents.

THE COURT: Okay. Let's see, Mr. Harrison, is that right, for the MAP Enterprises?

MR. PAVLASEK: Good morning, or good afternoon, Your Honor. This is Harrison Pavlasek with MAP Enterprises.

To follow up on my colleagues, I think we filed a limited objection at Docket 190. So we don't generally oppose the Trustee taking discovery. However, we do have a few issues and one of those being, we'd like to preserve our rights under the Federal Rules of Civil Procedure. And we understand that the Trustee thinks there's language to that in the proposed order. But we think this could be a little clearer with respect to preserving our rights under the Federal Rules.

And then to follow up on Mr. Hoard's comments, we don't think it's appropriate to have to create a chart for the Trustee in the interrogatory. We're comfortable sending our discovery and Bates labeling the document and directing the Trustee that way. And then we had concerns with the temporal limitations on the discovery request, but I think that's been hit pretty hard. So I won't speak too much to that.

THE COURT: Okay. All right. Anybody else?

(No audible response)

THE COURT: I think I've covered everybody that's made an appearance here. Mr. Jobe, do you want to briefly reply?

MR. JOBE: Your Honor, with respect to replying, one item is the state of the Debtor records, which I do have a brief proffer on for that. And the remaining items, I can handle in a closing-type argument. Would the Court be all right with that?

THE COURT: That's fine. I'll just say as far as closing, I'm looking to a brief closing.

MR. JOBE: Yes, Your Honor.

THE COURT: So I think I've got a good handle on where we're at, so.

MR. JOBE: Well, Your Honor, the issue with respect to the condition of the Debtor records and the efforts to date, Your Honor, with that, I would proffer some limited testimony from Mr. Reis.

THE COURT: Okay. I take it nobody opposes the proffer. Is that a fair assumption? Have you conferred with counsel, Mr. Jobe?

MR. JOBE: Your Honor, we brought this up last week in connection with how we were going to treat today's hearing in person or via remote. I did inform the parties that we had a brief proffer, and then the parties responded at the hearing last week with we can set this for a remote hearing. So I took that to mean that a limited proffer was acceptable and that we weren't planning on any further witness testimony.

THE COURT: All right. And you have Mr. Reis there.

Is that right? Or he's on the line, as well?

THE CLERK: Yes.

MR. JOBE: Yes, Your Honor.

THE COURT: Okay. All right. We have Mr. Reis. So you may go ahead.

MR. JOBE: Thank you, Your Honor.

Your Honor, if called to testify, I believe Mr. Reis would testify that he is the duly appointed and acting Chapter 7 Trustee of the three Debtors' estates in this case and has been operating in that capacity since the case was filed. He was appointed last May.

In connection with this case that's roughly a year old, I believe Mr. Reis would testify that we have received informal and some formal discovery from a number of parties, and we have also worked to obtain the Debtors' records. The Debtors' records in this case are primarily comprised of physical records for which we have approximately 36 boxes.

And based upon the review thus far, Judge, we have identified some folders and boxes here and there that have certain components of the file that we have described today in these documents, but not a file that we have a good belief comprehensively and completely contains all the Debtors' records on the transactions that we've been describing.

Specifically, Judge, we talked about, for instance, some invoices and how those relate to the contract and the

projection and the money in and money out of each one of these, what I've referred to in the past as investor transactions. We've identified, for instance, some physical records that have some invoices that we have little comfort represents all of the invoices. We have identified boxes of documents that have some but we have no assurances are all projection sheets, again, separately kind of by themselves. We've identified some folders and boxes that contain some, but we don't have any assurances, are all contracts.

And the state of the Debtors' records, Judge, in short, are that we have not yet identified any sort of records that would be sufficient to identify the contract, money-in invoice, projected profit, as well as the money back to the claimant. Have yet to identify physical records or electronic records that would give us all of the information on a particular transaction. As a result, the discovery that we are seeking now is not so much aimed at making life easier for us, but getting us information that we truly believe that we do need and do not have.

And that would conclude my proffer, Your Honor.

THE COURT: Okay. Let me ask if any counsel has any questions of Mr. Reis in light of his proffer provided by Mr. Jobe. First, Mr. LeBas.

THE CLERK: He's muted.

UNIDENTIFIED SPEAKER: You're on mute.

THE COURT: You're muted, Mr. LeBas. I don't think I've heard your response.

MR. LeBAS: Well, I'm sorry, I'll try to leave it on.

The question I would have for, this is sort of awkward because I'm not sure if counsel knows, but it might be for Mr. Reis. But the question is, where are the 36 boxes?

THE COURT: Let me -- I can swear in Mr. Reis before he answers that question, if you don't mind. So, Mr. Reis, can you, are you with us?

MR. REIS: Yes, I am, Your Honor.

THE COURT: Thank you.

KENT REIS, CHAPTER 7 TRUSTEE, SWORN

THE COURT: Okay. If you want to repeat your question, Mr. LeBas.

MR. LeBAS: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. LeBAS:

Q Mr. Reis, where are the 36 boxes of documents mentioned by Mr. Jobe a few minutes ago?

A Thirty-four boxes went from Rabo prior to bankruptcy being filed, went from Rabo to their own the best thing I could call it are consultants. Those were all scanned and have been produced to our -- to the estate's accountants, forensic accountants in Dallas, as well as to, I thought to, frankly, all the parties.

I thought Mr. Johnson provided that to anyone that asked for it. Those boxes were scanned in by him and by their consultants and turned over. There were a few boxes that came later, both from parts -- from people that work for the USDA for the state of Kentucky, as well as, I understand, the security guard. Those came to my office and then went directly to my forensic accountants in Dallas. They picked them up, physically picked them up and took them back to Dallas. And so they had those and scanned them in.

And again, I think those have been produced to everybody who wants them.

Q Thank you, Mr. Reis. I know that Mr. Johnson has produced many documents. Others have done, also. I'll contact Mr. Jobe if I can't find what you're describing in the records that have already been produced.

MR. LeBAS: I'll pass the witness.

THE COURT: Okay. Mr. Massouh?

MR. MASSOUH: Yes, Your Honor. Just a few questions for Mr. Reis.

CROSS-EXAMINATION

BY MR. MASSOUH:

Q In addition to the 36 boxes of physical documents, have you -- my understanding is also that, I could be wrong, but correct me if I'm wrong, Mr. Reis, that Rabo also downloaded various information from Debtor computers. Is that true? And

do you have that information, as well?
A I don't believe Rabo did. I think I did that, we did that directly with our forensic accountants. That's been -- the QuickBooks is what they used. That's been turned over. The QuickBooks database, I guess, is the best way to call it. Bases have been turned over to the forensic accountants.
Those were kept very haphazardly. I don't think Mr. McClain had a computer or used a computer. I think everything he did was by phone. I think his daughter, Meagan Goad, kept some records on -- did keep some records on a computer, and I did get those hard drives, and that's where my accountants got those because I got the actual computers themselves.
And then it's still kind of shocking to me, but the other person who did a fair amount of the accounting for this business was someone who worked for H&R Block, at least part-time, if not full-time. So, it was just like one woman, I think her name was Angela Powell, that did some of the recordkeeping for the company. But that's the best we have of electronic records. And again, I think it was primarily through QuickBooks.
Q With regard to Meagan Goad, you entered into, the Trustee entered into a settlement with her related to the life insurance proceeds. Is that correct?
A Correct.
Q And my understanding is part of that settlement agreement

was some sort of a cooperation agreement with Ms. Goad. Has she cooperated to the extent of producing additional documents or being able to assist you in deciphering the documents you have?

A I believe we have all the documents. I think anything that's tangible, we already -- whatever there was, we have. We are actually -- we have scheduled a time -- I think what we're going to get from here forward is more her memory of, you know, and testimony of what happened.

And we have scheduled a time with her to counsel for that. I can't tell you the exact date, but it's coming up in the next ten days or two weeks.

Q Have you retrieved information from Meagan Goad's phone, text messages, emails of that sort?

A We got that from Brian McClain's phone, her father's phone. I do not believe we have gotten that from her phone. Frankly, I've never really heard anyone say she did any other business by phone. I think that was her dad's method of doing business.

MR. MASSOUH: Pass the witness.

THE COURT: Mr. Weldon, any questions that you have?

MR. WELDON: No questions, Your Honor.

THE COURT: Mr. Hoard?

MR. HOARD: No questions, Your Honor.

THE COURT: Mr. Pavlasek, I apologize for calling you

by your first name earlier.

MR. PAVLASEK: Oh no, that's okay, Your Honor. No worries at all. No questions, Your Honor.

THE COURT: Okay. All right. Anything further, Mr. Jobe? Oh, Ms. Miller, I'm sorry.

MS. MILLER: That's okay, Your Honor. No questions.

THE COURT: All right. Thank you.

All right. Anybody else have anything they wish to add? Anything further for Mr. Jobe?

MR. JOBE: Just briefly, Your Honor. Your Honor, one follow-up point from the testimony. I don't think we need to complete the record for this today, but if the Court believes it moves the needle, we can.

On the docket sheet, there was some discovery made by Rabo to Ms. Goad in connection with the motion to transfer a venue. Those discovery requests are on the docket. They did include text messages. Incidentally, the Trustee, we also had our own request for production that's not filed of record. And we have received and reviewed those responsive documents from Ms. Goad.

So this is a large case with a lot of different moving pieces. And so, again, I don't think that the record changes much on that, but I just wanted to clarify that so parties weren't claiming that we were hiding the ball by any means.

THE COURT: Okay.

MR. JOBE: Your Honor, going back to the foundational documents that we're working with, we've got $100 million in and $100 million out on a monthly basis on two accounts and 20 on another. Just to respond to some of these points.

These parties are saying over and over that our characterization is not correct and that it's not as simple as these three buckets. Well, the documentation underlying their course of dealing and that detail, if they are correct, that's exactly the sort of information that we are seeking to obtain because we are characterizing -- my characterization, Judge, is limited to a limited and hopefully expanding set of documents. And if the transactions and course of dealing looks different in the past, then that is something that we need to know.

And Judge, taking a step back, and we have discussed this with some of the parties. First and foremost, Judge, is -- setting aside any sort of USDA trust issues in a potential Ponzi case, first and foremost, is the Trustee's duty to try to recover money, to get innocent investors paid back up to the principal amount of their losses. If you -- these claimants, any of them that were truly innocent, arm's length, operating in good faith, and have lost the principal amount of their money, they should be absolutely supporting the discovery that we are seeking today because that discovery is going to be required in order for us to evaluate, among other things,

potential claims including against a whole host of parties for transfers during the two-year period, the four-year period.

And Judge, as we briefed in our response, in the Fifth Circuit, the discovery rule applies essentially automatically in a Ponzi scheme case. So the discovery rule would apply to go back even further back than four years. Specifically with respect to maybe whether there's one or more claimants that have profited significantly from this enterprise and have liability, that claimant is to be evaluated on "net winner, net loser" basis, which arguably goes back in time until the beginning of their dealings. That's why a two-year isn't anywhere close to the time period that we need to fully evaluate those claims.

And again, if you are an innocent third-party investor that truly lost money on this deal, you should be supporting us. If, rather, you're a party that has not operated in good faith or has profited significantly, then you would want to throw some roadblocks up in our continuation of this case, which incidentally is we are one year into the case thus far and working hard towards getting all these sort of claims fully evaluated in advance of a two-year limitations period.

Your Honor, and this is very important. In those investor agreements, they are titled feed yard services. The first sentence of those agreements says, "This document is

intended to memorialize the partnership between claimant and the claim." There's a very good chance we will be litigating what was in fact the true nature of this relationship. But there's truly language in there going every which way.

The word "feeding" is dropped in that agreement. The word "partnership" is dropped in that agreement. The term "buy-sell" is in that agreement. And so there's quite a bit to get sorted out. And yeah, this is not as clear as a typical buy-sell agreement.

Your Honor, and this is also important. The subpoena item is a red herring. So in any discovery, whether you do a request for production under Rule 34 on a party to an adversary proceeding or its discovery, like we file an objection to claim, file a request for production. None of those procedures require subpoena. All of this discovery, specifically in connection with documents and interrogatories, it's all governed by Rule 26, Rule 34, and Rule 33.

And we briefed this. The way this is supposed to work is a party makes its discovery request, which has happened. The other party has a period of time to review that discovery request and lodge objections. That time period has been afforded. When there is a hearing on the objection, a party cannot reduce the scope of discovery by unsupported, vague claims that this might be a huge pain in the rear.

Judge, we briefed this. The burden-shifting is

clear. That party, prior to today, has an obligation to look and say, Okay, we've given this a first look. This is going back five years. There's 2,000 pages. It's on 16 different computers. There would be 10 different parties that were possibly party to communications. And this would require X number of hours, X number of days, and X number of dollars to comply with.

None of that has happened, Judge. And this is important because we can't -- this is the moment for this to be determined, and we can't argue in a vacuum. None of these parties have said my client's dealings are five years or 10 years. Or we're looking at 5 documents per transaction times, 5, 10, 50 transactions. And that's the level of detail that would be required to meet a burden to trim down this discovery. Assuming that we have met our burden to show general relevancy, Judge, which we have, again, these are all geared towards transfers.

As Your Judge, picked up on, I copied and pasted the definition of transfers out of TUFTA for the definition of transfers. And this is all geared towards transfers that we are evaluating during a relevant time period. That is two years under the Bankruptcy Code, four years under TUFTA, an unlimited amount of time before that under the discovery rule, and arguably an unlimited time before that under the "net winner, net loser" Ponzi scheme analysis of possible liability

for folks that were -- if there are folks that are identified to be big winners in what we believe appears to be a Ponzi scheme.

Judge, while, for example, and why these numbers matter, Judge, if you look at the numbers under one of those projections, give or take on any one transaction that was intended to get turned in about 60 to 90 days, so 60 to 90 days between when the money was sent by a claimant after the cattle were fattened up, sold the money back, that's 60 to 90 days. Ballpark the projected profit on that deal back to the investor was about 10 percent. If you call it three months, it's an annualized rate of 40 percent return.

If you've only done business with McClain for a year or two, and you made 40 percent on your money, and then you got stiffed on the last deal at the end, then there's a very good chance you are a net loser. But if you were a party that was doing business with McClain for 10 years, and you were doing transactions at the level and frequency of some of the levels and frequency, Judge, that we've seen on some of these claims, then these parties could have received several hundred percent annualized return back on their money, and could have profited tens of millions of dollars up and above over the years what they claim to be owed here at the end.

That's very important information for us to know. And Judge, we either have to know it and get it now, or there's

got to be another procedure for us to get it before such time as our limitations period expires.

Judge, the crazy thing is how little of documentation there is supporting these huge dollar amount of claims. On balance, we are talking about -- and no one's put into evidence, Judge, how long it took them to prepare their proofs of claim. Like Thorlakson is 119 pages of backup for like a six-month period for $10 million. We don't know if that took five minutes to prepare, 30 minutes, an hour, or five hours. Either way, you would expect and assume, because that's all you have to go on right now are assumptions based upon the lack of record, but you would assume that one of these claimants doing that level of business would have sophisticated records, and they could prepare the backup detail for their claims in fairly short order.

And so again, Judge, on the record that we have before you, it seems like a slam dunk to require these parties to just go a little bit further back in the preparation of their documents that they've already done for their claims and get us the entire course of dealing. There's certainly nothing in the record to suggest and support that that burden would be too much four years out, six years out, eight years out, or however much time, which again would be required in the record today to meet their burden to curtail back our discovery requests.

THE COURT: Okay.

MR. JOBE: Your Honor, with respect to communications, that definition is fairly standard. We did put in a limitation in there. We're not seeking any communications with attorneys. We're only seeking communications concerning the transfers with the McClain Debtors or the Debtor affiliates. The interrogatory is, the way that this has been lodged is typical and standard. So these parties in responding to the order as it currently sits with the reservation of rights language, they have an obligation to produce the documents pursuant to the order.

Under their Rule 33 rights, they have an obligation to respond to the interrogatory only as required to point us to that information on the documents that the interrogatory is asking for. There's a very good chance that if the documents, I think, are produced in, say, like the format that Thorlakson has done them and how they have described here, that we will not have a problem.

If for some other reason, if for some reason, some line item is not apparent from the documents, then we would like that answered. And that's what a proper response looks like. And that proper procedure and option to respond is already teed up in the way that this is drafted.

So, Your Honor, there are a number of parties that are not objecting to what we're requesting here. And just for

example, Judge, 2B is the largest USDA claimant on the USDA list. That's in evidence. That's a great example of a party that is not resisting the discovery that we are seeking today. I think today has been largely kind of overshadowed and characterized has been like this wholesale, knowing thoughtful response by all of these claimants when in fact, Judge, this is not all of the claimants. We have not received objections from a number of the parties. And frankly, the objections are not geared to where -- well, I'm sorry, I'll just strike that.

Your Honor, there's comparison of this case to Reagor-Dykes. Based upon the proper testimony, these records were not maintained in accordance with an actual normal business with many officer and finance-related employees. This was essentially one guy and his daughter to some capacity. I wasn't involved in this case but, based upon the description here, this sounds a lot more like that Atkins Oil & Gas case that I've heard about from Abilene with a bunch of money changing hands on handshakes than it was well-documented transactions, which is why we need this assistance from these parties in getting this information.

Again, this is not an issue where we're just seeking to avoid time we would spend to fill in the gaps. This is to truly get information and documents that we don't have.

Your Honor, with that, again, two years is not going to be close to the level of time that we have to look at to

properly evaluate and start fully evaluating and eventually marshal up for claims that we will likely have in this case. At a bare minimum, by default, it's four years. The automatic application of the discovery rule takes us further beyond that. For us to fully analyze whether any particular party right now is a net winner or net loser sitting here today arguably requires us to go back to the beginning of their dealings with the Debtor.

That's why on balance, Judge, if you are going to curtail and trim down our discovery based upon what we maintain is an insufficient record from the responding parties to do so, what we would offer up is, for instance, like the $1 million materiality threshold that if you are going to curtail it, then just trim it down as two parties with total dealings with the McClain Entities of less than a million dollars. Because, Judge, any party that has more than a million dollars in claims against this Debtor is going to be important enough information both globally and on a claimant level that we are going to need to fully evaluate that claimant.

Your Honor, with that, we appreciate the Court's time and I apologize for going over quite a bit on what I estimated. That would conclude our presentation unless the Court has any questions.

THE COURT: I don't believe so. I think I'll just go down quickly through the opposing counsel, which I heard

principally their arguments. I went through it earlier, but I'll certainly give each one an opportunity to make a brief closing if they so desire.

So, Mr. LeBas?

MR. LeBAS: Your Honor, we think our position has been fully stated on the record and so we won't take up any more of your time. Thank you, Your Honor.

THE COURT: Okay, thank you. Mr. Massouh?

MR. MASSOUH: Just briefly, one point, Your Honor, and I hate to belabor this. I think the procedural mechanism, to the extent the Court is willing to enter the order as proposed by the Trustee, if you look at their motion, their motion is a basic motion.

There is actually no actual request for production attached to the motion. The only thing attached to the motion is a proposed order that contains an order ordering the various parties to produce a set of documents. There's no actual request for production.

And so, to the extent Mr. Jobe argues that the creditors here have not presented evidence of X, Y, or Z, or presented evidence of burdensome or proportionality, because the reason that's not in front of you, Your Honor, because it hasn't been procedurally teed up in that fashion. And if it was properly procedurally teed up in that fashion, you would see that evidence. But here, it's not properly teed up in that

fashion.

We've told the Court we're willing to -- we're not trying to avoid discovery. We're willing to produce documents, but just documents and information that is within a reasonable scope and time period. Thank you, Your Honor.

THE COURT: Okay.

MR. WELDON: Your Honor, nothing further to add.

THE COURT: Thank you, Mr. Weldon.

Ms. Miller?

MS. MILLER: Nothing further, Your Honor.

THE COURT: Okay, Mr. Hoard?

MR. HOARD: Nothing further.

THE COURT: And Mr. Pavlasek?

MR. PAVLASEK: Nothing further, Your Honor. Thank you.

THE COURT: All right. Thank you. I will try to get an order out shortly. I had an idea here. Just a second. Let me find it.

(Pause)

THE COURT: All right. No, I don't think I have anything further. So, all right, the Court will take the matter under advisement. Thank you all. Have a good rest of the day. We'll be adjourned.

(Proceedings adjourned at 4:01 p.m.)

* * * * *

C E R T I F I C A T I O N

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

__________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: May 26, 2026